**CARELLA BYRNE CECCHI**
 **OLSTEIN BRODY & AGNELLO, PC**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joshua E. D'Ancona
Eric K. Gerard (admitted *Pro Hac Vice*)
Melanie A. Rader (admitted *Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Lead Plaintiff Industriens*
*Pensionsforsikring A/S and Lead Counsel*
*for the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BECTON, DICKINSON AND COMPANY, VINCENT A. FORLENZA, THOMAS E. POLEN, and CHRISTOPHER R. REIDY,<br><br>Defendants. | Case No. 2:20-cv-02155-SRC-CLW<br><br>Hon. Stanley R. Chesler<br>District Judge<br><br>Hon. Cathy L. Waldor<br>Magistrate Judge<br><br>**MOTION DAY**: January 4, 2021 |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF THE COMPLAINT.........................................................................3

    A.    The FDA's Long-Running Scrutiny of the Troubled Alaris Infusion Pump Line ....................................................................................................................3

    B.    After Acquiring Alaris, Defendants Flout Federal Regulations and Defy the FDA's Clearance Requirement for Years ............................................................5

    C.    As the Class Period Begins, Defendants Issue Aggressive FY20 Guidance Based on Strong Alaris Sales and Announce Brief Shipping Hold for "Upgrades"................................................................................................................9

    D.    Defendants Dump BD Stock While Proclaiming that Alaris Shipments Have Resumed, FDA Talks Are Complete, and the FY20 Guidance Will Be Attained ...........................................................................................................10

    E.    As Alaris Safety Problems Mount, Defendants Spin Critical Remediation as a "Voluntary Recall" With No Risk of Interrupting Shipments or Sales ..........10

    F.    Alaris is Pulled from the Market, and the Truth Is Revealed ................................11

ARGUMENT.................................................................................................................12

I.    PLAINTIFF STATES A VALID CLAIM UNDER SECTION 10(b) .............................13

    A.    Plaintiff Alleges Material Misstatements and Omissions......................................13

        1.    Defendants' Statements About Software Changes, FDA Talks, and "Momentum" In Alaris Sales Were Materially Misleading .....................13

        2.    The Alleged Misstatements Regarding the FY20 Guidance Are Actionable .....................................................................................................23

        3.    BD's Form 10-K Risk Disclosures and Related Statements of Regulatory Compliance Were Materially Misleading ...............................25

    B.    The Safe Harbor Does Not Shield Defendants from Liability...............................27

        1.    Material Misrepresentations and Omissions of Present Fact Do Not Receive Safe Harbor Protection................................................................27

        2.    The Alleged Misstatements Lacked Meaningful Cautionary Language......................................................................................................30

        3.    Defendants Knew That Their Statements Lacked a Reasonable Basis............................................................................................................32

    C.    Plaintiff Adequately Alleges Scienter...................................................................33

        1.    Plaintiff Alleges Facts Supporting a Strong Inference of Scienter............33

        2.    The FE Allegations Are Reliable and Should Be Credited.......................40

        3.      Defendants' Remaining Scienter Arguments Fail ....................................42

    D.    Plaintiff Adequately Alleges Loss Causation .......................................................44

II.    PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(a) CLAIM .............45

III.    PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(A) CLAIM.............45

CONCLUSION....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advance Auto Parts, Inc., Sec. Litig.*,
  2020 WL 599543 (D. Del. Feb. 7, 2020) ................................................................................40

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ..................................................................................................32

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ...................................................................................................36

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) ..............................................................................36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................................13

*In re AT&T Corp. Sec. Litig.*,
  2002 WL 31190863 (D.N.J. Jan. 30, 2002) ...........................................................................24

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ......................................................................................16, 19, 20

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................................26

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017) ................................................................................26, 27

*Bing Li v. Aeterna Zentaris, Inc.*,
  2016 WL 827256 (D.N.J. Mar. 2, 2016) ...........................................................................43, 45

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ......................................................................................19

*In re Bristol-Myers Squibb Sec. Litig.*,
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) ..........................................................2, 17, 20, 30

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...........................................................................................23, 33

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................................35

*Carmignac Gestion, S.A. v. Perrigo Co.*,
  2019 WL 3451523 (D.N.J. July 31, 2019)......................................29, 30, 32, 40, 41

*In re Celgene Corp. Sec. Litig.*,
  2019 WL 6909463, . (D.N.J. Dec. 19, 2019).........................................................32

*In re Cell Pathways, Inc. Sec. Litig.*,
  2000 WL 805221 (E.D. Pa. 2000) ...............................................................18, 41, 43

*In re Cephalon Sec. Litig.*,
  1997 WL 570918 (E.D. Pa. Aug. 29, 1997) ...........................................................18

*In re Cigna Corp. Sec. Litig.*,
  2005 WL 3536212 (E.D. Pa. Dec. 23, 2005)....................................................24, 25

*City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal.*
  *v. Toll Bros., Inc.*,
  2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ...................................................24, 25

*In re Craftmatic Sec. Litig. v. Kratsow*,
  890 F.2d 628 (3d Cir. 1990)....................................................................................24

*Curran v. Freshpet, Inc.*,
  2018 WL 394878 (D.N.J. Jan. 12, 2018)...........................................................28, 29

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
  2019 WL 1299673 (D.N.J. Mar. 21, 2019).................................................... *passim*

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................44

*In re Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015).................................................... *passim*

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).....................................................................25

*Feinberg v. Am. Express Co.*,
  2011 WL 4807916 (E.D. Pa. Oct. 7, 2011)..............................................................22

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................38

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018).....................................................................28

*In re Genta, Inc. Sec. Litig.*,
  2005 WL 2416970 (D.N.J. Sept. 30, 2005) .............................................................37

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .........................................................................40

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)................................................................................................37

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019) ..........................................................................36

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017) .....................................................................31, 39

*In re Honeywell Int'l Inc. Sec. Litig.*,
  182 F. Supp. 2d 414 (D.N.J. 2002) ..........................................................................33, 38, 39

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).......................................................................................... *passim*

*Kanefsky v. Honeywell Int'l Inc.*,
  2020 WL 2520669 (D.N.J. May 18, 2020) ...........................................................................19

*Kline v. First W. Gov't Sec., Inc.*,
  24 F.3d 480 (3d Cir. 1994)............................................................................................17, 21

*Kost v. Kozakiewicz*,
  1 F.3d 176 (3d Cir. 1993) .............................................................................................12, 13

*In re Lucent Techs., Inc. Sec. Litig.*,
  217 F. Supp. 2d 529 (D.N.J. 2002) ......................................................................................28

*Marsden v. Select Med. Corp.*,
  2007 WL 1725204 (E.D. Pa. June 12, 2007) .......................................................................45

*Master Cutlery, Inc. v. Panther Trading Co., Inc.*,
  2013 WL 4517860 (D.N.J. Aug. 26, 2013) ..........................................................................21

*McCabe v. Ernst & Young LLP*,
  494 F.3d 418 (3d Cir. 2007)................................................................................................44

*McClain v. Iradimed Corp.*,
  111 F. Supp. 3d 1293 (S.D. Fla. 2015) ................................................................................19

*McCullough v. Advest, Inc.*,
  754 F. App'x 109 (3d Cir. 2018) .........................................................................................33

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
  2012 WL 3779309 (D.N.J. Aug. 29, 2012) ...............................................................1, 22, 23

v

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...............................................................17, 44, 45

*In re Merck Co., Inc., Sec., Derivative & "ERISA" Litig.*,
2006 WL 8460903 (D.N.J. Jan. 20, 2006) ...........................................................................21

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)...........................................................................................25, 26

*In re MobileMedia Sec. Litig.*,
28 F. Supp. 2d 901 (D.N.J. 1998) ........................................................................................25

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ...........................................................................................35

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004) ......................................................................................38

*In re Par Pharm. Sec. Litig.*,
2008 WL 2559362 (D.N.J. June 24, 2008) ...........................................................................3

*Pritchard v. Apyx Med. Corp.*,
2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ...................................................................31

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) ....................................................................35, 37

*In re QLT Inc. Sec. Litig.*,
312 F. Supp. 2d 526 (S.D.N.Y. 2004)...................................................................................28

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013)..................................................................................................42

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)................................................................... *passim*

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................................19

*SEB Inv. Mgmt. AB v. Endo Int'l*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ....................................................................3, 18, 30, 35

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)..................................................................................................31

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ................................................................18, 19

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999)..................................................................................39

*Stichting Pensioenfonds ABP v. Merck & Co., Inc.*,
2012 WL 3235783 (D.N.J. Aug. 1, 2012) ...........................................................13

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)................................................................................39

*In re Synchronoss Techs., Inc. Sec. Litig.*,
2019 WL 2849933 (D.N.J. July 2, 2019)...................................................38, 39, 40

*Tellabs, Inc. v. Makor Issues & Rights*,
551 U.S. 308 (2007)..........................................................33, 34, 42, 43, 44

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018).......................................................40, 41

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) .............................................................35, 39

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017) ...........................................................14

*In re Valeant Pharm. Int'l, Inc., Sec. Litig.*,
2019 WL 2724075 (D.N.J. June 30, 2019)............................................................45

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) ...............................................................30, 37

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997)..........................................................................13, 26

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)..................................................................................25

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017).................................................................................13

**Statutes**

15 U.S.C. § 78u-5(c) ..............................................................................................27

**Other Authorities**

17 C.F.R. § 240.10b5-1(c) ......................................................................................40

AMERICAN HERITAGE DICTIONARY 1154 (3rd ed.1993) ............................................15

Lead Plaintiff Industriens Pensionsforsikring A/S ("Plaintiff"), individually and on behalf of the Class,[1] submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF Nos. 36 & 36-1) ("Motion" or "MTD").

## PRELIMINARY STATEMENT

When a company chooses to put an issue "in play," it acquires a duty to disclose information relating to that topic. *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2012 WL 3779309, at *3 (D.N.J. Aug. 29, 2012) (Chesler, J.). Here, during the Class Period, Defendants put numerous critical issues in play in statements to investors: characterizing remediation of a key product line—the Alaris infusion pump ("Alaris")—as mere "upgrades" and "enhancements"; claiming a temporary shipping hold on Alaris related simply to these "upgrades"; describing FDA review of the changes as limited to "timing" and signaling that no FDA clearance of these changes was needed; assuring "ongoing momentum" in Alaris sales that implicitly faced no known impediment; and issuing aggressive fiscal year 2020 guidance ("FY20 Guidance") reliant on BD quickly resuming Alaris shipments. Defendants needed to speak fully and truthfully about these matters in their public statements. Instead, they misled the market, hiding the existence or severity of internally known Alaris problems.

By the middle of 2019, BD's own Regulatory Department had determined that a parade of changes the Company had made to Alaris software required approval under the FDA's 510(k) premarket clearance program. Meanwhile, the FDA discovered a multitude of defects in Alaris's software and compliance systems during a 2019 inspection. BD scurried to redress the glaring deficiencies (of which it had long been aware) through a cumulative "catch-up" 510(k) application

---

[1] Unless otherwise noted: (1) capitalized terms have the same meanings as in Plaintiff's Amended Class Action Complaint (ECF No. 31) ("Complaint"); (2) "¶ __" refers to a paragraph in the Complaint; (3) internal quotation marks and citations are omitted; and (4) emphasis is added.

1

looking to cover the previously unapproved Alaris modifications, which the FDA rejected in 2019. BD halted Alaris sales and began the Class Period bereft of regulatory clearance for the device. Rather than come clean, when speaking about Alaris, Defendants concealed these problems, spinning and minimizing issues and touting Alaris's expected FY20 sales.

