**CARELLA BYRNE CECCHI**
**OLSTEIN BRODY & AGNELLO, PC**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joshua E. D'Ancona
Eric K. Gerard (admitted *Pro Hac Vice*)
Vanessa Milan (admitted *Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Lead Plaintiff Industriens*
*Pensionsforsikring A/S and Lead Counsel*
*for the Putative Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br>  v.<br><br>BECTON, DICKINSON AND COMPANY, VINCENT A. FORLENZA, THOMAS E. POLEN, and CHRISTOPHER R. REIDY,<br><br>   Defendants. | Case No. 2:20-cv-02155-SRC-CLW<br><br>Hon. Stanley R. Chesler<br>District Judge<br><br>Hon. Cathy L. Waldor<br>Magistrate Judge<br><br>**MOTION DAY**: TO BE DETERMINED |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED**
**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

SUMMARY OF THE COMPLAINT..........................................................................................5

    A.    The FDA's Long-Running Scrutiny of the Troubled Alaris Infusion Pump Line ...............................................................................................................................5

    B.    After Acquiring Alaris, Defendants Conceal Endemic Safety Problems, Flout Federal Regulations, and Defy the FDA's Clearance Requirement for Years.............................................................................................................................6

    C.    Defendants Issue Aggressive FY20 Guidance Based on Strong Alaris Sales and Announce Brief Alaris Shipping Hold for "Upgrades".........................11

    D.    Defendants Dump BD Stock While Proclaiming That Alaris Shipments Have Resumed, FDA Talks Are Complete, and the FY20 Guidance Will Be Attained ...............................................................................................................12

    E.    As Safety Problems Mount, Defendants Spin Critical Remediation as a "Voluntary Recall" With No Risk to Alaris Shipments or Sales...........................13

    F.    BD Discloses the Resumed Alaris Shipping Hold, and the Truth Is Revealed .............................................................................................................14

ARGUMENT....................................................................................................................16

I.    PLAINTIFF STATES A VALID CLAIM UNDER SECTION 10(b) ............................16

    A.    Plaintiff Alleges Material Misstatements and Omissions......................................16

        1.    Defendants' Statements About Software Changes, FDA Talks, and "Momentum" in Alaris Sales Omitted Adverse Material Facts................16

        2.    The Alleged Misstatements Regarding the FY20 Guidance Are Actionable .............................................................................................27

        3.    BD's Form 10-K Risk Disclosures and Related Statements of Regulatory Compliance Were Materially Misleading ..............................29

    B.    The Safe Harbor Does Not Shield Defendants from Liability...............................31

        1.    Material Misrepresentations and Omissions of Present Fact Do Not Receive Safe Harbor Protection................................................................31

        2.    The Alleged Misstatements Lacked Meaningful Cautionary Language................................................................................................34

        3.    Defendants Knew That Their Statements Lacked a Reasonable Basis...................................................................................................36

    C.    Plaintiff Adequately Alleges Scienter.................................................................37

        1.    Plaintiff Alleges Facts Supporting a Strong Inference of Scienter...........37

        2.    The FE Allegations Are Reliable and Should Be Credited......................44

3.      Defendants' Remaining Scienter Arguments Fail ....................................47

D.      Plaintiff Adequately Alleges Loss Causation .......................................................48

II.     PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(a) CLAIM ..............49

III.    PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(A) CLAIM.............50

CONCLUSION.................................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)................................................................................36

*Alberici v. Recro Pharma, Inc.*,
    2021 WL 798299 (E.D. Pa. Mar. 1, 2021)...........................................................33

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002).................................................................................44

*In re Allergan Generic Drug Pricing Sec. Litig.*,
    2019 WL 3562134 (D.N.J. Aug. 6, 2019) ......................................................43, 44

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................16

*In re AT&T Corp. Sec. Litig.*,
    2002 WL 31190863 (D.N.J. Jan. 30, 2002)..........................................................28

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) .........................................................................21, 24

*Bauer v. Eagle Pharms., Inc.*,
    2017 WL 2213147 (D.N.J. May 19, 2017)............................................................35

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ..............................................................................30

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)....................................................................31

*Bing Li v. Aeterna Zentaris, Inc.*,
    2016 WL 827256 (D.N.J. Mar. 2, 2016)....................................................48, 49, 50

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)....................................................................24

*In re Bristol-Myers Squibb Sec. Litig.*,
    2005 WL 2007004 (D.N.J. Aug. 17, 2005) .......................................................4, 19, 25, 34

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..........................................................................27, 37

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp*,
 394 F.3d 136 (3d Cir. 2004)................................................................................................45

*In re Campbell Soup Co. Sec. Litig.*,
 145 F. Supp. 2d 574 (D.N.J. 2001) .....................................................................................43

*In re Campbell Soup Co. Sec. Litig.*,
 2020 WL 7022655 (D.N.J. Nov. 30, 2020) .........................................................................45

*Carmignac Gestion, S.A. v. Perrigo Co.*,
 2019 WL 3451523 (D.N.J. July 31, 2019)..............................................................33, 36, 44

*In re Celgene Corp. Sec. Litig.*,
 2019 WL 6909463 (D.N.J. Dec. 19, 2019)...........................................................................36

*In re Cell Pathways, Inc., Sec. Litig.*,
 2000 WL 805221 (E.D. Pa. 2000) .............................................................................23, 45, 48

*In re Cephalon Sec. Litig.*,
 1997 WL 570918 (E.D. Pa. Aug. 29, 1997) .........................................................................22

*In re Cigna Corp. Sec. Litig.*,
 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005).......................................................................28

*City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v.*
 *Toll Bros., Inc.*,
 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) .......................................................................28

*In re Craftmatic Sec. Litig. v. Kratsow*,
 890 F.2d 628 (3d Cir. 1990)................................................................................................28

*Dahhan v. OvaScience, Inc.*,
 321 F. Supp. 3d 247 (D. Mass. 2018) ..................................................................................33

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
 2019 WL 1299673 (D.N.J. Mar. 20, 2019)................................................................ *passim*

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005)............................................................................................................48

*Emps. Ret. Sys. of P. R. Elec. Power Auth. v. Conduent Inc.*,
 2020 WL 3026536 (D.N.J. June 5, 2020).............................................................................33

*In re Enzymotec Sec. Litig.*,
 2015 WL 8784065 (D.N.J. Dec. 15, 2015)................................................................. *passim*

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
 986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................................29

iv

*Feinberg v. Am. Express Co.*,
    2011 WL 4807916 (E.D. Pa. Oct. 7, 2011)....................................................................26

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................................43

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018).......................................................................32, 33

*In re Genta, Inc. Sec. Litig.*,
    2005 WL 2416970 (D.N.J. Sept. 30, 2005) ................................................................41

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)................................................................39

*GSC Partners CDO Fund v. Wash.*,
    368 F.3d 228 (3d Cir. 2004)..........................................................................................42

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)...................................................................43

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    2017 WL 1536223 (D.N.J. Apr. 27, 2017) ...................................................................35

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018)..........................................................................................39

*Hoey v. Insmed Inc.*,
    2018 WL 902266 (D.N.J. Feb. 15, 2018) .....................................................................25

*In re Honeywell Int'l Inc. Sec. Litig.*,
    182 F. Supp. 2d 414 (D.N.J. 2002) ....................................................................37, 38, 39

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)................................................................................ *passim*

*Kanefsky v. Honeywell Int'l Inc.*,
    2020 WL 2520669 (D.N.J. May 18, 2020)................................................................23, 24

*Kline v. First W. Gov't Sec., Inc.*,
    24 F.3d 480 (3d Cir. 1994).............................................................................................19

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993) ..............................................................................................16

*In re Lucent Techs., Inc. Sec. Litig.*,
    217 F. Supp. 2d 529 (D.N.J. 2002) ...............................................................................32

v

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012)............................................................33

*Marrari v. Med. Staffing Network Holdings, Inc.*,
    395 F. Supp. 2d 1169 (S.D. Fla. 2005) ...........................................................33

*Marsden v. Select Med. Corp.*,
    2007 WL 1725204 (E.D. Pa. June 12, 2007)...................................................49

*McCabe v. Ernst & Young LLP*,
    494 F.3d 418 (3d Cir. 2007)......................................................................48, 49

*McClain v. Iradimed Corp.*,
    111 F. Supp. 3d 1293 (S.D. Fla. 2015) ...........................................................24

*McCullough v. Advest, Inc.*,
    754 F. App'x 109 (3d Cir. 2018) .....................................................................37

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..................................................19, 49

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    2012 WL 3779309 (D.N.J. Aug. 29, 2012) ................................................1, 26, 27

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)......................................................................29, 31

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ...................................................................29

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .................................................................40, 41

*In re NUI Sec. Litig.*,
    314 F. Supp. 2d 388 (D.N.J. 2004) ..................................................................38

*In re Par Pharm. Sec. Litig.*,
    2008 WL 2559362 (D.N.J. June 24, 2008) .........................................................4

*In re PolarityTE, Inc., Sec. Litig.*,
    2020 WL 6873798 (D. Utah Nov. 22, 2020)...............................................24, 25

*Pritchard v. Apyx Med. Corp.*,
    2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ..................................................34

*In re PTC Therapeutics, Inc. Sec. Litig.*,
    2017 WL 3705801 (D.N.J. Aug. 28, 2017) .................................................40, 41

vi

*In re QLT Inc. Sec. Litig.*,
312 F. Supp. 2d 526 (S.D.N.Y. 2004)........................................................................32

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013)......................................................................................47

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)........................................................ *passim*

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................................................23

*SEB Inv. Mgmt. AB v. Endo Int'l*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ................................................................ *passim*

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)................................................................................34, 35

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ..........................................................23

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999)........................................................................................38

*Stichting Pensioenfonds ABP v. Merck & Co., Inc.*,
2012 WL 3235783 (D.N.J. Aug. 1, 2012) ................................................................16

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)................................................................................38, 39

*In re Synchronoss Techs., Inc. Sec. Litig.*,
2019 WL 2849933 (D.N.J. June 28, 2019)..........................................................38, 39

*Tanaskovic v. Realogy Holdings Corp.*,
2021 WL 211049 (D.N.J. Jan 21, 2021).....................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................37, 47, 48

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018)...................................................................45

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ..................................................................39, 41

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017).................................................................17

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
 2019 WL 2724075 (D.N.J. June 30, 2019) ........................................................50

*In re Viropharma, Inc., Sec. Litig.*,
 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ...................................................41, 42

*In re Viropharma Inc. Sec. Litig.*,
 21 F. Supp. 3d 458 (E.D. Pa. 2014) ...............................................................33, 34

*Weiner v. Quaker Oats Co.*,
 129 F.3d 310 (3d Cir. 1997) ...........................................................................16, 30

*In re Westinghouse Sec. Litig.*,
 90 F.3d 696 (3d Cir. 1996) ...................................................................................29

*Williams v. Globus Med., Inc.*,
 869 F.3d 235 (3d Cir. 2017) ...........................................................................16, 17

**Statutes**

15 U.S.C. § 78u-5(c) .................................................................................................31

**Other Authorities**

17 C.F.R. § 240.10b5-1(c) ........................................................................................39

AM. HERITAGE DICTIONARY 1154 (3rd ed.1993) .........................................................18

Fed. R. Civ. P. 15(a) ...................................................................................................4

## GLOSSARY OF DEFINED TERMS[1]

| TERM | DEFINITION |
|---|---|
| "1Q20" | BD's first quarter of FY20, running from October 1, 2019, to December 31, 2019 (both dates inclusive) |
| "2Q20" | BD's second quarter of FY20, running from January 1, 2020 to March 31, 2020 (both dates inclusive) |
| "510(k)" | FDA's Premarket Notification 510(k) program |
| "ACD" | The Amended Consent Decree with the U.S. Department of Justice covering all Alaris infusion pumps |
| "Alaris" | BD's Alaris infusion pump line |
| "BD" or "Company" | Becton, Dickinson and Company |
| "cGMP" | Current Good Manufacturing Practice |
| "Class" | The putative class of BD shareholders who purchased or otherwise acquired BD common stock during the Class Period |
| "Class Period" | The period from November 5, 2019, to February 5, 2020 (both dates inclusive) |
| "Complaint" | Plaintiff's Second Amended Class Action Complaint (ECF No. 60-2) |
| "Defendants" | BD, Forlenza, Polen, and Reidy (collectively) |
| "EPS" | Earnings per share |
| "FDA" | U.S. Food and Drug Administration |
| "FDA 510(k) Software Guidance" | FDA guidance entitled *Deciding When to Submit a 510(k) for a Software Change to an Existing Device*, finalized in 2017 |
| "FE" | Former employee |
| "Forlenza" | Vincent A. Forlenza |
| "FY20" | BD's 2020 fiscal year, running from October 1, 2019, to September 30, 2020 (both dates inclusive) |
| "FY20 Guidance" | BD's FY20 financial guidance, announced November 5, 2019 |
| "Individual Defendants" | Forlenza, Polen, and Reidy (collectively) |
| "KVO" | Keep vein open |
| "LBA" | Low battery alarm |
| "MDR" | Federally mandated "Medical Device Reporting" |
| "Motion" or "MTD" | Defendants' Motion to Dismiss the Second Amended Class Action Complaint (ECF Nos. 69 & 69-1) |
| "MMS" | BD Medical's Medication Management Solutions unit |
| "Plaintiff" | Lead Plaintiff Industriens Pensionsforsikring A/S |
| "Polen" | Thomas E. Polen |
| "PSLRA" | Private Securities Litigation Reform Act of 1995 |
| "QS" | Quality Systems |
| "Reidy" | Christopher R. Reidy |
| "Rule" | Federal Rule of Civil Procedure |

---

[1] Unless otherwise noted, capitalized terms have the same meanings as in the Complaint; "¶ __" refers to the Complaint; internal quotation marks and citations are omitted; and emphasis is added.

