James P. Smith III (admitted *pro hac vice*)
Matthew L. DiRisio (admitted *pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
jpsmith@winston.com
mdirisio@winston.com

Richard Hernandez
Omar A. Bareentto
**MCCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
Telephone: (973) 622-4444
rhernandez@mccarter.com
obareentto@mccarter.com

*Counsel for Defendants Becton, Dickinson and Company,
Vincent A. Forlenza, Thomas E. Polen and Christopher R. Reidy*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-02155-SRC-CLW |
| Plaintiff, | Honorable Stanley R. Chesler District Judge |
| v. | Honorable Cathy L. Waldor Magistrate Judge |
| BECTON, DICKINSON AND COMPANY, VINCENT A. FORLENZA, THOMAS E. POLEN, and CHRISTOPHER R. REIDY, | **Oral Argument Requested** |
| Defendants. | |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
### MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 3

    I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B) ...................... 3

          A.     THE SAC FAILS TO PLEAD SCIENTER ....................................................... 3

               1.     Plaintiff's FE Allegations Do Not Support a Strong Inference of Scienter ............................................................................................ 4

               2.     Plaintiff's "Motive" Allegations Do Not Support a Strong Inference of Scienter ........................................................................... 7

               3.     Plaintiff's Remaining Scienter Allegations Are Equally Deficient ...................................................................................................... 9

          B.     THE SAC FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION ................................................................................................. 12

               1.     No Actionable Omissions ................................................................. 12

                    a.     Plaintiff's "Omission" Theory Refutes Itself ......................... 12

                    b.     Using Synonyms for "Changes" Isn't Fraud ......................... 17

                      c.     The Stated Reasons for the November Ship Hold Omitted Nothing .................................................................... 17

                2.     The SAC Alleges No Actionable Affirmative Misstatements ............ 18

                    a.     The FY20 Guidance and 10-K Risk Disclosures Are Not Actionable .................................................................... 18

                    b.     More Than Half of the Alleged Misrepresentations Fall Squarely Within the PSLRA Safe Harbor ............................. 20

          C.     THE SAC FAILS TO PLEAD LOSS CAUSATION .................................... 23

    II.      THE SAC FAILS TO PLEAD A SECTION 20(A) OR 20A CLAIM ...................... 24

CONCLUSION ..................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)...................................................................23

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   No. 16-9449 (KSH) (CLW), 2019 WL 3562134 (D.N.J. Aug. 6, 2019) .................................11

*In re AT&T Corp. Sec. Litig.*,
   No. Civ. 00-CV5364 (GEB), 2002 WL 31190863 (D.N.J. Jan. 30, 2002)..............................18

*In re Atossa Genetics Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) .................................................................................................15

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .................................................................................................20

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................19

*In re Bristol-Myers Squibb Sec. Litig.*,
   No. Civ. A 00-1990 (SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005) ..........................14, 22

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)..................................................................................................18

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) .........................................................................................11

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
   No. 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ................................................5, 23

*In re Celgene Corp. Sec. Litig.*,
   No. 18-4772, 2019 WL 6909463 (D.N.J. Dec. 19, 2019).......................................................22

*In re Cigna Corp. Sec. Litig.*,
   No. Civ.A. 02-8088, 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005) ........................................18

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
   No. 3:17-cv-6436 (PGS) (DEA), 2019 WL 1299673 (D.N.J. Mar. 21, 2019) ..............7, 10, 11

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................................24

ii

*In re Egalet Corp. Sec. Litig.*,
  340 F. Supp. 3d 479 (E.D. Pa 2018) ...................................................................................11

*In re Enzymotec Sec. Litig.*,
  No. 14-5556 (JLL) (MAH), 2015 WL 8784065 (D.N.J. Dec. 15, 2015)...........................11, 22

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................................................19

*In re Genta, Inc. Sec. Litig.*,
  No. Civ.A. 04-2123(JAG), 2005 WL 2416970 (D.N.J. Sept. 30, 2005) ...............................10

*George v. China Auto. Sys., Inc.*,
  No. 11 CIV. 7533(KBF), 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)...................................8

*GSC Partners CDO Fund v. Wash.*,
  368 F.3d 228 (3d Cir. 2004)......................................................................................9, 10, 23

*Hall v. Johnson & Johnson*,
  C.A. No. 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ...................................11

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd sub nom*, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018)..........................................................22

*In re Honeywell Int'l, Inc. Sec. Litig.*,
  182 F. Supp. 2d 414 (D.N.J. 2002) .................................................................................8, 10

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)...............................................................................4, 5, 11, 20, 21

*Marsden v. Select Med. Corp.*,
  No. Civil Action No. 04-4020, 2007 WL 1725204 (E.D. Pa. June 12, 2007) ........................24

*McCabe v. Ernst & Young LLP*,
  494 F.3d 418 (3d Cir. 2007)...............................................................................................24

*McClain v. Iradimed Corp.*,
  111 F. Supp. 3d 1293 (S.D. Fla. 2015) ..........................................................................13, 16

*McCullough v. Advest, Inc.*,
  754 F. App'x 109 (3d Cir. 2018) ...........................................................................................9

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
  MDL No. 1658 (SRC), 2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...................................14, 24

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................................20

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ...................................................................................19

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ..........................................................................................11

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .........................................................................................9

*In re NUI Sec. Litig.*,
    314 F. Supp. 2d 388 (D.N.J. 2004) ...................................................................................8

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ............................................................................................13

*Pritchard v. Apyx Med. Corp.*,
    No. 8:19-cv-00919-SCB-AEP, 2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ......................22

*In re PTC Therapeutics, Inc. Sec. Litig.*,
    No. 16-1124 (KM) (MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...........................9, 10

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) ..............................................................................................5

*Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc.*,
    No. 07-1513, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ...............................................18

*Roofer's Pension Fund v. Papa*,
    No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ....................................................5

*In re Salix Pharms., Ltd.*,
    14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...................................14

*SEB Inv. Mgmt. AB v. Endo Int'l, plc*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) .................................................................................9

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000) ............................................................................................22

*In re STEC Inc. Sec. Litig.*,
    No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217 (C.D. Cal. June 17, 2011) ................14

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ................................................................................................8

*In re Suprema Spec., Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ..............................................................................................8

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    No. 17-2978 (FLW) (LHG), 2019 WL 2849933 (D.N.J. July 2, 2019) ....................................8

*Tanaskovic v. Realogy Holdings Corp.*,
    Civil Action No. 19-15053 (SRC), 2021 WL 211049 (D.N.J. Jan. 21, 2021)....................21, 25

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*,
    396 F. Supp. 3d 413 (E.D. Pa 2019) .....................................................................................10

*In re Toronto-Dominion Bank Sec. Litig.*,
    Civ. No. 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ...................................4

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................................8, 9

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) .......................................................................................22

*In re Viropharma, Inc. Sec. Litig.*,
    No. Civ.A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ..........................................10

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).....................................................................................................19

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)...................................................................................................19

Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss Plaintiff's Second Amended Class Action Complaint ("SAC") (ECF No. 60-2).

