**CARELLA BYRNE CECCHI**
**OLSTEIN BRODY & AGNELLO, PC**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joshua E. D'Ancona
Eric K. Gerard (admitted *Pro Hac Vice*)
Vanessa Milan (admitted *Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Lead Plaintiff Industriens*
*Pensionsforsikring A/S and Lead Counsel*
*for the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BECTON, DICKINSON AND COMPANY, VINCENT A. FORLENZA, THOMAS E. POLEN, and CHRISTOPHER R. REIDY, <br><br> Defendants. | Case No. 2:20-cv-02155-SRC-CLW <br><br> Hon. Stanley R. Chesler <br> District Judge <br><br> Hon. Cathy L. Waldor <br> Magistrate Judge <br><br> **MOTION DAY**: TO BE DETERMINED |

## LEAD PLAINTIFF'S SUR-REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

I.    PLAINTIFF ADEQUATELY ALLEGES FALSITY ...........................................................3

    A.    Defendants Badly Distort the Omissions Pled in the Complaint............................3

    B.    Plaintiff Alleges Actionable Misstatements............................................................6

        1.    Defendants' Statements About the Shipping Hold, Software Remediation, and Talks with the FDA Were Misleading...........................6

        2.    The FY20 Guidance and Risk Disclosure Statements Are Actionable ...................................................................................................9

II.    PLAINTIFF ADEQUATELY ALLEGES SCIENTER.......................................................11

    A.    The FE Allegations Are Reliable..........................................................................11

    B.    Viewed Holistically, the Allegations Support a Strong Inference of Scienter .................................................................................................................13

III.    PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION.....................................15

CONCLUSION................................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ..........................................................................14

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..................................................................................................10

*In re Celgene Corp. Sec. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019)..............................................................................11

*In re Cigna Corp. Sec. Litig.*,
2005 WL 3536212 (E.D. Pa. Dec. 23, 2005)...........................................................................10

*City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for
N. Cal. v. Toll Bros., Inc.*,
2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ..........................................................................10

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 14, 2015)............................................................................8, 9

*Hernandez v. Montoya*,
2017 WL 2113136 (D.N.J. May 15, 2017)................................................................................3

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).......................................................................................13, 14, 15

*Juan Su v. Guang Yang Li*,
2011 WL 3329882 (D.N.J. Aug. 1, 2011) ...............................................................................12

*McClain v. Iradimed Corp.*,
111 F. Supp. 3d 1293 (S.D. Fla. 2015) .....................................................................................8

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)..................................................................................................7, 8

*Phillips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008)......................................................................................................3

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)........................................................................14, 15

*SEB Inv. Mgmt. AB v. Endo Int'l, plc*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ........................................................................................2

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)................................................................................................14

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018)..........................................................................14

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)..............................................................................................10

## GLOSSARY OF DEFINED TERMS[1]

| TERM | DEFINITION |
|---|---|
| "1Q20" | BD's first quarter of FY20, running from October 1, 2019, to December 31, 2019 (both dates inclusive) |
| "510(k)" | FDA's Premarket Notification 510(k) program |
| "ACD" | Amended Consent Decree with the U.S. Department of Justice |
| "Alaris" | BD's Alaris infusion pump line |
| "BD" or "Company" | Becton, Dickinson and Company |
| "Class" | The putative class of BD shareholders who purchased or otherwise acquired BD common stock during the Class Period |
| "Class Period" | The period from November 5, 2019, to February 5, 2020 (both dates inclusive) |
| "Complaint" | Plaintiff's Second Amended Class Action Complaint (ECF No. 60-2) |
| "Defendants" | BD, Forlenza, Polen, and Reidy (collectively) |
| "FDA" | U.S. Food and Drug Administration |
| "FDA 510(k) Software Guidance" | FDA guidance entitled Deciding When to Submit a 510(k) for a Software Change to an Existing Device, finalized in 2017 |
| "FE" | Former employee |
| "Forlenza" | Vincent A. Forlenza |
| "FY20" | BD's 2020 fiscal year, running from October 1, 2019, to September 30, 2020 (both dates inclusive) |
| "FY20 Guidance" | BD's FY20 financial guidance, announced November 5, 2019 |
| "KVO" | Keep vein open |
| "LBA" | Low battery alarm |
| "Motion" or "MTD" | Defendants' Motion to Dismiss the Second Amended Class Action Complaint (ECF Nos. 69 & 69-1) |
| "MMS" | BD Medical's Medication Management Solutions unit |
| "Plaintiff" | Lead Plaintiff Industriens Pensionsforsikring A/S |
| "Polen" | Thomas E. Polen |
| "Reidy" | Christopher R. Reidy |
| "Response" | Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 75) |
| "Reply" | Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 80) |
| "Rule" | Federal Rule of Civil Procedure |
| "November 2019 shipping hold" | BD's stoppage of Alaris shipments announced November 5, 2019 |

---

[1] Unless otherwise noted, capitalized terms have the same meanings as in the Complaint; "¶ __" refers to the Complaint; internal quotation marks and citations are omitted; and emphasis is added.

