**CARELLA BYRNE CECCHI**
**OLSTEIN BRODY & AGNELLO, PC**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Sharan Nirmul
David A. Bocian
Joshua E. D'Ancona
Vanessa Milan (admitted *Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Lead Plaintiff Industriens
Pensionsforsikring A/S and Lead Counsel
for the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BECTON, DICKINSON AND COMPANY, VINCENT A. FORLENZA, THOMAS E. POLEN, and CHRISTOPHER R. REIDY,<br><br>Defendants. | Case No. 2:20-cv-02155-SRC-CLW<br><br>Hon. Stanley R. Chesler<br>District Judge<br><br>Hon. Cathy L. Waldor<br>Magistrate Judge<br><br>**MOTION DAY**: TO BE DETERMINED |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   FACTUAL BACKGROUND.................................................................................5

      A.    Alaris and Defendants.................................................................................5

            1.    BD, BD Medical and the Medication Management Solutions Unit ............5

            2.    Alaris.........................................................................................7

                  a.    Device and FDA Regulation............................................................7

                  b.    Alaris's Role as a "Key Brand" and Driver of BD Revenues..........8

            3.    Individual Defendants Forlenza, Reidy and Polen Consistently Discussed Alaris in Statements to Investors ................................................9

      B.    In Pre-Class Period FDA Meetings, the FDA Learned of the Extent of Alaris Defects and Explicitly Told BD It Should Not Ship Alaris due to the Issues ...................................................................................................10

      C.    In Direct Response to the FDA, BD Immediately Imposed the Ship Hold, Halting Alaris Sales and Shipments........................................................12

      D.    In the Pre-Class Period Meetings, the FDA Also Stated That BD Should Seek a New Alaris 510(k), and in Response, BD Immediately Started Preparing a 510(k) Submission .................................................................12

      E.    Polen, Forlenza and BD Upper Management Were Promptly Informed about the Outcomes of the Pre-Class Period FDA Meetings, and Knowledge of the Meetings was Widespread throughout BD..............................14

      F.    Defendants Characterized the Alaris Ship Hold to Investors but Failed to Disclose That BD Had Imposed the Ship Hold Because the FDA Had Said to .......................................................................................................15

      G.    In December 2019, the FDA Asked BD to Confirm That the Ship Hold Was Still in Place, and BD Represented That it Was ..........................................16

      H.    Days Later, BD Made Certain Alaris Modifications, Leaving Aside "More Significant" Issues, and Resumed Shipping without Informing the FDA.............17

      I.    In December 2019, Polen and Forlenza Began Selling BD Shares .......................17

      J.    When the FDA Found Out That BD Had Started Shipping Alaris Again, It Rejected the Move—and Reaffirmed Its Unchanged Position That Alaris Should Not Be Shipped, and Needed a 510(k) ........................................18

      K.    Defendants Told Investors That Alaris Shipments Had Resumed in Full and FY20 Guidance Was on Track, as Forlenza Continued to Dump Shares.........................................................................................................19

      L.    Defendants Made Negative Disclosures Related to the Fraud, Causing BD to Lose $10 Billion in Market Capitalization .......................................20

i

M.    Post-Class Period Developments ...........................................................................20

III.    PLEADING STANDARD ..............................................................................................21

IV.    PLAINTIFF STATES A SECTION 10(b) CLAIM ......................................................21

A.    Plaintiff Alleges Actionable Misrepresentations and Omissions..........................22

1.    Defendants Misrepresented and Omitted Material Facts about the Precipitating Cause and Ongoing Risk of the Ship Hold..........................23

a.    Defendants Misrepresented Why BD Stopped Shipping Alaris...............................................................................................23

b.    Defendants Misrepresented the Fact That the FDA Expressly Told BD That It Should Obtain a New Alaris 510(k) ....................................................................................26

2.    Defendants' Misrepresentations about Alaris Sales and BD's FY20 Guidance Lacked a Reasonable Basis............................................27

3.    Defendants Misrepresented That Alaris Risks Were Contingent ..............28

4.    Defendants' Falsity Arguments Mischaracterize the TAC........................29

5.    The TAC's FE-Based Allegations Are Internally Consistent, Highly Detailed and Reliable.....................................................................36

B.    The Safe Harbor Does Not Apply to Defendants' Misrepresentations..................39

1.    Defendants' Misrepresentations and Omissions of Present Fact Fall outside the Safe Harbor..............................................................................39

2.    Defendants' Statements Lacked a Reasonable Basis.................................40

3.    The Cautionary Language Was Not Effective ..........................................41

4.    The Safe Harbor Does Not Apply to Defendants' Omissions ..................42

C.    Plaintiff Pleads Scienter.......................................................................................42

1.    Defendants Had Knowledge of Facts and Access to Information .............43

2.    Defendants' Detailed Public Statements Support Scienter.......................47

3.    Alaris's Importance to BD Further Supports Scienter ..............................49

4.    Defendants Were Motivated to Conceal the Truth ...................................51

D.    Plaintiff Pleads Loss Causation ...........................................................................53

V.    PLAINTIFF STATES A SECTION 20(a) CLAIM.......................................................55

VI.    PLAINTIFF STATES A SECTION 20A CLAIM .........................................................55

VII.    CONCLUSION..............................................................................................................55

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Lab'ys Sec. Litig.*,
  2008 WL 1967509 (D.N.J. March 24, 2019) ..........................................................38

*In re Adolor Corp. Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009) ....................................................................46

*In re Advance Auto Parts, Inc., Sec. Litig.*,
  2020 WL 599543 (D. Del. Feb. 7, 2020) ...............................................................40

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)..................................................................................49

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ..........................................................47, 49, 50

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) ..............................................................50

*In re Amarin Corp. PLC.*,
  2015 WL 3954190 (D.N.J. June 29, 2015) .............................................................46

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................21

*In re AT&T Corp. Sec. Litig.*,
  2002 WL 31190863 (D.N.J. Jan. 30, 2002) .......................................................40, 42

*In re ATI Techs., Inc. Sec. Litig.*,
  216 F. Supp. 2d 418 (E.D. Pa. 2002) ....................................................................24

*Bauer v. Eagle Pharms., Inc.*,
  2017 WL 2213147 (D.N.J. May 19, 2017) .............................................................46

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006)..................................................................................35

*Bing Li v. Aeterna Zentaris, Inc.*,
  2016 WL 827256 (D.N.J. Mar. 2, 2016)..................................................................55

*Brennan v. William Paterson Coll.*,
  34 F. Supp. 3d 416 (D.N.J. 2014) .........................................................................22

*In re Bristol-Myers Squibb Sec. Litig.*,
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) .........................................................25, 26

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)........................................................................40, 42

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)..............................................................22, 36, 38, 44

*In re Cambrex Corp. Sec. Litig.*,
2005 WL 2840336 (D.N.J. Oct. 27, 2005).............................................................43

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) .................................................................25, 48

*In re Cell Pathways, Inc. Sec. Litig.*,
2000 WL 805221 (E.D. Pa. June 20, 2000)..........................................................31

*In re Cephalon Sec. Litig.*,
1997 WL 570918 (E.D. Pa. Aug. 29, 1997) .........................................................28

*City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for
N. Cal. v. Toll Bros., Inc.*,
2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ..................................................28, 41

*In re Columbia Lab'ys, Inc. Sec. Litig.*,
2013 WL 5719500 (D.N.J. Oct. 21, 2013).............................................................46

*In re CommVault Sys., Inc. Sec. Litig.*,
2016 WL 5745100 (D.N.J. Sept. 30, 2016) ...........................................................34

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 9, 2018)...........................................................40, 42

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018).............................................................48

*In re Discovery Lab'ys Sec. Litig.*,
2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ..........................................................31

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
2019 WL 1299673 (D.N.J. March 21, 2019)..........................................................38

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).....................................................................................53, 54

*In re Egalet Corp. Sec. Litig.*,
340 F. Supp. 3d 479 (E.D. Pa. 2018) ....................................................................46

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)..................................................................................53

iv

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 14, 2015)......................................................................50, 52

*Fain v. USA Techs., Inc.*,
    707 F. App'x 91 (3d Cir. 2017) ................................................................................................49

*Feinberg v. Am. Express Co.*,
    2011 WL 4807916 (E.D. Pa. Oct. 7, 2011)...............................................................................34

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) ..........................................................................28, 43, 47

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................................47

*In re Genta, Inc., Sec. Litig.*,
    2005 WL 2416970 (D.N.J. Sept. 30, 2005) ..............................................................................48

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
    2014 WL 4064256 (N.D. Ohio Aug. 18, 2014).........................................................................26

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ......................................................................................................53

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)...................................................................25, 35, 50

*Hoey v. Insamed Inc.*,
    2018 WL 902266 (D.N.J. Feb. 15, 2018) .................................................................................32

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
    2021 WL 4191467 (D.N.J. Sept. 15, 2021) ...................................................................... *passim*

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    2020 WL 1479128 (E.D. Pa. Mar. 25, 2020).............................................................................29

*Inst. Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................................................... *passim*

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
    173 F. Supp. 2d 129 (S.D.N.Y. 2001)................................................................................33, 34

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    363 F. Supp. 3d 476 (D. Del. 2019)..........................................................................................39

*Lovallo v Pacira Pharms., Inc.*,
    2015 WL 7300492 (D.N.J. Nov. 18, 2015) ..............................................................................31

v

*In re Lucent Techs., Inc. Sec. Litig.*,
    217 F. Supp. 2d 529 (D.N.J. 2002) ...................................................................24

*In re Majesco Sec. Litig.*,
    2006 WL 2846281 (D.N.J. Sept. 29, 2006) ......................................................33

*Marsden v. Select Medical Corp.*,
    2007 WL 1725204 (E.D. Pa. June 12, 2007) ...............................................54, 55

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).......................................................................................22, 23

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007).........................................................................5, 54

*McClain v. Iradimed Corp.*,
    111 F. Supp. 3d 1293 (S.D. Fla. 2015) ............................................................32

*McCullough v. Advest, Inc.*,
    754 F. App'x 109 (3d Cir. 2018) ................................................................34, 35

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................................................. *passim*

*In re Merck & Co., Inc., Sec., Derivative & "ERISA" Litig.*,
    2012 WL 3779309 (D.N.J. Aug. 29, 2012) .......................................................25

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245, 251 (2d Cir. 2014).....................................................................29

*Mill Bridge V, Inc. v. Benton*,
    2009 WL 4639641 (E.D. Pa. Dec. 3, 2009).......................................................48

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..............................................................................45

*Odeh v. Immunomedics, Inc.*,
    2020 WL 4381924 (D.N.J. July 31, 2020)........................................................29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).........................................................................................36

*In re Par Pharm. Sec. Litig.*,
    2009 WL 3234273 (D.N.J. Sept. 30, 2009) .......................................................51

*Pearlstein v. BlackBerry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015)...........................................................47, 48

vi

*Pelletier v. Endo Int'l plc*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) ................................................................38

*In re PolarityTE, Inc., Sec. Litig.*,
    2020 WL 6873798 (D. Utah Nov. 22, 2020) ........................................................32

*In re PTC Therapeutics, Inc. Sec. Litig.*,
    2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...................................................47, 48

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................................41

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)....................................................... *passim*

*Sapir v. Averback*,
    2016 WL 554581 (D.N.J. Feb. 10, 2016) .............................................................46

*SEB Inv. Mgmt. AB v. Endo Int'l, plc*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ............................................................. *passim*

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)..............................................................................46

*Senn v. Hickey*,
    2005 WL 3465657 (D.N.J. Dec. 19, 2005).....................................................52, 53

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3rd Cir. 1992) ........................................................................ *passim*

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2d Cir. 1999)................................................................................51

*Sturgeon v. Pharmerica Corp.*,
    438 F. Supp. 3d 246 (E.D. Pa. 2020) ..................................................................35

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)..........................................................................51, 52

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    2019 WL 2849933 (D.N.J. July 2, 2019)..............................................................52

*In re Synchronoss Sec. Litig.*,
    705 F. Supp. 2d 367 (D.N.J. 2010) ...............................................................47, 48

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................21, 42, 43

vii

*Tomaszewski v. Trevena, Inc.*,
   482 F. Supp. 3d 317 (E.D. Pa. 2020) ................................................................35

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ...............................................33, 38, 39, 52

*U.S. v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ...............................................................22

*United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*,
   316 F.3d 392 (3d Cir. 2003) ...............................................................22

*In re Urb. Outfitters, Inc., Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................ *passim*

*Utesch v. Lannett Co., Inc.*,
   385 F. Supp. 3d 408 (E.D. Pa. 2019) ................................................32, 48

*Va. Sur. Co., Inc. v. Macedo*,
   2011 WL 1769858 (D.N.J. May 6, 2011) ..........................................22

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
   2019 WL 2724075 (D.N.J. June 30, 2019) ........................................55

*In re Viropharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) .................................................42, 51, 52

*In re Viropharma, Inc. Sec. Litig.*,
   2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .......................................35

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   2015 WL 3755218 (E.D. Pa. June 16, 2015) ....................................50

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ..................................................48

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997) ............................................................21

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) ..............................................................29

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) .............................................22, 29, 32, 33

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
   2020 WL 3169506 (D.N.J. June 12, 2020) .......................................42

**Statutes**

15 U.S.C. § 78u-4(b)............................................................................................21, 22

15 U.S.C. § 78u-5(c)..................................................................................................39

**Other Authorities**

17 C.F.R. § 240.10b-5(b)...........................................................................................22

## GLOSSARY OF DEFINED TERMS[1]

| TERM | DEFINITION |
|---|---|
| "Q1" or "Q1 FY20" | BD's first quarter of FY20, October 1 to December 31, 2019 |
| "Q2" or "Q2 FY20" | BD's second quarter of FY20, January 1, 2020 to March 31, 2020 |
| "510(k)" | FDA's Premarket Notification 510(k) program |
| "ACD" | The Amended Consent Decree with the U.S. Department of Justice covering all Alaris infusion pumps |
| "Alaris" | BD's Alaris infusion pump line |
| "BD" or "Company" | Becton, Dickinson and Company |
| "cGMP" | Current Good Manufacturing Practice |
| "Class" | The putative class of BD shareholders who purchased or otherwise acquired BD common stock during the Class Period |
| "Class Period" | November 5, 2019, to February 5, 2020 (both dates inclusive) |
| "Complaint" or "TAC" | Plaintiff's Third Amended Class Action Complaint (ECF No. 91) |
| "Defendants" | BD, Forlenza, Polen, and Reidy (collectively) |
| "FDA" | U.S. Food and Drug Administration |
| "FE" | Former employee |
| "Forlenza" | Vincent A. Forlenza |
| "FY19" | BD's 2019 fiscal year, running from October 1, 2018, to September 30, 2019 (both dates inclusive) |
| "FY20" | BD's 2020 fiscal year, running from October 1, 2019, to September 30, 2020 (both dates inclusive) |
| "FY20 Guidance" | BD's FY20 financial guidance, announced November 5, 2019 |
| "Individual Defendants" | Forlenza, Polen, and Reidy (collectively) |
| "KVO" | Keep vein open |
| "LBA" | Low battery alarm |
| "Motion" or "MTD" | Defendants' Motion to Dismiss the Third Amended Class Action Complaint (ECF Nos. 99 & 99-1) |
| "MMS" | BD Medical's Medication Management Solutions unit |
| "Opinion" or "Op." | September 15, 2021 Opinion (ECF No. 87); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467 (D.N.J. Sept. 15, 2021) (Chesler, J.) |
| "Plaintiff" | Lead Plaintiff Industriens Pensionsforsikring A/S |
| "Polen" | Thomas E. Polen |
| "PSLRA" | Private Securities Litigation Reform Act of 1995 |
| "QS" | FDA Quality System |
| "Reidy" | Christopher R. Reidy |
| "Rule" | Federal Rule of Civil Procedure |
| "SAC" | Plaintiff's Second Amended Class Action Complaint (ECF No. 60-2) |

---

[1] Unless otherwise noted, capitalized terms have the same meanings as in the TAC; "¶" refers to paragraphs in the TAC; internal quotation marks and citations are omitted; and emphasis is added.

