Case 2:20-cv-02155-SRC-CLW   Document 152-3   Filed 05/03/23   Page 1 of 30 PageID: 3669

# Exhibit B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BECTON, DICKINSON AND COMPANY and THOMAS E. POLEN,<br><br>Defendants. | Civil Action No. 2:20-cv-02155-SRC-CLW<br><br><br>EXPERT REBUTTAL REPORT OF<br><br>STEWART MAYHEW, PH.D.<br><br><br>May 3, 2023 |

**Table of Contents**

I.    Qualifications ................................................................................................ 1

II.   Assignment ................................................................................................... 2

III.  Summary of Opinions ................................................................................. 3

IV.   Overview of Relevant BDX Options During the Putative Class Period ............................. 3

V.    Dr. Mason Provides No Reliable Economic Support for His Claim that BDX Options Traded in Efficient Markets during the Putative Class Period ......................................... 4

      A.    Overview of Dr. Mason's Assessment of Market Efficiency for BDX Options .... 4

      B.    Dr. Mason's Opinion that Efficiency of Option Markets Follows Automatically from Stock Market Efficiency Is Not Based on Rigorous Economic Principles or Evidence ....................................................... 6

      C.    Relevant BDX Options Had Low Trading Volume and High Bid-Ask Spreads During the Putative Class Period ....................................... 10

      D.    Dr. Mason's Analysis of Put-Call Parity Deviations Does Not Support His Opinion that the Markets for BDX Options Were Efficient During the Putative Class Period ......................................... 12

VI.   Dr. Mason Mischaracterizes Basic Facts about Option Markets ..................... 16

## I.    Qualifications

1.    I am Vice President at Cornerstone Research, an economic and financial consulting firm, where I have been working since 2010.  At Cornerstone Research, I have worked as a consultant on over 100 matters, where I have conducted economic analysis of issues related to loss causation, damages, materiality, and various other economic issues that arise in the context of litigation, arbitration, and regulatory investigations.

2.    Prior to joining Cornerstone Research, I worked at the Securities and Exchange Commission ("SEC") as Deputy Chief Economist (2008-2010), Assistant Chief Economist (2004-2008), and Visiting Academic Scholar (2002–2004).  As Deputy Chief Economist, I supervised economic analysis of proposed rules from the SEC's Divisions of Corporation Finance, Investment Management, and Trading and Markets.  From 2004 to 2008, I supervised a group that was responsible for providing economic analysis and support for Trading and Markets, Investment Management, and the Office of Compliance Inspections and Examinations ("OCIE").  Over my entire tenure at the SEC, my responsibilities also included assisting OCIE and the Division of Enforcement on numerous investigations and enforcement actions involving issues related to rule compliance, trading, and asset management.  These matters involved economic analysis of harm to market participants, unjust enrichment, and disgorgement.  Many of the rulemaking and enforcement projects I worked on at the SEC involved option markets.

3.    I have taught doctoral-, masters-, and undergraduate-level classes in finance as a tenure-track faculty member in the Finance Group at the Krannert School of Management, Purdue University (1996-1999), and in the Department of Banking and Finance at the Terry College of Business, University of Georgia (2000-2004).  These include undergraduate- and graduate-level courses on option pricing.  I also taught masters-level classes on option pricing as an adjunct Lecturer at the Robert H. Smith School of Business at the University of Maryland (2012, 2018).  I earned Bachelor of Science and Master of Science degrees in economics from Brigham Young University, and a Ph.D. in Business Administration with an emphasis in finance from the University of California, Berkeley.  I have authored numerous articles, including studies published in peer-reviewed academic journals.  The main topics of my published research include option markets microstructure and empirical option pricing.  My curriculum vitae is

attached as **Appendix A**.  A list of my testimony over the last four years is attached as **Appendix B**.

**II.     Assignment**

4.      I have been retained by counsel for Becton, Dickinson and Company ("BDX" or the "Company") and Thomas E. Polen (collectively, "Defendants").  Defendants' counsel has asked me to evaluate and respond to opinions regarding the efficiency of the markets for relevant call options and put options on BDX stock ("Relevant BDX Options")[1] in the Expert Report of Joseph R. Mason, Ph.D. ("Dr. Mason" or "Mason Report") and in Dr. Mason's deposition in this matter on April 4, 2023,[2] including the methodologies and bases he provides for such opinions.[3] I understand that the relevant question at this stage of the proceedings is whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period, and have conducted my analyses accordingly.

5.      A list of the documents I have considered in forming my opinions is attached hereto as **Appendix C**.  Cornerstone Research is being compensated for my work in this matter at my standard billing rate of $1,025/hour.  In preparing this report, other individuals from Cornerstone Research provided assistance and research under my direct supervision.  Neither my compensation nor Cornerstone Research's compensation is dependent on the outcome of this or any other matter.

---

[1] I understand that the option series that would potentially be eligible to be a part of the class in this matter are those that expired on or after the alleged corrective disclosure date, February 6, 2020, and that had trading volume greater than zero during the "Putative Class Period" (i.e., between November 5, 2019 and February 5, 2020, both dates inclusive).  I refer to these options as the "Relevant BDX Options."  It is further my understanding that option traders are not currently members of the putative class and are the subject of a proposed fourth amended complaint that Plaintiff has sought to file but is currently pending a decision by the Court.  *See* Memorandum of Law in Support of Lead Plaintiff's Motion for Leave to Amend the Third Amended Class Action Complaint filed on December 22, 2022, p. 1.

[2] Throughout this report, I cite the transcript of Dr. Mason's deposition as "Mason Dep. Tr."

[3] It is further my understanding that option traders are not currently members of the putative class and are the subject of a proposed fourth amended complaint that Plaintiff has sought to file but is currently pending a decision by the Court.  *See* Memorandum of Law in Support of Lead Plaintiff's Motion for Leave to Amend the Third Amended Class Action Complaint filed on December 22, 2022, p. 1.

**III.    Summary of Opinions**

6.    Below is a summary of my opinions in this matter.  The bases for each opinion are detailed in the sections that follow.  My work in this matter is ongoing, and I reserve the right to supplement my current analysis if additional information becomes available.

- Dr. Mason provides no reliable economic support for his claim that BDX options traded in efficient markets during the Putative Class Period.

  ◦ Dr. Mason's opinion that efficiency of option markets follows automatically from stock market efficiency is not based on rigorous economic principles or evidence (see Section V.B).

  ◦ Dr. Mason failed to consider the low trading volume and high bid-ask spreads of Relevant BDX Options during the Putative Class Period (see Section V.C).

  ◦ Dr. Mason's analysis of put-call parity deviations does not support his opinion that the markets for BDX options were efficient during the Putative Class Period (see Section V.D).

- Dr. Mason mischaracterizes basic facts about option markets (see Section VI).

