# Exhibit C



# Transcript of Joseph R. Mason, Ph.D.

**Date:** April 4, 2023
**Case:** Industriens -v- Becton, Dickinson and Company, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

57

point in the future at some prespecified price.

Q   Is my understanding correct that the underlying stock strike price and expiration date uniquely define an option series?

A   Though they uniquely define an option, a series would be a sequential series of, say, expiration dates for a particular strike price or strike prices for an expiration date or the combination of thereof.

Q   And option series are being traded on different prices?

MR. NIRMUL:  Object to form.

A   Well, they're being -- they're not traded -- they may not be traded on the same exchange as the stock.

Q   And they have different trading volumes than the stock?

MR. NIRMUL:  Object to form.

A   Likely, yes.

Q   And let me say they can have different trading volumes as the stock and they can also have different bid ask spreads than the stock; correct?

MR. NIRMUL:  Object to form.

A   There's not really a concept of bid-ask spread for options.  Options typically trade in

58

pretty high volumes, at least overall, thinking of all of the options on a stock because options are useful to obtain an exposure, long or short, to a stock in a very convenient way.

Bid-ask spread is just not a kind of a concept when it comes to options because there aren't dealers that will hold an inventory of options or market makers in the same way that you have a stock because the market is so fluid that those things aren't necessary.  I do test the analog to that, which is put-call parity in my report, and you find the put-call parity on Becton, Dickinson options is well within the bounds one would think of as defining an efficient market in those options.

But perhaps more importantly, since options derive their value from the stock and the stock itself trades in an efficient market, there's really no reason to believe that the options don't trade in an efficient market as well.

Q   You mentioned that bid-ask spread is not the kind of concept when it comes to the operations market since you don't have market makers in the same way that you have in the stock market because the market is so fluid.  So the options market is more fluid than the stock market, and then you don't

59

have a need for a bid-ask spread the same way.  Is that correct?

A   Right.

(Court Stenographer clarification.)

MR. NIRMUL:  Object to form.

MS. CHARMANI:  I apologize.  I'll try to let you formulate your objection.

THE WITNESS:  I think it was my fault for rushing in too quickly.

A   So if you have a call option, say, in a particular maturity in strike, you don't need to sell that call option to someone else like you do a stock.  You can enter into a put option with the same maturity and strike so that the combination of the call and the put provides you a neutral exposure.  They cancel one another out.

So we don't need a market maker to be in the middle here to -- they can buy the call option from you and then sell it to someone else.  The market just works a little bit differently because it is, one might say, more flexible than the market for the stocks themselves.

Q   And I will ask you to explain a little bit more on the put-call parity analysis a bit later.

Do you have an opinion as to whether each

60

option series represents a different security?

A   My opinion is that they don't.  Since all of those options derive their value from the same Becton, Dickinson stock that I find trades in an efficient market, one can reasonably conclude that all the options trade efficiently, that is, the price of those options, the value of those options will fluctuate in response to new value-relevant information in a timely manner just as the stock itself does.

Q   And when you assess market efficiency with respect to -- do you do it with respect to common stock and then with respect to each series of call options and each series of put options?

A   No, as I just said, because the common stock from which the option derived its value, no matter what series that option is in, trades in an efficient market and responds promptly to new information, there's no reason to expect the option that, again, derives its value directly from the common stock not to respond to new value-relevant information.  Therefore, if the market for the common stock is efficient, then the market for the option is informationally efficient as well.

Q   Okay.  I'm going to take you back to the

93

A Well, you have embedded in that question a presumption that I expanded the events I think in Endo or maybe in the present case over what I did in Endo but expanded in one of the other two. I'm not sure that's a fair presumption. As I noted, I haven't prepared for a deposition on Endo today, so I haven't gone through that in great detail.

It could be that there was a wide number of 8-Ks in Endo. I really don't remember whether that was the case. As I said, some firms can file 8-Ks for a lot of things. They can file hundreds of 8-Ks a year. Here BDX filed, I think, about 10 per year. So maybe it's an issue that I needed to weed through the 8-Ks in Endo to get to the ones that had material, value-relevant information. I really don't remember.

