# Exhibit D



**Planet Depos**

We Make It *Happen*™

# Transcript of Jan Østergaard, Corporate Representative

**Date:** April 12, 2023
**Case:** Industriens -v- Becton, Dickinson and Company, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

A No.

Q Are you familiar with the third amended complaint filed in this action in October 2021?

A Yes.

Q Did you help prepare the document?

MR. BERMAN: Objection to form.

A Yes, we had it from our counsel for review and comments and our approval.

Q How did you determine that the allegations in the third amended complaint were true?

MR. BERMAN: Objection to form.

A We, Industriens, were informed by our counsel about what happened and the reason for having this litigation.

Q So your view about the allegations in the complaint are based exclusively on your conversations with counsel?

MR. BERMAN: Objection to form.

A Yes. Yes.

Q How do you assert that Becton lied to its investors regarding the Alaris infusion pumps?

MR. BERMAN: Objection to form.

A Could you clarify that question?

Q What was the nature of the alleged misrepresentations?

MR. BERMAN: Objection to form.

A Yeah, Becton, Dickinson produces an infusion pump, it's named Alaris. It's one of the primary revenue drivers of the company. And there were some effects on that pump, Becton, Dickinson was told by the FDA, Federal Drug Administration, to make -- to have a ship hold and also to make -- to have a new -- of the new so-called 510(k) --

(Court Stenographer clarification.)

A -- 510(k) clearance before being allowed to sell or ship the product again.

Becton, Dickinson didn't tell the whole truth about that meeting at the 5th of November 2019. They told the investors that there was a ship hold, but that ship hold was to be temporary and it would just move sales (indiscernible). They did not inform the investors about the dialogue with the FDA. And it wasn't until the 6th of February 2020 that the truth about the FDA conversation requirement was disclosed, resulting in a decline in the price of the stock at about 12 percent.

Q Were there specific statements during the class period that you contend Industriens relied on and that were proven false or misleading?

MR. BERMAN: Objection to form.

A No, not that Industriens relied on since our investment. Our investment model is to have external investment managers making these investments.

Q So Industriens didn't have any involvement with the investment managers' decisions during the class period?

MR. BERMAN: Objection to form.

A No, you're right. We're not supposed to have, given that the investment manager has full discretion.

Q When did Industriens first become involved in this lawsuit?

A When we were informed by our counsel in February, late February 2020.

Q Why did Industriens seek to be appointed as lead plaintiff?

A Because we have had a substantial loss and we find that we are a typical investor, we are a large investor, a professional investor, we have the organization and resources to be a lead plaintiff for the class.

Q Was the board of directors involved in this decision?

A No.

Q Is the board of directors involved -- is the board of directors normally involved in litigation decisions?

MR. BERMAN: Objection to form.

A No.

Q Who is?

MR. BERMAN: Objection. Who is what?

Q Who is involved in these decisions if the board of director is not?

MR. BERMAN: I'm sorry. Which -- I'm sorry, are you talking about litigation generally or are you talking about for this lawsuit?

Q Litigation generally.

A That would be myself. That would be our corporate lawyer, Uffe Berg. That would be our CIO, Peter Lindebaard. Peter is easy, P-e-t-e-r, Lindegaard is L-i-n-d-e-g-a-a-r-d. Peter Lindegaard would be involved, and so will our head of equities Morten Nymark, and the CEO, Laila Mortensen.

Q And, Mr. Østergaard, I'm going to remind you that if you want me to clarify any questions, I'm happy to do that.

MS. CHARMANI: I would ask Counsel to limit his participation and objections on the record.

77

MR. BERMAN: Objection to form.

A Yes.

Q For the ones that remained, or even better, for the two that we have been discussing, MFS and Wellington during the class period, was there any active management on behalf of Industriens regarding the investments?

MR. BERMAN: Objection to form.

A Not from Industriens since we gave them, the managers, the full discretion to invest on our behalf.

Q And you -- and at no instance did you ask Wellington or MFS why they bought a specific security at the point in time?

A No, they would never do that.

Q Or why they sold?

A Same answer.

Q Do you know what do they consider in deciding whether to sell or purchase a security?

A I know how their -- what his philosophy is, and their philosophy -- for both managers their philosophy so to invest in so-called high-quality stocks, stocks delivering high dividends being the leading comparative markets positions. So they stick to that strategy, and that's what we go but

78

why they choose to invest in that stock, that's not a question that we are able to answer.