Defendants' bid for dismissal fails because it ignores these well-pleaded allegations. Their claim that "BD promptly announced FDA's determination that a new 510(k) submission for Alaris was needed within days of learning of it" on February 3, 2020 (MTD 19), overlooks Plaintiff's allegation that BD knew of its need for 510(k) clearance before the Class Period even began. They all but ignore allegations of severe and longstanding Alaris quality systems compliance deficiencies that Defendants essentially admitted at the close of the Class Period. While arguing that the truth of BD's Alaris changes and lack of FDA approval was "on the market," they gloss over BD's failed 510(k) application (which was never disclosed), falling well short of the high hurdle to a truth-on-the-market defense at the pleading stage. *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*16 (D.N.J. Dec. 15, 2015). Defendants' position that manufacturers have near-complete discretion to decide when 510(k) clearance is required is both eviscerated by the FDA's action here and irrelevant, as agency approval is indisputably required where, as alleged, the manufacturer *itself* deems 510(k) clearance necessary. Equally flawed is their claim that certain statements are shielded by "cautionary language" warning of potential future FDA action; Plaintiff alleges such action had already occurred, and the safe harbor or bespeaks caution doctrine "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon is one foot away." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at \*52 (D.N.J. Aug. 17, 2005) (Chesler, J.). BD's hypothetical risk disclosures misled for the same reason. Under Plaintiff's

2

allegations (which must be credited, despite Defendants' efforts to re-write them at every turn) the alleged misstatements are actionable, for a defendant may not "paint[] a favorable picture without including the details that would have presented a complete and less favorable one." *SEB Inv. Mgmt. AB v. Endo Int'l, plc*, 351 F. Supp. 3d 874, 897, 900 (E.D. Pa. 2018).

The Complaint also alleges a strong inference of scienter. Defendants repeatedly spoke to investors on the topics at issue and implied first-hand knowledge of the underlying facts—and then confirmed key facts of the Complaint in statements at the Class Period's end. The Individual Defendants occupied posts at the apex of BD's hierarchy, which gave them clear views into a product line and regulatory interaction of great importance to the Company. Moreover, even as they issued upbeat promises of Alaris's positive return and "on track" status to the FY20 Guidance, Defendants Forlenza and Polen dumped over $58 million in BD stock in a flurry of suspiciously timed sales. Defendants offer no nonculpable explanation for this conduct that is more plausible than an inference of scienter.

Finally, Defendants' loss causation argument merely repurposes the truth-on-the-market claim that fails as to falsity. Because Defendants' primary liability under Section 10(b) is well-pleaded, their liability under Sections 20(a) and 20A of the Exchange Act is also plausibly alleged. Defendants have established no reason to dismiss the Complaint. Their Motion should be denied.[2]

## SUMMARY OF THE COMPLAINT

### A.    The FDA's Long-Running Scrutiny of the Troubled Alaris Infusion Pump Line

BD manufactures medical devices, instruments, and reagents. ¶ 26. Its largest business unit, BD Medical, accounts for over half of the Company's operating income. ¶ 27. BD Medical's

---

[2] Should the Motion be granted, Plaintiff respectfully requests leave to amend under Federal Rule of Civil Procedure 15(a). *In re Par Pharm. Sec. Litig.*, 2008 WL 2559362, at *14 (D.N.J. June 24, 2008) (leave to amend should be freely granted post dismissal).

flagship product line is the Alaris infusion pump system—electronic devices programmed to deliver medication, blood, and other critical fluids intravenously—which the Company has manufactured and marketed since acquiring medical technology company CareFusion in 2015. ¶¶ 28, 33-35, 79-82. Before and during the Class Period, Defendants repeatedly touted the success of Alaris and its integral role in driving revenues for the Company's key Medical segment, and thus the Company as a whole. ¶¶ 98-105.

Given the potentially dire consequences of a malfunctioning infusion pump to patient safety—improper medication delivery can cause severe injury or death—such devices are heavily regulated. Infusion pump manufacturers must obtain FDA approval through a Premarket Notification 510(k) process at least ninety days before making a change, including a software change, to a previously approved device that could significantly affect its safety, effectiveness, or intended use. ¶¶ 37-38, 45-47. Without formal clearance, the manufacturer may not lawfully market or distribute the modified device. ¶ 49; *see also* ECF No. 36-5 at 4 ("[D]evices with changes requiring submission of a new 510(k) may not be legally commercially distributed before FDA clears the[m]."). In addition, FDA quality systems (or "QS") regulations require manufacturers to meet current good manufacturing practice ("cGMP") design and manufacture standards *at all times*. ¶ 39. Manufacturers must also maintain sufficient procedures for detecting, documenting, and remedying problems and defects in their pumps and maintain records documenting, among other things, device changes in design history files. ¶¶ 40-42. Failure to comply with any of these standards may prompt the FDA to order recalls, among other penalties. ¶¶ 43, 54-57.

In the years leading up to the Class Period, BD and other infusion pump manufacturers chronically failed to satisfy these regulations. ¶¶ 58-62. The Alaris line came in for heavy scrutiny. ¶ 67. Since 2006, a raft of Alaris safety problems, compliance violations, and product defects

prompted the FDA to issue a series of Class I and II recalls (the two most serious classifications), a Form 483, a forfeiture complaint, and other regulatory action, including a 2007 consent decree that, since 2009, has applied to *all* Alaris pumps ("Amended Consent Decree" or "ACD"). ¶¶ 68-74. By the time BD acquired CareFusion—a deal spearheaded by Polen—Alaris's checkered safety record was well documented, and BD publicly acknowledged that the FDA would be closely watching Alaris under the ACD. ¶¶ 83, 221.[3]

**B.**     **<u>After Acquiring Alaris, Defendants Flout Federal Regulations and Defy the FDA's Clearance Requirement for Years</u>**

Alaris's endemic safety issues, product defects, and compliance problems did not abate under Defendants' stewardship. ¶ 90. In 2016 and 2017 alone, various Alaris models were the subject of no fewer than *ten* Class I and II FDA recalls, involving hundreds of thousands of units. ¶¶ 90-97. Similar to Alaris issues during and around the Class Period, these recalls often concerned software defects that could impede proper functioning, jeopardizing patient health. ¶¶ 93-96.

Unbeknownst to the public, these high-profile recalls were only the tip of the iceberg. Indeed, a former employee ("FE") with relevant knowledge, FE-3 (an Associate Director in engineering who worked directly on Alaris through late 2019), reported that, as of 2019, BD maintained numerous "trackers" identifying Alaris defects and issues requiring remediation— many of which had existed for years. ¶¶ 132, 135, 185, 190. Desperate to keep its cash cow on the market, BD settled for a patchwork of software changes that it typically implemented wirelessly. ¶¶ 125, 127, 190. According to FE-1, a senior BD engineer who worked directly on such software changes, the Company repeatedly modified Alaris's software to address various "core anomalies" impacting pump performance. ¶ 125. The serial nature of these modifications was later noted in

---

[3] The ACD authorized the FDA to order BD to cease manufacturing and distributing Alaris, recall products, and pay punitive damages in the event of any violation of FDA regulation. ¶ 83.

Polen's February 2020 disclosure that BD had made an unspecified number of "historical changes" to Alaris's software "over multiple years going back." ¶ 197. *None* of these Alaris changes received FDA approval, despite Defendants' internal recognition by no later than mid-2019 that such approval for the cumulative changes was required, as explained below. ¶¶ 89, 128-32.

In repeatedly changing Alaris software without FDA clearance, Defendants consistently flouted federal regulations governing infusion pumps, all the while knowing that the Amended Consent Decree put BD at heightened risk of FDA intervention. ¶¶ 71-74, 199. Unknown to the public, Defendants knowingly disregarded its regulatory obligations in at least three ways.

*First*, Defendants persistently violated the FDA's 510(k) clearance requirement. As described above, that regulation required BD to obtain agency approval of any change or modification to Alaris that could significantly affect the device's safety or effectiveness *before* it marketed or distributed the device, and it indisputably applied to software changes. ¶¶ 46-47, 49. BD's predecessor manufacturers of the Alaris line sought and received at least a half-dozen 510(k) approvals between 2002 and 2015 when BD acquired the product, including for software changes. ¶ 88. Polen understood the clearance process, acknowledging that BD had a "specific quality process within the Infusion business within the consent decree" that ostensibly considered 510(k) compliance. ¶ 199; *see also* ¶¶ 190, 197. Despite its recognition that the 510(k) clearance requirement applied to Alaris software changes, BD *never* obtained the requisite FDA approval for *any* of the multitude of changes it made to Alaris after 2015. ¶ 89.

Defendants' years-long dereliction was a conscious choice. FE-1 reported that BD had, for a period, internally justified avoiding 510(k) clearance on the ground that most of the software changes were implemented wirelessly and thus did not change the physical structure of the pump. ¶¶ 127, 190, 197, 199. But this rationale was baseless. In August 2016, the FDA had issued draft

6

formal guidance on this specific subject, entitled *Deciding When to Submit a 510(k) for a Software Change to an Existing Device* ("FDA 510(k) Software Guidance"), which it finalized in 2017. ¶ 50. This document directs that where a device modification is intended to "significantly affect the safety or effectiveness of the device," including "to mitigate a known risk," the "*submission of a new 510(k) is likely required*." ECF No. 36-5 at 5; ¶ 48.[4] Moreover, the guidance instructs that even where a discrete change did not require 510(k) clearance, the *cumulative* effect of several software changes could render the modified device no longer "substantially equivalent" to an approved device, thus requiring FDA review and approval. ¶¶ 47, 52; ECF No. 36-5 at 7-8.

In truth, although the Company had avoided seeking FDA approval for fear of alerting the agency to the volume of unapproved changes it had already made, multiple FEs confirmed that, *no later than mid-2019, BD had determined that 510(k) clearance was necessary, prompting its Regulatory Department to file a "catch-up" 510(k) application encompassing <u>all</u> of the previously unapproved Alaris modifications*. *See* ¶¶ 128-32, 199. Meanwhile, an FDA auditor found out about BD's litany of "trackers" on pending Alaris defects and "bugs" during a 2019 audit. ¶ 135. *The FDA rejected BD's "catch-up" 510(k) application*, leading BD to stop shipping Alaris just before the Class Period. ¶¶ 49, 130-31, 135-37.

*Second*, BD consistently failed in its obligation to maintain proper records of Alaris design changes and modifications, which the FDA's quality systems regulations required of the Company at all times. *See* ¶¶ 40-41, 144. The QS recordkeeping requirements have a direct and vital relationship to the 510(k) clearance process, particularly when a manufacturer opts not to submit

---

[4] The FDA 510(k) Software Guidance further provides: "Software modifications may be identified by many names, including, but not limited to: bug fix, hot fix, patch, software change, code change, or tweak. *Regardless of name or form, these are considered design changes* under the Quality System regulation, 21 CFR Part 820." ECF No. 36-5 at 5.

a new 510(k) application. The FDA 510(k) Software Guidance makes this point clear:

> The net effect of the QS regulation is to **require** that, when manufacturers of a finished medical device make a change in the design of a device, there is a process in place to demonstrate that the manufactured device meets the change in design specifications (or the original specifications, if no change was intended). They **must** keep records, and these records must be made available to an FDA investigator upon request. . . . For many changes to a device, submission of a new 510(k) may not be required. ***In these cases, including many software design changes, compliance with the QS regulation*** can reasonably assure the safety and effectiveness of the changed device.

ECF No. 36-5 at 2-3. In short, where a manufacturer makes a software change without a new 510(k) application, the company ***must document*** that change properly and provide that documentation to the FDA upon request. ¶¶ 42-44, 53; *see also* ECF No. 36-5 at 8, 10. Here, too, BD was derelict. By mid-2019, BD's Alaris records were a mess, with numerous deficiencies and missing documents—including the all-important design history file. ¶¶ 145-51.

***Third***, BD defied the FDA's requirement that manufacturers satisfy QS and cGMP standards and maintain sufficient procedures for detecting, documenting, and remedying device defects, electing instead to conceal a raft of internally recognized Alaris problems. *See* ¶¶ 37, 42, 83, 131, 221. Indeed, multiple former employees confirmed that Defendants tolerated problems with the Alaris line that had existed ***for years***, even as a series of recalls signaled systemic deficiencies. ¶¶ 90-97, 135, 138-39, 185, 190. Meanwhile, a "GAP Analysis Report" recounted by FE-4 and prepared in mid-2019 in anticipation of an FDA inspection identified various compliance and uniformity problems at BD's three Alaris production facilities. ¶ 150. These problems would continue during the Class Period, as partially seen in a February 4, 2020 "voluntary recall" of 750,000 Alaris devices later designated as a Class I recall that disclosed some, but not all, of the underlying issues. *See* ¶¶ 172-73, 178, 207.