Plaintiff, individually and on behalf of the Class, submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

When a company chooses to put an issue "in play" through its public statements, it acquires a duty to disclose, not omit, material information relating to that topic. *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2012 WL 3779309, at *3 (D.N.J. Aug. 29, 2012) (Chesler, J.). Here, in making a series of positive public statements about sales of BD's flagship Alaris infusion pump line, Defendants put in play—but failed to disclose—critical device and regulatory problems that impeded BD's ability to continue selling this key source of Company revenues.

The problems fell into two distinct but related categories. Either could independently halt Alaris sales. Together, and unknown to the market, they did just that from the outset of the Class Period onward through a publicly announced (but profoundly mischaracterized) "shipping hold" supposedly lasting only one fiscal quarter. These two fundamental obstacles to Alaris's marketability were finally revealed to investors at the end of the Class Period, when Defendants announced that the hold on new pump sales would be extended ***indefinitely*** while BD sought necessary regulatory clearance for multiple presently-needed device fixes and for what they now admitted was a years-long campaign of unapproved remediation to the troubled Alaris line.

***First***, Alaris was riddled with defects. For years, it had suffered from software "anomalies," safety issues, and other malfunctions rooted in BD's failure to comply with federal standards. Certain defects—some linked to patient deaths—had been the subject of various product recalls, FDA sanctions and other regulatory scrutiny already heightened because of a federal consent decree to which Alaris was subject. Many went unresolved. Although well-documented internally, most of these defects were unknown outside BD. Then, shortly before the Class Period, the FDA discovered multiple significant software problems that BD had concealed. The discovery forced

1

BD to stop Alaris shipments altogether by November 2019 to address both these issues and a persistent "low battery alarm" failure with dire implications for patient safety. Neither the FDA's discovery of these defects nor the true reason for the shipping hold was publicly disclosed.

*Second*, Alaris lacked the FDA approval necessary for the product to be lawfully sold. BD had frequently implemented changes to Alaris in the years before the Class Period. BD had repeatedly concluded that clearance through the FDA's 510(k) process was necessary for Alaris changes it had already made: it had even submitted a "catch-up" 510(k) application that the FDA *rejected* shortly before the Class Period. Separately it had informed the FDA in writing that it needed 510(k) clearance for the imminent fix to the Alaris LBA failure. BD's non-compliant internal QS and recordkeeping practices made obtaining such approval far more difficult. Hence, by the start of the Class Period, BD knew not only that Alaris was beset by critical defects requiring remediation, but also that past and present remedial efforts required 510(k) clearance—and the FDA knew it. Defendants also did not publicly disclose these facts.

Rather than come clean with investors about the true factors that were already impeding Alaris revenues as the Class Period began, Defendants misleadingly spun the November shipping hold as merely a brief pause to roll out customer "upgrades" and "enhancements." At the same time, they issued upbeat FY20 earnings guidance predicated on Alaris's prompt, uninterrupted return to market, which Defendants knew was at grave risk. Such statements violated the rule that a defendant may not "paint[] a favorable picture without including the details that would have presented a complete and less favorable one." *SEB Inv. Mgmt. AB v. Endo Int'l, plc*, 351 F. Supp. 3d 874, 897, 900 (E.D. Pa. 2018). Defendants soon doubled down by reaffirming the FY20 guidance and proclaiming that Alaris sales had "fully resumed" by the end of 1Q20, now concealing not only the acute risk to revenues posed by Alaris's defects and unapproved

2

modifications, but also the fact that the FDA had not accepted BD's unilateral resumption of Alaris sales. Indeed, BD was quickly forced to resume the shipping hold.

When the truth was revealed—that BD needed to resume the Alaris shipping hold indefinitely and seek 510(k) clearance for multiple unapproved modifications, reducing Alaris revenues to *zero* for the rest of FY20 and eliminating $400 million in BD revenues—the disclosure erased roughly ten billion dollars of BD's market capitalization in one day.

Defendants' bid for dismissal ignores these well-pleaded allegations, offering scattershot arguments that misstate the law, the facts alleged, or both. For example, while Defendants contend that they are not liable for failing to predict that an "adverse FDA determination [requiring 510(k) clearance] was coming ahead of time" (MTD 1), Plaintiff alleges that BD had determined *before* the Class Period that 510(k) clearance was needed and *informed the FDA* of the same. Their insistence that "BD promptly announced FDA's determination that a new, comprehensive 510(k) submission for Alaris was needed within days of learning of it" in February 2020 fails for the same reasons. MTD 20. Meanwhile, the claim that manufacturers have unfettered discretion to decide when 510(k) clearance is required is eviscerated by the FDA's action here and irrelevant, as agency approval is indisputably required where the manufacturer *itself* deems 510(k) clearance necessary.

Similarly, Defendants' claim that the market knew of various Alaris changes and lack of 510(k) approval since 2015 overlooks the many critical facts the market indisputably did *not* know. These include BD's recent failed 510(k) applications, that the November 2019 shipping hold was prompted by FDA findings concerning unremediated software defects and the LBA malfunction, and that Defendants' abortive attempt to resume Alaris shipments in December 2019 was done without FDA approval and *reversed* once the agency caught wind of it. Given such allegations, Defendants cannot clear the high hurdle to a truth-on-the-market defense at the pleading stage. *See*

3

*In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*16 (D.N.J. Dec. 15, 2015).

Separately, Defendants' argument that the PSLRA's safe harbor shields the FY20 Guidance fails because the language on which Defendants rely warned only of "possible" regulatory risks, when those risks had already arrived in force. It is well-settled that the safe harbor "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon is one foot away," as Defendants did here. *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at \*52 (D.N.J. Aug. 17, 2005) (Chesler, J.). BD's hypothetical risk disclosures misled in the same way.

The Complaint also alleges a strong inference of scienter. Defendants repeatedly spoke to investors on the topics at issue, implied first-hand knowledge of the underlying facts, and reaffirmed their prior knowledge of key facts in statements at the Class Period's end. The Individual Defendants sat at the apex of BD, with clear views into this product line and regulatory fiasco of critical importance to BD. Moreover, while they touted Alaris's positive return and contributions toward the FY20 Guidance, Defendants Forlenza and Polen dumped ***over $58 million*** of BD stock in a flurry of suspicious sales. Defendants offer no nonculpable explanation for this conduct that is more plausible than an inference of scienter.

Finally, Defendants' loss causation argument merely repurposes their truth-on-the-market claims that fail as to materiality and falsity; the Complaint's allegations on this element more than satisfy Rule 8(a). Because Defendants' liability under Section 10(b) is well-pleaded, their arguments against Plaintiffs' Sections 20(a) and 20A claims also collapse. Defendants have established no basis for dismissal, and their Motion should be denied.[2]

---

[2] Plaintiff respectfully requests leave to amend were the Motion to be granted. *See* Fed. R. Civ. P. 15(a); *In re Par Pharm. Sec. Litig.*, 2008 WL 2559362, at \*14 (D.N.J. June 24, 2008).

## SUMMARY OF THE COMPLAINT

**A.     The FDA's Long-Running Scrutiny of the Troubled Alaris Infusion Pump Line**

BD manufactures medical devices, instruments, and reagents. ¶ 26. Its largest business unit, BD Medical, accounts for over half of the Company's operating income. ¶ 27. BD Medical's flagship product line is Alaris—infusion pumps programmed to deliver medication, blood, and other critical fluids intravenously. ¶¶ 33, 66, 79-80. BD has manufactured and marketed Alaris since acquiring medical technology company CareFusion in 2015. ¶¶ 28, 79-82. Before and during the Class Period, Defendants repeatedly touted the success of Alaris and its integral role in driving revenues for BD Medical and the Company as a whole. ¶¶ 100-07.

Because a malfunctioning infusion pump can cause severe patient injury or death, these devices are heavily regulated. ¶¶ 37-38, 61. Pump manufacturers must obtain FDA approval through the premarket notification 510(k) process at least ninety days before making a change, including a software change, to a previously approved device that could significantly affect its safety, effectiveness, or intended use. ¶¶ 45-47. "*[D]evices with changes requiring submission of a new 510(k) may not be legally commercially distributed before FDA clears the[m]*." ECF No. 69-4 at 4; *see also* ¶ 49. In addition, FDA QS regulations require manufacturers to meet cGMP standards at all times. ¶ 39. Manufacturers must also maintain sufficient procedures for detecting, documenting, and remedying problems and defects in their pumps and records documenting, among other things, device changes in design history files. ¶¶ 40-42. Failure to comply with any of these standards may prompt the FDA to order recalls and impose other penalties. ¶¶ 43, 54-57.

For years prior to the Class Period, BD and other infusion pump manufacturers chronically failed to satisfy these regulations. ¶¶ 58-62. Alaris was a repeat offender. ¶ 67. Since 2006, Alaris safety problems, compliance violations, and product defects prompted the FDA to penalize it with

5

a series of Class I and II recalls (the two most serious classifications), at least two Forms 483, a forfeiture complaint, and other sanctions including the ACD, a 2007 federal consent decree with the Justice Department that, since 2009, has applied to *all* Alaris pumps. ¶¶ 68-74. After BD acquired CareFusion—a deal spearheaded by Polen—it publicly acknowledged the device's checkered safety record and the ACD, which specifically authorized the FDA to take a variety of enforcement actions regarding Alaris if device and compliance issues persisted. ¶¶ 83, 257.[3]

### B. After Acquiring Alaris, Defendants Conceal Endemic Safety Problems, Flout Federal Regulations, and Defy the FDA's Clearance Requirement for Years

Alaris's product defects and compliance problems did not abate under Defendants' stewardship. ¶ 90. In 2016 and 2017 alone, various Alaris models were the subject of no fewer than **ten** FDA Class I and II recalls, several concerning software defects that could impede functioning, jeopardizing patient health. ¶¶ 90-98. These public recalls were only half the story. Unknown to the public, a mounting set of intractable Alaris defects and regulatory compliance failures increasingly commanded both Defendants' attention and the FDA's.

***Pervasive Alaris Defects and Software Anomalies.*** Multiple FEs confirmed Alaris was plagued by defects that drove both the Alaris shipping hold announced in November 2019 and the recalls and withdrawal of Alaris from the market at the end of the Class Period. For example, FE-5, who routinely worked on Alaris regulatory matters in BD's Regulatory Department from mid-2016 through the latter half of 2020, recounted an FDA inspection of BD's San Diego facilities between July and September 2018, during which the agency discovered a raft of objectionable conditions and QS deficiencies related to Alaris. ¶¶ 97-98, 135, 146. In September 2018, the FDA issued a Form 483 to BD identifying these deficiencies, which BD never publicly disclosed.¶ 97,

---

[3] For example, the ACD authorized the FDA to order BD to cease manufacturing and distributing Alaris, recall products, and pay punitive damages in the event of any violation. ¶ 83.

146.[4] The FDA focused on continuing problems with Alaris's LBA malfunction that had been the subject of a recall in November 2016. ¶¶ 94, 98. According to FE-5, the Form 483 noted that "the problem had not been fixed" following the recall. ¶ 147. FE-5 reported that this LBA issue was part of the Alaris shipping hold BD announced in November 2019. ¶¶ 153-54, 159-61.

Multiple FEs also confirmed that Alaris was beset by software anomalies threatening pump performance and patient safety. FE-3 (an Associate Director in engineering who worked directly on Alaris through late 2019) reported that, as of 2019, BD maintained numerous "trackers" on Alaris defects and issues requiring remediation, many of which had existed for years. ¶¶ 134, 157. Desperate to keep its cash cow on the market, however, BD settled for a patchwork of remedial changes that it typically implemented wirelessly. ¶¶ 127, 129, 224. FE-1, a senior BD engineer who worked directly on such changes, similarly reported that BD repeatedly modified Alaris's software to address various "core anomalies" impacting pump performance. ¶ 127. None of these changes received FDA approval, despite Defendants' internal recognition by no later than mid-2019 that 510(k) clearance was required. ¶¶ 89, 130-34, 138.

FE-5 confirmed these accounts of FE-3 and FE-1. Specifically, FE-5 explained that BD compiled "software anomaly reports" (or "Issue Tracking Memos") listing known or reported Alaris software problems, details about the error, and its association with patient harm. ¶ 160. FE-5 reported that in 2016, the Alaris software anomaly report included around 200 anomalies; by May 2019, it was *eighty-seven pages long* and included a "custom concentration" anomaly linked to approximately fifty deaths and numerous FDA-mandated MDRs and MedWatch reports. ¶¶ 160-63. FE-3 and FE-5 both report that the FDA's discovery of this litany of "trackers" on

---

[4] Defendants' prior statement to the Court that "no Form 483 was issued in relation to Alaris until well after the close of the Class Period" was false. ECF No. 36-1, at 5 n.4.

unresolved defects and software anomalies during an audit in the fall of 2019 led to and underlay the Alaris shipping hold announced in November 2019. ¶¶ 157-61.

**_Regulatory Failures._** In repeatedly changing Alaris software without FDA clearance, Defendants flouted federal regulations governing infusion pumps, despite knowing that the ACD put BD at heightened risk of FDA intervention. ¶¶ 71-74, 233. Unknown to the public, Defendants disregarded BD's regulatory obligations in at least three ways.

**_First_**, Defendants persistently failed to comply with the FDA's 510(k) clearance mandate, which, as described above, required BD to obtain approval of any modification to Alaris that could significantly affect its safety or effectiveness before distributing the device and indisputably applied to software changes. ¶¶ 46-49. Alaris's prior manufacturers sought and obtained at least a half-dozen 510(k) approvals between 2002 and 2015, including for software changes. ¶ 88. Polen acknowledged BD's "quality process within the Infusion business within the [ACD]" that supposedly considered 510(k) compliance. ¶ 233; *see also* ¶¶ 224, 231. BD never obtained the requisite FDA approval for any of the changes it made to Alaris after 2015, despite its **_repeated_** recognition that 510(k) clearance was required. ¶ 89.