## PRELIMINARY STATEMENT

On February 3, 2020, the FDA informed BD[1] that it would require a comprehensive "510(k)" submission – advance regulatory clearance for certain medical devices and modifications thereto – for BD's infusion pump product Alaris, halting sales and distribution of the product other than in select cases of medical necessity.  At bottom, this case turns on whether Plaintiffs have alleged, with particularity, that Defendants *knew* that FDA decision was coming prior to February 3.  As demonstrated in Defendants' opening brief in support of their motion to dismiss ("Opening Brief") (ECF No. 69-1), the answer is "no."  The SAC nowhere alleges (with particularity or otherwise) that any Defendant knew that the FDA – having never required such a submission in the 5+ years BD had owned the Alaris product – would suddenly demand advance 510(k) clearance for all past and planned modifications to Alaris software.

Plaintiff's 50-page opposition brief ignores this fatal shortcoming, instead cobbling together unparticularized and often conflicting allegations, primarily from five former employees ("FEs"), about supposed Alaris product defects and quality control issues, internal debate within BD about whether certain modifications required 510(k) clearance and BD's interactions with FDA in an effort to show that Defendants must have known this determination was coming, and that Defendants' statements about Alaris prospects, FDA interactions and financial guidance were therefore false or misleading "half-truths."  None of these arguments salvages an SAC whose allegations, taken as true, yield the opposite inference: that the FDA knew of various alleged Alaris

---

[1] Unless otherwise noted, capitalized terms shall have the meaning ascribed to them in Defendants' Opening Brief.

defects and modifications for years but never required a comprehensive 510(k) as a gating item to continued marketing and sale of the product.

As set forth herein and in Defendants' Opening Brief, the SAC fails to state a claim for securities fraud under Section 10(b) of the Securities Exchange Act or SEC Rule 10b-5 and should be dismissed for at least three independent reasons:

*First*, Plaintiff has not alleged particularized facts establishing a strong inference of scienter, *i.e.*, that Defendants knew, or recklessly ignored, that FDA would require a comprehensive 510(k) submission and clearance covering all Alaris modifications implemented since the prior 510(k). Plaintiff supplements makeweight arguments regarding Defendants' executive positions, core operations and insider trades executed almost exclusively through 10b5-1 plans (which are routinely rejected in this Circuit) with FE allegations claiming that: (i) BD's Regulatory Department (of which the FE was not a member) determined in 2019 that certain Alaris modifications required 510(k) clearance; (ii) BD tried to file a "catch-up" 510(k) application in mid-2019 (while a different FE stated that BD actively *avoided* seeking 510(k) clearance from the FDA); and (iii) certain employees believed that Alaris modifications required 510(k) clearance and so apprised management (who disagreed with them). These generic (and inconsistent) assertions from a smattering of low-level FEs, some of whom were not even at BD during the Class Period and *none* of whom is alleged to have had *any* direct contact with any Individual Defendant, provides no basis for pleading scienter. Indeed, the non-culpable inference to be drawn from the SAC's allegations – BD received an unexpected blow from FDA – is far more compelling than any inference of scienter. *See infra* Sect. I.A.

*Second*, the SAC fails to allege any actionable omission or misrepresentation of material fact. For starters, the fact that BD had not received 510(k) clearance for Alaris modifications over

2

the course of several years was public, and upon learning that FDA was requiring a comprehensive 510(k) submission and clearance before additional product could be sold outside of certain limited exceptions, Defendants promptly disclosed that fact to the market.  And since the SAC fails to allege that the Defendants knew of FDA's determination prior to February 3, 2020, its assertion that their statements regarding prospects for Alaris, expectations of future performance and financial guidance were false or misleading when made also fail.  Passing that, the vast majority of challenged statements are (i) accurate statements of historical fact, (ii) forward-looking statements subject to the PSLRA's statutory safe harbor and/or (iii) inactionable puffery or statements of opinion/belief.  Plaintiff's last-ditch effort to evade dismissal with a "half-truth" omissions theory changes none of this, as Defendants had no duty to speculate about potential FDA determinations.  *See infra* Sect. I.B.

*Third*, Plaintiff has failed to plead loss causation because the announcement of FDA's 510(k) determination three days after Defendants learned of it did not constitute a "corrective disclosure" or otherwise reveal any fraud.  *See infra* Sect. I.C.

*Finally*, since the SAC fails to allege a claim under Section 10(b), Plaintiff's Section 20(a) and 20A claims likewise fail.  *See infra* Sect. II.

**ARGUMENT**

**I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B)**

**A.      THE SAC FAILS TO PLEAD SCIENTER**

As shown in Defendants' Opening Brief, the SAC's scienter allegations consist of little more than conclusory assertions that Defendants "must have known" that the FDA would require a comprehensive 510(k) submission, without any particularized facts "'giving rise to a strong inference'" that each Defendant omitted information or made the challenged statements with an intent "'to deceive, manipulate, or defraud'" BD investors. *Institutional Inv'rs Grp. v. Avaya, Inc.*,

3

564 F.3d 242, 252-53 (3d Cir. 2009). Plaintiff's opposition does nothing to salvage those deficient allegations. Neither the scattered assertions of FEs (none of whom purport ever to have spoken to any Individual Defendant), nor Messrs. Polen's and Forlenza's Class Period trades (nearly all of which were indisputably made pursuant to 10b5-1 plans), nor the unremarkable fact that BD has engaged in sustained dialogue (and sometimes disagreed) with the FDA about Alaris raises the strong inference of scienter required to plead securities fraud.

> **1.    Plaintiff's FE Allegations Do Not Support a Strong Inference of Scienter**

The crux of the SAC's scienter theory (indeed, Plaintiff's entire fraud theory) is purported statements by five FEs. But sifting the sprawling FE allegations – which date back years before the start of the Class Period and purport to describe an array of alleged product defects, attempted regulatory submissions and internal assessments regarding the need for 510(k) clearance in connection with Alaris software modifications (both planned and historical) – not one even remotely suggests that any Defendant was aware or recklessly disregarded, prior to February 3, 2020 (*i.e.*, two days before the end of the Class Period), that the FDA would abruptly compel BD to file a comprehensive 510(k) application.[2] In fact, those very allegations indicate ***exactly the opposite***: that for several years, BD navigated the regulatory process, addressed alleged Alaris defects and implemented software modifications, and the FDA never required that BD submit a comprehensive 510(k) covering all Alaris software modifications. That alone dooms Plaintiff's scienter allegations and, by extension, its fraud claim.

---

[2] Because BD's alleged pre-Class Period conduct has no bearing on Defendants' (lack of) foreknowledge of the FDA's comprehensive 510(k) determination, *In re Toronto-Dominion Bank Sec. Litig.*, Civ. No. 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) (Pl. Br. 45) is inapposite. *See id.* at *5 (alleged misstatements during the class period were based on defendants' conduct prior to the class period).

In any event, as demonstrated in Defendants' Opening Brief, Plaintiff's FE allegations are fundamentally unreliable because, among other things, none of the FEs – former low-level employees, some of whom did not even work at BD during the Class Period – is alleged to have ever had direct contact with any Individual Defendant or the FDA, nor does the SAC provide any other basis to suggest that they would have knowledge of the subject matter on which they opine (*i.e.*, the mental state and knowledge of the Company's senior-most executives).  Opening Br. 36-38.[3]  As described below, the opposition brief does nothing to alter that conclusion.