Plaintiff, individually and on behalf of the Class, submits this sur-reply memorandum of law in further opposition to Defendants' Motion to Dismiss the Complaint.  *See* ECF No. 84.

## PRELIMINARY STATEMENT

Throughout their Reply, Defendants insist that "[o]n February 3, 2020, the FDA informed BD that it would require a comprehensive 510(k) submission" and that, by extension, "this case turns on whether Plaintiffs have [sic] alleged . . . that Defendants *knew* that FDA decision was coming prior to February 3."  Reply 1 (emphasis in original); *see also id.* 2, 3, 4, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 23, 24.  Their argument fails.  For one, Plaintiff disputes their premise: that BD learned for the first time on February 3 the FDA required a "catch-up" 510(k).  Nothing beyond Polen's own suspect, highly ambiguous remarks at the end of the Class Period—identified as misleading in the Complaint—supports this claim, and Defendants' attempt to introduce their own version of the facts cannot be accepted at the pleading stage.  Moreover, by focusing solely on the claimed February 3 meeting, Defendants' argument improperly narrows and distorts the Complaint.  As explained in the Response, Plaintiff alleges that Defendants concealed "two distinct but related" problems underlying their fraud: (1) BD's *own* pre-Class Period determinations that it needed 510(k) clearance for Alaris fixes, and (2) the FDA's discovery of persistent, widespread Alaris software defects and rejection of BD's "catch-up" 510(k) application in mid-2019—and that these interrelated problems drove both the November 2019 shipping hold *and* the announcement on February 6, 2020, that Alaris shipments would *remain* on hold.  Resp. 1.

Defendants ignore these allegations of adverse FDA action and BD's own 510(k) determinations that occurred *before* the Class Period even began, a failure that infects their Reply.  For example, their falsity arguments overlook allegations that:

- The November 2019 shipping hold was *driven by adverse FDA action*, including the FDA's rejection of BD's mid-2019 510(k) and discovery of rampant Alaris software defects;

1

- BD had repeatedly determined that it needed 510(k) clearance for historical Alaris modifications *before* the Class Period, but did not obtain it;

- One of the "upgrades" made part of the November 2019 shipping hold was an attempted fix for the LBA defect that had been the subject of a prior Class I recall and FDA Form 483, and which ***Defendants had already told the FDA required 510(k) clearance***;

- The FDA *immediately rejected* BD's attempt to lift the Alaris hold in winter 2019/2020;

- Many of the *same defects*, including the LBA, KVO, and other issues known internally for years, persisted in February 2020 and were included in BD's "voluntary" recall; and

- The compliance problems and adverse FDA action beginning before the Class Period were *also* responsible for the indefinite hold on Alaris shipments announced on February 6, 2020.

These negative facts were omitted from Defendants' cheery public storyline that Alaris shipments would pause only briefly for "upgrades" before resuming to drive strong FY20 earnings. Also misleading were claims that talks with the FDA were limited to "timing" and that Alaris shipments resumed in December 2019 "[e]xactly as expected," hiding adverse actions the agency had *already* taken. Defendants' omissions concealed the nature and severity of the risks BD faced, preventing investors from accurately assessing the FY20 Guidance and "paint[ing] a favorable picture without including the details that would have presented a complete and less favorable one." *SEB Inv. Mgmt. AB v. Endo Int'l, plc*, 351 F. Supp. 3d 874, 897, 900 (E.D. Pa. 2018).

Defendants' scienter arguments are similarly infirm. Their attack on the FEs ignores that these accounts strongly corroborate each other. Their rehash of Defendant Forlenza's 10b5-1 plan only confirms the import of its adoption at a time when he was privy to non-public information about Alaris's extensive defects, lack of regulatory approval, and the FDA's driving role in halting Alaris shipments. Defendants' awareness of these problems while concurrently speaking on Alaris modifications, the shipping hold, and talks with the FDA—and dumping millions in BD stock— supports an inference of scienter at least as probable as any non-culpable alternative. Meanwhile, Defendants' perfunctory loss causation argument merely repurposes the same strawman revision of the Complaint employed elsewhere. It, too, should be rejected.

2

I.      **PLAINTIFF ADEQUATELY ALLEGES FALSITY**

      A.      **<u>Defendants Badly Distort the Omissions Pled in the Complaint</u>**

Defendants insist the essence of Plaintiff's theory is "that Defendants *knew* that FDA decision [to require a comprehensive 510(k)] was coming prior to February 3"—foreknowledge they claim they did not have. Reply 1. This is not what Plaintiff alleges. Defendants' effort to insert unsupported facts while reshaping Plaintiff's theory to their advantage must be rejected.