Plaintiff, individually and on behalf of the Class, submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Third Amended Class Action Complaint.

## I.    PRELIMINARY STATEMENT

This case presents a simple, straightforward fraud.  BD, CEO Forlenza, COO Polen, and CFO Reidy informed investors of a major corporate action costing BD large sums of revenue:  as of Q1 of BD's 2020 fiscal year, the Alaris infusion pump system—a key BD product which had driven much-touted revenue growth in recent years—was not shipping to customers or generating revenues ("ship hold").  According to Defendants, BD had paused shipments to allow for Alaris upgrades in its ordinary "process" of modifying its devices.  They stated that, while BD was discussing the timing and implementation of the upgrades with the FDA, the ship hold would end within the quarter (which ran from October 1-December 31, 2019).  Defendants also disclosed BD's FY20 Guidance, in which they projected "strong" revenue growth of 5%-5.5% for the year, and that such growth incorporated robust Alaris sales after Q1 FY20.  Unknown to investors, these and similar statements by Defendants throughout the Class Period fraudulently concealed the truth—including the most important, adverse factor that had precipitated the ship hold.

The fact of the matter, which Defendants hid, was that, in meetings between BD and the FDA immediately preceding the Class Period ("Pre-Class Period FDA Meetings"), the FDA, after learning of various Alaris problems and BD's ineffectual responses, had expressly told BD that it should not be shipping Alaris to consumers.  BD stopped Alaris shipments and sales as a direct result.  As a former employee ("FE") who represented BD in the meetings put it, the FDA was "the impetus for the ship hold."  In other words, BD's chief U.S. regulator was the reason for the Alaris sales freeze.  The FDA also told BD that it should get a new premarket clearance ("510(k)") for Alaris, invoking a time-consuming and challenging process of regulatory approvals for device

1

changes. BD immediately started intensive preparations on the Alaris 510(k) submission, but knew it would take months to complete, and months more to pass through FDA review.

These were material, adverse facts withheld from investors. The true causes and risks of the ship hold were far more negative than Defendants disclosed. That the FDA had called for the ship hold and a new Alaris 510(k) meant that a key source of BD's revenues was shut off not for standard upgrades, but due to a severe regulatory problem with minimal probability of a near-term resolution. If disclosed, these facts would have dramatically altered the mix of information that investors were evaluating to understand the risks to revenues from Alaris sales after Q1 FY20, and whether BD could reasonably achieve its FY20 Guidance. But Defendants instead concealed these facts and provided materially misleading, incomplete explanations of the ship hold to the market.

BD's troubles deepened in December 2019, when, days after the FDA checked with the Company *to confirm* Alaris remained on ship hold, BD implemented a few device fixes and unilaterally resumed Alaris shipments without any communication to the FDA. At around the same time, with the market misled about the true risks to BD's FY20 Guidance prospects, Defendants Forlenza and Polen off-loaded BD stock netting over *$58 million* in proceeds in seven weeks. Meanwhile, Defendants continued to publicly tout Alaris sales in FY20 and reaffirm the FY20 Guidance. When the FDA found out about BD's unilateral action, it swiftly rejected it, reaffirming its position stated before the Class Period, and caused BD to re-instate the ship hold.

Boxed in, Defendants publicly acknowledged the regulatory bind that had beset Alaris for months. Defendants announced on February 6, 2020 that, in connection with ongoing discussions with the FDA, Alaris shipments would be indefinitely halted, and Alaris would need a new 510(k). The loss of Alaris sales caused BD to slash its FY20 Guidance by $400 million and cut its revenue growth estimate nearly in half from 5%-5.5% to 2.5%-3.5% for the year. Stunned investment

analysts pressed Defendants to explain how what Defendants had billed as ordinary upgrades was in fact something much more serious. BD's stock price fell $33.74 per share on the disclosure, decimating roughly $10 billion in shareholder wealth in one day. Plaintiff brought this suit to recover investors' losses from Defendants' fraud.

The Court dismissed the prior complaint with leave to replead because of a lack of allegations sufficient to support falsity or scienter. These deficiencies have been cured in the TAC with detailed new allegations, including facts reported by centrally-placed FEs with personal knowledge of the events at issue, and related refinement of Plaintiff's claims. The TAC alleges with specificity Defendants' actionable misrepresentations about the ship hold, BD's communications with the FDA, Alaris sales in FY20 and the FY20 Guidance. Detailed facts supplied by new FEs who worked on Alaris regulatory and quality compliance issues, including an FE who represented BD in its meetings on Alaris with the FDA, and FEs who worked on BD's 510(k) preparations for Alaris, amply support a reasonable inference that Defendants' positive public statements failed to disclose material adverse facts about the nature and risks of the ship hold and halted Alaris sales. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 82 (3rd Cir. 1992) (statements putting material subjects "in play" are actionable if they "omit[] certain facts contradicting the[] representations"). Indeed, mutually corroborative FE reports confirm both that it was known and communicated throughout BD that the FDA was the impetus for the ship hold, and BD's extensive efforts to prepare an Alaris 510(k) starting in Q1 FY20. The falsity of Defendants' alleged misstatements and omissions is clear.

Defendants' scienter is just as plain. Based on FE reports, the TAC specifically alleges that the Individual Defendants were directly informed of the Pre-Class Period FDA Meetings and resulting ship hold. Corroborating that fact, the Individual Defendants repeatedly went before

investors on behalf of the Company to provide commentary on the status of the ship hold and communications with the FDA, the FY20 Guidance and Alaris sales in FY20. Defendants' personal knowledge is also plausibly bolstered through other circumstantial facts, including their repeated, detailed and authoritative statements about Alaris and the ship hold, Alaris's core importance as an engine of BD revenues, the breadth of internal actions BD took in response to the FDA's call for a ship hold and 510(k), the FDA's unique power over Alaris under a consent decree, and Polen's prior personal involvement in Alaris regulatory problems. The inference is further bolstered by Forlenza and Polen's massive insider stock sales just before the truth was disclosed, and the investigation into BD by the SEC Enforcement Division related to Alaris. Considered collectively, as they must be, these facts support a strong inference of scienter.

Defendants contest three elements of Plaintiff's Rule 10b-5 claim: falsity, scienter and loss causation. Defendants' primary falsity argument is that they had no duty to disclose any information about the ship hold during the Class Period beyond what they publicly stated. MTD at 19-23. The pivotal question is: given what Defendants chose to tell the market about the ship hold and its effect on revenues, was the true reason *why* the ship hold was instituted—the FDA's explicit call for it, along with a 510(k)—a material, adverse fact? *See SEB Inv. Mgmt. AB v. Endo Int'l, plc*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018) ("once a company has chosen to speak on an issue . . . it cannot omit material facts"). It was. Plaintiff has comprehensively established the materiality of the facts Defendants omitted, including through allegations of Alaris's importance to BD, investment analysts' consistent questions about the nature of the ship hold and related talks with the FDA, and the Individual Defendants' repeated public statements about these matters. On this record, materiality—which Defendants do not affirmatively contest—is amply alleged. *Shapiro*, 964 F.2d at 280 ("Only if the alleged misrepresentations or omissions are so obviously

unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.").

On scienter, Defendants claim that the TAC's collective direct and circumstantial allegations, including that the Individual Defendants were personally informed of the FDA's actions, are insufficient to show their personal knowledge or recklessness. They suggest the more plausible inference is that the Individual Defendants went before investors to address the halting of Alaris sales in Q1 FY20—a major corporate action that was costing BD millions of dollars in revenues—without being informed of the most basic of questions: *why it was happening*. In light of all of the facts alleged, that inference is beyond implausible and must be rejected.

On loss causation, Defendants insist that the negative Alaris information BD disclosed on February 6, 2020 was not meaningfully related to information they misrepresented in the Class Period. But the alleged corrective disclosures more than "touch upon" the matters Defendants fraudulently concealed. *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 428 (3d Cir. 2007). Rule 8(a) is satisfied.

Lastly, Defendants' arguments that Plaintiff's Section 20A and Section 20(a) claims fail for lack of predicate liability cannot succeed, given the sufficiency of Plaintiff's 10b-5 claim.

The Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Alaris and Defendants

#### 1.    BD, BD Medical and the Medication Management Solutions Unit

BD is a medical technology company that manufactures medical devices, instrument systems, and reagents. ¶ 31. It lists its common stock for sale to investors on the New York Stock Exchange under the ticker symbol "BDX." *Id.*

BD operates three business segments: BD Medical, BD Life Sciences, and BD

5

Interventional.  ¶ 33.  For years before and during the Class Period, BD Medical was BD's largest segment, delivering more than half of the total annual revenues of the entire Company.  ¶ 34.

Leading up to the Class Period, the MMS unit was one of the two largest business units of BD Medical—and was by far the fastest growing unit, driving its growth.  ¶¶ 34-36, 105-06.  MMS marketed and sold infusion systems (Alaris) as well as interoperable dispensing and informatics devices (Pyxis and HealthSight).  ¶¶ 35, 61, 102-03.

MMS was organized into several functions that oversaw and managed the medical device design, manufacturing, regulatory and quality compliance, and marketing activities that the unit carried out.  ¶¶ 37-39, 64-83.  In particular, for Alaris and other devices sold by MMS:  (i) the MMS Quality function carried out BD's compliance with FDA regulations and Quality System ("QS") requirements, led during and before the Class Period by Global Head of Quality Keith Mclain; (ii) the MMS Regulatory Affairs (or Regulatory) function bore responsibility for regulatory affairs actions, led until November 1, 2019 by Jessica Smith, Global Head of Regulatory Affairs, and later by Neelu Gibson and others;[2] (iii) the MMS R&D function carried out design, testing and other matters for MMS devices, led during and before the Class Period by Steven Smith, Global Head of R&D; and (iv) the MMS Business function, led by Ranjeet Banerjee, Global Head of the MMS Business, carried out, e.g., sales and marketing actions for MMS products.  ¶¶ 38-39.  The functional areas overlapped extensively (e.g., Quality and Regulatory Affairs), and the function heads served on a joint MMS Leadership Team and met at least monthly to coordinate on MMS product matters.  ¶¶ 40-41.  When BD had to meet with the FDA about MMS products, and specifically Alaris, it was regularly represented in the meetings by the relevant MMS

---

[2] In one passage (¶ 39(b)), the TAC misstates Ms. Smith's title as "Global Head of Quality" due to an inadvertent typographical error.  Her position is stated correctly as "Global Head of Regulatory Affairs" at all other times in the TAC (see ¶¶ 39, 42, 124).

executives, in particular Mclain and Smith.  ¶ 42; *see also* ¶¶ 124, 126, 138.

### 2.    Alaris

### a.    Device and FDA Regulation

Alaris is an electronic infusion pump system medical professionals use to deliver blood, medication or other critical fluids to patients, and which operates using a range of hard- and software.  ¶¶ 60-63.  The FDA classifies Alaris as a Class II medical device, meaning it possesses a potential for dangerousness, and requires BD's Alaris-related operations to comply with applicable FDA QS regulations and cGMP standards.  ¶¶ 65-66, 71, 94-95.[3]  Failure to comply may prompt the FDA to impose penalties under its enforcement authority.  ¶¶ 64, 70.  In addition to the FDA's ordinary powers, since 2009, Alaris has been subject to an amended consent decree with the FDA ("ACD"), which authorized the FDA to take enforcement actions specifically related to non-compliance in connection with Alaris.  ¶¶ 92-93.

Because Alaris is a Class II medical device, BD must obtain approval through the FDA's 510(k) premarket clearance process before implementing any change that could significantly affect its safety, effectiveness or intended use.  ¶¶ 72-73.  A 510(k) submission package must include all design documentation, testing data and other information necessary to allow for FDA review, and the manufacturer must submit it to the FDA at least ninety days before it intends to begin marketing the changed device.  ¶¶ 73-75.  If the package is complete, and no further information is needed, the FDA aims to rule on the 510(k) within 90 days; but if further information is required (as routinely occurs), the process lengthens by 180 days or more.[4]  ¶¶ 75-77.

---

[3] These regulations include, for example, the requirement to document all software changes and to maintain complete design and change history files.  ¶¶ 67-69.

[4] In one pertinent example, BD's failed non-public 510(k) application for Alaris changes dubbed Project Monterey was pending at the FDA approximately ***eight months***, from November 2017-June 2018, before BD withdrew it for lack of adequate device documentation.  ¶¶ 157-62.

### b.    Alaris's Role as a "Key Brand" and Driver of BD Revenues

Before the Class Period, Alaris was a "Key Brand" driving revenues for BD for several years. *See* ¶¶ 1-2, 101-06.  BD acquired Alaris through its purchase of CareFusion in 2015, which doubled the size of BD Medical, and allowed BD to sell the market-leading Alaris system as well as CareFusion's Pyxis dispensing system, which BD actively promoted alongside Alaris and a suite of other Alaris-compatible devices. ¶¶ 86-88, 102-03, 108-09.  Pre-Class Period, Alaris commanded approximately 70% of the infusion pump market (¶ 127), and was an engine of continuous revenue growth for BD Medical and BD—as BD trumpeted in its SEC filings.[5]

During the Class Period, as discussed further below, Defendants touted Alaris's leading role as a revenue driver for BD, stating that Alaris sales were the swing factor between supposed Company-wide revenue growth of 1%-2% in Q1 FY20 (absent Alaris sales) and robust full-year FY20 revenue growth for BD of 5%-5.5% (propelled by resumed Alaris sales).  *See* ¶¶ 199-200, 211-12.  And, once disclosed by Defendants, the loss of Alaris sales for essentially all of FY20 was calculated to adversely impact BD revenue by $400 million for FY20 alone and drive a sharp cut in BD's overall guidance from 5% to 5.5% to 2.5% to 3.5%.  ¶¶ 243-44.

Given its role as a consistent source of BD revenues, Alaris was of considerable importance to investors.  Quarter after quarter, investment analysts covering BD focused on Alaris as a key factor in Company growth.[6]  *See* ¶¶ 114 (February 5, 2019 reports on BD by Evercore ISI and

---

[5] For example: (i) BD's November 21, 2018 Form 10-K for FY18 highlighted sales of infusion systems (i.e., Alaris) as a driver of "revenue growth" (¶ 105); (ii) BD's May 9, 2019 Form 10-Q for Q2 FY19 highlighted that BD Medical revenue growth was in part "attributable to [MMS's] installations of infusion systems" (¶ 106); and (iii) BD's August 6, 2019 Form 10-Q for Q3 FY19 again credited Alaris for the same (*id*.).  Defendants Forlenza and Reidy signed and certified BD's Forms 10-K and 10-Q, in accordance with the Sarbanes-Oxley Act.  ¶¶ 43, 45.