**IV.    Overview of Relevant BDX Options During the Putative Class Period**

7.    Stock option contracts traded on U.S. exchanges give holders of the options the right, but not an obligation, to buy (in the case of call options) or sell (in the case of put options) the underlying stock at a prespecified price ("strike price") up until the time of option expiration ("expiration date").  Moreover, a stock can have hundreds of different "option series," all of which are available for trading at the same time, and each of which has a particular combination of option type (call or put), strike price, and expiration date.  Investors trade stock options for a variety of reasons and, depending on their motives, will trade combinations of option series of different types, strike prices, and expiration dates.[4]  For example, one key use of options is to

---

[4] *See* Chapter 33 (Option Strategies) in Robert W. Kolb and James A. Overdahl, eds., *Financial Derivatives: Pricing and Risk Management*, Vol. 5 (Hoboken, NJ: John Wiley & Sons, 2010) ("Financial Derivatives"), and Chapter 11 (Trading Strategies Involving Options) in John C. Hull, *Options, Futures, and Other Derivatives*, 8th ed. (Boston: Prentice Hall, 2012) ("Hull").

make bets on the future volatility of the price of the underlying stock over some time horizon.[5] An investor who believes future volatility over the next month will be higher than the level of volatility reflected in the market price of options expiring in a month might buy call and put options with such expiration dates, to profit if this view is correct.

8.    Exhibit 1 shows that the Relevant BDX Options comprised 295 option series with positive trading volume on at least one day during the Putative Class Period (140 call option series and 155 put option series).[6]  Within these unique option series, there are 51 distinct strike prices, ranging from $125 to $400 and 11 distinct expiration dates spanning from February 7, 2020 to January 21, 2022, corresponding to option series covering 208 different combinations of strike price and expiration date.[7]

## V.    Dr. Mason Provides No Reliable Economic Support for His Claim that BDX Options Traded in Efficient Markets during the Putative Class Period

### A.    Overview of Dr. Mason's Assessment of Market Efficiency for BDX Options

9.    Dr. Mason opines that the market for BDX Options was efficient during the Putative Class Period.[8]  He claims that opinion is supported by his purported finding that:

---

[5] Financial Derivatives, p. 503.  Investors who wish to make bets on future volatility can do so in a way that hedges their exposure to changes in the underlying stock price.  These strategies will make or lose money as perceived future volatility changes, but not as the underlying stock price changes.

[6] In my analyses, whenever possible, I rely on the option data produced by Dr. Mason (MASON00004703_CONFIDENTIAL.csv and MASON00004704_CONFIDENTIAL.csv), which he states was obtained from the Chicago Board Options Exchange ("CBOE") (Mason Report, ¶ 97).

[7] As Exhibit 1 shows, the Relevant BDX Options include call options with strike prices ranging from deep "in-the-money" (low strike prices) to deep "out-of-the-money" (high strike prices), as well as put options with a wide range of strike prices ranging from deep "out-of-the-money" (low strike prices) to deep "in-the-money" (high strike prices).

[8] Mason Report, ¶¶ 2, 10.

      a.   BDX common stock traded in an efficient market during the Putative Class Period;[9]

      b.   There was an "absence of any persistent Put-Call Parity deviations during the [Putative] Class Period"[10] (put-call parity is a no-arbitrage relationship between the prices of call options, put options, and the underlying asset); and

      c.   "BDX Options traded in the largest U.S. options exchange [namely, CBOE]."[11]

10.    **BDX Stock Market Efficiency** – Dr. Mason claims that market efficiency for BDX Options follows from market efficiency for BDX stock because "BDX Options are derivative instruments whose values are derived from BDX stock."[12]  Moreover, Dr. Mason claims that practitioners "have found that when stocks of companies that trade on major exchanges generally trade in semi-strong form efficient markets, derivative securities based on such stock can also be considered to trade in efficient markets."[13]

11.    **Put-Call Parity** – Dr. Mason claims that "the lack of persistent Put-Call Parity deviations would indicate that the market for BDX Options traded in an efficient market"[14] and that there

---

[9] Dr. Mason opines that BDX common stock "traded during the [Putative Class Period] in a semi-strong-form efficient market in which new information was promptly reflected in the security's price" (Mason Report, ¶ 2, 10). *See* also, Mason Report, ¶ 91 ("To assess whether the market for BDX Options traded in an efficient market, one would first assess whether the market for the underlying asset (in this case, BDX Stock) also traded in an efficient market because the BDX Options are derivative instruments whose values are derived from BDX Stock.  Therefore, the factors that support the efficiency of BDX Stock also supports [*sic*] the efficiency of BDX Options.  I have already established that shares of BDX Stock traded in an efficient market."); Mason Dep. Tr., p. 60:2–10 ("Since all [BDX Options] derive their value from the same Becton, Dickinson stock that I find trades in an efficient market, one can reasonably conclude that all the options trade efficiently, that is, the price of those options, the value of those options will fluctuate in response to new value-relevant information in a timely manner just as the stock itself does.").  I have not been asked to evaluate whether BDX stock traded in an efficient market during the Putative Class Period.  Note that Dr. Mason appears to discuss option values and prices as if the two concepts were one and the same.  There is a distinction between value and price.  In an efficient market, one would expect all value-relevant information to be reflected in the price, so that traded prices would accurately the option's value.  If markets are not efficient, traded prices may deviate significantly from the option's "value."  Dr. Mason points out that the value of an option is derived from the value of the stock, but side-steps the crucial question of whether price accurately reflects value.  As explained in Section V.B below, option prices may not fully incorporate all publicly available information about future volatility of the stock price, which would impact option values.  Thus, option price may deviate from the option value that would be implied by considering all publicly available information about future volatility.

[10] Mason Report, ¶ 102.

[11] Mason Report, ¶ 93.  According to data obtained from the Options Clearing Corporation ("OCC") website, trading on CBOE accounted for only 10% of trading volume in BDX call and put options in 2021 (the year for which data closest to the Putative Class Period is readily available on the OCC website), with the remaining trading volume being accounted for by 15 other exchanges.

[12] Mason Report, ¶ 91.

[13] Mason Report, ¶ 92.

[14] Mason Report, ¶¶ 94, 98.

was an "absence of any persistent Put-Call Parity deviations during the [Putative] Class Period."[15]  Dr. Mason evaluates the presence of put-call parity deviations in BDX Options using two similar approaches, one that he calls the "Evans et al. Put-Call Parity Approach,"[16] and one that he calls the "Ofek et al. Put-Call Parity Approach."[17]  Based on his application of the so-called Evans et al. Put-Call Parity Approach, Dr. Mason claims that "the [average] Put-Call Parity deviations for BDX Options was -0.03 percent during the [Putative] Class Period …, lower than the [0.36 percent] average presented in [Evans et al.]."[18]  Based on his application of the so-called Ofek et al. Put-Call Parity Approach, Dr. Mason claims that "the [average] Put-Call Parity deviations for BDX Options was -0.09 during the [Putative] Class Period …, lower than the [0.30] average presented in [Ofek et al.]."[19]

### B. Dr. Mason's Opinion that Efficiency of Option Markets Follows Automatically from Stock Market Efficiency Is Not Based on Rigorous Economic Principles or Evidence

12.    Dr. Mason incorrectly claims that efficiency of the markets for Relevant BDX Options follows automatically from efficiency in the market for BDX stock because "[a] stock option is a derivative security that fundamentally derives its *value* from the underlying stock."[20]  His claim is unsupported by rigorous economic principles or evidence.  Indeed, as an economic matter,

---

[15] Mason Report, ¶ 102.