Q And I'm not trying to take your deposition in relation to the Endo matter, and I wouldn't want to. I'm just trying to -- and to correct the record, I'm not taking a position -- I'm not embedding a presumption that you expanded it. I'm just noting that there's a difference between the categories of events, and I'm trying to understand why.

A Sure. And I appreciate that clarification

94

about the expansion. And I didn't mean to say you were trying to take my deposition in another matter either, just that I don't really have a recollection from something I did five years ago in detail to really get down to why I made decisions I did. The decisions are driven by the facts and circumstances of the case really, and how the -- how the company discloses information and what information it discloses.

Q And going back to the issue of whether the statistically significant abnormal returns were directionally appropriate, what would lead you to perform that review in other cases but not here?

A I don't know. Again, likely the facts and circumstances of the case. I am a financial economist. I'm not an attorney. And I appreciated your clarification at the beginning of the deposition that you weren't going to ask me about the law. And I'm the least qualified in the room to make this observation, but it's my general understanding that the courts may not take directionality into account, which I think aligns with my view as a financial economist, as I noted previously.

Sometimes it's hard to figure out what a

95

firm should have done or what a firm stock purchase should have done in response to the release of new information, certainly devoid of hindsight bias, and that that should as at the core of any analysis of directionality.

And so it's more important merely that the stock price move than we start weighing in in a God-like fashion to decide which way is a right movement and which way is a wrong movement. Just like the importance of the other Cammer factors, as we discussed, it's important that you have adequate trading volume so that the price can move whatever direction the market deems relevant and that we have analysts interested in the stock that are trying to parse through the information to get at that same question.

And analysts have different ideas of what should be happening within a firm, and that's part of the great thing about the market system. At the end of the day, we add up all of these ideas and we harness them in an efficient market to get a price movement that usually almost always reflects pretty accurately the value of what happened.

Q So in the other two cases we looked at, you did perform this review. Here you didn't, and I

96

think you just explained that it's a difficult analysis to perform. Is that accurate from a layperson's perspective?

MR. NIRMUL: Objection to form.

A Sometimes it can be. Certainly in academic studies, unless you have a clear announcement, like a merger or acquisition, it can sometimes be tough to say what should have happened. And even with a merger and acquisition, there can be debate about did you overpay for that acquisition? Did you get a good deal? Why did you get a good deal? Maybe the firm is not really a good acquisition. There can be a lot of factors that come into play.

Q But what made the analysis easier or perhaps more appropriate on other cases and not here?

A Yeah, that I can't really say, sitting here. Acuity was filed in November 2019, so that's, what, three and a half, four years ago, and SEB was, as I noted, four and a half, five years ago, and I can't really say, sitting here, what led me to those specific decisions at those specific times.

Q I just have a couple more questions and then we can break.

In your report you also use the term "confounding information." Can you explain that term to me the way you use it in your report?

A   Sure.  Let's say that a firm made a positive announcement, I don't know, they expected greater earnings from Product Line A and greater earnings from Product Line B and the stock went up on the news.  If we're involved in a case where we're only concerned with Product Line A, how much of that stock price increase is attributable to Product Line A versus Product Line B, the announcement about Product Line B would be considered confounding information.

We can disentangle that typically utilizing standard financial tools.  But in this instance, with regard to what I've seen around the corrective disclosures in this matter, there doesn't appear to be confounding information that would need to be disentangled.  Now, of course, I say that with the caveat that I have not evaluated damages in this case and I haven't undertaken a complete analysis with the benefit of complete discovery in this matter, which I would want to do before -- if I was asked to evaluate damages, I would want to do before I came to that opinion.

But confounding information is that information that's correlated with what you think is -- is the effect of your primary piece of information that you're concerned about.

MS. CHARMANI:  I think this is actually a good time to break.  I think we can go off the record.

(Recess 12:34 p.m. - 1:37 p.m.)

BY MS. CHARMANI:

Q   Dr. Mason, I just want to go back to the discussion of the material you relied on.  I believe we discussed Appendix B to your report, page 45.  If you could go back there, I would appreciate it.

A   Okay.

Q   Under the "Analyst Reports" category, I believe the appendix lists 165 analyst reports. Could you please identify for me which analyst reports you reviewed in full?