Q And I think you mentioned that the majority of these funds are being closed out. When Industriens manages those investments, how do you decide your activity?

MR. BERMAN: Objection to form.

A The only portfolio we have managed internally in U.S. equities was the portfolio mentioned before that we ran from the end of 2020 until somewhere in the second half of '21, and that portfolio was a passive portfolio, meaning that it was invested as close as possible to a benchmark, S&P 500.

Q Does Industriens set any quarterly or annual benchmarks for returns?

A We -- we -- as part of the investment policy and guidelines which we discussed before, you will have an expected return for each calendar year.

Q What was that expected return for the class period years?

MR. BERMAN: Objection to form.

A Yeah, the expected return -- it would be two different returns since we are both at the end of 2019 and we are at the beginning of 2020. I

79

can't recall the exact figure, but it would have been in the range of 5 percent, 5, 6 percent in nominal terms.

Q Where is this expected return for 2019 and 2020 depicted, where is it laid out?

A You can see it in the investment guidelines. Overall investment guidelines which we discussed before.

MS. CHARMANI: We would again ask that these be produced. Thank you.

MR. BERMAN: Counsel, I'll ask at the end of the deposition if you want to send us a formal request for all the things that you think you're missing.

MS. CHARMANI: We will. We will.

MR. BERMAN: Thank you.

MS. CHARMANI: I'm just stating it on the record.

BY MS. CHARMANI:

Q Are you familiar with what it means to sell a stock short or to take a short position on a stock?

A Yes.

Q To your knowledge, did the external managers, MFS or Wellington, take a short position

80

on BD's stock during the class period?

A No, they were not allowed to go short.

Q Why were they not allowed?

A Because we didn't -- and, again, we don't want our managers to go short. All our mandates will be so-called long-only mandates.

Q So you have a formal policy in place that does not allow them to go short?

MR. BERMAN: Objection to form.

A Yes.

MS. CHARMANI: Let's mark Defendants' Exhibit 9, if I'm correct. No one is objecting to the number, so I am assuming it is 9.

THE TECHNICIAN: That's right, Counsel, it will be 9.

(Defendants' Exhibit 9 marked for identification.)

A I have it on the screen.

Q Are you familiar with this document?

A Yes.

Q Did you review it in preparation for your deposition?

A Yes, I did.

Q This is the investment management agreement with MFS International; correct?

Q Yes. When an external manager, or now that you have the global managers perform, do you consider 200 basis points lower than the index the threshold of acceptable performance?

MR. BERMAN: Objection to form.

A It's not good. Difficult to state where it's a threshold. I mean, in evaluating managers, you have to wait a long period. They can be below the benchmark for several months, maybe even several years, and that can change. So it has to be an evaluation taken over several years. But 200 basis points below the benchmark, that's not good and that will normally lead to the termination if it's sustained during a longer period.

Q On page 20 under "6.0 Investment Restrictions," I'm going to point you to the second-to-last bullet.

A Yes.

Q "The weight of a given sector (using Wellington Management's sector classifications) generally will be held to within plus/minus 10 percent or 2 times the sector's weight in the benchmark, whichever is greater."

Can you explain this for me, please.

A Yes. It means that the weight of, for instance --

(Court Stenographer clarification.)

A -- the healthcare sector, which is the security in which you find Becton, Dickinson, the total precision -- the total exposure to stocks in the healthcare sector, for instance, would have to be inside plus/minus 10 percentage points of the sector's weight of the total universe or two times the sector weight, if that is a greater figure.

Q And why was that?

A It's because of -- to be sure that the performance is well-diversified. And we would not, in general, be --

(Court Stenographer clarification.)

A We would in general not want our portfolio and portfolio run by Wellington to be exposed a hundred percent to financials, financial stocks, for instance, or healthcare stocks. So that's a reason why you set the limits for each sector, so that you assure that you are in each sector and that you are not too much in each sector.

Q And would you say that generally the sub-fund based on these guidelines would mirror the benchmark index, here the S&P 500?

MR. BERMAN: Objection.

A They would mirror in some way, but they should be allowed to deviate from the benchmark because that is more of the ways that they can create performance compared to benchmark.

Q But always subject to the restrictions set out in these agreements; correct?

A Yes.

Q How often did -- let's start with MFS. How often did MFS report back to you?

A They will present a monthly report, if the short month, showing the holdings, showing the performance, and they will send a more comprehensive formal report, as we had already, have seen already. In that you will find of course the performance data, holdings data, you will find the comments on sets of the performance and the best performance stocks, the bad performance stocks, and so on.