8

**C.** **As the Class Period Begins, Defendants Issue Aggressive FY20 Guidance Based on Strong Alaris Sales and Announce Brief Shipping Hold for "Upgrades"**

Against a backdrop of undisclosed Alaris defects, BD's failed "catch-up" 510(k) application covering a train of unapproved changes to Alaris software, and acute FDA scrutiny, the Class Period began on November 5, 2019, with Defendants publishing the aggressive FY20 Guidance while spinning an Alaris shipping hold as a mere pause to deliver benefits to BD's customers. ¶ 106. On the Company's quarterly earnings call that day, Defendants announced BD's FY20 Guidance, which included currency-neutral revenue growth of 5% to 5.5% and earnings per share ("EPS") of between $12.50 and $12.65. ¶¶ 107-09, 230-34. Defendants claimed the growth would be weighted toward the last three quarters of the fiscal year, which, Reidy explained, stemmed from a pause in Alaris shipments to allow BD to make "improvements" and "upgrades" to Alaris's software to be completed during the first fiscal quarter ("1Q20"). ¶ 109. Polen spun these "upgrades" in positive terms, calling them "part of our process and our strategy in the business to continually iterate and make enhancements." ¶¶ 109, 112, 234, 237. Critically, Defendants signaled the FDA's acquiescence to these changes without 510(k) clearance, describing talks with the agency as focused merely on "the *timing* of implementation of these upgrades" and whether to "bundl[e] them with a new software version." ¶¶ 111, 234. Meanwhile, they portrayed the shipping hold as limited and short-term, assuring investors it would not reduce Alaris sales in FY20, but simply "move the *timing* of some sales from Q1 to the balance of the fiscal year." ¶ 110. Polen highlighted demand and Alaris's growing market share, proclaiming, "we see no slowdown in that momentum" and assuring investors that Alaris sales in the last three quarters of FY20 would enable BD to meet its FY20 Guidance. ¶ 112, 237. Investment analysts credited Defendants' claims that while the wait for Alaris "upgrades" would dampen 1Q20 sales, Alaris would promptly resume shipments by 2Q20 and lift BD to its FY20 Guidance. ¶¶ 114-19.

D.      **Defendants Dump BD Stock While Proclaiming that Alaris Shipments Have Resumed, FDA Talks Are Complete, and the FY20 Guidance Will Be Attained**

Defendants' subsequent Class Period statements to investors sounded the same refrain and likewise failed to disclose the full truth about Alaris's troubles. On November 21, 2019, during a presentation to analysts at a Jefferies London Healthcare Conference, Defendants reaffirmed the FY20 Guidance and reiterated that the shipping delay related to supposed Alaris "upgrades" would soon end. ¶¶ 152-55, 242-48. On December 4, 2019, Reidy boasted at the Evercore HealthCONx Conference that BD had gained "200 points" of infusion pump market share in 2019 and that "we see that continuing," again downplaying the Alaris shipping hold as a mere "*timing* issue" limited to early FY20. ¶¶ 156-57, 257-61. During a JPMorgan Healthcare Conference on January 14, 2020, Defendants again reaffirmed FY20 Guidance while asserting that Alaris had "*[f]ully resumed shipping in the first quarter*" and that talks with the FDA had played out "*[e]xactly as expected*." ¶¶ 160-62, 263-69. Finally, at BD's Annual Shareholders Meeting on January 28, 2020, Forlenza affirmed the FY20 Guidance, assuring, "*we are on track for the full year*." ¶ 168.

As Defendants misled investors about the problems plaguing Alaris, the FDA's scrutiny of BD's unapproved changes to the pump line, and the related, acute risks to BD's FY20 performance, Forlenza and Polen enriched themselves by dumping BD stock. ¶¶ 213-19. Indeed, between mid-December 2019 and late-January 2020, the insiders sold 212,044 BD shares, with Forlenza garnering proceeds of more than $54.6 million and Polen $3.749 million. ¶¶ 16, 213-14, 217.

E.      **As Alaris Safety Problems Mount, Defendants Spin Critical Remediation as a "Voluntary Recall" With No Risk of Interrupting Shipments or Sales**

On February 4, 2020, BD issued letters to institutional customers stating it had identified Alaris software problems that could interfere with patient care. ¶¶ 172-74. Again misleadingly downplaying the problem, BD promised the defects would be promptly remediated through a "voluntary recall" consisting simply of "education," "training," and a future software upgrade,

10

throughout which the pumps could *still be used*. ¶¶ 172-77. The letters *nowhere* suggested the Alaris line was unsuitable for continued use, that any Alaris device would be removed from the market or unavailable for sale or installation (or other impact that could negatively affect BD Alaris revenues), or that the FDA might take action. ¶¶ 175-81. They also said *nothing* of the fact that, as Defendants later put it, the FDA had told BD "*as recently as*" February 3, 2020—*the previous day*—that it needed 510(k) clearance for the software changes, forcing BD to pull Alaris from the market. ¶¶ 190-91, 197. Given these omissions, investors made little of the letters, and BD's stock price remained artificially inflated on February 4 and 5, 2020. ¶ 182.

F.      **Alaris is Pulled from the Market, and the Truth Is Revealed**

Defendants' deception finally ran out of track on February 6, 2020, when, before the market's open, Defendants revealed that: (1) Alaris would be pulled from the market; (2) the FDA had demanded that BD obtain 510(k) clearance related to numerous historical software changes before resuming Alaris sales; and (3) the negative revenue impact to BD in FY20 from the loss of Alaris sales would be $400 million. ¶¶ 184-87, 190-99. BD took down Alaris revenues *to zero* for the balance of FY20, forcing Defendants to slash FY20 revenue guidance "to 2.5% to 3.5%, *specifically due to the Alaris situation*." ¶¶ 186, 193, 195. Defendants also revealed for the first time that BD had been "*continuing* to work with" the FDA on a "software *remediation* plan" for Alaris, which would require BD to submit a comprehensive 510(k) application for the litany of previously unapproved changes to Alaris software. ¶ 185. Defendants stated that the FDA had confirmed to BD the need for a 510(k) clearance not in some surprise reversal by the agency, but rather during "*ongoing dialogue*," "*including* in-depth discussion this past Monday," reiterating the FDA had confirmed its position "*as recently as*" February 3, 2020. ¶¶ 190, 197.

The news stunned investment analysts. Attempting to square Polen's explanation of an "*ongoing* dialogue with the FDA" about the changes (¶ 197) with Defendants' Class Period

11

representations that Alaris was undergoing a mere "upgrade," a Bank of America Merrill Lynch ("BAML") analyst pointedly remarked: "I'm struggling to understand kind of how you got caught offguard and how this went from sort of a software upgrade to something much more significant." ¶ 198. In response, Polen acknowledged that BD had known it would not be "unprecedented" for its years of unapproved Alaris software changes to result in precisely this sort of FDA penalty:

> [I]t's not unprecedented where there are situations where over time a product evolves. And then the FDA looks and says, wait a minute, your current 510(k) needs to be updated to reflect those series of changes over time. . . . [W]hen the FDA looks back at it over a 5-, 10-year period, they say, wait a minute, you actually need to put in a 510(k) given that series of changes that have been made.

¶ 199. Of course, this very scenario had been explicitly addressed in the FDA 510(k) Software Guidance since 2016. *See* ¶¶ 50, 52. Although Polen claimed on the call that "a specific quality process within the Infusion business within the consent decree that the team was following . . . said each of those *individual* changes didn't require a 510(k) process," he failed to mention that BD had internally recognized in *mid-2019* the need for a "*cumulative*" 510(k) "catch-up," which the FDA had *rejected* amid Alaris's glut of safety and compliance issues. ¶¶ 130, 199.

In response to the news that BD was slashing the FY20 Guidance and expecting no Alaris revenues for the rest of the year, BD's stock price plummeted $33.74 (nearly 12%) on February 6, 2020, wiping out approximately ten billion dollars of shareholder equity in a single day. ¶ 201. Analysts immediately attributed the drop to the "unexpected announcement that BDX is working with the FDA on a software remediation plan for the Alaris pump system." ¶ 203; *see also* ¶¶ 204-05. A month later, the FDA slapped BD's February 4, 2020 "voluntary recall" of Alaris with a Class I recall designation, the most serious. ¶ 207. Then, in June 2020, Polen admitted that BD *still* had over 150 people working full-time on the Alaris 510(k) application. ¶ 210.

## ARGUMENT

A motion under Federal Rule of Civil Procedure 12(b)(6) tests only the sufficiency of the

complaint, not its merits. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). Plaintiffs need only provide defendant with fair notice of a claim's basis that is "facially plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard" is met if the complaint pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, 2012 WL 3235783, at \*1 (D.N.J. Aug. 1, 2012). The court must accept as true all well-pleaded facts and draw all reasonable inferences in the plaintiff's favor. *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).

## I.    PLAINTIFF STATES A VALID CLAIM UNDER SECTION 10(b)

### A.    <u>Plaintiff Alleges Material Misstatements and Omissions</u>

#### 1.    Defendants' Statements About Software Changes, FDA Talks, and "Momentum" In Alaris Sales Were Materially Misleading

The "fundamental purpose" of the Securities Exchange Act was "to substitute a policy of full disclosure for the philosophy of *caveat emptor*." *Quaker Oats*, 129 F.3d at 315. To that end, "[t]he law does not permit corporate executives to mislead investors through half-truths." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*13 (D.N.J. July 27, 2018). Hence, "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). Defendants violated this black-letter law when they chose to speak publicly about changes to Alaris's software and related topics, including a hold in Alaris shipments, BD's talks with the FDA about the changes, and supposedly strong "momentum" in Alaris sales, but misleadingly disclosed only half-truths, at best.

*First*, during the Class Period, Defendants repeatedly cast critical Alaris software changes as innocuous "upgrades," "enhancements," and "improvements" for which, implicitly, FDA

13

clearance was unnecessary. *See* ¶¶ 234, 237; *see also* 246.[5] Meanwhile, they trumpeted "ongoing momentum" in Alaris sales, which they assured investors would resume in force once these "upgrades" were completed in early FY20. ¶¶ 233-34, 237, 248, 259. Importantly, Polen described the new changes as merely the latest in a continuing campaign to "make enhancements to" Alaris, emphasizing that "*we've been making those same type of investments in software upgrades over the last couple of years*" and that the "most recent changes" were part of the "*same process*." ¶¶ 112, 197, 237. Polen's effort to link the changes to previous "upgrades" was significant because, as was known then, BD had not obtained 510(k) clearance for Alaris since acquiring it in 2015. ¶ 89; *see also* MTD 4 ("BD had for years been making modifications to Alaris without 510(k) clearance, and was doing so again . . . ."). Since the new changes were purportedly of the "same type" as those that BD had made before the Class Period without a 510(k), investors were led to believe that the new changes similarly did not implicate the FDA's 510(k) clearance requirement (and the lengthy interruption in sales such review could entail).[6] Reidy's remarks that talks with the FDA were limited to the "timing" of the "upgrades" furthered the impression that regulatory

---

[5] Although BD Medical CFO John E. Gallagher ("Gallagher"), who made such statements to analysts at the conference on November 21, 2019 (¶ 246), is not a named defendant, BD is liable for his statements because he made them with apparent authority from the Company. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 251-52 (3d Cir. 2009). Moreover, Gallagher repeatedly used the pronoun "we" clearly indicating that he was representing BD. *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *12 (D.N.J. Apr. 28, 2017).

[6] Defendants' argument that the FDA's database showing that BD had not received 510(k) clearance for any software changes absolves them of liability is thus a red herring. MTD 18. Plaintiff alleges *not* that Defendants failed to disclose that BD had not obtained 510(k) clearance for past changes to Alaris, but that Defendants conveyed the impression that 510(k) clearance for the changes was *not necessary*. *See* ¶ 111. Unbeknownst to investors, however, BD had *already* determined that 510(k) clearance *was* necessary for Alaris changes, of which the new "upgrades" were more of the same. ¶¶ 130, 199. This is a critical flaw in Defendants' argument that the truth behind Defendants' alleged misstatements was "on the market." MTD 18. Because "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint," this argument must be rejected. *Enzymotec*, 2015 WL 8784065, at *16.