Defendants' dereliction was a conscious choice rooted in BD's desire to avoid the FDA review process. Indeed, FE-5 recalled that the BD Medical business unit that sold Alaris (under Polen's watch as head of BD Medical from 2014 to 2017 (¶ 30)) considered 510(k) submissions a "death sentence." ¶ 135. FE-1 reported that BD maintained the pretense internally that clearance was unnecessary because most of the software changes were implemented wirelessly and did not physically change the pump. ¶ 129. The rationale was baseless: under FDA 510(k) Software Guidance, finalized in 2017 and entitled *Deciding When to Submit a 510(k) for a Software Change to an Existing Device*, where a device modification is intended to "significantly affect the safety

8

or effectiveness of the device," including "to mitigate a known risk," the "submission of a new 510(k) is likely required." ECF No. 69-4 at 5; ¶¶ 48, 50.[5] Moreover, even where one software change did not require a 510(k), the cumulative effect of several changes could render the modified device no longer "substantially equivalent" to an approved device, thus requiring clearance. ¶¶ 47, 52; ECF No. 69-4 at 7-8. Both conditions applied to Alaris.

Well before the Class Period, even this pretense was discarded. Multiple FEs confirmed that internally, in the years and months before November 2019, BD had determined that 510(k) clearance *was* necessary for Alaris changes—ones it had already made and additional changes needed to address outstanding defects—and *had sought* but not obtained such clearance from the FDA. The Complaint describes *three* such examples from 2017 to 2019 alone. For instance, FE-5 worked directly on an Alaris regulatory project called "Project Monterey" in 2017 that involved changes to the pumps, which led BD to submit a 510(k) application to the FDA. ¶¶ 139-40. FE-5 confirmed that even though BD had concluded that BD needed 510(k) clearance for earlier unapproved changes to Alaris, the Project Monterey application consciously *omitted* those prior changes. *Id*. During its review of the Project Monterey application, the FDA asked BD to support why such earlier software changes (versions 9.15, 9.17 and 9.33) had not required 510(k) clearance and sought related data, which BD was unable to provide. ¶¶ 141-42. According to FE-5, around April 2018, the FDA informed BD that it was *rejecting* the application (which BD then withdrew), ***prompting Defendant Polen to direct an analysis of the failed FDA application***. ¶¶ 143, 145.

---

[5] The FDA 510(k) Software Guidance further provides: "Software modifications may be identified by many names, including, but not limited to: bug fix, hot fix, patch, software change, code change, or tweak. ***Regardless of name or form, these are considered design changes*** under the Quality System regulation, 21 CFR Part 820." ECF No. 69-4 at 5.

Neither the failed application nor the FDA's scrutiny of the prior Alaris changes was ever disclosed. ¶ 144.

A few months later, in September 2018, in a response to the FDA's (undisclosed) Form 483 from the 2018 inspection of BD's San Diego facilities noted above, BD *informed the FDA in writing that 510(k) clearance was necessary* for a software fix to Alaris's persistent LBA failure. ¶¶ 97-98, 146-48. Meanwhile, both FE-1 and FE-2 recount that, by mid-2019, BD again resolved that it required 510(k) clearance with respect to prior unapproved Alaris changes; according to FE-1, BD's Regulatory Department thus filed a "catch-up" application encompassing *all* of the previous Alaris modifications that had not been cleared, which the FDA again *rejected*. ¶¶ 130-33, 167. None of this was disclosed to investors.

*Second*, BD consistently failed in its obligation to maintain proper records of Alaris design changes and modifications, as required by FDA QS regulations. *See* ¶¶ 40-41, 174. As the FDA 510(k) Software Guidance makes clear, the QS design file requirements provide that the company "*must*" document all changes properly and provide such documentation to the FDA upon request. ECF No. 69-4 at 2-3, 8, 10; ¶¶ 41-44, 53. Here, too, BD was derelict. FE-5 reported encountering critical deficiencies in Alaris design files and records reflecting changes to the pump when performing regulatory assessments in 2019 and 2020. ¶¶ 183, 185; *see also* ¶¶ 177-81 (corroborating report of FE-4). FE-5 recounted that BD's failure to maintain necessary device testing records and data prevented BD from responding to FDA requests about unapproved Alaris changes during the Project Monterey 510(k) application, causing the agency to reject (and BD to withdraw) that 510(k) submission. ¶¶ 141-43.

*Third*, BD defied the FDA's requirement that it satisfy QS and cGMP standards and maintain sufficient procedures for detecting, documenting, and remedying device defects, electing

10

instead to conceal a range of internally recognized Alaris problems. *See* ¶¶ 37, 42, 133, 257. Multiple FEs confirmed that Defendants tolerated problems with the Alaris line that had existed for years, even as a series of recalls and myriad software anomaly reports documented systemic deficiencies. ¶¶ 90-97, 138, 157-63, 168-69, 219, 224. Certain deficiencies were reflected in the FDA's 2018 Form 483 regarding BD's Alaris facilities and its March 2020 Form 483 from a follow-on inspection. ¶¶ 97-98, 242. Similarly, FE-4 described a "GAP Analysis Report" prepared in mid-2019 in anticipation of another FDA inspection that identified various compliance deficiencies at BD's three Alaris production facilities. ¶ 180.

On the eve of the Class Period, these deep-seated product defects and regulatory failings converged to halt all Alaris shipments in the shipping hold that Defendants announced publicly on November 5, 2019. *See* ¶¶ 153-54, 157-61, 167, 169. FE-3 recalled that, after the FDA learned of the multiple "trackers" on Alaris software defects in 2019, BD put Alaris on a shipping hold in late October 2019. ¶¶ 157-58. FE-5 confirmed that the shipping hold was driven by Alaris software anomalies (including the "custom concentration" issue) and the persistent LBA problem—and that the *same issues* were behind the resumption of the shipping hold disclosed on February 6, 2020, when BD announced that it would halt all Alaris sales while preparing the 510(k) clearance application that it had known was needed for years. ¶¶ 153, 159-61.

    **C.**    **Defendants Issue Aggressive FY20 Guidance Based on Strong Alaris Sales and Announce Brief Alaris Shipping Hold for "Upgrades"**

The Class Period began on November 5, 2019, with Defendants publishing aggressive guidance while spinning the Alaris shipping hold as a brief pause to deliver "upgrades" to end-users. ¶ 108. On BD's quarterly earnings call, Defendants announced the FY20 Guidance, including 5%-5.5% currency-neutral revenue growth and EPS of $12.50- $12.65. ¶¶ 109-11, 266-70. Defendants claimed the growth would be weighted toward the last three fiscal quarters due to

a pause in Alaris shipments in 1Q20 to allow BD to deliver software "improvements" and "upgrades." ¶ 111. Defendants spun these "upgrades" in wholly positive terms as "part of our process and our strategy in the business to continually iterate and make enhancements." ¶¶ 111, 114, 270, 273. Critically, they also signaled the FDA's acquiescence to these changes *without* the indefinite delay of 510(k) clearance, describing talks with the agency as focused merely on "the *timing of implementation* of these upgrades" and whether to "bundl[e] them with a new software version." ¶¶ 113, 270. They underscored the short duration and lack of financial impact of the shipping hold, assuring investors it would not reduce Alaris sales in FY20 but simply "move the *timing* of some sales from Q1 to the balance of the fiscal year." ¶ 112. Polen emphasized strong demand for Alaris and BD's growing market share, proclaiming, "we see no slowdown in that momentum" while again assuring investors that Alaris sales in the last three quarters of FY20 would enable BD to meet its FY20 Guidance. ¶¶ 114, 273. Investment analysts credited Defendants' claims that BD would promptly resume Alaris shipments by 2Q20 after these "upgrades," lifting BD to its FY20 Guidance. ¶¶ 116-21.

**D.**      **<u>Defendants Dump BD Stock While Proclaiming That Alaris Shipments Have Resumed, FDA Talks Are Complete, and the FY20 Guidance Will Be Attained</u>**

Defendants' subsequent Class Period statements sounded the same refrain, mischaracterizing the real reason for the Alaris shipping hold (including the FDA's discovery of numerous software defects and the persistent LBA failure), concealing that BD had repeatedly concluded that Alaris lacked needed 510(k) clearance, and reiterating FY20 Guidance dependent on strong Alaris sales from 2Q20 onward. During a November 21, 2019 presentation, Defendants reaffirmed the FY20 Guidance and that the Alaris shipping hold for "upgrades" would soon end. ¶¶ 186-89, 278-84. On December 4, 2019, Reidy boasted to analysts that BD had gained pump market share in 2019 and "*we see that continuing*," again downplaying the shipping hold as a

12

mere "*timing* issue" limited to early FY20. ¶¶ 190-91, 293-97. At a JPMorgan Healthcare Conference on January 14, 2020, Defendants reaffirmed the FY20 Guidance and, in response to a question about interactions with the FDA on the issue, announced that Alaris had "*[f]ully resumed shipping in the first quarter*," with the matter having played out "*[e]xactly as expected*." ¶¶ 194-97, 299-305. Then, at BD's Annual Shareholders Meeting on January 28, 2020, Forlenza reaffirmed the FY20 Guidance yet again, assuring that "*we are on track for the full year*." ¶ 202.

Crucially, the FDA had not authorized or even known of BD's plan to lift the Alaris shipping hold in December 2019, nor did the agency accept BD's act once disclosed. ¶¶ 164-66. FE-5 reported that in a "pre-submission" communication concerning Alaris software changes during winter 2019-2020 (after the November 2019 shipping hold was imposed), the FDA asked BD to confirm that Alaris "was on a ship-hold," which BD did. ¶ 165. Shortly thereafter, BD hastily implemented certain software changes that addressed some but not all of Alaris's many software anomalies. *Id.* Notably, these remedial changes failed to address the custom concentration defect, which was "the most critical and serious" issue given its potentially fatal consequences. *Id*. Right after completing those changes, BD unilaterally resumed Alaris shipments. ¶ 166. The move caught the FDA completely off-guard, and once the agency learned of it in or around January 2020, BD was forced to resume the shipping hold. ¶¶ 166, 306. *None* of this was disclosed to the market.

Meanwhile, Forlenza and Polen enriched themselves by dumping BD stock. ¶¶ 249-55. From December 2019 to January 2020, the insiders sold 212,044 BD shares, with Forlenza garnering proceeds of more than $54.6 million and Polen, $3.749 million. ¶¶ 16, 249-50, 253.

**E.    As Safety Problems Mount, Defendants Spin Critical Remediation as a "Voluntary Recall" With No Risk to Alaris Shipments or Sales**

On February 4, 2020, BD issued letters to institutional customers stating it had identified Alaris software problems that could interfere with patient care. ¶¶ 206-08. Again misleadingly

downplaying the problems, BD promised the defects would be promptly remediated through a "voluntary recall" consisting of "education," "training," and a future software upgrade, throughout which the pumps could still be used. ¶¶ 206-11. The defects driving the February 4 "voluntary" recall were not new; they had been known within the Company for years. FE-5 confirmed that the LBA issue addressed in the February 4 recall was the same problem that had been the subject of both a November 2016 recall and the FDA's 2018 Form 483. ¶¶ 94, 154. The recall's "custom concentration" problem had been identified internally as a significant anomaly since at least 2015. ¶ 162. And the "system errors" and KVO failures the recall identified had been recognized within BD since at least mid-2019. ¶ 163.

BD's February 4, 2020 recall letters did not hint at any possible revenue impact. Nowhere did they suggest Alaris was unsuitable for continued use or that any device would be removed from the market or unavailable for sale or installation. ¶¶ 209-15. Moreover, they omitted the fact that the FDA had told BD "*as recently as*" February 3, 2020—the previous day—that BD needed 510(k) clearance for the multitude of prior, unapproved Alaris software changes. ¶¶ 224-25, 231; MTD 13. Critically, the letters omitted that BD had been forced to *reinstate* the shipping hold imposed in November 2019 after the FDA learned BD had unilaterally lifted it. ¶¶ 166, 306. With investors none the wiser to these critical threats to Alaris revenues (and the FY20 Guidance), BD's stock price remained artificially inflated on February 4 and 5, 2020. ¶ 216.

###### F.    BD Discloses the Resumed Alaris Shipping Hold, and the Truth Is Revealed

Defendants' deception ran out of track on February 6, 2020, when they revealed pre-market that: (i) BD would again halt all Alaris sales, this time indefinitely; (ii) the FDA had demanded that BD obtain 510(k) clearance for numerous historical software changes before resuming Alaris sales; and (iii) the resulting negative revenue impact to BD in FY20 would be $400 million, torpedoing the FY20 Guidance. ¶¶ 218-21, 224-33. BD took Alaris revenues down to zero for the

balance of FY20, slashing FY20 revenue guidance "to 2.5% to 3.5%, *specifically due to the Alaris situation*." ¶¶ 220, 227, 229. Defendants revealed for the first time that BD had been "*continuing to work with*" the FDA on a "software *remediation plan*" for Alaris under which BD would submit a cumulative 510(k) request for numerous previously unapproved changes to Alaris software. ¶ 219. The FDA had confirmed to BD the need for a 510(k) *not* in some surprise reversal, but rather during "*ongoing dialogue*," "*including* in-depth discussion this past Monday," reiterating the FDA had confirmed its position "*as recently as*" February 3, 2020. ¶¶ 224, 231.

The news stunned investment analysts. Attempting to square Polen's explanation with Defendants' prior representations, a Bank of America Merrill Lynch analyst pointedly remarked: "I'm struggling to understand kind of how you got caught offguard and *how this went from sort of a software upgrade to something much more significant*." ¶ 232. Polen's response acknowledged that BD had known its years of unapproved Alaris software changes could result in precisely this sort of FDA penalty:

> [I]t's not unprecedented where there are situations where over time a product evolves. And then the FDA looks and says, wait a minute, your current 510(k) needs to be updated to reflect those series of changes over time. . . . [W]hen the FDA looks back at it over a 5-, 10-year period, they say, wait a minute, you actually need to put in a 510(k) given that series of changes that have been made.