For example, the SAC attributes to FE-1 the assertions that BD's Regulatory Department – which FE-1 is not alleged to have been a member of or to have had any contact with – determined some time in 2019 that certain Alaris modifications required 510(k) regulatory clearance and that BD attempted to file a "catch-up" 510(k) application in mid-2019 (Pl. Br. 45).  But the SAC provides no basis from which to infer that FE-1 would have knowledge of either alleged development.  *See* Opening Br. 38-39; *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013).[4]  Nor do FE-2's generic allegations of "weekly meetings with BD Head of Quality Keith

---

[3] Plaintiff's authority only underscores this Circuit's stringent pleading requirements for FE allegations and the SAC's failure to demonstrate the FEs' reliability.  *See, e.g.*, *Avaya*, 564 F.3d at 266 ("Shareholders have adequately alleged when their sources were employed by Avaya, when they obtained the information they allegedly possess, and whether their supposed knowledge is first or second hand."); *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, No. 17-10467, 2019 WL 3451523, at *14 (D.N.J. July 31, 2019) (FEs had firsthand knowledge of key issues and engaged in conversations with supervisory-level employees about them); *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018) (FEs' "positions afforded them firsthand knowledge of the underlying facts" (quotations omitted)).

[4] Plaintiff's attempt to distinguish *Rahman* misses the mark.  Here, like there, the FEs fail to allege, among other things, the dates for key events, the source of their knowledge for many factual allegations, whether they interacted with Defendants or senior management and whether they personally attended key meetings (*e.g.*, where the Regulatory Department allegedly determined that a "catch-up" 510(k) submission was required).  *See Rahman*, 736 F.3d at 244-45.

McLain," where "staff discussed the need for 510(k) approval" (Pl. Br. 45-46), corroborate FE-1's allegations.[5]

Moreover, while FE-1 alleges that BD attempted to file a "catch-up" 510(k) application in mid-2019, FE-3 says that BD "*avoided* seeking 510(k) approval." Opening Br. 40. Plaintiff half-heartedly tries to sidestep this contradiction in a new argument that FE-3's allegations "simply explain a reason why BD had not sought 510(k) clearance for its numerous Alaris changes *before it eventually did so*, as FE-1 reports, in mid-2019." Pl. Br. 45 n.29. But this cannot be reconciled with FE-3's alleged tenure at BD "through late 2019" – *after* the supposed catch-up filing alleged by FE-1. This tortured and reverse-engineered interpretation speaks for itself.

Plaintiff's other key rejoinder to the FE reliability issues shown in Defendants' Opening Brief is that FE-5 attended a meeting "with multiple managers where BD determined it needed to file a 510(k) application for historical changes and planned changes to Alaris." *Id.* 46. That is a gross mischaracterization of the SAC. Parsed carefully, FE-5's alleged statements indicate that this meeting in fact involved (i) an assessment of *low-level employees*, (ii) being *reported* to managers, (iii) who *disagreed* with their conclusion. Opening Br. 39; SAC ¶138.

Finally, Plaintiff misapprehends Defendants' argument that the SAC fails to connect the alleged "software defects" and "deficient QS records" reported by FEs and FDA's ultimate determination regarding 510(k) clearance requirements. Plaintiff constructs a straw man argument that the alleged Alaris defects and quality issues are logically related to the alleged misstatements about Alaris modifications and internal controls. Pl. Br. 46. That is wrong, but beside the point. The missing nexus that undermines the FEs' reliability is any connective tissue between the

---

[5] The SAC is devoid of allegations regarding, among other things, the time period in which these weekly meetings took place, the participants (other than non-Defendant Keith McLain) or the specific Alaris modifications supposedly being discussed or what, if anything, was decided.

product defects and quality issues alleged by the FEs, on the one hand, and the FDA's eventual determination that BD must file a comprehensive 510(k) application for all Alaris modifications, on the other.[6]  Indeed, under Plaintiff's own theory, the FDA had known of these supposed defects and internal control issues for years, and yet had never previously required such a 510(k).

In sum, Plaintiff's opposition does nothing to rehabilitate the reliability issues endemic to the FE allegations, which, in any event, do not support an inference that Defendants knew or recklessly ignored that BD would be required to secure comprehensive 510(k) clearance or faced adverse FDA action for regulatory noncompliance.[7]

### 2.    Plaintiff's "Motive" Allegations Do Not Support a Strong Inference of Scienter

As shown in the Opening Brief, Plaintiff's motive allegations fare no better.  *See* Opening Br. 44-47.  Despite Plaintiff's best efforts to sensationalize Mr. Forlenza's and Mr. Polen's stock trades during the Class Period, *e.g.*, Pl. Br. 38 ("Forlenza['s] and Polen's combined insider trading windfall" [sic]), the reality – which Plaintiff does not and cannot dispute – is that nearly all of the trades were effected pursuant to 10b5-1 plans.  Recognizing that this decimates its motive theory, Plaintiff fixates on the alleged adoption of Mr. Forlenza's plan during the Class Period.  *Id*. 38-39.  But the law's concern with the timing of 10b5-1 plan adoption has nothing to do with class periods

---

[6] Plaintiff's assertion that "FE-3 plainly alleges that an FDA auditor's discovery of … longstanding defects immediately preceded an October 2019 hold on Alaris shipments" (Pl. Br. 46) again mischaracterizes its own pleading.  The SAC alleges that FE-3 "understood" that (i) the FDA learned of the "trackers" during an "audit in 2019" and (ii) the shipping hold was put in place "no later than October 31, 2019."  SAC ¶157 (emphasis omitted).  It **nowhere** says that the audit findings "immediately preceded," much less caused, the October 2019 Alaris hold.

[7] Plaintiff's reliance on *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, No. 3:17-cv-6436 (PGS) (DEA), 2019 WL 1299673 (D.N.J. Mar. 21, 2019) (Pl. Br. 46) is misplaced.  In that case, plaintiff's scienter "allegations [were] not solely *or substantially* dependent on [FE] statements."  *Id.* at *17.  Here, by contrast, the SAC relies overwhelmingly on FE allegations that, as Defendants have shown, fail to support a strong inference of scienter.

alleged by plaintiffs' lawyers; rather, the relevant inquiry is whether the plan was adopted at a time when the insider possessed material nonpublic information.[8] As set forth above and in the Opening Brief, there is no allegation that Mr. Forlenza possessed such information, or that any Individual Defendant knew that the FDA would compel a comprehensive 510(k) submission prior to February 3, 2020. *See In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978 (FLW) (LHG), 2019 WL 2849933, at *17 (D.N.J. July 2, 2019).

Beyond that, Plaintiff largely ignores the multitude of factors cutting against any Individual Defendant's motive to defraud, including: (i) the small volume of total shares sold by Messrs. Polen and Forlenza relative to their total holdings;[9] (ii) the absence of "suspicious timing" underlying the sales;[10] (iii) the fact that no shares were sold at the Class Period's highest price; and (iv) Mr. Forlenza's impending retirement. *See* Opening Br. 45-46.

---

[8] As Plaintiff's own authority attests, the "axiom [that trades under a 10b5-1 plan do not support a strong inference of scienter] does not apply … where a 10b5-1 plan is entered into – or strategically amended – to take advantage of an inflated stock price or insider information." *George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533(KBF), 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012).