*First*, Defendants state as *fact* that the FDA told BD for the first time that it needed to submit a 510(k) application for Alaris changes at a February 3, 2020 meeting. *Id.*; *see also* MTD 13. But their only support for this "fact" is Polen's *own remarks* during the February 6, 2020 earnings call, which did not even say what Defendants now claim. *See* MTD 13-14 (citing Smith Decl. Ex. D at 5, 12). Polen said: "***Through our ongoing dialogue*** with the FDA, ***including*** in-depth discussion [on February 3], we learned that the FDA disagreed with our conclusion about the need for a new 510(k) clearance for these software upgrades" (ECF No. 69-6; ¶ 224), and that "we had a key meeting with the FDA ***as recently as*** [February 3], through our ***ongoing dialogue with the FDA***, we learned that the FDA disagreed with that determination about the need for a new 510(k) clearance for the updated software." *Id.* at 12; ¶ 231. These cagey locutions are, if anything, inculpatory, avoiding a clear statement of when BD learned of this "disagreement." Indeed, the Complaint specifically identifies them as misleading. ¶ 225; *see also* Resp. 15. Because the Court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to" Plaintiff, Defendants' unsupported factual claim must be rejected—and with it, the central argument of their Reply. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Hernandez v. Montoya*, 2017 WL 2113136, at *3 (D.N.J. May 15, 2017) ("[T]he defendants ask the court to accept their version of the facts, which the court, at this stage of the proceedings, cannot do.").

3

*Second*, even if Defendants did learn the FDA required a 510(k) for the first time on February 3 (a disputed fact), that meeting merely confirmed what BD had repeatedly concluded *before* the Class Period: that Alaris lacked necessary 510(k) clearance.  Defendants emphasize that the FDA "assigns *to the manufacturer* the determination of whether a 510(k) submission is appropriate for a given modification."  MTD 4.[2]   BD had done just that, meaning Alaris could not be lawfully sold.  *See* ¶¶ 130-33, 167 (2019 510(k) "catch-up" application, which FDA rejected); ECF No. 69-4 at 4 (devices requiring 510(k) clearance "*may not be legally commercially distributed* before FDA clears the changed device"); *see also* ¶¶ 139-45 (Project Monterrey 510(k) application withdrawn after BD failed to provide adequate documentation of Alaris changes).  Moreover, at least one of the software defects the 1Q20 remediation (mischaracterized as "upgrades") targeted was a critical LBA problem that BD *had told the FDA* required 510(k) clearance.  ¶¶ 137-38, 148-51, 153.  Defendants' argument that they were oblivious to the need for 510(k) clearance until the FDA confirmed that fact on February 3 ignores these allegations.

*Third*, Defendants' refashioning of Plaintiff's theory into a singular focus on 510(k) clearance omits the importance of Alaris's software defects in driving the loss of FY20 Alaris revenues.  *See, e.g.*, ¶¶ 66-77, 90-98, 157-66.  FE-3 reported that when the FDA discovered widespread defects during an audit, Alaris shipments were placed on hold, which FE-3 learned about on October 31, 2019.  ¶¶ 157-58; *see also* ¶ 161.  Five days later, Defendants announced the November 2019 shipping hold.  ¶ 111.  FE-5 confirmed that shipping hold was driven by Alaris

---

[2] Defendants now suggest that BD's finding that 510(k) clearance was necessary is irrelevant. *See* Reply 13 (BD's determination "simply doesn't speak to whether or when the FDA had or would reach a conclusion that such clearance was required"), 16, 12 n.19.  This claim contradicts both their prior briefing (MTD 9, 22-23, 40) and the regulatory structure on which they rely.  *See id*. 9 n.9, 9 n.11.  That federal law grants manufacturers authority "in the first instance" to decide when 510(k) clearance is necessary but renders that determination meaningless makes no sense.  *Id*. 9.

software defects, which by May 2019 comprised an internal list eighty-seven pages long.  ¶¶ 135-54, 159-63.  One was the LBA problem that BD had met with the FDA about in August 2018 and March 2019 and which motivated an internal regulatory assessment in October 2019, just before the November 2019 shipping hold.  ¶¶ 149-51, 153, 159-61.  The FDA swiftly rejected BD's attempt to resume shipping Alaris in December 2019.  ¶¶ 164-66.  Then, on February 4, 2020, BD announced a recall of Alaris because of some of the same defects (including the LBA, KVO, and custom concentration defects) without suggesting Alaris sales would be impacted.  ¶¶ 161-63, 206-07, 212-13.  Two days later, Defendants revealed Alaris sales would ***be on hold indefinitely*** while BD worked on a "remediation plan" with the FDA, slashing the FY20 Guidance.  ¶¶ 219-20.