[6] BD was covered by investment firms including, e.g., Bank of America Merrill Lynch, Barclays, BMO Capital Markets, Cowen and Co., Evercore ISI, Goldman Sachs, J.P.Morgan, UBS, Wells Fargo, William Blair, and Zacks.  *See* ¶¶ 108, 112-120, 202-08, 213-14, 251, 255-56.

BMO Capital Markets noting Alaris growth); 116 (May 9, 2019 BMO Capital Markets report on BD noting growth "driven by strength in infusion systems"); 118 (August 6, 2019 J.P.Morgan report noting MMS was "standout once again, as the company continued to gain share with … Alaris and Pyxis"); 119 (November 1, 2019 Cowen report noting "continued momentum and share gains from Alaris … and Pyxis" as providing "tailwind" for BD earnings); 120 (November 4, 2019 Zacks report calling out Alaris as a product that "continue[d] to drive the company").   This focus on Alaris by investment analysts covering BD continued during the Class Period (¶¶ 202, 204-09, 214-15, 223, 228-29, 341), and after its end (¶¶ 251, 255-57).

### 3.   Individual Defendants Forlenza, Reidy and Polen Consistently Discussed Alaris in Statements to Investors

Reflecting personal knowledge of matters concerning Alaris and its importance to BD, BD's senior-most officials Forlenza,[7] Polen[8] and Reidy[9] routinely discussed Alaris and answered analyst questions about the device in public statements on behalf of the Company.   In just the roughly ten months before the Class Period, for example:

- On January 3, 2019, Forlenza answered a Goldman Sachs analyst's question about the "pump business" by asserting that Alaris had recently done "exceptionally well," and that an even "bigger driver" was "the interoperability" between Alaris, Pyxis and "the entire system," and that "the pumps are a vital part of that" (¶ 108);

- On January 22, 2019, Forlenza stated that Alaris was "continuing to fuel growth" for BD, along with the interoperable suite of MMS devices (¶ 109);

- On February 5, 2019, Forlenza stated on BD's quarterly earnings call that the Company expected "continued strong growth in MMS … particularly on the pump side of things" (¶ 110);

- On March 12, 2019, Polen answered a Barclays Bank PLC analyst's question about how investors should "think about the … Pyxis and the Alaris business going

---

[7] Forlenza was BD's CEO October 2011-January 28, 2020.  After retiring as CEO, Forlenza did not leave the Company, but remained actively involved in its oversight as a Director.  ¶ 43.

[8] Polen became BD's President in 2017.  He also served throughout the Class Period as BD's COO. ¶ 44.  Polen became CEO on January 28, 2020.  *Id.*

[9] Reidy served as BD's CFO and Chief Administrative Officer throughout the Class Period.  ¶ 45.

forward," by speaking at length about Alaris and the Company's continued "vision" from "the time of the CareFusion acquisition" (¶ 115); and

- On September 4, 2019, at an investor conference, Polen answered an analyst's question on "drivers" of BD's performance in part by stating, "the vast majority of that came from U.S. MMS infusion pump business [that grew] mid-teens" (¶ 112).

As described in detail below (Sections II.F, K, L, M), the Individual Defendants continued to discuss Alaris and related revenues in extensive detail during the Class Period (*see, e.g.*, ¶¶ 199-202, 215, 219-20, 227), at its end (¶¶ 246, 250, 252) and afterwards (¶¶ 259, 263). Thus, they consistently spoke to investors as authorities on Alaris issues on behalf of BD.

**B.    In Pre-Class Period FDA Meetings, the FDA Learned of the Extent of Alaris Defects and Explicitly Told BD It Should Not Ship Alaris due to the Issues**

In August-October 2019, the FDA met and communicated with BD regarding Alaris pump issues in the non-public Pre-Class Period FDA Meetings, which culminated directly in the ship hold Defendants announced to investors on November 5, 2019. ¶¶ 122-23. Numerous FEs provide detailed, consistent reports about these meetings and related actions by BD. ¶¶ 47-59, 123-45, 166-67, 174-92.[10] BD's representatives in the meetings included Mclain, Smith, Bhupesh Mahendru (Sr. Director, Quality, MMS) and Michelle Badal (VP of Regulatory Compliance, Quality, MMS)—i.e., BD's executives with direct responsibility for Alaris quality and regulatory issues. ¶¶ 38-42, 56, 124-26, 132.

According to FE-6—a senior executive in MMS with primary responsibilities for Alaris quality matters and a lead BD representative in the Pre-Class Period FDA Meetings—the meetings began in August 2019, when the FDA asked BD for information about potential issues with Alaris alarms, including the KVO alarm. ¶¶ 53, 127-30. FE-6 reports that, upon reviewing BD's

---

[10] The FEs worked on Alaris-related projects prior to and/or during the Class Period in positions within the core MMS functions: Quality (FE-2, FE-4, FE-6, FE-9, FE-10), Regulatory Affairs (FE-5, FE-8), and R&D (FE-7). ¶¶ 49, 51-57. FEs 1, 3 and 11 were engineers within the MMS unit who worked on engineering projects for the Alaris system at relevant times. ¶¶ 48, 50, 58.

10

information and response, the FDA identified defects in the device alarms that needed to be fixed.

¶ 130. FE-9—an Associate Director of Quality in MMS who reported directly to Mahendru—reports that attendee Mahendru informed him that the FDA became "frustrated" in the meeting with BD's responses to its Alaris alarm inquiries, and called for a larger follow-up meeting with BD to address "what was going on" with the device. ¶¶ 56, 130-31.

BD's follow-up meeting with the FDA on Alaris occurred in September or October 2019. ¶¶ 131-32, *see also* ¶¶ 136, 145. BD's primary representatives at this pivotal meeting remained Mclain, Smith, Mahendru and Badal. ¶¶ 132, 138. FE-6 participated in the meeting on behalf of BD. ¶ 133. Per FE-6, consistent with the FDA's call for a broader review of Alaris issues, in the meeting BD presented not only the alarm issues addressed previously, but also historical changes that BD had made to Alaris, and outstanding defects, software "anomalies" and issues with the device that BD had identified over time. *Id.* Other FE reports corroborate that BD presented multiple outstanding Alaris issues to the FDA—only some of which the FDA had known of previously. *See* ¶ 138 (Mahendru informed FE-9 that BD fully briefed FDA on numerous issues in early fall meeting); ¶¶ 52, 143 (FE-5 reporting that FDA learned of numerous Alaris software anomalies and errors in 2019 ahead of the ship hold); ¶¶ 50, 142 (FE-3 reporting that FDA learned of numerous defects in Alaris in roughly October 2019).

After BD's presentation to fully brief the FDA on Alaris issues, the FDA asked BD how long it would take to remediate the identified defects, and BD estimated nine months. ¶ 138. FE-6 reports that the FDA reacted negatively to the presented issues, and, in his presence, *stated its position that: (i) "[BD] should have been fixing these issues"; (ii) "[BD] should do a 510(k)"; and (iii) "we [the FDA] don't think [BD] should be shipping this product with these issues*." ¶ 135. Corroborating this percipient witness account, FE-9 was informed by Mahendru that BD's

11

responses in the "big meeting with the FDA" were "unacceptable to the FDA," and that the FDA "directed" and "dictated" that Alaris be placed on a ship hold.  ¶ 139.

### C. In Direct Response to the FDA, BD Immediately Imposed the Ship Hold, Halting Alaris Sales and Shipments

According to FE-6, "as soon as" the FDA stated to BD that Alaris should not be shipped given its defects, BD imposed the Alaris ship hold.  ¶ 136 (hold imposed in "less than an hour or two").  Put simply, FE-6 reports, *the FDA was "the impetus" for the ship hold*.  *Id.*

Multiple FEs independently corroborate that the Alaris ship hold was the direct result of the pre-Class Period communications from the FDA to BD.  *See* ¶ 139 (FE-9 informed by Mahendru that FDA "directed" and "dictated" that ship hold be imposed); ¶¶ 57, 126, 140 (FE-10, an MMS Senior Regulatory Compliance Specialist, informed by attendee Badal that the FDA "had placed a freeze" on Alaris shipments); ¶ 142 (FE-3 informed that Alaris put on ship hold in approximately October 2019 after FDA learned of device defects); ¶ 143 (FE-5 informed through Alaris responsibilities and MMS Regulatory colleagues that device anomalies and issues FDA saw in 2019 were driving factors for the ship hold); ¶¶ 54, 144 (FE-7, an MMS R&D Program Manager, learned from supervisors that in "September or October" 2019 the FDA had stated its express position that Alaris should be placed on ship hold in discussions with BD about device problems).

BD's executives responsible for Alaris quality issues—Mclain and Mahendru—executed the ship hold on behalf of BD.  ¶ 136.  This drastic action halted both Alaris shipments and sales, diminishing BD revenues, starting in Q1 FY20.  *See* ¶¶ 2, 177, 199-200, 210-15.

### D. In the Pre-Class Period Meetings, the FDA Also Stated That BD Should Seek a New Alaris 510(k), and in Response, BD Immediately Started Preparing a 510(k) Submission

As noted, the FDA also explicitly told BD in the Pre-Class Period FDA Meetings that BD should seek new pre-market clearance for Alaris.  ¶ 136.  Echoing FE-6's percipient account, FE-

11 reports that MMS Quality team members informed him that the FDA told BD in the fall of 2019 that it would have to submit a 510(k) for Alaris in connection with the ship hold.  ¶ 141.

Lending credence to these independent reports, ***BD actively started preparing to seek a new 510(k) for Alaris in and after Q1 FY20*** (October-December 2019), enlisting numerous professionals to prepare the extensive package of materials needed.  In October 2019, FE-5 personally worked on a regulatory assessment project on Alaris software changes to support a 510(k) application for the device.  ¶ 166.  FE-6 reports that in and after November 2019, MMS was working on building the voluminous data and testing results sets the Alaris package would require, with several 510(k) projects being handled by Luchy Roteliuk, a VP of R&D in MMS.  ¶ 181.  FE-8, an Associate Director of Regulatory Affairs in BD's MMS unit, personally worked on BD's 510(k) submission for Alaris in 2019 and 2020; he confirms that BD's Alaris 510(k) development was underway early in FY20.  ¶¶ 55, 182.  FE-8 also reports that his supervisor, Katie Walton, had significant responsibilities for BD's ongoing work and strategy on the Alaris 510(k), along with BD Medical's Mark O'Donnell, and recounts seeing whiteboards in Walton's office just after the holidays in January 2020 reflecting her ongoing work on the Alaris 510(k).  ¶ 182.[11]

Defendants knew the Alaris 510(k) submission BD was preparing would present significant challenges, not least because of the failure the year before of BD's non-public 510(k) application for some of the same fixes, internally dubbed "Project Monterey."[12]  ¶¶ 155-64.  FE-6 worked on

---

[11] Consistent with all these reports, FE-5 also recounts that, in early November 2019, the entire BD Regulatory Affairs department was assigned to a comprehensive review of Alaris changes that the FDA had recently called for, that demanded 70% of their time going forward.  ¶ 175; *see also* ¶ 260 (June 2020 Polen statement that "150 people" were working on Alaris 510(k) submission). And, FE-8 recounts attending a meeting in "***January*** or February of 2020" in which Polen and Amy Simunovich, Head of Regulatory Affairs at BD Medical, discussed the Alaris ship hold and 510(k), which Simunovich predicted would not be obtained for approximately 24 months.  ¶ 167.
[12] FE reports confirm that the same LBA issue that BD sought to correct through Project Monterey was at-issue in the Pre-Class Period FDA Meetings, the ship hold, and the 510(k) BD was

13

Project Monterey, which BD submitted in 2017 to clear Alaris corrections including a fix for a low battery alarm ("LBA") issue that had prompted a Class II recall in 2016-2017 but remained unresolved. ¶¶ 96, 156-57. FE-6 reports that after the FDA provided negative feedback due to missing documentation, BD withdrew the application in 2018 to avoid an adverse agency decision. ¶ 158. The independent report of FE-5, who also personally worked on Project Monterey in 2017-2018, corroborates FE-6's report. *See* ¶¶ 159-64. FE-5 also recounts that Defendant Polen was personally involved in Project Monterey: after June 2018, Polen directed an analysis of why the 510(k) application covering the Alaris LBA issue had failed. ¶ 164. Polen's personal involvement in that Alaris regulatory episode in 2018 is consistent with his knowledge of the much more serious—and revenue-impacting—FDA trouble driving the Alaris ship hold in late 2019.

> **E.    Polen, Forlenza and BD Upper Management Were Promptly Informed about the Outcomes of the Pre-Class Period FDA Meetings, and Knowledge of the Meetings was Widespread throughout BD**

FE-6 reports that BD's senior management was informed of the Pre-Class Period FDA Meetings "at every step of the way," and that he participated in such reporting up the chain of command to the Individual Defendants. ¶ 145. Unsurprisingly, given the stakes for BD, FE-6 confirms that Forlenza and Polen were informed about the meetings, their outcomes and the imposition of the costly ship hold—and that all the senior leaders were made aware of these revenue-shaping events. *Id.* FE-6 confirms that Polen was informed before he spoke to investors about the Alaris ship hold on BD's November 5, 2019 earnings call. *Id.*

Indeed, not just management, but people "throughout the business" soon knew about the FDA meetings and the ship hold. *Id.* Reports of, e.g., FE-9 (¶¶ 138-39), FE-10 (¶ 140), FE-11

---

preparing in and after Q1 FY20. *See* ¶¶ 133-34, 138-39, 143, 181, 184. The same unresolved Alaris issue was the subject of a non-public Form 483 BD received from the FDA in late 2018. ¶¶ 97-99, 149-53. In the absence of an approved software fix for the problem, BD had developed a "work-around": telling consumers to regularly throw away the batteries. ¶ 151.

14

(¶ 141), and FE-7 (¶ 144), independently corroborate these allegations and reflect widespread internal discussions in fall 2019 about the Pre-Class Period FDA Meetings and resulting ship hold.

**F.    Defendants Characterized the Alaris Ship Hold to Investors but Failed to Disclose That BD Had Imposed the Ship Hold Because the FDA Had Said to**

Defendants disclosed the Alaris ship hold to investors on November 5, 2019, and discussed it repeatedly during the Class Period alongside statements regarding FY20 Alaris sales, on which the FY20 Guidance relied. *See, e.g.,* ¶¶ 195-203, 210-15. Their statements misrepresented and concealed from investors the material adverse fact that Alaris sales and shipments had halted because of the FDA's explicit communication to BD, and so prevented investors from fairly evaluating both BD's present trouble and the probability that the loss of Alaris revenues in Q1 FY20 would go on indefinitely. ¶¶ 9, 194-95. Instead, they characterized the ship hold as effectively routine maintenance that would pause Alaris revenues only briefly.

For example, on November 5, 2019, during BD's 4Q19 and FY19 earnings call, Forlenza and Reidy disclosed the FY20 Guidance, and Reidy described the ship hold and its supposed revenue impacts:  it would dampen BD's Q1 revenue growth to 1%-2%, but ***the resumption of Alaris sales roughly within the quarter would allow BD to grow revenues 5%-5.5% in FY20***. ¶¶ 198-200, 298-301. Regarding Alaris sales, Polen referred to its track record of market share growth, and stated—a month into Q1 FY20—"we see no slowdown in that momentum." ¶ 202.