[16] Dr. Mason purports to follow the methodology to analyze put-call parity for option series applied in Richard B. Evans et al., "Failure Is an Option: Impediments to Short Selling and Options Prices," *Review of Financial Studies* 22, no. 5 (May 2009): 1955–1980 ("Evans et al.") (Mason Report, ¶¶ 98–99).

[17] Dr. Mason purports to follow the methodology to analyze put-call parity for option series applied in Eli Ofek, Matthew Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics* 74, no. 2 (November 2004): 305–342 ("Ofek et al.") (Mason Report, ¶¶ 100–101).

[18] Mason Report, ¶ 99.  Dr. Mason does not apply the Evans et al. Approach to all BDX options that traded during the Putative Class Period.  He excludes from his analysis BDX Options that meet the following criteria: (1) "Options with less than 6 calendar days and greater than 180 calendar days to maturity"; (2) "Options with prices less than $0.375"; (3) "Options where $C > S_0$ or $C < S_0 - PV(K) - PV(D)$"; and (4) "Options where $P > K$ or $P < K - S_0$" (Mason Report, Exhibit 3A).

[19] Mason Report, ¶ 101.  Dr. Mason does not apply the Ofek et al. approach to all BDX options that traded during the Putative Class Period.  He excludes from his analysis BDX Options that meet the following criteria: (1) "Options with zero open interest"; (2) "Options with underlying stock prices less than $5"; (3) "Options with less than 30 calendar days and greater than 365 calendar days to maturity"; (4) "Options that are out-of-the money, where $ln (S0 / K)| > 0.3$"; (5) "Options with bid-ask spreads greater than 50%"; and "Options where $C < S0 - PV(K) - PV(D)$" (Mason Report, Exhibit 3B).

[20] Mason Report, ¶ 89 (emphasis added).

efficiency of the markets for Relevant BDX Options does not follow automatically from efficiency in the market for BDX stock.

13.    As noted above (¶ 4), my understanding is that the relevant question at this stage of the proceedings is whether the *traded prices* quickly and fully reflected all publicly available information (i.e., whether the markets were efficient); it is not whether some theoretical value quickly and fully reflected all publicly available information.  Dr. Mason is opining that if the stock market is efficient, then the option market also must be efficient because option values are "derive[d]" from stock prices.[21]  Dr. Mason appears to be assuming incorrectly that actual traded prices in option markets must always occur at or very close to the option's theoretical value (and that there is a universally accepted methodology for determining what that theoretical value is). The fact that option prices depend on underlying stock prices does not mean that option prices in an actual traded market must trade at prices close to a theoretical price predicted by a model that depends on stock prices.  Nor does it mean that market participants would agree with each other on what is the correct model for valuing the option, or on what should be the inputs to the model.

14.    The idea that an exact option price can be computed from the stock price is based on models of option values that can only be derived by making highly simplified assumptions.[22] Because financial markets are complex in ways that contradict those assumptions, the traded prices of options in the *real world* often deviate substantially from theoretical prices according to those models.[23]

15.    The values of call and put options and, in an efficient market, their traded prices, are impacted by the arrival of new information in a more complex way than stock prices. Specifically, option values are affected by types of new information that are not subsumed by

---

[21] Mason Report, ¶ 89.

[22] For example, the Black-Scholes-Merton model referenced by Dr. Mason (Mason Report, ¶ 119) assumes that the volatility of stock prices is constant over time, that stock returns have a lognormal distribution, that stock prices always move continuously (with no jumps), and that transaction costs for trading the stock are zero.  The Black-Scholes-Merton formula also assumes that the option is European-style (i.e., it cannot be exercised early).  *See* Hull, pp. 299, 309.

[23] *See*, for example, Stephen Figlewski, "Options Arbitrage in Imperfect Markets," *Journal of Finance* 44, no. 5 (December 1989): 1289–1311, p. 1289 ("[I]n an actual market such as that for stock index options, the standard arbitrage is exposed to such large risk and transaction costs that it can only establish very wide bounds on equilibrium option prices."), and David S. Bates, "Empirical Option Pricing:  A Retrospection," *Journal of Econometrics*, 116, nos. 1-2 (September-October 2003): 387–404, p. 389 ("[The Black-Scholes-Merton model] implies only one free parameter [(volatility)] so the implicit standard deviations (ISDs) inferred from option prices should be identical across different strike prices (moneyness) and maturities.  This has been rejected by the non-flat 'smile' and 'smirk' patterns observed across different strike prices, and by non-flat term structure patterns.")

changes in stock prices, such as changes in the market's expectation of future volatility in the stock price. Future volatility affects option values because it affects the probability that the option can be exercised at a profit. Hull, in his well-known textbook on option markets states:

> Roughly speaking, the volatility of a stock price is a measure of how uncertain we are about future stock price movements. As volatility increases, the chance that the stock will do very well or very poorly increases. For the owner of a stock, these two outcomes tend to offset each other. However, this is not so for the owner of a call or put. The owner of a call benefits from [stock] price increases but has limited downside risk in the event of [stock] price decreases because the most the owner can lose is the price of the option. Similarly, the owner of a put benefits from [stock] price decreases, but has limited downside risk in the event of price increases. The values of both calls and puts therefore increase as volatility increases…[24]

16.     For decades, it has been widely understood in the academic literature that testing for efficiency in option markets means more than just testing whether information in the stock price is also reflected in the option price—the primary question is whether option prices reflect information about future volatility.[25]

17.     A news event or public disclosure can affect options in a different way than it affects the stock. A news announcement can cause the stock price to decrease, but call option prices to increase (for example, because the news causes an increase in future volatility that more than offsets the effect of the decreasing stock price). Information about future volatility can have an important impact on option prices even if it has no impact on the stock price.[26] This type of information cannot get impounded into option prices through changes in stock prices, because it is not subsumed by the effect of stock price. The value implications of this type of information for option prices can be impounded in the price of an exchange-traded option to the extent that sophisticated market participants trade on their views of future volatility there. However, if there is insufficient trading by market participants to incorporate their views of future volatility, option markets may be inefficient. Indeed, peer-reviewed academic literature documents that option

---

[24] *See* Hull, pp. 215–216.

[25] Ser-Huang Poon and Peter F. Pope, "Trading Volatility Spreads: A Test of Index Option Market Efficiency," *European Financial Management* 6, no. 2 (June 2000): 235–260 ("Poon and Pope"), pp. 235–236.

[26] *See* Hull, pp. 216–217, Figure 10.2, which illustrates how option prices fluctuate as future volatility varies.

markets do not always fully incorporate information about future volatility.[27]  In sum, it is possible for the stock market to be efficient and the option markets to be inefficient.