A   Really none.  As I said, the purpose of analyst reports was to opine upon the Cammer factor regarding analyst coverage, so I didn't review the content except to establish that these weren't, for instance, a report on another company that merely mentioned Becton, Dickinson.

Q   Okay.  And we also discussed the other material listed in the appendix, the court documents, articles and books, case law public filings, and SEC filings.  Are there any additional facts or material that you would like to have that could impact your opinions and you don't at this point?

A   I have a lot of questions about materials that may be received in discovery, but I don't think anything that's available at this point in time.

Q   What type of material could be received in discovery that could inform your opinions one way or another?

A   Well, that's just it.  I don't know.  So we'll see what we get there.

Q   Apart from public statements that are currently on the record, discovery material that would reveal any internal documents wouldn't be relevant to your opinions, would it?

MR. NIRMUL:  Object to form.

A   I don't know.  I don't know what's out there.  Could be.

Q   How would internal information at the company be relevant to your analysis?

A   I don't know sitting here today.  But based upon the fact record, there was a lot going on in this disclosure and the stock price path during the class period.  I look forward to seeing what's there.

Q   What I'm trying to understand is we talked a bit earlier about whether you reviewed material relevant to defendants' theory of the case.  And please correct me if I remember wrong, but you said you didn't because it's not relevant to the analysis you performed.  Is that accurate?

A   Sort of.  I believe the question was about defendants' filings in this matter.

Q   Yes, which, for example, defendants' motion to dismiss explains defendants' interpretation of the information the company had and the information that was put in the market.  Is that relevant to your analysis?

MR. NIRMUL:  Objection to form.

A   I don't think so.  My analysis is carried out assuming that plaintiff's allegations are true, though since we don't get to damages per se, we don't get in full the plaintiff's allegation.

Q   I want to discuss the opinions in your report regarding options.  Is it your position and the opinion expressed in this report that each option series must always trade in an efficient

it is the value difference that matters to us so that it would be far simpler to merely keep the parameters constant for each option series in order to estimate damages across the entire series.

Q   Would you apply the BSM model to option series with long maturities as well?

A   To the extent that it's necessary, yes. Typically there aren't many long-dated options outstanding, and so there's not likely to be -- how should I say -- there's not likely to move damages by a lot no matter what volatility we used.

Q   And same question as to whether you would apply the BSM model on option series' that are far out of the money?

A   Right, but, again, far out-of-the-money options aren't going to move much with regard to a change in the underlying stock prices we discussed earlier. So no matter what choice we were to make, the impact on damages would not be of significant magnitude.

Q   Under your methodology, how would you reconcile a situation or situations where the supposed dissipation of inflation exceeds the change actually observed in the option prices?

A   The dissipation of inflation would be reflected in the inflation ribbon and, therefore, the but-for stock price over time that would be embedded in option level damages merely by including that but-for stock price with the disputed inflation and computing damages.

Q   Does your inflation estimation use any data or information from the option series themselves?

MR. NIRMUL:  Objection to form.

A   One would of course need to incorporate the strike price at maturity.

Q   But do you utilize any of the observed option prices on any given day during that -- the period you looked at?

MR. NIRMUL:  Objection to form.

A   No, that's not intended here.  We only need the change in value, and we can derive that change in value abstracting from the existing trading price.

MS. CHARMANI:  Could you give me one minute?  I think we have no further questions.  I just want to confer with my team.

MR. NIRMUL:  Okay.

(Recess 3:10 p.m. - 3:11 p.m.)

BY MS. CHARMANI:

Q   Dr. Mason, I just wanted to ask you a question about whether you have any experience or knowledge with the 510(k) process that is central to the allegations in this case?

MR. NIRMUL:  Object to form.

A   No, I have no direct experience with that process.

MS. CHARMANI:  I believe I have no further questions for you.

MR. NIRMUL:  I don't have any questions. I will take a read and sign, please.

(Time noted: 3:12 p.m.)

*****

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, MONIQUE VOUTHOURIS, New Jersey License No. 30XI00083400, the officer before whom the foregoing remote deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony of JOSEPH RUSSELL MASON, PH.D.; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of April 2023.

_____
Monique Vouthouris, CCR, RPR, CRR
Notary Public of the State of New Jersey
My commission expires: April 8, 2024