Q How often would you -- I think you mentioned they would send a monthly report of the holdings showing the performance. How often would they send the more comprehensive formal reports that you mentioned?

A Four times a year, after each quarter.

Q After they shared the monthly report with you, would there be a call or a meeting to discuss that? First, would there be a call internally or a meeting to discuss the report?

MR. BERMAN: Objection to form.

A Internally the people in the team would of course look at the weekly report, and it would be put in archive, and that will normally be what happens for the monthly reports. After the quarterly reports you will have typically a call with the manager. It could be a physical meet as well. You would have those meetings, physical or calls at least four times a year.

Q Who would participate in those meetings?

A The people, the persons in the managers relations team.

Q Who specifically would participate in this meeting -- in these meetings with MFS during the class period?

MR. BERMAN: Objection to form.

A It would have been --

(Court Stenographer clarification.)

A -- Anders Dylov. Dylov, yeah, we have mentioned it before, D-y-l-o-v surname.

Q Would you say that these reports were important for Industrien to understand the manager's performance?

93

MR. BERMAN: Objection to form.

A The quarterly reports and the following meetings, yes, they were important since it's a measure of for us to understand how the manager perform it and why the performance as they did.

Q Would you ever criticize or ask questions about the sale or purchase of specific securities?

MR. BERMAN: Objection to form.

A No.

(Court Stenographer clarification.)

A I said no.

Q If any --

A We would not -- sorry, I'll just -- I want to add we would not go in details with the individual stocks.

Q Even if there were losses or big losses with respect to individual stocks?

A They report on that. They would report every quarter on the best performance stocks, typically the five best performance stocks and the five worst performing stocks. And they may have commented on why they were that good or that bad.

Q They would comment on it. Would Industriens comment on it?

A We would listen.

94

Q So apart from listening, you wouldn't ask specific questions with respect to specific stocks?

A No.

Q How about with Wellington, what was the reporting process there?

A As described, monthly reports short and quarterly reports in more detail.

Q And then would you have meetings or calls with Wellington to discuss the quarterly reports?

A Yes.

Q But not the monthly reports?

A No.

Q Were these reports transmitted to the board of directors?

A No.

Q Not the quarterly ones?

A No.

Q Was the performance of the outside managers reported to the board of directors?

A Not for the individual managers, but of course the both directors will have a report of performance in general for each of the asset classes. But how performance for foreign equities was split between the individual managers, that would not be reported to the board of directors.

95

MS. CHARMANI: Let's mark Exhibit 10, please -- 11, Exhibit 11.

(Defendants' Exhibit 11 marked for identification.)

MR. BRONER: It should be up now.

A Yes, it is on the screen.

Q Great. Do you recognize this document?

A Yes.

Q What is it?

A It's a quarterly report from Wellington, end of 2019.

Q Did you review this document in preparation for today's deposition?

A Yes.

Q I'm going to ask you to turn to page 4 of 8, or if easier to look at the Bates numbers underneath, the one ending in 155.

A Yes, I've got it.

Q The "Health Care" section is laid out on this page and your investments; correct?

A Yes.

Q And under "Health Care Equipment & Services," there is a list that includes Abbott Laboratories, Becton, Dickinson, CVS Health Corp., HCA Healthcare Incorporated, Medtronic PLC,

96

UnitedHealth Group; correct?

A Yes.

Q And Becton, Dickinson is the company with the smallest amount of holdings; correct?

A Yes.

Q Who decided to include Becton, Dickinson in your investments?

A The investment managers at Wellington.

Q And this wasn't discussed with you at any point?

A No.

Q Would you review the performance of each of these companies listed here and comment on it?

MR. BERMAN: Objection to form.

A No, we would not.

Q Thank you. You can put that to the side.

MS. CHARMANI: Let's mark Defendants' Exhibit 12, please.

(Defendants' Exhibit 12 marked for identification.)

Q Do you recognize this document?

A Yes.

Q What is it?

A It's a quarterly reporting from Wellington for the first quarter of 2020.

Q And this is the immediately subsequent quarter from the report we reviewed as Defendants' Exhibit 11 dated December 31, 2019; correct?

A Yes.

Q Did you review this document in preparation for today's deposition?

A Yes.

Q I'm going to direct you to page 4, which also ends in Bates Number 104.

A Yes.