14

approval was unnecessary (¶ 234), as did Defendants' assurances of Alaris's quick sales resumption in early FY20. ¶¶ 233-34, 237, 248, 259. Analysts credited Defendants' characterizations and representations. *See, e.g.*, ¶¶ 114-19.[7]

In truth, the Alaris software changes were far from the routine "upgrades" and "enhancements" that Defendants claimed, and their implementation without 510(k) clearance was hardly assured. Alaris had been riddled with unresolved defects and compliance deficiencies for years (*see, e.g.*, ¶¶ 90-97, 135, 139, 185, 190), repeatedly impelling BD to undertake software repairs addressing "***core anomalies***" impacting pump performance. ¶ 125. Defendants later confirmed that the changes announced on November 5, 2019, had been part of a continuing "software *remediation* plan," related to changes BD had been making for "a number of years." ¶¶ 185, 190, 197.[8] Rather than mere "semantics" (MTD 27 n.32), Defendants' mischaracterizations of the changes and sanguine claims of "ongoing momentum" obscured that BD's "remediation" campaign implicated Alaris's safety and effectiveness—and thus the requirement for 510(k) clearance. *See* ¶¶ 48-53; ECF No. 36-5 at 5.

Moreover, Defendants concealed that ***BD had already determined*** that the Alaris modifications required 510(k) clearance, prompting the failed "catch-up" application in mid-2019 that left Alaris without regulatory approval. ¶¶ 49, 130-31, 137; *see also* ECF No. 36-5 at 4 (devices requiring 510(k) approval "***may not be legally commercially distributed*** before FDA clears the changed device"). Multiple former employees attest to this fact. For example, FE-2, who left BD in ***early 2019***, recalled weekly staff meetings with BD Head of Quality Keith McLain and

---

[7] That Defendants' mischaracterizations had in fact misled the market was affirmed by the BAML analyst who expressed incredulity during BD's February 6, 2020 1Q20 earnings call at "***how this went from sort of a software upgrade to something much more significant***." ¶ 198.

[8] *See also* AMERICAN HERITAGE DICTIONARY 1154 (3rd ed.1993) (defining "remediate" as "the act or process of correcting a fault or deficiency").

others discussing the need to seek 510(k) clearance for the backlog in Alaris software modifications. ¶ 129. Corroborating this account, FE-1 reported that BD's Regulatory Department had attempted to obtain a "catch-up" 510(k) approval in mid-2019 that would clear retroactively previously unapproved Alaris software changes—*a fact that Defendants do not contest in their briefing*. ¶¶ 128, 130, 190, 199.[9] BD's failure to obtain the regulatory clearance that it recognized it needed for the Alaris changes was a material fact as to which Defendants misled investors. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 795 (9th Cir. 2017) ("If reasonable investors had known that the ForeCYTE Test was not FDA-cleared [through the 510(k) process], and therefore was at risk of government action that could remove the product from the market, such investors doubtless would have been less keen to invest in Atossa.").

*Second*, Defendants' statements obscured the defects and compliance problems plaguing the Alaris line throughout the Class Period. *See, e.g.*, ¶¶ 120-39, 150. Irrespective of the 510(k) clearance requirement, BD was obliged *at all times* to satisfy cGMP and QS standards and maintain proper procedures for identifying and redressing device defects. ¶ 39. It consistently failed to do so. FE-3 reported that BD maintained a panoply of "trackers" identifying Alaris defects in 2019, some of which had existed for years. ¶¶ 135, 185, 190. Meanwhile, as FE-4 recalled, a 2019 GAP analysis conducted before the Class Period in advance of an anticipated FDA inspection documented various compliance problems at BD's three Alaris plants. ¶¶ 145, 150. An FDA audit discovered the Alaris "trackers" before the Alaris shipping hold on October 31, 2019. ¶¶ 135-36.[10]

---

[9] These accounts track Defendants' admission on February 6, 2020, of a continuing Alaris "software *remediation* program" (¶ 185) involving both the November 5, 2019-announced changes and the unapproved changes BD had made over "*a number of years*" (¶ 197).

[10] While Alaris's compliance problems had been documented in years prior (*see, e.g.*, ¶¶ 84-85, 88-89), the degree and persistence of Alaris's still-extant software problems was not public knowledge until the end of the Class Period. Nor do Defendants contend that the FDA's new discovery of longstanding defects in 2019 had been disclosed. *See* ¶ 135.

16

Defendants' positive statements about "enhancements" to Alaris and "momentum" in pump sales while concealing these persistent defects and the FDA's discovery of them were misleading. *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation or duty to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated."); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at \*10 (D.N.J. Aug. 8, 2011) ("positive statements about Vioxx's commercial success" misleading "for failure to completely and accurately represent [negative] information known" about drug). To the extent that the software changes were indeed "improvements," as well as necessary fixes, Defendants' characterizations were at best misleading half-truths. *See Bristol-Myers Squibb*, 2005 WL 2007004, at \*22 ("[E]ven an objectively true statement, if it leaves out material information may be actionable.").

*Third*, Defendants misled investors about the reason for the Alaris shipping hold and, consequently, its significance to BD's performance. Defendants publicly claimed that the pause was a voluntary decision meant only to allow BD to deliver so-called "upgrades" and "enhancements" (¶¶ 234, 237, 246), a fleeting, several-week delay that would not affect Alaris's "ongoing momentum" or its ability to contribute to BD hitting guidance. ¶ 234; *see also* ¶¶ 237, 259. Analysts' contemporaneous reporting confirms that this was the market's impression. *See, e.g.*, ¶¶ 114, 119 (J.P. Morgan reporting that "the company implements improvements to the Alaris pump that will move sales from F1Q to the balance of the year" and "the company would rather upgrade the pumps and then ship them rather than vice versa"); 117 (Wells Fargo noting that "timing of Alaris pump software upgraded in the US will push sales into FQ2-FQ4").

In fact, stepped-up regulatory action by the FDA had precipitated the hold, which followed

17

the agency's rejection of BD's "catch-up" 510(k) application and discovery of persistent Alaris software deficiencies in 2019. ¶¶ 130, 135, 137. These well-pleaded allegations based on the accounts of FEs contradict Defendants' public explanations of the shipping hold, or at least show they were actionably misleading half-truths. *See In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997) (falsity exists if contemporaneous facts are inconsistent with defendant's public statements). Moreover, Defendants' claims of "ongoing momentum" falsely conveyed that there was little risk that Alaris sales faced a longer-term interruption. *See* ¶¶ 233, 237, 248, 259. Such statements painted a rosy portrait of the Alaris business while concealing facts that created a severe overhang. *See Endo*, 351 F. Supp. 3d at 900.

*Fourth*, Defendants misled investors about BD's interactions with the FDA. Announcing the so-called "upgrades" and "enhancements" during BD's November 5, 2019 earnings call, Reidy stated: "We are in discussions with the FDA about the *timing* of implementation of these upgrades and the possibility of bundling them with a new software version release." ¶¶ 111, 234. The remarks signaled that the agency was aware of the changes and agreed that 510(k) clearance was unnecessary, an impression confirmed by analyst reports that nowhere mentioned the need for such clearance. *See* ¶¶ 113-19. Polen again downplayed the issue on January 14, 2020, when he proclaimed that Alaris had "[f]ully resumed shipping in the first quarter [FY20]," adding that the issue had played out "[e]xactly as expected." ¶¶ 161-62. Afterwards, analysts following BD stated, "*mgmt. publicly revealed that discussions with the FDA were completed* and Alaris U.S. shipments returned in full during F1Q." ¶ 169.[11] After BD's February 6, 2020 announcement that

---

[11] Defendants' unsupported claim that the Cowen analysts who interpreted Polen's remarks in the same fashion as Plaintiff were "wrong" (MTD 28 n.34), is entitled to no weight at this stage. *In re Cell Pathways, Inc. Sec. Litig.*, 2000 WL 805221, at *8 (E.D. Pa. 2000). They also ignore that courts often look to analyst reports to determine how statements may reasonably be construed. *See, e.g.*, *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (analyst

Alaris was, in fact, being shelved pending 510(k) approval, analysts reiterated that the market had thought the FDA issue resolved in January. ¶¶ 203-04 (calling the announcement "unexpected").

Courts in this circuit and elsewhere hold that omissions of material information concerning actual, ongoing regulatory scrutiny are actionable. *See, e.g.*, *Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *6 (D.N.J. May 18, 2020) (sustaining claim that defendant corporation's Form 10-Q was misleading because it failed to disclose communications with SEC or that SEC "was contemplating an investigation or legal proceeding"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (finding statements regarding potential regulatory action misleading given failure to disclose civil investigative demand). Indeed, in reversing the dismissal of a 510(k) clearance case in which the defendants had disclosed an FDA warning letter while omitting information about the agency's concerns, the Ninth Circuit observed that failing to disclose specific, known regulatory scrutiny misleadingly implies that no such information existed:

> ***[T]he omissions gave the reasonable inference that the FDA had raised no concerns*** related to clearance for the ForeCYTE Test, when, as alleged, the FDA had raised precisely that concern. The amended complaint's allegations suggest that, regrettably for the investors who bought Attosa's stock, ***Atossa hid the ball***.

*Atossa*, 868 F.3d at 797.[12] Here, Defendants also misled the market. Reidy and Polen omitted ***any*** mention of the fact that the FDA had ***rejected*** BD's "catch-up" application, and that Alaris lacked

---

statements "underscore the plausibility and reasonableness of the false impression" plaintiffs alleged)*; In re Salix Pharm*., *Ltd*., 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (same).

[12] Defendants' showpiece authority, *McClain v. Iradimed Corp.*, is easily distinguishable. 111 F. Supp. 3d 1293 (S.D. Fla. 2015). There, plaintiff alleged the defendant pump manufacturer had received a Form 483 identifying deficiencies in its pumps that, plaintiff claimed, subjected them to seizure. *Id.* at 1298. Yet defendants promptly ***disclosed*** the Form 483 and product defects before the class period. *Id.* Then, on the ***last*** day of the class period, defendants announced that they had just received word from the FDA that 510(k) clearance was necessary for past changes, interrupting sales and causing a stock drop. *Id.* at 1299-1300. In contrast, Defendants knew of BD's 510(k) deficiency by the ***first*** day of the Class Period. Before the Class Period even began, Defendants knew that: (1) Alaris's software changes required FDA approval (¶¶ 128-30); (2) the FDA had been alerted that such approval was necessary (¶ 130); (3) the FDA had discovered a

needed clearance before the Class Period began. ¶¶ 49, 131. Only at the end of the Class Period did Defendants acknowledge that the FDA's scrutiny of Alaris issues had continued *throughout* the Class Period and had not been limited to "upgrade" implementation and "timing." ¶¶ 185 ("[BD] is *continuing* to work with the [FDA] on its *software remediation plan* for the Alaris System"); 190 (Polen citing "*ongoing* dialogue with the FDA" regarding need for new 510(k) clearance "for these software upgrades"). While Defendants may not have been obliged to discuss BD's engagement with the FDA on Alaris remediation issues publicly, once they chose to do so by referencing changes to Alaris's software and related topics, including a stoppage in Alaris shipments, talks with the FDA about the changes, and strong "momentum" in Alaris sales despite the shipping hold, they had to tell the full truth. *Bristol-Myers Squibb*, 2005 WL 2007004, at \*23 ("[A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths."). Instead, Defendants actionably "hid the ball." *Atossa*, 868 F.3d at 797.[13]

*Fifth*, Defendants failed to disclose BD's lack of compliance with QS regulations requiring that device changes be documented and proper records of the changes maintained, which substitute for premarketing clearance where the manufacturer determines *not* to submit a 510(k) application for device changes. ECF No. 36-5 at 2-3; ¶¶ 40-44, 53, 144. This fact undermines Defendants' already weak counterfactual that, until February 3, 2020, they were ignorant of the need to obtain 510(k) clearance for BD's various Alaris software changes. *See* MTD 19-20; *cf.* ¶¶ 128-30

---

bevy of longstanding Alaris software defects (¶135); (4) the FDA had *rejected* BD's catch-up application (¶ 130); and (5) Alaris shipments were stopped as a result. ¶¶ 135, 137. Rather than help their case, *McClain* shows what Defendants should have done from the start: come clean about its pump problems, the FDA enforcement action, and the effect of both on BD's business.

[13] Defendants are silent about their own February 6, 2020 admissions that the FDA had informed them "as recently as" February 3, 2020, that 510(k) clearance was required for BD's many unapproved Alaris software changes. ¶¶ 190-91, 197. At a minimum, those admissions *concede* the knowing falsity of BD's February 4, 2020 "voluntary recall" letters, which said nothing of the FDA's action, or that Alaris sales would halt.