¶ 233; *see also* ¶¶ 50, 52. Polen claimed on the call that "a specific quality process within the Infusion business within the consent decree that the team was following . . . said each of those *individual* changes didn't require a 510(k) process" but failed to mention that BD had privately concluded that 510(k) clearance was necessary long before and informed the FDA of the same. ¶ 233; *see also* ¶¶ 130-33, 139-48, 157-58, 167.

In response to the news that BD was halving the FY20 Guidance and would earn no Alaris revenues for the rest of the fiscal year, BD's stock price plummeted $33.74 (nearly 12%) on February 6, 2020, wiping out approximately ten billion dollars of shareholder equity in a single

day. ¶ 235. Analysts immediately attributed the drop to the "unexpected announcement that BDX is working with the FDA on a software remediation plan for the Alaris pump system." ¶ 237; *see also* ¶¶ 238-39. A month later, the FDA slapped BD's February 4, 2020 "voluntary recall" of Alaris with a Class I designation. ¶ 241. In June 2020, Polen admitted that BD *still* had over 150 people working full-time on the Alaris 510(k) application, reflecting the time and resources the clearance process entailed. ¶ 246.

## ARGUMENT

A motion under Federal Rule of Civil Procedure 12(b)(6) tests a complaint's sufficiency, not its merits. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). Plaintiffs need only provide defendants with fair notice of a claim's basis that is "facially plausible," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and meet this standard if the complaint pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, 2012 WL 3235783, at *1 (D.N.J. Aug. 1, 2012). The court must accept as true all well-pleaded facts and draw all reasonable inferences in the plaintiff's favor. *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).

## I.    PLAINTIFF STATES A VALID CLAIM UNDER SECTION 10(b)

### A.    <u>Plaintiff Alleges Material Misstatements and Omissions</u>

#### 1.    Defendants' Statements About Software Changes, FDA Talks, and "Momentum" in Alaris Sales Omitted Adverse Material Facts

The "fundamental purpose" of the Exchange Act was "to substitute a policy of full disclosure for the philosophy of *caveat emptor*." *Quaker Oats*, 129 F.3d at 315. To that end, "[t]he law does not permit corporate executives to mislead investors through half-truths." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018). Hence, "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to

16

address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). Defendants violated this black-letter law when they mischaracterized critical remediation to Alaris as mere "upgrades," ascribed the shipping hold announced November 5, 2019, to those modest changes, indicated the FDA had blessed the changes without 510(k) review, and touted strong "momentum" in Alaris sales—all while concealing the direct threat to Alaris's promised return to market in FY20 posed by Alaris's pervasive defects and the recognition by BD and the FDA that Alaris device changes in fact required 510(k) approval.

*First*, Defendants repeatedly miscast critical Alaris software changes as "upgrades," "enhancements," and "improvements." *See* ¶¶ 270, 273; *see also* 282.[6] Meanwhile, they noted "ongoing momentum" in Alaris sales, which they assured investors would resume in force once the "upgrades" were completed in early FY20. ¶¶ 269-70, 273, 284, 295. These statements misled investors because they conveyed that the changes were merely helpful enhancements rather than critical remediation addressing acute threats to patient safety. They also misled by implying that 510(k) clearance for the changes was unnecessary and that the FDA had countenanced their implementation without further review. That the market was misled by Defendants' innocuous reference to "upgrades" was confirmed by analysts at the end of the Class Period. *See, e.g.*, ¶ 232 (analyst questioning "how this went from sort of a software upgrade to something much more significant" following announcement of ongoing Alaris remediation plan with FDA).

---

[6] Although BD Medical CFO John E. Gallagher ("Gallagher"), who made such statements to analysts at the conference on November 21, 2019 (¶ 282), is not a named defendant, BD is liable for his statements because he made them with apparent authority from the Company. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 251-52 (3d Cir. 2009). Gallagher repeatedly used the pronoun "we," indicating that he was representing BD. *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *12 (D.N.J. Apr. 28, 2017).

17

In truth, the Alaris software changes were far from the routine updates Defendants claimed, but rather addressed safety problems that directly threatened the pumps' continued marketability. Alaris had been bedeviled by unresolved defects and compliance deficiencies for years, including scores of "core anomalies" impacting pump performance BD had tracked and failed to correct. *See, e.g.*, ¶¶ 90-96, 98, 127, 138, 156-63, 169, 219, 224. An FDA audit that discovered the Alaris "trackers" prompted the Alaris shipping hold in late October 2019. ¶¶ 157-61. Another continuing problem was the LBA malfunction addressed in a November 2016 Alaris recall, and identified by the FDA in the 2018 Form 483 as an unfixed problem. ¶¶ 94, 97-98, 146-47. Likewise, Alaris's "custom concentration" issue was recognized internally as a significant anomaly since 2015, having been linked to at least fifty deaths and numerous MDRs and MedWatch reports. ¶ 162. Similarly, the KVO defect was known to BD by at least mid-2019, when the FDA had instructed BD to undertake an Alaris recall to remedy this issue. ¶ 163.[7]

It was essential fixes to *these severe problems*—not unrelated, minor "upgrades"—that drove the November 2019 shipping hold. ¶¶ 153, 156-61. Corroborating this point, (i) Defendants confirmed on February 6, 2020, that the November 2019 changes had been part of a continuing "*software remediation plan*" BD had been conducting for "a number of years" ¶¶ 219, 224, 231;[8] and (ii) BD specifically included many of these problems (while still minimizing their true impact) in its "voluntary" recall, announced February 4, 2020. *See, e.g.*, ¶¶ 206-16.

Far from mere "semantics" (MTD 30 n.38), Defendants' Class Period representations about

---

[7] While some of Alaris's compliance problems had been documented in years prior (*see, e.g.*, ¶¶ 84-85, 88-89), the degree and persistence of Alaris's still-extant problems was not public knowledge until the end of the Class Period, nor was the FDA's (i) issuance of the 2018 Form 483 regarding the LBA issue, (ii) directive that BD recall Alaris to fix the KVO issue in 2019, or (iii) 2019 discovery of longstanding software defects. *See* ¶¶ 147, 157, 160, 163.

[8] *See also* AM. HERITAGE DICTIONARY 1154 (3rd ed.1993) (defining "remediate" as "the act or process of correcting a fault or deficiency").

Alaris "enhancements" and "ongoing momentum" in sales obscured that the shipping hold and related device changes were part of an ongoing "remediation" plan with the FDA for defects directly implicating Alaris's safety and marketability. Given the FDA's continuing scrutiny of Alaris and heightened enforcement authority under the ACD, these problems posed a clear and present danger to BD's continued ability to sell Alaris. ¶¶ 124-25, 154-57, 167. Once Defendants chose to describe these Alaris-related matters, they were obliged to speak accurately. *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at *10 (D.N.J. Aug. 8, 2011) (finding "positive statements" about drug's success misleading "for failure to completely and accurately represent [negative] information known" about drug); *see also Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994) (noting defendants' "obligation or duty to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated."). To the extent the software changes were in fact "improvements" in that they sought to remedy potentially dire threats to patients, Defendants' characterizations were actionable half-truths. *See Bristol-Myers Squibb*, 2005 WL 2007004, at *22 ("[E]ven an objectively true statement, if it leaves out material information may be actionable.").

Additionally, Defendants' misrepresentations concerning the nature of the Alaris changes were actionable because they misled investors into believing that the changes did ***not*** require 510(k) clearance. Spinning the changes as mere "upgrades" and "enhancements" avoided any indication that they implicated patient safety, effectiveness, or intended use. *Cf.* ¶¶ 37-38, 45-48 (510(k) clearance required for device changes that could significantly affect safety, effectiveness, or intended use). Polen described the changes as just the latest in a continuing campaign to "make enhancements to" Alaris through a supposed series "***of investments in software upgrades over the last couple of years***" and emphasized that the "most recent changes" were part of the "***same***

19

*process*." ¶¶ 114, 231, 273.

Polen's effort to link the changes to previous "upgrades" was significant because, as was known publicly, BD had not obtained 510(k) clearance for Alaris since 2015. ¶ 89; *see also* MTD 4. Because the new changes were purportedly of the "same type" as BD's prior changes, investors were led to believe that the new changes similarly did not implicate the 510(k) requirement (and the lengthy interruption in sales such review could entail, as "devices with changes requiring submission of a new 510(k) *may not be legally commercially distributed* before FDA clears the[m]"). ECF No. 69-4 at 4; *see also* ¶¶ 49, 114, 273.[9] Reidy's remarks that talks with the FDA were limited to the "timing" of the "upgrades" furthered the impression that 510(k) clearance was not required (¶ 270), as did Defendants' assurances of Alaris's quick sales resumption. ¶¶ 269-70, 273, 284, 295. Analysts credited Defendants' representations. *See, e.g.*, ¶¶ 116-21.

Defendants' statements concealed that BD had *repeatedly* concluded that prior Alaris modifications required 510(k) clearance, meaning that BD knew Alaris was *already* without necessary regulatory approval. ¶¶ 49, 132-33, 140-44, 167; *see also* ECF No. 69-4 at 4 (devices requiring 510(k) "may not be legally commercially distributed before FDA clears the changed device"). Multiple FEs attest to this fact, recalling that BD determined it needed comprehensive "catch-up" 510(k) clearance applications for unapproved changes already made in 2016 (¶¶ 137-38), 2017 (¶¶ 139-40), and 2019. ¶¶ 130-32. BD also repeatedly informed the FDA of its

---

[9] Defendants' argument that an FDA database showing BD had not received 510(k) clearance for Alaris changes absolves them of liability is a red herring. MTD 20. Plaintiff alleges *not* that Defendants failed to disclose that BD had not obtained 510(k) clearance for past changes to Alaris, but that Defendants conveyed the impression that 510(k) clearance for the changes was *not necessary*. *See* ¶ 113. Unknown to investors, BD had *already* determined that 510(k) clearance *was* necessary for Alaris changes *at least three times*, and the new "upgrades" were simply more of the same. ¶¶ 132, 135, 137-38, 141-43, 231, 233. Thus, the truth was not "on the market." MTD 19. Regardless, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Enzymotec*, 2015 WL 8784065, at \*16.

20

determination that Alaris changes needed 510(k) clearance in failed submissions in 2017 (¶ 140) and 2019. ¶ 132. These accounts track Defendants' admission on February 6, 2020, of a continuing Alaris "software *remediation* plan" (¶ 219) involving both the changes announced November 5, 2019, and those BD had made over "*a number of years*." ¶ 231.

Defendants also failed to disclose BD's lack of compliance with QS regulations requiring that device changes be documented and proper records of changes maintained so that the FDA could evaluate whether the modified devices were "substantially equivalent" to the version previously approved. ECF No. 69-4 at 2-3; ¶¶ 40-44, 53, 174. Sloppy recordkeeping had already prevented Alaris from obtaining 510(k) clearance in 2017-18, when BD proved unable to answer the FDA's questions about unapproved changes to the pumps. *See* ¶¶ 141-43 (FE-5's account of failed Project Monterey 510(k) application); *see also* ¶¶ 175-81 (Quality Assurance Manager FE-4's detailed allegations of widespread deficiencies, holes, and inaccuracies in BD's Alaris records). These deficiencies further imperiled FY20 Alaris revenues, as they made obtaining 510(k) clearance (which BD had concluded was necessary) all the more difficult. That BD took several months with over 150 employees working full-time to complete the 510(k) submission undertaken after the Class Period stands testament to this fact. *See* ¶¶ 246-47.

Defendants dispute *none* of these allegations in their briefing. BD's failure to obtain the regulatory clearance that BD had itself deemed necessary for unapproved Alaris changes was a material fact as to which Defendants misled investors. As the Ninth Circuit recently found under similar circumstances, "*[i]f reasonable investors had known that the [product] was not FDA-cleared [through the 510(k) process], and therefore was at risk of government action that could remove the product from the market, such investors doubtless would have been less keen to invest*." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 795 (9th Cir. 2017).

***Second***, Defendants misled investors about the reason for the shipping hold and, consequently, its significance to BD's performance. Defendants publicly represented that the pause was a voluntary decision to allow BD to deliver "upgrades" and "enhancements," a limited delay that would not affect Alaris's "ongoing momentum" or ability to contribute to BD hitting guidance. ¶¶ 269-70, 273, 282, 295. Analysts' contemporaneous reporting confirms that this was the market's impression. *See, e.g.*, ¶¶ 116, 121 (J.P. Morgan: "the company implements improvements to the Alaris pump that will move sales from F1Q to the balance of the year" and "the company would rather upgrade the pumps and then ship them rather than vice versa").

In fact, it was BD's need to remediate longstanding defects that had been discovered by the FDA that precipitated the hold. ¶¶ 153-54, 157-59, 165-67, 169. In the fourteen months prior, the FDA had criticized BD's failure to seek 510(k) clearance for earlier changes (¶ 141), issued BD a Form 483 following an inspection citing various compliance problems and Alaris defects (including the LBA issue) (¶¶ 146-47), directed BD to recall Alaris to fix the KVO problem (¶ 163), discovered a litany of "trackers" on software anomalies that BD had long failed to fix (¶ 157), rejected BD's "catch-up" 510(k) application (¶ 132), and demanded that BD undertake a full review of all Alaris changes made over the past five years. ¶ 184. The shipping hold was directly related to addressing such outstanding safety and compliance problems. ¶¶ 154-63.