[9] As Plaintiff's own case law makes clear, Messrs. Forlenza's and Polen's trades of 14% and 18% of their total holdings, respectively, were far from unusual. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 645-55 (E.D. Pa. 2015) (sale of 99% of holdings during class period); *In re Synchronoss,* 2019 WL 2849933, at *17 (no inference of scienter when individual defendants held significant numbers of shares at the end of the class period); *In re Suprema Spec., Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (individual defendants alleged to have sold over 30% of their holdings); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (individual defendant sold a "much larger portion of his stock" than 11%); *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 427-28 (D.N.J. 2002) (sale of $4,444,375 worth of shares, with "[a] significant portion of the sales … in the period shortly before disclosure of the serious problems," was, alone, insufficient to show scienter). The *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 415 (D.N.J. 2004), case cited by Plaintiff does not involve insider trading.

[10] While Plaintiff asserts that many of the trades "were clustered after dates on which each is alleged to have made false statements to investors" (Pl. Br. 38), the SAC does not allege that these alleged "misstatements" affected BD's stock price in real time.

8

### 3.        Plaintiff's Remaining Scienter Allegations Are Equally Deficient

Plaintiff continues to proffer a grab-bag of additional make weight theories, none of which comes close to supporting a strong inference of scienter.

*First*, Plaintiffs' argument that the Individual Defendants' "implied … first-hand knowledge" of all things Alaris and FY20 Guidance (Pl. Br. 40) gives rise to scienter is the opposite of "pleading with particularity" and virtually defeats itself.  No one is alleged to have known in advance about the FDA's February 2020 510(k) determination, and Plaintiff fails to explain how an "investigat[ion] [of] the underlying facts" (*id.* 41) would have revealed the FDA's future determination at the time of the alleged misstatements when discussions with the agency itself did not.[11]   The fact that investors and analysts inquired about these topics is equally inconsequential for scienter purposes, as Plaintiff's own authority demonstrates.[12]

Finally, Plaintiff's attempted "gotcha" argument that Defendants "admit[ted]" to concealing information from investors at the end of the Class Period by disclosing "ongoing

---

[11] Rather than support its argument, Plaintiff's authority in fact confirms that its allegations that the Individual Defendants spoke publicly about Alaris are insufficient; it must allege that they knew or recklessly ignored information that made those statements misleading. *See In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017) (defendants' alleged misstatements "hard to square with the facts allegedly known to PTC, including that the ACT DMD had failed on its own terms, and that the FDA would not accept a post hoc statistical analysis as a substitute for a successful clinical trial"); *SEB Inv. Mgmt. AB v. Endo Int'l, plc*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (defendants "knew that withholding the negative data that contradicted their public statements was misleading to investors"); *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018) (dismissing on statute of limitation grounds but noting that defendant held himself out as having "special access to information about" investments he recommended).  Plaintiff has not done so here.  *See* Opening Br. 30-33; *see also GSC Partners CDO Fund v. Wash.*, 368 F.3d 228, 239 (3d Cir. 2004) (requiring plaintiff to plead alleged knowledge with particularity).

[12] *In re Urban Outfitters*, 103 F. Supp. 3d at 653-55 ("[D]efendants' omission of actual circumstances that were contrary to their answers presents an obvious risk of misleading investors" (quotations omitted)); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (individual defendants "received information about the inventory buildup in Celestica's North American plants").

dialogue" and "conversations" with the FDA – in the supposed corrective disclosure (Pl. Br. 42) – is baseless. At the outset of the Class Period, BD disclosed that it was "in discussions with the FDA" about both "the timing of implementation" of the Q1 Upgrades and "the possibility of bundling them with a new software version release." Opening Br. 10. Thus, investors knew of BD's ongoing interactions with the FDA from the start.

*Second*, well-settled case law (in this Circuit and others) makes clear that the Individual Defendants' executive positions are insufficient to plead a strong inference of scienter, and nothing in Plaintiff's brief says otherwise.[13] Absent allegations that Defendants knew that the FDA would require a comprehensive 510(k), their executive positions do not support scienter. *See* Opening Br. 43-44; *see also Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 466-67 (E.D. Pa 2019) (no scienter where "[t]here are no allegations that these individuals participated in the misconduct, heard about the misconduct from internal sources, or instructed others to engage in misconduct" and only circumstantial "must have known" allegations).[14]

---

[13] *See, e.g.*, *Dr. Reddy's*, 2019 WL 1299673, at *16 (company allegedly received an FDA warning letter informing company "about a problem with a product") (quotations omitted); *In re Genta, Inc. Sec. Litig.*, No. Civ.A. 04-2123(JAG), 2005 WL 2416970, at *7 (D.N.J. Sept. 30, 2005) ("Plaintiffs do not argue that Warrell must have known only because he was President and CEO, but rather, that Warrell must have known about the clinical trials because … he was 'personally involved in the design' of the trials …."); *In re Honeywell*, 182 F. Supp. 2d at 427-28 (finding scienter where plaintiff sufficiently pled that CEO "led the campaign to present the false picture to the investing public, making statement he knew to be false"); *PTC Therapeutics*, 2017 WL 3705801, at *16-17 (defendants "alleged to have known that [a clinical trial] had failed on its own terms, and that the FDA would not accept a post hoc statistical analysis as a substitute …"); *In re Viropharma, Inc. Sec. Litig.*, No. Civ.A. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) ("Defendants had access to non-public annual reports which contained the results of the clinical trials, the NDA for Pleconaril which contained data from the Phase II and III trials, and the Case Report Forms prepared during the clinical trials.").

[14] Plaintiff's effort to distinguish *GSC Partners* only reiterates the futility of "must have known" allegations absent allegations that defendants were aware of facts contrary to the alleged misstatements at the time they were made. *See* 368 F.3d at 239-40 ("To establish that Washington had actual knowledge to the contrary, plaintiffs refer to a comment in Washington's October 27, 1999 presentation …. However, this comment could not have been made in reference to the

*Third*, the "core operations" doctrine is not supported by Plaintiff's allegations. *See* Opening Br. 42-43. Again mischaracterizing its own allegations, Plaintiff argues that Alaris was identified as "BD's *'[k]ey' product*" (Pl. Br. 43).[15] In fact, the SAC alleges that after the acquisition of CareFusion, BD "hailed Alaris *and Pyxis* as '*Key Brands*' that would now make up BD's '*Key Platforms*.'" SAC ¶80.[16] And the same documents from which Plaintiff pulled its alleged misstatements – and which are incorporated by reference in the SAC – make clear that Alaris is not the proverbial "crown jewel" product that has at times justified application of the "core operations" doctrine to infer scienter.[17] And even if it were, Plaintiff's scienter allegations would still fail because it has not alleged that Defendants knew of the FDA's future 510(k) determination. *See In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 512 (E.D. Pa 2018) (even assuming "FDA approval for ARYMO was … [a] core operation[,] … knowledge of ARYMO's

_____

financial statements for the stub period between January and April 2000, since those statements would not have been available in October of 1999.").

[15] Unless noted otherwise, all emphases in this brief are added.

[16] This stands in sharp contrast to the products at issue in Plaintiff's authority. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("U.S. soup sales are indisputably the bread and butter of Campbell's business …."); *Hall v. Johnson & Johnson*, C.A. No. 18-1833 (FLW), 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (J&J identified its Talc Product as "an institution," "flagship product" and "sacred cow"); *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449 (KSH) (CLW), 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) ("generic drug sales comprised a substantial portion of its revenues and operations during the class period, accounting for 32% of 2014's total revenues and jumping to 42% in 2015."); *Dr. Reddy's*, 2019 WL 1299673, at *16 (threat to sales comprising "nearly half of Dr. Reddy's revenue"); *In re Enzymotec Sec. Litig.*, No. 14-5556 (JLL) (MAH), 2015 WL 8784065, at *18 n.17 (D.N.J. Dec. 15, 2015) (business segment "made up 96% of Company's revenues in 2012"); *Avaya*, 564 F.3d at 271 ("Avaya's operating margin was viewed as so important to the health of the company … that its supposed ability to hold and grow this margin was described as the 'Avaya story.'").