These well-pleaded allegations establish that the FDA's findings and actions regarding serious, unresolved Alaris defects drove the November 2019 shipping hold that was effectively ***extended indefinitely*** on February 6, 2020.  Moreover, at least some of these ***same defects*** were behind the 510(k) submission announced in February 2020. *See* ¶ 219 (disclosing "continuing" work with FDA on "software remediation plan" for Alaris, "which will require [510(k) clearance]"); *see also* ¶ 148 (BD told FDA that fix for LBA defect included in 2019 shipping hold and February 4 recall required 510(k) clearance). Defendants ignore this interconnection, and thus the import of BD's knowledge of those defects before the Class Period.[3]

---

[3] Defendants' claim that Plaintiff's theory "rest[s] on a stock drop they allege was caused ***not*** by the revelation of any Alaris product defects or poor quality controls, or of BD's previous failure to secure 510(k) clearance . . . but by FDA's decision . . . to require comprehensive 510(K) [sic] clearance before Alaris could be sold with the Q1 Upgrades" is misplaced.  Reply 16-17.  The drop followed the announcement that BD was lowering its FY20 Guidance because Alaris shipments would remain on hold, which was attributed to ongoing remediation of Alaris software defects. ¶¶ 219-21, 226-27, 229, 237.  Their claim that the drop was unrelated to "BD's previous failure to secure 510(k) clearance for prior modifications" is also refuted by their own statements, as Polen stated that the FDA's "determination about the need for a new 510(k) clearance . . . . applies not just to the upgraded software that we're talking about in November, but that decision process that had ***occurred over time***."  Reply 16; ¶ 231 (noting remedial changes had occurred over "a number

B.       **Plaintiff Alleges Actionable Misstatements**

1.  **Defendants' Statements About the Shipping Hold, Software Remediation, and Talks with the FDA Were Misleading**

Defendants argue their alleged misstatements about the Alaris shipping hold (¶¶ 273, 282, 295-97, 304-05), software "upgrades" (¶¶ 269-70, 273, 282), and BD's talks with the FDA (¶¶ 269-70, 273, 290-91), were not misleading because (they claim) the FDA did not confirm until February 3 that 510(k) clearance was necessary, which Defendants supposedly could not have predicted. *See, e.g.*, Reply 13, 14, 16.  In truth, and as detailed in Plaintiff's Response, Defendants failed to disclose, among other things: (1) that the shipping hold was really imposed to address critical defects the FDA had recently discovered; (2) that the 1Q20 "upgrades" were really remedial measures meant to address those defects, including a fix for the LBA defect; and (3) that, far from limiting its discussions to "timing," BD's talks with the FDA covered matters such as BD's repeated failed efforts to obtain 510(k) clearance for historical remediation, the need for 510(k) clearance for anticipated fixes (including the LBA defect), and the FDA's discovery of myriad defects in Alaris software.  *See* ¶¶ 13-15, 19, 94, 97-98, 132, 146-49, 153-54, 156-63, 167, 169-72; *see also* Resp. 16-27.[4]

Defendants largely ignore these allegations, hanging their hat on the misguided notion that their statements are not actionable because they "are not alleged to have spoken *at all* to the market

---

of years").  **Nothing** suggests that the need for 510(k) clearance announced on February 6 was limited to "Q1 Upgrades." *Cf.* Reply 16-17.

[4] Defendants' argument that "the assertion that the underlying issues the Q1 Upgrades were implemented to address had 'caus[ed] the FDA to intervene' at the start of the Class Period" is based on BD's meeting with the FDA in the "***winter*** of 2019/2020" and thus "does not speak to why the ship-hold was implemented" is another example of Defendants twisting the Complaint. Reply 17-18. Plaintiff clearly alleges, based on the accounts of multiple FEs, that BD imposed the hold due to: (1) the FDA's discovery of widespread Alaris software defects, and (2) the FDA's rejection of BD's 2019 "catch-up" 510(k) application.  ¶¶ 132, 153-54, 157, 159-61, 167.

about 510(k) clearance until the close of the Class Period." Reply 14 (emphasis in original); *see also id.* 15 n.23. Yet that is precisely the point. Their statements sunnily ascribing the hold to voluntary "upgrades" while ***concealing*** that Alaris lacked needed FDA clearance and that certain "upgrades" were really remedial measures that ***also*** required 510(k) approval (¶¶ 94, 98, 147-51 (LBA remediation)) were misleading ***because*** they concealed the need for FDA clearance.

Defendants' statements also misled by omitting mention of Alaris's myriad defects, including that the shipping hold was driven by the FDA's discovery of those defects (¶¶ 97-98, 146-49, 153-54, 157-59, 167, 169), the "upgrades" and "enhancements" BD was implementing were in fact critical remedial measures designed to redress those defects (including ones singled out for FDA enforcement in the past) (¶¶ 153-54, 156-63, 169), and BD's engagement with the FDA encompassed not only its past failures to obtain 510(k) clearance, but also Alaris's presently defective software. ¶¶ 130, 133-34, 141-43, 146-49, 157-58, 161, 163-67. Later in the Class Period, Defendants falsely assured investors that BD's discussions with the FDA were completed, then issued recall notices that said nothing of the threat to continued Alaris sales.[5] Defendants indisputably acquired a duty to disclose ***both*** sets of obstacles to Alaris's return—the lack of 510(k) clearance and Alaris's intractable defects—when they put "in play," *inter alia,* the expected duration of the shipping hold, the swift resumption of Alaris sales by early FY20, and discussions with the FDA. *See e.g.* ¶¶ 171-72, 270; *see also* ¶¶ 215-16.[6]

---

[5] Defendants cannot simply erase an analyst's reporting of Defendants' public statements at the motion to dismiss stage by declaring it "wrong." *See* Reply 14 n.21; MTD 31 n.41; *see also* ¶ 203. Their attempt to distinguish this case from Plaintiff's authorities by suggesting a rule that ***multiple*** analysts need have issued identical coverage finds ***zero*** support in those cases. Reply 14 n.21. Separately, their Reply effectively concedes that the recall notices were false. *See id*. 12 n.18.