Additionally, in prepared remarks, Reidy told investors that BD had imposed the ship hold in order to "***make some improvements to our Alaris pump software, including upgrades to alarm prioritization and optimization***," and stated, with respect to the FDA's role, that "*[w]e are in discussions with the FDA about the timing of implementation of these upgrades and the possibility of bundling them with a new software version release*." ¶¶ 199-201, 301. Defendants did not disclose that FDA findings regarding numerous Alaris defects had directly precipitated the

15

ship hold.    Instead, in response to investment analyst questioning, Reidy and Polen both characterized the ship hold further, with Polen stating, "***it's part of our process and our strategy in the business to continually iterate and make enhancements to the platform***…. And we've been making those same type of investments in software upgrades over the past couple of years. ***And this upgrade right here is a continued reflection on those investments*** …." ¶¶ 202, 302-04.

Analysts widely accepted Defendants' representations regarding the purportedly temporary sales and shipping hold, the role of the FDA, and BD's FY20 Guidance. *See* ¶¶ 203-09.

Further, at the November 21, 2019 Jeffries London Healthcare Conference, in response to analyst questioning about "factors" and "puts and takes" affecting BD's FY20 Guidance, BD's representative stated, *inter alia*, "[w]e're upgrading some software in the pumps, and that will delay some installations and shipment into the subsequent quarters, and we anticipate getting all of that back inside of the fiscal year." ¶¶ 210-13, 310-15.   At the Evercore HealthCONx Conference on December 4, 2019 (now near the end of Q1 FY20), Reidy told investors that BD saw Alaris continuing to grow its infusion pump market share in FY20, as it had done in FY19 ("the pump side, we've been taking 200 points of share last year, and we see that continuing, and we have some visibility to that"), and responded to an analyst question by characterizing the ship hold's revenue impact as "a timing issue. First half issue." ¶¶ 214-15, 330-34.[13]

At no time during the Class Period did Defendants disclose to investors that the FDA had been the impetus for the ship hold, and had told BD that it should get a 510(k) for Alaris.

G.      **In December 2019, the FDA Asked BD to Confirm That the Ship Hold Was Still in Place, and BD Represented That it Was**

Underscoring the FDA's position on the matter, in a non-public meeting in late 2019 the

---

[13] Further, in its November 27, 2019 Form 10-K, signed and certified by Forlenza and Reidy, BD identified potential regulatory risks that "could" potentially impact its sales in the future. ¶¶ 319-28 (requirements of regulators "could delay or prevent" the "marketing or sale of our products").

FDA asked BD to confirm that Alaris was, in fact, on a ship hold. ¶ 178. FE-6, a participant in the meeting, reports that it occurred in roughly December 2019, while the ship hold was in effect.[14] *Id.* BD's lead representative in the meeting, Mclain, confirmed to the FDA that BD was not shipping Alaris—and the FDA responded with clear approval. *Id.* Similarly, FE-5 reports that, during the pendency of the ship hold announced in November 2019, the FDA asked BD to confirm that Alaris "was on ship hold," and BD confirmed to the agency that it was. ¶ 179.

### H.    Days Later, BD Made Certain Alaris Modifications, Leaving Aside "More Significant" Issues, and Resumed Shipping without Informing the FDA

Meanwhile, BD implemented fixes for certain Alaris defects. According to FE-6, who was personally involved, BD's Alaris modifications did not address the larger, "more significant" device defects the FDA had reviewed in the Pre-Class Period FDA Meetings. ¶¶ 180, 184. They did not include a fix for the LBA issue, for example—but did include "minor ones." *Id.*

Then, prior to December 25, 2019, after implementing these limited fixes, BD unilaterally lifted the ship hold, resuming Alaris shipments and sales. ¶¶ 180, 184-85.[15] BD did so just *after* the meeting in which the FDA had explicitly asked BD to confirm that Alaris was *on* a ship hold. ¶¶ 178, 184-86. BD did not even communicate with the FDA about lifting the ship hold before taking that major action. ¶¶ 185-87.

### I.    In December 2019, Polen and Forlenza Began Selling BD Shares

In the background, starting in December 2019, Defendants Forlenza and Polen sold tens of thousands of their personally held shares, reaping millions of dollars in illicit proceeds. Forlenza sold over *$4.3 million* worth of shares on December 12, 2019, outside of any 10b5-1 stock trading plan. ¶ 271. He then executed a trading plan on December 16, 2019, and sold an additional *$50*

---

[14] Per FE-6, during the Class Period, BD—stuck on the ship hold and needing a 510(k) clearance that would take extensive time and work—was "damned if you do, damned if you don't." ¶ 192.
[15] Polen confirmed that BD had lifted the ship hold in December 2019. ¶ 250.

*million* worth of shares in January 2020.  ¶¶ 271-74.  Polen sold over *$3.7* million worth of shares on December 16, 2019.  ¶ 277.  They made these sales after making misrepresentations to investors about the ship hold, and Alaris and BD revenues, and just before the forthcoming disclosure of negative information that investors did not see coming.  ¶¶ 273-75, 278-79.

> **J.** **When the FDA Found Out That BD Had Started Shipping Alaris Again, It Rejected the Move—and Reaffirmed Its Unchanged Position That Alaris Should Not Be Shipped, and Needed a 510(k)**

Approximately three weeks after BD unilaterally lifted the ship hold, the FDA found out what BD had done, and rejected the move.  ¶¶ 187-90.  FE-6 participated as a representative of BD on the non-public call with the FDA.  ¶ 190.  Participants for BD included Mclain, Mahendru, Badal and O'Donnell.  ¶¶ 189-90.  According to FE-6, the FDA reacted negatively, and, after hearing BD's rationale, rejected it, and reaffirmed its position to BD all along, including that BD needed a 510(k) for Alaris.  *Id.*  BD re-imposed the ship hold immediately.  *Id.*

FE-8 corroborates this report.  FE-8 was informed of this meeting by his supervisor, Walton, who was informed by meeting participant O'Donnell, with whom Walton worked on the Alaris 510(k).  ¶ 189.  FE-8 reports that when the FDA learned in January 2020 that BD had lifted the ship hold, its response was "forceful," and drove BD to resume the ship hold.  *Id.* (BD had to resume Alaris ship hold "immediately, or face the wrath of FDA and the Justice Department").  Reinforcing these independent accounts, FE-5 reports that BD's resumption of Alaris sales in December 2019 was not authorized or accepted by the FDA, and that the FDA's response upon learning of it was essentially, "You did what?!," obligating BD to resume the ship hold.  ¶ 188.

Thus, BD re-imposed the ship hold in direct response to the FDA confirming *for the third time* that Alaris should not be shipped due to device defects and needed a new 510(k).  FE-6 reports that, consistent with the Pre-Class Period FDA Meetings, the report of events and the resumption of the ship hold "quickly went to everyone."  ¶ 191.  In particular, it was reported to BD's "senior

18

management within an hour or so." *Id.*

> **K.     Defendants Told Investors That Alaris Shipments Had Resumed in Full and FY20 Guidance Was on Track, as Forlenza Continued to Dump Shares**

As these adverse events went on outside the public eye, Defendants made more misrepresentations about Alaris shipments and sales and the FY20 Guidance. ¶ 225. For example, on January 14, 2020 at a JPMorgan Healthcare Conference, an investment analyst asked Polen for an "update" on "pump shipments" and related communications "from the FDA." ¶ 341. Evincing command of the topic, Polen responded that BD "[f]ully resumed shipping in the first quarter … we're back to shipping in Q1 to the majority of our customers." ¶¶ 219, 342. Asked if that "played out as expected," Polen responded, "[e]xactly as expected." ¶¶ 220, 343.

Then, on January 28, 2020, at BD's Annual Shareholders Meeting, Forlenza again affirmed the FY20 Guidance, stating, "[O]ur quarter is consistent with the guidance we provided in November, and we are on track for the full year." ¶¶ 227, 346-47.[16] Finally, on February 4, 2020, BD notified the public it was issuing a "voluntary recall" to address certain Alaris software issues, including the LBA defect, through "an upcoming software release." ¶¶ 231-33, 236-37. It did not disclose that Alaris was unavailable for shipment or sale for an indefinite period of time (let alone the adverse reason why), rendering the FY20 Guidance unattainable. ¶¶ 234-35, 238.

Investment analysts covering BD, ignorant of the true state of affairs, repeated Defendants' storyline about Alaris from the beginning of the Class Period to the end. *See, e.g.*, ¶¶ 205, 208-09, 223-24. Tellingly, a February 3, 2020 Cowen report to investors on BD noted that "mgmt. publicly revealed that discussions with the FDA were completed and Alaris U.S. shipments returned in full during F1Q," and noted in positive terms management's "public disclosures that the Alaris software upgrade was completed and shipping was fully resumed in F1Q." ¶¶ 228-30.

---

[16] By then, Forlenza and Polen had sold 212,044 shares in seven weeks for ***$58 million***. ¶ 271.

**L.    Defendants Made Negative Disclosures Related to the Fraud, Causing BD to Lose $10 Billion in Market Capitalization**

The truth was revealed to the market on February 6, 2020 when, in a press release and earnings conference call regarding Q1 FY20, Defendants disclosed that BD was halting shipments and sales of Alaris indefinitely for software remediation and to seek a new 510(k) for the device. ¶¶ 240-42. BD estimated an adverse revenue impact of $400 million in FY20, and lowered its FY20 Guidance from 5%-5.5% to 2.5%-3.5%, "entirely" due to "the pump issue." ¶¶ 241-48. Stunned investment analysts fired questions at Defendants reflecting the market's shock that what Defendants had portrayed as a commonplace software upgrade was actually something far worse (as Defendants knew all along). For example, a Bank of America Merrill Lynch analyst asked, "I'm struggling to understand … how this went from sort of a software upgrade to something much more significant." ¶ 251; *see also* ¶ 249 (analyst from William Blair & Company L.L.C. asking "what specifically did the FDA come in and say…?"). Polen's lengthy answers referenced BD's preceding "ongoing dialogue" with the FDA, and how BD internally had handled past Alaris changes. ¶¶ 249-52. Polen also offered the material misimpression that it had not been until February 3, 2020 ("this Monday") that the FDA had conveyed to BD "the need for a new 510(k)." ¶ 250. In truth, the FDA had consistently stated this position to BD since before the Class Period.

Upon the disclosure, BD's stock price plunged by *$33.74*, or nearly 12%, in one day, eliminating roughly $10 billion in market capitalization and shareholder value. ¶ 253.

**M.    Post-Class Period Developments**

Reflecting Alaris's core importance to BD, on May 7, 2020, Polen told investors that the 510(k) application for Alaris was "the critical priority for the company." ¶ 259. He asserted that "the executive team" was "directly engaged" on the Alaris project "on a daily and weekly basis." *Id.* Despite the benefit of preparations started in October 2019, BD did not submit its Alaris 510(k)

20

application until April 26, 2021.  ¶¶ 250, 258-61.  BD's public disclosures, including its Form 10-Q dated February 3, 2022, indicate that as of this writing, the FDA still had not granted clearance.

Meanwhile, the SEC is investigating BD with respect to possible securities violations in connection with Alaris.  BD disclosed in its May 6, 2021 Form 10-Q that in February 2021, BD received "a subpoena from the Enforcement Division of the SEC requesting information from the Company relating to, among other things, Alaris infusion pumps," and that BD was "cooperating with the SEC and responding to these requests." ¶¶ 264-65.

## III.   PLEADING STANDARD

A complaint will survive a motion under Rule 12(b)(6) if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint meets this standard if it "pleads factual content that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged." *Id.*  The court considers the complaint in its entirety, takes its factual allegations as true, and construes them in the light most favorable to plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 326 (2007); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997). While allegations suggesting a "mere possibility of unlawful conduct will not do," the complaint "need not demonstrate that a defendant is probably liable" for wrongdoing.  Op. at 17.

## IV.   PLAINTIFF STATES A SECTION 10(b) CLAIM

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  Op. at 18.  In addition, a federal securities fraud complaint must satisfy the requirements of the PSLRA and Rule 9(b) by specifically alleging "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and stating "with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1)(B) & (2)(A); *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). The TAC alleges with specificity facts establishing every element of a Rule 10b-5 claim. Defendants challenge the TAC as to just three: material misrepresentations or omissions; scienter; and loss causation. Their challenges all fail.[17]

### A.    Plaintiff Alleges Actionable Misrepresentations and Omissions

Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To plead falsity, the complaint must "support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).

In accordance with Rule 10b-5, courts have long recognized that, "[a]bsent a duty to disclose, silence is not fraudulent or misleading under Rule 10b-5…. When you speak, however, and it is material, you are bound to speak truthfully." *U.S. v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010). "[O]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading." *Williams v. Globus Med., Inc.,* 869 F.3d 235, 241 (3d Cir. 2017). Similarly, an omission from a public statement may violate Rule 10b-5 where it is material, i.e., where there is

---

[17] Defendants urge the Court not to revisit rulings it made on the prior superseded pleading under "the law of the case doctrine." MTD at 16. The TAC is an amended pleading with dozens of new factual allegations and contentions and significantly evolved claims—very different from the prior pleading this Court dismissed. The law of the case doctrine does not preclude new consideration of an amended pleading such as the TAC. *Va. Sur. Co., Inc. v. Macedo*, 2011 WL 1769858, at *6-7 (D.N.J. May 6, 2011); *see also United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 398 (3d Cir. 2003) ("we must be careful to prevent the doctrine from being used to prevent a properly raised argument from being considered even *once*") (emphasis in original); *Brennan v. William Paterson Coll.*, 34 F. Supp. 3d 416, 427 (D.N.J. 2014) (law of the case doctrine would not "appropriately dictate a result" where "there is new evidence (in this context . . . new allegations)").

"a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Op. at 20 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).  Thus, incomplete or misleading disclosures about material issues are unlawful.  The TAC alleges that Defendants violated Rule 10b-5 by making misleading statements of material fact and omitting material facts when addressing the Alaris ship hold, the extent of existing Alaris regulatory issues and risks, Alaris sales in FY20, and the FY20 Guidance.

### 1. Defendants Misrepresented and Omitted Material Facts about the Precipitating Cause and Ongoing Risk of the Ship Hold

During the Class Period, Defendants characterized the ship hold and related discussions that BD had with the FDA in public statements to the market.  *See* ¶¶ 199, 201-02, 212, 215, 219-20, 301-04, 313, 315, 333-34, 341-43. The allegations in the TAC support a reasonable inference that these statements were actionably false and misleading.  *See* ¶¶ 305-06, 318, 335, 344.

### a. Defendants Misrepresented Why BD Stopped Shipping Alaris

Defendants' statements were materially false and misleading because they did not disclose the material, adverse reason why the ship hold had been implemented:  specifically, because the FDA, upon learning the extent of Alaris defects and BD's "unacceptable" responses in meetings in August-October 2019, had told BD that Alaris should not be shipped to consumers.  ¶¶ 130-39. In direct response, BD stopped shipments.  ¶¶ 135-36, 138-39.  Multiple, consistent FE reports corroborate that the FDA was "the impetus" for this drastic action (and that this fact was rapidly communicated throughout the Company).  ¶¶ 135-45.  This material fact is amply alleged.