18.    Importantly, alleged misrepresentations can cause market participants to have distorted views of future volatility and, consequently, cause option prices to be artificially inflated or deflated in ways that are unrelated to the inflation or deflation in the stock price.  Moreover, corrective disclosures can correct this misinformation and lead the market to reassess the value of call and put options based on their revised views of future volatility.  Thus, as an economic matter, the extent to which investors can rely on the integrity of the market price in option markets to make their investment decisions depends on whether traded prices of options fully and accurately reflect new information about future volatility of stock price, not just information about the underlying stock price.

19.    In his report, Dr. Mason did not identify any peer-reviewed academic articles, textbooks, or industry practitioner articles that support his claim that if the market for a given stock is efficient, then so are the markets for all exchange-traded call and put options referencing the stock.  Moreover, he performed no empirical analysis of traded prices of BDX stock and options to support that claim.  Thus, Dr. Mason provided no support based on economic principles and evidence for his claim that efficiency of the markets for Relevant BDX Options follows automatically from efficiency in the market for BDX stock.  As I demonstrate above, this claim is unsupported by rigorous economic principles.

---

[27] The academic literature identifies instances when option prices do not fully incorporate information with respect to future volatility of stock prices.  Poon and Pope analyze the price of call options on two large-capitalization stock indexes, the S&P 100 and the S&P 500; both of these options traded on the CBOE.  *See* Poon and Pope (p. 235).  Despite the active trading in the S&P 100 and S&P 500 option markets, Poon and Pope find that the markets for options on those indices were not efficient because investors could exploit information embedded within the volatility of index returns to generate consistent profits even after accounting for transaction costs.  *See* Poon and Pope (p. 258).  My own research identifies situations where publicly available information about future volatility is not fully incorporated into option prices.  *See* Stewart Mayhew and Chris Stivers, "Stock Return Dynamics, Option Volume, and the Information Content of Implied Volatility," *Journal of Futures Markets* 23, no. 7 (July 2003): 615–646, p. 616 ("[T]his study explores cross-sectional variation in the relative forecasting power of implied volatility and time-series models.  By evaluating a cross-section of firms with varying levels of option volume, one can examine whether the quality of implied-volatility information depends on option trading volume.  Indeed, the results indicate that even within the sample of 50 stocks with the highest option volume, implied volatility performs significantly better for those firms having higher trading volume.  Outside of the 10 highest option-volume firms, past return shocks generally provide incremental information about future volatility.  Thus, *the evidence in this study suggests that a highly liquid option market is necessary for implied volatility to incorporate all relevant information about volatility*." (emphasis added)).

**C.      Relevant BDX Options Had Low Trading Volume and High Bid-Ask
Spreads During the Putative Class Period**

20.      Whether the market for a particular option series is efficient is an empirical question. Different option series with different strike prices and expiration dates are likely to have very different economic characteristics, and their indicia of market efficiency may vary considerably. Thus, efficiency of option markets should be established empirically for each of the option series at issue.

21.      The concept of market efficiency is based on the economic idea that security prices will react quickly and fully to new, value-relevant information when sophisticated investors trade based on their assessment of how that information affects the value of the security.[28] Information is impounded into security prices through these trades.  For example, when sophisticated investors observe a security with a price that failed to react fully to positive information, those investors may seek to buy the security until its price increases enough to eliminate any profitable trading opportunities.  However, when trading costs are high (as reflected in high bid-ask spreads or the lack of any trading in the security), there may be limited (if any) profits to be made and sophisticated investors may not be incentivized to gather and analyze information and trade on it.  When such situations arise in option markets, the incorporation of new information relevant to option prices, such as information about expectations of future volatility, may not be taking place and the efficiency of the option markets is far from assured.

22.      Although Dr. Mason evaluated trading volume and bid-ask spreads for BDX stock in his assessment of market efficiency for BDX stock,[29] he has not analyzed any of these factors for any of the BDX option series.  Had he done so, he would have found that individual BDX option series exhibited very low trading volume and high bid-ask spreads during the Putative Class Period.  Given the low trading volume and high bid-ask spreads, Dr. Mason cannot assume that

---

[28] Professor Eugene Fama, the seminal researcher on the efficient markets hypothesis, defined an efficient market as one where security prices "always 'fully reflect' available information."  Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (May 1970): 383–417, p. 383. Prof. Fama also explained that "the [market] efficiency hypothesis says that prices reflect information to the point where the marginal benefits of acting [i.e., trading] on information (the profits to be made) do not exceed the marginal costs."  Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46, no. 5 (December 1991): 1575–1617, p. 1575.

[29] *See* Mason Report, ¶¶ 31-32 (regarding trading volume) and ¶¶ 75-77 (regarding bid-ask spreads).

all publicly available information was quickly and fully incorporated through trading into the prices of all BDX option series during the Putative Class Period.[30]

23.      **Trading volumes in the markets for Relevant BDX Options were very low.**  As Exhibit 2 shows, trading volume for the Relevant BDX Option series during the Putative Class Period was low, and for a significant majority of the classes, trading volume was negligible, near zero.  Across the 140 call option series, 90% had average daily trading volume ("ADTV") of less than 10 contracts, where one contract corresponds to 100 shares of BDX.  The mean ADTV across the 140 call option series was 3.74 contracts, and the median was 0.41 contracts (meaning less than one contract per day).[31]  As shown in Exhibit 2, the numbers for the 155 put option series tell the same story.  In contrast, according to data provided by Dr. Mason for BDX stock, the average trading volume in BDX stock during the Putative Class Period was greater than 1.2 million shares and the lowest amount of trading volume on any given day during the Putative Class Period according to Dr. Mason's data was 210,521 shares (on December 24, 2019).[32]

24.      As another manifestation of the very low trading volume, the Relevant BDX Option series also traded infrequently during the Putative Class Period.  Across all call and put option series in the set of Relevant BDX Options, the average option did not trade at all (i.e., had trading volume of zero) on most trading days in the Putative Class Period.  As Exhibit 2 shows, the average call option traded only on 19% of trading days, approximately one in five days, or once a week on average (18% for the average put option).  Moreover, 10% of call and put option series traded on no more than 3% of trading days during the Putative Class Period, which corresponds to trading once every six to seven weeks on average.  Dr. Mason has not explained why one would be able to conclude that an option series traded in an efficient market when it traded on no more than 3% of days during the Putative Class Period.  In contrast, according to

---

[30] I note that high trading volumes and low bid-ask spreads are technical characteristics of markets that tend to be efficient.  However, finding high trading volumes and low bid-ask spreads does not establish efficiency.  Testing market efficiency also requires an evaluation of the speed of incorporation of unexpected value-relevant news into security prices, a test that Dr. Mason does not conduct for any BDX options.

[31] Note that these calculations exclude many other BDX option series that are listed for trading but are not considered Relevant BDX Options because they did not trade at all over the entire Putative Class Period.