Q This page depicts, among other things, the largest buys for the quarter, and Becton, Dickinson is listed first, going from 0.2 percent of equities as of December 31st, 2019, to 1.3 percent of equities as of March 31st, 2020; correct?

A Yes.

Q Was Industriens involved in this decision to up the Becton, Dickinson buy in this quarter?

MR. BERMAN: Objection to form.

A No, no, we were not since we have given full discretion to Wellington.

Q And you never discussed the rationale behind this?

A No.

Q If you could turn your attention to Exhibit 11, which is the December report, again. And page -- I think the easiest way for me to direct you is to look at the Bates number at the bottom, 174, please.

A It's a bit slow.

Q Please take your time.

A You said 174?

Q 174.

A Yes.

Q It's the "Summary of Equity Portfolio Characteristics" of --

A Yes, I've got it.

Q I will direct you roughly to the middle of the table where the healthcare sector is addressed and where it says "Health Care Equipment & Services," the percentage of equities is 6.5, which matches the benchmark exactly which is also at 6.5; correct?

A Yes.

Q And now turning back to Exhibit 12, which is the March report, if you could take a look at page with the Bates number 126, which has the same table but as March 31st, 2020.

A Would you repeat the page number, please?

Q Yes. 126. I'm referring to the Bates number at the bottom of the page.

A Yeah. Yeah, I have it here.

Q And it's the same table that we looked at before, the "Summary of Equity Portfolio Characteristics"; correct?

A Yes.

Q And as of March 31st, 2020, looking again at the "Health Care Equipment & Services" sector, it rose from 6.5 to 7.6 percent; correct?

A Yes.

Q And in this quarter it's actually overweight compared to the benchmark which is 6.8; correct?

A Yes.

Q Was Industriens involved in the decision to again go up in the percentage here at all?

MR. BERMAN: Objection to form.

A No.

Q Did this raise any concern for Industriens?

MR. BERMAN: Objection to form.

A No, it would not do that because the manager, the managers in general would be expected to --

(Court Stenographer clarification.)

A -- deviate from the benchmark in their -- in trying to -- because of trying to beat the benchmark.

Q This is as of March 31st, 2020, which is after the losses you allege you sustained due to the fall in the price of BD's stock; correct?

A Yes.

Q And you allege that these losses were significant; correct?

MR. BERMAN: Objection to form.

A Yes.

Q But you still were not concerned when you received this quarterly report and they had raised your interest in the sector so significantly even though you had sustained significant losses?

MR. BERMAN: Objection to form.

A We have had losses for one stock at least, but that shouldn't be seen as an argument for reducing exposure to the sector. There are many reasons for having increased the exposure to the healthcare sector. There are several companies in that sector.

Q Would that be a reason, though, to stop investing in this specific company?

MR. BERMAN: Objection to form.

A   It would be a decision of the manager to do so.

Q   When you say -- did you say "the management" or "the manager"?

A   "The manager," Wellington.

Q   Wellington or MFS?

A   Yes.

Q   You mentioned -- strike that.

MS. CHARMANI:  Let's mark Exhibit 13, 21.

(Defendants' Exhibit 13 marked for identification.)

A   I've got it.

Q   Do you recognize this document?

A   Yes.

Q   This is the declaration of James C. Cecchi in support of the motion of Industriens for appointment as lead plaintiff and approval of selection of counsel filed on April 27, 2020; correct?

A   Yes.

Q   If you could take a look at Exhibit B, which is page 9 of the overall PDF.

A   Yes.

Q   If you look at page 10, which is the second page of this document, it shows the U.S. Equities II fund, and it shows sales on December 9, 2019, for 258.07 per share; correct?

A   Yes.

Q   And then if you look at page 1 of the same PDF discussing U.S. Equities I, you see purchases throughout December 2019 for 260.88, 264.55, 263.38, all the way to the end of January, and the range ends with $276.41 per share; correct?

A   Yes.

Q   Why would one fund sell at 258, while at the same period, the other fund, by significant amount of shares or any amount of shares, at a rate that's higher than that, up to 276.41?

MR. BERMAN:  Objection to form.

A   I can't tell you.  The only reason would be that they have reached different conclusions about the future performance of this stock --

(Court Stenographer clarification.)

A   -- on this stock's future performance.

Q   And, again, this wasn't something that concerned Industriens?

MR. BERMAN:  Objection to form.

A   No.  No.  We know that using a number of managers -- managers for the same market will from time to time result in that one manager sells a given stock at the same point in time as another manager buys it.