(alleging BD knew before the Class Period that 510(k) clearance was necessary and unsuccessfully sought such clearance); *Master Cutlery, Inc. v. Panther Trading Co., Inc.*, 2013 WL 4517860, at *3 (D.N.J. Aug. 26, 2013) ("At the motion to dismiss stage, the Court may not weigh evidence or otherwise decide which version of the facts is true.").[14] Even if it were true that Defendants were surprised by the need for a 510(k), BD's failure to satisfy the QS rules requiring accurate recordkeeping for FDA review would have cut off the Company's ability to rely on this alternate route for regulatory compliance, as the agency had no way to evaluate whether the modified devices were "substantially equivalent" to the version previously approved. *See* ¶¶ 145-51 (Quality Assurance Manager FE-4's detailed allegations of widespread deficiencies, holes, and inaccuracies in BD's Alaris records). Defendants' claims of Alaris's "ongoing momentum" and speedy return to market in 2Q20 were thus doubly misleading, as BD had neither obtained FDA clearance for the changes (which is undisputed) nor maintained the necessary records to demonstrate compliance in lieu of 510(k) approval (which FE-4 confirmed). ¶¶ 145-49, 151; *see Kline*, 24 F.3d at 490-91.

Rather than accept these well-pleaded allegations as true as required at the pleading stage, Defendants look to distort them. For example, they proclaim, "there is no duty to disclose 'quality control deficiencies' where no deficiency has yet been found by the FDA." MTD 5. Yet Plaintiff unmistakably alleges that ***the FDA had identified a range of defects before the Class Period began***, hastening the shipping hold. ¶ 135. Defendants again elide the plain language of the Complaint in contending that "Plaintiff nowhere alleges that FDA had . . . explicitly stated that

---

[14] It also rests on an attempt to ask the Court to treat as true Defendants' February 6, 2020 characterization of BD's late history with the FDA regarding Alaris—descriptions which are ***themselves*** explicitly alleged to have been misleading. *See* ¶ 191. While Defendants cite language from BD's February 6, 2020 earnings call transcript, judicial notice may be taken ***only*** that Defendants stated those words, ***not*** that they were true. *In re Merck Co., Inc., Sec., Derivative & "ERISA" Litig.*, 2006 WL 8460903, at *3 (D.N.J. Jan. 20, 2006).

[the] product[] required 510(k) clearance at any time prior to the February 3, 2020 meeting, just days before BD disclosed it to the market." MTD 20 (alterations in original). But Plaintiff alleges that **BD itself** recognized the need to obtain "catch-up" 510(k) clearance and sought it in mid-2019, only to be rebuffed by the FDA. ¶¶ 128-30.[15] Finally, Defendants' claim that their statements regarding so-called "enhancements" and "upgrades" were disclosures that insulate Defendants from liability because "their truth is central to Plaintiff's entire theory" twists the Complaint beyond recognition. MTD 27; *see also id.* 4, 18, 21. Plaintiff alleges that those statements mischaracterized and downplayed the changes and omitted material facts that rendered them misleading. *See* ¶¶ 238, 249.

Defendants' efforts to refashion the Complaint to their liking must be rejected. *See Feinberg v. Am. Express Co.*, 2011 WL 4807916, at \*3 (E.D. Pa. Oct. 7, 2011) ("[T]he Court may not consider defendant's version of the facts at the motion-to-dismiss stage."). So, too, must their suggestion that "half-truths" satisfy their obligations under the securities laws. *Papa*, 2018 WL 3601229, at \*13. Even if they did not have an independent duty to disclose the negative information alleged, once Defendants chose to speak on these issues, they "put the[se] issues in play" and were

---

[15] Defendants' claim that the FDA "actually assigns **to the manufacturer** the determination of whether a 510(k) submission" is necessary (MTD 4; *see also id.* 8) is false. While the agency may place on the manufacturer the duty of making an accurate assessment of the issue "in the first instance" (*id.* 8), that assessment is not afforded the deference Defendants suggest, as even their inaccurate portrayal of the facts make clear: "FDA had determined that the Q1 Upgrades and various prior modifications BD had made to Alaris would require the Company to submit a new 510(k) application." *Id.* 3. Regardless, even if true, where, as here, a manufacturer determines 510(k) clearance is necessary, the pump "may not be legally commercially distributed before FDA clears the changed device." ECF No. 36-5 at 4; *see also* ¶¶ 49, 131. Defendants' contention that "the possibility that FDA might *at some point disagree* with the Company . . . was also well-known" is equally unavailing (MTD 21), given the facts alleged: BD had submitted a "catch-up" 510(k) application before the Class Period began, which the FDA rejected. ¶¶ 130, 137.

obliged to share that information with investors. *Merck*, 2012 WL 3779309, at *3.[16]

### 2.      The Alleged Misstatements Regarding the FY20 Guidance Are Actionable

"The federal securities laws do not obligate companies to disclose their internal forecasts. . . . However, if a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997). A projection lacks a reasonable basis if it was made after inadequate consideration of available information. *Id.* at 1429.

As explained in Section I.A.1 above, BD's Alaris revenues were in acute jeopardy throughout the Class Period. Defendants knew by November 5, 2019, that BD had made a series of changes to Alaris's software which had not received needed FDA approval. ¶¶ 89, 112, 128-30, 190, 197. Some addressed "core anomalies" affecting the pumps' performance. ¶ 125. The 510(k) regulations themselves, as well as the FDA 510(k) Software Guidance, made clear that such changes required FDA clearance, and that the cumulative effect of multiple changes could trigger that requirement. ¶¶ 46-47, 49-52. BD's Regulatory Department determined in mid-2019 that 510(k) clearance was necessary and submitted a "catch-up" application to the FDA seeking retroactive approval, but the FDA rejected that application before the Class Period began. ¶¶ 128-

---

[16] For the same reasons, Defendants' argument that several alleged misstatements were non-actionable opinions fails. *See* MTD 29, 29 n.35. As Defendants acknowledge, an "opinion" that "omits facts concerning the basis for the opinion and those facts conflict with what a reasonable investor would take from the statement" is actionable. *Id.* 29. Polen's January 2020 claim that implementation of the software changes announced in November 2019 had played out "[e]xactly as expected," with BD having "fully resumed" Alaris shipments, omitted that BD knew that it *still* lacked necessary FDA approval for a long line of software changes. ¶¶ 49, 130, 162, 170, 269-70. Likewise, BD's assertion in its FY19 Form 10-K that it "d[id] not believe that a loss is probable in connection with the [ACD]" omitted the lack of FDA clearance and the agency's recent discovery of longstanding software defects. ¶ 252. These omissions misled the market to believe the issue was resolved and that talks with the FDA had concluded. *See Papa*, 2018 WL 3601229, at *10 (opinions actionable that "omit known material information undermining" them).

23

30. Moreover, even had 510(k) clearance not been required, BD's failure to comply with the FDA's QS regulations rendered it out of compliance with FDA requirements. *See* ¶¶ 42-44, 53, 145-49, 151. Alaris therefore lacked needed regulatory approval throughout the Class Period. ¶¶ 49, 131; ECF No. 36-5 at 4. Nevertheless, Defendants issued and repeatedly reaffirmed as "on track" the FY20 Guidance that depended on the quick resumption of Alaris shipments and buoyant Alaris revenues following the 1Q20 shipping hold. *See* ¶¶ 228, 230-34, 236, 244, 261, 264-65, 272-73. Under these circumstances, the alleged misstatements regarding FY20 Guidance lacked "a reasonable basis . . . and [are thus] actionable." *In re Craftmatic Sec. Litig. v. Kratsow*, 890 F.2d 628, 645-46 (3d Cir. 1990).

Courts routinely hold that optimistic projections made without regard to negative business circumstances far less obvious than the regulatory barrier here are actionable. *See, e.g. In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *15 (D.N.J. Jan. 30, 2002) (sustaining claim that "defendants' statements were patently unreasonable because at the time defendants were promising revenue growth in the Business Services unit, [they] w[ere] being appraised of the serious operational problems within that unit"); *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc.*, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) (sustaining Section 10(b) claim that company's "projections lacked any reasonable basis" due to undisclosed softening in demand and business delays). Courts have also held that statements professing a company to be "on track" to meet financial guidance were misleading given undisclosed evidence to the contrary. *See, e.g.*, *Enzymotec*, 2015 WL 8784065, at *13 (finding falsity sufficiently pleaded as to statements that company was "confident" in financial projections, was "on track" to achieve them, and expects "net revenues to increase"); *In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) ("on track" statements held "false

because CIGNA knew there were serious technological flaws and significant delays"). Plaintiff's detailed allegations of contemporaneous "material adverse facts" indicating that Defendants' projections were "unreasonable at the time they were made" render the FY20 Guidance statements actionable. *Toll Bros.*, 2008 WL 4058690, at \*2.

### 3. BD's Form 10-K Risk Disclosures and Related Statements of Regulatory Compliance Were Materially Misleading

"To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996). Applying this principle, courts regularly deem risk disclosures in securities filings actionable when the defendant failed to disclose that a hypothetical risk presented had already materialized. *See, e.g.*, *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (finding allegation that defendants' warning of possible difficulties with acquired company's subscriber base actionable when they were already experiencing integration difficulties); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized"). Professed commitments to regulatory compliance omitting that the company is already out of compliance are likewise misleading. *See, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (finding compliance statements actionable on ground that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability").

Forlenza and Reidy made risk-related misstatements of both varieties in BD's FY19 Form 10-K. ¶ 250. The 10-K warned of various dangers that, unbeknownst to investors, had already hit home. For example, while the 10-K warned that "[o]ur failure to comply with the applicable good

25

manufacturing processes, adverse event reporting, and other requirements of these agencies [including the FDA] *could* delay or prevent the production or sale of our products" (¶ 251; *see also* ¶ 254), former employees confirm that the shipping hold announced in November 2019 had been prompted by the FDA's rejection of BD's failed "catch-up" 510(k) application and discovery of unresolved Alaris software defects. ¶¶ 130, 135, 137.[17] Likewise, Defendants' warning that "[t]he consent decree authorizes the FDA, *in the event of any violations in the future*, to order us to cease manufacturing and distributing products, recall products or take other actions" (¶ 253), concealed that Alaris was *already* wracked with defects and cGMP violations before the Class Period began. ¶ 187. Such disclosures were misleading, as they spoke "entirely of as-yet unrealized risks and contingencies," and did not alert "the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008).

Defendants' 10-K statements touting BD's supposed "substantial progress in its compliance efforts" and anticipation of no losses from regulatory failings under the ACD were also misleading. ¶ 252. In truth, BD's cGMP and QS deficiencies, and failed 510(k) application before the Class Period had received negative FDA scrutiny, jeopardizing BD's "vital" Alaris revenues. ¶ 101; *see also* ¶¶ 90-96, 128-31, 135, 139, 145-51. Defendants' statements omitting these facts are thus actionable, as they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable . . . regulations." *Jinkosolar*, 761 F.3d at 251; *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (claims of safety

---

[17] Defendants' claim that, "[a]part from the delay in shipping occasioned by the Q1 Updates, which was fully disclosed on the first day of the Class Period, the Complaint fails to allege that any of the risks it cites . . . had materialized at the time the risk disclosures were made" simply ignores these allegations. MTD 26. It also overlooks that Defendants' disclosure of the shipping hold was itself misleading. ¶ 238. At the pleading stage, the Court takes as true Plaintiff's *actual* allegations, not what Defendants might wish them to be. *See Quaker Oats*, 129 F.3d at 315.

commitment actionable given undisclosed safety problems).

**B.       The Safe Harbor Does Not Shield Defendants from Liability**

The Private Securities Litigation Reform Act of 1995 ("PSLRA") safe harbor protects only statements that are forward-looking and accompanied by meaningful cautionary language, or for which plaintiff fails to establish that the defendants had actual knowledge that the statement was false. 15 U.S.C. § 78u-5(c). It protects none of Defendants' alleged misstatements.

**1.       Material Misrepresentations and Omissions of Present Fact Do Not Receive Safe Harbor Protection**

At the threshold, Defendants do not identify *any* of the specific portions of their alleged misstatements that they contend implicate safe-harbor protection in the body of their brief. *See* MTD 22-26. Instead, they direct the Court to a thirty-page, color-coded appendix that sets forth the particularized arguments that they fail to make in their briefing. *See id.* 22 n.24, 23 n.26 (citing ECF No. 36-2). This is the subject of Plaintiff's motion to strike, filed separately herewith.