These well-pleaded allegations based on FE accounts contradict Defendants' public explanations of the shipping hold. At minimum, they establish that Defendants' statements were actionably misleading half-truths concealing that the hold was rooted in the pumps' endemic defects, causing the FDA to intervene. *See In re Cephalon Sec. Litig.*, 1997 WL 570918, at \*2 (E.D. Pa. Aug. 29, 1997) (falsity exists if contemporaneous facts are inconsistent with defendants' public statements). Those statements concealed the acute risk that the shipping hold would ***not*** be

22

merely a temporary "timing" issue limited to 1Q20 but could be extended indefinitely—as it was at the end of the Class Period. ¶¶ 218-24. Defendants' claims of "ongoing momentum" likewise falsely conveyed that there was little risk that Alaris sales faced a longer-term interruption. *See* ¶¶ 269, 273, 284, 295; *Endo*, 351 F. Supp. 3d at 900.

*Third*, Defendants misled investors about BD's interactions with the FDA. On November 5, 2019, Reidy stated: "We are in discussions with the FDA about the timing of implementation of these upgrades and the possibility of bundling them with a new software version release." ¶¶ 113, 270. The remarks signaled that the agency knew of the changes and had determined that they did *not* require 510(k) clearance; analyst reports nowhere mentioned the need for such clearance. *See* ¶¶ 115-21. Polen downplayed the issue on January 14, 2020, when he proclaimed Alaris had "[f]ully resumed shipping in the first quarter [FY20]," and that the issue had played out "[e]xactly as expected." ¶¶ 195-96. Afterwards, analysts following BD stated, "mgmt. publicly revealed that discussions with the FDA were completed and Alaris U.S. shipments returned in full during F1Q." ¶ 203.[10] After BD disclosed on February 6, 2020, that Alaris was shelved pending 510(k) approval, analysts reiterated their belief that the FDA issue had been resolved in January. ¶¶ 237-38.

Courts in this circuit and elsewhere hold that omissions of material information concerning actual, ongoing regulatory scrutiny are actionable. *See, e.g.*, *Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *6 (D.N.J. May 18, 2020) (sustaining claim that corporation's disclosure was

---

[10] Defendants' claim that analysts who interpreted Polen's remarks as Plaintiff does were "wrong" (MTD 31 n.41), is entitled to no weight. *In re Cell Pathways, Inc., Sec. Litig.*, 2000 WL 805221, at *8 (E.D. Pa. 2000). In fact, courts often look to analyst reports to determine how statements may reasonably be construed. *See, e.g.*, *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (analysts showed "plausibility and reasonableness" of alleged falsity)*; In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (same).

23

misleading because it failed to disclose communications with SEC or that SEC "was contemplating an investigation or legal proceeding"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (finding statements regarding potential regulatory action misleading given failure to disclose civil investigative demand). Indeed, in reversing the dismissal of a 510(k) clearance case in which the defendants had disclosed an FDA warning letter while omitting information about the agency's concerns, the Ninth Circuit observed that failing to disclose specific, known regulatory scrutiny misleadingly implies that no such information existed:

> *[T]he omissions gave the reasonable inference that the FDA had raised no concerns* related to clearance for the ForeCYTE Test, when, as alleged, the FDA had raised precisely that concern. The amended complaint's allegations suggest that, regrettably for the investors who bought Attosa's stock, *Atossa hid the ball*.

*Atossa*, 868 F.3d at 797.

Here, Defendants hid the ball. Reidy and Polen omitted *any* mention of the various negative actions the FDA had taken over the previous fourteen months. *See* ¶¶ 141 (FDA's 2017-2018 questioning BD's failure to obtain 510(k) clearance for prior changes); 146-47 (2018 Form 483), 163 (FDA's 2019 KVO recall directive to BD), 157 (FDA's 2019 discovery of software defects), 132 (FDA's 2019 rejection of "catch-up" 510(k) submission), 184 (FDA's 2019 demand for five-year review of Alaris changes).[11] Only at the end of the Class Period did Defendants acknowledge

---

[11] Defendants' showpiece authority, *McClain v. Iradimed Corp.*, is easily distinguished. 111 F. Supp. 3d 1293 (S.D. Fla. 2015). There, plaintiff alleged the defendant pump manufacturer had received a Form 483 identifying pump deficiencies that subjected them to seizure. *Id.* at 1298. Yet defendants promptly *disclosed* the Form 483 and product defects before the class period. *Id.* Then, on the *last* day of the class period, defendants announced that they had just received word from the FDA that 510(k) clearance was necessary for past changes, interrupting sales and causing a stock drop. *Id.* at 1299-1300. In contrast, Defendants here knew of BD's 510(k) deficiency by the *first* day of the Class Period. *See* ¶¶ 130-32, 137-40. Rather than help their case, *McClain* shows what Defendants should have done from the start: come clean about Alaris's problems, the FDA enforcement action, and the effect of both on BD's business. Separately, Defendants try but fail to analogize the omissions of the FDA's definitive actions, including rejecting the catch-up 510(k) and rejecting BD's resumption of Alaris sales, to other cases where the SEC made a single isolated inquiry without indicating it was investigating the defendant (*In re PolarityTE, Inc., Sec. Litig.*,

that the FDA's scrutiny of Alaris issues had been continuous and not limited to "upgrade" implementation and "timing." ¶¶ 219 ("[BD] is *continuing* to work with the [FDA] on its *software remediation plan* for the Alaris System"); 224 (Polen citing "*ongoing* dialogue with the FDA" regarding need for new 510(k) "for these software upgrades"). While Defendants may not have been obliged to discuss BD's engagement with the FDA on Alaris remediation issues publicly, once they chose to do so by referencing changes to Alaris's software and related topics, including a pause in Alaris shipments, talks with the FDA about the changes, and strong "momentum" in Alaris sales despite the shipping hold, they had to tell the full truth. *Bristol-Myers Squibb*, 2005 WL 2007004, at \*23 ("[A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths.").[12]

Rather than accept these well-pleaded allegations as true, Defendants distort or ignore them. Defendants elide the plain language of the Complaint in contending that "Plaintiff nowhere alleges that FDA had . . . explicitly stated that [the] product[] required comprehensive 510(k) clearance at any time prior to the February 3, 2020 meeting, just days before BD disclosed it to the market." MTD 22 (alterations in original); *see also id.* 5 ("[T]here was simply no duty to disclose until the FDA 'explicitly stated' to BD that clearance of a comprehensive 510(k) submission was necessary."). But Plaintiff alleges that *BD itself* recognized the need to obtain "catch-up" 510(k) clearance and sought it in mid-2019, only to be rebuffed by the FDA, and had also admitted to the FDA that 510(k) clearance was needed for required fixes to the LBA issue. ¶¶ 130-32, 138, 146-

---

2020 WL 6873798, at \*13 (D. Utah Nov. 22, 2020)) or where a European regulatory body made a non-final determination about a drug's approvability. *Hoey v. Insmed Inc.*, 2018 WL 902266, at \*15 (D.N.J. Feb. 15, 2018)). Both cases are inapposite.

[12] Defendants also ignore their February 6, 2020 admissions that the FDA had informed them "*as recently as*" February 3 that a 510(k) was required for the unapproved Alaris changes. ¶¶ 224-25, 231. At minimum, those admissions *concede* the knowing falsity of BD's February 4 "voluntary recall" letters, which said nothing of the FDA's action or any hold on Alaris sales.

49, 151-53.[13] Furthermore, Defendants fail entirely to grapple with the FEs' interlocking allegations that the FDA had identified a range of defects and compliance failures before the Class Period began, which prompted the shipping hold announced in November 2019 and the Alaris recall and resumption of the shipping hold in February 2020 to "continu[e] to work with the [FDA] on [BD's] software remediation plan for the Alaris System" and related regulatory clearance. ¶ 219; *see also* ¶¶ 154, 159-63, 166, 200, 206-07, 212-13. Finally, Defendants' claim that their statements regarding "enhancements" and "upgrades" insulate them from liability because "their truth is central to Plaintiff's entire theory" twists the Complaint beyond recognition. MTD 30; *see also id.* 4, 19-20, 23. Plaintiff expressly alleges that those statements fundamentally mischaracterized the changes, concealing Alaris's pervasive defects, its lack of necessary 510(k) clearance, and the FDA's role in driving the shipping hold. *See* ¶¶ 274, 285.

Defendants' efforts to refashion the Complaint to their liking must be rejected. *See Feinberg v. Am. Express Co.*, 2011 WL 4807916, at *3 (E.D. Pa. Oct. 7, 2011) ("[T]he Court may not consider defendant's version of the facts at the motion-to-dismiss stage."). So, too, must their suggestion that "half-truths" satisfy their obligations under the securities laws. *Papa*, 2018 WL 3601229, at *13. Once Defendants chose to speak on these issues, they "put the[se] issues in play"

---

[13] Defendants' claim that the FDA "actually assigns **to the manufacturer** the determination of whether a 510(k) submission" is necessary is false. MTD 4 (emphasis in original); *see also id.* 9. While the agency may place on the manufacturer the duty of making an accurate assessment of the issue "in the first instance" (*id.* 9), that assessment is not afforded the deference Defendants suggest, as they acknowledge "FDA had determined that the Q1 Upgrades (as well as various prior modifications to Alaris) would require clearance under the 510(k) program." *Id.* 3. Regardless, where, as here, a manufacturer determines 510(k) clearance is necessary, the pump "may not be legally commercially distributed before FDA clears the changed device." ECF No. 69-4 at 4; *see also* ¶¶ 49, 133. Defendants' contention that "the possibility that FDA might *at some point disagree* with the Company . . . was also well-known" (MTD 23), overlooks that BD had submitted a "catch-up" 510(k) application before the Class Period that the FDA rejected. ¶¶ 132, 141-43, 167.

and were obliged to share truthful information with investors. *Merck*, 2012 WL 3779309, at *3.[14]

### 2.    The Alleged Misstatements Regarding the FY20 Guidance Are Actionable

"The federal securities laws do not obligate companies to disclose their internal forecasts. . . . However, if a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997). A projection lacks a reasonable basis if it was made after inadequate consideration of available information. *Id.* at 1429.

As explained in Section I.A.1 above, BD's FY20 Alaris revenues were in acute jeopardy throughout the Class Period due to defects and other problems threatening patient safety (*see, e.g.*, ¶¶ 98, 127, 147, 156-63, 169) and BD's various compliance failures. *See, e.g.*, ¶¶ 146, 163, 177-85. Defendants also knew well before November 5, 2019, that BD had made multiple changes to Alaris which had not received needed FDA approval. ¶¶ 49, 89, 114, 130-33, 138, 224, 231; ECF No. 69-4 at 4. Given the ACD and the FDA's role in the November 2019 shipping hold on these very grounds, BD had a concrete indication that the FDA would take further action, interrupting BD's ability to sell Alaris. ¶¶ 74, 127, 130, 147, 156-57, 159-63, 169, 172. Nevertheless, Defendants issued and repeatedly reaffirmed the FY20 Guidance that ***depended*** on the quick

---

[14] For the same reasons, Defendants' argument that several alleged misstatements were non-actionable opinions fails. *See* MTD 31-32, 32 n.42. As Defendants acknowledge, an "opinion" that "omits facts concerning the basis for the opinion and those facts conflict with what a reasonable investor would take from the statement" is actionable. *Id*. 29. Polen's January 2020 claim that implementation of the software changes announced in November 2019 had played out "[e]xactly as expected," with BD having "fully resumed" Alaris shipments, omitted that BD knew that it ***still*** lacked necessary FDA approval for a long line of software changes. ¶¶ 49, 132, 138, 196, 204, 233-34, 292. Likewise, BD's assertion in its FY19 Form 10-K that it "d[id] not believe that a loss is probable in connection with the [ACD]" omitted the lack of FDA clearance and the agency's recent discovery of longstanding software defects. ¶ 288. These omissions misled the market to believe the issue was resolved and that talks with the FDA had concluded. *See Papa*, 2018 WL 3601229, at *10 (opinions actionable that "omit known material information undermining" them).

resumption of Alaris shipments and strong Alaris revenues following the 1Q20 shipping hold. *See* ¶¶ 264, 266-70, 272, 280, 297, 300-01, 308-09. Under these circumstances, the FY20 Guidance statements lacked "a reasonable basis" and were thus actionable. *In re Craftmatic Sec. Litig. v. Kratsow*, 890 F.2d 628, 645-46 (3d Cir. 1990).

Courts routinely hold that optimistic projections made without regard to negative business circumstances far less obvious than the pervasive defects, compliance failures, and federal regulatory intervention here are actionable. *See, e.g. In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *15 (D.N.J. Jan. 30, 2002) (sustaining claim that "defendants' statements were patently unreasonable because at the time defendants were promising revenue growth in the Business Services unit, [they] w[ere] being appraised of the serious operational problems within that unit"); *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc.*, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) (sustaining Section 10(b) claim that company's "projections lacked any reasonable basis" due to undisclosed softening in demand and business delays). Courts have also held that statements professing that the company is "on track" to meet financial guidance were misleading given undisclosed evidence to the contrary. *See, e.g.*, *Enzymotec*, 2015 WL 8784065, at *13 (finding falsity sufficiently pleaded as to statements that company was "confident" in financial projections, was "on track" to achieve them, and expects "net revenues to increase"); *In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) ("on track" statements held "false because [defendants] knew there were serious technological flaws and significant delays"). Plaintiff details "material adverse facts" that rendered Defendants' FY20 Guidance statements "unreasonable" when made, and thus actionable. *Toll Bros.*, 2008 WL 4058690, at *2.

28

### 3. BD's Form 10-K Risk Disclosures and Related Statements of Regulatory Compliance Were Materially Misleading

"To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996). Applying this principle, courts regularly deem risk disclosures in securities filings actionable when the defendant failed to disclose that a mentioned hypothetical risk had already materialized. *See, e.g.*, *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (finding allegation that defendants' warning of possible difficulties with acquired company's subscriber base actionable when they were already experiencing integration difficulties); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized"). Professed commitments to regulatory compliance omitting that the company is already out of compliance are likewise misleading. *See, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (finding compliance statements actionable on ground that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability").