[17] To that end, contextualizing BD's FY20 Guidance is not an "improper attempt to set forth a factual counternarrative" (Pl. Br. 44 n.27); it is appropriate and permissible to consider the content of documents incorporated by reference at the motion to dismiss stage where, as here, that content refutes the factual allegations in a complaint. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); Opening Br. 43.

prospects for FDA approval in general is different from knowledge that ARMYO definitely would or would not receive approval for specific claims of abuse deterrence").

The nonculpable inferences evident from the SAC and the documents incorporated therein – that Defendants implemented the Q1 Upgrades and only later learned, unexpectedly, that the FDA would demand a comprehensive 510(k) submission for all Alaris modifications (which BD publicly disclosed within three days)[18] – are more compelling than any competing inference of scienter.[19]  Opening Br. 47.

**B.      THE SAC FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION**

### 1.      No Actionable Omissions

#### a.      *Plaintiff's "Omission" Theory Refutes Itself*

Plaintiff does not dispute that the absence of 510(k) clearance for BD's historical Alaris modifications was known to the market prior to and throughout the Class Period, contending instead that BD "conveyed the impression that 510(k) clearance for the changes was ***not necessary*...." Pl. Br. 20 n.9 (emphasis in the original).  But this mischaracterizes Plaintiff's own allegations, which were premised instead on the notion that BD had "conveyed the impression" that ***FDA*** had determined that 510(k) clearance was unnecessary (and would thus not halt sales), whereas BD knew (or should have known) that FDA had, in fact, concluded otherwise.

---

[18] If, as Plaintiff argues, Defendants should have disclosed the FDA's determination that 510(k) clearance was needed in the February 4, 2020 Voluntary Recall notice (Pl. Br. 43), the class period would consist of the day and a half between the recall letter and February 6, depriving Plaintiff of standing.  *See* SAC Ex. A (ECF 60-2) (no trades between February 4-6, 2020).

[19] Plaintiff's allegations of BD's supposed pre-Class Period determinations that 510(k) submissions were necessary (Pl. Br. 48) (insufficiently pled for reasons discussed *supra* Sect. I.A.1), do nothing to upset this.  The facts (as alleged) say nothing about the FDA requiring from BD a comprehensive 510(k) submission in order to continue shipping Alaris.

Plaintiff's attempt to repackage its claims to suggest that the relevant issue is whether **BD** "had already determined that 510(k) clearance was necessary," relying heavily on the SAC's allegations regarding prior abortive actual or contemplated 510(k) submissions (*id.* 19-20 (emphasis omitted)), falls flat. First, as shown in the Opening Brief, the regulatory scheme initially gives manufacturers the discretion to determine whether a submission is necessary. Opening Br. 8-9. And it expressly recognizes that the manufacturer's determination in that regard may differ from the FDA's. Accordingly, that BD may have determined to seek 510(k) clearance for certain previously proposed modifications simply doesn't speak to whether or when the FDA had or would reach a conclusion that such clearance was required, or would someday conclude that comprehensive 510(k) clearance was needed before Alaris could be sold with the Q1 Upgrades.

Tellingly, nowhere in its opposition brief does Plaintiff ever even cite, let along grapple with, the Third Circuit's controlling decision in *Oran v. Stafford*, in which the Court of Appeals held that until the FDA notified the company "of [FDA's] own data," the risk plaintiff claimed should earlier have been disclosed was "purely speculative"; the issue of when the company had first learned of adverse data, therefore, "*was immaterial as a matter of law*." 226 F.3d 275, 286 (3d Cir. 2000); *see* Opening Br. 20-21.

Indeed, where "the FDA h[as] not explicitly stated that [the] product" required 510(k) clearance "as of the date" of the alleged "omissions," there is no duty to disclose. *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1304 (S.D. Fla. 2015) ("[T]he record reflects that the FDA did not state that Iradimed's products were adulterated or misbranded until its warning letter, which was sent on August 18, 2014. Thus, Iradimed could not have made any such disclosure prior to that point."). Plaintiff, in attempting to distinguish *McClain*, actually underscores its similarity to this case, observing that, in that case:

13

> [O]n the *last* day of the class period, defendants announced that they had just received word from the FDA that 510(k) clearance was necessary for past changes, interrupting sales and causing a stock drop.

Pl. Br. 24 n.11 (emphasis in the original). That is *exactly* what the SAC alleges happened here.

Moreover, both Iradimed and BD had allegedly received Form 483s prior to the commencement of the class period, which plaintiffs contended put them on notice that the FDA would later require 510(k) clearance. That argument did not carry the day in *McClain* and the Court should not hesitate over it here.[20]

In any case, Plaintiff has failed to adequately allege either that Defendants "misled investors into believing that the [Q1 Upgrades] did not require 510(k) clearance" (Pl. Br. 19-21 (emphasis omitted)) or somehow "signaled" that FDA had "determined" that the Q1 Upgrades did not require 510(k) clearance (*id.* 23-25).[21] This is so for the simple reason that Defendants are not alleged to have spoken *at all* to the market about 510(k) clearance until the close of the Class Period.[22] Because they had no duty to speak on the matter and *did not do so*, none of their Class

---

[20] The fact that Iradimed had disclosed the Form 483 (Pl. Br. 24 n.11) is irrelevant. The purported significance of the receipt of the Form 483 – in that case as in this one – lay in what it allegedly augured about the likelihood that 510(k) clearance would be required. Plaintiff does not (and could not) argue that BD was under any obligation to disclose the pre-Class Period 483.

[21] As noted in the Opening Brief, the Cowen analyst (SAC ¶203) simply got this wrong. Contrary to Plaintiff's contention (Pl. Br. 23 & n.10), it is a single analyst's interpretation that "is entitled to no weight" in this regard, as Plaintiff's own case law shows. *In re Salix Pharms., Ltd.*, 14-CV-8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("several different analysts" had the same interpretation of what was said on a conference call); *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (multiple analyst reports supported plaintiff's interpretation of defendants' statements). In other words, one "listener's misunderstanding of what was said, does not, on its own, make a statement misleading." *Salix Pharms*, 2016 WL 1629341, at *11.