[6] Defendants' continued reliance on *Oran v. Stafford* and *McClain v. Iradimed Corp.* reflects their refusal to face up to Plaintiff's allegations. The very passage of *Oran* from which Defendants selectively quote shows the defendants there lacked knowledge of the risks at the time of the alleged misstatements. Reply 13 (citing 226 F.3d 275, 286 (3d Cir. 2000)) ("[U]ntil the FDA

7

Defendants' other scattershot attacks fly wide of their marks. Their contention that the contrast between "upgrades" and "critical remediation" is a "distinction without a difference" (Reply 17) ignores both the market's incredulity when Defendants disclosed the truth and the commonsense observation that investors would have wanted to know that a key product line was riddled with defects, lacked regulatory clearance, and could not be sold due to recent FDA scrutiny. *See, e.g.*, ¶ 232 (analyst questioning "how this went from sort of a software upgrade to something much more significant" after Defendants announced "software remediation plan" delaying Alaris's return indefinitely). Their dismissal as "ludicrous" that Defendants concealed such FDA scrutiny because "FDA oversight of and involvement with infusion pumps is by its nature continuous and never-ending" (Reply 17 n.26) is itself absurd, as a company may deceive investors about undisclosed enforcement action even in a highly regulated industry. Finally, Defendants' regurgitation of their claim that "BD had been making ongoing modifications to Alaris without 510(k) approval was on the market for years" (Reply 15) fails to grapple with Plaintiff's observation that this fact only made Defendants' characterization of the 1Q20 remediation *more* misleading, as it suggested that these changes, too, did not require 510(k) clearance. *See* Resp. 19-21. In fact, Defendants had repeatedly resolved that 510(k) clearance for historical Alaris changes *was* necessary and that 510(k) clearance for at least some of the *new* remedial changes was *also* required. ¶¶ 130-32, 137-38, 141-43. Defendants thus cannot meet the heavy burden of

---

notified AHP on September 12 of its own data showing a link between the two drugs and heart-valve disorders, there was no statistically significant evidence establishing a serious health risk."). And in *McClain*, there was no allegation that the defendants knew 510(k) clearance was needed, and they promptly disclosed the adverse FDA action before the class period. 111 F. Supp. 3d 1293, 1297-99 (S.D. Fla. 2015) (cited at Reply 13-14). By contrast, BD *itself* recognized the need for 510(k) clearance before the Class Period, and Defendants *concealed* that adverse FDA actions drove the November 2019 shipping hold. ¶¶ 125, 130, 138, 148, 153-54, 161.

establishing a truth-on-the-market defense at the pleading stage. *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 14, 2015).

## 2. The FY20 Guidance and Risk Disclosure Statements Are Actionable

Defendants' central argument concerning the FY20 Guidance (¶¶ 264, 266-68, 270, 272-73, 280, 282, 284, 300-01, 308-09) and "risk disclosures" (¶¶ 287-91) is that "BD's history of modifying Alaris without obtaining 510(k) clearance and without FDA objection suggested that BD could continue selling Alaris as it implemented the Q1 Upgrades." Reply 18. For several reasons, this argument fails. *First*, nothing in the Complaint supports the idea that BD modified and sold Alaris lacking 510(k) clearance "without FDA objection." To the contrary, Plaintiff alleges that the shipping hold was implemented because of: (1) the FDA's discovery of various Alaris software defects; and (2) the FDA's *rejection* of BD's 2019 "catch-up" 510(k) application. ¶¶ 132, 153-54, 157, 159-61, 167. *Second*, BD clearly did *not* believe it "could continue selling Alaris as it implemented the Q1 Upgrades" (Reply 18), *as evidenced by the shipping hold BD imposed to implement those changes*. ¶¶ 158-59.