Further supporting the reasonable inference that the FDA precipitated the ship hold, FE reports also show that BD was not addressing new problems with Alaris in the ship hold, but issues it had known of previously, and had presented when fully briefing the FDA about Alaris in the

Pre-Class Period FDA Meetings. ¶¶ 130-36, 138-39, 142-44.[18]   BD had not halted Alaris shipments based on those internally-known issues before.  What was *new*, and triggered the ship hold, was that the FDA now knew the extent of Alaris's outstanding issues and BD's responses— and on that basis, had said it should not be shipped. *Id.*

More corroboration comes from independent FE reports that the FDA expressed the same, resolute position to BD twice more in close succession—in December 2019, when the FDA specifically confirmed with BD that Alaris was not shipping, and in January 2020, after it learned that BD had unilaterally lifted the ship hold, and swiftly rejected the move, causing BD to resume it.  ¶¶ 178-79, 184-191.  That the FDA precipitated the ship hold is decisively pled.

Defendants' statements discussing the ship hold in Q1 FY20 were actionable for their failure to disclose the critical factor that had driven this major, revenue-affecting corporate action. ¶¶ 305-06, 318, 335, 344; *see, e.g.*, *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 558 (D.N.J. 2002) (defendant "omitted critical facts explaining the reasons for the revenue loss and in doing so, withheld information that a reasonable investor might consider important in making investment decisions"); *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002) (attributing material event or result "to the wrong source[] is misleading under the securities laws").  Their January 14, 2020, alleged misrepresentation about the purported successful resumption of Alaris sales in December 2019 was further actionable because it did not disclose the critical fact that the FDA had not known of BD's resumption of Alaris sales, but had expressly stated that Alaris should not be shipped.  ¶¶ 340, 344.  *Endo*, 351 F. Supp. 3d at 897, 900 (defendant

---

[18] While the FDA had known about some of the Alaris issues previously (*see* MTD at 10), such as the LBA issue (¶ 134), the full extent of outstanding issues and "anomalies," and BD's responses, were new.  ¶¶ 130-31, 133, 135, 138-39, 142-44.

may not describe "a favorable picture" of material issue "without including the details that would have presented a complete and less favorable one").

To be sure, the undisclosed fact that BD stopped shipping Alaris at the FDA's insistence—and not merely in BD's ordinary "process … to continually iterate" or because of an industry-wide initiative (¶¶ 202, 208)—was highly material to investors, who were trying to assess the significance of the underlying issues, and how long the cessation of sales would continue to hurt revenues.[19]  The questions and reports of investment analysts about the ship hold, its expected impact and duration, and BD's related communications with the FDA underscore investors' focus on those issues.  *See* ¶¶ 202, 207, 209, 228-29, 333, 341; *see also In re Urb. Outfitters, Inc., Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("In the context of specific inquiries" from analysts on the issue, "and the consistent content of [defendants'] responses, defendants' omission of actual circumstances that were contrary to their answers presents 'an obvious risk of misleading investors'" (quoting *Avaya*, 564 F.3d at 270 n.43)).  Defendants elected to speak about the halted Alaris shipments and sales; by failing to disclose the highly material underlying FDA action, Defendants breached a legal duty and violated Rule 10b-5.  *In re Merck & Co., Inc., Sec., Derivative & "ERISA" Litig.*, 2012 WL 3779309, at *3 (D.N.J. Aug. 29, 2012) (Chesler, J.) (company must disclose material information about issue it puts "in play" in public statements); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) ("[b]y placing the nature of the Company's" conduct "in play," defendants acquired duty to disclose adverse facts); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 590 (D.N.J. 2001) (actionable misrepresentation where company failed to attribute result to true source); *In re Bristol-Myers Squibb Sec. Litig.,* 2005 WL 2007004, at *23 (D.N.J. Aug. 17, 2005) ("a defendant may choose

---

[19] Defendants do not contest the materiality element.

silence or speech based on the then-known factual basis, but cannot choose half-truths"); *see also*

*Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *7 (N.D. Ohio Aug. 18, 2014)

("Defendants appreciated the gravity of the FDA's concerns, knew the risks facing the Company,

yet downplayed and mischaracterized them in disclosures to the investing public.").

        **b.**       **Defendants Misrepresented the Fact That the FDA Expressly Told BD That It Should Obtain a New Alaris 510(k)**

Defendants' misrepresentations concerning the ship hold and FDA communications were

also materially false and misleading because they omitted the fact that, in addition to stating it

should not be shipped, the FDA had also told BD that it should obtain new 510(k) regulatory

clearance for Alaris. ¶¶ 135-36, 141. BD's swift internal response reflects the force of the FDA's

express position: in the weeks following the Pre-Class Period FDA Meetings, BD began broad

action on the "voluminous" 510(k) application for needed Alaris fixes. ¶¶ 166, 175, 181-82.

Defendants knew the Alaris 510(k) process would be lengthy and fraught with risk. BD

had told the FDA that correcting the Alaris fixes alone would take approximately nine months,

with agency review of the 510(k) taking months more. ¶¶ 73-77, 138. BD's knowledge of the

failure of the Project Monterey 510(k) application the year before (for some of the same Alaris

issues) indicated that obtaining clearance may be a particular challenge. ¶¶ 155-64. The FDA's

position that Alaris should get a new 510(k) severely undermined Defendants' claim that revenue

would catch up by year end, and their failure to disclose this material information prevented the

investing public from independently evaluating that likelihood. ¶ 192. Omitting this material

adverse fact was actionably false and misleading. *See Shapiro*, 964 F.2d at 282 (statements putting

material subjects "in play" actionable if they "omit[] certain facts contradicting the[]

representations"); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199,

at *10 (D.N.J. Aug. 8, 2011) ("positive statements" about drug misleading "for failure to completely and accurately represent [negative] information known" at same time).[20]

### 2.    Defendants' Misrepresentations about Alaris Sales and BD's FY20 Guidance Lacked a Reasonable Basis

During the Class Period, Defendants also repeatedly reaffirmed the FY20 Guidance and issued positive statements about Alaris sales in FY20 on which that guidance relied:

- the November 5, 2019 disclosure of BD's FY20 Guidance to investors, including "strong revenue growth of 5% to 5.5%" for the Company.  ¶¶ 198-99, 296-99;

- Reidy stated to investors on November 5, 2019 that the ship hold "is expected to move the timing of some [Alaris] sales from Q1 to the balance of the fiscal year" such that BD's revenues would be phased, and "we expect revenue growth in the first half of [FY20] to be approximately 100 basis points below the full year guidance range driven by [Q1] revenue growth" of 1%-2%.  ¶¶ 199-200, 301, 303;

- Polen stated to investors on November 5, 2019 that BD had seen "about 200 basis points of gain in infusion" market share in FY19, and that (now over one month into Q1 FY20) "we see no slowdown in that momentum."   ¶¶ 202, 304;

- BD stated to investors on November 21, 2019 that:  (i) "we're expecting the first half [of FY20] to be about 4%, the back half to be about 6%; (ii) the ship hold "will delay some installations and shipment into the subsequent quarters, and we anticipate getting all of that back inside of the fiscal year"; and (iii) regarding "Alaris pump business," "although we do see some timing outside of Q1 and into the subsequent quarters of fiscal '20 . . . we expect that momentum to continue when you look at the full year of fiscal '20."  ¶¶ 212-13, 311, 313, 315;

- Reidy stated to investors on December 4, 2019—in response to an analyst question—"pump side" BD had taken market share in FY19, "and we see that continuing, and we have some visibility to that."  ¶¶ 214, 330-31; and

- Polen (along with Reidy) and Forlenza, in statements to investors on January 14 and January 28, respectively, reaffirmed FY20 Guidance, and stated BD was on track to meet it.  ¶¶ 218, 227, 338-39, 346-47.

These statements were actionably false and misleading.  ¶¶ 307-08, 316-17, 335-36, 340, 349.

---

[20] Defendants' February 4, 2020 statements disclosing an Alaris recall involving "education," "reference guides and training videos" and a future "software release" were actionable for failing to disclose that the FDA had rejected BD's resumption of Alaris sales and reaffirmed the need for a new 510(k), resulting in an indefinite halt to Alaris shipments.  ¶¶ 231-38.

In particular, Defendants' statements about Alaris sales in FY20, including their expected timing, and the current sales growth "momentum" Defendants were "see[ing]" in Q1 FY20, were actionable because the FDA had expressly told BD that Alaris should not be shipped and should obtain new regulatory clearance, rendering profoundly unlikely the prospect of Alaris shipments promptly resuming and driving BD revenues for the rest of FY20.  Defendants' statements concealed the true, far-more-adverse state of affairs.  *Frater v. Hemispherx Biopharma, Inc*., 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("When the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.").

For similar reasons, Defendants' statements affirming the FY20 Guidance were false and misleading.  Defendants made clear that BD's ability to achieve the FY20 Guidance hinged on robust Alaris sales after Q1 FY20, which required the resumption of shipments.  But it was unreasonable to assume that predicate, given that the FDA had consistently called for the ship hold and a 510(k), rendering these statements actionable.  *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. Cal. v. Toll Bros., Inc.*, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) ("material adverse facts" existing at time of guidance suggested "these projections were unreasonable" when made); *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997) (falsity well-pled where contemporaneous facts conflict with defendants' statements).

### 3.     Defendants Misrepresented That Alaris Risks Were Contingent

Defendants also made actionable misrepresentations in BD's Form 10-K for FY19 dated November 27, 2019.  BD stated that various risks *could* materially affect BD's earnings.  *See, e.g.*, ¶¶ 319-20 (noting that BD's "failure to comply with . . . requirements of [its regulators] could delay or prevent the . . . marketing or sale of our products . . . ."), 322, 326.  These statements were false and misleading because they presented the risks as contingent possibilities when, in fact, they

28

had materialized—the FDA had stated that Alaris should not be shipped, causing Alaris sales to cease. The Third Circuit has long-recognized that "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit," in violation of Rule 10b-5. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996); *see also* Op. at 27 (citing *Williams,* 869 F.3d at 242 (risk of potential sales impact "materialized . . . if sales were adversely affected at the time the risk disclosures were made")); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 n.6 (D.N.J. July 31, 2020) (actionable risk disclosure treated issue that had occurred as "hypothetical issue"); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *17 (E.D. Pa. Mar. 25, 2020) (finding false and misleading risk disclosure); *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) ("[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability"). Thus, the risk disclosures were actionable since the risks they warned of had already occurred—as Defendants knew, but investors did not.

### 4.   Defendants' Falsity Arguments Mischaracterize the TAC

Defendants make a series of misplaced arguments contesting falsity.

*First*—in an error that permeates their entire brief—Defendants wrongly insist that the TAC alleges a failure to disclose "ongoing FDA scrutiny of Alaris" and that "BD made numerous modifications to the Alaris pump without FDA clearance under the 510(k) process and was certain to face adverse regulatory action as a result." MTD at 19; *see also id*. at 18 ("the gist of Plaintiff's case . . . ."), 20 ("Plaintiff's core theory . . . ."), 23. This misses the point. Defendants misrepresented the material, adverse reason ***why*** BD abruptly stopped shipping Alaris, and concealed that the FDA had precipitated this action through a call for a ship hold and a new 510(k). This material, adverse action occurred before the Class Period and resulted directly in the ship

29

hold that had frozen Alaris revenues in Q1 FY20. It all but eliminated the probability that BD could regain or sustain its Alaris sales "momentum" or meet its FY20 Guidance.

*Second*, Defendants did not, as they contend, disclose "the Allegedly 'Omitted' Facts," which they wrongly claim were: (i) that Alaris changes in recent years had not received a new 510(k); and (ii) that certain BD personnel had met with the "FDA concerning Alaris in late 2019 where these issues were discussed." *Id*. at 19-20. Again, this is not what the TAC alleges was concealed. *See, e.g.*, ¶¶ 2-6, 9. Rather, the TAC alleges Defendants concealed the fact that the FDA expressly stated that Alaris should not be shipped, due to device issues BD presented to the FDA just before the Class Period and that Alaris should get a new 510(k), which was the impetus for the ship hold. *Id.* In other words, Defendants misrepresented by omission the most important reason for the ongoing loss of Alaris sales. *See* ¶ 305(a) & (b). Neither Defendants' public statements nor "the FDA's online Premarket Notification database" they invoke disclosed or were "consistent with" those material adverse facts. MTD at 20, 44.[21] To the contrary, Defendants' statements referring to the ship hold as "part of our process . . . to continually iterate and make enhancements" portrayed this drastic action triggered by the FDA as an update done in the ordinary course of BD's processes, like others BD had taken "over the last couple of years," when the truth was far more dire. *Id*. at 20 (alteration in original).[22] Even if Defendants' statements were literally

---

[21] Defendants did not "indicate[] from the start" to investors or otherwise "sa[y] publicly" that they "believed [BD] could address certain immediate issues through the Q1 Upgrades, allowing it to continue shipping Alaris while it prepared a 510(k) application." MTD at 45. They never said that. In any event, what Defendants now assert they "believed" has no bearing on whether the TAC adequately alleges that they misrepresented material adverse facts.

[22] Defendants quote the Opinion dismissing the SAC, suggesting that the allegations and claims in the TAC are **in all material respects the same** as those in the prior pleading. MTD at 20. They are not. Based on Plaintiff's investigation, the TAC alleges numerous critical, new facts with particularity that Plaintiff could not adequately allege in the SAC—including detailed FE accounts of the FDA's pre-Class Period actions that resulted in the ship hold. *See, e.g.*, ¶¶ 123-41, 144-45, 150-54, 156-58, 167, 177-78, 181-86, 189-92.

true, they were actionable due to the material facts left out. *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*13 (D.N.J. July 27, 2018) ("The law does not permit [defendants] to mislead investors through half-truths.").[23]

**Third**, Defendants claim they had "no duty" to disclose anything further, since, before February 2020, they confronted only "a purely speculative threat to sales and FY 20 Guidance." MTD at 21-22. Again, they misconstrue and contradict the Complaint. *In re Cell Pathways, Inc. Sec. Litig.*, 2000 WL 805221, at \*8 (E.D. Pa. June 20, 2000) (defendant's "insistence on their version of contested issues" cannot support dismissal on Rule 12(b)(6) motion). The TAC does not allege, nor can it be plausibly inferred from the alleged facts, that BD faced a mere "speculative threat," or was left to predict what the FDA's position might be. It alleges Defendants failed to disclose what had already happened:  the FDA had stated BD should not ship Alaris and should seek a new 510(k) for the device—and in direct response, without disclosing the true reason, BD stopped shipping it and started preparing a 510(k) submission. ¶¶ 135-36, 138-41, 166, 175, 181-83. Far from speculative, the event was real enough to cause BD to take these significant actions. Indeed, these events would not have transpired but for the FDA's intervention. Defendants' implicit legal argument—they omitted no material fact, and thus breached no duty—therefore fails. The true circumstances of the ship hold were material facts that Defendants had a duty to disclose upon discussing the ship hold. *Endo*, 351 F. Supp. 3d at 897 ("once a company has chosen to speak on an issue . . . it cannot omit material facts"); *see also Shapiro*, 964 F.2d at 280 n.11

---

[23] *Lovallo v Pacira Pharmaceuticals, Inc.*, 2015 WL 7300492 (D.N.J. Nov. 18, 2015) and *In re Discovery Laboratories Securities Litigation*, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) are distinguishable because Defendants' public statements and filings did not publicly "disclose" the allegedly concealed facts.  MTD at 20-21.