[32] Calculated using daily trading volume during the Putative Class Period provided by Dr. Mason in his production materials (*see* "Class Data to Chart" tab in MASON00004833_CONFIDENTIAL.XLSX).

data provided by Dr. Mason for BDX stock, there was not a single trading day during the Putative Class Period when BDX stock did not trade.[33]

25.    **Bid-ask spreads on Relevant BDX Options were high.**  High bid-ask spreads, such as those found in the markets for Relevant BDX Option series, indicate that it was costly to trade in these markets.  Exhibit 3 shows that bid-ask spreads among Relevant BDX Options series varied widely and were generally high during the Putative Class Period, with average spread for one option series as high as 160%.  During the Putative Class Period, the average bid-ask spread for call option series was 19% and the average bid-ask spread for put option series was 23%, approximately 950 times and 1,150 times higher, respectively, than the average bid-ask spread for BDX stock according to Dr. Mason.[34]  In percentage terms, bid-ask spreads on BDX options were smaller for in-the-money options than for out-of-the-money options.[35]  But even for these options the average bid-ask spread was 5%, roughly 250 times higher than the bid-ask spread for BDX stock according to Dr. Mason.[36]

### D.    Dr. Mason's Analysis of Put-Call Parity Deviations Does Not Support His Opinion that the Markets for BDX Options Were Efficient During the Putative Class Period

26.    Dr. Mason's claim that "[o]ptions demonstrating qualities of put-call parity are thought to trade in an efficient market"[37] is incorrect.  Put-call parity is an economic relationship that is expected to hold in the absence of arbitrage opportunities (i.e., in the absence of opportunities to make economic profits without taking on any risk).  However, the lack of arbitrage opportunities

---

[33] *See* "Class Data to Chart" tab in MASON00004833_CONFIDENTIAL.XLSX.

[34] Mason states that "Bloomberg reports that the average bid-ask spread for BDX Stock for each trading day during the [Putative] Class Period never exceeded 0.07 percent (i.e., the same ratio as a bid-ask spread of $0.07 on a trading price of $100) and *averaged 0.02 percent*" (Mason Report, ¶ 77, emphasis added).

[35] A call (put) option is "in-the-money" if the underlying stock price is greater (less) than the strike price. Conversely, a call (put) option is "out-of-the-money" if the underlying stock price is less (greater) than the strike price (Hull, p. 201).  *See* Hull, p. 201.

[36] *See* Exhibit 3.

[37] Mason Report, ¶ 94.

in a market is only a necessary condition for market efficiency, not a sufficient one.[38]  Thus, as an economic matter, demonstrating the absence of put-call parity deviations for Relevant BDX Option series does not demonstrate that the markets for all Relevant BDX Option series were efficient during the Putative Class Period.

27.     While finding that put-call parity is rarely violated rules out one egregious type of inefficiency, it does not imply that the market is efficient.  There can be extreme inefficiencies in the market even if put-call parity is always satisfied.

28.     To understand how, note that the put-call parity relationship analyzed by Dr. Mason means that for a particular strike price and expiration date, the *difference* between the call price and the put price is equal to the current stock price minus the present value of the strike price and expected future dividends, or  $C - P = S_0 - PV(K) - PV(D)$.[39]

29.     Writing the equation this way makes it clear that whether or not put-call parity is satisfied depends only on the *difference* between the call and put prices, not on the level of the call and put prices.  This means that if put-call parity holds for a particular combination of stock, call and put prices, one could add an arbitrary number such as $1 or $100 to both the call and the put price and the put-call parity equation would still be satisfied.  Call and put prices can deviate by an arbitrarily large amount from efficient prices that reflect all publicly available information without any violation of put-call parity.  This equality holds true for an infinite number of combinations of call and put option prices,[40] including an infinity of combinations that do not correspond to efficient option prices that reflect all publicly available information.

---

[38] In a seminal paper, Professors Andrei Shleifer and Robert Vishny discussed how markets can be inefficient even in the absence of riskless opportunities to profit from those inefficiencies (Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *Journal of Finance* 52, no. 1 (March 1997): 35–55 ("Textbook arbitrage in financial markets requires no capital and entails no risk.  In reality, almost all arbitrage requires capital, and is typically risky. Moreover, professional arbitrage is conducted by a relatively small number of highly specialized investors using other people's capital.  Such professional arbitrage has a number of interesting implications for security pricing, including the possibility that arbitrage becomes ineffective in extreme circumstances, when prices diverge far from fundamental values.")).

[39] Dr. Mason states that $C + PV(K) = P + S_0 - PV(D)$ (Mason Report, ¶ 95), which is mathematically equivalent to $C - P = S_0 - PV(K) - PV(D)$, where C represents the price of a call option at a particular strike price and expiration date, P represents the price of a put option with the same strike price and expiration date, $S_0$ represents the current stock price, PV(K) is the present value of the strike price, and PV(D) is the present value of expected dividends through the expiration date.

[40] For example, suppose the current stock price minus the term that depends on the strike price and expected future dividends is equal to $1.  In that case, put-call parity holds equally well if the call and put option prices are $2.0 and $1.0, respectively, as if the call and put option prices are $1,000 and $999, respectively.

30.     Thus, satisfying put-call parity does not mean that the option market is efficient in the sense that it responds quickly to reflect value-relevant information.  To illustrate further, suppose that new information is disclosed that reveals to the public that the company faces a large uncertainty that will be resolved in the near future, and it may be resolved in a way that is very favorable or very unfavorable to the company.  Suppose this announcement has no impact on the stock price but doubles the market's assessment of future volatility of the stock price.  This is value-relevant information that increases the value of both call and put options (as discussed in ¶15 above).  If the markets for call and put options are inefficient, it may be the case that the option prices do not change in response to new information (thereby failing to reflect the value implications of the increase in future volatility), or the call and put prices may perversely move in the wrong direction (decreasing in response to an increase in volatility).  In those situations, put-call parity may still hold even though the prices of call and put options failed to incorporate the rise in volatility.  As this example illustrates, as an economic matter, demonstrating the absence of put-call parity deviations for Relevant BDX Option series does not demonstrate that the markets for Relevant BDX Option series were efficient.

31.     Even setting aside that the absence of put-call parity deviations does not demonstrate market efficiency for call and put options, there are additional methodological reasons why, as an economic matter, Dr. Mason's analysis of put-call parity deviations fails to support a finding of efficiency in the markets for all Relevant BDX Option series.

32.     *First*, Dr. Mason's reliance on Ofek et al. and Evans et al. as benchmarks for analyzing the efficiency of option markets is misplaced.  As discussed in ¶ 11 above, Dr. Mason compares average deviations of put-call parity for BDX options to the average deviations of put-call parity in Ofek et al. and Evans et al.  However, neither Ofek et al. nor Evans et al. purport to establish thresholds based on average put-call parity deviations to determine whether option markets are efficient.  Instead, both Ofek et al. and Evans et al. designed their methodology to address a

different question—whether short selling constraints, can lead to inconsistencies between the prices of the call options, put options, and the underlying stock.[41]

33.    *Second*, Dr. Mason's analysis of put-call parity deviations only presents the *average* put-call parity deviation across the days and BDX options series that he analyzes.  Thus, it cannot be used to evaluate whether individual option series exhibited put-call parity deviations that are substantially different from the average and may be indicative of inefficiency in option markets.  Substantial or persistent arbitrage opportunities at particular strike price/expiration date combinations would be relevant evidence suggesting market inefficiency, even if they are not evident in the average.  Indeed, Dr. Mason's finding that the average put-call parity deviation is near zero[42] is consistent with there being *no* deviations from put-call parity just as it is consistent with many or even *all* put-call pairs deviating from put-call parity (e.g., if the negative deviations from put-call parity in some option pairs offset the positive deviations from put-call parity in other pairs).  Thus, Dr. Mason's analysis is uninformative about whether the market for *each* Relevant BDX Option series was efficient during the Putative Class Period.[43]

34.    *Third*, Dr. Mason's application of the Ofek et al. Put-Call Parity Approach and the Evans et al. Put-Call Parity Approach is methodologically unsound because he uses a put-call parity equality that applies to European-style options (i.e., options that can only be exercised upon expiration), but not American-style options (i.e., options that can be exercised at any time until expiration) such as BDX options.[44]  While it may be appropriate for Ofek et al. and Evans et al.