Q   And I believe you testified that you continued to -- that Industriens continued to purchase BD stock after the end of the class period; correct?

A   Yes, the managers MFS traded the stock after the class period, and it was somewhat later it was included in the internal portfolio which we discussed before.  But there was a portfolio which was very close to the benchmark.

Q   Given that at this point after February 6, 2020, Industriens believed that Becton, Dickinson lied to its investors and misrepresented information relating to the Alaris pump, why did you continue to invest in Becton, Dickinson?

MR. BERMAN:  Objection to form.

A   Internal there would be a number of thoughts being involved in litigation cases.  It's not our policy to teach a manager or tell the manager which stock not to buy.  I mean, we give the discretion to managers to decide on investing or not out of pure investment analysis-based arguments, and if the manager think this stock is worth investing in even after like something like Becton, Dickinson, it's okay for us to do that.  We wouldn't -- we wouldn't try to -- we don't have the same knowledge as even close to the market.  There is a reason why we keep giving the manager the discretion.

Q   And I believe you testified in the beginning that you learned of the alleged misrepresentations based on your conversations with Kessler Topaz around the end of February; correct?

A   Yes.

MR. BERMAN:  Objection to form.

Q   And I understand that based on the policy you have described, you give the managers full discretion.  But did you discuss with MFS or Wellington that, hey, we were just informed that Becton, Dickinson committed securities fraud?

MR. BERMAN:  Objection to form.

A   We -- we -- I don't -- I don't recall, but I'm quite sure we did not present this litigation hold to them later on.  We may have informed them that they would --

(Court Stenographer clarification.)

A   We may have informed them in advance that they would receive this litigation hold letter in our dialogue with them.

Q   But apart from the litigation hold, at the

105

end of February when you allegedly learned -- or when you learned that Becton, Dickinson allegedly committed securities fraud, you did not communicate that to your investment managers?

MR. BERMAN: Objection; asked and answered.

A   No.

Q   Did you later on discuss the case with them apart from the litigation hold?

A   Not that I'm aware.

Q   So you're not aware whether your investment managers indeed relied on any of the Becton, Dickinson alleged misstatements during the class period?

MR. BERMAN: Objection to form.

A   Can you clarify the question?

Q   Did you discuss with either MFS or Wellington whether the statements that the complaint filed in this case alleges are false or misleading contributed to their view as to how to manage the company?

MR. BERMAN: Objection to form.

A   No. Again, we would typically not discuss individual stocks.

Q   Okay. And apart from the two managers

106

that we have discussed, MFS and Wellington, and your monitoring agreement with Kessler Topaz, did you have any other third parties, consultants, or outside counsel that would advise you with respect to U.S. investments?

MR. BERMAN: Objection to form.

A   No.

MR. BERMAN: Counsel, it has been over an hour. Is it a good time for a break?

MS. CHARMANI: I'm almost done.

MR. BERMAN: Okay.

Q   Does Industriens communicate with Becton, Dickinson at all?

A   No.

Q   And prior to first investing in the company or during the period that you mentioned you internally handled the portfolio, did Industriens perform any due diligence on Becton, Dickinson?

MR. BERMAN: Objection to form.

A   No. No.

Q   And to clarify, when you handled the portfolio internally, it was after the end of the class period; correct?

A   Yes.

Q   And you still maintained investments in

107

Becton, Dickinson?

A   Yes, that was because it was part of the benchmark. That portfolio, as I mentioned, was a passive portfolio just trying to be positioned as close as possible to the benchmark. And since Becton, Dickinson is included in the benchmark, we would have proceeded for that reason.

Q   But now you no longer handle that portfolio internally; correct?

A   Yes.

Q   It is handled by your global manager, Nykredit?

A   Yes.

Q   And they still have holdings, Industriens still holds holdings in Becton, Dickinson; correct?

MR. BERMAN: Objection.

A   Yes.

Q   Do you know the size of it?

A   No.

Q   If you could give me two minutes, I could confirm whether I have further questions.

(Recess 10:23 a.m. - 10:27 a.m.)

MS. CHARMANI: We have no further questions. Thank you so much for your time today. I'm going to note that we reserve the right to

108

reopen this deposition pending production of the process you mention is ongoing and the investment policies that you also referenced today.

Apart from that, thank you again so much for your time and for being so patient with us with the back and forth and the virtual deposition.

MR. BERMAN: I have no questions.

MS. CHARMANI: Have a good afternoon.

(Time noted: 10:28 a.m.)

*****