That aside, many statements that Defendants contend are forward-looking refer, at least in part, to the present, depriving them of safe-harbor protection. *Avaya*, 564 F.3d at 255 (A "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."); *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *18 (D.N.J. Mar. 21, 2019) ("The mere fact that a statement contains *some* reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement."). For example, various statements discussing future Alaris sales mischaracterize the ***ongoing*** software changes as "upgrades" and the ***extant*** shipping hold as a mere "timing" issue.[18] While Defendants attempt to

---

[18] *See, e.g.*, ¶¶ 246 ("*[w]e're upgrading* some software in the pumps, and *that* [i.e., so-called 'upgrades' then underway] will delay some installations and shipment into the subsequent quarters"); 236 ("we expect revenue growth to be between 1% and 2% [in 1Q20], and one of the

subdivide these statements into distinct utterances with color-coding (ECF No. 36-2 *in globo*), they must be read in context. *See Enzymotec* 2015 WL 8784065, at *11 ("[S]tatements relating to Enzymotec being 'well positioned for future growth' . . . or 'increased market penetration' . . . relate to then-existing conditions as opposed to future projections. These statements, ***even if made within the context of truly forward-looking statements***, are not entitled to the safe harbor.").

Similarly, Defendants' statements touting ***continuing*** "momentum" and market-share gains are outside the safe harbor, as they necessarily incorporate assessments of current conditions and past and present Alaris sales. *See, e.g.*, *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 545-46 (D.N.J. 2002) (statement that company was "experiencing" growth, and "is growing" not forward-looking).[19] Defendants' assertions that BD was "on track" to meet the FY20 Guidance are also the sort that courts hold to be statements of present fact. *See, e.g.*, *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("[w]e remain comfortable with our previously stated EPS guidance for 2017" held statement of present fact not protected by safe harbor); *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004) (rejecting application of safe harbor to statement that "we're comfortable" with projected growth rate); *Enzymotec*, 2015 WL 8784065, at *13.[20]

Even if certain statements could be deemed forward-looking, they would fall outside the safe harbor because they ***omitted*** then-present facts necessary to render them not misleading.

---

drivers of that ***is the timing of the upgrades*** on the Alaris pump software"); 234 ("[t]his [discussion with the FDA about the timing of software changes] is expected to move the ***timing*** of some sales from Q1 to the balance of the fiscal year"); 248 ("***we do see some timing*** outside of Q1 and into the subsequent quarters of fiscal '20"); 260-61 ( "***That's a timing issue***. First half issue, yes.").

[19] *See, e.g.*, ¶¶ 237 ("***we see*** no slowdown in that momentum"); 248 ("we expect that momentum to ***continue***"); 259 ("[On] the pump side, ***we've been taking*** 200 points of share last year, and ***we see*** that ***continuing***, and ***we have some visibility*** to that. So ***we don't see that being the case***.").

[20] *See, e.g.*, ¶¶ 264 ("[W]e remain very much ***on track*** for the year."); 272-73 ("[W]e are ***on track*** for the full year" and reaffirming FY20 Guidance).

*Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) ("[O]missions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor."). As explained in Section I.A above, Defendants failed to disclose that: (1) Alaris suffered from defects and compliance problems before and during the Class Period (*see, e.g.*, ¶¶ 120-39, 150); (2) various changes to Alaris addressed "***core anomalies***" implicating pump performance and patient safety (and thus the 510(k) requirement) ***before the Class Period*** (¶¶ 48, 51, 125); (3) the ***cumulative*** effect of the Alaris changes, unknown to investors, independently implicated the 510(k) requirement (¶¶ 52, 123); (4) BD's own Regulatory Department had determined that ***510(k) clearance was required*** for the Alaris software changes before the Class Period (¶¶ 128-30); (5) again, before the Class Period, BD ***submitted*** a "catch-up" 510(k) application to the FDA seeking clearance for the Alaris changes (¶ 130); (6) the FDA ***rejected*** BD's "catch-up" 510(k) application before the Class Period (*id.*); (7) following the rejected 510(k) application, BD ***knew*** that it ***lacked regulatory clearance*** to distribute Alaris throughout the Class Period (¶ 49, ECF No. 36-5 at 4); (8) the shipping hold owed ***not*** simply to a Company-driven decision to provide "upgrades" and "enhancements" to customers, but also to the fact that the FDA had learned of numerous Alaris software defects and rejected the "catch-up" 510(k) application (¶¶ 130, 135, 137); (9) Defendants' discussions with the FDA had not been limited to the "***timing***" of the software changes, and were not resolved by January 2020 (*see, e.g.*, ¶¶ 239, 270); and (10) even had 510(k) clearance not been required for the many software changes, Defendants' failure to comply with QS recordkeeping rules would have ***still*** rendered it out of regulatory compliance for BD's various unapproved Alaris modifications. ¶¶ 145-49, 151.

These undisclosed, ***existing*** facts contradicted Defendants' qualitative statements about the nature of the Alaris changes, the shipping hold, BD's discussions with the FDA, and the purported

29

"momentum" in Alaris sales, taking the statements at issue outside the safe harbor. *See, e.g.*, *Carmignac Gestion, S.A. v. Perrigo Co. plc*, 2019 WL 3451523, at *11 (D.N.J. July 31, 2019) (statements company was confident it could keep pricing flat were not "forward-looking statements for safe harbor purposes because they omit *existing* facts that bear on" pricing projections). The same undisclosed facts undermined Defendants' FY20 Guidance statements, which were predicated on strong Alaris sales. While such statements "appear to be forward-looking," they are "incomplete," and "because they did not disclose facts that contradicted them," they "do not qualify for protection under the safe harbor provision." *Endo*, 351 F. Supp. 3d at 901.

## 2. The Alleged Misstatements Lacked Meaningful Cautionary Language

Furthermore, the claimed cautionary language that Defendants rely on was deficient. To begin, BD's Form 10-K risk disclosures (MTD 25-26) misleadingly described as hypothetical risks that had already materialized. *See supra* Section I.A.3; *Bristol-Myers Squibb*, 2005 WL 2007004, at *52. While the November 2019 filing's forward-looking statement section cautioned of potential "[p]roduct efficacy or safety concerns regarding our products resulting in product holds or recalls[] [or] regulatory action on the part of the FDA" (ECF No. 36-4 at 42 (cited at MTD 25)), BD had *already* recognized that it lacked necessary FDA approval for the Alaris changes and had already had its "catch-up" 510(k) application *rejected* by the FDA, prompting a shipping hold. ¶¶ 128-30, 135-37; *see Enzymotec*, 2015 WL 8784065, at *7, *11 (cautionary language not meaningful where "Defendants warned generally of significant and increasing government regulations" but "these risks had already come to pass"); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) ("cautionary language could not cure the fact that, at the time the statements were made, the sNDA was already lacking a necessary condition precedent to exclusivity"). The only other passage Defendants rely on—stating that delays "in obtaining necessary approvals or clearances from [FDA] . . . may also delay product launches and increase development costs" (MTD 25)—

30

ignores the same facts. ¶¶ 128-30; *see, e.g., Pritchard v. Apyx Med. Corp.*, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020) ("[C]autioning that 'there can be no assurance that [product for which 510(k) clearance was sought] will be successful or that such future revenues and profitability will be realized' . . . is not narrowly-tailored to the *existing* known risk [to FDA approval]."). Further, warnings of delayed "product launches" and increased "development costs" are irrelevant to Plaintiff's claims. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) (warnings "must be substantive and tailored to the *specific* future projections, estimates or opinions" the plaintiffs challenge). Thus, *none* of the statements supposedly shielded by the 10-K came with meaningful cautionary language. *See* ECF No. 36-2 at 7-17, 21-25, 27-30.

Much of the other language Defendants cite in their safe harbor argument was also boilerplate or irrelevant. For example, Defendants point to the November 5, 2019 press release warning of hypothetical risks relating to "difficulties inherent in product development" and "product efficacy or safety concerns resulting in product recalls or actions being taken by the FDA or other regulators (including the potential ongoing impact of the FDA letters regarding the use of drug-coated balloons)" as immunizing all purportedly forward-looking statements issued that day. ECF No. 36-13 at Ex. 99.1 (cited at MTD 24). They are wrong. Aside from omitting the material, contrary, presently existing facts noted above, Defendants' warnings about potential FDA intervention on an *unrelated product* (drug-coated balloons) obscured the truth, rather than alerting investors to the risk to Alaris revenues that they posed. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *14 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc.,* 905 F.3d 106 (3d Cir. 2018) ("[A]lthough the warnings cross-reference risk factors listed in other SEC filings like the Form 10-Ks, those filings discuss numerous *other* potential hazards in detail but make no further mention of accounting risks."). As this lone, legally

31

insufficient passage is Defendants' sole support for safe harbor protection for *all* the November 5, 2019 statements, *none* of those statements is shielded by the safe harbor. *See* ECF No. 36-2 at 1-7; ¶¶ 228, 230-34, 236-37.[21]

The remaining statements for which Defendants claim safe harbor came with *no cautionary language whatsoever*. Defendants argue in their appendix that their statements at the November 21, 2019 and December 4, 2019 conferences (¶¶ 244, 246, 248, 259, 261), and those in BD's February 4, 2020 recall letters (¶ 276), are insulated from liability due to the same passage from BD's 2019 Form 10-K discussed above. ECF No. 36-2 at 7-14, 21-25, 27-30. Yet *none* of these statements referred to the 10-K or its purportedly cautionary language. "Although cautionary language need not directly accompany a challenged statement, there must be *some* attempt to incorporate the cautionary language 'by reference' as part of the challenged statement." *Perrigo*, 2019 WL 3451523, at *12. Defendants may not incorporate that language for the first time here.[22]

### 3.      Defendants Knew That Their Statements Lacked a Reasonable Basis

"[T]he safe harbor will not apply if the statement was made with 'actual knowledge' that the statement was false or misleading." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999). As detailed in Section I.C below, Plaintiff alleges that Defendants knew their public

---

[21] Likewise, Defendants' January 14, 2020 statements are not protected by the November 5, 2019 press release and November 27, 2019 Form 10-K. *See* ECF No. 36-2 at 25-26.

[22] Defendants' claim (again, made *only* in their appendix) that Forlenza's reaffirmations of the FY20 Guidance at the January 28, 2020 shareholder meeting (¶¶ 272-73) are immunized by his statement that "[w]e have information posted on our website regarding forward-looking statements" similarly fails. ECF No. 36-2 at 27. Defendants neither quote nor describe this "information" in their Motion or appendix, nor do they attach it as an exhibit, precluding the Court from determining whether it was meaningful. *See In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *15 n.21. (D.N.J. Dec. 19, 2019) (because defendants failed to provide supposed warnings, "the Court is unable to ascertain whether Defendants provided sufficient cautionary language. Given the fact that at the motion to dismiss stage, the Court must construe the SAC in Plaintiff's favor, the Court will assume that there was not appropriate cautionary language.").

statements—including the FY20 Guidance—lacked a reasonable basis due to their pre-Class Period interactions with the FDA, internal analyses of their compliance and record-keeping failures, the true rationale behind the shipping hold, their February 6, 2020 admissions that discussions with the FDA about the changes had been "ongoing" and "continuing," and their acknowledgements that it was not "unprecedented" to need 510(k) clearance due to cumulative device changes. *See, e.g.*, ¶¶ 185, 190, 197-99, 233-37, 246-48, 268, 276; *see also Avaya*, 564 F.3d at 270-71 (public remarks on issue support inference that CFO knew of contradictory facts related to same issue).[23] Knowledge of these facts deprived Defendants' forward-looking statements of the reasonable basis required for the safe harbor to apply. *Burlington Coat*, 114 F.3d at 1427.