Forlenza and Reidy made risk-related misstatements of both varieties in BD's FY19 Form 10-K. ¶ 286. The 10-K warned of various dangers that, unbeknownst to investors, had already hit home. For example, while the 10-K warned that "[o]ur failure to comply with the applicable good manufacturing processes, adverse event reporting, and other requirements of these agencies [including the FDA] ***could*** delay or prevent the production or sale of our products" (¶ 287; *see also* ¶ 290), FEs confirm that the shipping hold announced in November 2019 had been prompted by the FDA's rejection of BD's failed "catch-up" 510(k) application, the agency's discovery of

29

unresolved Alaris software defects, and BD's attempt to address the LBA defect that it had already told the FDA required 510(k) clearance. ¶¶ 132, 149, 153-54, 157, 167.[15] These same conditional warnings concealed that the FDA had criticized BD's earlier failures to seek 510(k) clearance, issued a Form 483 concerning compliance problems and defects (including the LBA issue), directed BD to recall Alaris shortly before the Class Period regarding the KVO problem, and required BD to conduct a full review of five years' worth of unapproved Alaris changes, in addition to the agency's actions driving the shipping hold set forth above. ¶¶ 132, 141, 146-47, 157, 163, 184. Likewise, Defendants' warning that "[t]he consent decree authorizes the FDA, *in the event of any violations in the future*, to order us to cease manufacturing and distributing products, recall products or take other actions" (¶ 289) obscured that BD was *already* violating various FDA regulations, including the 510(k) clearance requirement, cGMP standards, and QS recordkeeping standards well before the Class Period began. ¶¶ 127, 130, 147, 156-57, 159-60, 161-63, 169, 175-85. Such disclosures spoke "entirely of as-yet unrealized risks and contingencies" and did not alert "the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008).

Defendants' 10-K statements touting BD's "substantial progress in its compliance efforts" and anticipation of no losses under the ACD were also misleading. ¶ 288. In truth, the agency's various actions against BD in just fourteen months reflected the peril that BD's "vital" Alaris revenues were in at the start of the Class Period. *See* ¶¶ 90-96, 103, 130-33, 141, 157, 163, 169,

---

[15] Defendants' claim that, "[a]part from the delay in shipping occasioned by the Q1 Updates, which was fully disclosed on the first day of the Class Period, the Complaint fails to allege that any of the risks it cites . . . had materialized at the time the risk disclosures were made" ignores these allegations. MTD 28. It also overlooks that Defendants' disclosure of the shipping hold was itself misleading. *See* ¶ 274. At the pleading stage, the Court takes as true Plaintiff's *actual* allegations, not what Defendants might wish them to be. *See Quaker Oats*, 129 F.3d at 315.

30

175-81. Defendants' statements omitting these facts misleadingly "gave comfort to investors that reasonably effective steps were being taken to comply with applicable . . . regulations." *Jinkosolar*, 761 F.3d at 251; *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (statements of safety commitment actionable given undisclosed safety problems).

### B.  The Safe Harbor Does Not Shield Defendants from Liability

The PSLRA's safe harbor protects only statements that are forward-looking and accompanied by meaningful cautionary language, or for which plaintiff fails to establish that the defendants had actual knowledge that the statement was false. 15 U.S.C. § 78u-5(c). It protects none of Defendants' alleged misstatements.

### 1.  Material Misrepresentations and Omissions of Present Fact Do Not Receive Safe Harbor Protection

At the threshold, Defendants do not identify *any* of the specific portions of their alleged misstatements that they contend implicate safe harbor protection in the body of their brief. *See* MTD 24-29. Instead, they direct the Court to a thirty-page, color-coded appendix that sets forth the particularized arguments that they fail to make in their briefing. *See id.* 24 n.29, 25 n.31 (citing ECF No. 69-17). This is the subject of Plaintiff's motion to strike, filed separately herewith.

That aside, many statements that Defendants contend are forward-looking refer, at least in part, to the present, depriving them of safe harbor protection. *Avaya*, 564 F.3d at 255 ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."); *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *18 (D.N.J. Mar. 20, 2019) ("The mere fact that a statement contains *some* reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement."). For example, various statements discussing future Alaris sales mischaracterize the ***ongoing*** software changes as

31

"upgrades" and the ***then-present*** shipping hold as a mere "timing" issue.[16] While Defendants attempt to subdivide these statements into distinct utterances with color-coding (ECF No. 69-17 *in globo*), they must be read in context. *See Enzymotec* 2015 WL 8784065, at *11 ("[S]tatements relating to . . . being 'well positioned for future growth' . . . or 'increased market penetration' . . . relate to then-existing conditions as opposed to future projections. These statements, ***even if made within the context of truly forward-looking statements***, are not entitled to the safe harbor.").

Similarly, Defendants' statements touting ***continuing*** Alaris "momentum" and market-share gains are not protected, as they necessarily incorporate assessments of current conditions and sales. *See, e.g.*, *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 545-46 (D.N.J. 2002) (statement company was "experiencing" growth and "is growing" not forward-looking).[17] Defendants' statement that BD was "on track" to meet the FY20 Guidance are also the sort courts hold to be statements of present fact. *See, e.g.*, *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("[w]e remain comfortable with our previously stated EPS guidance for 2017" held statement of present fact not protected by safe harbor); *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004) (rejecting application of safe harbor to statement that "we're comfortable" with projected growth rate); *Enzymotec*, 2015 WL 8784065, at *13.[18]

---

[16] *See, e.g.*, ¶¶ 282 ("***[w]e're upgrading*** some software in the pumps, and ***that*** [i.e., so-called 'upgrades' then underway] will delay some installations and shipment into the subsequent quarters"); 272 ("we expect revenue growth to be between 1% and 2% [in 1Q20], and one of the drivers of that ***is the timing of the upgrades*** on the Alaris pump software"); 270 ("[t]his [discussion with the FDA about the timing of software changes] is expected to move the ***timing*** of some sales from Q1 to the balance of the fiscal year"); 284 ("***we do see some timing*** outside of Q1 and into the subsequent quarters of fiscal '20"); 296-97 ( "***That's a timing issue***. First half issue, yes.").

[17] *See, e.g.*, ¶¶ 276 ("***we see*** no slowdown in that momentum"); 284 ("we expect that momentum to ***continue***"); 295 ("[On] the pump side, ***we've been taking*** 200 points of share last year, and ***we see*** that ***continuing***, and ***we have some visibility*** to that. So ***we don't see that being the case***.").

[18] *See, e.g.*, ¶¶ 300 ("[W]e remain very much ***on track*** for the year."); 308 ("[W]e are ***on track*** for the full year" and reaffirming FY20 Guidance).

Even if certain statements could be deemed forward-looking, they would fall outside the safe harbor because they *omitted* then-present facts necessary to render them not misleading. "[O]missions of existing facts or circumstances are not forward-looking, and thus do not qualify for safe harbor protection." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014). Courts in this circuit and around the country have broadly recognized that omissions of present facts are not forward-looking statements protected by the safe harbor. *See, e.g., Emps. Ret. Sys. of P. R. Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *7 (D.N.J. June 5, 2020); *Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *9 (E.D. Pa. Mar. 1, 2021); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).[19]

As explained in Section I.A above, undisclosed, *existing,* severely adverse facts contradicted Defendants' statements about the nature of the Alaris changes, the shipping hold, discussions with the FDA, and the purported Alaris sales "momentum," taking them outside the safe harbor. *See, e.g.*, *Carmignac Gestion, S.A. v. Perrigo Co. plc*, 2019 WL 3451523, at *11 (D.N.J. July 31, 2019) (statements company was confident it could keep pricing flat were not "forward-looking statements for safe harbor purposes because they omit *existing* facts that bear on" pricing projections). The same undisclosed facts undermined Defendants' FY20 Guidance statements, which implied strong Alaris sales.[20] While such statements "appear to be forward-

---

[19] *See also Galestan*, 348 F. Supp. 3d at 304; *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1188 (S.D. Fla. 2005); *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018).

[20] Here, Plaintiff has alleged Defendants' omissions of then-present facts misled investors in multiple ways, including by contradicting their own statements about Alaris and undermining the FY20 Guidance, easily distinguishing it from *Realogy*, where the plaintiff's conclusory allegations failed to allege that the defendants' omissions mislead investors. *Tanaskovic v. Realogy Holdings Cor*p., 2021 WL 211049, at *17 (D.N.J. Jan 21, 2021).

33

looking," they are "incomplete," and "because they did not disclose facts that contradicted them," they "do not qualify for protection under the safe harbor provision." *Endo*, 351 F. Supp. 3d at 901.

### 2.      The Alleged Misstatements Lacked Meaningful Cautionary Language

Furthermore, the cautionary language that Defendants rely on was deficient. To begin, BD's Form 10-K risk disclosures (MTD 26-28) misleadingly described as hypothetical risks that had already materialized. *See supra* Section I.A.3; *Bristol-Myers Squibb*, 2005 WL 2007004, at *52. While the November 2019 filing's forward-looking statement section cautioned of potential "[p]roduct efficacy or safety concerns regarding our products resulting in product holds or recalls[] [or] regulatory action on the part of the FDA" (ECF No. 69-3 at 42 (cited at MTD 27)), BD had *already* recognized that it lacked necessary FDA approval for the Alaris changes, had already had its "catch-up" 510(k) application *rejected* by the FDA, and had already taken in the results of the FDA's audit in which the agency discovered multiple software anomalies, prompting a shipping hold. ¶¶ 130-32, 138, 140-43, 157-58, 167; *see Enzymotec*, 2015 WL 8784065, at *7, *11 (cautionary language not meaningful where "Defendants warned generally of significant and increasing government regulations" but "these risks had already come to pass"); *Viropharma*, 21 F. Supp. 3d at 471 ("cautionary language could not cure the fact that, at the time the statements were made, the sNDA was already lacking a necessary condition precedent to exclusivity").

The only other passage Defendants rely on—stating delays "in obtaining necessary approvals or clearances from [FDA] . . . may also delay product launches and increase development costs" (MTD 27) (brackets in original)—ignores the same facts. ¶¶ 130-32; *see, e.g., Pritchard v. Apyx Med. Corp.*, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020) ("[C]autioning that 'there can be no assurance that [product for which 510(k) clearance was sought] will be successful or that such future revenues and profitability will be realized' . . . is not narrowly-tailored to the *existing* known risk [to FDA approval]."). Warnings of delayed "product launches" and increased

"development costs" are irrelevant to Plaintiff's claims. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) (warnings "must be substantive and tailored to the ***specific*** future projections, estimates or opinions" the plaintiffs challenge). Thus, ***none*** of the statements supposedly shielded by the 10-K came with meaningful cautionary language. *See* ECF No. 69-17 at 7-17, 21-25, 27-30.[21]

Much of the other language Defendants cite in their safe harbor argument was also boilerplate or irrelevant. For example, Defendants point to the November 5, 2019 press release warning of hypothetical risks relating to "difficulties inherent in product development" and "product efficacy or safety concerns resulting in product recalls or actions being taken by the FDA or other regulators (including the potential ongoing impact of the FDA letters regarding the use of drug-coated balloons)" as immunizing all purportedly forward-looking statements issued that day. ECF No. 69-12 at Ex. 99.1 (cited at MTD 26). They are wrong. Aside from omitting the material, contrary, presently existing facts noted above, Defendants' warnings about potential FDA intervention on an ***unrelated*** product obscured the truth, rather than alerting investors to the acute risk at hand. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *14 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc.,* 905 F.3d 106 (3d Cir. 2018) ("[A]lthough the warnings cross-reference risk factors listed in other SEC filings like the Form 10-Ks, those filings discuss numerous *other* potential hazards in detail but make no further mention of accounting risks."). As this lone, legally insufficient passage is Defendants' sole support for safe harbor protection for ***all*** the November 5, 2019 statements, ***none*** of those statements is

---

[21] In *Bauer,* the cautionary language was found to be "sufficiently tailored" to warn investors "in no uncertain terms" of risks that would later "form the basis of [the] complaint." *Bauer v. Eagle Pharms., Inc.*, 2017 WL 2213147, at *11 (D.N.J. May 19, 2017). Here, Defendants point to boilerplate, largely irrelevant language concerning risks that had *already* come to fruition.

shielded by the safe harbor. *See* ECF No. 69-17 at 1-7; ¶¶ 264, 266-70, 272-73.[22]

The remaining statements for which Defendants claim safe harbor came with ***no cautionary language whatsoever***. Defendants contend that their statements at the November 21, 2019 and December 4, 2019 conferences (¶¶ 280, 282, 284, 295, 297), and those in BD's February 4, 2020 recall letters (¶ 312), are insulated from liability due to the same passage from BD's 2019 Form 10-K discussed above. MTD at 26 n.35; *see also* ECF No. 69-17 at 7-14, 21-25, 27-30. Yet ***none*** of these statements referred to the 10-K or its purportedly cautionary language. "Although cautionary language need not directly accompany a challenged statement, there must be ***some*** attempt to incorporate the cautionary language 'by reference' as part of the challenged statement." *Perrigo*, 2019 WL 3451523, at *12. Defendants may not take that step for the first time here.[23]

### 3. Defendants Knew That Their Statements Lacked a Reasonable Basis

"[T]he safe harbor will not apply if the statement was made with 'actual knowledge' that the statement was false or misleading." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999). As detailed in Section I.C below, Plaintiff alleges that Defendants knew their public statements—including the FY20 Guidance—lacked a reasonable basis as indicated by their pre-Class Period interactions with the FDA, internal analyses of their compliance and record-keeping

---

[22] Likewise, Defendants' January 14, 2020 statements are not protected by the November 5, 2019 press release and November 27, 2019 Form 10-K. *See* ECF No. 69-17 at 25-27.