[22] The cases cited on p.19 of Plaintiff's opposition are thus inapposite. *See In re Bristol-Myers Squibb Sec. Litig.*, No. Civ. A 00-1990 (SRC), 2005 WL 2007004, at *39 (D.N.J. Aug. 17, 2005) ("Discussion of the 'most commonly reported side effects' without mentioning a side effect that was the subject of substantial attention and concern at [the company] is a misleading half truth."); *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, MDL No. 1658 (SRC), 2011 WL 3444199,

Period statements can properly be characterized either as "omissions" or as "half-truths."[23]

Moreover, the fact that BD had been making ongoing modifications to Alaris without 510(k) approval was on the market for years. Accordingly, Plaintiff's citation to the Ninth Circuit's decision in *In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 795 (9th Cir. 2017), in which the court speculates about what the effect might have been in that case "if reasonable investors had known that the [product] was not FDA-cleared [through the 510(k) process]" (Pl. Br. 21 (emphasis and quotations omitted)), is not merely irrelevant but self-defeating. Here, as Plaintiff had just conceded on the immediately preceding page of its brief, it "was *known publicly [that] BD had not obtained 510(k) clearance for Alaris since 2015*." *Id.* 20. Thus, it was not BD that had "conveyed the impression" that the FDA had determined 510(k) clearance was unnecessary; it was *FDA itself*, which had for years permitted the continued sale of Alaris despite its knowledge of multiple Alaris modifications made without 510(k) clearance. Indeed, that impression was conveyed not just to the market, but to BD.[24] Again, *McClain* is on point. There, as explained in the Opening Brief (at 23 & n.28), the company indicated that:

> there were several phone discussions and e-mails between FDA and Iradimed Corporation to determine the possible need for a 510(k) submission related to the recall. From Iradimed's perspective, there was no need for such a submission because we believed that our interactions with

---

at *10-11 (D.N.J. Aug. 8, 2011) (statements of drug's "exceptional safety protocol" misleading in light of internal analysis showing "serious concern" about drug causing cardiovascular events).

[23] There are literally no allegations to support the assertions in Plaintiff's brief that "Defendants … indicated the FDA had blessed [the Q1 Upgrades] without 510(k) review" or "impl[ied] that 510(k) clearance for the changes was unnecessary …." Pl. Br. 17. Until the alleged corrective disclosures, there was no mention of 510(k) clearance at all in any of Defendants' public statements during the Class Period. In fact, as Plaintiff itself notes, "analyst reports nowhere mentioned the need for [510(k)] clearance." *Id.* 23.

[24] The alleged "fourteen months" of "various negative actions the FDA had taken" before the Class Period (Pl. Br. 24) – none resulting in the FDA requiring a 510(k) submission – underscored this impression.

> FDA, and FDA's acceptance of our recall fix, without further comment indicated that no 510(k) was necessary.

111 F. Supp. 3d at 1303.   Here, the circumstances were substantially similar:

> [W]e were in active discussions with the FDA about the timing and implementation of these improvements.  Relying on our quality process within the Infusion business and how we've managed Alaris software updates over time, the team believed we could take a phased approach to releasing Alaris software updates and that these releases did not require a 510(k) clearance.

SAC ¶224.  As an analyst from Bank of America Merrill Lynch, quoted in the SAC and Plaintiff's opposition, succinctly summed it up, BD "got caught offguard."  SAC ¶232; *see* Pl. Br. 17.

Plaintiff strives to characterize Defendants' Class Period statements concerning the Q1 Upgrades, the November 2019 shipping hold and Alaris sales as "half-truths" that concealed a known threat to Alaris's permanent return to market in early 2020:  that FDA would require comprehensive 510(k) approval before allowing the product to be marketed.  Pl. Br. 16-27.  But for all of the SAC's sweeping (if unparticularized) allegations regarding supposed Alaris product defects and quality control issues, internal BD debate over 510(k) clearance and communication with the FDA, not a single one alleges that any of the Defendants was aware, until a few days prior to the end of the Class Period, that FDA had determined to require comprehensive 510(k) clearance before Alaris could continue to be marketed and sold pending comprehensive 510(k) clearance.[25]

That missing allegation – the proverbial "dog that didn't bark" – obliterates Plaintiff's fraud claims, which rest on a stock drop they allege was caused not by the revelation of any Alaris product defects or poor quality controls, or of BD's previous failure to secure 510(k) clearance for prior modifications (which they concede the market knew), but by FDA's decision – contrary to

---

[25] That BD's alleged "lack of compliance with QS regulations" "made obtaining 510(k) clearance … all the more difficult" (Pl. Br. 21), even if true, is similarly beside the point.  Defendants did not even know FDA would require such clearance until the end of the Class Period.

its years-long practice – to require comprehensive 510(K) clearance before Alaris could be sold with the Q1 Upgrades. And that was fully disclosed within days of being communicated to BD.[26]

### b.    Using Synonyms for "Changes" Isn't Fraud

As demonstrated above, quibbling over the terminology BD used to characterize the Q1 Upgrades (Pl. Br. 17-21) misses the point. While Plaintiff prefers the term "changes," the fact remains that the modifications in question were, indisputably, "upgrades," "enhancements" and "improvements," whether or not they were implemented to "remediate" or "fix" previously identified issues. Indeed, it's telling that Plaintiff has to resort to a dictionary definition to try to establish a distinction between the terms (*id.* 18 n.8), strongly suggesting that any such distinction is one not readily apparent to the average listener/investor (meaning, in the context of a securities fraud claim, that it's a distinction without a difference). What really matters, as shown above, is that the SAC fails to allege either that Defendants ever said that FDA would not require comprehensive 510(k) clearance or that they knew, until a few days before the February 6, 2020 "corrective disclosure," that it would.

### c.    The Stated Reasons for the November Ship Hold Were Accurate

Nor did Defendants mislead the market about the reasons for BD's November 2019 ship-hold. Pl. Br. 22-23. Embedded in Plaintiff's argument here is the assertion that the underlying issues the Q1 Upgrades were implemented to address had "caus[ed] the FDA to intervene" at the start of the Class Period. Pl. Br. 22. But FE-5's entire support for this is that in the "***winter*** of 2019/2020," BD met with the FDA and at that meeting the FDA "asked BD to confirm that Alaris

---

[26] Plaintiff's effort to suggest that BD somehow failed to disclose that FDA scrutiny was ongoing (Pl. Br. 23-25) is ludicrous. As noted in the Opening Brief, it is apparent from Plaintiff's own allegations that FDA oversight of and involvement with infusion pumps is by its nature continuous and never-ending. Opening Br. 31.

17

'was on a ship hold,' and BD confirmed that it was." *Id.* ¶165.  This does not speak to why the ship-hold was implemented.[27]

### 2.    The SAC Alleges No Actionable Affirmative Misstatements

#### a.    *The FY20 Guidance and 10-K Risk Disclosures Are Not Actionable*

Plaintiff challenges Defendants' "optimistic business projections" for lacking a "reasonable basis."  Pl. Br. 28.  As shown in the Opening Brief, however, the FY20 Guidance and Defendants' reaffirmations were reasonably based on the facts then known.[28]  Opening Br. 24-29. As discussed *supra* Sect. I.A, notwithstanding the various alleged defects and compliance failures, there was no indication from FDA that they "posed a clear and present danger to BD's continued ability to sell Alaris" (Pl. Br. 19) or that "Alaris revenues were in acute jeopardy" (*id*. 27) at the time of the alleged misstatements.  On the contrary, BD's history of modifying Alaris without obtaining 510(k) clearance and without FDA objection suggested that BD could continue selling Alaris as it implemented the Q1 Upgrades.[29]

---

[27] FE-3 alleges only that he "understood" the decision to implement the ship-hold had followed an FDA audit, but that, again, says nothing about the reasons it was implemented.  *See* SAC ¶157.