*Third*, this argument rests on the flawed premise that if BD had escaped sanction for skirting federal regulations previously, it would be permitted to do so for all time, no matter the new conduct. Here, the 1Q20 remediation included a fix designed to address the persistent LBA defect that BD itself had told the FDA required 510(k) clearance after a Class I recall and FDA Form 483. ¶¶ 94, 97-98, 146-48. Defendants do not suggest that the FDA nevertheless permitted remediation of so serious an issue without 510(k) approval. Moreover, the cumulative effect of software modifications could trigger the 510(k) requirement, rendering BD's reliance on a purported lack of prior enforcement even more unreasonable. ¶¶ 52, 234. The combination of adverse FDA action before the Class Period and BD's knowledge that Alaris lacked 510(k) approval for historical changes *and* elements of the 1Q20 remediation thus indeed "posed a clear

9

and present danger to BD's continued ability to sell Alaris" and rendered the FY20 Guidance misleading.  Reply 18 (quoting Resp. 19).[7]

BD's Form 10-K disclosures are likewise actionable.  *See* Resp. 29-31.  Again shifting the focus from their own knowledge to what they claim was the unpredictable whim of the FDA, Defendants claim the risk actually warned of was "that FDA had the power and might take action to prohibit the marketing of BD products, which would negatively impact sales."  Reply 19.  But the FDA's authority to "take action" was obvious to all; what was ***not*** was that the agency had ***already*** taken adverse action ***before*** the Class Period, rejecting BD's "catch-up" 510(k) application and discovering a raft of software defects that impelled the shipping hold.  ¶¶ 132, 159-61, 167, 169.[8]  Similarly, Defendants' contention that the "cautionary language" they attach in their Appendix to purported forward-looking statements was meaningful because "the risk of adverse FDA action had not materialized at the time" overlooks these detailed allegations, corroborated by multiple FEs, about the FDA's pre-Class Period "adverse . . . action."  Reply 21-22; ¶¶ 91-99.  Meanwhile, Defendants still have no explanation (or supporting authority) for how purported statements made on November 21, 2019, can be protected by cautionary language in BD's 2019 Form 10-K issued ***six days later***, on November 27, 2019.  *See* ECF No. 69-17, Stmts. 9-11.  Nor

---

[7] Defendants' recitation of Plaintiff's case law only further undermines their position. The *In re Burlington Coat Factory Securities Litigation* plaintiffs' failure to support their claim that defendants "had no reasonable basis" for their misstatements bears no resemblance to Plaintiff's allegations here. 114 F.3d 1410, 1430 (3d Cir. 1997) (cited at Reply 18 n.29). The Complaint details numerous "material adverse facts" concerning Alaris's compliance problems and software defects that deprived Defendants of "any reasonable basis" for the FY20 Guidance. *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc.*, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008); *see also In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (public statements contradicted what defendants knew).

[8] *Williams v. Globus Med., Inc.*, is inapposite because the risk warned of—an adverse effect on sales due to the end of a distributorship agreement—had not yet come to fruition. 869 F.3d 235, 242-43 (3d Cir. 2017). Defendants knew the risk of FDA action had ***already*** materialized.

do they attempt to identify what "information posted on [BD's] website" inoculated their statements on January 28, 2020. *See id.*, Stmts. 23 & 24.[9]

## II.    PLAINTIFF ADEQUATELY ALLEGES SCIENTER

Addressing scienter, Defendants again whittle Plaintiff's fraud theory down to the question of when Defendants knew "about the FDA's February 2020 510(k) determination." Reply 9; *see also id.* 3, 4, 6, 7, 10, 11, 12. For all the reasons above, this gambit must be rejected. *See supra* Section I.A. Their remaining arguments fail for again ignoring the Complaint's allegations.

### A.    The FE Allegations Are Reliable

Defendants' reheated attacks on the FEs are no better the second time around. Again insisting FE-3's recollection that BD had historically avoided 510(k) approval is somehow fatally inconsistent with FE-1's report of BD's failed "catch-up" application in 2019 (Reply 6), Defendants overlook that ***both*** allegations are corroborated by ***other*** FEs. As to the former, FE-5 reported that BD's MMS unit of BD Medical, which Polen ran from 2014 to 2017, viewed 510(k) submissions as a "death sentence," reflecting concern over FDA attention to a product line already plagued by defects and subject to the ACD. ¶ 135. Meanwhile, FE-2 confirmed that BD deemed 510(k) clearance necessary for unapproved Alaris changes by mid-2019 (¶ 131), while FE-5 recalled two instances in 2018 when BD discussed the need for 510(k) clearance with the FDA. ¶¶ 97, 143, 145-49. The juxtaposition of these facts reflects the truism that one may avoid an undesirable task before acknowledging it can no longer be delayed. If anything, BD's struggles in obtaining FDA approval ***explain*** BD's deep-seated aversion to the 510(k) process.[10]

---

[9] Defendants' misconstrue *In re Celgene Corp. Securities Litigation*. *See* Reply 22 n.37 (citing 2019 WL 6909463, at \*15 n.21 (D.N.J. Dec. 19, 2019)). There, as here, the court had no way to evaluate the supposed cautionary language, supporting the inference that it was ***not***.