(materiality questions depend on "delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts" and "are peculiarly for the trier of fact.").[24]

*Fourth*, Defendants' suggestion that the TAC must allege "a formal FDA finding or directive" is unsupported and incorrect. MTD at 22. Beyond the report of FE-6, the TAC contains multiple other allegations (which Defendants ignore) that corroborate that it was the FDA that drove the ship hold. *See, e.g.*, ¶¶ 138-39 (FE-9 informed by FDA meeting participant that FDA "directed" and "dictated" ship hold), ¶ 140 (FE-10 informed by FDA meeting participant that FDA "had placed a freeze" on Alaris shipments), ¶¶ 178-79 (FDA confirmed with BD in Q1 FY20 that ship hold was in place), ¶¶ 187-90 (FDA learns BD has unilaterally lifted ship hold and rejects move, causing ship hold to resume); *see also Utesch v. Lannett Co., Inc.,* 385 F. Supp. 3d 408, 420 (E.D. Pa. 2019)) ("individual allegations cannot be viewed in isolation from one another—rather, they must be taken together and in context."). Thus, regardless of whether the FDA's actions meet Defendants' definition of "formal," ***they were the precipitating cause of the cessation of Alaris shipments***, and substantially heightened the probability that the sales interruption would go on for an indefinite period of time. This was the very type of information that investors sought throughout the Class Period. *See, e.g.*, ¶¶ 202-09, 310-15, 330-34, 341, 343 (investment analysts asking and reporting about ship hold). It was unlawful for Defendants to characterize the ship hold to

---

[24] *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293 (S.D. Fla. 2015) is distinguishable because here, unlike there, the FDA explicitly told BD it should halt shipments of a revenue-generating product and obtain a new 510(k), and BD took major corporate action as a direct result. *In re PolarityTE, Inc., Securities Litigation*, 2020 WL 6873798, at *13 (D. Utah Nov. 22, 2020) is distinguishable because here, unlike there, the regulator did directly "inform[]" BD that it should undertake material, revenue-impacting action, which BD immediately did. *Hoey v. Insamed Inc.*, 2018 WL 902266 (D.N.J. Feb. 15, 2018) is distinguishable because here, the FDA's position was hardly inconclusive: it was firm enough to precipitate the ship hold and commencement of work on a 510(k) submission, and was reinforced by the FDA subsequently confirming that Alaris was not being shipped and rejecting BD's resumption of sales. MTD at 21 n.29.

32

investors but conceal such material facts about this revenue-impacting event. *Williams*, 869 F.3d at 241 (company may not omit material fact from public disclosure that renders it misleading); *Merck*, 2011 WL 3444199, at *9 ("the disclosure required by the securities laws is measured" by material's ability "to accurately inform rather than mislead").[25]

*Fifth*, Defendants contend the TAC insufficiently specifies "which precise 'issues' the FDA thought needed fixing," and does not "suggest a determination by the FDA that *all* prior modifications to Alaris needed 510(k) clearance prior to continued shipment." MTD at 22 (emphasis in original).[26] This argument is meritless. The TAC sufficiently alleges what the FDA said and how BD responded. It shows that the underlying bases for the cessation of sales were material, yet omitted from Defendants' public statements. Nothing more is needed to allege falsity under Rule 10b-5. Moreover the argument is wrong: the TAC *does* specify at least one defect—the LBA defect—that was at-issue in the Pre-Class Period FDA Meetings, the ship hold, and the 510(k) submission BD undertook in Q1 FY20. ¶¶ 96-99, 133-34, 138-39, 143, 149-53, 155-64, 181, 184. FE reports also consistently refer to device "anomalies" and "trackers," and KVO problems as among the issues BD presented to the FDA. ¶¶ 127, 130, 133, 138, 142-43. No more precision is demanded at this stage. *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018) ("Defendants place too much emphasis on the particularity requirement."); *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *6 (D.N.J. Sept. 29, 2006) (particularity "does not demand an exhaustive cataloging of facts"); *Liberty Ridge LLC v.*

---

[25] Defendants' argument that "the applicable regulations consign such determinations to the manufacturer" (MTD at 22) refers to the 510(k) clearance process, and has little bearing on whether Defendants actionably misrepresented the main, adverse factor driving the ship hold.

[26] This argument sidesteps altogether allegations that the FDA called for the ship hold.

*RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) (fraud pleadings do not require specificity that can be achieved only through discovery).

The TAC does *not* allege that the FDA never "suggested" that Alaris should obtain a new 510(k) "***until February 3, 2020***." MTD at 22. That is Defendants' contrary "version of the facts," which "the Court may not consider." *Feinberg v. Am. Express Co.*, 2011 WL 4807916, at *3 (E.D. Pa. Oct. 7, 2011). At any rate, the distinction Defendants seek to draw—between the FDA stating (i) that BD should get a 510(k) for needed Alaris fixes, or (ii) that all prior modifications should be cleared—is irrelevant to whether Defendants had a duty to disclose, because both statements are material. Both would considerably heighten the probability that the ship hold would not be resolved quickly. Further, the TAC alleges the FDA's position about the Alaris 510(k) was serious enough that BD immediately launched extensive 510(k) preparations. ¶¶ 166, 175, 181-82.

**Sixth**, Defendants' factual assertions "[t]hat BD and FDA . . . had different views on the need for 510(k) clearance" and that the FDA "eventual[ly] require[d]" a 510(k) also stray from the TAC. MTD at 23; *see In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *8 (D.N.J. Sept. 30, 2016) (court cannot resolve factual questions in defendants' favor on Rule 12(b)(6) motion). The TAC alleges that when the FDA told BD Alaris should obtain a new 510(k), BD immediately began full-scale preparations for the submission, and that BD had acknowledged that some fixes at issue (*e.g.*, LBA) required a 510(k)—not "different views." ¶¶ 149-53, 155-64, 166, 175, 181-83. Whether BD disagreed with the FDA's stated position is of no moment; what matters is that the communications were material, as BD's resulting corporate actions show they were.

Similarly improper, Defendants ask the Court *to accept as true* documents they submit for judicial notice as incorporated by reference in the TAC, in which they spin their alleged fraudulent conduct. MTD at 23. But this is inappropriate; as a matter of law, statements in such documents

34

may not be taken as true.  *See McCullough v. Advest, Inc.*, 754 F. App'x 109, 110 (3d Cir. 2018) (exhibits introduced in support of motion to dismiss may not be accepted for the truth of matters contained therein); *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (articles supplied by party not taken by court to indicate "whether the contents of those articles were in fact true"); *Hall*, 2019 WL 7207491, at *10 (finding it "inappropriate" to assume the truth of factual assertions in documents supplied by party); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 259 (E.D. Pa. 2020); *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *1 (E.D. Pa. Apr. 7, 2003) ("the Court will not accept as true the statements made by Viropharma in its SEC and FDA filings"); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 329 (E.D. Pa. 2020) ("use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims," especially in federal securities fraud litigation where "there is a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access").[27]

**Seventh**, Defendants inexplicably assert that several alleged misstatements are not alleged to be false.  MTD at 29-31.  The TAC does allege that these statements are actionable misrepresentations for reasons noted above, for example: (i) Defendants' statements about the FY20 Guidance (MTD at 29) (*see* ¶¶ 299, 308); (ii) Defendants' statements purporting to describe the Alaris upgrades underlying the ship hold (MTD at 30) (*see* ¶¶ 301, 303, 305, 313, 315-16); and (iii) Polen's January 14, 2020 misrepresentation that Alaris had "fully resumed shipping" in Q1 FY20 and the process with the FDA went "[e]xactly as expected" (MTD at 31) (*see* ¶¶ 341-44).

---

[27] That "the risk that FDA might at some point take such action was well-known" is misplaced, as the TAC alleges the FDA **had in fact spoken**, resulting in the ship hold.  MTD at 23.

35

*Finally*, if Polen's January 14, 2020 statement is construed as a statement of opinion—despite Defendants' assertion that it should not be—it is actionable. MTD at 32; ¶¶ 341, 343. That is because Polen omitted material facts: (i) that, as he knew, the FDA had called for the ship hold (¶¶ 135-36, 145); and (ii) that, as he either knew or recklessly did not (through a failure to access available facts), the FDA had not approved or authorized the resumption of Alaris sales. ¶¶ 185, 187-90; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189, 196 (2015) (opinion statement actionable if it "omits material facts about the issuer's inquiry into or knowledge concerning [the] statement," and the omitted facts show that the speaker "lacked the basis for making those statements that a reasonable investor would expect").

### 5. The TAC's FE-Based Allegations Are Internally Consistent, Highly Detailed and Reliable

When evaluating the FE reports in the TAC, the Court assesses the "detail provided by the confidential sources, . . . the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Op. at 25 (quoting *Avaya*, 564 F.3d at 261). The FE accounts in the TAC show extensive indicia of reliability.

***First***, the TAC alleges employment details that "support the probability that a person in the position occupied by the [FEs] would possess the information alleged." *Chubb*, 394 F.3d at 148. The TAC alleges for each FE: (i) his job title or function; (ii) that he worked in BD's MMS unit; (iii) with specific responsibilities related to Alaris quality, regulatory, R&D, or engineering matters; (iv) at relevant times during and/or before the Class Period. *See* ¶¶ 47-59.

It also alleges how the FEs had access to the information they report, for example:

- FE-6 reports information based on his personal participation as a BD representative in meetings and interactions with the FDA about Alaris issues, in BD's related internal 510(k) and ship hold actions in response, and his role in related internal reporting, ¶¶ 124, 132-36, 145, 150-53, 156-58, 181, 184-85, 190-91;

- FE-9 reports information about the Pre-Class Period FDA Meetings that was told to him by meeting participant Mahendru, his direct supervisor, in the course of his job responsibilities doing Alaris risk assessments and meeting periodically with Mahendru on Alaris matters, ¶¶ 56, 125, 131, 138-39;

- FE-10 reports information about the FDA meetings that was told to him by meeting participant Badal, his direct supervisor, in the course of his job responsibilities that focused exclusively on Alaris-related regulatory projects, ¶¶ 57, 126, 140;

- FE-5 reports information about the ship hold, BD's 510(k) actions in Q1 FY20, the LBA issue, Project Monterey, and related FDA interactions and BD actions based on personal involvement in such actions including BD's Alaris 510(k) preparations starting in October 2019, Project Monterey, and his other full-time Alaris-related regulatory work responsibilities, ¶¶ 52, 143, 148-49, 159-64, 166, 174-76, 179;

- FE-8 reports information based on his personal involvement in BD's Alaris 510(k) preparations and information told to him by Walton, his supervisor, who also had significant responsibilities for the Alaris 510(k) preparation, ¶¶ 55, 167, 182, 189.

Similarly, the receipt of alleged information by the other FEs is consistent with their Alaris-related job responsibilities, and allegations of broad overlap and collaboration and sharing of Alaris information within MMS. *See, e.g.,* ¶¶ 144 (FE-7), 141 (FE-11), 142 (FE-3), 170-73 (FE-4); *see also* ¶¶ 39-42 (noting structure, overlap and coordination of key MMS functions); 145 (people "throughout the business" rapidly informed of ship hold). Thus, the allegations thoroughly describe how the FEs "had access to such information." *Avaya*, 564 F.3d at 263.

*Second*, the FE allegations, from independent individual sources, are consistent. *See, e.g.,* ¶¶ 124-26, 132, 138 (FEs 6, 9 and 10 reporting BD's representatives in FDA meetings on Alaris issues); 135-36, 138-39, 140, 143-44 (FEs 6, 9, 10, 5 and 7 reports stating or consistent with fact that FDA communication resulted in ship hold just prior to Class Period); 133, 142-43 (FEs 6, 3, and 5 reporting that FDA became aware of Alaris "anomalies" or "trackers" in meetings before Class Period); 136, 141 (FEs 6 and 11 reporting that FDA told BD in fall 2019 in connection with ship hold that it should obtain new 510(k) for Alaris); 156-65 (FEs 5 and 6 relating consistent reports about Project Monterey); 166, 175, 181-82 (FEs 5, 6 and 8 relating consistent reports about

37

BD preparations for Alaris 510(k) in Q1 FY20); 178-79 (FEs 5 and 6 relating consistent reports that FDA confirmed with BD that Alaris was on ship hold); 185-90 (FEs 5, 6 and 8 relating similar reports about FDA reaction upon learning BD had unilaterally resumed shipping Alaris). Thus, the reports from this "large number of varied sources" provide ample particularity, as they "corroborate and reinforce one another." *Chubb*, 394 F.3d at 155. Such consistent reports from independent sources are compelling indicia of reliability. *See Pelletier v. Endo Int'l plc*, 439 F. Supp. 3d 450, 468 n.8 (E.D. Pa. 2020) ("the [FE] allegations are specific, mutually consistent, and plausibly within the scope of knowledge each [FE] would have acquired during his or her employment"); *Toronto-Dominion*, 2018 WL 6381882, at *7.

*Third*, the FE reports provide extensive detail—*e.g.*, naming multiple participants in meetings (¶¶ 124-26, 132), the substantive content of regulatory communications and reports (¶¶ 133, 135, 138-39, 147-53, 157-64), and specific aspects of Alaris-related projects (¶¶ 166, 170-73, 175, 181-82, 184-86). These detailed reports further support a finding of credibility. *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *2-6 (D.N.J. March 21, 2019); *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *2, *7, *9 (D.N.J. March 24, 2019).

Defendants do not assert *anywhere* in their falsity arguments that the TAC's FE-based allegations are not sufficiently credible to be considered by the Court. They do lodge certain arguments against the FEs' credibility with respect to scienter. MTD at 36. These fail. First, Defendants' contention that the Court's prior evaluation of FEs 1-5 in the context of a superseded pleading governs the review of the TAC is wrong. MTD at 37. The TAC contains numerous new allegations from multiple sources (including FEs 6-11) that, as just seen, extensively corroborate the reports of, *e.g.*, FE-5 in several respects—and, consistent with the entire amendment process, these allegations must be considered collectively now in their own right.

Next, Defendants discount some of the FEs as "low-level employees" who, they imply, would not know material facts.  MTD at 38.  Courts in this circuit routinely reject such attacks. *See Avaya*, 564 F.3d at 265-66 (crediting "relatively low-level former employees"); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (rejecting argument that former employee reports should be discounted because they were "low-level").

Defendants also suggest that FEs 1-4 may be discounted because "they do not definitively state that they actually worked at the Company during the Class Period."  MTD at 38 n.52.  This is another argument courts regularly reject.  *See Toronto-Dominion,* 2018 WL 6381882, at *5 (FE's departure before the class period did not undermine credibility because alleged misrepresentations related to pre-class period events); *Avaya*, 564 F.3d at 249 n.13.

Finally, Defendants contend the FE-based allegations lack needed specificity.  MTD at 43. Defendants are wrong, and insist on a degree of pre-discovery precision that, one suspects, could never be satisfied.  *Toronto-Dominion*, 2018 WL 6381882, at *5 ("It seems Defendants would only find these statements 'particular' if the alleged bad actors stepped forward and provided statements concerning the specific date, location" and misconduct.).

### B.      The Safe Harbor Does Not Apply to Defendants' Misrepresentations

The PSLRA's safe harbor applies only to statements that are forward-looking and accompanied by meaningful cautionary language, or for which plaintiff fails to establish that the defendants had actual knowledge that the statement was false. 15 U.S.C. § 78u-5(c). It protects none of Defendants' alleged misstatements.