---

[41] *See* Ofek et al., p. 327 ("Several important conclusions can be drawn from [our results].  First, there is substantial evidence that across the universe of stocks, there are limits to arbitrage.  A significant percentage of these stocks face short sales restrictions (e.g., over 10% of the observations are associated with negative rebate rate spreads of -1% or larger), which have an effect on the ability to conduct arbitrage between the equity and options markets.  Second, and related, these limits to arbitrage lead to violations of put–call parity.  Third, transactions costs, whether the shorting cost or the bid–ask spread in the options market, seem to limit the magnitude of these deviations in many cases."), and Evans et al., pp. 1965, 1966 ("The significantly positive coefficient on [the short selling constraint] confirms that as [the short selling constraint] increases, so does put-call disparity.  Thus, [the short selling constraint] passes through to options prices, consistent with findings elsewhere… For puts, both the presence and the magnitude of [the short selling constraint] are statistically significant and positive.  Thus we conclude that [the short selling constraint] increases the prices of puts.  Call prices do not show this sensitivity; neither the presence nor the magnitude of [the short selling constraint] has a statistically significant effect on call prices.").

[42] Mason Report, Exhibits 3A and 3B.

[43] Moreover, despite Dr. Mason's claim that he finds an "absence of persistent Put-Call Parity deviations" (Mason Report, ¶ 102), he has provided no analysis of the extent to which violations of put-call parity for any particular option series were "persistent."

[44] All single-stock exchange-traded options in the U.S. are American-style options.  *See also* Mason Report, footnote 128 ("The BDX Options traded during the Class Period are American options and can be exercised at any time up to the expiration date.")

to apply the put-call parity equality for the purposes of their analyses (i.e., to analyze the impact of short-selling constraints on the prices of stocks and related call and put options), it is not methodologically sound to use an equation that applies only to European options to analyze whether American-style call and put options traded in efficient markets as Dr. Mason purports to do.[45]   Indeed, using the European equality to analyze market efficiency of American-style options may lead to incorrect conclusions.  American-style option prices, if the option market is efficient, should be expected to deviate from European option prices in systematic ways (due to the early exercise premium of the options) that should cause the (European) put-call parity equality to be violated.[46]

## VI.   Dr. Mason Mischaracterizes Basic Facts about Option Markets

35.    Based on my review of the Mason Report and the Mason Dep. Tr., Dr. Mason appears to mischaracterize basic facts about option markets, including trading and risk management.

36.    *First*, Dr. Mason claims incorrectly that market makers or dealers are not necessary in option markets.  Specifically, Dr. Mason states that in option markets "there aren't dealers that will hold an inventory of options or market makers in the same way that you have a stock because the market is so fluid that those things aren't necessary."[47]  Dr. Mason is incorrect. Market makers are present and regularly facilitate trading in option markets.[48]

37.    *Second*, and relatedly, Dr. Mason claims incorrectly that the concept of bid-ask spread does not apply to option contracts.  Specifically, Dr. Mason states that "[t]here's not really a concept of bid-ask spread for options."[49]  That is also incorrect.  Market makers facilitate trading

---

[45] Hull, p. 231.

[46] Ofek et al., pp. 308–309.

[47] Mason Dep. Tr., p. 58:6–10.

[48] *See,* for example, "Rules of Cboe Exchange, Inc. (Updated as of December 15, 2020)," Cboe Exchange, Inc. ("Rules of Cboe Exchange"), Rule 5.51 (describing the rules faced by market makers that impose upon them an obligation to facilitate trading in option markets).

[49] Mason Dep. Tr., pp. 57:24–25, 58:5–10.

in option markets by quoting bid prices (prices at which market makers are willing to buy) and ask prices (prices at which market makers are willing to sell).[50]

38.    *Third*, Dr. Mason appears to mischaracterize the basic risk profile of call and put options, and the nature of option risk management when he claims that the risk exposure from buying a call option contract can be cancelled by purchasing a put option contract with the same strike price and maturity.[51]  His claim is incorrect.  While purchasing a put option does hedge some of the directional exposure to movements in the underlying stock price (to a varying degree, depending on the strike price) it leaves the investor with an ongoing risky position that has positive exposure to volatility.  Combining the purchase of a call option with the purchase of a put option results in an option strategy, known as a straddle, that has long exposure to the stock's volatility—that is, it makes money if the underlying stock price experiences large positive or negative movements, and loses money if the stock price remains flat.[52]

---

[50] *See*, for example, Rules of Cboe Exchange, Rule 5.52 (describing rules for bid and ask quotes provided by market makers) and Hull, p. 203 ("A market maker for a certain option is an individual who, when asked to do so, will quote both a bid and an offer price on the option.  The bid is the price at which the market maker is prepared to buy, and the offer or ask is the price at which the market maker is prepared to sell. … The offer is always higher than the bid, and the amount by which the offer exceeds the big is referred to as the bid-offer spread [or bid-ask spread].).

[51] Mason Dep. Tr., p. 59:13–16 ("You can enter into a put option with the same maturity and strike so that the combination of the call and the put provides you a neutral exposure.  They cancel one another out."), and pp. 105:6–8 ("You don't need someone to buy your call option from you if you want to remove your call option exposure. You merely buy a [put].").

[52] Financial Derivatives, p. 516.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Washington, D.C., on May 3, 2023.


_____

Stewart Mayhew, Ph.D.

**Appendix A**

## STEWART MAYHEW
### Vice President

**Cornerstone Research**
2001 K Street NW, North Tower, Suite 800
Washington, D.C.  20006
202.912.8960
smayhew@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1996 | **University of California, Berkeley** | Berkeley, California |
| | **Walter A. Haas School of Business** | |
| | *Ph.D., Finance* | |
| | | |
| | **Brigham Young University** | Provo, Utah |
| 1992 | *M.S., Applied Economics* | |
| 1991 | *B.S., Economics* | |

## PROFESSIONAL EXPERIENCE

**Cornerstone Research**                                                      Washington, D.C.

2015-Present  *Vice President*
2012-2015      *Principal*
2010-2012      *Senior Economist*

Provides economic and financial consulting services and analysis in connection with litigation and regulatory investigations involving financial markets. Specializes in securities class actions, trading in equity, option, futures, and fixed income markets, and economic analysis for securities regulation. Experience includes numerous 10(b)-5 and Section 11 cases and matters involving market manipulation, insider trading, short selling, best execution, dark pools, suitability, and risk disclosures. Has assisted respondents in enforcement actions involving the DOJ, SEC, FINRA, CFTC, FERC, and State Attorneys General. Experience with directing complex cases involving multiple experts.