### C.     Plaintiff Adequately Alleges Scienter

#### 1.     Plaintiff Alleges Facts Supporting a Strong Inference of Scienter

In this circuit, scienter may be established by alleging "facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud." *Papa*, 2018 WL 3601229, at *15. A plaintiff pleads the requisite strong inference of scienter when it sufficiently alleges that the defendants "knew facts ***or had access to information*** suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018). A "strong" inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 324 (2007). It "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.*

Plaintiff alleges numerous facts that, viewed holistically, support a strong inference that

---

[23] That Defendants were BD's highest-level executives, holding unique vantages of the Company's key operations serves as more evidence that they knew about the rejected application. ¶¶ 29-31; *see In re Honeywell Int'l Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 428 (D.N.J. 2002) (CEO's "prominent position" required him to have "knowledge of the subject matter" in question).

Defendants knew or recklessly disregarded the risk that their alleged misstatements were materially misleading. *Id.* at 326. Specifically, Defendants knew or recklessly disregarded that BD had recognized before the Class Period even began that it needed FDA clearance for its serial changes to the Alaris software (¶¶ 128-29, 131), submitted a "catch-up" 510(k) application in mid-2019 (¶ 130), and saw that application rebuffed by an FDA that had recently discovered various defects in the Alaris software (¶¶ 130, 134-39), depriving Alaris of the necessary regulatory approval for lawful distribution and prompting a shipping hold on Alaris as the Class Period began. ¶ 49; ECF No. 36-5 at 4; ECF No. 36-6 at 8; *see supra* Section I.A. A multitude of allegations supports Defendants' knowledge or reckless disregard of these facts.

*First*, Defendants repeatedly spoke to investors *about these exact topics*. Indeed, the Individual Defendants' public statements indicated that each was knowledgeable about and actively involved in: (1) reviewing and approving BD's FY20 Guidance; (2) formulating and overseeing BD's Alaris-related strategy and business; (3) overseeing the status of purported Alaris software "updates" and "improvements"; (4) assessing the impact of Alaris-related revenue on BD's overall performance; and (5) participating in and guiding the Company's interactions with the FDA concerning Alaris. *See, e.g.*, ¶¶ 234 (explaining that BD's "discussions with the FDA [are] about the timing of implementation of these upgrades" and whether to "bundl[e] them with a new software version."); 237 (assuring investors shipping hold was temporary delay due to "upgrades," "enhancements," and "improvements" that would merely "move the timing of some [Alaris] sales from Q1 to the balance of the fiscal year"); 161-62 (stating Alaris had "[f]ully resumed shipping in the first quarter" and the situation with the FDA had played out "[e]xactly as expected"); 259 ("[On] the pump side, we've been taking 200 points of share last year, and we see that continuing, and *we have some visibility to that*."). Many of these and other statements were

34

made in response to investment analyst queries. *See also* ¶¶ 244-45, 260-61, 267-69.

When, as here, a defendant's statements "implied that they had first-hand knowledge" of the matter at issue, this supports a strong inference of scienter. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*16-17 (D.N.J. Aug. 28, 2017) ("powerful evidence of scienter" where defendants spoke "explicitly and repeatedly" about results and company's talks with FDA); *see also Endo*, 351 F. Supp. 3d at 906 (defendants' public comments "confirm they had intimate knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think. ***These officers were speaking as authoritative sources who possessed the information to support their statements***."). That the misstatements concern a "subject about which investors and analysts often inquired" further supports the inference. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *see In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) ("powerful evidence of scienter is the content and context of the statements made" in response to analyst questions). At a minimum, Defendants were reckless in speaking on these subjects without investigating the underlying facts. *Avaya*, 564 F.3d 242 at 269 (false denials in response to repeated questions by analysts suggested at least recklessness).

***Second***, the "core operations" doctrine supports a strong inference of scienter. "Knowledge may be imputed to individual defendants when the disclosures involve the company's core business." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001); *see also Avaya*, 564 F.3d at 271. BD Medical made up over half of BD's total annual revenue in 2017, 2018, and 2019 (¶ 27), and BD reported BD Medical's underlying revenue growth was "driven" by the "[MMS] unit's installation of dispensing and infusion systems." ¶ 220. Alaris was among the MMS unit's most important product lines and was routinely identified by the Company as BD's "[k]ey" product, serving as the linchpin to the Company's "interoperability" strategy. ¶¶ 80-

35

82.

Other courts in this circuit have found similar allegations sufficient to support a finding of scienter. *See, e.g.*, *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (core operations applies where product was among "the top one or two products" associated with company); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (scienter well-pled where misrepresentations concerned three drugs constituting "substantial portion" of revenues and operations); *Enzymotec*, 2015 WL 8784065, at *18 (scienter inferred where "matter at issue" "central to the core business of the Company,"[] about which Defendants spoke regularly"). That Alaris had long been plagued by persistent defects and FDA monitoring under the ACD (¶¶ 83-85, 90-97) and was one of only three products identified by name in the 2019 Form 10-K's regulatory risk disclosures and warnings (*see* ECF No. 36-4 at 9, 15-16) strengthens the "strong inference that the defendants were aware of the alleged severe and pervasive problems" belying the alleged misstatements. *Dr. Reddy's*, 2019 WL 1299673, at *16.[24]

***Third***, the Individual Defendants' Class Period positions as BD's highest-ranking executives also support the inference that they had access to the facts about which they spoke. Forlenza was BD's CEO from 2011 until January 2020, including when BD submitted the failed "catch-up" Alaris 510(k) application. ¶ 29. Polen was BD's Chief Operating Officer and President from 2017 through January 2020, when he assumed the role of CEO, and routinely spoke to investors about Alaris and related interactions with the FDA. ¶ 30. Reidy served as BD's CFO

---

[24] Defendants' claim that despite Alaris's conceded "importance to the MMS unit and BD," BD "repeatedly emphasized that the reason for BD's positive FY20 Guidance . . . was the success of all three business segments and its balanced portfolio" (MTD 38) is another improper attempt to set forth a factual counternarrative at the pleading stage. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002) (even under "strict" PSLRA pleading requirements, "district court, on a motion to dismiss, must draw all reasonable inferences . . . in the plaintiff's favor").

from 2013 through the Class Period. ¶ 31. Forlenza and Reidy signed BD's 10-K for 2019. ¶ 250.

Courts in this circuit routinely impute scienter to top executives concerning business-critical matters on which those executives publicly speak. *See, e.g.*, *In re Genta, Inc. Sec. Litig.*, 2005 WL 2416970, at *6 (D.N.J. Sept. 30, 2005) ("[c]omprehensive knowledge" of clinical trials involved in development of company's lead product "may be reasonably imputed to" senior-most executives); *PTC Therapeutics*, 2017 WL 3705801, at *17 (finding it "implausible" that CEO and CFO "were not paying close attention" to results of critical trial for important drug or "played a subordinate role" in decision on application); *Viropharma*, 2003 WL 1824914, at *9 ("it can be assumed" that "highest" company executives "were aware" of negative facts about key product). The unique threat of adverse agency action in a highly regulated industry—the situation that Defendants faced after the FDA's rejection of the "catch-up" 510(k) application in 2019 (¶ 130)— further supports the inference that BD's top brass knew that Alaris revenues were imperiled as the Class Period began. *See Dr. Reddy's*, 2019 WL 1299673, at *16 ("[W]hen the FDA tells a company about a problem with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.") (alteration in original).[25]

***Fourth***, following Alaris's removal from the market at the end of the Class Period, Defendants ***admitted*** to having known many of the facts they had concealed from investors. For example, Defendants revealed that, contrary to their alleged misstatements, the FDA's scrutiny of the Alaris changes had ***not*** been limited merely to "timing," nor had it been resolved by January

---

[25] *GSC Partners CDO Fund v. Washington* (MTD 33) is inapt. 368 F.3d 228, 239 (3d Cir. 2004) There, plaintiff's scienter theory turned on defendants' pre-class period comments that were disconnected from the alleged misstatements. *See id.* at 239-40 ("this comment could not have been made in reference to the financial statements for the stub period"). No such incongruity exists here. Plaintiff alleges BD knew before the Class Period that the FDA had discovered the Alaris defects and compliance failures that underlay the alleged misstatements. ¶¶ 128-30, 135-37.

14, 2020. *See* ¶¶ 234, 236, 260-61, 267-69. Rather, work with the FDA on the "software remediation plan" for Alaris was continuing and ongoing. *See, e.g.*, ¶¶ 185 (BD press release announcing BD was "***continuing*** to work with the [FDA] on its [Alaris] software remediation plan"); 197 (Polen revealing that meetings with FDA regarding Alaris changes occurred "***as recently as*** this Monday" amidst "***ongoing dialogue***" with agency); 193 (slashing FY20 Guidance "based on our ***ongoing conversations*** with the FDA"). Polen acknowledged his understanding that 510(k) clearance could be required due to the cumulative effect of multiple Alaris changes to a device. *See* ¶ 199.   And Polen reaffirmed top management's direct involvement, telling investors on May 7, 2020 that the "***executive team is directly engaged on this on a daily and weekly basis***" and that it was "the critical priority for the company." ¶ 209.  Moreover, Defendants have all but conceded the knowing falsity of their February 4, 2020 "voluntary recall" letters by asserting that they knew no later than February 3, 2020, that 510(k) clearance was required for the Alaris changes. ¶¶ 172-74, 190; *see Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183 (S.D.N.Y. 2010) ("plaintiffs may rel[y] on postclass period [statements] to confirm what a defendant should have known during the class period") (alterations in original).

*Fifth*, Forlenza's and Polen's combined insider trading windfall of ***$58,417,985.36*** in proceeds during the three-month Class Period supports an inference of scienter, especially in combination with the forgoing allegations. ¶ 213; *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 415 (D.N.J. 2004) ("insider trading [is] a powerful motive to commit fraud"). Stock sales will support an inference of scienter when they are unusual in scope or timing, *In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at \*15 (D.N.J. July 2, 2019), or "dramatically out of line with prior

38

trading practices," *Honeywell*, 182 F. Supp. 2d at 428.[26]

Here, Forlenza's and Polen's insider stock sales were clustered after dates on which each is alleged to have made false statements to investors. *See* ¶¶ 215, 218; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-6 (2d Cir. 1999) (stock sales made after optimistic statements indicative of scienter and motive to inflate stock price). Moreover, Forlenza made substantial sales during the period immediately preceding the February 6, 2020 corrective disclosure, including selling 90,000 shares just nine days before. ¶ 215. *See Honeywell*, 182 F. Supp. 2d at 427 (significant portion of insider sales before disclosure of serious problems indicative of scienter); *Urban Outfitters*, 103 F. Supp. 3d at 655 (sales one week before disappointing announcement "particularly suspicious"). Furthermore, Forlenza sold four times more BD common stock in the three-month Class Period than he sold during the same three-month period the year prior, and *twelve* times more than in the three-month period that immediately preceded the Class Period. ¶ 214. *See Suprema Specialties*, 438 F.3d at 277-78 (sales not normal or routine when defendant sold over five times amount sold prior to that time period). Polen's sales during the three-month Class Period exceeded those he made in the three-month period directly preceding it, and during the same three-month period the year prior. ¶ 217. These large volumes of insider sales are made even more suspicious by the brevity of the Class Period—a mere ninety-three days. *See Hertz*, 905 F.3d at 120.

Defendants' claim that a 10b5-1 trading plan immunizes Forlenza's transactions (MTD at 41-42) fails due to the fact that he entered into the plan on December 16, 2019—*during* the Class Period and was in possession of material, non-public information. ¶ 215. Defendants' authority makes clear that *when* a 10b5-1 plan was adopted or amended is an important inquiry. *See*

---

[26] Defendants are incorrect that all Defendants must have engaged in insider trading to support a finding of scienter. *See, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (scienter found adequately alleged where only two of six defendants sold stock).

*Synchronoss*, 2019 WL 2849933, at *5, *17 (plaintiffs failed to show 10b5-1 plans were amended while defendants possessed material, non-public information); *cf. George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) ("*[W]here . . . 10b5–1 trading plans are entered into during the class period, they are not a cognizable defense to scienter allegations*."). Moreover, the SEC regulation that creates this affirmative defense makes clear that the plan must have been established "[b]efore becoming aware" of inside information and "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. 17 C.F.R. § 240.10b5-1(c). Forlenza can make no such showing here, particularly at the pleading stage.