[23] Defendants' claim that Forlenza's reaffirmations of the FY20 Guidance at the January 28, 2020 shareholder meeting (¶¶ 308-09) are immunized by his statement that "[w]e have information posted on our website regarding forward-looking statements" similarly fails. MTD at 26 n.34; ECF No. 69-17 at 27. Defendants neither quote nor describe this "information" in their Motion or appendix, nor do they attach it as an exhibit, precluding the Court from determining whether it was meaningful. *See In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *15 n.21. (D.N.J. Dec. 19, 2019) (because defendants failed to provide supposed warnings, "the Court is unable to ascertain whether Defendants provided sufficient cautionary language. Given the fact that at the motion to dismiss stage, the Court must construe the SAC in Plaintiff's favor, the Court will assume that there was not appropriate cautionary language.").

36

failures, the true rationale behind the shipping hold, and their February 6, 2020 admissions that discussions with the FDA about the changes had been "ongoing" and "continuing." *See, e.g.,* ¶¶ 197-99, 219, 224, 231-33, 269-73, 282-84, 304, 312; *see also Avaya*, 564 F.3d at 270-71 (public remarks on issue support inference that CFO knew of contradictory facts related to same issue).[24] Knowledge of these facts deprived Defendants' forward-looking statements of the reasonable basis required for the safe harbor to apply. *Burlington Coat*, 114 F.3d at 1427.

### C.    Plaintiff Adequately Alleges Scienter

#### 1.    Plaintiff Alleges Facts Supporting a Strong Inference of Scienter

In this circuit, scienter may be established by alleging "facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud." *Papa*, 2018 WL 3601229, at \*15. A plaintiff pleads the requisite strong inference of scienter when it sufficiently alleges that the defendants "knew facts ***or had access to information*** suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018). A "strong" inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). It "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.*

Plaintiff alleges numerous facts that, viewed holistically, support a strong inference that Defendants knew or recklessly disregarded the risk that their alleged misstatements were materially misleading. *Id.* at 326. Specifically, Defendants knew or recklessly disregarded that BD

---

[24] That the Individual Defendants were BD's highest-level executives, holding unique vantages of the Company's key operations serves as more evidence that they knew about the rejected application. ¶¶ 29-31; *see In re Honeywell Int'l Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 428 (D.N.J. 2002) (CEO's "prominent position" required him to have "knowledge of the subject matter" in question).

had recognized before the Class Period began that it needed FDA clearance for its serial changes to Alaris software (¶¶ 130-131, 133, 138), submitted a "catch-up" 510(k) application in mid-2019 (¶ 130) and mid-2018 (¶¶ 140, 143), and saw both applications rebuffed by an FDA that had recently discovered various defects in Alaris software (¶¶ 132, 156-58, 167-69), depriving Alaris of the necessary regulatory approval for lawful distribution and prompting a shipping hold on Alaris as the Class Period began. ¶ 49; ECF No. 69-4 at 4; ECF No. 69-5 at 8; *see supra* Section I.A. Multiple allegations support Defendants' knowledge or reckless disregard of these facts.

*First*, Forlenza and Polen's combined insider trading windfall of **$58,417,985.36** in proceeds during the three-month Class Period supports an inference of scienter, especially in combination with Plaintiff's other allegations above and below. ¶ 249; *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 415 (D.N.J. 2004) ("insider trading [is] a powerful motive to commit fraud"). Stock sales will support an inference of scienter when they are unusual in scope or timing (*In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *15 (D.N.J. June 28, 2019)), or "dramatically out of line with prior trading practices." *Honeywell*, 182 F. Supp. 2d at 428.[25]

Forlenza's and Polen's insider stock sales were clustered after dates on which each is alleged to have made false statements to investors. *See* ¶¶ 251, 254; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-6 (2d Cir. 1999) (stock sales made after optimistic statements indicative of scienter and motive to inflate stock price). Moreover, Forlenza made substantial sales during the period immediately preceding the February 6, 2020 corrective disclosure, including selling 90,000 shares just nine days before. ¶ 251. *See Honeywell*, 182 F. Supp. 2d at 427 (significant portion of

---

[25] Defendants' assertion that *all* Defendants must have engaged in insider trading to support a finding of scienter (MTD 45 n.53) is incorrect. *See, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (scienter adequately alleged where only two of six defendants sold stock).

insider sales before disclosure of serious problems indicative of scienter); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) (sales one week before disappointing announcement "particularly suspicious"). Furthermore, Forlenza sold four times more BD common stock in the three-month Class Period than he sold during the same three-month period the year prior, and ***twelve*** times more than in the three-month period that immediately preceded the Class Period. ¶ 250. *See Suprema Specialties*, 438 F.3d at 277-78 (sales not normal or routine when defendant sold over five times amount sold prior to that time period). Polen's sales during the three-month Class Period exceeded those he made in the three-month period directly preceding it, and during the same three-month period the year prior. ¶ 253. These large volumes of insider sales are made even more suspicious by the brevity of the Class Period—a mere ninety-three days. *See Hertz*, 905 F.3d at 120.

Defendants' claim that a 10b5-1 trading plan immunizes Forlenza's transactions (MTD at 45) fails due to the fact that he entered into the plan on December 16, 2019—***during*** the Class Period and while in possession of material, non-public information. ¶ 251. Defendants' own authority makes clear that ***when*** a 10b5-1 plan was adopted or amended is an important inquiry. *See Synchronoss*, 2019 WL 2849933, at *5, *17 (plaintiffs failed to show 10b5-1 plans were amended while defendants possessed material, non-public information); *cf. George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) ("***[W]here . . . 10b5–1 trading plans are entered into during the class period, they are not a cognizable defense to scienter allegations***."). Moreover, the SEC regulation that creates this affirmative defense provides that the plan must have been established "[b]efore becoming aware" of inside information and "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. 17 C.F.R. § 240.10b5-1(c). Forlenza can make no such showing, particularly at the pleading stage.

*Second*, Defendants repeatedly spoke to investors in detail *about these exact topics*. Indeed, the Individual Defendants' public statements indicated that each was knowledgeable about and actively involved in: (i) reviewing and approving BD's FY20 Guidance; (ii) formulating and overseeing BD's Alaris-related strategy and business; (iii) overseeing the status of purported Alaris software "updates" and "improvements"; (iv) assessing the impact of Alaris-related revenue on BD's overall performance; and (v) participating in and guiding the Company's interactions with the FDA concerning Alaris. *See, e.g.*, ¶¶ 270 (explaining that BD's "discussions with the FDA [are] about the timing of implementation of these upgrades" and whether to "bundl[e] them with a new software version"); 273 (assuring investors shipping hold was temporary delay due to "upgrades," "enhancements," and "improvements" that would merely "move the timing of some [Alaris] sales from Q1 to the balance of the fiscal year"); 195-96 (stating Alaris had "[f]ully resumed shipping in the first quarter" and the situation with the FDA had played out "[e]xactly as expected"); 295 ("[On] the pump side, we've been taking 200 points of share last year, and we see that continuing, and *we have some visibility to that*."). Many of these and other statements were made in response to analyst queries. *See also* ¶¶ 280-84, 296-97, 303-05.

When, as here, a defendant's statements "implied that they had first-hand knowledge" of the matter at issue, this supports a strong inference of scienter. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017) ("powerful evidence of scienter" where defendants spoke "explicitly and repeatedly" about results and company's talks with FDA); *see also Endo*, 351 F. Supp. 3d at 906 (defendants' public comments "confirm they had intimate knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think. *These officers were speaking as authoritative sources who possessed the information to support their statements*."). That the misstatements concerned a "subject about which investors and

analysts often inquired" further supports the inference. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *see Urban Outfitters*, 103 F. Supp. 3d at 653-54 ("powerful evidence of scienter is the content and context of the statements made" in response to analyst questions). At a minimum, Defendants were reckless in speaking on these subjects without investigating the underlying facts. *Avaya*, 564 F.3d 242 at 269 (false denials in response to repeated questions by analysts suggested at least recklessness).

*Third*, the Individual Defendants' Class Period positions as BD's highest-ranking executives permits no other inference but that they had access to the facts about which they spoke. Forlenza was BD's CEO from 2011 until January 2020, including when BD submitted the failed "catch-up" Alaris 510(k) application. ¶ 29. Polen was BD's Chief Operating Officer and President from 2017 through January 2020, when he assumed the role of CEO, and routinely spoke to investors about Alaris and related interactions with the FDA. ¶ 30. Reidy served as BD's CFO from 2013 through the Class Period. ¶ 31. Forlenza and Reidy signed BD's 10-K for 2019. ¶ 286. Given their positions, it is absurd to suggest that Defendants were unaware of Alaris's rampant defects, lack of 510(k) clearance, and the FDA's knowledge of and resulting action regarding both.

Indeed, courts in this circuit routinely impute scienter to top executives concerning business-critical matters on which those executives publicly speak. *See, e.g.*, *In re Genta, Inc. Sec. Litig.*, 2005 WL 2416970, at *6 (D.N.J. Sept. 30, 2005) ("[c]omprehensive knowledge" of clinical trials involved in development of company's lead product "may be reasonably imputed to" senior-most executives); *PTC Therapeutics*, 2017 WL 3705801, at *17 (finding it "implausible" that CEO and CFO "were not paying close attention" to results of critical trial for important drug or "played a subordinate role" in decision on application); *In re Viropharma, Inc., Sec. Litig.*, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) ("it can be assumed" that "highest" company executives

41

"were aware" of negative facts about key product). According to FE-5, Defendant Polen in fact knew that Alaris was encountering trouble with its submissions to the FDA as he directed an analysis of why the Project Monterey 510(k) application failed and received reports regarding the lack of critical testing and analysis documentation. ¶¶ 145, 257. The unique threat of adverse agency action in a highly regulated industry—the situation that Defendants faced after the FDA's rejection of the "catch-up" 510(k) application in 2019 (¶ 132) and after the withdrawal of the Project Monterey 510(k) application in or around June 2018 (¶ 143)—especially given the ACD—further supports the inference that BD's top brass knew that Alaris revenues were imperiled as the Class Period began. *See Dr. Reddy's*, 2019 WL 1299673, at *16 ("[W]hen the FDA tells a company about a problem with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.") (alteration in original).[26]

*Fourth*, following Alaris's removal from the market at the end of the Class Period, Defendants *admitted* to having known many of the facts they had concealed from investors. For example, Defendants revealed that, contrary to their alleged misstatements, the FDA's scrutiny of the Alaris changes had *not* been limited merely to "timing," nor had it been resolved by January 14, 2020. *See* ¶¶ 270, 272, 296-97, 303-05. Rather, work with the FDA on the "software remediation plan" for Alaris was continuing and ongoing. *See, e.g.*, ¶¶ 219 (BD press release announcing BD was "*continuing* to work with the [FDA] on its [Alaris] software remediation plan"); 231 (Polen revealing that meetings with FDA regarding Alaris changes occurred "*as*

---

[26] *GSC Partners CDO Fund v. Washington* (MTD 36) is inapt. 368 F.3d 228, 239 (3d Cir. 2004) There, plaintiff's scienter theory turned on defendants' pre-class period comments that were disconnected from the alleged misstatements. *See id.* at 239-40 ("this comment could not have been made in reference to the financial statements"). No such incongruity exists here. Plaintiff alleges BD knew before the Class Period that the FDA had discovered the Alaris defects and compliance failures that underlay the alleged misstatements. ¶¶ 130-32, 138, 157-58, 167, 292.

*recently as* this Monday" amidst "*ongoing dialogue*" with agency); 227 (slashing FY20 Guidance "based on our *ongoing conversations* with the FDA"). Polen acknowledged his understanding that 510(k) clearance could be required due to the cumulative effect of multiple Alaris changes to a device. *See* ¶ 233. And Polen reaffirmed top management's direct involvement, telling investors on May 7, 2020 that the "*executive team is directly engaged on this on a daily and weekly basis*" and that it was "the critical priority for the company." ¶ 245. Moreover, Defendants have all but conceded the knowing falsity of their February 4, 2020 "voluntary recall" letters by asserting that they knew no later than February 3, 2020, that 510(k) clearance was required for the Alaris changes. ¶¶ 206-08, 224; *see Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183 (S.D.N.Y. 2010) ("plaintiffs may rel[y] on postclass period [statements] to confirm what a defendant should have known during the class period") (alterations in original).

*Fifth*, the "core operations" doctrine supports a strong inference of scienter. "Knowledge may be imputed to individual defendants when the disclosures involve the company's core business." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001); *see also Avaya*, 564 F.3d at 271. BD Medical made up over half of BD's total annual revenue in 2017, 2018, and 2019 (¶ 27), and BD reported BD Medical's underlying revenue growth was "driven" by the "[MMS] unit's installation of dispensing and infusion systems." ¶ 256. Alaris was among BD's most important product lines and was routinely identified by the Company as BD's "[k]ey" product, serving as the linchpin to the Company's "interoperability" strategy. ¶¶ 80-82.

Other courts in this circuit have found similar allegations sufficient to support a finding of scienter. *See, e.g.*, *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (core operations applies where product was among "the top one or two products" associated with company); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J.