[28] **Stmts. 1–4** (SAC ¶¶264, 266-68)**, 7** (SAC ¶272)**, 9** (SAC ¶280)**, 19** (SAC ¶300)**, 20** (SAC ¶301)**, 23** (SAC ¶308) **& 24** (SAC ¶309)**.**

[29] As Plaintiff's cases acknowledge, for projections to be actionable, their preparers must be alleged to have had reason to know the projections were false when made; a "plaintiff simply mouth[ing] the required legal conclusions" is not enough.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1997) ("Plaintiffs' Complaint contains a number of vague factual assertions regarding the period prior to November 1, 1993, but plaintiffs have failed to link any of these allegations to their claim that the November 1 forecast was actionably unsound when made.").  *Contrast In re Cigna Corp. Sec. Litig.*, No. Civ.A. 02-8088, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) ("on track" statement contradicted by "internal memoranda … which raised numerous problems"); *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc.*, No. 07-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) (projections undercut by then-existing facts that defendant "was experiencing difficulty in opening new selling communities, and that the demand for [its] homes was softening"); *In re AT&T Corp. Sec. Litig.*, No. Civ. 00-CV5364 (GEB), 2002 WL 31190863, at *15 (D.N.J. Jan. 30, 2002) (no

Similarly, Plaintiff argues that BD's Form 10-K risk disclosures[30] were misleading because they characterized as "hypothetical" a "risk [that] had already materialized." Pl. Br. 29. Plaintiff's contention that the risk warned of had already materialized because "BD was already violating various FDA regulations, including the 510(k) clearance requirement, cGMP standards, and QS recordkeeping standards well before the Class Period began" (Pl. Br. 30) (emphasis omitted), aside from being inadequately pled, focuses on the wrong risk.

The risk warned of at the start of the Class Period – that FDA had the power and might take action to prohibit the marketing of BD products, which would negatively impact sales[31] – did not materialize until February 2020. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) ("The risk actually warned of is the risk of adverse effects on sales – not simply the loss of independent distributors generally. Accordingly, the risk at issue only materialized – triggering Globus's duty to disclose – if sales were adversely affected at the time the risk disclosures were made.") Plaintiff's case law is, accordingly, distinguishable on the ground that, in those cases, the disclosed risks had in fact materialized at the time of the risk disclosures.[32]

---

[30] reasonable basis for forecasts where defendants were "aware of the problems in the Business Services unit" and "top executives … were aware of the ongoing wireless subscriber scams").

[30] **Stmts. 12–17 (SAC ¶¶287-91, 295).**

[31] The 2019 10-K warned that unapproved use of BD's products:

> *could lead to recalls … required by the FDA* … and could result, in certain cases, in the *removal of a product from the market*.

Smith Decl. Ex. A (ECF No. 69-3) at 16.

[32] *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709-10 (3d Cir. 1996) (warning of future impact to loan losses where company knew current reserves were insufficient); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (warning of possible integration difficulties when the company was already experiencing difficulties); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 81 (S.D.N.Y. 2017) (commitment to safety misleading where defendants knew of "some of the problems and their potential consequences"); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (registration statement warned of potential revenue cut, but did not disclose that company had already experienced the negative impact on

### b.    *More Than Half of the Alleged Misrepresentations Fall Squarely Within the PSLRA Safe Harbor*

Defendants' Opening Brief demonstrated that over half of the misstatements alleged in the SAC were, in whole or in part, forward-looking statements protected by the PSLRA's safe harbor. Opening Br. 24-29.[33] Plaintiff's opposition attempts to strip those statements of that protection on the grounds that they were made in close proximity or mixed with statements of present fact. Pl. Br. 31-34. This is a red herring. As the cases Plaintiff cites clearly indicate, "a mixed present/future statement is not entitled to the safe harbor ***with respect to the part of the statement that refers to the present.***" *Id*. 31 (quoting *Avaya*, 564 F.3d at 255). Here, of course, Defendants have only argued for dismissal of the forward-looking component of such statements based on the safe harbor. As to any accompanying "present" statements, Defendants have demonstrated that they must be dismissed because they were either statements of present or historical fact that were accurate when made or inactionable statements of opinion, belief or corporate optimism. *See* Opening Br. 29-32.

So, for example, the statement that Q4 2019 performance in the Medical segment was driven by "ongoing momentum" – a phrase with which the opposition brief is inexplicably enamored – "and share gains in Medication Management Solutions" (*see* SAC ¶269; **Stmt. 5**) was a statement of past performance and present fact that is nowhere alleged to be inaccurate (and is

---

revenue and revenue growth); *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements about compliance measures found misleading because company was already experiencing failures in the compliance measures); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-87 (9th Cir. 2008) ("Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether.").

[33] **Stmts. 1-4, 7, 9, 19, 20 & 24** (FY20 Guidance or statements reaffirming it); **Stmts. 1 (SAC ¶264), 3 (SAC ¶267), 4 (SAC ¶268), 6-11 (SAC ¶¶270, 272, 273, 280, 282, 284), 13 (SAC ¶288), 17 (SAC ¶295), 18 (SAC ¶297), 23 (SAC ¶308) & 25 (SAC ¶312)** (statements of future plans and expectations).

inactionable for that reason).  The statement that "we expect that momentum to continue" (SAC ¶284; **Stmt. 11**; Pl. Br. 32 & n.17), on the other hand, contains both a statement of accurate historical/present fact – that there is "momentum" – and an inactionable forward-looking statement protected by the safe harbor, *i.e.*, "we expect [it] to continue."  The statement that BD was "on track" to meet FY20 Guidance, meanwhile, was both inactionable corporate optimism and clearly forward-looking.  *See Avaya*, 564 F.3d at 254-56 (any "assertion of current fact" in "on track" and "position us" statements was "too vague to be actionable" and statements were nevertheless forward-looking).

Finally, with respect to reaffirmations of guidance, Plaintiff's own authority teaches that they remain forward-looking so as long as they "do not advert to a particular current fact such as cash on hand but express only defendants' continuing comfort with the earlier … projection, which they were then reiterating[.]"  *Id.* at 256.

Nor do Defendants' forward-looking statements lose the protection of the safe harbor because they "omitted" then-present material facts.  Pl. Br. 33-34.  Initially, as shown at length in Section I.B.1, *supra*, there were no such material omissions.  Period.  In addition, as this Court has recognized, the argument for stripping a statement of safe-harbor protection due to the omission of then-present facts is "weak" and generally unestablished in this district.  *See Tanaskovic v. Realogy Holdings Corp.*, Civil Action No. 19-15053 (SRC), 2021 WL 211049, at *17 (D.N.J. Jan. 21, 2021) (noting no citation to relevant published cases in District of New Jersey).