[10] Defendants' reading of Plaintiff's cases confirms the FEs' reliability. For example, the "FEs had firsthand knowledge of key issues and engaged in conversations with supervisory-level employees about them" (Reply 5 n.3 (citing *Carmignac Gestion, S.A. v. Perrigo Co. plc*, 2019 WL 3451523,

Defendants then press a counternarrative of disagreement within BD about the need for 510(k) clearance (Reply 6) at odds with the Complaint's detailed allegations of *three separate examples* of BD internally concluding 510(k) clearance was necessary over just a two-year period—*none* of which was disclosed to investors. *See* ¶¶ 139-45 (failed Project Monterey 510(k)), 97-98, 146-48 (notice to FDA about needed 510(k) for LBA fix), 130-33, 167 (failed 2019 510(k)). This "improper factual argument[]" "cannot support their Rule 12(b)(6) motion to dismiss." *Juan Su v. Guang Yang Li*, 2011 WL 3329882, at *5 (D.N.J. Aug. 1, 2011). Separately, Defendants claim the Complaint "nowhere says that the [FDA's] audit findings 'immediately preceded,' much less caused, the October [sic] 2019 Alaris hold" (Reply 7 n.6 (citing ¶ 157)), overlooking that the *same* paragraph states "that *when an FDA auditor learned of these trackers* during the course of an audit in 2019, Alaris product shipments were put on hold by no later than October 31, 2019." ¶ 157; *see also* ¶¶ 159-61 (FE-5 confirming same). The temporal and causal connections between these events is plain and, at minimum, may properly be inferred.

Finally, the "connective tissue" Defendants claim to miss between the alleged intractable Alaris defects and "deficient QS records" on the one hand, and Alaris's withdrawal from the market on the other, is both strong and obvious. Reply 6. First, it was those software defects, discovered by the FDA shortly before the Class Period, that: (1) prompted the November 2019 shipping hold (*see* ¶¶ 138, 153, 157-59, 161, 167, 169, 171); (2) drove the FDA to shut down BD's unilateral attempt to lift the shipping hold in January 2020 after addressing some but not all of the defects (*see* ¶¶ 154, 161-67); (3) impelled BD to issue the February 4 recall notices announcing

---

at *14 (D.N.J. July 31, 2019)), and their "'positions afforded them firsthand knowledge of the underlying facts.'" *Id.* (quoting *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018)); *see, e.g.*, ¶¶ 127, 131, 134-54, 159-66, 175-81. Defendants' remaining FE arguments fail for reasons explained in Plaintiff's Response. *See* Resp. 44 (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 265 (3d Cir. 2009)).

fixes that it falsely indicated would have no revenue impact (*see* ¶¶ 138, 154, 161-63, 206-17); and (4) forced BD's disclosure of a continuing Alaris "software remediation plan," 510(k) submission to obtain FDA approval for those remedial changes, and halt of all Alaris shipments at the end of the Class Period.  ¶¶ 219-35.  Meanwhile, BD's deficient recordkeeping had already doomed one pre-Class Period 510(k) application (Project Monterrey) (¶¶ 141-43) and made the prospect of strong FY20 Alaris sales more precarious because BD *still* could not give the FDA adequate records.  *See* ECF No. 69-4 at 2-3, 8, 10; ¶¶ 41-44, 53, 177-81, 183, 185.  **Both** problems—Alaris's myriad defects and lack of FDA approval for the remedial measures taken to address them—were through-lines of Defendants' fraud, and the FEs' detailed, interlocking allegations describe them with ample particularity.  *See, e.g.*, Resp. 1-2, 6-11, 18-21.

**B.      Viewed Holistically, the Allegations Support a Strong Inference of Scienter**

Defendants again try to pick off Plaintiff's scienter allegations in isolation, ignoring that courts must consider "whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.  First, Plaintiff agrees that the "axiom that trades under a 10b5-1 plan do not support a strong inference of scienter does not apply where a 10b5-1 plan is entered into – or strategically amended – to take advantage of an inflated stock price or insider information."  Reply 8 n.8 (quoting *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012)).  Here, Forlenza's adoption of his plan during the Class Period is significant because, *during that time*, Defendants were aware of but concealed, among other things: (1) rampant Alaris software defects (¶¶ 90-98, 127, 138, 156-63, 169, 219, 224); (2) the FDA's discovery of those defects and its role in driving the Alaris shipping hold (¶¶ 146, 157-61, 163, 165); (3) BD's repeated internal acknowledgment that Alaris lacked the necessary 510(k) clearance for unapproved changes (¶¶ 97-98, 130-33, 135, 139-40, 143, 145-48); and (4) the FDA's knowledge that BD had determined that 510(k) clearance was

needed, without which Alaris could not be lawfully sold.  ¶¶ 97-98, 146-48.[11]