### 1.      Defendants' Misrepresentations and Omissions of Present Fact Fall outside the Safe Harbor

This Court held that several of Defendants' alleged misstatements regarding the then-present state of the Company "are not entitled to protection under the PSLRA's safe harbor."  Op.

at 29. Plaintiff understands that ruling to pertain to the misstatements of present fact alleged in the statements at, *e.g.*, ¶¶ 298-99, 301, 304, 313, 315, 331, 334, 338-39, 342-43, 346-47. The TAC presently before the Court alleges with particularity that these statements were false and misleading when made because they failed to disclose that BD's Alaris sales performance had hit a wall—prior to the Class Period, the FDA had told BD Alaris should not be shipped and should obtain a new 510(k), and as a result of this adverse regulatory statement, Alaris sales had halted in Q1 FY20, and the likelihood of their prompt resumption was severely impaired.

### 2. Defendants' Statements Lacked a Reasonable Basis

Where a company voluntarily issues a forecast or projection, such as earnings guidance, "that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997). Such "[a] projection lacks a reasonable basis if it was made after inadequate consideration of available information." Op. at 31 (citing *id.* at 1429). Courts in this circuit regularly find publicly disclosed projections of financial performance actionably unreasonable where internally-known material adverse conditions significantly undermine them. *See, e.g., Curran v. Freshpet, Inc.,* 2018 WL 394878, at *5 (D.N.J. Jan. 9, 2018) (financial projection actionable where defendants failed to disclose manufacturing problems); *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *15 (D.N.J. Jan. 30, 2002) (growth projections actionable where at odds with "serious operational problems"); *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *3 (D. Del. Feb. 7, 2020).

The TAC alleges that Defendants' Class Period statements about the FY20 Guidance and related statements about BD's revenues and Alaris sales in FY20 were unreasonable when made. ¶¶ 298-301, 303-04, 311, 313, 315, 331, 334, 338-39, 346-47. Such projections depended on strong Alaris sales in FY20 as Defendants acknowledged. *See, e.g.,* ¶¶ 311, 313. But resumed, sustained Alaris sales after Q1 FY20 were highly improbable (or worse) because of the FDA action

40

that Defendants concealed, which was so significant that it had already precipitated the ship hold that caused Alaris revenues to cease in Q1 FY20, and had caused BD to launch all-hands-on-deck internal Alaris 510(k) preparations.  *See, e.g.,* ¶¶ 136, 138-39, 181-82, 192. These undisclosed facts created extraordinary risk that Defendants' financial projections, reliant on Alaris sales in FY20, would not be met, and rendered Defendants' statements actionable.  *See Toll Bros.*, 2008 WL 4058690, at *2 (guidance actionable where alleged "material adverse facts" "suggest[ed] that these projections were unreasonable at the time they were made").

### 3.     The Cautionary Language Was Not Effective

As the new allegations in the TAC make clear, the cautionary language that Defendants rely on in BD's FY19 Form 10-K fails because it casts as merely possible risks that had already come to pass.  *See supra* Section IV.A.3.  Defendants contend none of the risks cited in the 10-K "had materialized at the time the risk disclosures were made." MTD at 28.  That ignores the TAC's allegations that the *very* risk warned of—a delay or interruption in the sale of a product due to regulatory action—had occurred in the form of the ship hold and cessation of Alaris sales in Q1 FY20, precipitated directly by the FDA.  Defendants' argument that "the delay in shipping" was "fully disclosed on the first day of the Class Period" fails because it refers to an actionably misleading half-truth—Defendants did disclose the ship hold, but they concealed the true, highly adverse reason why it was happening.  *Id*.  The same defect prevents the cautionary language Defendants issued on November 5, 2019 from being effective.  *Id*. at 25-26.  Because the FDA's express communication to BD had resulted in the halting of Alaris sales in Q1 FY20 and injected tremendous risk into the sustained return of such sales in the near term, the November 5 cautions regarding potential regulatory risks to Defendants' projections "cannot insulate" Defendants from liability.  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

41

**4.     The Safe Harbor Does Not Apply to Defendants' Omissions**

Defendants contend Plaintiff's case concerns mostly "material **omissions**."  MTD at 18 (emphasis in original).  To the extent the Court construes the TAC to claim "defendants' alleged omission of present facts with respect to the challenged statements, [the] PSLRA's safe harbor does not apply."  *Papa*, 2018 WL 3601229, at *7.  Many courts in this circuit have held that "omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for the safe harbor protection."  *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014)); *see also Curran*, 2018 WL 394878, at *4 ("PSLRA's safe harbor does not apply" to "alleged omission[s] of present facts"); *Endo*, 351 F. Supp. 3d at 901 ("because they did not disclose facts that contradicted them, the statements do not qualify for protection under the safe harbor"); *AT&T*, 2002 WL 31190863, at *14 (safe harbor "does not afford corporations a free pass to lie to investors . . . purposeful omission[s] . . . do not qualify as forward-looking statements").

**C.     Plaintiff Pleads Scienter**

Scienter is pled by alleging facts that "constitute circumstantial evidence of either recklessness or conscious behavior." *Burlington*, 114 F.3d at 1422.  At the pleading stage, a court evaluates whether "all of the facts alleged, taken collectively" support a strong inference of scienter, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323; *see also Avaya*, 564 F.3d at 268; *Merck*, 2011 WL 3444199, at *18.  This will "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the **whole factual picture** painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.  Thus, even where allegations are wholly circumstantial, "the requirement of a strong inference of scienter is not thereby undermined." *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *8 (D.N.J. June 12, 2020).  A "strong" inference is "cogent and at least as compelling as any opposing

42

inference one could draw from the facts alleged," but "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.

The TAC contains numerous detailed factual allegations of the Individual Defendants' personal knowledge that, alone, meet the requisite standard, but are also corroborated by myriad circumstantial allegations that collectively establish a strong inference of scienter. *See, e.g.,* ¶¶ 266-94.

### 1. Defendants Had Knowledge of Facts and Access to Information

It "is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradicts their statements." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). Plaintiff has alleged that Defendants had both. Specifically, the TAC alleges that Defendants had actual knowledge about the impetus for the ship hold and the FDA's call that BD submit a 510(k)—facts that were omitted from the company's public pronouncements. *See* ¶¶ 130-32, 135-36, 138-45, 178-79, 188-91, 290-91. *See Frater*, 996 F. Supp. 2d at 350 (when "FDA tells a company about problems with a product, and [it] nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity").

In meetings and communications, the FDA told BD that it should not be shipping Alaris because of significant concerns about device safety and the need for regulatory reauthorization. As a result, BD stopped shipping Alaris. ¶¶ 132-36. The TAC similarly contains allegations about the FDA's "forceful" reaction to BD's lifting of the ship hold, and a detailed description of those events pled on the percipient observations of FE-6. ¶¶ 189-91. The TAC also includes reports of numerous other FEs who, although not in attendance at these meetings, were informed about the substance of them from other attendees in the course of their employment duties. *See* ¶¶ 138-39 (FE-9 informed by attendee Mahendru that the FDA "directed" and "dictated" the ship hold); 140 (FE-10 similarly informed by meeting participant Badal). Other consistent allegations abound,

recounted by FEs who had every reason to learn what had precipitated the Alaris sales freeze. ¶¶ 144, 187-91. The allegations, together, present a cohesive, logical narrative of the FDA's insistence that BD suspend sales of Alaris, relayed in detail by a percipient witness and corroborated by numerous MMS employees who were told the same information from other attendees. *See Chubb*, 394 F.3d at 155 (particularity established when "accounts supplied by the sources corroborate and reinforce one another"); *Urb. Outfitters*, 103 F. Supp. 3d at 649 (scienter satisfied where several FEs asserted existence of fraud).

Directly contrary to Defendants' assertion that the TAC fails to allege that critical communications were "relayed to any Individual Defendant," MTD at 45, the TAC contains specific allegations that the Defendants were personally informed about the content of the meetings with the FDA and the basis for the resulting ship hold. The TAC includes myriad allegations that this information was roundly known among BD's regulatory compliance personnel and reported up to management before the statements at issue were made—just as one would expect when a company's primary regulator states that a critical product, subject to a consent decree, should cease shipment because it is dangerous. Those allegations include:

- that FE-6 personally participated in upward reporting of the FDA meetings, which he had attended,[28] ¶¶ 132-36, 145;

- that upper management was informed about the meetings "at every step of the way" and that "all senior leaders of the business units, and the corporate leaders" were made aware, ¶ 145;

---

[28] Defendants argue FE-6's allegations are not sufficiently particular because they do not include "***what*** exactly was supposedly conveyed up the chain to the Individual Defendants." MTD at 39 n.53 (emphasis in original). To the contrary, FE-6 specifically recounts that the corporate leaders were informed about the outcomes of the FDA meetings, including the bases for BD's decision to impose the ship hold: "[T]he decision was given to Shkolnik . . . and up to the CEO . . . . Everyone was involved." ¶ 145.

- that the adverse information was reported up the chain of command from FE-6, to Banerjee, to Mas, and to Polen, and also to Forlenza—exactly as the reporting structure was designed, *id.*; and

- that Polen was informed about the FDA meetings before the ship hold was announced, and Polen publicly discussed it on November 5, 2019, *id.*

The TAC also alleges that Defendants were personally informed when in January 2020, the FDA returned, reiterated its original position, and rejected BD's resumption of Alaris sales. ¶¶ 187-91.

These allegations are corroborated by other circumstances evidencing scienter, including Defendants' access to information through BD's regulatory compliance framework. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter alleged where defendants failed to check information they maintained a duty to monitor). As set forth in the TAC, BD was required to maintain a quality system for Alaris design, manufacturing and distribution processes in order to comply with FDA regulations, and had implemented an internal corporate quality program in that regard. ¶¶ 37-42, 64-71. Moreover, during the Class Period, BD remained subject to the ACD with the FDA regarding Alaris that further demanded ongoing oversight. ¶¶ 92-93.[29] It is simply not a plausible inference that executive management remained unaware of matters implicating the consent decree and its substantial penalties for noncompliance, let alone with regard to specific concerns identified by the very agency by whom it was enforced.[30]

Polen's knowledge is circumstantially reinforced by the fact that he was similarly informed of Project Monterey, receiving direct reports about that failed 510(k) application for Alaris in 2018—and doubly so by the fact that, unlike the FDA interactions at issue here, Project Monterey never resulted in a cessation of Alaris sales. ¶¶ 163-64, 286.

---

[29] Forlenza and Reidy each certified BD's FY19 Form 10-K, which specifically states that BD maintains compliance with the ACD. ¶¶ 319-20.

[30] To the extent that Defendants suggest that the substance of the meetings with the FDA was not conveyed to executive management, then, under the circumstances and given the potential consequences, that was reckless.

Defendants mischaracterize the TAC's scienter allegations by arguing that Plaintiff has failed to support an inference that Defendants "knew of the eventual adverse FDA action ahead of time," or knew "that the FDA was going to mandate comprehensive 510(k) clearance." MTD at 34, 39-40. The TAC, however, does not allege that Defendants were insufficiently prescient. Plaintiff's scienter allegations concern what the Defendants knew (or recklessly disregarded) at the time the alleged misrepresentations were made.[31] Thus, the TAC alleges that when speaking on the ship hold, Defendants knew that its precipitating cause was, in fact, the FDA's specific call for it, which Defendants failed to reveal. Indeed, the FDA's communications represented to BD an externality so significant that immediately after meeting with the FDA, BD stopped shipping Alaris. The TAC does not allege that BD failed to predict the future; it alleges that BD was unlawfully deceptive about what had already happened.[32]

---

[31] Defendants argue Plaintiff has failed to establish that the "Individual Defendants intended to deceive" investors. MTD at 33. The Court of Appeals, however, rejected this standard in *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000). Once Defendants chose to speak about the ship hold and communications with the FDA, their knowledge of facts belying those statements establishes scienter. Defendants cite cases where, unlike here the FDA's position was unknown to the defendants at the time of the misstatements. *See In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 511-12 (E.D. Pa. 2018) (defendants did not know scope of exclusivity that FDA would grant competitor drug until after class period); *Bauer v. Eagle Pharms., Inc.*, 2017 WL 2213147, at *11 (D.N.J. May 19, 2017) (no allegations of what FDA said to defendants at ongoing meetings so defendants did not know company's new drug application would be rejected).

[32] Defendants' fraud by hindsight citations are misplaced. MTD at 51. Plaintiff does not allege Defendants must have known about *potential* FDA action, but that they *knew* about *actual* FDA action. *See Sapir v. Averback*, 2016 WL 554581 at *9-10 (D.N.J. Feb. 10, 2016) (rejecting claim defendants withheld negative results based on contrary documents); *In re Amarin Corp. PLC.*, 2015 WL 3954190 at *2, *7 (D.N.J. June 29, 2015) (scienter not found where "FDA did not issue any conclusions about the studies" but "merely commented" that they would "provide important information"); *In re Columbia Lab'ys, Inc. Sec. Litig.*, 2013 WL 5719500, at *2, *7 (D.N.J. Oct. 21, 2013) (FDA letter stating results of ongoing drug trial were "potential review issue"); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 573 (E.D. Pa. 2009) (claim defendants "must have learned" information from "their scientists and researchers" insufficient to support scienter).

46

## 2.      Defendants' Detailed Public Statements Support Scienter

Defendants' detailed and repeated statements regarding the ship hold, the discussions the Company was having with the FDA and the financial implications thereof are further circumstantial evidence supporting scienter. The Individual Defendants held themselves out to investors as knowledgeable about these matters, suggesting they were aware of the circumstances about which they spoke. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (inferring scienter where executive "held himself out to investors as knowledgeable" by speaking "in detail" about project); *Endo,* 351 F. Supp. 3d at 906 (defendants' public comments "confirm they had intimate knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think. These officers were speaking as authoritative sources who possessed the information to support their statements"); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017) (speaking "explicitly and repeatedly" about results and company's talks with FDA supported scienter); *Frater*, 996 F. Supp. 2d at 349 (statements "impl[ied]" that speakers knew "the FDA's feedback").

Reidy and Polen, for example, gave prepared remarks on November 5, 2019 in which they discussed the ship hold in detail, made characterizations about modifications to Alaris, how long the ship hold was expected to last, related communications with the FDA, and answered analyst questions. ¶¶ 296-304.[33] It is implausible that BD produced its top corporate executives to speak

---

[33] Polen and Reidy further discussed and answered analyst questions about BD's "ongoing conversations" and "dialogue" with the FDA on February 6, 2020, implying their knowledge of the FDA's interactions with BD all along. ¶¶ 246, 250, 252. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183 (S.D.N.Y. 2010) (post-class period statements may "confirm what a defendant should have known during the class period"). Nor is this a case where temporal proximity suggests a counter-inference on scienter as Defendants contend. The TAC alleges Defendants knew about the impetus for the ship hold and the 510(k) for months before making the misstatements, but cut FY20 Guidance only nine days after re-affirming it. ¶ 294. Cases cited by Defendants are thus distinguishable. MTD at 50. *Synchronoss* did not evaluate the issue of temporal proximity while *Pearlstein* merely found "temporal proximity alone" was insufficient to

extensively on issues pertaining to Alaris—a critical product whose shipment was abruptly ceased—without management being made aware of the most basic circumstances regarding this corporate action; that is, ***why it was undertaken***.  *See Avaya*, 564 F.3d at 269 (statements in which the truth was explicitly misrepresented in response to repeated questions from analysts was "powerful evidence of scienter"); *Utesch*, 385 F. Supp. 3d at 422.  The far more probable inference is that BD's executives knew the content of the meetings with the FDA and the precipitating cause of the shipping and sales halt about which they spoke—as Plaintiff alleges.