**University of Maryland, Robert H. Smith School of Business**      College Park, MD

2012, 2018    *Adjunct Faculty*

Taught MBA-level course in derivative securities.

**U.S. Securities and Exchange Commission**                       Washington, D.C.

2008-2010    *Deputy Chief Economist (Senior Officer)*
2004-2008    *Assistant Chief Economist*
2002-2004    *Visiting Academic Scholar*

Supervised teams of PhD financial economists. Provided economic analysis and support for SEC Divisions of Trading and Markets, Investment Management, Corporation Finance, and Enforcement, and the Office of Compliance Inspections and Examinations.

**Appendix A**

STEWART MAYHEW
Vice President

---

Worked on examinations and enforcement matters related to market manipulation, insider trading, derivative security valuation, mutual fund market timing/late trading, option backdating, churning, front-running, best execution, and other areas. Worked on rulemaking projects in areas including market structure, short selling, option trading, regulation of broker dealers, clearing and settlement, securities lending, credit rating agencies, investment advisors, hedge funds, mutual funds, exchange-traded funds, asset-backed securities, municipal bonds, option expensing, and proxy voting.

**University of Georgia, Terry College of Business**                Athens, GA

2000-2004    *Assistant Professor*

Taught courses in Mathematical Finance (PhD), Advanced Speculative Markets (MBA), Financial Engineering (MBA), Derivative Securities (undergraduate), Investments (undergraduate)

**Purdue University, Krannert School of Management**        West Lafayette, IN

1996-1999    *Assistant Professor*

Taught Investments Seminar (PhD), Options and Futures (MBA), Investment Management (undergraduate). Helped organize interdisciplinary program in computational finance.

**Berkeley Options Database**                                Berkeley, CA

1993-1996    *Database Manager*

**Financial Engineering Associates**                        Berkeley, CA

1995-1996    *Financial Engineer*

Consultant for financial engineering problems and valuation of fixed-income derivatives.

## PUBLICATIONS

Equity Trading and the Allocation of Market Data Revenue, **Journal of Banking and Finance,** v62 (January 2016): 97-111. (with C. Caglio)

Ex-dividend Arbitrage in Option Markets, **Review of Financial Studies**, v23 n1 (January 2010): 271-303. (with J. Hao and A. Kalay)

Microstructural Biases in Empirical Tests of Option Pricing Models, **Review of Derivatives Research**, v12 n3 (October 2009): 169-191. (with P. Dennis)

Option Strategies, in "Financial Derivatives: Pricing and Risk Management," Robert Kolb and James Overdahl, eds. Wiley-Blackwell Publishers, 2009.

Stock Returns, Implied Volatility Innovations, and the Asymmetric Volatility Phenomenon **Journal of Financial and Quantitative Analysis**, v41 n2 (June 2006): 381-406. (with P. Dennis and C. Stivers)

Informed Trading in Stock and Option Markets, **Journal of Finance**, v59 n3 (June 2004): 1235-1259. (with S. Chakravarty and H. Gulen)

How Do Exchanges Select Stocks for Option Listing? **Journal of Finance**, v59 n1 (February 2004): 447-471. (with V. Mihov)

**Appendix A**

**STEWART MAYHEW**
**Vice President**

**PUBLICATIONS (continued)**

Stock Return Dynamics, Option Volume, and the Information Content of Implied Volatility **Journal of Futures Markets**, v23 n7 (July 2003): 615-646. (with C. Stivers)

Risk-Neutral Skewness: Evidence from Stock Options **Journal of Financial and Quantitative Analysis** v37 n3 (September 2002): 471-493. (with P. Dennis)

Competition, Market Structure and Bid-Ask Spreads in Stock Option Markets, **Journal of Finance** v57 n2 (April 2002): 931-958. [Reprinted in *Financial Markets*, Jeff Madura, editor, SAGE Library in Business and Mangagement, Sage publications, 2004.]

The Dynamics of International Stock Index Returns, **Research in Banking and Finance** v1 (2000): 219-230. (with H. Gulen)

Stock Index Futures Trading and Volatility in International Equity Markets. **Journal of Futures Markets** v20 n7 (August 2000): 661-685. (with Huseyin Gulen)

The Allocation of Informed Trading Across Related Markets: An Analysis of the Impact of Changes in Equity-Option Margin Requirements **Journal of Finance** v50 n5 (December 1995): 1635-1653. (with A. Sarin and K. Shastri)

Implied Volatility, **Financial Analysts Journal**, v51 n4, (July/Aug 1995): 8-20.

The Political Economy of Early Federal Reclamation in the West, in "The Political Economy of the American West," Anderson and Hill, eds., Rowman and Littlefield, 1994. (with B. D. Gardner)

**PRESENTATIONS**

Research papers presented on program at 25 conferences including:
- American Finance Association (4 papers)
- Western Finance Association (3 papers)
- European Finance Association (3 papers)
- Financial Management Association (3 papers)
- NBER Microstructure Conference
- Vanderbilt Financial Markets Conference
- Cornell/Queens Conference on Derivative Securities
- Q Group Conference
- Chicago Board of Trade Research Symposium

Research presented at 47 seminars at universities and other research organizations

**Appendix B**

# Prior Testimony of STEWART MAYHEW

# Last Four Years

1. *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial.,* Unites States District Court, Southern District of Florida (Deposition Testimony, July 2021).

2. *Ruben A. Luna et al. v. Carbonite, Inc. et al.,* United States District Court, District of Massachusetts (Deposition Testimony, December 2022).

**Appendix C**

# Documents Considered List

**Pleadings**

- Third Amended Class Action Complaint (October 29, 2021)

- Memorandum of Law in Support of Lead Plaintiff's Motion for Leave to Amend the Third Amended Class Action Complaint (December 22, 2022)

**Academic Literature**

- Bates, David S., "Empirical Option Pricing: A Retrospection," *Journal of Econometrics* 116, nos. 1-2 (September-October 2003): 387–404

- Evans, Richard B., et al., "Failure Is an Option: Impediments to Short Selling and Options Prices," *Review of Financial Studies* 22, no. 5 (May 2009): 1955–1980

- Fama, Eugene F., "Efficient Capital Markets: II," *Journal of Finance* 46, no. 5 (December 1991): 1575–1617

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (May 1970): 383–417

- Figlewski, Stephen, "Options Arbitrage in Imperfect Markets," *Journal of Finance* 44, no. 5 (December 1989): 1289–1311

- Hull, John C., *Options, Futures, and Other Derivatives*, 8th ed. (Boston: Prentice Hall, 2012)

- Kolb, Robert W., and James A. Overdahl, eds., *Financial Derivatives: Pricing and Risk Management* (Hoboken, NJ: John Wiley & Sons, 2010)