## 2.    The FE Allegations Are Reliable and Should Be Credited

Defendants next launch a volley of failed attacks on the FEs themselves. *See* MTD 34. First, Defendants' argument that the FEs should be disregarded because they were merely "low-level employees" (*id.*) misstates both the FEs' positions and Third Circuit law. *See, e.g., Avaya*, 564 F.3d at 265 (crediting allegations of "relatively low-level former employees (or non-employees)" none of whom were officers, "worked at headquarters," or "claimed to participate in the forecasting process"); *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *3 (D. Del. Feb. 7, 2020) ("Courts will not disregard a confidential witness' allegations simply because he or she was a low-level employee."). Also erroneous is their suggestion that a confidential witness must have had direct contact with, "worked in a direct reporting line" to, or been "privy to senior-level strategic planning or executive decision-making processes" involving an Individual Defendant. MTD 34; *cf. Avaya*, 564 F.3d at 268-69 (rejecting "direct link" requirement); *Perrigo*, 2019 WL 3451523, at *14 (fact that "confidential witnesses did not have contact with [defendants] does not render their statements immaterial" to scienter analysis). Similarly off-base is Defendants' objection that none of the FEs "states definitively" that they worked at BD during the Class Period. MTD 34. "[T]he misstatements at issue made during the class period were based on [BD's] conduct

40

*before* the class period"—including BD's determination that 510(k) clearance was needed and submission of a "catch-up" application that the FDA rejected. *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*5 (D.N.J. Dec. 6, 2018) (rejecting similar argument, finding "[t]he CWs statements are certainly relevant" to allegedly false statements); ¶¶ 128-30, 135. What matters is that each FE worked in a role that provided a vantage from which to observe the facts underlying his or her allegations—a point Defendants do not contest. *Papa*, 2018 WL 3601229, at \*23; *cf.* MTD 34.

Defendants' attacks on the "substantive content" of the FE allegations are equally strained. MTD 34-37. While Defendants argue that FE-1 fails to explain in adequate detail the background behind or personnel involved in the Regulatory Department's determination by mid-2019 that 510(k) clearance was necessary (MTD 35), they ignore that FE-1 also alleges that BD, in fact, *filed* a "catch-up" 510(k) application in mid-2019—an allegation Defendants do not dispute. ¶¶ 128, 130.[27] Defendants also ignore that FE-2, responsible for managing BD's quality systems, recalled weekly meetings with BD Head of Quality Keith McLain during which staff discussed the need for 510(k) approval, providing both added particularity and critical corroboration of FE-1's account. ¶ 129. These interlocking allegations are further corroborated by Defendants' post-Class Period statements, in which they admitted that BD had been making unapproved Alaris changes for "a number of years," that they knew the cumulative effect of changes could trigger the 510(k)

---

[27] The report of FE-3 that BD had "avoided seeking 510(k) approval" for the multiple prior Alaris changes it had made (¶ 132), does not "contradict[]"(MTD 35-36) FE-1's report that BD had determined by mid-2019 that it needed 510(k) clearance from the FDA, and had sought such clearance. Rather, the report of FE-3 simply explains a reason why BD had not sought 510(k) clearance for its numerous Alaris changes *before it eventually did so*, as FE-1 reports, in mid-2019. ¶ 130. Plaintiff is entitled under law to this natural inference, and Defendants are not entitled to their strained, contrary interpretation. *Cell Pathways*, 2000 WL 805221, at \*8 (a defendant's "insistence on their version of contested issues in th[e] case" is not a valid basis for dismissal).

41

clearance requirement, that discussions with the FDA had been "ongoing" (implicitly, during the Class Period), and that the "executive team" was steeped in the issue. *See supra* Section I.A.1.

Meanwhile, Defendants' contention that both FE-3's description of software defects and FE-4's allegations of BD's deficient QS records lack a sufficient "nexus" with the alleged misstatements is simply wrong. MTD 36-37. FE-3 plainly alleges that an FDA auditor's discovery of those longstanding defects immediately preceded an October 2019 hold on Alaris shipments, which, Plaintiff alleges, Defendants publicly—and falsely—spun on November 5, 2019 as a voluntary move to roll out "upgrades" to customers. ¶¶ 134-36, 238. And FE-4's detailed description of BD's failings in meeting its QS recordkeeping obligations (¶¶ 145-51) relates directly to Defendants' misstatements because, even had Defendants *not* known 510(k) clearance was necessary (they did), BD would have been out of compliance with the FDA regulations governing unapproved changes, putting their aggressive FY20 projections in peril. *See supra* Section I.A.1. The FE accounts, viewed together with Plaintiff's other allegations, support a strong inference of scienter. *Dr. Reddy's*, 2019 WL 1299673, at \*17 ("Overall, the totality of the direct contradictions of the truth, statements about core operations, information provided by Plaintiff's confidential witness, and additional allegations support a strong inference of scienter.").

### 3. Defendants' Remaining Scienter Arguments Fail

Defendants' other arguments fall short for similar reasons. For example, Defendants' argument that "[t]he fact that BD promptly disclosed the FDA's determination to the public [in February 2020] dispels any inference of corporate scienter" (MTD 31 n.38), disregards that Plaintiff has expressly alleged that the FDA rejected BD's 510(k) application in mid-2019. ¶¶ 128-30.[28] And while Defendants fault Plaintiff for "cit[ing] no documents, witnesses who interacted

---

[28] Defendants' reliance on *Rahman v. Kid Brands, Inc.* (MTD 33-35) is misplaced. 736 F.3d 237 (3d Cir. 2013). There, the confidential witness provided merely "abstract commentary," and "little

with Defendants[,] or other evidence at all" establishing scienter (MTD 32), they ignore both that no such "smoking-gun" is required, *Tellabs*, 551 U.S. at 324, and that Plaintiff *does* identify particular documents in support of its scienter allegations. *See, e.g.*, ¶¶ 128-30 (detailing BD's submission of rejected "catch-up" 510(k) application); 148 (describing deficient Alaris "Design History File"); 150 (describing GAP Analysis Report addressing Alaris production facilities' compliance deficiencies); 151 (describing second GAP Analysis Report identifying deficient Alaris defect and modification records). Further, the Third Circuit does not require the very sort of "direct link" that Defendants argue is necessary here, emphasizing that the proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Avaya*, 564 F.3d at 268-69 (emphasis in original).[29]

Equally unconvincing is the "nonculpable inference" that Defendants propose. MTD 42-43. The crux of this alternative narrative—that "BD learned on February 3, 2020 that FDA would demand a new comprehensive 510(k) filing that Defendants did not believe would be necessary" (*id.* 43)—is irreconcilable with Plaintiff's allegations that, among other things, BD had *itself* determined that such an application was necessary, *submitted* that application, and seen it *rejected* by the FDA, *before the Class Period began*. ¶¶ 128-30; *Cell Pathways*, 2000 WL 805221, at *8. Defendants also miss that their own storyline appears to admit to securities fraud: BD's February 4, 2020 "voluntary recall" letters were issued a day *after* the meeting at which they now claim to have "learned" of the FDA's final decision, yet those letters said nothing of the agency's action or

---

more than generalized allegations with few specifics and even less concrete support." *Id.* at 245. In contrast, the FE allegations here provide particularized, mutually reinforcing reports of deficiencies in the Alaris line and BD's related QS. *See, e.g.*, ¶¶ 125-32, 135-38, 145-51.

[29] At least one court in this District has found corporate scienter adequately alleged without the alleged knowledge of *any* individual defendant. *See Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *3 (D.N.J. Mar. 2, 2016) (scienter found based on company's submission of improperly modified study to FDA despite no allegation of "knowledge of any defendant").

BD's indefinite cessation of Alaris shipments. *See* ¶¶ 275-77. This uncontested act of deception further undermines Defendants' nonculpable explanation, which is certainly no ***more*** compelling than the well-pleaded strong inference of scienter. *Tellabs*, 551 U.S. at 314.

### D.      Plaintiff Adequately Alleges Loss Causation

A plaintiff pleads loss causation by providing a "short and plain statement" giving defendants "some indication of the loss and the causal connection that [it] has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). The Third Circuit takes a "practical approach" to loss causation, applying "general causation principles" under which a plaintiff need only show that "the misrepresentation touches upon the reasons for the investment's decline." *McCabe v. Ernst & Young LLP*, 494 F.3d 418, 426, 428 (3d Cir. 2007). This "highly factual" inquiry is "often unsuited to disposition . . . on the pleadings." *Merck*, 2011 WL 3444199, at *29.

The Complaint adequately pleads the requisite link between Defendants' misconduct and Plaintiff's loss. Defendants' misrepresentations were corrected by their disclosure on February 6, 2020, that the FDA—following what Defendants admitted had been "continuing" discussions— had required BD to cease all Alaris sales, and that FY20 guidance would be cut by $400 million as a result. ¶¶ 184-205. The corrective disclosure substantially affected BD's stock price, which dropped nearly 12% that day on unusually heavy volume, a sharp decline that was publicly linked to Defendants' announcement. ¶¶ 184-205, 280. The disclosure itself was immediately recognized by analysts as revealing previously undisclosed information about the severity of Alaris issues that had beset the Company all along, including failures in Alaris-related "quality systems" and software issues previously minimized as "upgrades." ¶¶ 196-98. The alleged corrective disclosure more than "touche[d] upon" the subject matter of the alleged misrepresentations and led to the stock price decline and investors' losses. *McCabe*, 494 F.3d at 428; *see also Merck*, 2011 WL 3444199, at *32 (loss causation alleged where public release of information revealing misleading

44

nature of prior statements was substantial cause of stock price drop).[30]

## II.       PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(a) CLAIM

Defendants do not dispute that the Section 20(a) Defendants controlled BD, and while "the overwhelming trend in this circuit is that culpable participation does not have to be pled," Plaintiff pleads Defendants' culpable participation in BD's Section 10(b) violations. *Aeterna Zentaris*, 2016 WL 827256, at \*4.

## III.      PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(A) CLAIM

As discussed above, Defendants Forlenza and Polen are liable under Section 10(b). While in possession of material, nonpublic information about the alleged Alaris issues, Forlenza and Polen sold 146,047 and 6,386 shares of BD common stock in open market sales, exclusive of sales to the issuer. ¶¶ 282-84. Contemporaneous with their sales, Plaintiff purchased 23,754 shares of BD common stock at inflated prices—a point Defendants do not contest. ¶ 285. Plaintiff has thus properly alleged their violation of Section 20(A). *See In re Valeant Pharm. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at \*5 (D.N.J. June 30, 2019).

### CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

---

[30] Defendants ignore the facts alleged, claiming that the disclosure did not reveal "anything new," and was merely "bad news." MTD at 43-44. In support, they cite a factually inapt case where the "[c]omplaint contain[ed] not a single allegation that the 'relevant truth' about [the company's] improper revenue [accounting] practices and inadequate internal controls . . . was . . . made known to the market by way of any public disclosures." *Marsden v. Select Med. Corp.*, 2007 WL 1725204, at \*2 (E.D. Pa. June 12, 2007). Here, Plaintiff alleges the corrective disclosure revealed significant information that touched upon the previously-concealed truth about BD's Alaris and FDA issues.

45

Dated: November 23, 2020                                        Respectfully submitted,

**CARELLA BYRNE CECCHI**                       **KESSLER TOPAZ**
**OLSTEIN BRODY & AGNELLO, PC**           **MELTZER & CHECK, LLP**
                                                               Joshua E. D'Ancona
*s/ James E. Cecchi*                                     Eric K. Gerard (admitted *Pro Hac Vice*)
James E. Cecchi                                          Melanie A. Rader (admitted *Pro Hac Vice*)
Donald A. Ecklund                                       280 King of Prussia Road
5 Becker Farm Road                                     Radnor, PA 19087
Roseland, NJ 07068-1739                              Telephone: (610) 667-7706
Telephone: (973) 994-1700                           Facsimile: (610) 667-7056
Facsimile: (973) 994-1744                            jdancona@ktmc.com
jcecchi@carellabyrne.com                            egerard@ktmc.com
decklund@carellabyrne.com                          mrader@ktmc.com

*Liaison Counsel for the Putative Class*       *Counsel for Lead Plaintiff Industriens*
                                                               *Pensionsforsikring A/S and Lead Counsel for*
                                                               *the Putative Class*

46

## <u>CERTIFICATE OF SERVICE</u>

I, James E. Cecchi, hereby certify that on November 23, 2020, I caused a true and correct copy of the foregoing Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated: November 23, 2020

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI
OLSTEIN BRODY & AGNELLO, PC**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative Class*