43

Aug. 6, 2019) (scienter well-pleaded where misrepresentations concerned three drugs constituting "substantial portion" of revenues and operations); *Enzymotec*, 2015 WL 8784065, at \*18 (scienter inferred where "matter at issue [wa]s central to the core business of the Company,[] about which Defendants spoke regularly"). That Alaris had long been beset by persistent defects and FDA monitoring under the ACD (¶¶ 83-85, 90-97, 143, 146, 292) strengthens the "strong inference that the defendants were aware of the alleged severe and pervasive problems" belying the alleged misstatements. *Dr. Reddy's*, 2019 WL 1299673, at \*16.[27]

### 2.  The FE Allegations Are Reliable and Should Be Credited

Defendants next launch a volley of failed attacks on the FEs themselves. *See* MTD 37. First, Defendants' argument that the FEs should be disregarded because they were merely "low-level employees" (*id.*) misstates both the FEs' positions and Third Circuit law. *See, e.g., Avaya*, 564 F.3d at 265 (*crediting* allegations of "relatively low-level former employees (or non-employees)" none of whom were officers, "worked at headquarters," or "claimed to participate in the forecasting process"). Also erroneous is their suggestion that a confidential witness must have had direct contact with, "worked in a direct reporting line" to, or been "privy to senior-level strategic planning or executive decision-making processes" involving, an Individual Defendant. MTD 37; *cf. Avaya*, 564 F.3d at 268-69 (rejecting "direct link" requirement); *Perrigo*, 2019 WL 3451523, at \*14 (fact that "confidential witnesses did not have contact with [defendants] does not render their statements immaterial" to scienter analysis). Similarly off-base is Defendants'

---

[27] Defendants' claim that despite Alaris's conceded "importance to the MMS unit and BD," BD "repeatedly emphasized that the reason for BD's positive FY20 Guidance . . . was the success of all three business segments and its balanced portfolio" (MTD 43) is another improper attempt to set forth a factual counternarrative at the pleading stage. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002) (even under "strict" PSLRA pleading requirements, "district court, on a motion to dismiss, must draw all reasonable inferences . . . in the plaintiff's favor").

objection that none of the FEs except FE-5 states "definitively" that they worked at BD during the Class Period. MTD 37. "[T]he misstatements at issue made during the class period were based on [BD's] conduct *before* the class period"—including BD's determination that 510(k) clearance was needed and submission of a "catch-up" application that the FDA rejected. *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018) (rejecting similar argument); ¶¶ 130-32, 157. What matters is that each FE worked in a role from which they could observe the facts underlying his or her allegations—a point Defendants do not contest.[28] *Papa*, 2018 WL 3601229, at *23; *cf.* MTD 37.

Defendants' attacks on the "substantive content" of the FE allegations are equally strained. MTD 38-42. While Defendants argue that FE-1 fails to explain in adequate detail the background behind or personnel involved in the Regulatory Department's determination by mid-2019 that 510(k) clearance was necessary (MTD 38-39), they ignore that FE-1 also alleges that BD in fact *filed* a comprehensive "catch-up" 510(k) application in mid-2019—an allegation Defendants do not dispute. ¶¶ 130, 132.[29] Defendants also ignore that FE-2, responsible for managing BD's quality systems, recalled weekly meetings with BD Head of Quality Keith McLain during which

---

[28] Defendants' cited "rumor or conjecture" cases are inapplicable here where the FEs have established they had first-hand knowledge of the facts at issue. Moreover, the cases on which Defendants rely are inapt as those cases rejected FE testimony that provided opinion testimony rather than recounting facts (*see In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *8 n.5 (D.N.J. Nov. 30, 2020)) and testimony provided by witnesses who did not work in the relevant department or for the defendant corporation at all and thus could not explain the source of their knowledge. *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp*, 394 F.3d 136, 155 (3d Cir. 2004).

[29] The report of FE-3 that BD had "avoided seeking 510(k) approval" for the multiple prior Alaris changes it had made (¶ 134), does not "contradict[]"(MTD 40-41) FE-1's report that BD had determined by mid-2019 that it needed 510(k) clearance from the FDA, and had sought such clearance. Rather, the report of FE-3 simply explains a reason why BD had not sought 510(k) clearance for its numerous Alaris changes *before it eventually did so*, as FE-1 reports, in mid-2019. ¶ 132. Plaintiff is entitled under law to this natural inference, and Defendants are not entitled to their strained, contrary interpretation. *Cell Pathways*, 2000 WL 805221, at *8 (a defendant's "insistence on their version of contested issues in th[e] case" is not a valid basis for dismissal).

staff discussed the need for 510(k) approval, providing both added particularity and critical corroboration of FE-1's account. ¶ 131; *see also* ¶¶ 148-49, 151 (FE-5 recounting escalation to Keith McLain of LBA issue, which BD told FDA required 510(k) clearance). Moreover, FE-5, who, for over four years, often focused exclusively on Alaris regulatory matters, similarly reported participating in a meeting with multiple managers where BD determined it needed to file a 510(k) application for historical changes and planned changes to Alaris. ¶¶ 138, 152. These interlocking allegations are further corroborated by Defendants' post-Class Period statements, in which they admitted BD had been making unapproved Alaris changes for "a number of years," that they knew the cumulative effect of changes could require 510(k) clearance, that talks with the FDA had been "ongoing," and that the "executive team" was steeped in the issue. *See supra* Section I.A.1.

Meanwhile, Defendants' contention that both FE-3's description of software defects and FE-4's allegations of BD's deficient QS records lack a sufficient "nexus" with the alleged misstatements is simply wrong. MTD 42. FE-3 plainly alleges that an FDA auditor's discovery of those longstanding defects immediately preceded an October 2019 hold on Alaris shipments, which, Plaintiff alleges, Defendants publicly—and falsely—spun on November 5, 2019, as a voluntary move to roll out "upgrades" to customers. ¶¶ 156-58, 274. FE-5's account confirms FE-3's reports that there were a number of software anomalies with Alaris that eventually contributed to the shipping hold announced in November 2019. ¶¶ 159-61. And FE-4's detailed description of BD's failings in meeting its QS recordkeeping obligations (¶¶ 175-81) corroborates FE-5's account of BD's QS recordkeeping failures and "shoddy" testing and documentation in Alaris files. ¶¶ 141-43, 151, 182-83, 185. Defendant Polen oversaw an analysis of the Project Monterey 510(k) application that failed for that reason. ¶ 145. The FE accounts, viewed with Plaintiff's other allegations, support a strong inference of scienter. *Dr. Reddy's*, 2019 WL 1299673, at *17

("Overall, the totality of the direct contradictions of the truth, statements about core operations, information provided by Plaintiff's confidential witness, and additional allegations support a strong inference of scienter.").

### 3. Defendants' Remaining Scienter Arguments Fail

Like their attacks on the FEs, Defendants' remaining arguments fall short because they misconstrue Plaintiff's allegations and the governing legal standards. For example, Defendants' argument that "[t]he fact that BD promptly disclosed the FDA's determination to the public [in February 2020] dispels any inference of corporate scienter" (MTD 34 n.45), disregards that Plaintiff has expressly alleged that the FDA rejected BD's 510(k) application in mid-2019. ¶¶ 130-32.[30] Defendants' contention that Plaintiff must describe specific documents (MTD 35) ignores that Plaintiff *does* identify a number of particular documents bearing directly on Plaintiff's allegations. *See, e.g.*, ¶¶ 130-32 (detailing BD's submission of rejected "catch-up" 510(k) application); 160 (describing software anomaly reports or Issue Tracking Memos); 178 (describing deficient Alaris "Design History File"); 180 (describing GAP Analysis Report addressing Alaris production facilities' compliance deficiencies); 181 (describing second GAP Analysis Report identifying deficient Alaris defect and modification records). As to Defendants' complaint that none of the FEs personally interacted with the Individual Defendants, no such "smoking-gun" allegations are required to survive the pleading stage. *Tellabs*, 551 U.S. at 324. Indeed, the Third Circuit has made clear the very sort of "direct link" that Defendants demand here is unnecessary, emphasizing instead that the proper inquiry is "whether *all* of the facts alleged, taken collectively,

---

[30] Defendants' reliance on *Rahman v. Kid Brands, Inc.* (MTD 42-44) is misplaced. 736 F.3d 237 (3d Cir. 2013). There, the confidential witness provided merely "abstract commentary," and "little more than generalized allegations with few specifics and even less concrete support." *Id.* at 245. Here, the FE allegations provide detailed, mutually reinforcing reports of deficiencies in the Alaris line and BD's QS practices. *See, e.g.*, ¶¶ 127-34, 157-58, 168, 175-81.

give rise to a strong inference of scienter." *Avaya*, 564 F.3d at 268-69 (emphasis in original).[31]

Equally unconvincing is the "nonculpable inference" that Defendants propose. MTD 47. The crux of this alternative narrative—that "BD learned on February 3, 2020 that FDA would demand a new comprehensive 510(k) filing (including the Q1 Upgrades) that Defendants did not believe would be necessary" (*id.*)—is irreconcilable with Plaintiff's allegations that, among other things, BD determined it needed 510(k) clearance applications for unapproved changes ***three times*** (¶¶ 130-32, 137-40) and twice ***failed*** to obtain 510(k) clearance from the FDA (¶¶ 132, 140), all before the Class Period. *Cell Pathways*, 2000 WL 805221, at *8. Defendants also miss that their own storyline appears to admit to securities fraud: BD's February 4, 2020 "voluntary recall" letters were issued a day ***after*** the most recent meeting at which they now claim to have "learned" of the FDA's final decision, yet those letters said nothing of the agency's action or BD's indefinite cessation of Alaris shipments. *See* ¶¶ 311-13. This uncontested act of deception further undermines Defendants' nonculpable explanation, which is far less compelling than Plaintiff's well-pleaded strong inference of scienter. *Tellabs*, 551 U.S. at 314.

### D.    Plaintiff Adequately Alleges Loss Causation

A plaintiff pleads loss causation by providing a "short and plain statement" giving defendants "some indication of the loss and the causal connection that [it] has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). The Third Circuit takes a "practical approach" to loss causation, applying "general causation principles" under which a plaintiff need only show that "the misrepresentation touches upon the reasons for the investment's decline."

---

[31] At least one court in this district has found corporate scienter adequately alleged without the alleged knowledge of ***any*** individual defendant. *See Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *3 (D.N.J. Mar. 2, 2016) (scienter found based on company's submission of improperly modified study to FDA despite no allegation of "knowledge of any defendant").

*McCabe v. Ernst & Young LLP*, 494 F.3d 418, 426, 428 (3d Cir. 2007). This "highly factual" inquiry is "often unsuited to disposition . . . on the pleadings." *Merck*, 2011 WL 3444199, at \*29.

The Complaint adequately pleads the requisite link between Defendants' misconduct and Plaintiff's loss. Defendants' misrepresentations were corrected by their disclosure on February 6, 2020, that the FDA—following what Defendants admit had been "continuing" discussions—had required BD to cease all Alaris sales, and that BD had cut the FY20 Guidance by $400 million as a result. ¶¶ 218-39. The corrective disclosure substantially affected BD's stock price, which dropped nearly 12% that day on unusually heavy volume, a sharp decline that was publicly linked to Defendants' announcement. ¶¶ 218-39, 316. The disclosure itself was immediately recognized by analysts as revealing previously undisclosed information about the severity of Alaris's problems, including failures in Alaris-related "quality systems" and software issues previously minimized as "upgrades." ¶¶ 230-32. The alleged corrective disclosure more than "touche[d] upon" the subject matter of the alleged misrepresentations and led to the stock price decline and investors' losses. *McCabe*, 494 F.3d at 428; *see also Merck*, 2011 WL 3444199, at \*32 (loss causation alleged where public release of information revealing misleading nature of prior statements was substantial cause of stock price drop).[32]

## II.   PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(a) CLAIM

Defendants do not dispute that the Section 20(a) Defendants controlled BD, and while "the overwhelming trend in this circuit is that culpable participation does not have to be pled," Plaintiff

---

[32] *Marsden v. Select Med. Corp.* is inapposite. 2007 WL 1725204 (E.D. Pa. June 12, 2007). The complaint in that case "contain[ed] not a single allegation that the 'relevant truth' about [the company's] improper revenue [accounting] practices and inadequate internal controls . . . was . . . made known to the market by way of any public disclosures." *Id.* at \*2 (E.D. Pa. June 12, 2007). Here, Plaintiff alleges the corrective disclosure revealed, among other things, the FDA's intense, ongoing scrutiny of then-existing problems defect-riddled Alaris pump line and its internally recognized need for 510(k) clearance for past remediation, both of which Defendants concealed.

49

pleads it as to BD's Section 10(b) violations. *Aeterna Zentaris*, 2016 WL 827256, at \*4.

### III.    PLAINTIFF ADEQUATELY ALLEGES A VALID SECTION 20(A) CLAIM

As discussed above, Defendants Forlenza and Polen are liable under Section 10(b). While in possession of material, nonpublic information about the alleged Alaris issues, Forlenza and Polen sold 146,047 and 6,386 shares of BD common stock in open market sales, exclusive of sales to the issuer. ¶¶ 318-20. Contemporaneous with their sales, Plaintiff purchased 23,754 shares of BD common stock at inflated prices—a point Defendants do not contest. ¶ 321. Plaintiff has thus properly alleged their violation of Section 20(A). *See In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at \*5 (D.N.J. June 30, 2019).

### CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: May 3, 2021                                                    Respectfully submitted,

**CARELLA BYRNE CECCHI**                    **KESSLER TOPAZ**
**OLSTEIN BRODY & AGNELLO, PC**         **MELTZER & CHECK, LLP**
                                                                           Joshua E. D'Ancona
s/ *James E. Cecchi*                                          Eric K. Gerard (admitted *Pro Hac Vice*)
James E. Cecchi                                                Vanessa Milan (admitted *Pro Hac Vice*)
Donald A. Ecklund                                            280 King of Prussia Road
5 Becker Farm Road                                          Radnor, PA 19087
Roseland, NJ 07068-1739                                 Telephone: (610) 667-7706
Telephone: (973) 994-1700                              Facsimile: (610) 667-7056
Facsimile: (973) 994-1744                               jdancona@ktmc.com
jcecchi@carellabyrne.com                             egerard@ktmc.com
decklund@carellabyrne.com                          vmilan@ktmc.com

*Liaison Counsel for the Putative Class*          *Counsel for Lead Plaintiff Industriens*
                                                                           *Pensionsforsikring A/S and Lead Counsel for*
                                                                           *the Putative Class*

50

# CERTIFICATE OF SERVICE

I, James E. Cecchi, hereby certify that on May 3, 2021, I caused a true and correct copy of the foregoing Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 3, 2021

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI
OLSTEIN BRODY & AGNELLO, PC**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative Class*

51