Moreover, meaningful cautionary language accompanied each of Defendants' forward-looking statements.  Opening Br. 25-29.  As discussed *supra* Sect. I.B.1.c, the risk of adverse FDA action had not materialized at the time the risk was disclosed, rendering that risk disclosure

meaningful.[34]   Plaintiff lobs in a series of frivolous attacks on BD's cautionary language.   For example, Plaintiff challenges the language in the November 5, 2019 press release by focusing on the warning's mention of "drug-coated balloons."[35]   Pl. Br. 35.   But as Plaintiff's own quotation shows, drug-coated balloons were referenced solely by way of example, and not to the exclusion of Alaris.[36]   Plaintiff also argues that the November 21 and December 4, 2019 conferences and the February 4, 2020 Voluntary Recall notice are not insulated by the cautionary language in the 2019 Form 10-K.[37]   Pl. Br. 36.   This argument is meritless.   Cautionary language does not need to

---

[34] Plaintiff's cases cited to the contrary (Pl. Br. 34-35) are distinguishable.   *See Bristol-Myers Squibb*, 2005 WL 2007004, at *54 ("the general representations of blockbuster potential were mitigated by the discussion" of warning that "there can be no guarantees that products will receive regulatory approvals"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182-83 (3d Cir. 2000) (warnings that "the risk that the results of operations could vary in *future* fiscal years" and that that the announced range of restatement "might differ from those made by the Audit Committee" were not sufficiently tailored to risk that company could change the restatement range); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) (warnings that approval of drug was dependent on FDA determination was misleading because the FDA had previously told defendants the underlying study was not "adequate or well-controlled"); *Enzymotec*, 2015 WL 8784065, at *11 (warning of "significant and increasing government regulations" were "unreasonable" because the regulations were already in effect); *Pritchard v. Apyx Med. Corp.*, No. 8:19-cv-00919-SCB-AEP, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020) (general warnings of "industry that is highly regulated by the [FDA] … which ha[s] substantial authority to establish criteria which must be complied with in order for [company] to continue in operation" did not encompass risk that company's product would not gain FDA approval) (alteration in original).

[35] Because the January 14, 2020 statements (**Stmts. 19 (SAC ¶300) & 20 (SAC ¶301)**) incorporate the November 5, 2019 and November 27, 2019 Form 10-K, it is also insulated by these disclosures. Opening Br. 25-27.

[36] *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd sub nom,*, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018) (Pl. Br. 35) is inapposite.   That case held that a boilerplate warning of accounting risks was not meaningful in light of other potential hazards that were discussed in detail.   *See* 2017 WL 1536223, at *14.

[37] Plaintiff's challenge to the cautionary language incorporated into statements made at the January 28, 2020 meeting (**Stmts. 23 (SAC ¶308) & 24 (SAC ¶309)**) (Pl. Br. 36 n.23) must also fail.   The cautionary instruction was given during the meeting, such that both listeners and those reviewing the transcript received the information.   *Compare In re Celgene Corp. Sec. Litig.*, No. 18-4772, 2019 WL 6909463, at *15 n.21 (D.N.J. Dec. 19, 2019) (cited Pl. Br. 36 n.23) (assuming statements were not accompanied by meaningful cautionary language because defendant did not "include a transcript from the presentation or copy of the deck used during presentations during which each

"actually accompany the alleged misrepresentation." *GSC Partners*, 368 F.3d at 243 n.3. The 2019 Form 10-K expressly applies its cautionary language to all forward-looking statements made "in publicly released material, both written and oral."[38] *See* Smith Decl. Ex. A (ECF No. 69-3) at 40-42. Defendants' cautionary language is thus meaningful and applicable to all forward-looking statements.

Finally, as demonstrated in Section I.A., *supra*, Plaintiff has not alleged "specific facts to support an inference that" Defendants had "actual knowledge of [their] statement's falsity" with respect to any of their forward-looking statements. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The SAC makes no effort to plead actual knowledge with particularity. Opening Br. 35-44.

## C.    THE SAC FAILS TO PLEAD LOSS CAUSATION

Plaintiff has also failed to plead that the bad news of the FDA's decision to suspend sales of Alaris pending clearance of a comprehensive 510(k), publicized on February 6, 2020, revealed a fraud underlying any of Defendants' statements – Defendants themselves having become aware

---

statement was made"). In any event, the January 28, 2020 statements are still incorporated by reference in the 2019 Form 10-K. Smith Decl. Ex. A (ECF No. 69-3) at 40-42.

[38] These warnings were not too "attenuated" from the challenged statements, as the 2019 Form 10-K (filed on November 27, 2019) expressly incorporated them. *Contrast Carmignac Gestion*, 2019 WL 3451523, at *12 (statements about pricing strategy were too "attenuated" from 10-K disclosures because they were not referenced, with no discussion of a clause in the 10-K incorporating them).

of the news only three days prior.[39]  *See id.* 48-49.  Plaintiff's authority cited in support of loss causation (Pl. Br. 48-49) merely underscores the SAC's deficiency.[40]

## II.     THE SAC FAILS TO PLEAD A SECTION 20(A) OR 20A CLAIM

Plaintiff does not dispute that the failure to plead a viable primary violation compels dismissal of a Section 20(a) claim.  *See* Opening Br. 49; Pl. Br. 49-50.  As shown above and in the Opening Brief, that is the case here.  The same is true for the Section 20A claim insofar as the SAC fails to plead any primary violation on the part of Messrs. Forlenza and Polen (or that either traded on material nonpublic information).  Opening Br. Sect. I.B.

---

[39] Plaintiff's attempt to distinguish *Marsden v. Select Med. Corp.*, No. Civil Action No. 04-4020, 2007 WL 1725204 (E.D. Pa. June 12, 2007), fails.  Pl. Br. at 49 n.32.  As discussed *supra* Sect. I.A.1, even crediting the unreliable FE allegations, Plaintiff has not pled that BD "internally recognized [the] need for 510(k) clearance for past remediations" (Pl. Br. 49 n.32) in order for the FDA to permit continued marketing and sale of Alaris.  Rather, its allegations show that FDA was aware for years of the allegedly "defect-riddled Alaris pump line," yet never required comprehensive 510(k) clearance until February 3, 2020.  Thus, as in *Marsden*, the SAC "contains not a single allegation that the 'relevant truth'" was revealed to the market.  2007 WL 1725204, at *2.

[40] *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (loss must be caused by the truth being disclosed); *In re Merck*, 2011 WL 3444199, at *30 ("series of corrective disclosures, each of which allegedly made a partial revelation of the fraud"); *McCabe v. Ernst & Young LLP*, 494 F.3d 418, 429 (3d Cir. 2007) (affirming grant of summary judgment because plaintiff failed to show the misrepresentations and omissions "were a substantial factor in causing the … economic loss …").

## CONCLUSION

For the foregoing reasons, and those set forth in the Opening Brief, the SAC should be

dismissed in its entirety with prejudice.[41]

Dated:  June 2, 2021                                    Respectfully submitted,

                                                        **MCCARTER & ENGLISH, LLP**

                                                         /s/  Richard Hernandez
                                                        Richard Hernandez
                                                        Omar A. Bareentto
                                                        Four Gateway Center
                                                        100 Mulberry St.
                                                        Newark, NJ 07102
                                                        Telephone: (973) 622-4444
                                                        Facsimile: (973) 624-7070
                                                        rhernandez@mccarter.com
                                                        obareentto@mccarter.com

                                                        **WINSTON & STRAWN LLP**
                                                        James P. Smith III (admitted *pro hac vice*)
                                                        Matthew L. DiRisio (*pro hac vice*)
                                                        200 Park Avenue
                                                        New York, New York 10166
                                                        Telephone: (212) 294-6700
                                                        Facsimile: (212) 294-4700
                                                        jpsmith@winston.com
                                                        mdirisio@winston.com

                                                        *Counsel for Defendants Becton, Dickinson and
                                                        Company, Vincent A. Forlenza, Thomas E.
                                                        Polen and Christopher R. Reidy*

---

[41] *See Realogy Holdings*, 2021 WL 211049, at *21 ("[B]ecause there is no indication that Plaintiff could allege facts curing the deficiencies in the Amended Complaint, leave to further amend will not be granted").

25