Defendants' claim that "[a]bsent allegations that Defendants knew that the FDA would require a comprehensive 510(k), their executive positions do not support scienter" again misses the point, as that is not what Plaintiff alleges was concealed.  Reply 10.  It defies credulity to assume that Defendants were unaware of the FDA's discovery of Alaris's endemic defects, which had been the subject of at least one FDA Form 483 (¶¶ 97, 146) and prompted the shipping hold that they announced at the beginning of the Class Period, halting sales of a product line they told investors would help carry BD to its ambitious earnings guidance.  ¶¶ 114, 153, 157-59; *cf.* Reply 10 n.13 (quoting *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at \*16 (D.N.J. Mar. 20, 2019) ("company allegedly received an FDA warning letter informing company 'about a problem with a product'")).  Equally implausible is the notion that Defendants did not know that BD had repeatedly determined 510(k) clearance was necessary, informed the FDA of the same, and consistently ***failed*** to obtain the approval needed to continue lawfully selling this flagship product.  ¶¶ 97-98, 146-48.  Indeed, ***Defendant Polen personally oversaw*** BD's post-mortem of the Project Monterrey 510(k) application that the FDA ***rejected***.  ¶ 145.  That Defendants' statements often came in response to analyst queries further supports a finding of scienter.  *See*

---

[11] While Defendants focus on the percentage of shares Forlenza and Polen sold compared to their total holdings, they ignore the suspect timing and abnormal amounts compared to prior sales, which support a strong inference of scienter. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (finding scienter where defendants' sales were not routine as compared with their prior trading pattern); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*16 (D.N.J. Dec. 6, 2018) ("[T]he percentage of holdings sold off in this case would not affect the outcome. . . . The reason: the timing, amount – as compared to sales from the previous year, and individuals involved all support a plausible allegation of scienter."). Meanwhile, that the shares were not sold at the Class Period's highest price does not negate such a finding, as Defendants cannot be expected to predict the market with precision. *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*19 (N.D. Cal. Nov. 27, 2018).  Finally, Defendants' observation that "the SAC does not allege that the[] alleged 'misstatements' affected BD's stock price in real time" (Reply 8 n.10) fails because they fraudulently maintained BD's artificially inflated share price.

*Avaya*, 564 F.3d at 270-71; *Papa,* 2018 WL 3601229, at *21 (executives' statements during Q&A with analysts "indicated personal knowledge of the subject").

Finally, Defendants' assertion that "BD disclosed that it was 'in discussions with the FDA' about both 'the timing of implementation' of the Q1 Upgrades and 'the possibility of bundling them with a new software version," such that "investors knew of BD's ongoing interactions with the FDA from the start" turns the Complaint on its head.  Reply 10.  Plaintiff plainly alleges that those statements were fundamentally misleading because they obscured that the November 2019 shipping hold was driven by adverse FDA action, that the purported "upgrades" were in fact critical remedial repairs, and that BD knew and had communicated to the FDA that both historical Alaris changes and 1Q20 modifications required 510(k) clearance.  ¶¶ 274-75, 285, 306, 312. Defendants' disclosures at the end of the Class Period that the Company had been in talks with the FDA about BD's Alaris "remediation plan" and that such talks had ***not*** been limited to merely the "timing" of software "upgrades" and "enhancements" constituted clear admissions of wrongdoing, and they, too, are strong evidence of scienter.  *See* ¶¶ 219, 221, 224-25, 231-34.

## III.    PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION

Again warping the Complaint, Defendants argue the alleged corrective disclosure was information Defendants had learned only days earlier.  Reply 23-24.  In fact, it revealed the fundamental circumstances Plaintiff claims Defendants had hidden all along:  serious, widespread Alaris defects, Alaris's lack of needed 510(k) clearance, and resulting adverse FDA action affecting BD's ability to sell Alaris.  *See* Resp. 49.  These allegations more than satisfy Rule 8(a).

## CONCLUSION

For all these reasons, Defendants' Motion should be denied.

15

Dated: July 19, 2021                                    Respectfully submitted,


**CARELLA BYRNE CECCHI**                   **KESSLER TOPAZ**
**OLSTEIN BRODY & AGNELLO, PC**            **MELTZER & CHECK, LLP**
                                           Joshua E. D'Ancona
_s/ James E. Cecchi_                       Eric K. Gerard (admitted _Pro Hac Vice_)
James E. Cecchi                            Vanessa Milan (admitted _Pro Hac Vice_)
Donald A. Ecklund                          280 King of Prussia Road
5 Becker Farm Road                         Radnor, PA 19087
Roseland, NJ 07068-1739                    Telephone: (610) 667-7706
Telephone: (973) 994-1700                  Facsimile: (610) 667-7056
Facsimile: (973) 994-1744                  jdancona@ktmc.com
jcecchi@carellabyrne.com                   egerard@ktmc.com
decklund@carellabyrne.com                  vmilan@ktmc.com


_Liaison Counsel for the Putative Class_   _Counsel for Lead Plaintiff Industriens_
                                           _Pensionsforsikring A/S and Lead Counsel for_
                                           _the Putative Class_

16

## CERTIFICATE OF SERVICE

I, James E. Cecchi, hereby certify that on July 19, 2021, I caused a true and correct copy of the foregoing Lead Plaintiff's Sur-Reply Memorandum of Law in Further Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 19, 2021

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative Class*

17