The well-established presumption that the highest-ranking executives of a company are kept informed about critical communications received from its primary regulator is yet another corroborative piece of the scienter "puzzle."  *PTC*, 2017 WL 3705801, at *17 ("It seems implausible that [CEO and CFO] were not paying close attention" to critical regulatory event involving critical product); *Campbell Soup*, 145 F. Supp. 2d at 599 ("the Company's CEO and CFO . . . are presumed to have had pertinent knowledge"); *In re Genta, Inc., Sec. Litig.*, 2005 WL 2416970, at *6 (D.N.J. Sept. 30, 2005) (collecting cases); *Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, at *30 (E.D. Pa. Dec. 3, 2009) (defendant's position "giving her access to a wealth of information" is "an important piece of a larger puzzle").  That BD is presently the subject of an SEC investigation further supports the scienter inference.[34]  ¶¶ 264-65.

---

demonstrate scienter.  *See Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015); *see also In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 399 n.43 (D.N.J. 2010).

[34] While a pending governmental investigation may not, standing alone, give rise to a strong inference of scienter, it is considered as part of the cumulative analysis.  *See Papa*, 2018 WL 3601229, at *21; *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *36 (D.N.J. Dec. 31, 2018); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (government investigation "one more piece of the puzzle" in scienter analysis).

Contrary to Defendants' characterization, Plaintiff does not allege scienter "merely by virtue" of these high-ranking positions.[35]  MTD at 50.  The Individual Defendants were informed of the material facts they omitted (¶ 145); they are also specifically alleged to have participated directly in the management of BD operations, in the oversight of BD's regulatory functions, and in accessing confidential information concerning Alaris, corroborating both the direct and circumstantial evidence of scienter. *See* ¶¶ 267-69; 289-92; *see also* ¶¶ 164 (Polen directed analysis of failed 510(k)); 167 (meeting with Polen to discuss ship hold and 510(k)); 191 (ship hold resumption reported up "chain of command through senior management within an hour or so"); *see Energy Transfer*, 532 F. Supp. 3d at 227-28; *Urb. Outfitters*, 103 F. Supp. 3d at 653.

There also exists no basis for Defendants' demand that the TAC allege "mandatory FDA action," or that the "FDA mandated either the ship hold or a comprehensive 510(k)" in order to plead scienter.  MTD at 43-44.  The TAC alleges that Defendants knew the FDA was the impetus for the ship hold and made misleading statements implicating that material adverse fact— irrespective of how the FDA's communications are characterized.  The cessation of Alaris sales in Q1 FY20 was not part of a "process" or "strategy" of continued product enhancement as Defendants publicly represented; it was a direct and immediate reaction to the FDA.

### 3.    Alaris's Importance to BD Further Supports Scienter

Alaris represents a critical operation that BD management is presumed to know. "[M]isstatements and omissions made on core matters of central importance to the company and its high-level executives give rise to an inference of scienter when taken together with additional

---

[35] Cases rejecting this inference typically suggest over-reliance on executive position in the complaint. *See, e.g., Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017) (scienter alleged primarily based upon the defendants' positions in the company); *In re Advanta Corp. Sec. Litig.* (scienter inference rejected where "plaintiffs offer conclusory assertions that the defendants acted 'knowingly,' . . . as well as blanket statements that the defendants must have been aware of the impending losses" due to their positions within the company) 180 F.3d 525, 539 (3d Cir. 1999).

allegations connecting the executives' positions to their knowledge." *Urb. Outfitters*, 103 F. Supp. 3d at 653-54; *see also In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (scienter supported where misstatements concerned three drugs constituting "substantial portion" of revenues); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *18 (D.N.J. Dec. 14, 2015)  (scienter inferred where "matter at issue" "central" to the core business, "about which Defendants spoke regularly").[36]  While "core operation" allegations may not be "sufficient in and of themselves to show scienter," they are properly considered "when viewing the entirety" of the complaint. *Papa*, 2018 WL 3601229, at *24.

Alaris was a noted driver of BD's revenues, and a focal point for investors and investment analysts trying to value the company and its potential future earnings.  BD stressed in SEC filings and investor calls that Alaris reliably fueled growth for BD.  ¶¶ 104-12, 282.  It also promoted the interoperability of Alaris with several other BD products, such that Alaris was a key to BD's sales of multiple product suites and growth within BD Medical.  ¶¶ 102-03, 283.

Investment analysts likewise focused their attention on Alaris, recognizing it as a product that would "drive the company," and inquiring about it frequently after the ship hold was announced—signaling its importance to BD and investors.  ¶¶ 113-20, 202-09, 213-15, 220, 223-24, 247, 249-52, 284.  Alaris's significance to BD was proven when, owning up to the inability to sell Alaris, BD slashed its guided revenue amount by $400 million for FY20.  ¶¶ 241-46, 287.

---

[36] *See also W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *16 (E.D. Pa. June 16, 2015) (inference "strong" where allegations "relate to [d]efendants' core business").  Indeed, courts have found core operations even where financial metrics, such as sales or revenue, were comparatively low.  *See, e.g.*, *Hall*, 2019 WL 7207491, at *21 (product accounting for 0.3% of sales was core operation); *Energy Transfer*, 532 F. Supp. 3d at 232-33 (small revenue project with independent reputational value core operation).

### 4.    Defendants Were Motivated to Conceal the Truth

While a plaintiff need not allege a culpable motive to plead a strong inference of scienter, Forlenza and Polen were financially motivated to conceal the FDA's call for the ship hold and a new Alaris 510(k), and their substantial insider stock sales further support the cumulative inference of scienter alleged. *See In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (stock sales "in combination with [p]laintiffs' other allegations . . . reinforce the Court's conclusion that the [complaint] states a claim").

Insider trades can bolster a motive inference where the "sales were unusual in scope or timing." *Avaya*, 564 F.3d at 279.  Relevant factors include: "amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved" and "whether the sales were normal and routine," and the profits "substantial relative to the seller's ordinary compensation." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006).

The critical inquiry is whether trades were planned or made while in possession of material, non-public information.  Op. at 38.  Here, the TAC alleges that Defendants knew but concealed material facts about the FDA's role as the impetus for the ship hold and its statement that BD should obtain a new 510(k).  It is against this backdrop that the stock sales are assessed.

The timing of the sales supports scienter, as Forlenza and Polen engaged in their enormous transactions generating over $58 million concurrently with their alleged misstatements to the public and just days or weeks prior to the corrective disclosures on February 6, 2020.  ¶¶ 271, 273, 278; *see Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (stock sales made after optimistic statements indicative of scienter).  Forlenza's sale of 90,000 shares nine days before the corrective disclosures is especially probative of scienter.  ¶¶ 271, 273; *Urb. Outfitters*, 103 F. Supp. 3d at 655 (sales one week before negative news disclosure "particularly suspicious"); *Viropharma*, 21 F. Supp. 3d at 474 (sales weeks before corrective disclosure supported scienter).

51

The size and scope of the sales further supports a finding of motive. Forlenza and Polen sold 18% and 14% of their holdings in 93 days for proceeds of over $54.6 million and $3.7 million, respectively. Forlenza sold four times more shares during the three-month class period than he sold during the same period the year before, and twelve times more than in the three months immediately before the Class Period. ¶ 272. The value of his sales during the three month Class Period is more than four times his proceeds during all of 2018. Similarly, Polen's sales during the Class Period exceeded the sales during the same three-month period the year before by 18%. ¶ 277. Courts have found significantly lower amounts suspicious. *Urb. Outfitters*, 103 F. Supp. 3d at 654 ($50 million profit unusual); *In re Suprema*, 438 F.3d at 278 ($2.3 million and $627,000 in profits probative of scienter); *Viropharma*, 21 F. Supp. 3d at 474 ($8 million in profits); *Enzymotec*, 2015 WL 8784065, at *19 (gross proceeds of $6.5 million and $1.45 million).[37] Defendants' sales were suspiciously large and far from routine. *Suprema*, 438 F.3d at 277-78 (sales five times amount sold prior probative of scienter); *see also Viropharma*, 21 F. Supp. 3d at 474 (sales netting $8 million profit not normal or routine compared to $400,000 the year before).

That the Defendants retained sizeable holdings in stock options thereafter does not rebut the inference of motive. To the contrary, the percentage sold, when considered in totality with "the timing, amount – as compared to sales from the previous year, and individuals involved" supports, and certainly does not "overwhelm the strength of these factors." *Toronto-Dominion*, 2018 WL 6381882, at *16; *see Senn v. Hickey*, 2005 WL 3465657, at *6 (D.N.J. Dec. 19, 2005),

---

[37] Unlike here, the defendants in *In re Synchronoss Technologies, Inc. Securities Litigation* had class period sales that were consistent with or even lower than their prior trades. 2019 WL 2849933, at *17 (D.N.J. July 2, 2019). Considering the totality of the allegations presented, this case more closely resembles *Suprema*, where the Third Circuit found the defendants' stock sales were suspicious despite the fact that the defendants retained a majority percentage of their stock because, among other reasons, the sales occurred six weeks before the defendants' resignations, were made at artificially high prices, and resulted in a $3 million profit. 438 F.3d at 277-78.

(finding scienter where defendant "only sold 11.8% of his stock" "due to the amount of money [the defendant] received," $4 million); *Urb. Outfitters*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015) (scienter found where defendant retained 94% of holdings but sold 1.2 million shares for profits of $50 million); *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) ($49 million in profit by two defendants in nine months supported scienter, ***without even considering percentage of stock retained***). Indeed, the percentage of shares sold is not a predominant factor for good reason—to elevate its importance would risk insulating from the motive inference those insiders who enjoy enormous stock holdings, and thus can generate massive wealth by liquidating mere fractions of their holdings.

The circumstances of the trades also support scienter. Forlenza entered a 10b5-1 trading plan in the midst of the fraud, in December 2019. Defendants' stock appreciation rights were at no risk of expiration: the majority of Forlenza's rights would not expire until November 2021 and the majority of Polen's not until November 2025. ¶¶ 276, 280. Moreover, Forlenza was particularly motivated to prevent the disclosure of information that would predictably cause BD's stock price to decrease because it would allow him to avoid diminished profits on his sales—when he disposed of his shares days before the February 6, 2020 corrective disclosure, he avoided losses of roughly $6.4 million. ¶ 275. Forlenza's resignation as CEO does not alter this analysis because Forlenza ***remained an insider*** as the Executive Chairman of BD's Board. ¶ 43.

Considering "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity," the TAC alleges a strong inference of scienter. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021).

**D.    Plaintiff Pleads Loss Causation**

A plaintiff pleads loss causation by providing a "short and plain statement" giving defendants "some indication of the loss and the causal connection that [it] has in mind." *Dura*

53

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). The Third Circuit takes a "practical approach" to loss causation, applying "general causation principles" under which a plaintiff need only show that "the misrepresentation touches upon the reasons for the investment's decline." *McCabe*, 494 F.3d at 426, 428. This "highly factual" inquiry is "often unsuited to disposition . . . on the pleadings." *Merck*, 2011 WL 3444199, at *29.

The TAC adequately pleads the requisite link between Defendants' misconduct and Plaintiff's loss. Defendants' misrepresentations were corrected by their disclosures on February 6, 2020, that the FDA—following "ongoing" discussions—had told BD to cease Alaris sales and to seek new regulatory clearance for the device, causing BD to cut the FY20 Guidance by $400 million as a result. ¶¶ 240, 244, 246. The corrective disclosures substantially affected BD's stock price, which dropped nearly 12% that day on unusually heavy volume, a sharp decline that was publicly linked to Defendants' announcement. ¶¶ 253-57, 355. The disclosure itself was immediately recognized by analysts as revealing previously undisclosed information about the severity of Alaris's regulatory issues and software issues previously minimized as "upgrade[s]." ¶ 251. The alleged corrective disclosures more than "touche[d] upon" the subject matter of the alleged misrepresentations—indeed, Plaintiff alleges it linked to and continued the ship hold that had been precipitated by the FDA in Q1 FY20, which Defendants had misrepresented (along with its risks to BD revenues) throughout the Class Period—and plainly led to the stock price decline and investors' losses. *McCabe*, 494 F.3d at 428; *see also Merck*, 2011 WL 3444199, at *29, *32 (loss causation alleged where public release of information revealing misleading nature of prior statements was substantial cause of stock price drop).[38]

---

[38] *Marsden v. Select Medical Corp.* is inapposite. 2007 WL 1725204 (E.D. Pa. June 12, 2007). The complaint there "contain[ed] not a single allegation that the 'relevant truth' about [the company's] improper revenue [accounting] practices and inadequate internal controls . . . was . . . made known

## V.    PLAINTIFF STATES A SECTION 20(a) CLAIM

Defendants do not dispute that the Section 20(a) Defendants controlled BD, and while "the overwhelming trend in this circuit is that culpable participation does not have to be pled," Plaintiff amply pleads it. *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016).

## VI.    PLAINTIFF STATES A SECTION 20A CLAIM

As discussed above, Defendants Forlenza and Polen are liable under Section 10(b). While in possession of material, nonpublic information about the alleged Alaris issues, Forlenza and Polen sold 198,137 and 13,907 shares of BD common stock in open market sales, exclusive of sales to the issuer. ¶ 359.  Contemporaneous with their sales, Plaintiff purchased 23,754 shares of BD common stock at inflated prices.  ¶ 360.  Plaintiff thus alleges their violation of Section 20A. *See In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *5 (D.N.J. June 30, 2019).

## VII.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: February 4, 2022                    Respectfully submitted,

**CARELLA BYRNE CECCHI**                   **KESSLER TOPAZ**
**OLSTEIN BRODY & AGNELLO, PC**            **MELTZER & CHECK, LLP**
                                           Sharan Nirmul
*s/ James E. Cecchi*                       David A. Bocian
James E. Cecchi                            Joshua E. D'Ancona
Donald A. Ecklund                          Vanessa Milan (admitted *Pro Hac Vice*)
5 Becker Farm Road                         280 King of Prussia Road
Roseland, NJ 07068-1739                    Radnor, PA 19087
Telephone: (973) 994-1700                  Telephone: (610) 667-7706
Facsimile: (973) 994-1744                  Facsimile: (610) 667-7056
jcecchi@carellabyrne.com                   snirmul@ktmc.com
decklund@carellabyrne.com                  dbocian@ktmc.com
                                           jdancona@ktmc.com

---

to the market by way of any public disclosures." *Id*. at *2.  Here, Plaintiff alleges the corrective disclosures revealed, among other things, the FDA's explicit position that Alaris should not be shipped and should obtain a new 510(k), both of which Defendants had concealed.

55

*Liaison Counsel for the Putative Class*                    vmilan@ktmc.com

*Counsel for Lead Plaintiff Industriens
Pensionsforsikring A/S and Lead Counsel for
the Putative Class*

56

## CERTIFICATE OF SERVICE

I, James E. Cecchi, hereby certify that on February 4, 2022, I caused a true and correct copy of the foregoing Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Third Amended Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: February 4, 2022

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI
OLSTEIN BRODY & AGNELLO, PC**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative Class*