- Mayhew, Stewart, and Chris Stivers, "Stock Return Dynamics, Option Volume, and the Information Content of Implied Volatility," *Journal of Futures Markets* 23, no. 7 (July 2003): 615–646

- Ofek, Eli, Matthew Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics* 74, no. 2 (November 2004): 305–342

- Poon, Ser-Huang, and Peter F. Pope, "Trading Volatility Spreads: A Test of Index Option Market Efficiency," *European Financial Management* 6, no. 2 (June 2000): 235–260

- Shleifer, Andrei, and Robert W. Vishny, "The Limits of Arbitrage," *Journal of Finance* 52, no. 1 (March 1997): 35–55

**Expert Reports**

- Expert Report of Joseph R. Mason (January 17, 2023)

**Appendix C**

**Depositions**

- Deposition Transcript of Joseph R. Mason, Ph.D. (April 4, 2023)

**Produced Documents**

- MASON00004703_CONFIDENTIAL.CSV

- MASON00004704_CONFIDENTIAL.CSV

- MASON00004833_CONFIDENTIAL.XLSX

**Data**

- Center for Research in Security Prices ("CRSP")

- OCC, "Volume and Open Interest; Exchange Volume by Class," available at https://www.theocc.com/market-data/market-data-reports/volume-and-open-interest/exchange-volume-by-class

**Other**

- "Rules of Cboe Exchange, Inc. (Updated as of December 15, 2020)," Cboe Exchange, Inc.

**All other materials cited in this report and the exhibits to this report.**

# Becton, Dickinson and Company
## Summary Statistics for Relevant BDX Options[1]
### 11/5/19 – 2/5/20

|  | Call Options | Put Options | All Options |
|---|---|---|---|
| Number of Relevant BDX Options[2] | 140 | 155 | 295 |
| Unique Strike Price-Expiration Combinations[3] |  |  | 208 |
| Number of Unique Strike Prices | 37 | 41 | 51 |
| Option Strike Price Range | $180 – $400 | $125 – $320 | $125 – $400 |
| BDX Stock Price Range[4] |  |  | $242.36 – $285.99 |
| Number of Unique Expiration Dates | 11 | 11 | 11 |
| Option Expiration Date Range[5] | 2/7/20 – 1/21/22 | 2/7/20 – 1/21/22 | 2/7/20 – 1/21/22 |

Source:  *MASON00004703_CONFIDENTIAL.csv; MASON00004704_CONFIDENTIAL.csv; CRSP*

Note:
[1]  Statistics are based on the set of Relevant BDX Options, which are BDX options with (1) an expiration date on or after 2/6/20, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Putative Class Period (11/5/19 – 2/5/20).  This set includes options for which the open interest is never positive.
[2]  Call and put options with the same strike price and expiration are counted separately.
[3]  Call and put options with the same strike price and expiration are counted together.
[4]  The BDX Stock Price Range is based on daily closing prices from CRSP.
[5]  The expiration dates among both call and put options range from 2/7/20 to 1/21/22, a range of 714 days (1.96 years).

# Becton, Dickinson and Company
## Trading Volume Summary Statistics for Relevant BDX Options[1]
### 11/5/19 – 2/5/20

| | Mean | Min | 10% | 25% | Median | 75% | 90% | Max |
|---|---|---|---|---|---|---|---|---|
| **Average Daily Trading Volume (Option Series)** | | | | | | | | |
| **Call Options** | 3.74 | 0.02 | 0.05 | 0.13 | 0.41 | 2.13 | 9.62 | 88.60 |
| **Put Options** | 4.28 | 0.02 | 0.06 | 0.17 | 1.05 | 3.51 | 9.64 | 184.58 |
| **Percentage of Days with Trading** | | | | | | | | |
| **Call Options** | 19% | 2% | 3% | 5% | 11% | 23% | 43% | 97% |
| **Put Options** | 18% | 2% | 3% | 5% | 13% | 25% | 41% | 80% |

Source:  *MASON00004703_CONFIDENTIAL.csv; MASON00004704_CONFIDENTIAL.csv*

Note:

[1] Trading volume summary statistics are based on the set of Relevant BDX Options, which are BDX options with (1) an expiration date on or after 2/6/20, the alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Putative Class Period (11/5/19 – 2/5/20).  For each option, the start of the analysis period is the earliest day in the Putative Class Period for which there is a non-zero bid and ask price, and the end of the analysis period is the end of the Putative Class Period.  For each option series, the average daily trading volume and the percentage of days with trading volume is calculated.  Then, summary statistics are calculated for the distribution of average daily trading volume and percentage of days with trading across option series.

**Exhibit 3**

# Becton, Dickinson and Company
## Bid-Ask Spread Summary Statistics for Relevant BDX Options[1]
### 11/5/19 – 2/5/20

| | Mean | Min | 10% | 25% | Median | 75% | 90% | Max |
|---|---|---|---|---|---|---|---|---|
| **Average Bid-Ask Spread[2] (Option Series)** | | | | | | | | |
| **Call Options** | | | | | | | | |
| In-the-Money[3] | 5% | 2% | 3% | 3% | 5% | 6% | 7% | 9% |
| Out-of-the-Money[3] | 25% | 4% | 6% | 8% | 12% | 27% | 60% | 160% |
| **Total** | **19%** | **2%** | **3%** | **5%** | **8%** | **19%** | **53%** | **160%** |
| **Put Options** | | | | | | | | |
| In-the-Money[3] | 5% | 2% | 3% | 3% | 5% | 7% | 8% | 11% |
| Out-of-the-Money[3] | 26% | 3% | 6% | 9% | 14% | 30% | 63% | 124% |
| **Total** | **23%** | **3%** | **4%** | **7%** | **12%** | **27%** | **56%** | **124%** |

Source:  *MASON00004703_CONFIDENTIAL.csv; MASON00004704_CONFIDENTIAL.csv*

Note:
[1] Daily bid-ask spreads are calculated as the ratio of (1) the difference between the ask price and the bid price to (2) the midpoint of the bid and ask prices (the midpoint is the sum of the bid and ask prices divided by two).  Bid-ask spread summary statistics are based on the set of Relevant BDX Options, which are BDX options with (1) an expiration date on or after 2/6/20, the alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Putative Class Period.  For each option, the start of the analysis period is the earliest day in the Putative Class Period for which there is a non-zero bid and ask price, and the end of the analysis period is the end of the Putative Class Period.  Bid, ask, and stock price are as of 3:45pm.
[2] Days with a bid or ask price of zero are excluded from the average calculation.  Summary statistics are calculated for the distribution of average bid-ask spreads across option series.
[3] A call (put) option is "in-the-money" if the underlying stock price is greater (less) than the strike price.  Conversely, a call (put) option is "out-of-the-money" if the underlying stock price is less (greater) than the strike price.  Whether an option series is In-the-Money vs. Out-of-the-Money is evaluated on a daily basis.  Therefore, daily bid-ask spreads for a given option will be included under the In-the-Money average for days the option is in-the-money and under the Out-of-the-Money average for days the option is out-of-the-money.