**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BECTON, DICKINSON AND COMPANY and THOMAS E. POLEN, <br><br> Defendants. | Case No. 2:20-cv-02155-SRC-CLW <br><br> Hon. Stanley R. Chesler, District Court Judge <br><br> Hon. Cathy L. Waldor, Magistrate Judge <br><br> Motion Date: [TBD] |

**DECLARATION OF JAMES E. CECCHI IN SUPPORT OF LEAD PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION**

I, James E. Cecchi, hereby declare as follows:

1.    I am a partner of the law firm Carella, Byrne, Cecchi, Brody & Agnello, P.C., Court-appointed Co-Liaison Counsel for Lead Plaintiff and the putative class. I am admitted to practice before this Court.

2.    I submit this declaration in support of Lead Plaintiff's Reply in Further Support of Its Motion for Class Certification, and I have personal knowledge of or information bearing on the facts set forth herein.

3.    Attached hereto as Exhibit 1 is a true and correct copy of the transcript of the Hearing before the Honorable Cathy L. Waldor, dated June 15, 2023.

1

4.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the transcript of the Rule 30(b)(6) deposition of Lead Plaintiff Industriens Pensionsforsikring, dated April 12, 2023.

5.      Attached hereto as Exhibit 3 is a true and correct copy of the Expert Reply Report of Joseph R. Mason, Ph.D., dated June 30, 2023.

6.      Attached hereto as Exhibit 4 is a true and correct copy of the transcript of the deposition of Stewart Mayhew, Ph.D., dated May 31, 2023.

Executed on this 30th day of June, 2023 in Roseland, New Jersey.


*s/ James E. Cecchi*
James E. Cecchi

# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY

INDUSTRIENS                          .
PENSIONSFORSIKRING,                  .
                                     .
       Plaintiff,                    . Case No. 20-cv-02155
                                     .
vs.                                  . Newark, New Jersey
                                     . June   15, 2023
BECTON, DICKINSON AND                .
COMPANY, et al.,                     .
                                     .
       Defendants.                   .
```

                    TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE CATHY L. WALDOR
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES (the parties appeared via Zoom videoconference):

For the Plaintiff:      KEVIN G. COOPER, ESQ.
                        Carella Byrne Cecchi Olstein Brody &
                        Agnello
                        5 Becker Farm Road
                        Roseland, NJ 07068
                        (973) 994-1700
                        kcooper@carellabyrne.com

                        DONALD A. ECKLUND, ESQ.
                        Carella Byrne Cecchi Olstein Brody &
                        Agnello
                        5 Becker Farm Road
                        Roseland, NJ 07068
                        (973) 422-5579
                        decklund@carellabyrne.com

Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(APPEARANCES continued)

For the Plaintiff:      JOSHUA EDWARD D'ANCONA, ESQ.
                        Kessler Topaz Meltzer & Check LLP
                        280 King of Prussia Road
                        Radnor, PA 19087
                        (610) 667-7706
                        jdancona@ktmc.com

                        MARGARET ELIN MAZZEO, ESQ.
                        Kessler Topaz Meltzer & Check LLP
                        280 King of Prussia Road
                        Radnor, PA 19087
                        (610) 667-7706
                        mmazzeo@ktmc.com

For the Defendants:     MATTHEW ADAM SKLAR, ESQ.
                        McCarter & English LLP
                        100 Mulberry Street
                        Four Gateway Center
                        Newark, NJ 07102
                        (973) 622-4444
                        msklar@mccarter.com

                        JAMES P. SMITH III, ESQ.
                        Winston & Strawn LLP
                        200 Park Avenue
                        New York, NY 10166-4193
                        (212) 294-4633

                        MATTHEW DIRISIO, ESQ.
                        Winston & Strawn LLP
                        200 Park Avenue
                        New York, NY 10166-4193
                        (212) 294-4686

                        THANIA CHARMANI, ESQ.
                        Winston & Strawn LLP
                        200 Park Avenue
                        New York, NY 10166-4193
                        (212) 294-4659

(Commencement of proceedings)

THE COURT:  Let's have appearances for plaintiff, please.

MR. COOPER:  Good afternoon, Your Honor.  This is Kevin Cooper from Carella Byrne.

Co-counsel from Kessler Topaz will introduce themselves.

MR. D'ANCONA:  Good afternoon, Your Honor.  Joshua D'Ancona for Kessler Topaz Meltzer & Check and the lead plaintiffs.

THE COURT:  Okay.

Defense?

MR. SKLAR:  Good afternoon, Your Honor.  This is Matthew Sklar with McCarter & English for the defendants.

I'm here with my co-counsel from Winston & Strawn, and I will defer to them for introductions.

MR. SMITH:  Good afternoon, Your Honor.  James Smith of Winston & Strawn for the defendants.

MR. DIRISIO:  Good afternoon, Your Honor.  Matthew DiRisio from Winston & Strawn also for the defendants.

THE COURT:  And who else is on?

MR. ECKLUND:  Good afternoon, Your Honor.  Don Ecklund, also from Carella Byrne, on behalf of plaintiffs.

THE COURT:  Oh.  Okay.  I missed you.  Sorry.

MR. ECKLUND:  My apologies, Your Honor.

THE COURT:  And who's Charmani?

MS. CHARMANI:  Good afternoon, Your Honor.  Thania Charmani on behalf of the defendants.

THE COURT:  Okay.  And Margaret Mazzeo?

MS. MAZZEO:  Good afternoon, Your Honor.  Margaret Mazzeo from Kessler Topaz on behalf of the lead plaintiff.

THE COURT:  Okay.

So we're only going to discuss or you're going to make a record for oral argument on the amend.  The other issues, we're going to have to deal with at another time because they're not fully formed, as far as I'm concerned.  I don't know anything about them.  So let's just do that.  We'll have oral argument.

And I said -- but let me start out by dropping a hint.  This is a Judge Chesler case.  And Judge Chesler did issue the decision in *In re* Merck, as we all know.

Having said that, defense, what's the issue, if you will -- wasn't this filed?  Why does there have to be a good cause analysis?  Wasn't this filed within the time permitted by the scheduling order for amendment?

MR. SMITH:  Your Honor, Jim Smith.

The motion was filed within the time for amendment, but it was filed outside the time for additional parties.  And here when the approach is to attempt to expand the

class -- as Your Honor pointed out obviously, the case is in front of Judge Chesler.  There was a fairly extensive record developed in front of Judge Chesler at the lead plaintiff stage in this case with numerous representations made to the judge about how these plaintiffs were going to conduct the case as it relates to options holders.  And there was recognition, I think on the part of the Court and the parties that, to the extent the case was going to be amended to include options holders, that would be adding a named plaintiff who actually had standing to assert those claims, i.e., somebody who traded in options.

And, accordingly, for this to have been a timely motion, the amendment should have been to add an options holder plaintiff before that date expired.  And that date expired on December 1st, 2022, without any attempt to amend the complaint.

So that's one of the many reasons that we think the motion is not timely, in addition to the fact that the complaint's been amended three times already, including after the options holder issue was teed up, including after the motion to -- the initial motion to dismiss was decided, which is when these plaintiffs told Judge Chesler back in the lead plaintiff stage, they would reassess, and they didn't add an options holder plaintiff.  They chose not to do that.

So that may be a more long-winded answer than

Your Honor was looking for, but that's our view as to why this is not a timely motion.

THE COURT:  Okay.

Aren't they just redefining the class, though?

MR. SMITH:  We are redefining the class, Your Honor.  I would say a couple of things there.

First off, I think the parties are in agreement, from my reading of the briefing here, that some of these issues, the Court has now seized on some of these issues, the ones that go to futility on the class certification motion itself, which is in mid-briefing, and an evidentiary record is being developed there.  The plaintiff's reply brief is still due.  But we've had expert reports.  We've had depositions.

And Your Honor mentioned Judge Chesler's decision in the Merck case.  The Merck case, as you know, was -- on class certification, and one of the things that the judge said there in dealing with the options holder claims is that the defendants in that case, in which I was not involved, had not developed an evidentiary record to show that including the options holders would be problematic.

We've done that in spades here on class cert, Your Honor.

So, you know, that's -- that's a set of issues that, in our view, ought to abide, you know, the full

development of the evidentiary on a class certification; in other words, if Your Honor was sufficiently persuaded by our arguments on futility at this stage to deny the lead motion, that would be fine.  But you certainly ought not to grant the leave motion, given the futility issues until the Court has had an opportunity to look at the more fully developed record on class certification.

THE COURT:  So in the event I were to permit the amendment, what would you need do with respect to the motion, the class cert motion or any other discovery?

Have you contemplated that?

MR. SMITH:  Well, I don't think we'd have to do much of anything on the class cert motion, Your Honor.  I think, at least from our perspective, I would need to see what the plaintiffs say in their reply brief.  But I think that, you know, it all depends on the basis on which Your Honor were to grant leave.  I think that, you know, the issues that we have raised from a futility standpoint, which is to say the expiration of the statute of limitations for all options holders -- by the way, that's not disputed.  So I think if Your Honor parses through the record here -- and this goes all the way back to the lead plaintiff, lead counsel stage, and Your Honor can look at Docket Number 92, which is the oral argument before Judge Chesler on that motion, but I think people recognize that when the first

consolidated complaint was filed here and omitted -- and actually omitted the options holders, then to the extent the statute of limitations for options holders had been stayed for a brief of time, it began to run again.  And that ran out in July of 2022.

The only thing plaintiffs are arguing here is that not that the statute of limitations didn't run but that their -- amendment should relate back.  And I can get into the issues as to why that doesn't work.

THE COURT:  In the Merck case, isn't it clear -- and I understand that that was a class cert rather than a 12(b) analysis, but the logic that I recall Judge Chesler had his -- in terms of relation back, if it's the same essential acts or set of facts, then that qualifies as being purposely related back.

MR. SMITH:  Yeah, and I think the point there, Your Honor, again, I think, you know, different procedural stage in Merck, but from a relations back standpoint, yes, it's got to be -- you know, the new claim has to arise out of the same transactions.

And, here, it doesn't.

Remember, Your Honor, the way this started was a different plaintiff filed the complaint that included the options holder.  Okay?  The current plaintiffs came in, and when they were appointed lead, they filed a complaint that

|Hearing
|20-cv-02155, June 15, 2023

intentionally omitted the options holders.  Okay?  So that's a very different set of facts.

And for it to relate back -- this is why I say we get a little ahead of ourselves, given the class cert briefing and trying to compare apples and oranges with _Merck_, because what our expert has said on class cert is that options transactions are very, very different for very salient reasons, reasons from transactions in common stock on the New York stock exchange.  And we had extensive testimony on that point, which I think will distinguish it from Judge Chesler's decision in _Merck_ and also directly to whether it relates back -- because it doesn't.  Those -- the transactions that are raised by options holder claims were intentionally omitted by these plaintiffs on multiple occasions when they amended their complaint.

THE COURT:  All right.  Let me hear from plaintiffs.

MR. D'ANCONA:  Thank you very much, Your Honor.

So a few different points that we just heard about. I think, perhaps, taking them in order, there was no recognition or finding or holding by Judge Chesler or anything of the like at the lead plaintiff stage that there would need to be a named plaintiff who traded in options for an options claim to be pleaded back in here.

I was the one who argued for lead plaintiff before

Judge Chesler.  I'm very familiar with what occurred there. And the actual back-and-forth there was, it may be that upon analysis of the ultimate ruling in this case on a motion to dismiss that we determine that it is necessary to try to plead in a named plaintiff.  But in the very next sentence, we said to Judge Chesler, that, of course, courts recognize that a plaintiff with stock trades has standing to bring claims and to represent a class of options traders as well. And as Your Honor rightly pointed out at the beginning, that is what happened in the Merck case.  The lead plaintiff there did not trade in options.  Nevertheless the complaint included options, and nevertheless, that lead plaintiff was certified to represent a class that included options traders.

So there's no impediment -- there's no need for a new named plaintiff here.  And the passage of the deadline to add new parties has no bearing on what should happen here.

So I think that's just beside the point.

As for the merits of the amendment and whether a ruling here would affect class certification, you know, it's -- I guess I'll take the other side.

Mr. Smith just said they're happy for you to deny the motion to amend, but if you're going to grant it, you should wait.

Your Honor, we think if you're inclined to grant the motion to amend, it is entirely called for here.  And, in

fact, it would really clean up -- or at least address and probably moot many of the arguments in the class certification opposition that defendants have raised here -- because effectively they're saying a class certification that the lead plaintiff is inadequate because of problems with the way that the options claims were attempted to be folded into the class definition, you know, that renders the lead plaintiff inadequate.

If Your Honor were to find that the amendment should be granted, that would, of course, I think, do away with many of those arguments. Those arguments would fall away in many respects. And that would -- that would clean up the issues that Judge Chesler would have to rule upon at class certification. Judge Chesler still would hear the arguments about market efficiency in the options market, which defendants did raise and which their expert did propound and develop. And those would still be live. There would be still be arguments.

But it would clean up some of the other arguments that that the attempt to amend itself somehow renders the lead plaintiff an improper class representative.

So that's one way that this intersects with the class certification arguments, Your Honor.

But we believe that Your Honor is precisely on point with one of the questions that you asked a few minutes

ago, which is, look, isn't this amendment effectively governed by Rule 15 (1) (C) [sic] because the underlying facts and the underlying conduct that's at issue, it's the same.  It's the same core of facts here.  It's the same conduct by the defendant that allegedly gives rise to liability to both the stock traders and the options traders in the exact same way.  They're alleged to have harmed all of those investors, to have affected Merck -- I'm sorry -- it's not Merck -- it's the Merck case we're talking about, but Becton Dickinson stock price in the exact same way, directly injuring all of those investors in the same exact way, albeit that they invested in different instruments.

That is precisely the question that confronted Judge Chesler in the Merck opinion.  And Judge Chesler found that options traders and stock traders in a similar circumstance, were highly similarly situated such that there was no issue with standing.  Defendants attacked it directly at class certification.  But there was no issue with standing of a stock traded to represent a class of all of the above traders.

And that's what we've got here.  So, you know, under the Rule 15 (1)  (C) analysis, which regards relation back, where there is that common core of operative facts.  That really drives whether relation back is appropriate.  And there are many cases in this circuit where courts have found

|Hearing
|20-cv-02155, June 15, 2023

13

in precisely analogous situation, even where a class size or the membership in the class would be affected somewhat by the amendment, that amendment was appropriate.  And, you know, I can give you a couple of case cites, if I might, here.

One of them is the Royal Mile [phonetic] case, which is cited in our reply.  That's just one.  But these all really follow the Westinghouse decision of the Third Circuit.  And the cite for that is 869 F.2d 696.  We thought this might be developed by defendants in this argument, and so we -- this is a case cite.  This is not in our reply brief.  But, again, Westinghouse, 869 F.2d 696.

Another more recent from 2021 is Doe v. Bloomberg, which is a District of New Jersey case.  That's 2021 WL 1578358.

This case is just like those where a common core of the facts supports relation back, even when there is some effect on class membership.  And the relation back analysis should go the same way here.

And we really think that that hits both of defendant 's points on futility, Your Honor.  One was standing, which we believe is squarely addressed by Judge Chesler did in Merck.  And the other is the timeliness or whether these claims are somehow time-barred.  We think relation back is clearly appropriate here.

And, finally, Your Honor, if you -- if Your Honor

were to agree on these futility points that defendants have raised here, we think a trailing point but an important one that defendants put I believe in a footnote in their brief is this might cause some delay in the case because they would need to file a motion to dismiss once the amended complaint were allowed to pass through on points that they've raised in their futility argument.

And we believe that the case law in this circuit is clear that you don't get that second bite at the apple, because futility under Rule 15 and motion to dismiss under Rule 12(b)(6) are decided on the exact same standard. And so courts don't allow claimants -- or parties, rather, to oppose the motion to amend on futility grounds and then to raise the same grounds on a motion to dismiss under Rule 12(b)(6), and so we think that that -- that that proposition should be rejected, that that's a possibility here as far as a procedural matter, should the amendment be allowed to proceed and Your Honor pass on the futility arguments.

I hope that I hit all the points there, Your Honor. If there were others that I should hit, please let me know.

THE COURT: No.

Mr. Smith, did you want to add anything or anybody else on your team?

MR. SMITH: Yeah, I would, Your Honor, with Your Honor's indulgence on a couple of points.

First, the motion has to be judged before we even get to relation back. And, by the way, Merck was not a relation back case -- I'll come back to that in a minute -- because plaintiffs are very fond of Merck now. At the lead plaintiff, lead counsel stage, they were very fond of the Bank of America set of cases in the Southern District in front of Judge Chin and Judge Castel. Pointed to them several times.

And, by the way, I wasn't at -- I didn't argue in front of Judge Chesler at the lead plaintiff, lead counsel stage, since that was jockeying among plaintiffs' lawyers.

But the transcript at Docket Number 92, Your Honor, speaks very clearly to what was and wasn't represented to Judge Chesler at the time. And Mr. D'Ancona suggested to Judge Chesler that this case was essentially on all fours with the Bank of America case.

In the Bank of America case, the court determined that the way to remedy the absence of an options holder plaintiff was to add an options holder plaintiff. And the court subsequently, on a motion to dismiss on standing grounds, threw out purported claims on behalf of several series of options holders who were not represented. The plaintiffs added -- unlike these plaintiffs, the plaintiffs in that case actually added an options holder plaintiff to shore up standing, and the court determined that that only

applied to options holders who held the same series of options, and it dismissed on standing grounds the claims of -- purported claims on behalf of the rest of the class.

This is an important distinction because at this stage of the case, as distinct from class certification, the plaintiff needs to have standing to assert the claims. And this plaintiff doesn't have standing to assert options holders claims because they didn't trade in options.

That case -- the motion has to be determined under 15(a)(2), Your Honor, which before we even get to futility, as Your Honor knows, talks about undue delay, prejudice, failure to cure defects at multiple prior opportunities to amend.

And, Your Honor, we would suggest -- I could walk you through the entire procedural history of this options holder issue. And the plaintiffs have had multiple opportunities to cure this defect and chose strategically not to do so. Again, they told Judge Chesler at the lead plaintiff, lead counsel stage, that when the motion to dismiss was decided, the universe would be clarified and they would know whether they were going to try to assert options holders claims or not.

And Mr. D'Ancona told you there wasn't any recognition of discussion about the fact that the way to do that is to find a plaintiff who was, in fact, an options

trader.  If Your Honor reads that transcript, that is not the case.  The entire discussion was the way to fix this is to -- in fact, I can read to Your Honor, before they even got to the motion for reconsideration by the options holder plaintiff, when Judge Chesler decided the initial motion for lead plaintiff -- and this is Docket Number 24, among the things he said was to the extent that the claims -- this is a quote now; it's on page 6 of his opinion -- quote, [As read] To the extent that the claims of class members that have purchased Becton Dickinson options differ from the claims of Industriens, that consideration can be addressed by adding named plaintiffs on which the lead plaintiff can rely for aid in representing the class.

And when you fast-forward to the argument on the motion for reconsideration, there's a lot of discussion around that being the way to fix it.

And what Mr. D'Ancona told Judge Chesler is once this pending motion to dismiss is decided -- and that was against the original consolidated complaint -- then we'll know whether we're going to do this or not.

Now, in between the judge deciding that motion -- or that motion be briefed and the judge deciding it, the plaintiffs actually amended their complaint again, and we consented to it.  But they didn't amend it to add options holders.  They amended to add claims based on new

confidential witnesses, later-developed facts.

So we said fine.  And they had leave to do it. They didn't add any options holders.  We had to rebrief our initial motion to dismiss because they had done that amendment.

And then what happened?  The judge actually decided the motion to dismiss and dismissed the entire case with leave to replead.

So according to the representations that Mr. D'Ancona made to Judge Chesler at the lead plaintiff reconsideration hearing, that's when he was going to now know -- and I am not sure what it is that was mysterious that was somehow going to be clarified by the motion to dismiss about whether options holders should be in or out of the case.  But that was the break point at which he was supposed to have suddenly understood the lay of the land.

And what happened 45 days later when the plaintiffs filed yet another amended complaint?  And, by the way, it wasn't just some modest amendments.  There was enough additional pleading in that complaint that it ultimately, in part, withstood yet another motion to dismiss.  But guess what wasn't in there?  An options holder plaintiff or any attempt to expand the class to include options holder plaintiffs.

Your Honor, under the basic, you know, does justice

require another amendment here?  Absolutely not.

THE COURT:  Well, what's the prejudice?

MR. SMITH:  Pardon, Your Honor?

THE COURT:  Prejudice.

MR. SMITH:  Well, leaving aside the fact that we've now briefed three motions to dismiss against three different complaints that didn't include the options holder plaintiffs, one of which survived the motion to dismiss, the prejudice is that we're now faced with an expanded class where we should have had notice long ago.  And this goes now -- I'll pivot, Your Honor, if I may, to the substantive futility arguments, including the relations back argument.

Relations back, Mr. D'Ancona referred, I think, inadvertently to -- I think that what he meant to refer to is 15(c)(1)(C).  I think he referred to 15(c)(1)(B).  And that's the one we were discussing early where it doesn't arise out of the same transaction or occurrence.  I've suggested to Your Honor why we don't think that's the case.

But under the Feuerstack case, which we've cited in our brief, this case should actually be governed by 15(c)(1)(C), which says not only does the new claim have to relate back to transactions that were in the original complaint to put someone on fair notice that it's coming, but in the context of a new plaintiff in a class action under (C), there are several additional requirements -- it's got to

be on the same transaction or occurrence --

THE COURT:  -- differently --

MR. SMITH:  Sorry, Your Honor?

THE COURT:  What would you have done differently?

MR. SMITH:  What would I have done differently if you were the plaintiffs?

THE COURT:  No.  What would have done differently --

MR. SMITH:  Oh, you're asking how would we have litigated the case differently, had we known?

THE COURT:  Yeah.

MR. SMITH:  Well, we may well have addressed their lack of standing -- sorry, Your Honor.  I didn't mean to talk over you.

THE COURT:  The defendant did have notice because they were in originally.  Weren't the options people in originally?

MR. SMITH:  Yes, Your Honor. But I don't think that's the right time to look at notice because they were in originally, and these plaintiffs made a considered intentional decision on multiple occasions to exclude them.

THE COURT:  Okay.  So what --

(Simultaneous conversation)

MR. SMITH:  -- what they said, Your Honor -- sorry. I mean to talk over Your Honor.

THE COURT:  What would you have done differently?  How would you have litigated different if they were --

MR. SMITH:  We long ago would have briefed their standing to assert these claims.  And they would have been dismissed.

THE COURT:  Okay.

MR. SMITH:  And we wouldn't have been doing this, and we wouldn't -- and everything we're doing on class certification, because they would have been knocked out of the box.

THE COURT:  Okay.

MR. SMITH:  If I may just quickly --

(Simultaneous conversation)

MR. SMITH:  -- the thought I was on, Your Honor and then --

THE COURT:  Yeah.  I'm sorry.  Go ahead.

MR. SMITH:  Yes.  No -- what I want to say was under the relation back, under 15(c)(1)(C), there's an additional element that needs to be established, which was the reason that these claims were asserted earlier was a mistake and that we were somehow on notice that the reasons they weren't asserted earlier was because there was mistake made about the right parties to include.

And, again, this record is overwhelming that this was not a mistake but a considered tactical and strategic

decision on these plaintiffs' part.

THE COURT:  I am not sure what difference that makes.  But -- okay.

MR. SMITH:  Only because it's in the rule as a required element to the claim to the relate back.  And if it doesn't, they're out of the box on statute of limitations.

THE COURT:  Okay.

Mr. D'Ancona, did you want to ask?

MR. D'ANCONA:  Thank you, Your Honor, if I may.

First of all, on the delay point, I believe a lot of what Mr. Smith represented about the arguments that lead plaintiff and so forth are beside the point, what we told Judge Chesler -- I have the transcript right here.  I'm sure everyone has access to it; Mr. Smith has referenced it numerous times -- is that the consideration that we were going to do was to review the motion to dismiss opinion if and when the case passed through the motion to dismiss in order to analyze the scope of the case:  what statements were in, what was the length of time that the class period consisted of.

And the reason for that, as we told the Court and as we told Mr. Smith, who -- neither of whom registered any objection or concern with this approach at the time, the reason for that was to undertake the necessary economic analysis involved in analyzing options claims.  It's not a

slam-dunk.  It's not evident that options claims always make sense from an economic perspective.  And what dictates whether they make sense in a case like is this what is the scope of the case?  How long is it?  And concomitantly what options were trading at that time in the various markets.  There is a fair amount of economic analysis, which I won't bore you with, because it's tedious now, to analyze what options were being traded at what times, whether they would be affected by certain activities or not, depending on the scope of the case.

We told the Court that that was the precise type of economic analysis that we would do if and when a case was sustained; in other words, if and when a case passed through the motion to dismiss.

So the idea that we were going to add in the options claims before the case passed through the motion to dismiss is a bit of red herring.  The fact that we amended before receiving a motion to dismiss opinion and that we amended again after the case was fully dismissed never brought us to that point where there was the economic analysis that was ready to be done.  We didn't have the information that we needed to do that economic analysis until we had the motion to dismiss opinion that ultimately sustained the case.  It was not until August 10th of 2022.

At that point, the two-year statute of limitations

had run.  At that point, the two-year statute of limitations was over.  And at that point, to add any options claims, we nevertheless undertook the economic analysis we said we would do and within a couple of months informed the defendants that we intended to do what we had told them and Judge Chesler what we would do, which is plead them in if we thought that it was warranted.

We thought that it was warranted, and that's what we put before Your Honor today.

That's what happened.  There's no undue delay there.  All we did was exactly what we told the Court and defendants we would do within a matter of a couple of months, two, three months after receiving the motion to dismiss opinion that sustained the case.

As for prejudice, which I think Your Honor rightly zeroed in on, the Feuerstack case that defendants cited to, the prejudice in that case was manifest.  The defendant in that case went from facing a case with a single-state class action to an amendment that tried to turn the case into a 50-state class action.  The ramifications for what the defendant would be required to do in a 50-state versus a single-state class action are obvious:  The implications for the discovery that they would need to undertake and the multiplication of the scale of the litigation is obvious.

So that's the Feuerstack case where the prejudice

was quite clear.

And the appropriate cases that should govern what happened in this motion to amend decision are the cases that I noted which do not go to 15(c)(1)(C); they go to 15(c)(1)(B) because the factual basis for the claims and the claims themselves are essentially identical.  And that's the Westinghouse case and the others that I noted.  And that's the part of the rule that this case should be decided under.

THE COURT:  Okay.

So --

MR. SMITH:  Your Honor, may I just make two additional quick points.

THE COURT:  Absolutely, Mr. Smith.  Go ahead.

MR. SMITH:  I appreciate your indulgence, Your Honor.

On the issue of prejudice and the materiality of this amendment, I think it's telling that, as Your Honor knows, the entirety of our class certification opposition in this case is directed at options holder claims.  Okay?  If this had been raised early on when it should have been raised, the claim would be out, and that would not have occurred.  All of the briefing that's going on right now and that Judge Chesler is going to have to decide on class certification is a result of the timing of this, which never should have been done this way.

|Hearing
|20-cv-02155, June 15, 2023

And on this notion that the plaintiffs had to wait until a second motion to dismiss was decided to figure out whether to assert options holder claims because of the sophisticated economic analysis that needs to be done, two things:  This is Mr. D'Ancona's complaint.  He wrote it in the first place.  He didn't need any additional information to figure out what he wanted to be in the case.  And in addition to that, where is the economic analysis, the sophisticated economic analysis, that they supposedly did after the decision on the third amended complaint came down that led them suddenly to include that options holders were appropriately included, sophisticated economic analysis based on length of class period et cetera, et cetera.

Take a look at their expert report on class certification.  It's not in there.  There's no economic analysis.  I mean, there's four pages of it in the entirety of the class certification submission on their part.  And it is decidedly not the sophisticated analysis that's been alluded to.

The last point, Your Honor, because we've been back and forth with the lawyers characterizing the transcript in front of Judge Chesler -- and obviously everyone can read, and I'll save everybody a dramatic reading of it right now, but I would really ask Your Honor to please, in deciding this motion, take a look back at what our pages -- 8 through 11 of

27

that transcript -- and I think Your Honor will see exactly what I've been talking about on this -- in this discussion.

THE COURT: Okay. I've read the transcript and -- in preparation for this discussion.

This is a bit of an easier decision for me, number one, because the trial judge is Judge Chesler and, number two, because Judge Chesler wrote the opinion in the Merck case that we keep referring to.

So in terms of a Rule 16 analysis, I don't think it's necessary, the add and amend date -- this was filed within the add and amend date in Court's scheduling order. So I am not going to deal with that.

I think the issue here, as we've discussed, is relation back and standing. And I rely completely on Judge Chesler's opinion in Merck, albeit that was a class cert analysis rather than a 12(b)(6) challenge. But it's pretty clear to Judge Chesler in that case and to me that insofar as a 15 analysis, there's a common core of facts here. And the options people rely on the same set of facts that we have for the existing plaintiffs.

The other thing that is interesting to me and sort of as a sideline is that defense has asserted no prejudice. I asked. I asked what you would have done differently. It wasn't argued in your brief. I haven't heard anything about prejudice.

I also specifically asked defense what would change in the class cert briefing, and you said nothing.

So I find there's no prejudice whatsoever.

In terms of standing, I think I, again, rely on Judge Chesler's decision in <u>Merck</u> and say that -- or find that the facts, as I said, are certainly similar, on all fours, as Chesler said in <u>Merck</u>. I think that it's easy and easier in the interests of judicial economy to deal with this now and have Judge Chesler deal with it -- and the amendment, as I have stated, relates back to the pleading and the facts in the pleading. I don't see any reason not to permit the amendment.

So I will grant the motion to amend. And I find that there is a relation back and that there is standing to do so on behalf of the plaintiff.

Anything else we need to discuss with respect to scheduling?

MR. SMITH: Your Honor, I would just raise the issue of the still-pending motion for class certification on which the plaintiffs have an evidentiary burden and the defendants, obviously, have a right to a hearing.

And I presume that Your Honor's ruling on the motion for leave is without prejudice to our continuing to advance in front of Judge Chesler the arguments that we've made on class cert -- all of the arguments that we've made on

class certification.

THE COURT:  You can certainly make those arguments.

I did not address futility either, which would be the subject of a motion before Judge Chesler.  And I -- futility to Judge Chesler.

MR. SMITH:  Thank Your Honor for that clarification.

THE COURT:  All right.

MR. ECKLUND:  Your Honor, Don Ecklund from Carella Byrne.

I just wanted to raise one item that you noted at the beginning of today's conference, that we would not be discussing additional issues today.  In light of that, would it make sense while everyone's on the line with Your Honor to set a date for another conference to address those issues that have been raised either in letters or otherwise so that we can get decisions on those issues?  I think it would be beneficial to try to get something on the calendar as certifications are rapidly approaching, and I realize everyone's schedule also continue to become more complicated as we approach August.

So, perhaps, there's a date in this month and the second half of June or July that would work well for everyone.

But, respectfully, I think the need for a

conference with Your Honor's not a close question for those reasons.

THE COURT: Yeah, I need to see some letters, though. I need some information.

MR. SMITH: Yeah, Your Honor. This is Mr. Smith again.

I was going to suggest the same thing. Some of the issues that were on plaintiffs' proposed agenda are ones where we've just as recently as yesterday received, you know, a substantive position from the plaintiffs. So I do think that there's -- we should build in -- I don't disagree that another status conference is appropriate. But we should build in enough time for the parties to have some additional discussion, and if there has to be letters, there have to be letters, they potentially could be avoided.

THE COURT: Yeah, I --

MR. ECKLUND: That makes perfect sense as well to me, Your Honor. I think Mr. Smith is correct: We should briefly submit papers to Your Honor in short order, short letters setting forth what we need, the discovery issues that have been raised in either bullet form or otherwise so that Your Honor can decide these issues. I don't think they need to be complicated or lengthy letters, but the need for a conference and the need for those letters, I think we can get all of that done in short order.

THE COURT:  So once you're lettered up, so to speak, I can put a conference on.  You know, I don't want to press you on time.  Again, people are starting to take vacations.  I'm around all summer.  So that's not an issue.

So once you get that lettered up, we'll have another Zoom discussion if you can't iron out any of those issues.

MR. ECKLUND:  Thank Your Honor.  I appreciate your consideration of the request.

THE COURT:  Thank you all for your time.

(Conclusion of proceedings)

|Hearing
|20-cv-02155, June 15, 2023
|Certification

32

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 32 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

s/ *Sara L. Kern*                    23rd of June, 2023

_____    _____
Signature of Approved Transcriber              Date

Sara L. Kern, CET**D-338
King Transcription Services
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

--------------------------------x

INDUSTRIENS PENSIONSFORSIKRING   :

A/S, Individually and On         : Case No.

Behalf of All Others             : 2:20-cv-02155-SRC-CLW

Similarly Situated,              :

              Plaintiff,      :

    v.                           :

BECTON, DICKINSON AND COMPANY,   :

VINCENT A. FORLENZA, THOMAS E.   :

POLEN, and CHRISTOPHER R. REIDY, :

           Defendants.    :

--------------------------------x

30(B)(6) DEPOSITION OF INDUSTRIENS

By and Through Its Corporate Representative

JAN ØSTERGAARD

Conducted Virtually

Wednesday, April 12, 2023

6:08 a.m. EDT

Job No.: 486905

Pages: 1 - 109

Reported by:  Monique Vouthouris, CCR, RPR, CRR

Transcript of Jan Østergaard, Corporate Representative
Conducted on April 12, 2023                82

fees) over the S&P 500 index; correct?

A    Yes.

Q    Who chose this as the fund's objective?

MR. BERMAN:  Objection to form.

A    Yeah, the manager, external managers in general will always have a return target according to the philosophy and strategy they use.  So in this case MFS would have told us that the strategy they used would in the long term result in an excess return of --

(Court Stenographer clarification.)

A    -- 200 basis points.

Q    So it was pursuant to a presentation by MFS that this objective was set?

MR. BERMAN:  Objection to form.

A    Yes.

Q    I believe you said yes?

A    Yes.

Q    Then under "Portfolio Management" the agreement states:  The Sub fund will be managed by Kevin Beatty and Ted Maloney using a fundamental research process drawing on MFS's research analyst team; correct?

A    Yes.

Q    What did this fundamental research process

Transcript of Jan Østergaard, Corporate Representative
Conducted on April 12, 2023                                83

entail?

MR. BERMAN:  Objection to form.

A    A fundamental research process means that you are analyzing the individual's stocks, trying to identify the fundamental drivers of the stock's results and performance, and to enter the stock price.  It's also called a bottom-up approach, meaning that to start, say, from the bottom of the funds in your analysis.

Q    Was this process communicated to Industriens?

MR. BERMAN:  Objection.

A    Yes.

Q    How?

A    Yeah, it was communicated as part of the philosophy, and it was one of the reasons, an important reason for choosing MFS since it is that kind of process, strategy we wanted to provide for our U.S. managers.

Q    I understand that as a general matter and part of their philosophy, but was the results of this process communicated to Industriens with respect to specific stock?

MR. BERMAN:  Objection to form.

A    Not with respect to specific funds.  We

Transcript of Jan Østergaard, Corporate Representative
Conducted on April 12, 2023                    90

instance --

                (Court Stenographer clarification.)

     A    -- the healthcare sector, which is the security in which you find Becton, Dickinson, the total precision -- the total exposure to stocks in the healthcare sector, for instance, would have to be inside plus/minus 10 percentage points of the sector's weight of the total universe or two times the sector weight, if that is a greater figure.

     Q    And why was that?

     A    It's because of -- to be sure that the performance is well-diversified.  And we would not, in general, be --

                (Court Stenographer clarification.)

     A    We would in general not want our portfolio and portfolio run by Wellington to be exposed a hundred percent to financials, financial stocks, for instance, or healthcare stocks.  So that's a reason why you set the limits for each sector, so that you assure that you are in each sector and that you are not too much in each sector.

     Q    And would you say that generally the sub-fund based on these guidelines would mirror the benchmark index, here the S&P 500?

                MR. BERMAN:  Objection.

A    They would mirror in some way, but they should be allowed to deviate from the benchmark because that is more of the ways that they can create performance compared to benchmark.

Q    But always subject to the restrictions set out in these agreements; correct?

A    Yes.

Q    How often did -- let's start with MFS. How often did MFS report back to you?

A    They will present a monthly report, if the short month, showing the holdings, showing the performance, and they will send a more comprehensive formal report, as we had already, have seen already. In that you will find of course the performance data, holdings data, you will find the comments on sets of the performance and the best performance stocks, the bad performance stocks, and so on.

Q    How often would you -- I think you mentioned they would send a monthly report of the holdings showing the performance. How often would they send the more comprehensive formal reports that you mentioned?

A    Four times a year, after each quarter.

Q    After they shared the monthly report with you, would there be a call or a meeting to discuss

No.486905

Re: Deposition of Jan Østergaard, Corporate Representative

Deposition Date: April 12, 2023

Case: Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.

Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 12 | 21 | "I see it" / Change to "I've seen it" (transcription error) |
| 15 | 9 | "deliver" / Change to "delivered" (transcription error) |
| 15 | 14 | "It include" / Change to "It includes" (transcription error) |
| 15 | 21 | "with comment" / Change to "will comment" (transcription error) |
| 17 | 8 | "He" / Change to "She" (transcription error) |
| 17 | 21 | "reports" / Change to "report" (transcription error) |
| 18 | 5 | "do" / Change to "know" (transcription error) |
| 18 | 17 | "with" / Change to "have" (transcription error) |
| 21 | 10 | "CRO and was the CRO" / Change to "CIO and was the CIO" (transcription error) |
| 24 | 21 | "funds" / Change to "fund" (transcription error) |
| 25 | 2 | "(indiscernable" / Change to "It took up" (transcription error) |
| 26 | 7 | "small" / Change to "smaller" (transcription error) |
| 30 | 3 | "and" / Change to "and in" (transcription error) |
| 30 | 5 | "those money" / Change to "those moneys" (transcription error) |
| 36 | 10 | "to job" / Change to "to the job" (transcription error) |
| 36 | 20 | "the people you" / Change to "the people, you" (transcription error) |
| 36 | 20-21 | "the people you will make – do a study of the performance " / Change to "you will do a study" (transcription error) |
|  |  |  |

| 38 | 4 | "losing" / Change to "was in" |
|---|---|---|
| 47 | 9 | "MII" / Change to "NII" (transcription error) |
| 47 | 15 | "200" / Change to "100 (transcription error) |
| 47 | 15 | "MII" / Change to "NII" (transcription error) |
| 51 | 9 | "case" / Change to "cases" (transcription error) |
| 77 | 15 | "they" / Change to "we" (transcription error) |
| 81 | 13 | "performance" / Change to "performed" (transcription error) |
| 83 | 4 | :individual's" / Change to "individual" (transcription error) |
| 84 | 10-11 | "allow all this use" / Change to "follow all issues" (transcription error) |
| 84 | 16 | "COO" / Change to "CIO" (transcription error) |
| 84 | 17 | "was elevated as --" / Change to "served as Head of Investments" (transcription error) |
| 85 | 5 | "and -- or" / Change to "or a person" (transcription error) |
| 90 | 4 | "security" / Change to "sector" (transcription error) |
| 90 | 12 | "performance" / Change to "portfolio" (transcription error) |
| 92 | 9 | "meet" / Change to "meeting" (transcription error) |
| 93 | 5 | "perform it" / Change to "performed" (transcription error) |
| 93 | 19 | "performance" / Change to "performing" (transcription error) |
| 93 | 20 | "performance" / Change to "performing" (transcription error) |
| 103 | 18 | "Internal" / Change to "Internally" (transcription error) |
| 103 | 19 | "thoughts being" / Change to "thoughts on being" (transcription error) |
| 104 | 3 | "even" / Change to "people" (transcription error) |
| 104 | 19 | "them later" Change to "them until later" (transcription error) |
|  |  |  |

16.05.2023

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated,<br><br>**Plaintiff,**<br><br>BECTON, DICKINSON AND COMPANY and THOMAS E. POLEN,<br><br>**Defendants.** | **CASE NO.**<br><br>**2:20-cv-02155-SRC-CLW** |

---

**REPLY EXPERT REPORT OF**
**JOSEPH R. MASON, PhD**

**JUNE 30, 2023**

---



**TABLE OF CONTENTS**

<u>Page</u>

I.    Introduction and Summary of Opinions ........................................................................ 1

II.    Dr. Mayhew's Analyses and Opinions Do Not Support a Lack of Efficiency in the Market for BDX Options ....................................................................................................... 6

    A.    Dr. Mayhew Improperly Dismisses Evidence of Market Efficiency Based on a Purported Lack of "Rigorous Economic Principles or Evidence" ........................................... 6

        1)    Dr. Mayhew Does Not Dispute the Central Role of Stock Prices in Determining Option Values ................................................................................ 6

        2)    Dr. Mayhew Ignores the Quote-Driven Nature of Stock Option Markets ............ 10

    B.    Dr. Mayhew's Observations that the Relevant BDX Options Had Lower Trading Volumes and Higher Bid-Ask Spreads than BDX Stock Are Not Dispositive of an Inefficient Market ................................................................................................................. 13

        1)    Dr. Mayhew's Examination of BDX Options Is Incomplete and Selective ........... 13

        2)    "Low" Trading Volume Is Not Dispositive of an Inefficient Market ...................... 14

        3)    "High" Bid-Ask Spreads Are Not Dispositive of an Inefficient Market ................. 18

    C.    Dr. Mayhew Acknowledges the Lack of Arbitrage Opportunities as a Necessary Condition for Market Efficiency ..................................................................................... 19

        1)    Dr. Mayhew's Dismissal of Put-Call Parity as a Measure of Efficiency is Contrary to Relevant Academic Literature .......................................................... 19

        2)    Dr. Mayhew Concedes the Usefulness of Put-Call Parity Analysis .................... 21

        3)    Dr. Mayhew's Methodological Critiques are Similarly Misplaced ....................... 23

III.    Dr. Mayhew Mischaracterizes the Mason Deposition ................................................ 24

IV.    Defendants' Criticisms of My Damages Methodology for the BDX Options Are Unfounded ........ 26





7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 1150
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

## I.    Introduction and Summary of Opinions

1.    I previously submitted a report in this matter dated January 17, 2023 (the "<u>Mason Report</u>") in which I reached the following conclusions:[1]

    a.    Shares of BDX Stock, BDX Call Options, and BDX Put Options traded during the Class Period in a semi-strong form efficient market in which new information was promptly reflected in the security's price.[2]

    b.    In a semi-strong form efficient market, one may apply an event study in conjunction with other generally accepted methods to estimate the security's price inflation, if any, that was attributable to, or was maintained by, Defendants' alleged material misrepresentations and omissions throughout the Class Period.  The security's price inflation may be used, along with other widely accepted financial and economic methods, to arrive at damages for every member of the proposed Class using a common technique that is grounded in Plaintiff's theory of liability.[3]

2.    I was also deposed in this matter on April 4, 2023 (the "<u>Mason Deposition</u>").[4]  On May 3, 2023, Stewart Mayhew, Ph.D. issued an expert report in this matter (the "<u>Mayhew Report</u>") responding to the Mason Report and the Mason Deposition.[5]  Dr. Mayhew was also deposed on May 31, 2023 in this matter (the "<u>Mayhew Deposition</u>").[6]  In his report, Dr. Mayhew presents certain critiques of my opinions regarding the efficiency of BDX Options; he does not, however, challenge my conclusion that BDX Stock traded during the Class Period in a semi-strong form efficient market,[7] nor does he challenge my conclusion that damages for every member of the proposed Class can be calculated using a common methodology that is grounded in Plaintiff's theory of liability.[8]

---

[1]    Defined terms in this report have the same meanings as used in the Mason Report unless otherwise noted.

[2]    Mason Report, ¶ 10.

[3]    Mason Report, ¶ 11.

[4]    Dr. Mayhew refers to the transcript of my deposition as "Mason Dep. Tr."  *See* Mayhew Report, note 2.  For ease of reference, I adopt this terminology.

[5]    Expert Rebuttal Report of Stewart Mayhew, Ph.D., May 3, 2023.

[6]    Deposition Transcript of Stewart Mayhew, Ph.D., May 31, 2023 ("<u>Mayhew Dep. Tr.</u>").

[7]    *See* Mayhew Report, note 9 ("I have not been asked to evaluate whether BDX stock traded in an efficient market during the Putative Class Period.")  *See also*, Mayhew Dep. Tr. 10:13-11:3 ("Q. Okay. And you're not providing any opinions with respect to the efficiency of the market for BD's common stock; is that correct? A. That's correct. Q. Okay. And you don't have an opinion with respect to whether BD's common stock traded in an efficient market; is that right? A. I'm not offering an opinion on that question, that's correct. Q. Okay. And you're not offering any opinion disputing Dr. Mason's opinions regarding the efficiency of BD's common stock; correct? A. That's correct.")

[8]    *See* Mayhew Dep. Tr. 11:15-12:1 ("Q. Okay. And you're not offering any opinion as to whether damages in this case may be measured on a class-wide basis; correct? A. That's correct. That was outside of the scope of my assignment. Q. Okay. And you

---



3.      According to Dr. Mayhew, he was asked by Defendants' counsel "to evaluate and respond to [my] opinions regarding the efficiency of the markets for relevant call options and put options on BDX stock… in the [Mason Report] and in [the Mason Deposition], including the methodologies and bases [I provide] for such opinions."[9]  The Mayhew Report opines that "[I provide] no reliable economic support for [my] claim that BDX options traded in efficient markets during the Putative Class Period."[10]  Dr. Mayhew arrives at his opinion by asserting that: (1) my opinion that the "efficiency of option markets follows automatically from stock market efficiency is not based on rigorous economic principles or evidence;"[11] (2) I have "failed to consider the low trading volume and high bid-ask spreads of Relevant BDX Options during the Putative Class Period;"[12] and (3) my "analysis of put-call parity deviations does not support [my] opinion that the markets for BDX options were efficient during the Putative Class Period."[13]  Dr. Mayhew also contends that I "mischaracterize[] basic facts about option markets."[14]

4.      Dr. Mayhew's opinions are unsupported by empirical evidence, are contradicted by his own deposition testimony as well as his academic research, and fail to consider evidence in favor of market efficiency for the BDX Options.  Notably, Dr. Mayhew *does not* opine that the Relevant BDX Options traded in an inefficient market during the Class Period.  Rather, he simply asserts that I have failed to provide sufficient "reliable economic support" to establish that the markets for BDX Options were efficient during the Class Period.[15]

5.      Dr. Mayhew improperly dismisses evidence of market efficiency based on what he purports to be a lack of "rigorous economic principles or evidence."[16]

   a.      Dr. Mayhew does not dispute the central role of stock prices in determining option values. Dr. Mayhew also does not contest that the market for BDX Stock is efficient, or that

---

don't dispute any of Dr. Mason's conclusions with respect to whether damages may be measured on a class-wide basis in this case; correct? A. I am not offering an opinion on that topic.")

9       Mayhew Report, ¶ 4.

10      Mayhew Report, ¶ 6.

11      Mayhew Report, ¶ 6.

12      Mayhew Report, ¶ 6.  Dr. Mayhew, however, bases his analyses of such characteristics on only a subset of options that he understands are relevant to this case.  *See*, Mayhew Report, note 1 ("I understand that the option series that would potentially be eligible to be a part of the class in this matter are those that expired on or after the alleged corrective disclosure date, February 6, 2020, and that had trading volume greater than zero during the 'Putative Class Period' (i.e., between November 5, 2019 and February 5, 2020, both dates inclusive). I refer to these options as the 'Relevant BDX Options.'")

13      Mayhew Report, ¶ 6.

14      Mayhew Report, ¶ 6.

15      I also understand that courts have accepted that there is efficiency in the option market when the efficiency of the underlying stock is established.  *See, e.g., In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,* 2013 WL 396117 (D.N.J. Jan.30, 2013) ("insofar as the alleged Rule 10b-5 violations are predicated on put or call options transactions, the trading of Merck stock on the efficient NYSE suffices to establish that the options also traded on an efficient market"); *In re Enron Corp. Securities Litigation,* 529 F. Supp. 2d 644 (S.D. Tex. 2006) ("evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' 10(b) claims based on the options."); *In re Scientific-Atlanta Inc. Securities Litigation,* 571 F. Supp. 2d 1315, 1329 (N.D. Ga. 2007) ("[a]lthough there is little authority on the subject, in the Court's view, a put options seller, upon proof of market efficiency in the underlying stock, is generally entitled to a rebuttable presumption of reliance."); and *In Rougier v. Applied Optoelectronics Inc.,* 2019 WL 6111303 (S.D. Tex. 2019) ("Courts in the Fifth Circuit routinely have held that a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock.")

16      Mayhew Report, ¶ 6.



information about the underlying stock (*e.g.*, changes in the stock price) is fully incorporated in the option prices.  Dr. Mayhew's opinions rest on the assertion that the efficiency of the option market is divorced from the efficiency of the stock price.  This assertion is incorrect and contradicted by the fundamental nature of the option contracts, as well as by academics who have long found that the option market, in fact, helps to further facilitate the efficiency of the stock market.

b.    By focusing his analysis exclusively on traded prices, Dr. Mayhew ignores the quote-driven nature of stock option markets that facilitate the informational efficiency of BDX Options. He does concede, however, that the impact of new value-relevant information may be impounded in option quotations, which he also acknowledges "are updated very frequently."[17]

6.    Dr. Mayhew's observation that the Relevant BDX Options had lower trading volumes and higher bid-ask spreads than BDX Stock is not meaningful and is not dispositive of an inefficient market:

a.    Dr. Mayhew's examination of the BDX Options is incomplete and selective, since it ignores option series that also necessarily contributed to the efficiency of the BDX Options during the Class Period.

b.    Dr. Mayhew conceded in deposition that there is no defined threshold to assess the efficiency of BDX Options by reference to the trading volumes of individual BDX Options to BDX Stock, as he does in his report.  Dr. Mayhew also conceded that "low" trading volume of options is not a label he would "assign a lot of meaning to," and is not by itself dispositive of an inefficient market.  Dr. Mayhew also presents a calculation of average daily trading volume by individual option series that is misleading and inconsistent with his prior academic work.  Applying Dr. Mayhew's prior academic research methodology to BDX Options demonstrates levels of BDX Options trading that, in comparison to options Dr. Mayhew has analyzed in his academic work, are comparable to other "actively traded" options.

c.    Dr. Mayhew also conceded in deposition that there is no defined threshold to assess the efficiency of BDX Options by reference to the bid-ask spreads of individual BDX Options to BDX Stock.  Dr. Mayhew conceded there is no "magic threshold at which spreads become high,"[18] and that "high" bid-ask spreads would not be dispositive of an inefficient market.

7.    Dr. Mayhew acknowledges that a lack of arbitrage opportunities is a necessary condition for market efficiency:

---

[17]    Mayhew Dep. Tr. 48:7-12.
[18]    Mayhew Dep. Tr. 72:24.



a.  Dr. Mayhew agrees that an analysis of Put-Call Parity is relevant but opines that a lack of arbitrage opportunities is "only a necessary condition for market efficiency, not a sufficient one."[19] Dr. Mayhew speculates, based on hypothetical scenarios that he does not support with any empirical evidence, that BDX Options may not reflect their fundamental values because future volatility may not be accurately priced into BDX Options.  Notwithstanding that this critique relates to fundamental efficiency and not informational efficiency (whether new information was promptly reflected in the prices of BDX Options), I found the daily returns of BDX Stock and the daily returns of the synthetic stock prices comprising BDX Options to be highly correlated, providing further evidence that BDX Options prices promptly respond to information concerning the underlying stock and thus traded in an efficient market.

b.  Dr. Mayhew's assertion that assessing the efficiency of the option market based on an examination of Put-Call Parity is "unsupported by rigorous economic principles"[20] is incorrect and contradicted by relevant academic research.  Contrary to Dr. Mayhew's opinion, academics have found that Put-Call Parity analyses can be used to assess the efficiency of the markets for both stocks and options.

c.  Dr. Mayhew's methodological critiques of my Put-Call Parity analysis are similarly misplaced.

i.  Dr. Mayhew asserts that the academic articles I cite in the Mason Report do not purport to establish thresholds on average Put-Call Parity deviations to determine whether option markets are efficient.  In response to Dr. Mayhew's concerns, I further examined whether the Put-Call Parity deviations, after accounting for transaction costs, persisted during the Class Period.  Accounting for the transaction costs imposed by the bid-ask spreads, I found that out of 24,272 Put Call option pairs tested during the Class Period, no arbitrage opportunities exist for 96.4% of the options.  This additional evidence further supports my findings of a lack of arbitrage opportunities, which provides further evidence that BDX Options traded in an efficient market.

ii.  Dr. Mayhew contends that my Put-Call Parity approach is methodologically unsound because I use "a put-call parity equality that applies to European-style options" but not "American-style options" and that "using the European equality to analyze market efficiency of American-style options may lead to incorrect conclusions."[21] Dr. Mayhew, however, fails to recognize that academic literature

---

[19]  Mayhew Report, ¶ 26.
[20]  Mayhew Report, ¶ 12.
[21]  Mayhew Report, ¶ 34.



supports the application of European-style Put-Call Parity analyses to American-style options and that this approach is often used to examine market efficiency.  I demonstrate, nonetheless, that Dr. Mayhew's methodological critique is rendered moot by showing the correlation between the change (or return) in the underlying stock price and the change (or return) in the synthetic stock prices is nearly one (97.8%).

8.    Dr. Mayhew also mischaracterizes my deposition testimony by ignoring the substance of the answers I gave in response to the questions I was asked.  My answers relate to the fluidity of the option market in hedging risks, and its distinction from the stock market, which Dr. Mayhew ignores.

9.    Defendants' criticisms of my damages methodology for the BDX Options are also unfounded.  Defendants contend that my damages methodology is deficient because it purportedly "fails to consider, let alone account for, the prices that BD option traders actually paid or received for their options."[22]

  a.    Defendants' own expert, Dr. Mayhew, does not contest that options damages can be estimated on a class-wide basis, nor does he assert that the trading volumes or bid-ask spreads for options have any impact on the ability to estimate damages.  In fact, Dr. Mayhew himself concedes, he has "no reason to doubt that an option model might be part of [estimating damages for options]."[23]

  b.    Contrary to Defendants' contentions, my damages methodology directly measures the impact of the alleged wrongdoing and excludes any portion of the price decline or price difference that is unrelated to this alleged wrongdoing (*e.g.*, transaction costs or bid-ask spreads).  This out-of-pocket damages methodology for options is consistent with the out-of-pocket damages methodology for stocks, which examines the difference between the amount of inflation at the time of purchase and the amount of inflation at the time of sale.

10.    None of the issues or purported critiques of my analysis that Dr. Mayhew and Defendants raise affect the opinions I set forth in the Mason Report.

11.    My credentials and qualifications are set forth in the Mason Report.  My current curriculum vitae is attached to this report as **Reply Appendix A**.  A list of additional materials I have considered in my work for this matter as of the date of this report is contained in **Reply Appendix B**, as well as in the citations in the footnotes to the text presented in this report.

12.    I will review, evaluate, and analyze additional data, facts, or information as they become available. I reserve the right to amend or supplement my opinions based upon further information learned,

---

[22]    Defendants' Opposition to Lead Plaintiff's Motion for Class Certification dated May 3, 2023 ("Defendants' Opposition to Class Certification"), p. 18.  Emphasis removed.
[23]    Mayhew Dep. Tr. 91:8-13.



produced, or provided to me. The analyses and opinions described herein may, therefore, change based upon additional information that becomes available or other developments that occur.

## II. Dr. Mayhew's Analyses and Opinions Do Not Support a Lack of Efficiency in the Market for BDX Options

13.    As an initial matter, Dr. Mayhew has not provided any affirmative opinion that BDX Options *do not* trade in an efficient market.  Rather, he simply asserts that my analysis is insufficient to establish such a finding.  In making this assertion, Dr. Mayhew disregards evidence I have provided in support of market efficiency by contending that such evidence is necessary but not sufficient to establish market efficiency, and claiming, without analytical basis, that such evidence is not based on "rigorous economic principles".[24] Dr. Mayhew's critiques of my analysis are without merit.

## A. Dr. Mayhew Improperly Dismisses Evidence of Market Efficiency Based on a Purported Lack of "Rigorous Economic Principles or Evidence"

14.    Dr. Mayhew states his understanding, based on his assignment from Defendants' counsel, is that the "relevant question at this stage of the proceedings is whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period."[25]  Dr. Mayhew's analysis of this question, however, is flawed because he ignores the quote-driven nature of option markets, and overlooks entirely the fundamental role of stock prices in determining options prices.

### 1) Dr. Mayhew Does Not Dispute the Central Role of Stock Prices in Determining Option Values

15.    While Dr. Mayhew does not challenge my opinion that BDX Stock traded in an efficient market during the Class Period,[26] he disagrees with my opinion that "[t]o assess whether the market for BDX Options traded in an efficient market, one would first assess whether the market for the underlying asset

---

[24]    *See e.g.*, Mayhew Report, ¶ 12.

[25]    Mayhew Report, ¶ 4.  *See also*, Mayhew Dep. Tr. 18:23-19:4, explaining his understanding of "quickly": ("Q. Okay. Where did you – how did you reach this understanding of the relevant question in this case? A. So this is my – part of my assignment and this is my understanding from counsel.")  Dr. Mayhew also does not provide a view on what he considers to be "quickly" from an economic perspective.  *See* Mayhew Dep. Tr. 29:14-30:9 ("Q. Does – and what is your understanding of 'quickly' in this context? What does it – what does it mean to - for a stock price to quickly reflect all publicly available information? A. I'm not aware that there is a universally accepted definition in the academic community of "quickly." In many contexts people focus on the time period of one day to evaluate whether information is reflected quickly. But the question is context-specific. Q. So "quickly" could be more than one day in some – in some contexts; is that right? A. I'm not aware that the academic community has come up with a definition of what "quickly" means and I don't have an opinion about whether more than one day could be considered "quickly" from an economic perspective."); and Mayhew Dep. Tr. 30:11-31:1, explaining his understanding of "fully": ("Q. Okay. What do you mean by "fully reflect," - "fully reflected"? What does it mean for a security to fully reflect all publicly available information? A. Well, I think "fully" could be opposed to "partially." So, for example, one could have a situation where important information, value-relevant for a security becomes public and the market could start reacting immediately, but could take a very long time before it completely reflects the new information in the price. And so I think in an informationally efficient market, it's not just that the market starts to incorporate information quickly, but it incorporates all the information quickly.")

[26]    Mayhew Report, note 9 ("I have not been asked to evaluate whether BDX stock traded in an efficient market during the Putative Class Period.")



(in this case, BDX Stock) also traded in an efficient market because the BDX Options are derivative instruments whose values are derived from BDX Stock."[27] Dr. Mayhew's criticism of my opinion flies in the face of economic logic and ignores the many court rulings affirming such an approach.[28]

16. Dr. Mayhew states that "[i]n an efficient market, one would expect all value-relevant information to be reflected in the price, so that traded prices would accurately reflect [*sic*] the option's value."[29] Dr. Mayhew does not disagree with the principal that "the value of an option is derived from the value of the stock"[30] nor does he demonstrate that the BDX Options prices did not accurately reflect the value of the information released during the estimation period in the Mason Report. Indeed, Dr. Mayhew has provided no opinion regarding the market efficiency of BDX Stock, and therefore does not contest that information about the underlying stock price (*e.g.*, changes in the stock price) is reflected in the option prices.[31]

17. Dr. Mayhew's critiques turn on his assertion that "[t]he values of call and put options and, in an efficient market, their traded prices, are impacted by the arrival of new information in a more complex way than stock prices."[32] Dr. Mayhew then contends that "the primary question is whether option prices reflect information about future volatility."[33] But Dr. Mayhew's contention that "option prices *may not* fully incorporate all publicly available information about future volatility of the stock price, which would impact option *values*," is mere conjecture and is a question that relates to fundamental efficiency and not informational efficiency (whether new information was promptly reflected in the prices of BDX Options).[34]

18. Continuing, Dr. Mayhew posits that "[i]nformation about [expected] future volatility can have an important impact on option prices even if it has no impact on the stock price"[35] and that "if there is insufficient trading by market participants to incorporate their views of future volatility, option markets *may* be inefficient."[36] Dr. Mayhew then claims, hypothetically, that "option markets do not always fully incorporate information about future volatility" and that "it is *possible* for the stock market to be efficient and the option markets to be inefficient."[37]

19. Dr. Mayhew's argument, however, is not only premised on a series of hypothetical scenarios but is also conclusory: for instance, if traders don't trade on information, such information is not impounded

---

[27]    Mayhew Report, note 9, citing to Mason Report, ¶ 91.

[28]    *See*, *e.g.*, supra note 15.

[29]    Mayhew Report, note 9.

[30]    Mayhew Report, note 9.

[31]    *See* Mayhew Dep. Tr. 34:22-35:7 ("Q. You would agree that if - if the value of a BDX stock changes, so, too, must the value of BDX options; correct? A. So holding everything else constant, if nothing else changes and there is a change in the underlying price of BDX stock, I would expect there to be an effect on the value of the – of the BDX options.")

[32]    Mayhew Report, ¶ 15.

[33]    Mayhew Report, ¶ 16. While future volatility may be one mechanism through which option prices are affected by the arrival of new information, it cannot be reasonably argued that an option's value—by definition—is not inextricably tied to the underlying stock price.

[34]    Mayhew Report, note 9, discussing his expectations that "traded prices would accurately [ref]ect] the option's value" in an efficient market. Emphasis added.

[35]    Mayhew Report, ¶ 17.

[36]    Mayhew Report, ¶ 17. Emphasis added.

[37]    Mayhew Report, ¶ 17. Emphasis added and internal footnotes omitted.



in trade prices.[38]  But I have already provided evidence in the Mason Report, which Mayhew does not challenge, that information was impounded in the BDX Stock prices, from which BDX Options prices derived their value, which I demonstrate through the Put-Call Parity relationship that prevailed in the market for BDX Options during the Class Period.[39]  Dr. Mayhew's argument merely posits that there could theoretically be another type of information that also affects options prices—expected volatility of stock prices—in addition to information about the stock prices, that has not been accurately impounded in the BDX Options prices.

20.    In any event, while Dr. Mayhew posits that it is *possible* for the option market to be inefficient, he provides no empirical evidence that would allow him to support a claim that the market *for the BDX Options* was inefficient during the Class Period.[40]

21.    Dr. Mayhew also claims that I "did not identify any peer-reviewed academic articles, textbooks, or industry practitioner articles that support [my] claim that if the market for a given stock is efficient, then so are the markets for all exchange-traded call and put options referencing the stock."[41]  Yet, (aside from the definitional relationship between the underlying stock price and the value of the options) contrary to Dr. Mayhew's suggestion that the efficiency of the option market is divorced from the efficiency of the stock price, academics have long found that option markets, in fact, further facilitate the efficiency of stock markets.

22.    For instance, Doran et al. (2010) performed a study examining the information content in option markets surrounding recommendation changes, and noted findings from Black (1975):

> As Black (1975) notes, informed traders are more likely to go to the option markets first to take advantage of leverage imbedded in option contracts.  Empirical evidence supports this assertion, suggesting option markets lead stock markets.[42]

23.    Jennings et al. (1986) performed a study on the effects of option trading on the behavior of underlying stock prices, concluding:

---

[38]    Leaving aside that, as described above, option markets are quote-driven and Dr. Mayhew has not opined that any purported change is not included in quotes in lieu of trades.

[39]    *See also* Section II.C(2) of this report.

[40]    *See*, Mayhew Dep. Tr. 28:4-12 ("Q. Did you do any other empirical tests in evaluating the efficiency of the market for BDX options? A. Though your question implies that my assignment was to evaluate the efficiency of BDX options, my assignment was to evaluate the opinions and methodologies in Dr. Mason's report. But with that clarification, I didn't do other form – formal analyses.") Dr. Mayhew's analyses are also limited to a review of an incomplete set of BDX Options.

[41]    Mayhew Report, ¶ 19.

[42]    James S. Doran, et al. "Option Market Efficiency and Analyst Recommendations," *Journal of Business Finance & Accounting*, Volume 37, No. 5, 2010, 560-590, p. 561.  *See also*, Fisher Black, "Fact and Fantasy in the Use of Options," *Financial Analysts Journal*, Volume 31, No. 4, 1975, 36-41 and 61-72, p. 62 ("The fact that the options market brings out information traders who wouldn't otherwise trade means that the market for the stock will be more efficient than it would be without the options market. Even if a piece of information shows up first on the options market, hedgers will rapidly cause the information to be incorporated in stock prices.")  Emphasis added.



We find that the stock prices of nonoption firms take longer to adjust to earnings announcements than the prices of control portfolios of option firms. <u>This supports the argument that the existence of the option market is useful in disseminating earnings news</u>.[43]

…

<u>MR hypothesize that option markets make stock market pricing more efficient.  We find this conjecture is supported by the data</u>.[44]

24.    Figlewski et al. (1993) found that the trading in options contributes to both transactional and informational efficiency of the stock market by reducing the effect of short sale constraints:

<u>This paper presents empirical evidence that trading in options contributes to both transactional and informational efficiency of the stock market by reducing the effect of constraints on short sales</u>.  The significantly higher average level of short interest exhibited by optionable stocks supports the argument that options facilitate short selling.  We also find significant effects on option prices, related to the short interest in the underlying stock.  <u>We then present evidence that options also increase information efficiency</u>.  Earlier work, that is replicated and extended here, has suggested that short sale constraints cause stock prices to underweight negative information.  Options appear to reduce that effect.[45]

25.    Kumar et al. (1998) performed a study and found that options trading improves the market quality of the underlying security:

We find that option listings are associated with a decrease in the variance of the pricing error, a decrease in the adverse selection component of the spread, and an increase in the relative weight placed by the specialist on public information in revising prices for the underlying stocks.  We also find that there is a decrease in the spread and increases in quoted depth, trading volume, trading frequency, and transaction size after option listings.  Overall, our results suggest that option listings improve the market quality of the underlying stocks.[46]

26.    In any event, Dr. Mayhew conceded in his deposition that he is not offering an affirmative opinion as to whether BDX Options were trading in an efficient market during the Class Period:

Q. Correct. So – and <u>you don't have an opinion as to whether BDX options were trading efficiently in the market; correct?</u>

---

[43]    Robert Jennings et al., "Earnings Announcements, Stock Price Adjustment, and the Existence of Option Markets," *Journal of Finance*, Volume 41, No. 1, 1986, 107-125, pp. 122-123.

[44]    Robert Jennings et al., "Earnings Announcements, Stock Price Adjustment, and the Existence of Option Markets," *Journal of Finance*, Volume 41, No. 1, 1986, 107-125, pp. 122-123, p. 108, discussing the Manaster and Rendleman [MR] study ("The studies cited hypothesize that organized option trading may affect the efficiency of secondary equity markets and document some evidence of 'non- normal' activity related to option listing and expiration.  <u>Manaster and Rendleman (MR), however, suggest a scenario where option trading may improve market efficiency.  They argue that the option market may affect the manner in which stock prices adjust to the release of information relevant to firm valuation</u>.  The logic of their argument follows.  If some traders believe the option market provides a superior investment vehicle (because of transactions costs, leverage, liquidity, or short sales restrictions), they may execute their investment strategies using options as a substitute for or supplement to stock positions.  These option market 'plays' may move option premia out of equilibrium relative to the underlying stocks' prices.  If the premia become far enough 'out of line,' arbitrageurs intervene to realign stock and option prices.  Thus, the option market may play an important role in determining equilibrium stock values.  <u>MR test and reject the hypothesis that equilibrium stock prices implied by option premia provide no information regarding future stock price movements</u>.")  Emphasis added.

[45]    Stephen Figlewski et al., "Options, Short Sales, and Market Completeness," *Journal of Finance*, Volume 48, No. 2, 1993, 761-777, p. 761.  Emphasis added.

[46]    Raman Kumar, et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance*, Volume 53, No. 2, 1998, 717-732, p. 717.



A. <u>I'm not offering an affirmative opinion on that topic.</u>[47]

27.    As previously discussed, Dr. Mayhew's critique rests primarily upon his conjecture that the BDX Options prices *may not* fully and accurately incorporate information about the future *volatility* of BDX Stock.[48]  But nowhere does he show that information about future volatility was not actually reflected in the prices of BDX Options such that it impeded efficiency in BDX Options markets.[49]   Without showing that information about expected volatility was, in reality, not reflected and was an impediment to efficiency in the market for BDX Options, Dr. Mayhew's argument amounts to nothing more than an assertion that artificial inflation (or deflation) *might* include a component that represents the effect of such changes,[50] which relates to damages rather than efficiency.  But such an opinion is beyond the scope of Dr. Mayhew's report, in which he confirmed that he does not express any opinions with regard to damages in this matter.[51]

**2)    Dr. Mayhew Ignores the Quote-Driven Nature of Stock Option Markets**

28.    Because of the central role of stock prices in determining option values, quoted option prices ("quotes") are known to be ubiquitous and informative.  But by only examining option series with *traded prices*, Dr. Mayhew ignores price discovery based on market quotations provided by market makers, which quickly and fully reflect publicly available information.  Dr. Mayhew contends the issue at hand is "whether

---

[47]    Mayhew Dep. Tr. 20:22-21:4. Emphasis added.  *See also*, Mayhew Dep. Tr. 19:9-20:20 ("Q. So am I correct that you don't have an opinion as to whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period? A. So my report summarizes my opinions.  I am offering opinions in response to Dr. Mason's report and <u>not offering affirmative opinions</u>.  Q. So – so let me just ask the question again: You are not offering an opinion as to whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period; correct? A. I am offering testimony pursuant to my assignment that's relevant to that question.  It's – my assignment was to evaluate and response to Dr. Mason's report.  Q. Okay.  Your assignment was not to answer this question that you understand to be the relevant question at this stage of the proceedings; correct? A. My assignment was to evaluate and respond to opinions in Dr. Mason's report and that is relevant to the answer of the bigger – of the bigger question.  <u>I'm not offering an affirmative opinion.</u>")  Emphasis added.

[48]    *See, e.g.*, Mayhew Report, note 9 ("In an efficient market, one would expect all value-relevant information to be reflected in the price, so that traded prices would accurately reflect [*sic*] the option's value.")  Also, Dr. Mayhew's assertion that option prices incorporate all publicly available information relates to fundamental efficiency (*i.e.*, whether the actual traded price accurately reflected its theoretical fundamental value), which is different from informational efficiency (*i.e.*, whether the security at issue responds quickly and fully to reflect all new publicly available information), which I understand is the relevant standard with regard to reliance.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014).  *See also*, *In re Xcelera.com Securities Litigation*, 430 F.3d 5-3, 511 (1st Cir. 2005), with the Court explaining that the "district court was right to worry about these implications of Defendants' efficiency arguments; it did not err by rejecting Defendants' proposed definition of market efficiency requiring consistency with fundamental value.  By drawing on the standard of efficiency in *Cammer* and holding that "a share's market price [must] reflect publicly available information, not . . . perfectly and correctly incorporate it," the district court adopted the correct standard of efficiency.")  *See also*, supra note 15.

[49]    Dr. Mayhew's opinion is also based on his assertion that efficiency is "more of a spectrum."  *See* Mayhew Dep. Tr. 65:6-8, discussing that "quality and the ability of option markets to reflect that information" is "a spectrum."  But Dr. Mayhew does not opine that such markets are inefficient.

[50]    *See* Mayhew Report, ¶ 18. By suggesting that "alleged misrepresentations can cause market participants to have distorted views of future volatility, and consequently, cause option prices to be artificially inflated or deflated in ways that are unrelated to the inflation or deflation in the stock price" and that "corrective disclosures can correct this misinformation and lead the market to reassess the value of call and put options based on their revised views of future volatility", Dr. Mayhew effectively suggests that the volatility but for the alleged fraud may differ from the actual volatility observed in the marketplace.  To the extent Dr. Mayhew is correct, an options pricing model can certainly be used to assess the impact between the actual volatility and but-for volatility.

[51]    Dr. Mayhew does not contest my damages methodology for BDX Options.  Dr. Mayhew also agrees that an option-pricing model could be used to estimate damages.  *See* Mayhew Dep. Tr. 91:8-13, stating that he has "no reason to doubt that an option model might be part of [damages estimation]" and only alludes to "numerous complexities that one would have to address in how to implement that model for it to be reliable.")

**bva**group®

the *traded prices* quickly and fully reflected all publicly available information (*i.e.*, whether the markets were efficient)" and "not whether some theoretical value quickly and fully reflected all publicly available information."[52]

29.     Dr. Mayhew does not contend that market quotations provided by market makers do not incorporate market views on the underlying share price or future volatility.  Notably, Dr. Mayhew concedes that the impact of new value-relevant information may be impounded in option quotations, which he also acknowledges "are updated very frequently."[53]

30.     Academics have also understood the connection between option prices, quotes, and underlying stock prices, as well as the role of the option market in facilitating price discovery and information processing.  Andersen et al. (2021) performed a study on high-frequency option trade and quote data disseminated by the Options Price Reporting Authority (OPRA), noting that the number of option quotations *greatly* exceeds the number of trades[54] and that high-frequency option data have the potential to convey accurate real-time information.[55]  As Andersen et al. (2021), explained:

> High-frequency option data have the potential to convey accurate real-time information regarding investors' expectations about a company, a sector, or even the entire market. Through the tight connection between option and underlying stock prices, intraday data provide a more comprehensive view of the realized and expected asset price dynamics, offering potential insights for short-term asset return predictability, intraday risk management, price discovery, information processing, and the role of liquidity.[56]

31.     According to Dr. Mayhew, "the traded prices of options in the *real world* often deviate substantially from theoretical prices according to [options pricing] models".[57]  He does not, however, contend that broker-dealer quotes are uninformed by the traded prices of all available options in the real world.

32.     Dr. Mayhew further asserts that "[I appear] to be assuming incorrectly that actual traded prices in option markets must always occur at or very close to the option's theoretical value (and that there is a universally accepted methodology for determining what that theoretical value is)."[58]  Contrary to Dr.

---

[52]  Mayhew Report, ¶ 13.  Emphasis in original.

[53]  Mayhew Dep. Tr. 48:22.  *See* Mayhew Dep. Tr. 48:7-12 ("Q. In other words, can you – can you see the impact of value-relevant information on options by changes in the quotations they provided?  A. You may be able to, yes.") and Mayhew Dep. Tr. 48:14-22 ("Q. Okay. And you said that you were aware that market makers – market makers actively provide quotations in the options market; correct?   A. Yes. Q. Do you know how – how active they are? How frequent do they provide quotations? Is it hourly? Is it by minute? Daily? A. My understanding is that option quotes are updated very frequently.")

[54]  Torben Andersen et al., "A Descriptive Study of High-Frequency Trade and Quote Option Data," *Journal of Financial Econometrics*, Volume 19, No. 1, 2021, 128-177, p. 173 ("Our data are provided by OPRA in accordance with the 'Plan for Reporting of Consolidated Options Last Sale Reports and Quotation Information.'  It contains more than 150 million trade and 1.2 trillion quote records at a millisecond resolution for all option classes written on individual equities, stock indices, and ETPs traded in the U.S. during the first eight months of 2015.")

[55]  Torben Andersen et al., "A Descriptive Study of High-Frequency Trade and Quote Option Data," *Journal of Financial Econometrics*, Volume 19, No. 1, 2021, 128-177, p. 129.

[56]  Torben Andersen et al., "A Descriptive Study of High-Frequency Trade and Quote Option Data," *Journal of Financial Econometrics*, Volume 19, No. 1, 2021, 128-177, p. 129.

[57]  Mayhew Report, ¶ 14.  Emphasis in original.

[58]  Mayhew Report, ¶ 13.



Mayhew's mischaracterization, I have made no such assertion.  The relevant question at issue is whether "new information was promptly reflected"[59] in the prices of BDX Options, not whether the BDX Options are *accurately* priced in total (which is a question that relates to fundamental efficiency).

33.    As Dr. Mayhew acknowledges, "[m]arket makers facilitate trading in option markets by quoting bid prices (prices at which market makers are willing to buy) and ask prices (prices at which market makers are willing to sell)."[60]  These quotations reflect boundaries for option prices because market makers are bound to transact at such prices.  Market quotations were provided by market makers throughout each trading day in the Class Period for all BDX Options.[61]  Andersen et al. (2021) describes the market making activity in the option markets as follows:

> The option market is a hybrid quote-driven market, where market makers are responsible for providing continuous bid and offer quotes.
>
> …
>
> There are several market-wide obligations for option market makers.  First, in February 2001, the SEC introduced a market-wide firm quote obligation through an amendment of the Quote Rule (Securities Exchange Act Rule 11Ac1-1), which was previously applied only to the equity market.  This rule requires the market makers to post firm quotes that are valid for order executions of at least one contract.
>
> …
>
> Second, in 2010, the SEC proposed an amendment to the local exchange rules that prohibit market maker stub quotes, that is, quotes that are far away from the prevailing market.  Stub quotes might be posted, when market makers attempt to fulfill quoting obligations without an actual intent to trade.
>
> …
>
> By the Quote Rule, market makers must provide continuously updated two-sided quotes throughout the trading day.  Each option exchange (or a self-regulatory organization) imposes additional obligations on its market makers.  In general, these quoting obligations are in force irrespective of the prevailing market conditions.  Therefore, during episodes of stress, market makers are supposed to maintain liquidity, absorbing the impact of shocks on individual investors. The requirement of continuous quoting is especially important for option markets, because an appreciable fraction of the securities is thinly traded.[62]

34.    In sum, Dr. Mayhew's failure to consider the role of option quotations in facilitating price discovery and informational efficiency in the option markets is unwarranted.  By failing to consider *all information* provided by market participants in the option markets,[63] Dr. Mayhew's review is incomplete

---

59    *See e.g.*, Mason Report, ¶ 10.

60    Mayhew Report, ¶ 37.

61    Market option quotes are available in up to 1-minute intervals from CBOE.  *See* CBOE Option Quotes, available at https://datashop.cboe.com/option-quote-intervals.

62    Torben Andersen et al., "A Descriptive Study of High-Frequency Trade and Quote Option Data," *Journal of Financial Econometrics*, Volume 19, No. 1, 2021, 128-177, pp. 136-137.  Emphasis added.

63    For example, as discussed later in this report, Dr. Mayhew fails to consider the trading volumes across all BDX Options series and applies an average trading volume metric inconsistent with his prior research.



and his critique of my approach in assessing the market efficiency for BDX Options—using all available options—is fundamentally unsound.

**B.    Dr. Mayhew's Observations that the Relevant BDX Options Had Lower Trading Volumes and Higher Bid-Ask Spreads than BDX Stock Are Not Dispositive of an Inefficient Market**

35.    In his report, Dr. Mayhew states that "when trading costs are high (as reflected in high bid-ask spreads or the lack of any trading in the security), there may be limited (if any) profits to be made and sophisticated investors may not be incentivized to gather and analyze information and trade on it" and that "[w]hen such situations arise in option markets, the incorporation of new information relevant to option prices, such as information about expectations of future volatility, may not be taking place and the efficiency of the option markets is far from assured."[64]  But Dr. Mayhew disavowed the relevance of bid-ask spreads to examining the market efficiency of options in his deposition and was unable to specify what thresholds could be applied to distinguish "when trading costs are high"[65] from other periods.[66]  Dr. Mayhew similarly distanced himself from an approach based on trading volume for the same reason—*i.e.*, Dr. Mayhew was unable to identify a specific threshold for "a definition of low versus medium or high" trading volume.[67]

36.    Dr. Mayhew also contends in his report that the "efficiency of option markets should be established empirically for each of the option series at issue."[68]  It is well-understood, however, that options investors may enter into various short-dated or long-dated option combinations with various strike prices during a given period as part of their trading strategies and can use certain combinations of options to mimic other options.[69]    From an economic perspective, therefore, contrary to Dr. Mayhew's contention, one should consider the option markets for all BDX Options available for trade when examining trading volumes and bid-ask spreads.[70]

**1)    Dr. Mayhew's Examination of BDX Options Is Incomplete and Selective**

37.    In examining the volumes and bid-ask spreads of the BDX Options during the Class Period, Dr. Mayhew limits his analyses to the "Relevant BDX Options", which he "understands" are "option series that would potentially be eligible to be a part of the class in this matter" that "expired on or after the alleged corrective disclosure date, February 6, 2020, and that had trading volume greater than zero during the

---

[64]    Mayhew Report, ¶ 21.

[65]    Mayhew Report, ¶ 21.

[66]    Mayhew Dep. Tr. 76:17-78:2.

[67]    Mayhew Dep. Tr. 50:1-5.

[68]    Mayhew Report, ¶ 20.

[69]    Sugato Chakravarty et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004, 1235-1257, p. 1252.  The authors include Sugato Chakravarty, Huseyin Gulen, and Stewart Mayhew.

[70]    Notwithstanding that Dr. Mayhew characterized trading volumes and bid-ask spreads as not "particularly meaningful" in the context of assessing market efficiency for BDX Options.  *See, e.g.*, Mayhew Dep. Tr. 55:15-20 and 77:7-12.



'Putative Class Period' (*i.e.*, between November 5, 2019 and February 5, 2020, both dates inclusive)."[71] Dr. Mayhew excludes from consideration the other option series that contribute to the efficiency of the BDX Options as a whole during the Class Period.

38.     To assess whether BDX Options traded in an efficient market during the Class Period, one should consider *all available evidence,* not just evidence related to those options that may be eligible for damages.  There was a total of 919 call options and 919 put options, or a total of 919 unique put-call pair options, available for trade during the Class Period.  Dr. Mayhew limits his analysis, however, to just 140 call options and 155 put options, or a total of 208 unique put-call pair options.[72]  *See* **Exhibits 1 and 2**.

39.     Contrary to his own academic work, Dr. Mayhew ignores the relevance of other traded options that facilitate the informational efficiency of the BDX Options as a whole.  Specifically, Dr. Mayhew, in his own research (with Sugato Chakravarty and Huseyin Gulen, herein Chakravarty et al.) acknowledges that "information revealed in one series can spread quickly to all other options."[73]  As Chakravarty et al. (2004) further explained:

> We begin with a caveat.  <u>Option market makers view the incoming order flow on all option series, and have the technology to update quotes simultaneously.  Thus, information revealed in one series can spread quickly to all other options, making it more difficult to distinguish price discovery across multiple options.  However, we should note that updating of option prices from other option prices is not automatic – it requires an active intervention from a market maker.  Also quotes may be revised not only by market makers, but as a result of public limit orders.  Thus, it is not uncommon to see one option price move first, and the others follow</u>.  Although the view may be somewhat clouded, we believe that differences in estimated information shares across strike prices reflect, at least to some extent, differences in levels of price discovery across strikes.[74]

40.     Without taking into account the relevance of other options, Dr. Mayhew's selective analysis of his Relevant BDX Options is incomplete.

### 2)   "Low" Trading Volume Is Not Dispositive of an Inefficient Market

41.     Dr. Mayhew claims that the average daily trading volume ("<u>ADTV</u>") for the Relevant BDX Options was very low during the Class Period.  Dr. Mayhew arrives at his conclusion by computing the total trading volume for each Relevant BDX Option series *individually* and then dividing that amount by the number of applicable trading days during the Class Period.[75]  Dr. Mayhew reports that "[a]cross the 140

---

[71]   Mayhew Report, note 1.

[72]   Mayhew Report, ¶ 8 ("Exhibit 1 shows that the Relevant BDX Options comprised 295 option series with positive trading volume on at least one day during the Putative Class Period (140 call option series and 155 put option series).  Within these unique option series, there are 51 distinct strike prices, ranging from $125 to $400 and 11 distinct expiration dates spanning from February 7, 2020 to January 21, 2022, corresponding to option series covering 208 different combinations of strike price and expiration date.")  Internal footnotes omitted.

[73]   Sugato Chakravarty et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004, 1235-1257, p. 1252.

[74]   Sugato Chakravarty et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004, 1235-1257, p. 1252.  Emphasis added.

[75]   Mayhew Report, Exhibit 2.  More specifically, the start of his analysis period is the "earliest day in the Putative Class Period for which there is a non-zero bid and ask price, and the end of the analysis period is the end of the Putative Class Period."



call option series, 90% had [an ADTV] of less than 10 contracts" with the mean and median ADTV of 3.74 contracts and 0.41 contracts, respectively.[76]  Dr. Mayhew further states that the "Relevant BDX Option series also traded infrequently during the Putative Class Period," and reports that "the average call option traded only on 19% of trading days, approximately one in five days, or once a week on average (18% for the average put option)."[77]  Dr. Mayhew also compares the ADTVs for each *individual* option series against the ADTV for BDX Stock, which he states is "greater than 1.2 million shares"[78] and the fact that BDX Stock traded on every single day during the Class Period.[79]

42.    Leaving aside that he examines only a subset of options that contribute to market efficiency, Dr. Mayhew conceded in deposition that such measures are of little value. Specifically, Dr. Mayhew admitted that the purportedly *low* trading volume of options is not a label that he would "assign a lot of meaning to,"[80] and is not by itself dispositive of an inefficient market.[81]  Notably, Dr. Mayhew does not identify any peer-reviewed academic articles, textbooks, or industry practitioner articles that establish that the frequency of option trades and ADTV of options must exceed some defined threshold to be deemed efficient, or that the frequency of option trades and ADTV of individual options must necessarily mirror that of the ADTV of the underlying stock.[82]  In fact, Dr. Mayhew conceded that he has no "strong view" on his comparison of the Relevant BDX Options and BDX Stock with respect to the frequency of trades and "whether that particular [comparison] is highly relevant or not."[83]  As Dr. Mayhew testified:

> Q. Okay. Is there a particular threshold of frequency that you would consider for options to be – to be, you know, frequently traded? A. That label does not – I have – <u>I don't think that was a very particularly useful label for me in the context of my – my work</u>.  Q. Uh-huh. You – you do a comparison in Paragraph 24 with – with BDX stock, which you point out traded on – on every single day of the Class Period.  <u>Why – why is that a relevant comparison?</u>  A. <u>I don't – I don't have a strong view about whether that particular sentence is – is highly relevant or not</u>.[84]

---

[76]  Mayhew Report, ¶ 23.  One contract corresponds to 100 shares of BDX.  Dr. Mayhew notes that "the numbers for the 155 put option series tell the same story."

[77]  Mayhew Report, ¶ 24.  Dr. Mayhew also notes that "10% of call and put option series traded on no more than 3% of trading days during the Putative Class Period, which corresponds to trading once every six to seven weeks on average."

[78]  Mayhew Report, ¶ 23.

[79]  Mayhew Report, ¶ 24.

[80]  Mayhew Dep. Tr. 68:19-24.

[81]  I note that Dr. Mayhew does not provide any affirmative opinions that the market for BDX Options is not efficient.  Rather, he suggests that option series with lower trading volumes and higher bid-ask spreads may be less efficient, but he does not say they are inefficient.

[82]  Mayhew Dep. Tr. 49:23-50:5 ("Q. Okay.  So let me just – let me just ask a definitional question.  What would be – what is a threshold that you would consider as – as a low trading volume for options?  A. I don't have such a threshold for a – for a definition of low versus medium or high."); Mayhew Dep. Tr. 55:8-20 ("Q. Okay. Do you consider that high volume, 88.6 contracts a day?  A. Again, I don't have a definition of what is the level of cutoff for volume to be high or low.  That corresponds to 8,860 shares of stock in a day compared with 1.2 million shares a day in the stock market.  Q. But you don't have a view as to whether that's high or low or medium volume?  A. I don't think that those are particularly meaningful labels.")

[83]  Mayhew Dep. Tr. 63:15-16.

[84]  Mayhew Dep. Tr. 62:10-63:16, with Dr. Mayhew further elaborating, Mayhew Dep. Tr. 63:16-64:6 ("I constructed the discussion of Paragraph 24 to be parallel to the construction of the prior Paragraph 23, which provides a comparison of the trading volume so that one could get a sense from the report on the relative amount of trading volume in the op – in the typical option series compared with the underlying stock where the lowest trading volume on any given day was 210 sells and shares.  So given what I've already said in Paragraph 23, that pretty much follows automatically that it must have traded every single day.")



43.     Similarly, Dr. Mayhew conceded that there is no "magic level … to surpass that threshold" in order establish that the Relevant BDX Options traded in an efficient market and that "the label 'low volume' is not something that [he would] assign a lot of meaning to."[85]  As Dr. Mayhew testified:

> Q. Is it your view that in order for an options market to be efficient, the trading volume should approximate that of the stock?  A. I'm not offering that opinion?  Q. What should, in your view, be the trading volume of the options to facilitate an efficient market for those options?  A. First of all, I don't think that trading a volume – trading volume alone would be indicative one way or the other.  But it – of market efficiency.  But it could be a relevant thing that a person would want to look at to – as part of the mix of information that they're looking at.  I don't have a specific level in mind as to some magic level as to you have to surpass that threshold. It's – it's more of a spectrum.[86]
>
> …
>
> Q. And – and just to be clear, when we – when you're talking about low trading volume, you don't have a benchmark in mind with respect to options.  A. Well, I think I testified before that the label "low volume" is not something that I assign a lot of meaning to.[87]

44.     Apparently in order to justify the above views, Dr. Mayhew claims that efficiency is "more of a spectrum"[88] and only suggests that *lower* trading volumes may be indicative of a security that trades in a *less* efficient market, not that the market for the securities at issue was necessarily inefficient.[89, 90]  But, of course, "less efficient: is not the same as "inefficient."

45.     Even if trading volumes and bid-ask spreads were relevant to analyzing option market efficiency, the volume of trades that Dr. Mayhew presents are calculated in a manner that is inconsistent with his prior academic work and are, therefore, misleading.  When viewed collectively across all option series, BDX Options in fact traded on every single trading day (or 100% of the time) during the Class Period.  Across *all* BDX Options, the options had an ADTV of 1,648 contracts (which corresponds to 164,800 shares).[91]  That includes trading volume of all of the options – not just Dr. Mayhew's "Relevant BDX Options" – aggregated together, rather than reported individually.

---

[85]    Mayhew Dep. Tr. 68:22-24.

[86]    Mayhew Dep. Tr. 64:8-23, with Dr. Mayhew further elaborating, Mayhew Dep. Tr. 64:24-65:11 ("In my published research I – I have looked at the degree to which option prices reflect information in the past for returns and found that even as you go from the top ten options to other options that are still in the top 50 but not in the top ten, then you already see a degradation in quality and the ability of option markets to reflect that information.  So it's, I would say, a spectrum and the lower the option volume is, the less you would expect the price discovery mechanism to be functioning efficiently.")

[87]    *See* Mayhew Dep. Tr. 68:18-24.

[88]    Mayhew Dep. Tr. 64:23.

[89]    Dr. Mayhew concedes that it would be inappropriate to make a determination of market efficiency based solely on the trading volume.  *See* Mayhew Dep. Tr. 68:8-17 ("Q. But – but you wouldn't say that a market that has low trading volume is necessarily an inefficient market. Correct?  A. I don't think it would be appropriate to isolate one factor and focus only on that and make a determination of market efficiency based solely on the trading volume, no.")

[90]    While Dr. Mayhew concedes that the absence of arbitrage opportunities is "relevant evidence one would consider in assessing the efficiency of a market" (Mayhew Dep. Tr. 79:1-2), Dr. Mayhew also does not examine or perform any analysis to assess whether arbitrage opportunities persisted with options that had low trading volumes and/or high bid-ask spreads in this matter.  *See* Mayhew Dep. Tr. 79:10-14 ("Q. Did you determine whether arbitrage opportunities persisted with options that had low trading volumes and/or high bid-ask spreads in this case?  A. I did not look at that.")

[91]    This is calculated simply as the sum of all call and put option contracts *across all option series* during the Class Period divided by the number of trading days during the Class Period.  One contract corresponds to 100 shares of BDX.  If calls and puts are

---



46.     Setting aside Dr. Mayhew's testimony undermining his opinions regarding the significance of options trading volumes, Dr. Mayhew's comparison of ADTV of *individual* option series to the ADTV of the underlying stock is also inapt and contradicted by his own research.  Dr. Mayhew seems to suggest in the Mayhew Report that the ADTV of each individual BDX Option series must be similar to the ADTV of BDX Stock for the option market to be efficient.[92]  By ignoring the *breadth* of available BDX Options available for trade, however, Dr. Mayhew's reasoning implies that the total trading volume of all BDX Options would need to be approximately 900 times the trading volume of the underlying stock.[93]

47.     By comparing and contrasting the ADTV of each *individual* BDX option series with the ADTV of BDX Stock, Dr. Mayhew has presented a misleading perception that the trading volumes for the BDX Options were relatively low.  Furthermore, based on Dr. Mayhew's own academic research, in which options with an ADTV as low as 264.8 contracts are characterized as "actively traded," he should have characterized the BDX Options in this matter as "actively traded."[94]

48.     In his academic research, Dr. Mayhew applies a measure of "average daily option contract volume" that deviates from his measure of ADTV for Relevant BDX Options in this matter.  In Dr. Mayhew's research, he applies an "average daily option contract volume" that is <u>aggregated across strikes and maturities</u>.[95]  In his academic work, Dr. Mayhew reported the ADTV of options to be between 264.8 contracts and 22,175.8 contracts, or an average of 1,774.0 contracts for "60 [of the] *most actively traded stock options* on the CBOE" over the five-year period between 1988 and 1992.[96, 97]  As noted earlier, BDX

---

[92]  counted separately, the ADTV of all call and put contracts amount to 915 contracts (or 91,500 shares) and 734 contracts (or 73,400 shares), respectively.

[92]  In the Mayhew Deposition, Dr. Mayhew conceded that is it typical for options to have lower trading volumes than the underlying stock.  *See* Mayhew Dep. Tr. 65:20-66:1 ("Q. Is it your experience based on your research that options tend to have lower volume of trading than – than stock?  A. Yes, I think that's true for – true for many different option classes. In fact, a lot of – some stocks don't even have listed options.")

[93]  This simplified example assumes each option series is available for trade on every day during the Class Period.

[94]  Also, the ratio of option volume (in equivalent shares) to stock volume based on Dr. Mayhew's own academic research varies between 7.6% and 132.2% (with an average and median of 24.4% of 18.0%, respectively) for "60 [of the] most actively traded stock options in the CBOE."  This is in contrast to ADTV for BDX Options of 1,648 contracts (or 164,800 shares) and ADTV of BDX Stock of 1.2 million shares (or approximately 13.7%).  Calculations based on figures provided in Table 1 of Sugato Chakravarty et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004, 1235-1257, pp. 1245-1246.

[95]  *See* Sugato Chakravarty et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004, 1235-1257, p. 1246.  Emphasis added.

[96]  *See* Sugato Chakravarty et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004, 1235-1257, pp. 1244 ("Our analysis is based on five years of transactions data for 60 stocks that are listed on the New York Stock Exchange (NYSE) and that have options trading on the Chicago Board Options Exchange (CBOE). Stock market trade and quote data were obtained from the Institute for the Study of Securities Markets (ISSM) database for the period 1988 to 1992. Trades and quotes from the options market were obtained from the Berkeley Options Data Base. <u>The sample is composed of the 60 most actively traded stock options on the CBOE over this period</u>. The firms in our sample are listed in Table 1."); p. 1245 ("Option volume is measured as the time-series average of daily contract volume for all options on the firm. Stock volume (in thousands) is measure[d] as the time-series average of stock volume as reported in CRSP."); and p. 1246 ("Table 1 provides summary statistics for the 60 stocks in our sample. For each firm in our sample, the table reports the <u>average daily option contract volume (aggregated across strikes and maturities)</u>, average daily stock volume (in 1,000's of shares), average effective spreads for ATM short-term options and for the underlying stock, and the volatility of the underlying stock.")  Emphasis added.

[97]  *See also*, Mayhew Dep. Tr. 69:1-10 ("But I will say that in my own research and other research that I've seen on individual stock options, researchers often will focus their empirical testing of option models on a select group of the highest volume options, which might include the top 30 or the top 50 most actively traded option classes.  So that would be one way that I would think about the concept of high volume or high and medium volume options.")



Options had an ADTV of 1,648 contracts during the Class Period (when calculated consistent with the methodology Dr. Mayhew applied in his prior academic research).

### 3)  "High" Bid-Ask Spreads Are Not Dispositive of an Inefficient Market

49.    Dr. Mayhew asserts that "[h]igh bid ask spreads, such as those found in the markets for Relevant BDX Option series, indicate that it was costly to trade in these markets."[98]  Dr. Mayhew notes that the average bid-ask spreads of individual option series "varied widely and were generally high during the Putative Class Period" with average percentage bid-ask spreads for call and put options of 19% and 23%, respectively.[99]  Dr. Mayhew also notes that bid-ask spreads for BDX options were smaller for in-the-money options than out-of-the-money options.[100]

50.    In his deposition, however, Dr. Mayhew disavowed the usefulness of his bid-ask spread analysis. Dr. Mayhew has not identified any peer-reviewed academic articles, textbooks, or industry practitioner articles that dictate that the bid-ask spreads of options must fall below a certain threshold for the market to be considered efficient, nor does he consider whether these "higher" bid-ask spreads are typically observed, even for options on broad market indices.  Dr. Mayhew testified:

> Q. Okay. What is the threshold for describing the bid-ask spreads as high? What is the benchmark against which you're comparing these bid-ask spreads to arrive at the conclusion that they were high?  A. Similar to my prior answers, I don't have a magic threshold at which spreads become high.[101]

51.    One reason that "high" bid-ask spreads are not meaningful lies in Dr. Mayhew's own observation that it is not unusual for out-of-the money options to have higher bid-ask spreads than in-the-money options and that the size of the bid-ask spread is a function of the option's moneyness.[102] Options that are out-of-the money are naturally priced lower than options that are in-the-money.[103]  Due to the lower price levels of deep out-of-the-money options, the *percentage* bid-ask spreads of deep out-of-the money options are naturally accentuated.

---

[98]    Mayhew Report, ¶ 25.

[99]    Mayhew Report, ¶ 25.  Dr. Mayhew notes that the bid-ask spreads were "approximately 950 times and 1,150 times higher, respectively, than the average bid-ask spread for BDX stock according to Dr. Mason."  Dr. Mayhew calculates the percentage bid-ask spread by taking the difference between the bid and ask prices, divided by the midpoint of the bid and ask prices of the options.

[100]   Mayhew Report, ¶ 25 and Exhibit 3.  Dr. Mayhew notes that even for the in-the-money options, the "average bid-ask spread was 5%, roughly 250 times higher than the bid-ask spread for BDX stock according to Dr. Mason."

[101]   Mayhew Dep. Tr. 72:18-24.

[102]   *See* John C. Hull, Options, Futures, and Other Derivatives (9th ed. 2014), p. 220 ("Options are referred to as in the money, at the money, or out of the money. If S is the stock price and K is the strike price, a call option is in the money when S > K, at the money when S = K, and out of the money when S < K. A put option is in the money when S < K, at the money when S = K, and out of the money when S > K.")

[103]   By way of example, assume a stock with a current share price (S) of $100.  A short-term in-the-money call option with a strike price (K) of $95 may have an option price of $5.20, with bid and ask prices of $5.10 and $5.30, respectively (reflecting a bid-ask spread of approximately 4%).  A short-term deep out-of-the money option with a strike price (K) of $400 may have an option price of $0.02, with bid and ask prices of $0.01 and $0.03, respectively (reflecting a bid-ask spread of 100%).



52.    Thus, Dr. Mayhew's opinion about high (or rather, higher) bid-ask spreads (relative to the underlying asset) is not a meaningful observation and, as he concedes, is not by itself, dispositive of an inefficient market.[104]

## C.    Dr. Mayhew Acknowledges the Lack of Arbitrage Opportunities as a Necessary Condition for Market Efficiency

53.    One approach to assess whether the markets for BDX Stock and BDX Options are efficient is by testing for any Put-Call Parity deviations, a test which I have in fact performed, and which Dr. Mayhew dismisses as insufficient.[105]  Dr. Mayhew conceded at his deposition that the absence of arbitrage is "relevant evidence one would consider in assessing the efficiency of a market" and that such evidence can be supportive of the efficient market hypothesis.[106]  By dismissing relevant evidence I provide in support of option market efficiency, Dr. Mayhew incorrectly claims that I have "performed no empirical analysis of traded prices of BDX stock and options to support [my] claim" that the factors that support the efficiency of BDX Stock also support the efficiency of BDX Options.[107]  Much like his other critiques, Dr. Mayhew simply dismisses evidence in support of the market efficiency for BDX Options by suggesting that such analysis is not "rigorous" enough.    However, academics have long recognized that the absence of arbitrage opportunities (as can be analyzed through the Put-Call Parity deviations discussed in the Mason Report) *supports* the hypothesis that the BDX Stock and BDX Options traded in an efficient market.

### 1)    Dr. Mayhew's Dismissal of Put-Call Parity as a Measure of Efficiency is Contrary to Relevant Academic Literature

54.    Dominik M. Rösch et al. (2017) noted that put-call parity deviations tests for violations of the law of one price across different markets (stocks and options) and can be used to assess the efficiency of the markets for both stock and options.  As Rösch et al. (2017) explained:

> Market efficiency is a central concept in finance, and academic research has a long-standing interest in measuring the extent to which financial markets or individual securities exhibit efficient price formation.  <u>A number of distinct efficiency measures have been developed in the literature</u>.  Some of these measures are designed to capture the extent to which stock prices deviate from a random walk (e.g., return predictability, variance ratios), while others aim to measure pricing errors relative to the efficient market benchmark (e.g., Hasbrouck 1993) <u>or violations of the law</u>

---

[104]    *See, e.g.*, Mason Report, ¶ 98.  *See also*, Mayhew Dep. Tr. 79:10-14 ("Q. Did you determine whether arbitrage opportunities persisted with options that had low trading volumes and/or high bid-ask spreads in this case?  A. I did not look at that.")

[105]    Mayhew Report, ¶ 19.

[106]    Mayhew Dep. Tr. 78:13-79:9 ("Q. Let me ask you just a basic foundational question: Do you agree that the absence of arbitrage opportunities is supportive of a hypothesis that the market is efficient?  A. In a general – in a very general sense it is supportive. But if the reason why there's no arbitrage opportunities is because the bid-ask spreads are so wide that the transaction costs would eliminate any profits from any attempted arbitrage opportunity, then I'm not sure that the absence of arbitrage alone carries much weight. Q. But – but you agree that it's – it is a relevant – it is relevant evidence one would consider in assessing efficiency of a market. A. Yes. If one looked at arbitrage relationships and found that there were large systematic violations, then that would be a concern and that would be a relevant factor that one would consider in evaluating. That would be, as I say in my report, one form of it, inefficiency. So that would be relevant.")

[107]    Mayhew Report, ¶ 19.



of one price across different markets (e.g., put-call parity deviations). All of these measures have been used in different lines of research.

…

Our fourth daily proxy for the price efficiency of individual stocks is a law of one price measure derived from options markets. The use of this measure enhances our understanding of comovement in market efficiency by extending the notion of efficiency to derivatives markets for individual stocks.[108]

55.    Brunetti et al. (2005) similarly recognized that the efficiency of option markets can be investigated either by means of model-based tests or testing no-arbitrage relationships that must be held among financial assets.  As Brunetti et al. stated:

Efficiency is of uttermost importance for the functioning and the development of financial markets and can be investigated either by means of model-based tests or by testing no-arbitrage relationships that must hold among financial assets.  Given that the former approach involves a joint test of the market efficiency and of the option pricing model specification, most empirical research rests on the definition of market efficiency as the absence of arbitrage opportunities. Among the no-arbitrage relationships that must hold in an efficient market, the most famous is the Put–Call Parity (PCP), which particularly lends itself to the empirical investigation of the cross-market (option and underlying) efficiency.[109]

56.    Nisbet (1992) also noted that put-call parity, after accounting for transaction costs, can be used to test the efficiency of the option market, stating:

Put-call parity theory in the presence of dividends is extended to take account of transaction costs and new, testable models are derived.  These models are used to test the efficiency of the London Traded Options Market using synchronous option and share prices.  When account is taken only of option spread, significant numbers of deviations from put-call parity are identified.  When commission costs on options and shares are considered however, almost none of these deviations prove to be exploitable.[110]

57.    Urbi Garay et al. (2003) similarly investigated put-call parity violations, taking into account transaction costs, to assess the efficiency of the option market, stating:

This paper investigates the put-call parity (PCP) relation using options on futures on the Standard and Poor's 500 (S&P 500) Index using daily closing options and futures prices between 2nd January and 31st December, 2001.  Results obtained demonstrate that the inclusion of transaction costs in the model considerably reduces the number of times that a violation of the PCP relation occurs at the same time that it diminishes the magnitude of the distortion.  Similarly, the PCP relation applies more accurately to those options that are the nearest to being at-the-money. When deep out-of-the-money or deep in-the money options were used in the tests the number of violations increased.  This may be the result of the low liquidity levels of these contracts. Finally, the authors verify in this study that when transaction costs — commission costs and bid-ask spreads on options and on futures — are included in the model, arbitrage opportunities are translated in the possibility of a gain well below $1,000 for an option contract on

---

[108]  Dominik M. Rösch et al., "The Dynamics of Market Efficiency," *The Review of Financial Studies*, Volume 30, No. 4, 2017, 1151-1187, pp. 1155 and 1158.  Emphasis added.

[109]  Marianna Brunetti et al., "Put-call parity and cross-markets efficiency in the index options markets: evidence from the Italian market," *International Review of Financial Analysis*, Volume 14, Issue 5, 2005, 508-532, p. 508.  Emphasis added.

[110]  Mary Nisbet, "Put-call parity theory and an empirical test of the efficiency of the London Traded Options Market," *Journal of Banking & Finance*, Volume 16, Issue 2, 1992, 381-403, p. 381.



<u>futures on the S&P 500. This amount does not represent an economically significant value, especially if it is considered that other factors such as taxes have not been considered in this paper. These results offer support to the efficient market theory.</u>[111]

58.     Dr. Mayhew's assertion that assessing the efficiency of the option market based on an examination of Put-Call Parity is "unsupported by rigorous economic principles" is, therefore, simply incorrect.

### 2)    Dr. Mayhew Concedes the Usefulness of Put-Call Parity Analysis

59.     Dr. Mayhew contends that my claim that "'[o]ptions demonstrating qualities of put-call parity are thought to trade in an efficient market' is incorrect."[112]  Notably, Dr. Mayhew concedes that (1) "[p]ut-call parity is an economic relationship that is expected to hold in the absence of arbitrage opportunities (i.e., in the absence of opportunities to make economic profits without taking on any risk)," and (2) "the lack of arbitrage opportunities in a market is only a necessary condition for market efficiency, not a sufficient one."[113]

60.     By claiming in his report that a finding of a lack of arbitrage opportunities is "only a necessary condition for market efficiency, not a sufficient one,"[114] Dr. Mayhew already concedes the relevance of analyzing Put-Call Parity to assess option market efficiency.  Dr. Mayhew also contends in his report that while "finding that put-call parity is rarely violated rules out one egregious type of inefficiency, it does not imply that the market is efficient."[115]  Dr. Mayhew, therefore, concedes almost immediately after asserting I am "incorrect" that such concepts are relevant, even if they don't tell the whole story.

61.     Dr. Mayhew then provides a hypothetical example to illustrate how *both the call and put options* can be fundamentally misvalued and that the Put-Call Parity equation would still be satisfied.[116]  Dr. Mayhew provides another hypothetical example whereby an "announcement has no impact on the stock price but doubles the market's assessment of future volatility of the stock price" and posits that the option prices "may perversely move in the wrong direction (decreasing in response to an increase in volatility)."[117]  Based in large part on these hypothetical scenarios, Dr. Mayhew concludes that "satisfying put-call parity does not mean that the option market is efficient in the sense that it responds quickly to reflect value-relevant

---

[111]    Urbi Garay et al., "Tests of the Put-Call Parity Relation Using Options on Futures on the S&P 500 Index," *Trading & Regulation*, Volume 9, No. 3, 2003, 259-280, p. 259.  Emphasis added.

[112]    Mayhew Report, ¶ 26.

[113]    Mayhew Report, ¶ 26.

[114]    Mayhew Report, ¶ 26.

[115]    Mayhew Report, ¶ 27.

[116]    Mayhew Report, ¶ 27 and note 40 ("For example, suppose the current stock price minus the term that depends on the strike price and expected future dividends is equal to $1. In that case, put-call parity holds equally well if the call and put option prices are $2.0 and $1.0, respectively, as if the call and put option prices are $1,000 and $999, respectively.")

[117]    Mayhew Report, ¶ 30.  Dr. Mayhew posits that "[i]n those situations, put-call parity may still hold even though the prices of call and put options failed to incorporate the rise in volatility."



information."[118]  As set forth in the Mason Report and further discussed below, the BDX Options prices respond to information concerning BDX Stock and Dr. Mayhew has not provided any empirical support that his hypothetical scenarios have any relevance here.

62.    To assess whether BDX Options prices respond to information concerning BDX Stock (*i.e.*, whether the BDX Options are informationally efficient and promptly respond to changes in the underlying BDX Stock prices), one can examine the relationship between the daily returns of BDX Stock and the daily returns of the synthetic stock prices comprising BDX Options based on the Put-Call Parity relationship.[119] I found that the daily returns of BDX Stock and the daily returns of the synthetic stock prices are highly correlated across all individual BDX Option series with an average correlation of 97.8%.[120]  These high correlations persist for all BDX Option series.  *See* **Exhibit 3A**.  Even if I were to limit my analysis to the Relevant BDX Options as defined by Dr. Mayhew's criteria, the average correlation across all individual Relevant BDX Option series is 99.2%.[121]  *See* **Exhibit 3B**.  This evidence indicates that BDX Options respond rapidly to changes in the underlying reference stock price and further supports my opinion that the BDX Options are informationally efficient.[122]

63.    These results make sense given that Dr. Mayhew does not contest that BDX Options are informationally efficient with respect to changes in the underlying stock price.  Dr. Mayhew only posits a scenario whereby the underlying stock price *may not* accurately incorporate information concerning changes in future volatility (*e.g.*, if the market's assessment of future volatility should rise with no change in the underlying stock price, but that the option prices move perversely in the wrong direction)[123] such that the BDX Options market *may not be fundamentally efficient* because the BDX Stock prices may not *accurately* incorporate information concerning future volatility.[124]  Dr. Mayhew has presented no empirical evidence that would indicate that the BDX Options do not reflect their respective fundamental values, nor do I understand a finding of *fundamental efficiency* is necessary to establish a finding of informational efficiency.[125]

---

[118]   Mayhew Report, ¶ 30.

[119]   *See e.g.*, Mason Report, notes 42 and 46.

[120]   I note that five option series had negative correlations based on only two return observations.  Excluding those five option series, correlations across all individual BDX Option series range from 85.3% to 100%.  If I impute a volume-weighted average return for the synthetic stock prices based the total options volume each day, the correlation between the returns of BDX Stock and the returns of the volume-weighted average synthetic stock prices is 99.9%.

[121]   The correlations across all individual Relevant BDX Option series range from 96.1% to 100%.  If I impute a volume-weighted average return for the synthetic stock prices based the total options volume each day, the correlation between the returns of BDX Stock and the returns of the volume-weighted average synthetic stock prices is 99.8%.

[122]   I understand that Dr. Mayhew does not contest that BDX Stock traded in an efficient market during the Class Period.

[123]   Mayhew Report, ¶ 30.

[124]   Dr. Mayhew is effectively questioning whether the implied volatilities, which are implied based on traded prices or quotes, are accurate relative to some theoretical fundamental future volatility that he presupposes the market should have accurately priced in.  While Dr. Mayhew presents this theoretical scenario, he has provided no empirical evidence with respect to the BDX Options that would support his conjecture that the option prices did not accurately incorporate the market's perception of future volatility. He simply posits that that it may be possible due to the "low" trading volumes and "high" bid-ask spreads of the options (which he admitted in his deposition were meaningless distinctions).

[125]   Given Dr. Mayhew's contention that no single option-pricing model could accurately price the options, it is also unclear how Dr. Mayhew would assess the *fundamental or true value* of the options.



**3)     Dr. Mayhew's Methodological Critiques are Similarly Misplaced**

64.     Dr. Mayhew also contends that my analysis of Put-Call Parity deviations fails for additional methodological reasons.

65.     *First*, Dr. Mayhew asserts that "neither Ofek et al. nor Evans et al. purport to establish thresholds based on average put-call parity deviations to determine whether option markets are efficient."[126] In response to Dr. Mayhew's disagreement with my comparison of average Put-Call Parity deviations with prior studies, I have further examined whether the Put-Call Parity Deviations, *after accounting for transaction costs*, persist during the Class Period.  Accounting for just the cost imposed by the bid-ask spreads,[127] I found that out of 24,272 Put-Call option pairs tested during the Class Period, no arbitrage opportunities exist for 96.4% of the options.  If I were to further assume commission costs of 0.25%, I found that no arbitrage opportunities exist for 99.4% of the options.[128]   Accordingly, the evidence here overwhelmingly indicates the lack of arbitrage opportunities, which provides evidence that the BDX Options traded in an efficient market.

66.     *Second*, Dr. Mayhew contends that my "analysis of put-call parity deviations only presents the *average* put-call parity deviation across the days and BDX options series that [I analyze]" and that the average can potentially obscure significant Put-Call Parity deviations of individual option pairs such that my "analysis is uninformative about whether the market for *each* Relevant BDX Option series was efficient during the Putative Class Period."[129]  To address Dr. Mayhew's criticism and illustrate the lack of arbitrage opportunities across all BDX Option series, I present both the average Put-Call Parity deviations by individual option pairs for all BDX Options (**Exhibit 4A**) and Mayhew's Relevant BDX Options (**Exhibit 4B**) and the average profit opportunities (if any) after accounting for transaction costs by individual option pairs for all BDX Options (**Exhibit 5A**) and Mayhew's Relevant BDX Options (**Exhibit 5B**).  While Dr. Mayhew posits that the average obscures potentially wide deviations in Put-Call Parity violations, the results overwhelming indicate the lack of arbitrage opportunities on the BDX Options and Mayhew's Relevant BDX Options, undermining Dr. Mayhew's critique.[130]

67.     *Third*, Dr. Mayhew contends that my Put-Call Parity approach is methodologically unsound because I use "a put-call parity equality that applies to European-style options" but not "American-style options" and that "using the European equality to analyze market efficiency of American-style options may lead to incorrect conclusions."[131]  Dr. Mayhew's critique is unwarranted.  While Put-Call Parity defines the

---

[126]   Mayhew Report, ¶ 32.

[127]   I assume that stock and option prices are purchased at the ask and sold at the bid.

[128]   Assuming commission costs of 0.50%, 0.75%, and 1.00% of the underlying stock price, no arbitrage opportunities exist for 99.8%, 99.9%, and 100% of the options.

[129]   Mayhew Report, ¶ 33.

[130]   There are only a small number of option series with arbitrage opportunities based on the average profit (loss) with average profits between 0.1% and 0.5%.  These profits fall well within the reasonable range of commission costs.

[131]   Mayhew Report, ¶ 34.  Dr. Mayhew acknowledges that both Ofek et al. and Evans et al. applied put-call parity to American-style options.  However, he reasons that it may be suitable for their purposes (to analyze the impact of short-selling constraints) but



relationship of European options, it can nevertheless be used to establish a lower bound for the synthetic value of the underlying security.[132]  American-style options are *more* valuable than European-style options and the difference between the underlying stock price and synthetic stock price can be attributed to the early exercise premium ("EEP").[133]  Dr. Mayhew also fails to acknowledge that by applying the Put-Call Parity relationship to American-style options, one would expect to observe violations of Put-Call Parity which, in reality, do not reflect arbitrage opportunities but the value of the EEP.[134,135]  Nevertheless, by measuring the correlation between the *change* (or return) in the underlying stock price and the *change* (or return) in the synthetic stock prices, which I have done here, the EEP is no longer relevant.[136]

68.    In sum, none of Dr. Mayhew's critiques of my methodology in examining Put-Call Parity deviations impact my conclusions regarding Put-Call Parity in BDX Options or alter in any way my opinion that the market for BDX Options was efficient.

### III.    Dr. Mayhew Mischaracterizes the Mason Deposition

69.    Dr. Mayhew claims based on his review of the Mason Report and the Mason Deposition that I have mischaracterized "basic facts about option markets, including trading and risk management."[137]  In critiquing my discussion of options, however, Dr. Mayhew mischaracterizes my deposition testimony by ignoring the substance of the answers I gave in response to the questions I was asked.

70.    *First*, in the Mason Deposition, I was asked whether options "have different bid ask spreads than the stock."[138]  Dr. Mayhew claims that my statement in response to that question clarifying that "there aren't dealers that will hold an *inventory* of options or market makers *in the same way* that you have a stock because the market is so fluid that those things aren't necessary" is incorrect.[139]  Dr. Mayhew responds,

---

that it would not be "methodologically sound" to analyze whether the BDX Options traded in an efficient market.  I disagree with the distinction he is drawing.

132    *See* John C. Hull, Options, Futures, and Other Derivatives (9th ed. 2014), p. 250.

133    *See, e.g.*, Eli Ofek, et al., "Limited Arbitrage and Short Sale Restrictions: Evidence from the Options Markets," Vol 74, *Journal of Financial Economics*, 2004.  S = PV(K) + C – P + EEP, where EEP is the early exercise premium on the American put option, assuming no dividends.

134    *See, e.g.*, Avraham Kamara et al., "Daily and Intraday Tests of European Put-Call Parity," *Journal of Financial and Quantitative Analysis*, Volume 30, No. 4, 1995, 519-539, p. 519 ("Existing empirical studies of the put-call parity condition report frequent, substantial violations.  An important problem in interpreting these results is that these studies all investigate American options.  While some of these studies attempt to reduce the effects of possible early exercise on their tests, they cannot fully account for the effect of early exercise.  Therefore, it is not possible to conclude from these studies whether, or to what extent, observed put-call parity violations are due to market inefficiency or due to the value of early exercise.  We avoid the early exercise problem by testing put-call parity using European options.  We find violations that are much less frequent and smaller than the studies using American options. Moreover, these violations reflect premia for liquidity (immediacy) risk.")

135    To the extent there are Put-Call Parity deviations, such a finding, on its own, is not indicative of an inefficient market but rather is the result of limitations in testing American-style options.  Dr. Mayhew's assertion that such an analysis is methodologically unsound appears to be an attempt to create a strawman argument by arguing that (1) testing for the absence of arbitrage opportunities, for example, based on an analysis of put-call parity is a necessary (but insufficient) condition and (2) one cannot test for the absence of arbitrage opportunities based on analyzing put-call parity simply because BDX Options are American-style options.

136    This assumes that the EEP does not materially change based on the one-day return.

137    Mayhew Report, ¶ 35.

138    Mason Dep. Tr. at 57:21-22.

139    Mason Dep. Tr. at 58:6-10.  Emphasis added.



inappositely, that "[m]arket makers are present and regularly facilitate trading in option markets."[140]  But I did not claim that there are no market makers for the option markets.  It is correct that market makers are present in option markets and regularly facilitate trading in option markets.  Market makers, however, are not constrained by the inventory of any one particular option series and can utilize the multitude of available options series to hedge their risk.  This is different than in stock markets.[141]

71.    *Second*, Dr. Mayhew claims that my statement in response to the same question that "[t]here's not really a concept of bid-ask spread for options" is incorrect.[142]  Dr. Mayhew states that "[m]arket makers facilitate trading in option markets by quoting bid prices (prices at which market makers are willing to buy) and ask prices (prices at which market makers are willing to sell)."[143]  Once again, Dr. Mayhew mischaracterizes my deposition testimony.  I was asked to equate bid-ask spreads in stock and option markets.  It is apparent that bid-ask spreads for options exist.  In fact, I have relied on bid and ask quotations for my Put-Call Parity analysis in the Mason Report.[144]  I do not dispute Dr. Mayhew's claim that bid-ask spreads exist in the option markets.

72.    *Third*, Dr. Mayhew claims that I have mischaracterized the basic risk profile of call and put options.  Ironically, the answer Dr. Mayhew takes issue with is in response to a question that clarifies my stance on his two points above.  In the Mason Deposition, I was asked the following question and provided the following answer:

> Q. You mentioned that bid-ask spread is not the kind of concept when it comes to the operations market since you don't have market makers in the same way that you have in the stock market because the market is so fluid.  So the options market is more fluid than the stock market, and then you don't have a need for a bid-ask spread the same way. Is that correct? A. Right.[145]

In explaining the fluidity of the stock versus option markets, I noted further:

> A. So if you have a call option, say, in a particular maturity in strike, you don't need to sell that call option to someone else like you do a stock.  You can enter into a put option with the same maturity and strike so that the combination of the call and the put provides you a neutral exposure. They cancel one another out. So we don't need a market maker to be in the middle here to -- they can buy the call option from you and then sell it to someone else.  The market just works a little bit differently because it is, one might say, more flexible than the market for the stocks themselves.[146]

---

[140]   Mayhew Report, ¶ 36.

[141]   Market makers for options, moreover, can maintain a delta-neutral position by entering into various different option series to hedge their risk.  As discussed earlier, the number of available put and call options during the Class Period exceed 900 with various strike prices and maturities.  As such, the option market is more fluid due to the breadth of available option series available for hedging inventory risk.  It is in that sense that the market making activity in option markets differs even further from that in stock markets.

[142]   Mayhew Report, ¶ 37.

[143]   Mayhew Report, ¶ 37.

[144]   Mason Report, ¶ 97 ("I use the average of the daily best bid and best ask quotes provided by CBOE to estimate the prices of the BDX Options, and the underlying BDX Stock prices provided by CBOE.")

[145]   Mason Dep. Tr. at 58:20-59:3. *See also*, Mason Dep. Tr. 104:25-105:8 (discussing the operation of arbitragers).

[146]   Mason Dep. Tr. at 59:10-22. *See also*, Mason Dep. Tr. 104:25-105:8 (discussing the operation of arbitragers).



73.    My discussion of hedging exposure relates to the fluidity of the option markets in hedging risks.[147] The holder of a call option that previously expected the stock price to rise, for example, can obtain an offsetting position in the event their expectations change in response to the stock price going down by purchasing a put option. This is otherwise known as a straddle, wherein the investor is only out the cost of the call and the put but gains if the price goes up or down.[148] The straddle need not necessarily have the same strike price or same expiration for both the call and put options. The point I was making, however, is that the investor need not sell the call (although they could do that), a point with which Dr. Mayhew apparently does not disagree.[149] I made the same point when asked, "[h]ow do low trading volumes affect the operation of arbitragers and inform traders in the options market?," to which I responded "They don't. I described earlier that your trading is taking place a little bit differently than stock markets in order to increase efficiency. *You don't need someone to buy your call option from you if you want to remove your call option exposure.*"[150]

## IV.    Defendants' Criticisms of My Damages Methodology for the BDX Options Are Unfounded

74.    As an initial matter, Dr. Mayhew has not opined in his report and did not contest during his deposition that options damages cannot be estimated on a class-wide basis, nor does he suggest that the trading volumes or bid-ask spreads for options have any impact on the ability to estimate damages. Dr. Mayhew also agrees that an option-pricing model can be implemented to estimate damages and only suggests that there may be "numerous complexities that one would have to address in how to implement that model for it to be reliable."[151]

75.    I understand that the Defendants' Opposition to Class Certification, contends that my damages methodology is deficient because it purportedly "fails to consider, let alone account for, the prices that BD option traders **actually paid or received** for their options."[152] Defendants also assert that "[i]t is simply not possible to calculate damages incurred by securityholders without knowing what they paid (or received) for

---

[147]   One can enter into offsetting options positions that can either hedge or eliminate (*i.e.*, cancel) certain risks (*e.g.*, directional movements in the stock price or movements in volatility).

[148]   *See, e.g.,* John C. Hull, Options, Futures, and Other Derivatives (9th ed. 2014), p. 267.

[149]   For instance, an investor can change its risk exposure with various hedging procedures such as delta-hedging. *See e.g.,* John C. Hull, Options, Futures, and Other Derivatives (9th ed. 2014), pp. 404-405.

[150]   Mason Dep. Tr. 104:25-105:8. Emphasis added.

[151]   Mayhew Dep. Tr. 90:14:91:13 ("Q. Yeah. Assume that as plaintiffs allege, that the stock price was inflated during the Class Period and that inflation was removed with the corrective disclosure. Can you use an options pricing model to estimate the amount of inflation in the price of the options during the Class Period? A. So let me preface my answer by saying that this question was not part of my assignment and I haven't thought about it specifically in the context of this case. And damages estimation generally was not part of my assignment in this case. I have not given a lot of thought in this case or generally about the best way or the optimal way to try to estimate damages for options. I have no reason to doubt that an option model might be part of that. But I think that there would be numerous complexities that one would have to address in how to implement that model for it to be reliable.") Emphasis added.

[152]   Defendants' Opposition to Class Certification, p. 18. Emphasis in original. Defendants' motion also contends that Plaintiff provides no support that an "out-of-pocket" damages approach is the appropriate means of calculating damages to option traders based on existing case law. While I am not an attorney, it is my opinion that the concept of damages based on the difference between the amount of inflation at the time of purchase (or sale) and the amount of inflation at the time of sale (or purchase) for the call (or put) option is economically sound.

---

**bva**group®                                     Page 26 of 27

the securities," citing to *WM High Yield Fund v. O'Hanlon*, in claiming that to properly "perform [the out-of-pocket] calculation of damages, 'that portion of the price decline or price difference which is unrelated to the alleged wrong' **must be identified** and removed from the price at which the stock sold."[153]

76.    Contrary to Defendants' contentions, my damages methodology *directly* measures the impact of the alleged wrongdoing and *excludes* any portion of the price decline or price difference that is unrelated to this alleged wrongdoing (*e.g.*, bid-ask spreads).  The actual option prices paid (or premium received) and their associated actual realized losses reflect additional transactional costs (*e.g.*, bid-ask spreads) that are unrelated to the alleged fraud.  As a result, the damages methodology and inflation calculation for BDX Options are agnostic to the level of trading volume or bid-ask spreads, and can be implemented for any BDX Option series taking into account the characteristics of each option series (*e.g.*, varying strike prices and expirations).  The damages methodology I proposed, *directly* measures the impact on the option price (irrespective of the level of trading volume or bid-ask spread) of the alleged fraud due to the amount of inflation in the underlying share price.[154]  This out-of-pocket damages methodology for options is consistent with the out-of-pocket damages methodology for stocks, which examines the difference between the amount of inflation at the time of purchase and the amount of inflation at the time of sale.[155]

77.    My analysis is ongoing and I reserve the right to supplement my opinions as additional information is made available to me.

_____
Joseph R. Mason, PhD

---

[153]   Defendants' Opposition to Class Certification, p. 18.  Emphasis in original.

[154]   As discussed earlier, to the extent that the lower share price imputes a different implied volatility, the but-for volatility can nevertheless be imputed from available option series such that any incremental impact (positive or negative) can be directly estimated from the options pricing model.

[155]   As discussed in the Mason Report, I understand that there may be other statutory limitations on damages based on the PSLRA that take into account the actual purchase or sale prices, and which can also be applied.  Mason Report, ¶ 107.



**Reply Appendix A**



**JOSEPH R. MASON** PhD

*Senior Advisor*

Dr. Joseph Mason is a Professor at Louisiana State University and Fellow at the University of Pennsylvania's Wharton School of Business.

He has more than 25 years of experience advising corporations, government agencies, and research institutions on financial risk management issues, reviewing corporate risk management systems and internal models and working on contemporary finance and valuation issues.

Dr. Mason is frequently retained as an expert in disputes and investigations involving financial markets, valuation, and macroeconomic dynamics, particularly with respect to securities analysis involving equities, debt instruments, derivative instruments (including options, futures, swaps, and associated underlying price dynamics), and a variety of structured financial products.  Dr. Mason has been deposed more than fifty times and has testified at trials and hearings in the United States District Court in the Southern District of New York, the District of Connecticut, and others.

Dr. Mason has testified on economic causation, valuation, market efficiency, and damages in the areas of antitrust, PSLRA and Rule 10(b)-5, Section 11, class action, and breach of contract (*i.e.*, suitability, standard of care, financial guarantees and representations and warranties).  He has testified in several high-profile federal court cases, such as Assured Guaranty v. Flagstar Bank, In re Blue Cross Blue Shield Antitrust Litigation, and Law Debenture Trust Company v. WMC Mortgage.

In regulatory matters, Dr. Mason has been engaged by both the SEC and respondents in a variety of SEC investigations and lawsuits, including those relating to marking to market, algorithmic trading, and insider trading.  Dr. Mason has opined in connection with banks' risk management systems, their use and classification of structured finance arrangements, and economic capital assessments.  He has also been engaged as a principal in a variety of risk management and modeling reviews by institutions such as Fannie Mae, Credit Agricole CIB/Calyon, and ExxonMobil, among other firms.

With regard to public policy, Dr. Mason has testified on financial risk management and financial markets before numerous House and Senate Committees (approximately twenty times), the European Parliament, and the Federal Reserve Board. He has also advised Congress' Joint Economic Committee, the Government Accountability Office, the Congressional Research Service, the Federal Reserve Bank of Richmond, the Public Company Accounting Oversight Board, and the Financial Crisis Inquiry Commission.  At the request of the European Parliament Committee on Economic and Monetary Affairs, he co-authored the study, "Financial Supervision and Regulation in the US: Dodd-Frank Reform" (December 2018).  Prior to that study, Dr. Mason authored the "Overview and Structure of Financial Supervision and Regulation in the U.S." (September 2015) for that same committee.

Dr. Mason applies formal economic reasoning to issues involving litigation, risk management, and restructuring.  His formal economic training and experience is reflected in published academic articles and in his consultations on issues such as the economic dynamics of liquidations and recoveries, the economics of loss causation, and in valuation and risk management in the presence of imperfect information.  Not only is Dr. Mason an expert in finance, but also in regard to financial crises and the macroeconomic dynamics of losses and recoveries.

Dr. Mason was previously a Senior Financial Economist at the Office of the Comptroller of the Currency, where, among other things, he analyzed bank risks to support examination assignments and regulatory policy.  He has performed similar work for the Federal Reserve Bank of Philadelphia, the Federal Deposit Insurance Corporation, and the World Bank.

Dr. Mason holds a Doctor of Philosophy in financial economics and monetary theory, as well as Master of Science in economics from the University of Illinois at Urbana-Champaign and a Bachelor of Science in economics from Arizona State University.

**Direct** *+1.212.364.1926*
**Mobile** *+1.610.805.9083*
**Email** *jmason@bvagroup.com*



**JOSEPH R. MASON,** PhD

*Senior Advisor*

## TESTIMONY AND PUBLICATIONS

**DEPOSITION TESTIMONY:**

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*Industriens Pensionsforsikring A/S, Individually and On Behalf of All Others Similarly Situated v. Becton, Dickinson and Company, Vincent A. Forlenza, Thomas E. Polen, and Christopher R. Reidy*
No. 2:20-cv-02155-SRC-CLW
United States District Court, District of New Jersey

*Deutsche Bank National Trust Company, solely In its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 v. Morgan Stanley ABS Capital I Inc.*
No. 650291/2013
Supreme Court of the State of New York, County of New York

*Deutsche Bank National Trust Company, solely In its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.*
No. 651959/2013
Supreme Court of the State of New York, County of New York

*Sjunde AP-Fonden, individually and on Behalf of All Others Similarly Situated v. The Goldman Sachs Group, Inc., et al.*
No. 1:18-cv-12084-VSB
United States District Court, Southern District of New York

*Commerzbank AG v. U.S. Bank National Association*
No. 16-cv-04569-DLC-SDA
United States District Court, Southern District of New York

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*Phoenix Light SF Limited, et al. v. HSBC Bank USA, National Association*
No. 14-cv-10101-LGS-SN
United States District Court, Southern District of New York

*In re Acuity Brands, Inc. Securities Litigation*
No. 18-cv-02140-MHC
United States District Court, Northern District of Georgia, Atlanta Division

*SEB Investment Management AB, Individually and on Behalf of All Others Similarly Situated v. ENDO International PLC, et al.*
No. 17-cv-03711-TJS
United States District Court, Eastern District of Pennsylvania

*Atlantica Holdings, Inc., et al. v. BTA Bank JSC*
No. 13-cv-05790-JMF
United States District Court, Southern District of New York

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**



**JOSEPH R. MASON,** PhD

*Senior Advisor*

*Atlantica Holdings, Inc., et al. v. Sovereign Wealth Fund "Samruk- Kazyna," JSC*
No. 12-cv-08852-JMF
United States District Court, Southern District of New York

*Homeward Residential, Inc., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-2, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-2 Certificates v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation*
No. 12-cv-05067-JFK-JLC
United States District Court, Southern District of New York

*Homeward Residential, Inc., solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2006-3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-3 Certificates v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation*
No. 12-cv-07319-JFK-JLC
United States District Court, Southern District of New York

*Phoenix Light SF Limited, et al. v. The Bank of New York Mellon*
No. 14-cv-10104-VEC
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Amir Waldman*
No. 17-cv-02088-RMB
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Lawrence F. Cluff, Jr. and Roger E. Shaoul*
No. 17-cv-02460-RMB
United States District Court, Southern District of New York

*Nora Fernandez, et al. v. UBS Financial Services of Puerto Rico, et al.*
No. 15-cv-02859-SHS
United States District Court, Southern District of New York

*Vesta Halay Johnston and Lake Charles Rubber and Gasket Co. L.L.C. v. Susan Halay Vincent, Martin Bryan Vincent, Moby Goodwin, and Gulf Coast Rubber & Gasket, L.L.C*
No. 2015-4153-G
14th Judicial District Court, Calcasieu Parish, Louisiana

*Trust Instruction Proceeding regarding Deutsche Bank National Trust Co., solely as Trustee of Securitized Asset Backed Receivables LLC Trust 2007- BR2 (SABR 2007-BR2) and Securitized Asset Backed Receivables LLC Trust 2007-BR3 (SABR 2007- BR3 v. WMC Mortgage, LLC)*
No. 651789/2013
Supreme Court of the State of New York, County of New York

*Deutsche Bank National Trust Co., solely in its capacity as Trustee for the Morgan Stanley Structured Trust I 2007-1 v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc.*
No. 14-cv-03020-LTS
United States District Court, Southern District of New York

*The Bank of New York Mellon solely as Securities Administrator for the J.P. Morgan Mortgage Acquisition Trust, Series 2006-WMC4 v. WMC Mortgage. LLC, et al.*
No. 654464/2012
Supreme Court of the State of New York, County of New York

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**



**JOSEPH R. MASON,** PhD

*Senior Advisor*

*TMI Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 v. WMC Mortgage LLC, f/k/a WMC Mortgage Corp.*
No. 12-cv-01538-CSH
United States District Court, District of Connecticut

**TRIAL AND HEARING TESTIMONY:**

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*In re Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406)*
No. 13-cv-20000-RDP
United States District Court, Northern District of Alabama, Southern Division

*Vesta Halay Johnston and Lake Charles Rubber and Gasket Co. L.L.C. v. Susan Halay Vincent, Martin Bryan Vincent, Moby Goodwin, and Gulf Coast Rubber & Gasket, L.L.C*
No. 2015-4153-G
14th Judicial District Court, Calcasieu Parish, Louisiana

*United States of America v. Tinghui Xie, also known as Kelly Xie, also known as Kelly Liu, et al.*
No. 17-92-JWD-EWD
United States District Court, Middle District of Louisiana

*Securities and Exchange Commission v. Amir Waldman*
No. 17-cv-02088-RMB
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Lawrence F. Cluff, Jr. and Roger E. Shaoul*
No. 17-cv-02460-RMB
United States District Court, Southern District of New York

*TMI Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 v. WMC Mortgage LLC, f/k/a WMC Mortgage Corp.*
No. 12-cv-01538-CSH
United States District Court, District of Connecticut

**LEGISLATIVE AND REGULATORY TESTIMONY, BRIEFS, AND PRESENTATIONS:**

*Presentation to U.S. Securities & Exchange Commission Staff*
Confidential matter relating to whether and how a global asset management company applied algorithmic trading tools, models, and methods to emerging market debt portfolio management.
Washington, D.C.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Financial Economists in support of Respondents, on *Writ of Certiorari to the United States Court of Appeals for the Second Circuit, in the Supreme Court of the United States*, Goldman Sachs Group, Inc., et al., Petitioners, v. Arkansas Teacher Retirement System, et al., Respondents, March 3, 2021.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Economics and Finance Professors, in support of *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Defendant's Cross Motion-Motion for Summary Judgment*,

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**



**JOSEPH R. MASON,** PhD

**Reply Appendix A**

*Senior Advisor*

People of the State of California, et al., Plaintiffs, v. The Office of the Comptroller of the Currency, et al., Defendants, United States District Court, Northern District of California (Oakland), January 21, 2021.

*Testimony before the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Energy and Mineral Resources,* "Climate Change: Preparing for the Energy Transition," February 12, 2019.

Co-Author (with Jeffrey D. Balcombe and W. Scott Dalrymple), "Financial Supervision and Regulation in the US: Dodd-Frank Reform," *European Parliament*, December 2018.

*Testimony before the U.S. Senate Committee on Energy and Natural Resources,* "Hearing on the Bureau of Ocean Energy Management's 2017-2022 OCS Oil and Gas Leasing Program," May 19, 2016.

*Testimony before the U.S. House of Representatives Committee on Natural Resources,* "The Impacts of Federal Policies on Energy Production and Economic Growth in the Gulf," September 15, 2015.

"Overview and Structure of Financial Supervision and Regulation in the U.S.," Prepared for the European Parliament's Committee on Economic and Monetary Affairs, Directorate General for Internal Policies, Policy Department A: Economic and Scientific Policy, IP/A/ECON/2012-16, PE 492.470, September 2015.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee, Minority Field Hearing,* "The EPA's Threat to Louisiana's Ozone Attainment," August 5, 2014.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee,* "Climate Change: The Need to Act Now," June 18, 2014.

*Testimony before the U.S. House of Representatives Committee on Natural Resources*, "One Year after President Obama's Gulf of Mexico 6-Month Moratorium Officially Lifted: Examining the Lingering Impacts on Jobs, Energy Production and Local Economies," October 12, 2011.

**ACADEMIC PUBLICATIONS:**

"Odd Lot Illusion: The Lack of Discounts for Non-Agency Residential Mortgage Backed Securities after the Crisis," (with Jody W. Bland and W. Scott Dalrymple), *Securities Regulation Law Journal*, Spring 2023.

"ETF ownership and firm-specific information in corporate bond returns," (with Meredith E. Rhodes), *Journal of Financial Markets*, Vol. 63, March 2023.

"Asset Sales, Recourse, and Investor Reactions to Initial Securitizations: Evidence Why Off-Balance Sheet Accounting Treatment Does Not Remove On-Balance Sheet Financial Risk," (with Eric J. Higgins and Adi Mordel), *Journal of Risk Finance*, Vol. 20, Issue 3, August 12, 2019.

"Self-reporting under SEC Reg AB and transparency in securitization: evidence from loan-level disclosure of risk factors in RMBS deals," (with Michael Imerman and Hong Lee), *Journal of Risk Finance*, Vol. 15, Issue 4, August 18, 2014.

"The Effects of Reconstruction Finance Corporation Assistance on Michigan Banks' Survival in the 1930s," (with Charles Calomiris and Marc Weidenmier), *Explorations in Economic History*, Vol. 50, Issue 4, October 2013.

"Options-based Structural Model Estimation of Bond Recovery Rates," (with Robert R. Cangemi, Jr. and Michael S. Pagano), *Journal of Financial Intermediation*, Vol. 21, Issue 3, July 2012.

"'Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener), *Oxford Journal of Economic Policy*, October 2010.

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**



**JOSEPH R. MASON,** PhD
*Senior Advisor*

**BOOK CHAPTERS:**

"Financial Regulation and Fraud in CO2 Markets," *Research Handbook of Investing in the Triple Bottom Line*, Sabri Boubaker, Douglas Cummings and Doc Nguyen, eds., Cheltenham: Edward Elgar, 2018, pp. 9-28.

"Contagion and Bank Failures during the Great Depression: The Chicago Banking Panic of June 1932," (with Charles Calomiris). American Economic Review, December 1997 (87:5), pp. 863-884. Reprinted in The International Library of Critical Writings in Economics –*Regulation and Governance of Financial Institutions*, edited by James R. Barth and Ross Levine, Cheltenham: Edward Elgar Publishers, 2016.

"Fundamentals, Panics and Bank Distress during the Depression," (with Charles Calomiris), *American Economic Review,* December 2003 (93:5), pp. 1615-1647.  Reprinted in the International Library of Critical Writings in Economics – *Regulation* and *Governance of Financial Institutions*, James R. Barth and Ross Levine, eds., Cheltenham: Edward Elgar Publishers, 2016.  Also reprinted in The International Library of Critical Writings in Economics – Financial Crises. Franklin Allen, ed., Cheltenham: Edward Elgar Publishers, 2008.

"'Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener). *The Great Depression of the 1930s*, Peter Fearon and Nicholas Crafts, eds. Oxford University Press 2013, pp. 395-428.

**COMMENTS, OPINIONS, EDITORIALS:**

"COVID-19 Recovery and Commercial Real Estate Dynamics," (with Jody Bland), *BVA Group*, April 17, 2020.

"Evaluating Economic Losses in the Age of Coronavirus," (with Jody Bland), *BVA Group*, April 16, 2020.

"PPP Loan Policy and Lenders' Litigation Risk," (with Jody Bland), *BVA Group*, April 6, 2020.

"COVID-19 as a Natural Disaster and the Role of CARES," (with Jody Bland), *BVA Group*, April 2, 2020.

"Consumer Debt Defaults and the COVID-19 Pandemic," (with Jody Bland), *BVA Group*, March 27, 2020.

"Investing in a Consumer Debt Holiday," (with Jody Bland), *BVA Group*, March 25, 2020.

"COVID-19 Economic Policy to Fight the New War, " (with Jody Bland), *BVA Group*, March 24, 2020.

"Mortgage Payment Holidays, Servicing Advances, and Fed Policy," (with Jody Bland) *BVA Group*, March 23, 2020.

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**

## Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.
## Reply Appendix B - Additional Information Considered

**Court Documents:**
   (1) Defendants' Opposition to Lead Plaintiff's Motion forto Class Certification, May 3, 2023
   (2) Fourth Amended Class Action Complaint, June 22, 2023

**Expert Reports:**
   (1) Expert Report of Joseph R. Mason, Ph.D., January 17, 2023
   (2) Expert Rebuttal Report of Stewart Mayhew, Ph.D., May 3, 2023

**Depositions:**
   (1) Deposition Transcript of Joseph R. Mason, Ph.D., April 4, 2023
   (2) Deposition Transcript of Stewart Mayhew, Ph.D., May 31, 2023

**Articles and Books:**
   (1) Fisher Black, "Fact and Fantasy in the Use of Options," *Financial Analysts Journal*, Volume 31, No. 4, 1975
   (2) Robert Jennings, et al., "Earnings Announcements, Stock Price Adjustment, and the Existence of Option Markets," *Journal of Finance*, Volume 41, No. 1, 1986
   (3) Mary Nisbet, "Put-call parity theory and an empirical test of the efficiency of the London Traded Options Market," *Journal of Banking & Finance*, Volume 16, Issue 2, 1992
   (4) Stephen Figlewski et al., "Options, Short Sales, and Market Completeness," *Journal of Finance*, Volume 48, No. 2, 1993
   (5) Avraham Kamara, et al., "Daily and Intraday Tests of European Put-Call Parity," *Journal of Financial and Quantitative Analysis*, Volume 30, No. 4, 1995
   (6) Raman Kumar, et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance*, Volume 53, No. 2, 1998
   (7) Urbi Garay, et al., "Tests of the Put-Call Parity Relation Using Options on Futures on the S&P 500 Index," *Trading & Regulation*, Volume 9, No. 3, 2003
   (8) Sugato Chakravarty, et al., "Informed Trading in Stock and Option Markets," *Journal of Finance*, Volume 59, No. 3, 2004
   (9) Marianna Brunetti, et al., "Put-call parity and cross-markets efficiency in the index options markets: evidence from the Italian market," *International Review of Financial Analysis*, Volume 14, Issue 5, 2005
   (10) James S. Doran, et al. "Option Market Efficiency and Analyst Recommendations," *Journal of Business Finance & Accounting*, Volume 37, No. 5, 2010
   (11) Dominik M. Rösch, et al., "The Dynamics of Market Efficiency," *The Review of Financial Studies*, Volume 30, No. 4, 2017
   (12) Torben Andersen, et al., "A Descriptive Study of High-Frequency Trade and Quote Option Data," *Journal of Financial Econometrics*, Volume 19, No. 1, 2021

**Case Law and Related Documents:**
   (1) *In re Xcelera.com Securities Litigation*, 430 F.3d 5-3 (1st Cir. 2005)
   (2) *In re Enron Corp. Securities Litigation*, 529 F. Supp. 2d 644 (S.D. Tex. 2006)
   (3) *In re Scientific-Atlanta Inc. Securities Litigation*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007)
   (4) *In Rougier v. Applied Optoelectronics Inc.*, 2019 WL 6111303 (S.D. Tex. 2019)

**Other:**
   (1) CBOE Option Quotes, available at https://datashop.cboe.com/option-quote-intervals



**Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.**

**Exhibit 1**

**Summary Statistics for BDX Options**

### Mayhew Relevant BDX Option Statistics (1)

| | Call Options | Put Options | All Options |
|---|---|---|---|
| Number of Relevant BDX Options | 140 | 155 | 295 |
| Unique Strike Price-Expiration Combinations | | | 208 |
| | | | |
| Number of Unique Strike Prices | 37 | 41 | 51 |
| Option Strike Price Range | $180 - $400 | $125 - $320 | $125 - $400 |
| BDX Stock Price Range | | | $242.36 - $285.99 |
| | | | |
| Number of Unique Expiration Dates | 11 | 11 | 11 |
| Option Expiration Date Range | 2/7/20 - 1/21/22 | 2/7/20 - 1/21/22 | 2/7/20 - 1/21/22 |

### All BDX Option Statistics (2)

| | Call Options | Put Options | All Options |
|---|---|---|---|
| Number of Relevant BDX Options | 919 | 919 | 1838 |
| Unique Strike Price-Expiration Combinations | | | 919 |
| | | | |
| Number of Unique Strike Prices | 74 | 74 | 74 |
| Option Strike Price Range | $115 - $420 | $115 - $420 | $115 - $420 |
| BDX Stock Price Range | | | $242.36 - $285.99 |
| | | | |
| Number of Unique Expiration Dates | 23 | 23 | 23 |
| Option Expiration Date Range | 11/8/19 - 1/21/22 | 11/8/19 - 1/21/22 | 11/8/19 - 1/21/22 |

**Notes:**

(1) Mayhew Report, Exhibit 1.

(2) Includes all BDX Options available during the Class Period, irrespective of trading volume and expiration.

 bvagroup®

**Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.**
**Exhibit 2**
**Summary of All BDX Option Series and Mayhew Relevant BDX Option Series During the Class Period (1)**

| Strike Price | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ← Expiration Prior to February 6, 2020 → | | | | | | | | | ← Expiration On or After February 6, 2020 → | | | | | | | | | |
| 115.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 120.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 125.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 |
| 130.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 |
| 135.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 1 | 0 |
| 140.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | . | 1 | 1 |
| 145.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | . | 0 | 0 |
| 150.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | 0 | 1 | 1 |
| 155.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | 0 | 0 | 0 |
| 160.0 | . | . | . | . | . | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | 1 | 1 | 1 |
| 165.0 | . | . | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | . | . | . | . | . | 0 | 0 | 1 | 0 |
| 170.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | . | . | . | . | . | 1 | 1 | 1 | 0 |
| 175.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | . | 1 | 1 | 1 | 1 |
| 180.0 | . | 0 | 0 | . | . | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | . | 0 | 1 | 0 | 1 |
| 185.0 | . | 0 | 0 | 0 | 0 | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | . | 0 | 1 | 0 | 1 |
| 190.0 | . | 0 | 0 | 0 | 0 | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | . | 1 | 1 | 0 | 1 |
| 195.0 | . | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | . | 1 | 1 | 0 | 1 |
| 200.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | . | 1 | 1 | 0 | 1 |
| 205.0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 210.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | 0 | . | . | . | . | 1 | 1 | 1 | 0 |
| 215.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 217.5 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . |
| 220.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | 0 | . | . | . | . | 1 | 1 | 1 | 1 |
| 222.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . |
| 225.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . |
| 227.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . |
| 230.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | 1 | 1 | . | . | . | 1 | 1 | 1 | 1 |
| 232.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . |
| 235.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | . | . | . | . | . | . |
| 237.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . | . |
| 240.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | . | 1 | 1 | 1 | 1 | 1 |
| 242.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | . | . |
| 245.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | . | . | . | . | . | . |
| 247.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | 0 | 0 | 0 | . | . | . | . | . |
| 250.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | . |
| 252.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | . | . | . | . | . |
| 255.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . |
| 257.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | . | . | . | . | . |
| 260.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | . | . |
| 262.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . | . |
| 265.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 1 | . | . | . | . | . |
| 267.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | . | . | . | . | . |
| 270.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | . |
| 272.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . |
| 275.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . |
| 277.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | . | . | . | . | . |
| 280.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | . |
| 282.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . |
| 285.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . |
| 287.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | . |
| 290.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | . | 1 | 1 | 1 | 1 | . |
| 292.5 | 0 | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | . | . | . | . | . |
| 295.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | . | . | . | . | . |
| 297.5 | 0 | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | . | . | . | . | . |
| 300.0 | . | 0 | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 1 |
| 302.5 | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | . | 0 | 0 | 0 | . | . | . | . | . |
| 305.0 | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | . | . | . | . | . |
| 307.5 | . | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . |
| 310.0 | . | 0 | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 0 |
| 312.5 | . | . | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . |
| 315.0 | . | . | . | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . |
| 317.5 | . | . | . | . | . | . | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . |
| 320.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | 0 | 0 | 0 | 0 | 0 | 0 | . | 0 | 1 | 1 | 1 | 1 |
| 322.5 | . | . | . | . | . | . | . | . | . | . | . | . | 0 | 0 | . | . | . | . | . | . | . | . | . | . |
| 325.0 | . | . | . | . | . | . | . | . | . | . | . | . | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . | . | . | . |
| 330.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | 0 | 1 | 1 | 1 | 0 |
| 340.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | 0 | 1 | 0 | 1 | 1 |
| 350.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | 0 | 0 | 1 | 1 | 0 |
| 360.0 | . | 0 | . | . | . | . | 0 | . | . | . | 0 | . | . | . | . | 0 | . | . | . | 0 | 0 | 0 | 0 | 0 |
| 370.0 | . | 0 | . | . | . | . | . | . | . | . | 0 | . | . | . | . | 0 | . | . | . | 0 | 0 | 0 | 0 | 1 |
| 380.0 | . | 0 | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | . | . | . | . | 0 | 0 | 0 | 1 |
| 390.0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | . | . | . | . | . | 0 | 1 | 1 |
| 400.0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 | . | 1 |
| 410.0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 |
| 420.0 | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | . | 0 |

**Note:**
(1) 1 denotes an option Dr. Mayhew deemed to be a "relevant" option, and 0 otherwise.



Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.

**Exhibit 3A**

**Summary of Correlations Between Synthetic Stock Price Movements (Based on Long Call and Short Put Option) and Actual Stock Price Movements by Option Series During the Class Period (1)**

Strike Price — BDX Stock Price Range During CP

Expiration Date

← Expiration Prior to February 6, 2020 →  /  ← Expiration On or After February 6, 2020 →

| Strike | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 115.0 | | | | | | | 99.2% | | | | | | | | | | | | | | | | | |
| 120.0 | | | | | | | 98.9% | | | | | | | | | | | | | | | | | |
| 125.0 | | | | | | | 98.9% | | | | | | | | | | | | | | | | | 99.0% |
| 130.0 | | | | | | | 99.1% | | | | | | | | | | | | | | | | | 98.9% |
| 135.0 | | | | | | | 98.9% | | | | | | | | | | | | | | | | 99.1% | 97.8% |
| 140.0 | | | | | | | 99.1% | | | | | | | | | | | | | | | | 99.3% | 99.0% |
| 145.0 | | | | | | | 99.3% | | | | | | | | | | | | | | | | 99.2% | 97.5% |
| 150.0 | | | | | | | 99.0% | | | | | | | | | | | | | 98.9% | 99.1% | | 99.3% | 97.0% |
| 155.0 | | | | | | | 98.9% | | | | | | | | | | | | | 99.0% | 99.0% | | 99.1% | 97.9% |
| 160.0 | | | | | | | 98.8% | | | | | | | | | | | | | 99.0% | 99.2% | | 99.1% | 98.1% |
| 165.0 | | | | | | | 99.0% | | | | 97.6% | | | | | | | | | 98.8% | 99.2% | | 99.0% | 98.2% |
| 170.0 | | 99.7% | | | | | 98.8% | | | | 97.8% | | | | | | | | | 98.7% | 98.9% | | 98.5% | 97.1% |
| 175.0 | | 99.7% | | | | | 99.1% | | | | 98.5% | | | | | 98.2% | | | | 99.0% | 99.2% | | 98.6% | 98.3% |
| 180.0 | | 99.5% | 98.8% | | | | 99.2% | | | | 98.7% | | | | | 98.4% | | | | 98.8% | 99.2% | 99.4% | 98.4% | 97.6% |
| 185.0 | | 97.8% | 99.1% | 98.3% | 99.5% | | 99.2% | | | | 98.7% | | | | | 98.9% | | | | 98.5% | 98.9% | 99.8% | 99.0% | 97.8% |
| 190.0 | | 98.9% | 98.7% | 98.2% | 99.3% | | 98.8% | | | | 98.9% | | | | | 98.6% | | | | 98.6% | 99.4% | 99.4% | 99.0% | 98.0% |
| 195.0 | | 99.6% | 98.2% | 98.4% | 98.8% | 98.0% | 99.0% | | | | 98.6% | | | | | 99.2% | | | | 98.8% | 99.2% | 99.5% | 98.4% | 98.0% |
| 200.0 | 98.6% | 99.5% | 98.5% | 98.5% | 99.1% | 97.7% | 99.0% | | | | 98.6% | | | | | 98.2% | | | | 99.1% | 98.8% | 98.4% | 98.6% | 97.5% |
| 205.0 | 97.9% | 99.3% | 98.2% | 98.3% | 99.1% | 97.6% | | | | | | | | | | | | | | | | | | |
| 210.0 | 98.2% | 99.7% | 98.3% | 98.9% | 98.7% | 98.4% | 99.3% | 97.6% | 97.6% | 96.3% | 98.9% | | | | | 98.7% | | | | 99.2% | 99.0% | 99.8% | 99.1% | 96.1% |
| 215.0 | 98.7% | 99.6% | 99.3% | 99.3% | 99.3% | 98.5% | 99.1% | 97.3% | 98.1% | 95.0% | | | | | | | | | | | | | | |
| 217.5 | 96.3% | 97.4% | 99.0% | 98.2% | 99.2% | 99.0% | | | | | | | | | | | | | | | | | | |
| 220.0 | 98.5% | 99.6% | 99.5% | 98.7% | 98.6% | 98.0% | 99.1% | 98.8% | 98.1% | 95.1% | 99.2% | 96.5% | 94.3% | | | 98.9% | | | | 98.9% | 99.5% | 99.7% | 99.3% | 97.6% |
| 222.5 | 98.5% | 98.6% | 97.7% | 98.4% | 99.0% | 98.6% | 99.3% | 98.7% | 98.4% | 96.1% | | 96.3% | 96.2% | | | | | | | | | | | |
| 225.0 | 98.0% | 98.4% | 99.0% | 98.9% | 98.5% | 98.7% | 99.1% | 98.9% | 98.2% | 97.1% | | 97.3% | 96.8% | | | | | | | | | | | |
| 227.5 | 96.7% | 99.5% | 99.3% | 99.0% | 98.9% | 99.2% | 99.3% | 98.3% | 99.0% | 98.1% | | 97.4% | 97.1% | | | | | | | | | | | |
| 230.0 | 99.8% | 99.0% | 98.9% | 99.1% | 98.4% | 99.0% | 99.7% | 98.7% | 99.3% | 98.2% | 99.8% | 96.9% | 95.7% | | | 99.1% | 96.5% | | | 99.6% | 99.6% | 99.8% | 99.0% | 96.8% |
| 232.5 | 99.7% | 98.5% | 99.4% | 98.9% | 99.0% | 99.0% | 99.2% | 99.2% | 99.0% | 97.9% | | 97.9% | 96.2% | | | | | | | | | | | |
| 235.0 | 100.0% | 99.8% | 98.8% | 99.0% | 98.7% | 98.9% | 99.0% | 99.0% | 99.2% | 98.9% | 98.7% | 98.1% | 94.2% | 96.4% | 97.0% | 98.9% | 97.7% | 98.9% | | | | | | |
| 237.5 | 99.9% | 99.8% | 99.9% | 99.0% | 98.5% | 99.2% | 98.8% | 99.2% | 99.6% | 98.3% | -100.0% | 96.8% | 95.5% | | | | | | | | | | | |
| 240.0 | 100.0% | 99.8% | 99.5% | 99.2% | 99.3% | 99.5% | 99.7% | 98.9% | 99.6% | 99.1% | 99.7% | 97.0% | 96.8% | 97.1% | 98.5% | 99.5% | 98.7% | 97.9% | | 99.6% | 99.6% | 99.8% | 99.2% | 96.1% |
| 242.5 | 100.0% | 99.8% | 99.9% | 99.9% | 99.5% | 99.1% | 99.3% | 99.6% | 99.7% | 98.7% | -100.0% | 98.8% | 98.3% | 99.7% | | | | | | | | | | |
| 245.0 | 100.0% | 99.9% | 99.9% | 99.6% | 99.1% | 99.8% | 99.6% | 99.4% | 99.6% | 98.9% | 98.5% | 99.4% | 98.3% | 98.3% | 95.7% | 99.3% | 97.7% | 98.8% | | | | | | |
| 247.5 | 100.0% | 100.0% | 99.9% | 99.9% | 99.8% | 99.8% | 99.1% | 99.7% | 99.8% | 99.0% | 98.3% | 98.7% | 98.6% | 97.9% | 95.6% | | 99.9% | 99.7% | 99.9% | | | | | |
| 250.0 | 100.0% | 100.0% | 100.0% | 99.4% | 99.8% | 99.9% | 99.9% | 99.7% | 99.7% | 99.2% | 99.8% | 99.0% | 98.1% | 97.6% | 98.0% | 99.5% | 98.9% | 99.0% | 99.7% | 99.7% | 99.7% | 99.9% | 98.8% | 96.6% |
| 252.5 | 100.0% | 99.7% | 100.0% | 99.3% | 98.9% | 99.2% | 99.8% | 99.1% | 99.6% | 99.0% | 99.3% | 98.7% | 98.6% | 97.8% | 98.4% | 99.9% | 98.5% | 99.2% | 99.9% | | | | | |
| 255.0 | 100.0% | 99.9% | 99.3% | 98.7% | 99.3% | 99.8% | 99.9% | 99.4% | 99.5% | 99.3% | 98.7% | 98.6% | 98.8% | 97.9% | 98.7% | 99.0% | 99.2% | 98.6% | 100.0% | | | | | |
| 257.5 | 99.7% | 99.0% | 98.7% | 98.8% | 99.1% | 99.7% | 99.6% | 99.5% | 99.7% | 99.2% | 97.5% | 99.1% | 98.4% | 99.0% | 98.5% | 99.8% | 98.7% | 98.7% | 99.8% | | | | | |
| 260.0 | 100.0% | 99.8% | 98.7% | 98.8% | 99.5% | 99.8% | 99.8% | 99.6% | 99.4% | 99.5% | 99.8% | 99.0% | 99.4% | 99.4% | 99.2% | 99.7% | 99.7% | 99.8% | 100.0% | 99.7% | 99.8% | 99.3% | 98.4% | 96.1% |
| 262.5 | 99.4% | 99.6% | 98.9% | 98.9% | 99.3% | 99.1% | 99.4% | 98.6% | 99.9% | 99.6% | 99.5% | 99.6% | 98.2% | 99.8% | 99.6% | 100.0% | 99.2% | 99.4% | 100.0% | | | | | |
| 265.0 | 99.4% | 99.5% | 99.3% | 98.7% | 99.1% | 98.0% | 99.9% | 99.3% | 99.5% | 99.7% | 99.4% | 99.6% | 99.2% | 99.0% | 99.8% | 99.9% | 99.3% | 99.3% | 99.8% | | | | | |
| 267.5 | 98.5% | 99.4% | 98.7% | 98.9% | 99.1% | 98.4% | 99.5% | 99.4% | 99.9% | 99.7% | 99.4% | 99.6% | 98.9% | 99.7% | 99.8% | 99.9% | 99.7% | 99.4% | 99.8% | | | | | |
| 270.0 | 98.5% | 99.3% | 98.2% | 98.2% | 99.2% | 98.1% | 99.5% | 99.2% | 99.9% | 99.8% | 99.8% | 99.7% | 99.7% | 99.8% | 99.7% | 99.8% | 99.7% | 99.7% | 99.6% | 99.7% | 99.8% | 99.6% | 98.6% | 97.2% |
| 272.5 | 98.9% | 99.2% | 98.2% | 98.6% | 99.0% | 98.7% | 99.5% | 99.3% | 99.9% | 99.8% | 99.8% | 99.6% | 98.6% | 99.8% | 99.6% | 99.9% | 99.9% | 99.8% | 100.0% | | | | | |
| 275.0 | 99.6% | 99.4% | 98.7% | 98.4% | 98.9% | 98.6% | 99.6% | 99.0% | 99.5% | 99.4% | 99.7% | 98.9% | 99.6% | 99.6% | 99.8% | 99.9% | 99.8% | 99.3% | 99.7% | | | | | |
| 277.5 | 99.8% | 99.0% | 98.2% | 98.2% | 98.8% | 98.1% | 100.0% | 99.8% | 99.5% | 99.3% | 99.8% | 99.3% | 99.1% | 99.8% | 99.9% | 99.9% | 99.8% | 99.7% | 99.9% | | | | | |
| 280.0 | 99.2% | 98.7% | 97.9% | 97.5% | 99.5% | 97.7% | 99.1% | 97.9% | 99.1% | 99.7% | 99.1% | 98.5% | 99.4% | 99.6% | 99.8% | 99.8% | 99.7% | 99.9% | 99.9% | 99.8% | 99.6% | 99.9% | 99.1% | 96.8% |
| 282.5 | 99.7% | 99.7% | 98.7% | 98.4% | 99.2% | 98.7% | 97.1% | 99.8% | 98.7% | 97.7% | 99.9% | 98.9% | 98.7% | 99.5% | 99.5% | 99.9% | 99.7% | 99.7% | 99.9% | | | | | |
| 285.0 | 99.5% | 99.1% | 97.1% | 97.6% | 98.5% | 97.4% | 98.5% | 98.0% | 96.8% | 98.7% | 99.9% | 99.1% | 99.0% | 99.0% | 99.3% | 99.9% | 99.9% | 99.4% | 100.0% | | | | | |
| 287.5 | 99.6% | 99.4% | 98.2% | 98.0% | 98.8% | 97.7% | 99.5% | 99.4% | 98.5% | 99.0% | 96.4% | 97.4% | 99.5% | 99.7% | 99.5% | 99.9% | 99.4% | 99.3% | 99.8% | | | | | |
| 290.0 | 99.7% | 99.2% | 97.3% | 97.6% | 98.8% | 97.6% | 99.1% | 99.1% | 96.2% | 98.9% | 98.8% | 96.6% | 97.2% | 99.3% | 98.6% | 99.9% | 99.4% | 99.3% | 99.7% | 99.8% | 99.6% | 99.6% | 98.9% | 97.5% |
| 292.5 | 99.9% | | 97.7% | 97.4% | 98.5% | 98.5% | 99.9% | 99.6% | 99.7% | 97.8% | 98.6% | 93.7% | 97.8% | 99.4% | 99.6% | 100.0% | 99.7% | 99.7% | 99.7% | | | | | |
| 295.0 | 97.0% | 98.8% | 97.8% | 97.2% | 99.0% | 98.1% | 98.9% | 99.2% | 98.7% | 98.3% | 98.0% | 95.2% | 98.6% | 99.0% | 99.1% | 99.9% | 99.3% | 99.2% | 99.5% | | | | | |
| 297.5 | 98.7% | | | | | | 99.9% | 99.2% | 98.3% | 98.8% | 100.0% | 98.7% | 96.8% | 98.7% | 98.8% | 99.8% | 99.0% | 99.3% | 100.0% | | | | | |
| 300.0 | | 98.5% | | | | | 98.8% | 99.7% | 95.9% | 98.2% | 98.8% | 95.7% | 98.6% | 99.3% | 98.8% | 99.8% | 98.6% | 98.6% | 100.0% | 99.7% | 99.6% | 99.5% | 98.6% | 96.1% |
| 302.5 | | | | | | | 100.0% | 99.3% | 98.9% | 99.1% | -100.0% | 98.5% | 96.0% | 97.6% | 98.6% | | 99.5% | 99.3% | 100.0% | | | | | |
| 305.0 | | | | | | | 99.9% | 99.4% | 98.0% | 97.2% | 98.5% | 95.9% | 97.1% | 96.8% | 96.9% | 99.4% | 98.3% | 99.9% | 99.8% | | | | | |
| 307.5 | | | | | | | 100.0% | 98.7% | | | 100.0% | 85.7% | 99.7% | 99.9% | 99.4% | 99.6% | 99.4% | 100.0% | | | | | | |
| 310.0 | | 99.3% | | | | | 98.7% | 97.9% | 99.1% | 99.3% | 98.5% | 93.9% | 96.2% | 97.2% | 96.1% | 98.2% | 98.3% | 97.8% | 99.5% | 99.3% | 99.6% | 99.5% | 99.1% | 97.1% |
| 312.5 | | | | | | | | | | | -100.0% | 90.8% | 99.9% | 97.9% | 99.8% | 99.9% | 99.0% | 99.8% | | | | | | |
| 315.0 | | | | | | | | | | | -100.0% | 85.3% | 99.2% | 98.2% | 97.7% | 99.2% | 97.2% | 99.7% | 99.7% | | | | | |
| 317.5 | | | | | | | | | | | | | 99.5% | 99.3% | 99.5% | | 100.0% | 100.0% | 99.7% | | | | | |
| 320.0 | | 99.4% | | | | | 98.8% | | | | 98.1% | | 99.6% | 98.7% | 99.1% | 98.0% | 98.7% | 99.5% | | 98.9% | 99.6% | 99.6% | 98.8% | 97.9% |
| 322.5 | | | | | | | | | | | | | 100.0% | 99.0% | | | | | | | | | | |
| 325.0 | | | | | | | | | | | | | 100.0% | 99.1% | 99.1% | 99.4% | 99.8% | 99.5% | | | | | | |
| 330.0 | | 98.8% | | | | | 98.3% | | | | 98.7% | | | | | 98.0% | | | | 98.9% | 99.5% | 99.5% | 98.9% | 97.7% |
| 340.0 | | 99.2% | | | | | 98.3% | | | | 98.3% | | | | | 97.8% | | | | 99.0% | 99.0% | 99.6% | 99.1% | 98.0% |
| 350.0 | | 98.5% | | | | | 98.4% | | | | 97.8% | | | | | 99.1% | | | | 99.1% | 99.2% | 99.5% | 99.5% | 96.7% |
| 360.0 | | 99.4% | | | | | 98.8% | | | | 97.8% | | | | | 98.6% | | | | 99.1% | 99.1% | 99.3% | 99.3% | 97.3% |
| 370.0 | | 99.8% | | | | | | | | | 97.9% | | | | | 98.5% | | | | 99.2% | 99.1% | 99.7% | 99.6% | 98.5% |
| 380.0 | | 99.3% | | | | | | | | | | | | | | 98.1% | | | | | 99.3% | 99.4% | 99.4% | 98.8% |
| 390.0 | | | | | | | | | | | | | | | | 98.9% | | | | | | 99.5% | 99.0% | 98.0% |
| 400.0 | | | | | | | | | | | | | | | | | | | | | | 99.3% | 99.0% | 98.8% |
| 410.0 | | | | | | | | | | | | | | | | | | | | | | | | 99.0% |
| 420.0 | | | | | | | | | | | | | | | | | | | | | | | | 99.8% |

**Note:**
(1) Correlations between returns on BDX Stock prices and returns on synthetic prices (based on BDX Options).



Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.
**Exhibit 3B**
**Summary of Correlations Between Synthetic Stock Price Movements (Based on Long Call and Short Put Option) and Actual Stock Price Movements by Option Series During the Class Period (Based on Mayhew Relevant Options Criteria) (1)**

| | Expiration Date | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strike Price | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
| | ← Expiration Prior to February 6, 2020 → | | | | | | | | | | | | | ← Expiration On or After February 6, 2020 → | | | | | | | | | | |
| 115.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 120.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 125.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 130.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 135.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 140.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 145.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 150.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 155.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 160.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 165.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 170.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 175.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 180.0 | | | | | | | | | | | | | | | | | | | | | | | 98.4% | |
| 185.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 190.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 195.0 | | | | | | | | | | | | | | | | | | | | 98.8% | 99.2% | | 98.4% | |
| 200.0 | | | | | | | | | | | | | | | | | | | | 99.1% | 98.8% | | 98.6% | 97.5% |
| 205.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 210.0 | | | | | | | | | | | | | | | | | | | | 99.2% | 99.0% | | 99.1% | |
| 215.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 217.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 220.0 | | | | | | | | | | | | | | | | | | | | 98.9% | 99.5% | | | 97.6% |
| 222.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 225.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 227.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 230.0 | | | | | | | | | | | | | | | | | | | | 99.6% | 99.6% | | 99.0% | 96.8% |
| 232.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 235.0 | | | | | | | | | | | | | | 96.4% | | | | | | | | | | |
| 237.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 240.0 | | | | | | | | | | | | | | 97.1% | | 99.5% | | | | 99.6% | 99.6% | | 99.2% | |
| 242.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 245.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 247.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 250.0 | | | | | | | | | | | | | | | | 99.5% | | | | 99.7% | 99.7% | 99.9% | 98.8% | 96.6% |
| 252.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 255.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 257.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 260.0 | | | | | | | | | | | | | | | 99.2% | 99.7% | | | | 99.7% | 99.8% | 99.3% | 98.4% | |
| 262.5 | | | | | | | | | | | | | | 99.8% | | | | | | | | | | |
| 265.0 | | | | | | | | | | | | | | 99.0% | 99.8% | 99.9% | 99.3% | | | | | | | |
| 267.5 | | | | | | | | | | | | | | 99.7% | | | | | | | | | | |
| 270.0 | | | | | | | | | | | | | | 99.8% | 99.7% | 99.8% | | | | 99.7% | 99.8% | | 98.6% | 97.2% |
| 272.5 | | | | | | | | | | | | | | 99.8% | 99.6% | 99.9% | | | | | | | | |
| 275.0 | | | | | | | | | | | | | | 99.6% | 99.8% | 99.9% | 99.8% | 99.3% | | | | | | |
| 277.5 | | | | | | | | | | | | | | 99.8% | 99.9% | 99.9% | | 99.7% | | | | | | |
| 280.0 | | | | | | | | | | | | | | 99.6% | 99.8% | 99.8% | 99.7% | 99.9% | | 99.8% | 99.6% | 99.9% | 99.1% | 96.8% |
| 282.5 | | | | | | | | | | | | | | 99.5% | 99.5% | 99.9% | 99.7% | 99.7% | | | | | | |
| 285.0 | | | | | | | | | | | | | | 99.0% | 99.3% | 99.9% | 99.9% | | | | | | | |
| 287.5 | | | | | | | | | | | | | | 99.7% | 99.5% | 99.9% | 99.4% | | | | | | | |
| 290.0 | | | | | | | | | | | | | | 99.3% | 98.6% | 99.9% | 99.4% | | | 99.8% | 99.6% | 99.6% | 98.9% | 97.5% |
| 292.5 | | | | | | | | | | | | | | 99.4% | 99.6% | 100.0% | 99.7% | 99.7% | | | | | | |
| 295.0 | | | | | | | | | | | | | | 99.0% | 99.1% | 99.9% | 99.3% | | | | | | | |
| 297.5 | | | | | | | | | | | | | | 98.1% | 97.8% | 99.8% | 99.0% | | | | | | | |
| 300.0 | | | | | | | | | | | | | | 99.3% | 98.9% | 99.8% | | | 100.0% | 99.7% | 99.6% | | 98.6% | 96.1% |
| 302.5 | | | | | | | | | | | | | | 100.0% | 97.4% | | | | | | | | | |
| 305.0 | | | | | | | | | | | | | | | | 98.8% | | | 99.8% | | | | | |
| 307.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 310.0 | | | | | | | | | | | | | | | | | | | | 99.2% | 99.6% | 99.5% | 99.1% | |
| 312.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 315.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 317.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 320.0 | | | | | | | | | | | | | | | | | | | | | 99.6% | 99.6% | 98.8% | 97.9% |
| 322.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 325.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 330.0 | | | | | | | | | | | | | | | | | | | | | 99.4% | 99.5% | 98.9% | |
| 340.0 | | | | | | | | | | | | | | | | | | | | | 99.1% | | 99.1% | 98.0% |
| 350.0 | | | | | | | | | | | | | | | | | | | | | | 99.5% | 99.5% | |
| 360.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 370.0 | | | | | | | | | | | | | | | | | | | | | | | | 98.5% |
| 380.0 | | | | | | | | | | | | | | | | | | | | | | | | 98.8% |
| 390.0 | | | | | | | | | | | | | | | | | | | | | | 99.5% | | 98.0% |
| 400.0 | | | | | | | | | | | | | | | | | | | | | | | | 98.8% |
| 410.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 420.0 | | | | | | | | | | | | | | | | | | | | | | | | |

**Note:**
(1) Correlations between returns on BDX Stock prices and returns on synthetic prices (based on BDX Options).



**Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.**
**Exhibit 4A**
**Summary of Average Put-Call Parity Deviations by Option Series During the Class Period (1)**

Expiration Date — columns 11/8/19 through 1/31/20: ← Expiration Prior to February 6, 2020 →; columns 2/7/20 through 1/21/22: ← Expiration On or After February 6, 2020 →

Strike Price — BDX Stock Price Range During CP

| Strike | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 115.0 | | | | | | | -0.2% | | | | | | | | | | | | | | | | | |
| 120.0 | | | | | | | -0.2% | | | | | | | | | | | | | | | | | |
| 125.0 | | | | | | | -0.2% | | | | | | | | | | | | | | | | | -0.6% |
| 130.0 | | | | | | | -0.2% | | | | | | | | | | | | | | | | | -0.5% |
| 135.0 | | | | | | | -0.2% | | | | | | | | | | | | | | | | -0.3% | -0.4% |
| 140.0 | | | | | | | -0.2% | | | | | | | | | | | | | -0.2% | | | -0.3% | -0.4% |
| 145.0 | | | | | | | -0.2% | | | | | | | | | | | | | -0.2% | | | -0.3% | -0.3% |
| 150.0 | | | | | | | -0.2% | | | | | | | | | | | | | -0.2% | -0.3% | | -0.3% | -0.3% |
| 155.0 | | | | | | | -0.2% | | | | | | | | | | | | | -0.1% | -0.3% | | -0.2% | -0.3% |
| 160.0 | | | | | | | -0.2% | | | | | | | | | | | | | -0.2% | -0.3% | | -0.2% | -0.3% |
| 165.0 | | | | | | | -0.2% | | | | -0.1% | | | | | | | | | -0.2% | -0.3% | | -0.2% | -0.3% |
| 170.0 | | -0.1% | | | | | -0.2% | | | | -0.1% | | | | | | | | | -0.2% | -0.2% | | -0.2% | -0.2% |
| 175.0 | | -0.1% | | | | | -0.2% | | | | -0.1% | | | | | 0.1% | | | | -0.2% | -0.2% | | -0.2% | -0.2% |
| 180.0 | | -0.1% | 0.1% | | | | -0.2% | | | | -0.1% | | | | | 0.1% | | | | -0.2% | -0.3% | -0.2% | -0.2% | -0.2% |
| 185.0 | | 0.0% | 0.1% | 0.0% | 0.1% | | -0.2% | | | | -0.1% | | | | | 0.0% | | | | -0.1% | -0.2% | -0.1% | -0.1% | -0.2% |
| 190.0 | | -0.1% | 0.1% | 0.0% | 0.1% | | -0.2% | | | | -0.1% | | | | | 0.1% | | | | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% |
| 195.0 | | -0.1% | 0.0% | 0.0% | 0.1% | -0.1% | -0.2% | | | | -0.1% | | | | | 0.0% | | | | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% |
| 200.0 | 0.0% | -0.1% | 0.0% | 0.0% | 0.1% | -0.1% | -0.2% | | | | -0.1% | | | | | 0.0% | | | | -0.1% | -0.3% | -0.2% | -0.1% | -0.2% |
| 205.0 | 0.1% | -0.1% | 0.0% | 0.0% | 0.1% | -0.1% | | | | | | | | | | | | | | | | | | |
| 210.0 | 0.0% | -0.1% | 0.0% | 0.0% | 0.1% | -0.1% | -0.2% | -0.1% | 0.0% | 0.1% | -0.1% | | | | | 0.1% | | | | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% |
| 215.0 | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | -0.2% | -0.2% | -0.1% | 0.0% | 0.1% | | | | | | | | | | | | | | |
| 217.5 | 0.0% | -0.1% | -0.1% | 0.0% | 0.0% | -0.2% | | | | | | | | | | | | | | | | | | |
| 220.0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.2% | -0.2% | -0.1% | 0.0% | 0.1% | 0.0% | 0.1% | 0.1% | | | 0.0% | | | | -0.2% | -0.2% | -0.2% | 0.0% | -0.2% |
| 222.5 | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | -0.2% | 0.0% | -0.1% | 0.0% | 0.0% | | 0.1% | 0.1% | | | | | | | | | | | |
| 225.0 | 0.0% | -0.1% | -0.1% | 0.0% | 0.0% | -0.2% | -0.1% | -0.1% | 0.0% | 0.0% | | 0.1% | 0.1% | | | | | | | | | | | |
| 227.5 | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | -0.2% | -0.1% | -0.1% | -0.1% | 0.0% | | 0.0% | 0.1% | | | | | | | | | | | |
| 230.0 | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | -0.2% | -0.1% | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | | | 0.0% | 0.2% | | | -0.1% | -0.2% | -0.2% | 0.0% | -0.2% |
| 232.5 | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | -0.2% | -0.1% | -0.1% | -0.1% | 0.0% | | 0.0% | 0.0% | | | | | | | | | | | |
| 235.0 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.2% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.2% | | | | | | |
| 237.5 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | | | | | | | | | | | |
| 240.0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | | -0.2% | -0.2% | -0.2% | 0.0% | -0.2% |
| 242.5 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.1% | | | | | | | | | | |
| 245.0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 0.1% | 0.1% | 0.0% | 0.1% | | | | | | |
| 247.5 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.1% | -0.2% | | | | | | |
| 250.0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | -0.2% | -0.1% | -0.2% | -0.1% | 0.0% | -0.2% |
| 252.5 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.2% | | | | | |
| 255.0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.2% | | | | | |
| 257.5 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | -0.1% | | | | | |
| 260.0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.1% | -0.1% | -0.1% | 0.0% | -0.2% |
| 262.5 | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | | | | | | |
| 265.0 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | |
| 267.5 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | | | | | | |
| 270.0 | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.1% | -0.1% | -0.1% | 0.0% | -0.2% |
| 272.5 | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | -0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.2% | | | | | |
| 275.0 | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | | | | | |
| 277.5 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | | | | | |
| 280.0 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.1% | -0.1% | -0.1% | 0.0% | -0.1% |
| 282.5 | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | | | | | |
| 285.0 | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | -0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | | | | | |
| 287.5 | -0.1% | 0.0% | 0.0% | 0.0% | -0.1% | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | | | | |
| 290.0 | 0.0% | 0.0% | -0.1% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | | 0.0% | -0.1% | -0.1% | 0.0% | -0.1% |
| 292.5 | -0.2% | | -0.1% | -0.1% | -0.1% | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | | | | | |
| 295.0 | -0.2% | 0.0% | -0.1% | 0.0% | -0.1% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | |
| 297.5 | -0.1% | | | | | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% | 0.1% | 0.1% | 0.1% | | | | | |
| 300.0 | | 0.0% | | | | | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | -0.1% | 0.1% | -0.1% |
| 302.5 | | | | | | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | | 0.1% | 0.0% | 0.1% | | | | | |
| 305.0 | | | | | | | -0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | -0.1% | -0.1% | 0.0% | 0.1% | 0.1% | 0.1% | | | | | |
| 307.5 | | | | | | | -0.1% | 0.0% | | | 0.0% | -0.1% | -0.1% | | | | 0.1% | 0.1% | 0.1% | | | | | |
| 310.0 | | -0.1% | | | | | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | -0.1% | 0.1% | -0.1% | 0.0% | -0.1% | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% |
| 312.5 | | | | | | | | | | | -0.1% | -0.1% | 0.0% | -0.2% | -0.1% | | -0.1% | -0.1% | -0.3% | | | | | |
| 315.0 | | | | | | | | | | | | 0.0% | -0.1% | 0.0% | -0.1% | 0.0% | -0.1% | -0.1% | -0.2% | | | | | |
| 317.5 | | | | | | | | | | | | | 0.0% | -0.1% | -0.1% | | -0.2% | -0.1% | -0.2% | | | | | |
| 320.0 | | 0.0% | | | | | 0.1% | | | | 0.1% | | | 0.0% | 0.0% | 0.1% | -0.1% | -0.1% | | 0.1% | 0.1% | 0.0% | 0.2% | 0.1% |
| 322.5 | | | | | | | | | | | | | -0.2% | 0.0% | | | | | | | | | | |
| 325.0 | | | | | | | | | | | | | 0.0% | -0.1% | 0.0% | 0.0% | -0.1% | -0.1% | | | | | | |
| 330.0 | | -0.1% | | | | | 0.1% | | | | 0.2% | | | | | 0.1% | | | | | 0.1% | 0.2% | 0.1% | 0.2% |
| 340.0 | | -0.1% | | | | | 0.1% | | | | 0.2% | | | | | 0.1% | | | | | 0.1% | 0.3% | 0.2% | 0.3% |
| 350.0 | | 0.0% | | | | | 0.1% | | | | 0.2% | | | | | 0.1% | | | | | 0.1% | 0.3% | 0.2% | 0.4% |
| 360.0 | | 0.0% | | | | | 0.1% | | | | 0.2% | | | | | 0.1% | | | | | 0.1% | 0.4% | 0.2% | 0.6% |
| 370.0 | | 0.0% | | | | | | | | | 0.2% | | | | | 0.2% | | | | | 0.1% | 0.4% | 0.3% | 0.8% |
| 380.0 | | 0.0% | | | | | | | | | | | | | | 0.2% | | | | | 0.5% | 0.3% | 1.0% | 1.1% |
| 390.0 | | | | | | | | | | | | | | | | 0.2% | | | | | | | 0.4% | 1.3% |
| 400.0 | | | | | | | | | | | | | | | | | | | | | | 0.4% | | 1.3% |
| 410.0 | | | | | | | | | | | | | | | | | | | | | | | | 1.4% |
| 420.0 | | | | | | | | | | | | | | | | | | | | | | | | 1.5% |

**Note:**
(1) Analyses based on Put-Call Parity deviations estimated in the Mason Report.



**Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.**
**Exhibit 4B**
**Summary of Average Put-Call Parity Deviations by Option Series During the Class Period (Based on Mayhew Relevant Options Criteria) (1)**

|  | | Expiration Date | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strike Price | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
| | | | ← Expiration Prior to February 6, 2020 → | | | | | | | | | | | | ← Expiration On or After February 6, 2020 → | | | | | | | | | |
| 115.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 120.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 125.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 130.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 135.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 140.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 145.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 150.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 155.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 160.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 165.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 170.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 175.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 180.0 | | | | | | | | | | | | | | | | | | | | | | | -0.2% | |
| 185.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 190.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 195.0 | | | | | | | | | | | | | | | | | | | | -0.2% | -0.2% | | -0.1% | |
| 200.0 | | | | | | | | | | | | | | | | | | | | -0.1% | -0.3% | | -0.1% | -0.2% |
| 205.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 210.0 | | | | | | | | | | | | | | | | | | | | -0.2% | -0.2% | | -0.1% | |
| 215.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 217.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 220.0 | | | | | | | | | | | | | | | | | | | | -0.2% | -0.2% | | | -0.2% |
| 222.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 225.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 227.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 230.0 | | | | | | | | | | | | | | | | | | | | -0.1% | -0.2% | | 0.0% | -0.2% |
| 232.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 235.0 | | | | | | | | | | | | | | 0.1% | | | | | | | | | | |
| 237.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 240.0 | | | | | | | | | | | | | | 0.0% | | 0.0% | | | | -0.2% | -0.2% | | 0.0% | |
| 242.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 245.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 247.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 250.0 | | | | | | | | | | | | | | | | 0.0% | | | | -0.1% | -0.2% | -0.1% | 0.0% | -0.2% |
| 252.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 255.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 257.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 260.0 | | | | | | | | | | | | | | | 0.0% | 0.0% | | | | -0.1% | -0.1% | -0.1% | 0.0% | |
| 262.5 | | | | | | | | | | | | | | 0.0% | | | | | | | | | | |
| 265.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | | |
| 267.5 | | | | | | | | | | | | | | 0.0% | | | | | | | | | | |
| 270.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | | | | -0.1% | -0.1% | | 0.0% | -0.2% |
| 272.5 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | | | | | | | | |
| 275.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | |
| 277.5 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | | 0.0% | | | | | | |
| 280.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | -0.1% | -0.1% | -0.1% | 0.0% | -0.1% |
| 282.5 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | |
| 285.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | | |
| 287.5 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | | |
| 290.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | | | 0.0% | -0.1% | -0.1% | 0.0% | -0.1% |
| 292.5 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | | | | | | |
| 295.0 | | | | | | | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | | | | | | | |
| 297.5 | | | | | | | | | | | | | | 0.1% | 0.1% | 0.0% | 0.1% | | | | | | | |
| 300.0 | | | | | | | | | | | | | | 0.0% | 0.1% | 0.1% | 0.1% | | 0.0% | 0.0% | 0.0% | | 0.1% | -0.1% |
| 302.5 | | | | | | | | | | | | | | 0.0% | 0.0% | | | | | | | | | |
| 305.0 | | | | | | | | | | | | | | | | 0.1% | | | 0.1% | | | | | |
| 307.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 310.0 | | | | | | | | | | | | | | | | 0.0% | | | | 0.0% | 0.0% | 0.0% | 0.1% | |
| 312.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 315.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 317.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 320.0 | | | | | | | | | | | | | | | | | | | | | 0.1% | 0.0% | 0.2% | 0.1% |
| 322.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 325.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 330.0 | | | | | | | | | | | | | | | | | | | | | 0.2% | 0.1% | 0.2% | |
| 340.0 | | | | | | | | | | | | | | | | | | | | | 0.3% | | 0.3% | 0.3% |
| 350.0 | | | | | | | | | | | | | | | | | | | | | | 0.2% | 0.5% | |
| 360.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 370.0 | | | | | | | | | | | | | | | | | | | | | | | | 0.8% |
| 380.0 | | | | | | | | | | | | | | | | | | | | | | | | 1.1% |
| 390.0 | | | | | | | | | | | | | | | | | | | | | | | 1.1% | 1.3% |
| 400.0 | | | | | | | | | | | | | | | | | | | | | | | | 1.3% |
| 410.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 420.0 | | | | | | | | | | | | | | | | | | | | | | | | |

**Note:**
(1) Analyses based on Put-Call Parity deviations estimated in the Mason Report, limited to the Relevant BDX Options specified in the Mayhew Report.



**Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.**
**Exhibit 5A**
Summary of Average Percentage Profit (Loss) by Option Series During the Class Period (1)

| Strike Price | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ← Expiration Prior to February 6, 2020 → | | | | | | | | | ← Expiration On or After February 6, 2020 → | | | | | | | | | | |
| 115.0 | | | | | | | -0.5% | | | | | | | | | | | | | | | | | |
| 120.0 | | | | | | | -0.5% | | | | | | | | | | | | | | | | | |
| 125.0 | | | | | | | -0.5% | | | | | | | | | | | | | | | | | -0.7% |
| 130.0 | | | | | | | -0.4% | | | | | | | | | | | | | | | | | -0.8% |
| 135.0 | | | | | | | -0.4% | | | | | | | | | | | | | | | | -0.6% | -0.8% |
| 140.0 | | | | | | | -0.4% | | | | | | | | | | | | | -0.4% | | | -0.6% | -0.8% |
| 145.0 | | | | | | | -0.4% | | | | | | | | | | | | | -0.4% | | | -0.6% | -0.8% |
| 150.0 | | | | | | | -0.4% | | | | | | | | | | | | | -0.4% | -0.4% | | -0.6% | -0.8% |
| 155.0 | | | | | | | -0.4% | | | | | | | | | | | | | -0.4% | -0.4% | | -0.6% | -0.8% |
| 160.0 | | | | | | | -0.4% | | | | -0.4% | | | | | | | | | -0.4% | -0.4% | | -0.6% | -0.8% |
| 165.0 | | | | | | | -0.3% | | | | -0.4% | | | | | | | | | -0.4% | -0.4% | | -0.7% | -0.8% |
| 170.0 | | -0.6% | | | | | -0.4% | | | | -0.4% | | | | | | | | | -0.4% | -0.4% | | -0.7% | -0.8% |
| 175.0 | | -0.5% | | | | | -0.3% | | | | -0.4% | | | | | | | | | -0.4% | -0.4% | | -0.6% | -0.8% |
| 180.0 | | -0.4% | -0.6% | | | | -0.3% | | | | -0.4% | | | | | | | | | -0.4% | -0.4% | -0.7% | -0.6% | -0.8% |
| 185.0 | | -0.4% | -0.7% | -0.6% | -0.8% | | -0.3% | | | | -0.4% | | | | | -0.5% | | | | -0.4% | -0.4% | -0.7% | -0.5% | -0.8% |
| 190.0 | | -0.4% | -0.6% | -0.7% | -0.9% | | -0.3% | | | | -0.4% | | | | | -0.5% | | | | -0.3% | -0.3% | -0.7% | -0.4% | -0.8% |
| 195.0 | | -0.4% | -0.6% | -0.6% | -0.8% | -0.6% | -0.3% | | | | -0.4% | | | | | -0.5% | | | | -0.3% | -0.3% | -0.7% | -0.4% | -0.8% |
| 200.0 | -0.4% | -0.4% | -0.5% | -0.6% | -0.8% | -0.6% | -0.3% | | | | -0.4% | | | | | -0.5% | | | | -0.3% | -0.2% | -0.6% | -0.4% | -0.8% |
| 205.0 | -0.6% | -0.4% | -0.5% | -0.6% | -0.7% | -0.6% | | | | | | | | | | | | | | | | | | |
| 210.0 | -0.6% | -0.4% | -0.5% | -0.6% | -0.7% | -0.5% | -0.3% | -0.5% | -0.7% | -0.6% | -0.4% | | | | | -0.5% | | | | -0.2% | -0.2% | -0.2% | -0.4% | -0.8% |
| 215.0 | -0.5% | -0.4% | -0.5% | -0.6% | -0.7% | -0.4% | -0.3% | -0.5% | -0.6% | -0.6% | | | | | | | | | | | | | | |
| 217.5 | -0.4% | -0.4% | -0.4% | -0.5% | -0.7% | -0.4% | | | | | | | | | | | | | | | | | | |
| 220.0 | -0.5% | -0.5% | -0.4% | -0.5% | -0.6% | -0.4% | -0.2% | -0.4% | -0.5% | -0.6% | -0.3% | -0.6% | -0.6% | | | -0.5% | | | | -0.2% | -0.1% | -0.2% | -0.4% | -0.8% |
| 222.5 | -0.5% | -0.4% | -0.4% | -0.5% | -0.6% | -0.3% | -0.4% | -0.4% | -0.6% | -0.5% | | -0.6% | -0.7% | | | | | | | | | | | |
| 225.0 | -0.5% | -0.4% | -0.4% | -0.5% | -0.6% | -0.3% | -0.2% | -0.3% | -0.5% | -0.5% | | -0.6% | -0.6% | | | | | | | | | | | |
| 227.5 | -0.5% | -0.4% | -0.3% | -0.5% | -0.6% | -0.2% | -0.4% | -0.4% | -0.4% | -0.5% | | -0.5% | -0.7% | | | | | | | | | | | |
| 230.0 | -0.4% | -0.3% | -0.3% | -0.4% | -0.6% | -0.2% | -0.1% | -0.3% | -0.4% | -0.4% | -0.3% | -0.6% | -0.6% | | | -0.3% | -0.7% | | | -0.2% | -0.1% | -0.2% | -0.4% | -0.8% |
| 232.5 | -0.4% | -0.3% | -0.3% | -0.3% | -0.6% | -0.1% | -0.2% | -0.2% | -0.3% | -0.4% | | -0.5% | -0.6% | | | | | | | | | | | |
| 235.0 | -0.3% | -0.2% | -0.2% | -0.3% | -0.4% | -0.1% | -0.1% | -0.2% | -0.3% | -0.4% | -0.3% | -0.5% | -0.5% | -0.5% | -0.6% | -0.4% | -0.7% | -0.8% | | | | | | |
| 237.5 | -0.3% | -0.2% | -0.2% | -0.2% | -0.4% | -0.1% | -0.2% | -0.2% | -0.3% | -0.3% | -0.2% | -0.4% | -0.4% | | | | | | | | | | | |
| 240.0 | -0.2% | -0.1% | -0.2% | -0.2% | -0.3% | -0.1% | -0.1% | -0.2% | -0.3% | -0.3% | -0.2% | -0.4% | -0.4% | -0.5% | -0.5% | -0.2% | -0.6% | -0.7% | | -0.1% | -0.1% | -0.2% | -0.4% | -0.8% |
| 242.5 | -0.2% | -0.1% | -0.2% | -0.2% | -0.3% | -0.1% | -0.2% | -0.2% | -0.3% | -0.3% | -0.2% | -0.4% | -0.4% | -0.5% | | | | | | | | | | |
| 245.0 | -0.1% | -0.1% | -0.1% | -0.2% | -0.3% | -0.1% | -0.2% | -0.2% | -0.2% | -0.3% | -0.2% | -0.4% | -0.4% | -0.4% | -0.5% | -0.3% | -0.5% | -0.7% | | | | | | |
| 247.5 | -0.1% | -0.1% | -0.1% | -0.1% | -0.3% | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.3% | -0.3% | -0.3% | -0.4% | | -0.5% | -0.5% | -0.3% | | | | | |
| 250.0 | -0.1% | -0.1% | -0.1% | -0.1% | -0.3% | -0.1% | -0.1% | -0.2% | -0.2% | -0.2% | -0.1% | -0.3% | -0.3% | -0.3% | -0.4% | -0.2% | -0.3% | -0.6% | -0.4% | -0.1% | -0.1% | -0.2% | -0.3% | -0.8% |
| 252.5 | -0.1% | -0.2% | -0.2% | -0.2% | -0.3% | -0.1% | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.3% | -0.3% | -0.3% | -0.2% | -0.3% | -0.4% | -0.3% | | | | | |
| 255.0 | -0.1% | -0.2% | -0.2% | -0.3% | -0.4% | -0.2% | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.3% | -0.2% | -0.2% | -0.4% | -0.4% | | | | | |
| 257.5 | -0.1% | -0.3% | -0.3% | -0.4% | -0.4% | -0.2% | -0.1% | -0.2% | -0.2% | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.2% | -0.4% | -0.3% | | | | | |
| 260.0 | -0.1% | -0.4% | -0.4% | -0.4% | -0.5% | -0.2% | -0.1% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% | -0.3% | -0.3% | -0.1% | -0.1% | -0.2% | -0.3% | -0.8% |
| 262.5 | -0.2% | -0.5% | -0.4% | -0.5% | -0.5% | -0.2% | -0.1% | -0.2% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% | -0.3% | -0.2% | | | | | |
| 265.0 | -0.3% | -0.5% | -0.5% | -0.5% | -0.6% | -0.3% | -0.2% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% | -0.3% | -0.3% | | | | | |
| 267.5 | -0.3% | -0.5% | -0.5% | -0.5% | -0.6% | -0.4% | -0.2% | -0.3% | -0.1% | -0.1% | -0.1% | -0.1% | -0.2% | -0.2% | -0.1% | -0.1% | -0.2% | -0.2% | -0.3% | | | | | |
| 270.0 | -0.3% | -0.5% | -0.5% | -0.5% | -0.6% | -0.4% | -0.2% | -0.3% | -0.1% | -0.1% | -0.1% | -0.1% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.3% | -0.2% | -0.1% | -0.1% | -0.2% | -0.3% | -0.8% |
| 272.5 | -0.3% | -0.4% | -0.5% | -0.5% | -0.6% | -0.4% | -0.2% | -0.4% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.2% | -0.1% | -0.1% | -0.1% | -0.3% | -0.2% | | | | | |
| 275.0 | -0.4% | -0.5% | -0.5% | -0.5% | -0.7% | -0.5% | -0.2% | -0.4% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.2% | -0.2% | | | | | |
| 277.5 | -0.4% | -0.5% | -0.5% | -0.6% | -0.6% | -0.5% | -0.1% | -0.2% | -0.2% | -0.2% | -0.1% | -0.1% | -0.2% | -0.1% | -0.1% | -0.1% | -0.1% | -0.2% | -0.1% | | | | | |
| 280.0 | -0.4% | -0.5% | -0.5% | -0.6% | -0.7% | -0.5% | -0.2% | -0.5% | -0.4% | -0.2% | -0.2% | -0.2% | -0.2% | -0.1% | -0.1% | -0.1% | -0.1% | -0.2% | -0.1% | -0.1% | -0.1% | -0.2% | -0.3% | -0.9% |
| 282.5 | -0.5% | -0.6% | -0.5% | -0.6% | -0.7% | -0.5% | -0.2% | -0.2% | -0.2% | -0.3% | -0.1% | -0.2% | -0.2% | -0.1% | -0.2% | -0.1% | -0.1% | -0.2% | -0.2% | | | | | |
| 285.0 | -0.5% | -0.5% | -0.6% | -0.6% | -0.7% | -0.5% | -0.3% | -0.5% | -0.4% | -0.4% | -0.2% | -0.2% | -0.2% | -0.1% | -0.2% | -0.1% | -0.2% | -0.2% | -0.2% | | | | | |
| 287.5 | -0.4% | -0.6% | -0.6% | -0.6% | -0.7% | -0.6% | -0.2% | -0.2% | -0.4% | -0.4% | -0.2% | -0.3% | -0.2% | -0.2% | -0.2% | -0.1% | -0.1% | -0.3% | -0.2% | | | | | |
| 290.0 | -0.4% | -0.5% | -0.6% | -0.6% | -0.7% | -0.6% | -0.3% | -0.3% | -0.5% | -0.5% | -0.3% | -0.4% | -0.3% | -0.2% | -0.2% | -0.1% | -0.1% | -0.3% | -0.2% | -0.2% | -0.2% | -0.2% | -0.3% | -0.9% |
| 292.5 | -0.4% | | -0.6% | -0.6% | -0.7% | -0.5% | -0.3% | -0.3% | -0.2% | -0.4% | -0.2% | -0.4% | -0.3% | -0.2% | -0.2% | -0.1% | -0.1% | -0.3% | -0.3% | | | | | |
| 295.0 | -0.4% | -0.6% | -0.6% | -0.7% | -0.8% | -0.6% | -0.2% | -0.3% | -0.5% | -0.5% | -0.2% | -0.5% | -0.4% | -0.3% | -0.3% | -0.1% | -0.2% | -0.3% | -0.3% | | | | | |
| 297.5 | -0.4% | | | | | | -0.1% | -0.2% | -0.2% | -0.2% | -0.2% | -0.5% | -0.5% | -0.3% | -0.3% | -0.1% | -0.2% | -0.3% | -0.3% | | | | | |
| 300.0 | | -0.5% | | | | | -0.4% | -0.2% | -0.2% | -0.3% | -0.3% | -0.5% | -0.5% | -0.5% | -0.4% | -0.1% | -0.3% | -0.3% | -0.4% | -0.3% | -0.2% | -0.2% | -0.4% | -0.9% |
| 302.5 | | | | | | | -0.1% | -0.2% | -0.2% | -0.3% | -0.2% | -0.6% | -0.6% | -0.5% | -0.4% | | -0.4% | -0.5% | -0.4% | | | | | |
| 305.0 | | | | | | | -0.2% | -0.3% | -0.2% | -0.3% | -0.2% | -0.5% | -0.6% | -0.5% | -0.6% | -0.3% | -0.5% | -0.5% | -0.4% | | | | | |
| 307.5 | | | | | | | -0.1% | -0.2% | | | -0.1% | -0.3% | -0.3% | -0.5% | -0.5% | | -0.5% | -0.5% | -0.6% | | | | | |
| 310.0 | | -0.6% | | | | | -0.4% | -0.2% | -0.2% | -0.3% | -0.2% | -0.5% | -0.6% | -0.4% | -0.5% | -0.2% | -0.6% | -0.7% | -0.7% | -0.4% | -0.2% | -0.2% | -0.4% | -0.9% |
| 312.5 | | | | | | | | | | | -0.1% | -0.2% | -0.3% | -0.4% | -0.5% | | -0.7% | -0.8% | -0.7% | | | | | |
| 315.0 | | | | | | | | | | | -0.1% | -0.2% | -0.3% | -0.4% | -0.6% | -0.4% | -0.7% | -0.8% | -0.8% | | | | | |
| 317.5 | | | | | | | | | | | | | -0.3% | -0.5% | -0.5% | | -0.6% | -0.8% | -0.8% | | | | | |
| 320.0 | | -0.6% | | | | | -0.4% | | | | -0.4% | | -0.4% | -0.4% | -0.6% | -0.3% | -0.8% | -0.9% | | -0.4% | -0.3% | -0.2% | -0.3% | -0.9% |
| 322.5 | | | | | | | | | | | | | -0.4% | -0.4% | | | | | | | | | | |
| 325.0 | | | | | | | | | | | | | -0.7% | -0.6% | -0.5% | -0.5% | -0.8% | -0.9% | | | | | | |
| 330.0 | | -0.5% | | | | | -0.4% | | | | -0.3% | | | | | -0.4% | | | | -0.4% | -0.3% | -0.2% | -0.3% | -0.9% |
| 340.0 | | -0.6% | | | | | -0.5% | | | | -0.3% | | | | | -0.3% | | | | -0.4% | -0.4% | -0.2% | -0.3% | -0.8% |
| 350.0 | | -0.5% | | | | | -0.4% | | | | -0.3% | | | | | -0.4% | | | | -0.4% | -0.3% | -0.5% | -0.2% | -0.7% |
| 360.0 | | -0.6% | | | | | -0.4% | | | | -0.3% | | | | | -0.4% | | | | -0.3% | -0.3% | -0.7% | -0.1% | -0.5% |
| 370.0 | | -0.6% | | | | | | | | | -0.4% | | | | | -0.3% | | | | -0.3% | -0.2% | -0.6% | 0.0% | -0.3% |
| 380.0 | | -0.7% | | | | | | | | | | | | | | -0.4% | | | | | -0.2% | -0.6% | 0.1% | 0.0% |
| 390.0 | | | | | | | | | | | | | | | | -0.4% | | | | | | -0.5% | 0.2% | 0.3% |
| 400.0 | | | | | | | | | | | | | | | | | | | | | | -0.5% | | 0.3% |
| 410.0 | | | | | | | | | | | | | | | | | | | | | | | | 0.4% |
| 420.0 | | | | | | | | | | | | | | | | | | | | | | | | 0.5% |

*Strike Price — BDX Stock Price Range During CP*

**Note:**
(1) Average percentage profit (loss) opportunity accounting for bid-ask spreads but not accounting for any commission costs. Amounts in red denote potential arbitrage opportunities.



Exhibits - Page 7 of 8

**Industriens Pensionsforsikring A/S v. Becton, Dickinson and Company, et al.**
**Exhibit 5B**
**Summary of Average Percentage Profit (Loss) by Option Series During the Class Period (Based on Mayhew Relevant Options Criteria) (1)**

| Strike Price | 11/8/19 | 11/15/19 | 11/22/19 | 11/29/19 | 12/6/19 | 12/13/19 | 12/20/19 | 12/27/19 | 1/3/20 | 1/10/20 | 1/17/20 | 1/24/20 | 1/31/20 | 2/7/20 | 2/14/20 | 2/21/20 | 2/28/20 | 3/6/20 | 3/13/20 | 3/20/20 | 6/19/20 | 9/18/20 | 1/15/21 | 1/21/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | ← Expiration Prior to February 6, 2020 → | | | | | | | | | | ← Expiration On or After February 6, 2020 → | | | | | | | |
| 115.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 120.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 125.0 | | | | | | | | | | | | | | | | | | | | | | | | -0.7% |
| 130.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 135.0 | | | | | | | | | | | | | | | | | | | | | | | -0.5% | |
| 140.0 | | | | | | | | | | | | | | | | | | | | | | | -0.5% | -0.7% |
| 145.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 150.0 | | | | | | | | | | | | | | | | | | | | | | | -0.5% | -0.8% |
| 155.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 160.0 | | | | | | | | | | | | | | | | | | | | | -0.6% | | -0.5% | -0.8% |
| 165.0 | | | | | | | | | | | | | | | | | | | | | | | -0.6% | |
| 170.0 | | | | | | | | | | | | | | | | | | | | -0.4% | -0.5% | | -0.6% | |
| 175.0 | | | | | | | | | | | | | | | | | | | | -0.4% | -0.4% | | -0.6% | -0.8% |
| 180.0 | | | | | | | | | | | | | | | | | | | | | -0.4% | | -0.5% | -0.8% |
| 185.0 | | | | | | | | | | | | | | | | | | | | | -0.3% | | -0.5% | -0.8% |
| 190.0 | | | | | | | | | | | | | | | | | | | | -0.3% | -0.3% | | -0.4% | -0.8% |
| 195.0 | | | | | | | | | | | | | | | | | | | | -0.3% | -0.3% | | -0.4% | -0.8% |
| 200.0 | | | | | | | | | | | | | | | | | | | | -0.3% | -0.2% | | -0.4% | -0.8% |
| 205.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 210.0 | | | | | | | | | | | | | | | | | | | | -0.2% | -0.2% | -0.2% | -0.4% | |
| 215.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 217.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 220.0 | | | | | | | | | | | | | | | | | | | | -0.2% | -0.1% | -0.2% | -0.4% | |
| 222.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 225.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 227.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 230.0 | | | | | | | | | | | | | | | -0.3% | | | | | -0.1% | -0.1% | -0.2% | -0.4% | -0.8% |
| 232.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 235.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 237.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 240.0 | | | | | | | | | | | | | | -0.5% | -0.2% | | | | | -0.1% | -0.1% | -0.2% | -0.4% | -0.8% |
| 242.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 245.0 | | | | | | | | | | | | | | | -0.3% | | | | | | | | | |
| 247.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 250.0 | | | | | | | | | | | | | | | -0.3% | -0.2% | -0.3% | | | -0.1% | -0.1% | | -0.3% | |
| 252.5 | | | | | | | | | | | | | | -0.2% | -0.3% | -0.1% | | | | | | | | |
| 255.0 | | | | | | | | | | | | | | | -0.2% | -0.1% | -0.2% | -0.4% | | | | | | |
| 257.5 | | | | | | | | | | | | | | -0.2% | | -0.2% | -0.2% | | -0.3% | | | | | |
| 260.0 | | | | | | | | | | | | | | -0.2% | -0.2% | -0.1% | -0.2% | -0.3% | | -0.1% | -0.1% | | -0.3% | -0.8% |
| 262.5 | | | | | | | | | | | | | | -0.2% | -0.2% | -0.1% | -0.2% | | | | | | | |
| 265.0 | | | | | | | | | | | | | | -0.2% | -0.2% | -0.1% | -0.2% | | -0.3% | | | | | |
| 267.5 | | | | | | | | | | | | | | -0.2% | -0.1% | -0.2% | | -0.2% | -0.3% | | | | | |
| 270.0 | | | | | | | | | | | | | | -0.1% | -0.1% | -0.1% | -0.2% | | -0.2% | -0.1% | -0.1% | -0.2% | -0.3% | -0.8% |
| 272.5 | | | | | | | | | | | | | | -0.2% | -0.1% | -0.1% | -0.1% | | | | | | | |
| 275.0 | | | | | | | | | | | | | | -0.1% | -0.1% | -0.1% | -0.2% | | | | | | | |
| 277.5 | | | | | | | | | | | | | | -0.1% | -0.1% | -0.1% | -0.2% | | | | | | | |
| 280.0 | | | | | | | | | | | | | | -0.1% | -0.1% | -0.1% | -0.2% | | | -0.1% | -0.1% | -0.2% | -0.3% | |
| 282.5 | | | | | | | | | | | | | | -0.1% | -0.2% | -0.1% | | | | | | | | |
| 285.0 | | | | | | | | | | | | | | -0.1% | | -0.1% | -0.2% | -0.2% | | | | | | |
| 287.5 | | | | | | | | | | | | | | -0.2% | -0.2% | -0.1% | -0.1% | | | | | | | |
| 290.0 | | | | | | | | | | | | | | | | | | | | -0.2% | -0.2% | -0.2% | -0.3% | |
| 292.5 | | | | | | | | | | | | | | -0.2% | | -0.1% | -0.3% | | | | | | | |
| 295.0 | | | | | | | | | | | | | | -0.3% | | | | | | | | | | |
| 297.5 | | | | | | | | | | | | | | | | -0.1% | | | | | | | | |
| 300.0 | | | | | | | | | | | | | | | | | | | | | -0.3% | -0.2% | | |
| 302.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 305.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 307.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 310.0 | | | | | | | | | | | | | | | | | | | | | -0.2% | | -0.4% | |
| 312.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 315.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 317.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 320.0 | | | | | | | | | | | | | | | | | | | | | -0.3% | | -0.3% | |
| 322.5 | | | | | | | | | | | | | | | | | | | | | | | | |
| 325.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 330.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 340.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 350.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 360.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 370.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 380.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 390.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 400.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 410.0 | | | | | | | | | | | | | | | | | | | | | | | | |
| 420.0 | | | | | | | | | | | | | | | | | | | | | | | | |

Strike Price — BDX Stock Price Range During CP

**Note:**

(1) Average percentage profit (loss) opportunity accounting for bid-ask spreads but not accounting for any commission costs on the Relevant BDX Options based on Dr. Mayhew's criteria.  Amounts in red denote potential arbitrage opportunities.



# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

INDUSTRIENS PENSIONSFORSIKRING :  CIVIL ACTION
A/S, Individually and On Behalf:
of All Others Similarly        :
Situated,                      :
          Plaintiffs,          :
                               :
          vs.                  :
                               :
BECTON, DICKINSON AND          :
COMPANY, VINCENT A.            :
FORLENZA, THOMAS E. POLEN,     :
and CHRISTOPHER R. REIDY,      :  NO. 2:20-cv-02155
          Defendants.          :  SRC-CLW

- - -

Wednesday, May 31, 2023

- - -

        Remote Video-Recorded Deposition of STEWART
MAYHEW, Ph.D., held via Zoom/Veritext Virtual,
commencing at 9:31 a.m. and stenographically
reported by Susan Marie Migatz, a Federally Approved
Registered Merit Reporter, Certified Realtime
Reporter, Certified LiveNote Reporter, and Notary
Public.

- - -

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, Pennsylvania 19103

Page 2

APPEARANCES:

                KESSLER TOPAZ MELTZER & CHECK, LLP
                BY:   SHARAN NIRMUL, ESQUIRE
                      VANESSA M. MILAN, ESQUIRE
                      NATHANIEL C. SIMON, ESQUIRE
                280 King of Prussia Road
                Radnor, PA 19087
                484-270-1465
                snirmul@ktmc.com
                vmilan@ktmc.com
                nsimon@ktmc.com
                Counsel for Lead Plaintiff Industriens
                Pensionsforsikring A/S and Lead Counsel for
                the Putative Class

                WINSTON & STRAWN, LLP
                BY:   ATHANASIA CHARMANI, ESQUIRE
                      ZACHARY BRONER, ESQUIRE
                      MICHELLE TUMA, ESQUIRE
                200 Park Avenue
                New York, NY 10166
                212-294-6700
                acharmani@winston.com
                zbroner@winston.com
                mtuma@winston.com
                Counsel for Defendants

                                    - - -

ALSO PRESENT:

                WILLIAM MILLER
                Videographer
                JASMINE BOVIA
                Summer Associate, Winston & Strawn LLP

                                    - - -

Page 3

- - -

INDEX

- - -

STEWART MAYHEW, Ph.D.                                    PAGE

By Mr. Nirmul                                              6

- - -

MAYHEW EXHIBITS

- - -

NUMBER                    DESCRIPTION                   PAGE

Exhibit 0001   Expert Report of Joseph R.

               Mason, Ph.D., 1/17/23                       8


Exhibit 0002   Expert Rebuttal Report of

               Stewart Mayhew, Ph.D.,

               5/3/23                                      13

- - -

Page 4

(Whereupon the video record commenced:

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:31 a.m. Eastern Time on May 31, 2023.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded.

This is Media Unit 1 of the video-recorded deposition of Stewart Mayhew, Ph.D., in the matter of Industriens versus Becton Dickinson and Company, et al., filed in the United States District Court, District of New Jersey, Case No. 2:20-cv-02155-SRC-CLW.

My name is William Miller representing Veritext Legal Solutions and I am the videographer. The court reporter is Susan Migatz from the firm Veritext Legal Solutions.

At this time will counsel please

Page 5

announce your appearance on the video record.

MR. NIRMUL:  Sharan Nirmul, Kessler Topaz Meltzer & Check, for plaintiff.

MS. CHARMANI:  Thania Charmani of Winston & Strawn for defendants.  I have with me my colleagues, Michelle Tuma and Zachary Broner.

THE VIDEOGRAPHER:  And with that, will the court reporter please swear in the witness and we can begin.

THE COURT REPORTER:  First let me say, the attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel further agree that the witness may be in a state where I am not a Notary and stipulate to the witness being sworn in by an out-of-state

Page 6

Notary.

If any party does have an objection to this manner of reporting, please state so now.

- - -

(No response.)

- - -

THE COURT REPORTER:  Hearing no objection, I will swear in the witness.

- - -

STEWART MAYHEW, Ph.D., after having been first duly sworn, was examined and testified as follows:

- - -

THE COURT REPORTER:  Thank you.

- - -

EXAMINATION

- - -

BY MR. NIRMUL:

Q.    Good morning, Dr. Mayhew.  My name is Sharan Nirmul.  I'm counsel for plaintiffs in this case.

Just for the record, where are you located today?

STEWART MAYHEW, Ph.D.

Page 7

A.      I'm in New York City.

Q.      Okay.  And is -- where in New York
City are you located?

A.      In the MetLife Building.

Q.      Okay.  Are you at Winston & Strawn's
offices?

A.      Yes.

Q.      And is anyone in the room with you
today?

A.      Yes.

Q.      Who's in the room with you?

A.      The Winston & Strawn counsel, Thania
Charmani and Zach Broner and Michelle Tuma.

Q.      Okay.  So three -- three lawyers in
the room with you?

A.      Yes.

Q.      And anyone else?

A.      There's a --

MS. BOVIA:  Summer associate.

A.      -- summer associate.

MS. CHARMANI:  Counsel, we have a
summer associate in the room with us.  Her
name is Jasmine Bovia.

MR. NIRMUL:  Okay.  Great.  Thank

STEWART MAYHEW, Ph.D.

Page 8

you.

BY MR. NIRMUL:

Q.    So, Dr. Mayhew, you've submitted a report in this case; is that right?

A.    Yes.

Q.    And you are seeking to offer expert testimony relating to BD's options; is that right?

A.    Relating to options.

Q.    Okay.

A.    Yes.

Q.    You've reviewed an expert report submitted by Dr. Joseph Mason; is that correct?

A.    Yes.

Q.    Okay.  And your opinions in this case respond to certain of the opinions expressed by Dr. Mason; is that right?

A.    Yes.

Q.    Okay.

MR. NIRMUL:  Actually, can we pull up as Mayhew Exhibit 0001 Tab 4.

- - -

(Whereupon a document was marked for identification purposes as Mayhew Exhibit 0001 and was placed on the video screen for

STEWART MAYHEW, Ph.D.

Page 9

the witness and counsel.)

- - -

MR. NIRMUL:  And can you just scroll to the first page.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  Okay.

BY MR. NIRMUL:

Q.   Dr. Mayhew, do you recognize this document?

A.   Yes, I believe so.

Q.   Okay.  And what is this document?

A.   This appears to be Dr. Mason's report.

Q.   Okay.  And did you review Dr. Mason's report in its entirety?

A.   Yes.

Q.   And you're familiar with the opinions that he's expressed in his report?

A.   I believe so, yes.

Q.   Okay.

STEWART MAYHEW, Ph.D.

Page 10

MR. NIRMUL:  Let's go to the second page and the Table of Contents, please.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.    You understand that -- that Dr. Mason provided an opinion on the efficiency of the market for BD's common stock; is that right?

A.    Yes.

Q.    Okay.  And you're not providing any opinions with respect to the efficiency of the market for BD's common stock; is that correct?

A.    That's correct.

Q.    Okay.  And you don't have an opinion with respect to whether BD's common stock traded in an efficient market; is that right?

A.    I'm not offering an opinion on that question, that's correct.

Q.    Okay.  And you're not offering any opinion disputing Dr. Mason's opinions regarding the efficiency of BD's common stock; correct?

STEWART MAYHEW, Ph.D.

Page 11

MS. CHARMANI:  Objection; asked and answered.

THE WITNESS:  That's correct.

BY MR. NIRMUL:

Q.    Okay.  And with respect to Section VIII of Dr. Mason's report, "Measuring Damages on a Class-wide Basis," are you familiar with his opinions with respect to measuring damages on a class-wide basis?

A.    Yes.

Q.    Okay.  And you reviewed that -- the section of his report that deals with measuring damages on a class-wide basis; is that right?

A.    Yes.

Q.    Okay.  And you're not offering any opinion as to whether damages in this case may be measured on a class-wide basis; correct?

A.    That's correct.  That was outside of the scope of my assignment.

Q.    Okay.  And you don't dispute any of Dr. Mason's conclusions with respect to whether damages may be measured on a class-wide basis in this case; correct?

A.    I am not offering an opinion on that

STEWART MAYHEW, Ph.D.

Page 12

topic.

Q.     Okay.

MR. NIRMUL:  Let's pull up Tab 1, please.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  And scroll to the first page.

- - -

(Whereupon the requested portion of the was placed on the video screen for the witness and counsel.)

- - -

MS. CHARMANI:  Counsel, we also have a printed copy of Dr. Mayhew's report here. If there are no objections, we can hand him the hard copy.  Otherwise, we're happy to print the one on the screen.  I represent it's exactly the same report.

MR. NIRMUL:  No.  That's fine.  He can refer to his report if he has it in

STEWART MAYHEW, Ph.D.

Page 13

front of him.

Okay.  So we'll mark this as Mayhew Exhibit 0002.

- - -

(Whereupon a document was marked for identification purposes as Mayhew Exhibit 0002 and was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.    Do you recognize this document, Dr. Mayhew?

A.    This appears to be my report.

Q.    Okay.

MR. NIRMUL:  And if we scroll to the last page.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  Actually, let's go to the signature page, please, so it's the end before the exhibits.

STEWART MAYHEW, Ph.D.

Page 14

THE VIDEOGRAPHER: Sure. One moment. Let me try and find that page.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q. And is that your signature, Dr. Mayhew?

A. Yes.

Q. Sitting here today, do you stand by the opinions that you've expressed in this -- in this document?

A. Yes.

Q. Are there any changes that you wish to make to any of the opinions that you express in this report?

A. No.

Q. Okay. Is there any information that you wish to update or amend in this report?

A. No.

Q. Okay.

MR. NIRMUL: And if we can go to

STEWART MAYHEW, Ph.D.

Page 15

Appendix A, which I believe is the next page from the signature page.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  Okay.

BY MR. NIRMUL:

Q.    And does Appendix A reflect your CV?

A.    This is my CV, yes.

Q.    Okay.  And is there anything on your CV that you wish to update?

A.    No.

Q.    Okay.

MR. NIRMUL:  Let's go to Appendix C, please.

Actually, Appendix B.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  Okay.

Case 2:20-cv-02155-SRC-CLW   Document 161-1   Filed 06/30/23   Page 106 of 216
PageID: 4128
STEWART MAYHEW, Ph.D.

Page 16

BY MR. NIRMUL:

Q.   Does this appendix reflect your deposition testimony in the last four years?

A.   Yes.

Q.   Okay.  Have you provided any other testimony, whether at deposition or trial, in the last four years?

A.   No.

Q.   Okay.  How many times have you been deposed before?

A.   I think it's about six or seven times.

Q.   Okay.  So those other occasions were prior to four years ago?

A.   Correct.

Q.   Okay.  Have you ever testified at trial?

A.   I've testified in a FINRA disciplinary proceeding.  I don't know whether you would consider that a trial.

Q.   Okay.  And how long ago was that?

A.   I think -- I think about seven years ago.

Q.   Okay.  What was the nature of the

STEWART MAYHEW, Ph.D.

Page 17

testimony that you provided in the SEC versus Keener case? That's listed as the first entry on -- on your -- on Appendix B.

A.    My testimony in the Keener matter related to the topic of disgorgement and whether anybody was harmed by the respondent's actions.

Q.    Did -- did your testimony relate in any way to options trading?

A.    Not exactly. It relates to convertible bonds, which have an embedded option, but I -- so I don't know if you would call that an option. But it's not trading of exchange-traded options.

Q.    Did your opinions in any way relate to the efficiency of an options market?

A.    No.

Q.    Okay. In the Luna versus Carbonite case what was the nature of your deposition testimony?

A.    In that matter I submitted a declaration explaining the mechanics and interpretation of an event study.

Q.    Did your opinions relate in any way to the efficiency of an options market?

STEWART MAYHEW, Ph.D.

Page 18

A.      No.

Q.      Okay.  Have you provided any expert testimony in any prior engagement on the efficiency of an options market?

A.      No, not that I recall.

Q.      Okay.  Let's go to Page 2 of your report.  That's under the heading "Assignment."

                        - - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

                        - - -

BY MR. NIRMUL:

Q.      You write in Paragraph 4 of your -- of your report that, and to quote, "I understand that the relevant question at this stage of the proceedings is whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period, and have conducted my analyses accordingly."

                Did I read that correctly?

A.      Yes.

Q.      Okay.  Where did you -- how did you reach this understanding of the relevant question in

STEWART MAYHEW, Ph.D.

Page 19

this case?

A.    So this is my -- part of my assignment and this is my understanding from counsel.

Q.    Okay.  Did you seek to answer this question through your expert analyses?

A.    No.  My assignment was to evaluate and respond to opinions in Dr. Mason's report.

Q.    So am I correct that you don't have an opinion as to whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period?

MS. CHARMANI:  Objection to form.

THE WITNESS:  So my report summarizes my opinions.  I am offering opinions in response to Dr. Mason's report and not offering affirmative opinions.

BY MR. NIRMUL:

Q.    So -- so let me just ask the question again:  You are not offering an opinion as to whether the traded prices of Relevant BDX Options quickly and fully reflected all publicly available information during the Putative Class Period;

STEWART MAYHEW, Ph.D.

Page 20

correct?

MS. CHARMANI:  Objection; asked and
answered.

THE WITNESS:  I am offering testimony
pursuant to my assignment that's relevant to
that question.  It's -- my assignment was to
evaluate and respond to Dr. Mason's report.

BY MR. NIRMUL:

Q.    Okay.  Your assignment was not to
answer this question that you understand to be the
relevant question at this stage of the proceedings;
correct?

MS. CHARMANI:  Objection; asked and
answered.

THE WITNESS:  My assignment was to
evaluate and respond to opinions in
Dr. Mason's report and that is relevant to
the answer of the bigger -- of the bigger
question.  I'm not offering an affirmative
opinion.

BY MR. NIRMUL:

Q.    Correct.  So -- and you don't have an
opinion as to whether BDX options were trading
efficiently in the market; correct?

STEWART MAYHEW, Ph.D.

Page 21

MS. CHARMANI:  Objection; asked and answered.

THE WITNESS:  I'm not offering an affirmative opinion on that topic.

BY MR. NIRMUL:

Q.    Okay.  How do you define "Relevant BDX Options" for purposes of your analyses?

A.    So I explain that in Footnote 1, which is on the same page that you're showing on the screen.

Q.    Uh-huh, yes.

MR. NIRMUL:  Can we -- can we just scroll down to Footnote 1, please.

- - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

- - -

A.    So it includes options that expired on or after the alleged corrective disclosure date and had trading volume greater than zero between November 5, 2019, and February 5, 2020.

Q.    Uh-huh.  So is it your view that when considering whether the market for BDX options was

STEWART MAYHEW, Ph.D.

Page 22

efficient, you should not consider options that expired before February 6, 2020?

I'm sorry; on or after February 6, 2020.

A.    Can you repeat the question, please?

Q.    Is it your view that in assessing the efficiency of the market for BDX' -- for BD's options, that options that expired on or after February 6, 2020, should not be considered?

A.    I'm sorry; you said options that expired on or after?

Q.    Yes, February 6.

A.    Should not be considered?

Q.    Yeah.

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.    I'm sorry; let me rephrase the question.

You've excluded from your analyses options that expired before February 6, 2020; correct?

A.    Which -- which analysis -- are you -- which analysis are you referring to?

Q.    Well, let's -- let's -- let's go to

STEWART MAYHEW, Ph.D.

Page 23

the definition that you've provided here.  You say:
"I understand that the option series that would
potentially be eligible to be a part of the class in
this matter are those that expired on or after the
alleged corrective disclosure date..."

You wrote that?

A.    Yes.

Q.    Okay.  So how does -- how does that
understanding impact your analysis of the efficiency
of BD's option market?

MS. CHARMANI:  Objection to form.

THE WITNESS:  First of all, I -- my
assignment was to evaluate and respond to
Dr. Mason's report, and so that -- that was
the focus of my analysis.

One example of how this affected what
I did in this report is this was a set of
options that is reflected in the statistics
that I report in this -- in the information
that I report in this report regarding
trading volume and bid-ask spreads for
options.  Those tables are based on what I
call the Relevant BDX Options.

STEWART MAYHEW, Ph.D.

Page 24

BY MR. NIRMUL:

Q.    Okay.  So with respect to volume then, to the extent an option traded within the Class Period but expired before February 6, 2020, you would not have taken into account the volume of trading of those particular options; is that right?

MS. CHARMANI:  Objection to form.

THE WITNESS:  So in that table that I was referring to regarding the trading volume, that table reports statistics for just the Relevant BDX Options.  It doesn't report statistics for those other options that expired before February -- the corrective disclosure.

BY MR. NIRMUL:

Q.    Okay.  And with respect to bid-ask spreads, your analysis doesn't take into account options that were traded during the Class Period but expired before February 6, 2020; is that right?

MS. CHARMANI:  Objection to form.

THE WITNESS:  So the table that I report bid-ask spreads in also reports the average bid-ask spreads for options that were Relevant BDX Options.

STEWART MAYHEW, Ph.D.

Page 25

With respect to both trading volume and bid-ask spreads, the data that this was based on was data that I reviewed that was part of the production connected to Dr. Mason's report and so I was able to review that data.

And based on that I do not believe that either the trading volume or the bid-ask spreads summarized in those two tables are substantively different from the other options that traded on BDX that expired before February 5, 2020.

BY MR. NIRMUL:

Q.   And -- and how do you -- how do you arrive at that -- at that belief?  Have you done any analyses of those options that expired before February 6, 2020?

A.   I did not do any formal analyses, but I looked carefully at the raw data and looked at the trading volume.

Q.   And how many option series are included within your volume analysis and bid-ask spread analysis?

MS. CHARMANI:  Objection to form.

STEWART MAYHEW, Ph.D.

Page 26

THE WITNESS:  So I would refer you to the exhibit.  My recollection is 295, but I would look at the -- am I allowed to look at the tables?

MS. CHARMANI:  Yes.

Counsel, I believe there's an exhibit to the report you're showing on the screen.

BY MR. NIRMUL:

Q.    Do you want to -- do you want us to do -- are you making reference to that exhibit?  Do you want us to go to that exhibit, Dr. Mayhew?

MS. CHARMANI:  Yes.  We can also print it here, but that --

MR. NIRMUL:  Why don't we --

MS. CHARMANI:  -- will take time.

MR. NIRMUL:  -- flip to Exhibit -- Exhibit 1, which is on Page 28.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

THE WITNESS:  So is the question still pending?

STEWART MAYHEW, Ph.D.

Page 27

BY MR. NIRMUL:

Q.    Yeah.  So I guess -- I guess the question is:  How many option pairs or option series did you take into account in analyzing bid-ask spreads and volume?

A.    The number of series is 295, of which 140 were call option series and 155 were put option series.

Q.    Okay.  And that's your definition of the "relevant options," is that right, for purposes of your analysis?

A.    My definition of "relevant options" is as expressed in Footnote 1:  options with an expiration date on or after February 6 and non-zero trading volume on at least one day during the Putative Class Period.

Q.    Okay.  And that's -- that's also in Note 1 of this exhibit; is that right?

A.    Yes; and that resulted in 295.

Q.    Okay.  Now, you've looked at trading volumes for these options in connection with your analyses; is that right?

A.    Yes.

Q.    Okay.  And you also looked at bid-ask

STEWART MAYHEW, Ph.D.

Page 28

spreads with respect to these Relevant BDX Options

as part of your analyses; is that right?

A.    Yes.

Q.    Did you do any other empirical tests

in evaluating the efficiency of the market for BDX

options?

A.    Though your question implies that my

assignment was to evaluate the efficiency of BDX

options, my assignment was to evaluate the opinions

and methodologies in Dr. Mason's report.  But with

that clarification, I didn't do other form -- formal

analyses.

Q.    Okay.

MR. NIRMUL:  Let's go to -- back to

the "Assignment," Page 1 (sic), please.

- - -

(Whereupon the requested portion of

the document was placed on the video screen

for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.    With respect to this -- the question

that you posed, "I understand that the relevant

question..." -- do you see where I'm reading?

Case 2:20-cv-02155-SRC-CLW   Document 161-1   Filed 06/30/23   Page 119 of 216
PageID: 4141
STEWART MAYHEW, Ph.D.

Page 29

A.      Yes.

Q.      -- do you have an understanding of the term "informational efficiency" with respect to stock -- stock prices?

A.      Yes.

Q.      What is your understanding of the phrase "informational efficiency" with respect to stock prices?

A.      I think the language in this sentence is a reasonable short-cut for describing the common understanding of "informational efficiency": "...quickly and fully reflected...publicly available information..."

Q.      Does -- and what is your understanding of "quickly" in this context?  What does it -- what does it mean to -- for a stock price to quickly reflect all publicly available information?

A.      I'm not aware that there is a universally accepted definition in the academic community of "quickly."  In many contexts people focus on the time period of one day to evaluate whether information is reflected quickly.  But the question is context-specific.

STEWART MAYHEW, Ph.D.

Page 30

Q.    So "quickly" could be more than one day in some -- in some contexts; is that right?

MS. CHARMANI:   Objection to form.

THE WITNESS:   I'm not aware that the academic community has come up with a definition of what "quickly" means and I don't have an opinion about whether more than one day could be considered "quickly" from an economic perspective.

BY MR. NIRMUL:

Q.    Okay.  What do you mean by "fully reflect" -- "fully reflected"?  What does it mean for a security to fully reflect all publicly available information?

A.    Well, I think "fully" could be opposed to "partially."  So, for example, one could have a situation where important information value-relevant for a security becomes public and the market could start reacting immediately, but could take a very long time before it completely reflects the new information in the price.

And so I think in an informationally efficient market, it's not just that the market starts to incorporate information quickly, but it

STEWART MAYHEW, Ph.D.

Page 31

incorporates all the information quickly.

Q.     How would you determine whether a stock price has fully reflected all publicly available information?

A.     Well, one approach to -- that has sometimes been used in the academic context is to evaluate whether one can implement a profitable trading strategy based on old information -- that's one example, information from several days ago -- or by looking to see if there's not a correlation in stock returns.  There are various ways that have been developed over time for evaluating that issue.

Q.     Uh-huh.  Do you think it's a prerequisite for informational -- informational efficiency for a stock to have fully reflected all publicly available information?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I understand that the definition of "informational efficiency" is a market where prices, traded prices, fully -- quickly and fully reflect public information.  I think -- I think that's essentially a definition; not a prerequisite.

STEWART MAYHEW, Ph.D.

Page 32

BY MR. NIRMUL:

Q.     Do you agree with Dr. Mason's conclusion that BD's common stock traded in a semi -- semi-strong form market?

MS. CHARMANI:  Objection to form; asked and answered.  The witness has already testified he's not offering an opinion on this issue.

THE WITNESS:  Again, my assignment was to evaluate and respond to Dr. Mason's opinion relating to stock options and I haven't evaluated and don't have an opinion about his work relating to stock market efficiency.

BY MR. NIRMUL:

Q.     Okay.  Do you have an understanding of the concept of a semi-strong form of market efficiency?

A.     Yes.

Q.     What is your understanding of that, that concept?

A.     The concept of semi-strong form efficiency was developed by Professor Fama over 50 years ago when he developed a framework for thinking

STEWART MAYHEW, Ph.D.

Page 33

about market efficiency and defined three levels of market efficiency:  weak form, semi-strong form, and strong form; and the three levels of market efficiency related to how much information would be incorporated into the stock price.

The semi-strong form, which is the one in the middle, relates to public -- publicly available information being reflected in the stock price.

Q.    Okay.  Now, if you go to Paragraph 10 of your report, scroll down here --

- - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.    Okay -- you note here that "Dr. Mason claims that market efficiency for BDX options follows from market efficiency for BDX stock because 'BDX options are derivative instruments whose values are derived from BDX stock.'"  Okay?

Do you agree that BDX options are derivative instruments whose values are derived from

STEWART MAYHEW, Ph.D.

Page 34

BDX stock?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Clearly BDX options are derivative instruments and, yes, I agree that the underlying stock price is a key factor that affects the value of the BDX options.

But there are also other factors that affect the option value beyond the stock and even within the stock there are other aspects of the stock other than the stock price level that affects the value of the BDX options.

BY MR. NIRMUL:

Q.    But you would expect that if the value of a stock changes, the value of a BDX option should also change; correct?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Can you repeat the question?

BY MR. NIRMUL:

Q.    You would agree that if -- if the value of a BDX stock changes, so, too, must the value of BDX options; correct?

Page 35

MS. CHARMANI:  Objection to form.

THE WITNESS:  So holding everything else constant, if nothing else changes and there is a change in the underlying price of BDX stock, I would expect there to be an effect on the value of the -- of the BDX options.

BY MR. NIRMUL:

Q.   Okay.  With respect to the next sentence, you note that "...Dr. Mason claims that practitioners 'have found that when stocks of companies that trade on major exchanges generally trade in semi-strong form efficient markets, derivative securities based on such stock can also be considered to trade in efficient markets.'"

Do you disagree with Dr. Mason's observation?

A.   I'm not sure what practitioners he is referring to.  I noticed he quoted a number of legal decisions in support of this statement.  But I could not figure out which practitioners he was referring to or what they did to support -- to come to such a conclusion.

Q.   Do you have a view as to whether

STEWART MAYHEW, Ph.D.

Page 36

stocks of companies that trade on major exchanges generally trade in semi-strong form efficient markets -- let me rephrase that.

Do you agree that when stocks of companies that trade on major exchanges generally trade in semi-strong form efficient markets, derivative securities based on such stock can also be considered to trade in efficient markets?

MS. CHARMANI:  Objection to form.

THE WITNESS:  In Paragraph 12 of my report I write:  "Indeed, as an economic matter, efficiency of the markets for Relevant BDX Options does not follow automatically from efficiency in the market for BDX stock."

I do not believe that's true as an economic matter.

BY MR. NIRMUL:

Q.   And what is your support for that opinion?

A.   I am looking for the paragraphs in my report where I address that.

Q.   Okay.

A.   So broadly speaking, the -- this

STEWART MAYHEW, Ph.D.

Page 37

opinion is informed by my decades of experience and research in the options area; specifically, as I mentioned in this report, the concept of informational efficiency relates to the question of whether value-relevant information is quickly and fully reflected in the price.

Q.      Uh-huh.

A.      As I explain in Paragraph 15 of my report, "...option values are affected by types of new information that are not subsumed by changes in the stock prices, such as changes in the market's expectations of future volatility in the stock price."

In Paragraph 17 of my report I explain that "Information about future volatility can have an important impact on option prices even if it has no impact on the stock price."

Q.      Uh-huh.

A.      And "This...information cannot get impounded into option prices through changes in stock prices, because it is not subsumed by the effect of" the "stock price."

Q.      Okay.  So -- so you're -- you're basically saying that there may be other information

STEWART MAYHEW, Ph.D.

Page 38

that could impact the price of an option that may not impact the price of a stock.  Is that -- is that essentially what you're saying?

MS. CHARMANI:  Objection to form.

THE WITNESS:  What I was trying to say just now is that there is information that is value-relevant to options that is not affecting the stock price and so would not automatically be incorporated into option prices even if option prices fully and quickly reflect the information in the stock price.

BY MR. NIRMUL:

Q.    And how does that bear on whether or not options could be considered to be informationally efficient?

A.    Well, it's highly relevant because you can have value-relevant information coming out that affects the value of options and the traded price of the options might not reflect that information quickly or fully and so could be not traded in an efficient market --

Q.    Is it --

A.    -- even if the stock is.

STEWART MAYHEW, Ph.D.

Page 39

Q.    Is it your opinion that informationally valuable information that impacts a stock price cannot impact the options price for that stock?

MS. CHARMANI:  Objection to form.

THE WITNESS:  No.

BY MR. NIRMUL:

Q.    Okay.  So you're not -- you're not -- you're not opining that there may be, you know, valuable information that impacts stock prices that would not impact the price of an option.

MS. CHARMANI:  Objection to form.

THE WITNESS:  You asked if I'm not opining that there's valuable information that would affect the stock but would not affect the option?

BY MR. NIRMUL:

Q.    Right.

A.    Well, that's a -- I don't think I'm opining that.  But as I said in my report, there are types of -- let me see if I can find it.  Excuse me.  I'm looking for something in my report where I -- that's relevant to this.

So in Paragraph 17 of my report I

STEWART MAYHEW, Ph.D.

Page 40

talk about a possibility that "A news announcement can cause the stock price to decrease, but call option prices to increase (for example, because the news causes an increase in future volatility that more than offsets the effect of a decreasing stock price)."

So this is an example where there could be information about the level of the stock that affects the stock price and the same announcement could have -- could contain information that affects the option price in a way that offsets the impact of that information with respect to the option.

Q.    Is that inconsistent with informational efficiency --

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.    -- of the options?

A.    I don't really understand the question.  Is what inconsistent with informational efficiency?

Q.    Well, that -- so you've -- you've posed the relevant question here as to whether -- you know, in this analysis, whether options quickly

STEWART MAYHEW, Ph.D.

Page 41

and fully reflect public information, right,

valuable public information.  Okay?

What you're positing here in

Paragraph 17, is that there -- there could be

information that impacts the stock price, but it

also impacts the options, but you're saying in a

different way.  That's not inconsistent with

informational efficiency; am I right?

MS. CHARMANI:  Objection to form.

THE WITNESS:  You could have a market

that was informationally efficient and the

efficient stock price reaction could be in

one direction and the efficient option --

call option reaction could be in another

direction.

BY MR. NIRMUL:

Q.    Okay.  And that is -- and that's not

inconsistent with the concept of informational

efficiency for those options; correct?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I answered it in the

most clear way I could.  I don't

understand --

STEWART MAYHEW, Ph.D.

Page 42

BY MR. NIRMUL:

Q.      Okay.

A.      -- what else you're asking.

Q.      So just going to Paragraph 19 of your report --

- - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.      -- you argue here that Dr. Mason hasn't identified "...any peer-reviewed academic articles, textbooks, or industry practitioner articles that support his claim that if the market for a given stock is efficient, then so are the markets for all exchange-traded call and put options referencing the stock."

Have you identified any articles, textbooks, or industry practitioner articles that refute Dr. Mason's claim?

A.      From my perspective, it's obvious -- it's obviously not true and is not the kind of statement that would -- that would need an academic

STEWART MAYHEW, Ph.D.

Page 43

article to refute.

Q.      And you -- and you are not aware of any academic articles or textbooks or industry practitioner articles that -- that support Dr. Mason's view; is that right?

A.      That's correct.

Q.      Okay.  So you're not aware of any that refute it and you're not aware of any that support his view.

MS. CHARMANI:  Objection to form; asked and answered.

THE WITNESS:  There is a large academic literature that addresses the question of market efficiency in option markets, which I think that entire literature would be unnecessary if -- if one could simply just assume that efficiency in the option market automatically follows from efficiency in the stock market.  So I think it's ridiculous to assume that it automatically follows.

BY MR. NIRMUL:

Q.      And when you're talking about efficiency in this context, you're talking about

STEWART MAYHEW, Ph.D.

Page 44

informational efficiency?

A.     Yes.

Q.     Okay.  So you think it's ridiculous to assume that if information impacts a stock price, then the same information will impact the -- the price of the -- of the -- of the derivative options.

MS. CHARMANI:  Objection to form; asked and answered.

THE WITNESS:  That's not even close to what I said.

BY MR. NIRMUL:

Q.     Okay.  What do you think is ridiculous, what assumption?

A.     The assumption that if the market for a stock is efficient, then the market for any exchange-traded option based on that stock is automatically also informationally efficient.

Q.     Okay.  And -- and so if -- but it's not ridiculous to assume that if a stock price reacts to valuable information, the derivative options would also react to the same information.

MS. CHARMANI:  Objection to form.

THE WITNESS:  It is true that the theoretical value of a option that is based

STEWART MAYHEW, Ph.D.

Page 45

on the underlying stock is a function of the underlying stock price and other -- and other factors.  And if the underlying stock price changes, everything else equal, you would expect the value of the under -- of the option to change.

The price at which options trade in a market may or may not be equal to the theoretical value.

BY MR. NIRMUL:

Q.   Okay.  And -- and that's not inconsistent with informational efficiency; correct?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I don't understand the question.

BY MR. NIRMUL:

Q.   Okay.  Withdrawn.

Is -- is -- are trading prices of options the only way to understand whether option values are impacted by value-relevant information?

MS. CHARMANI:  Objection to form.

THE WITNESS:  You said are traded prices of options the only way --

STEWART MAYHEW, Ph.D.

Page 46

BY MR. NIRMUL:

Q.    Yeah.

A.    -- to evaluate.

Q.    Correct.

A.    I don't -- I don't quite understand "traded."  I don't understand what you mean, "traded."  You mean analysis?  I don't understand what -- what you mean.  Traded prices of options are not -- is not a way to do anything.  It's just the traded price of the option.  Can you rephrase the question?

Q.    Well, how would you observe whether option prices are being impacted by value-relevant information?

A.    Well, there's a big academic literature on testing option market efficiency.  I cite to a couple of -- a couple of examples of that in my report in Footnote 27 to -- which is a footnote in Paragraph 17 on Page 9 of my report.

For example, I cite to a paper by Poon and Pope.  I have a paper that I've published with Chris Stivers in the Journal of Futures Markets.

There are numerous ways to evaluate

STEWART MAYHEW, Ph.D.

Page 47

whether option prices fully reflect public information.

Q.    In -- in that -- in Footnote 27, are you concerned there with fundamental efficiency as opposed to informational efficiency?

A.    I don't think so, no.

Q.    Okay.  When you write:  "Despite the active trading in the S&P 100 and S&P 500 option markets, Poon and Pope find that the markets for... volatility of index returns" -- I'm sorry -- "find that the markets for options on those indices were not efficient because investors could exploit information embedded within the volatility of index returns to generate consistent profits even after accounting for transaction costs," is that an issue with respect to the fundamental efficiency or does that relate to informational efficiency?

A.    I believe informational efficiency.

Q.    All right.  Do you -- do you agree that market makers provide quotations in the options market?

A.    Yes.

Q.    Okay.  And can value-relevant information be observed in the -- in the changes in

STEWART MAYHEW, Ph.D.

Page 48

the underlying options quotations?

                    MS. CHARMANI:  Objection to form.

                    THE WITNESS:  You -- can you -- you
          said "underlying options quotations"?  I
          didn't understand what you mean.

BY MR. NIRMUL:

          Q.    In other words, can you -- can you
see the impact of value-relevant information on
options by changes in the quotations they provided?

                    MS. CHARMANI:  Objection to form.

                    THE WITNESS:  You may be able to,
          yes.

BY MR. NIRMUL:

          Q.    Okay.  And you said that you were
aware that market makers -- market makers actively
provide quotations in the options market; correct?

          A.    Yes.

          Q.    Do you know how -- how active they
are?  How frequent do they provide quotations?  Is
it hourly?  Is it by minute?  Daily?

          A.    My understanding is that option
quotes are updated very frequently.

          Q.    Okay.  Let me turn to Paragraph 22 of
your -- of your report.

STEWART MAYHEW, Ph.D.

Page 49

- - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.     You -- in this paragraph you criticize Dr. Mason for not looking at bid-ask spreads and trading volume and you note that the "...individual BDX option series exhibited very low trading volume and high bid-ask spreads during the Putative Class Period"; is that -- is that right?

A.     Yes.

Q.     Okay.  And -- and I guess you summarize your analysis of trading volume in -- in Exhibit 2 of your report; is that right?

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

A.     Yes.

Q.     Okay.  So let me just -- let me just ask a definitional question.

STEWART MAYHEW, Ph.D.

Page 50

What would be -- what is a threshold that you would consider as -- as a low trading volume for options?

A.    I don't have such a threshold for a -- for a definition of low versus medium or high.

Q.    Well, you characterize the volume as -- as low.  So what is -- what is your benchmark against which you're evaluating volume?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I don't have a formal cutoff point for how low a volume has to be before it's considered low.  But I would consider the median volume of one contract a day to be extremely low.

BY MR. NIRMUL:

Q.    What would you consider high volume?

A.    I don't have a specific threshold in mind for how something -- I don't have a definition of what -- what constitutes high.

Q.    Okay.  What if it was five contracts a day; would that -- would that be low, medium, or high in your view?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I would consider five

Page 51

contracts a day to be low volume.

BY MR. NIRMUL:

Q.    Okay.  This is a kind of you know it when you see it test?

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.    What about ten contracts a day; would that be low, high, or medium?

MS. CHARMANI:  Objection to form.

THE WITNESS:  So the actively traded options that I've done my empirical analysis on have thousands or tens of thousands of -- well, sometimes have thousands or tens of thousands of contracts a day in volume.

BY MR. NIRMUL:

Q.    You -- in your summary statistics you look at "Average Daily Trading Volume"; right?  That's -- and you look at "Call Options" and "Put Options."

How did you calculate the average?

Let's just start with "Call Options"; right?  So I see you have columns that begin with "Mean" and then "Min" and then "10%," "25%," "Median," "75...," "90%," "Max."  Tell me what those

STEWART MAYHEW, Ph.D.

Page 52

columns mean.

We'll start with the "Mean."  So for "Call Options" at "3.74," what does that -- what does that convey?

A.     I started with the set of 295 option series that were -- met the definition of "Relevant BDX Options."

Q.     Uh-huh.

A.     I looked over the Putative Class Period.  If there were -- the time -- if there was a time period at the beginning of that period when the bid or the ask price was listed as zero in the data or a time period at the beginning of the -- or partway -- starting -- for part -- part of the class period, I exclude that.

Those would typically be early portion of the data where the bid is zero, volume would typically be zero.  I discard that portion and start my average, compute my average, starting on the earliest day when there was a non-zero bid and ask price.

Then I calculate -- calculate a time series average volume for each series, and then I calculate the cross-sectional mean or the average

STEWART MAYHEW, Ph.D.

Page 53

across those series, across the 140 call option series to get the 3.74 and across the 155 put option series to get the 4.28.

Q.   Uh-huh.

The option series, we'll stick with call options that you considered for your analysis, they had varying levels of moneyness; is that right? I'm assuming --

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.   -- you are familiar with that phrase.

A.   That's correct.  I'm including in-the-money options, at-the-money, out-of-the-money options.

Q.   And deep-out-of-the-money options included in your analysis; is that right?

A.   Yes.

Q.   Okay.  And when you average the trading volume, it is without regards to the moneyness of the -- of the options; is that right?

A.   Correct.

Q.   Okay.  And did you -- did you consider whether there may be differences in trading volume that are related to the moneyness of an

STEWART MAYHEW, Ph.D.

Page 54

option?

A.    Yes, I would expect there to be; and that is one of the reasons that I report statistics describing the entire distribution of trading volume across the series --

Q.    Uh-huh.

A.    -- shown in the remaining columns in this ta -- table.

Q.    So 10% of the call options that you observed had a trading average of 9.62 contracts a day; is that -- am I reading this correctly?

A.    The top 10%, the most actively traded series, the cutoff for being in the top 10% would be less than ten contracts a day.  So 90% of the series traded less than 9.62 -- 9.62 or less contracts a day.

Q.    And is the 90% -- or the 10% of most highly traded contracts, is that associated with the moneyness of these options?

MS. CHARMANI:  Objection to form.

THE WITNESS:  This analysis does not address that question.

BY MR. NIRMUL:

Q.    Okay.  What -- do you have an

STEWART MAYHEW, Ph.D.

Page 55

understanding of what the top 5% of -- of -- of volume by contract was?

A.   I did not compute that.  There was one that had an average trading volume of 88.6 and that's reported in the final column, and there was one put option that had a volume -- average daily volume of 184.58.

Q.   Okay.  Do you consider that high volume, 88.6 contracts a day?

A.   Again, I don't have a definition of what is the level of cutoff for volume to be high or low.  That corresponds to 8,860 shares of stock in a day compared with 1.2 million shares a day in the stock market.

Q.   But you don't have a view as to whether that's high or low or medium volume?

MS. CHARMANI:  Objection to form; asked and answered.

THE WITNESS:  I don't think that those are particularly meaningful labels.

BY MR. NIRMUL:

Q.   Okay.  With respect to put options --

MS. CHARMANI:  Mr. Nirmul, I'm sorry. We've been going for a while now.  When you

STEWART MAYHEW, Ph.D.

Page 56

find a natural stop, let's take a break.

MR. NIRMUL:  Okay.  Let me -- let me finish with this exhibit and then we'll take a break if that's okay.

THE VIDEOGRAPHER:  And, counsel, I have -- I actually -- I was just about to chime in as well.  I have about nine minutes left on this media before I'll need to break and change.

MR. NIRMUL:  Okay.  All right.  I'll be quick.

BY MR. NIRMUL:

Q.    So with respect to put options, same question:  You have not looked at the -- you have not considered the moneyness of the put options in -- in -- in connection with trading volume; correct?

A.    Well, it's not uncommon to see in markets that there are different option series at different moneyness levels that have different -- different trading volumes.  That's -- that's -- that's certainly true in -- true in general.

Q.    Okay.

A.    But I did not have to consider that

Case 2:20-cv-02155-SRC-CLW   Document 161-1   Filed 06/30/23   Page 147 of 216
PageID: 4169
STEWART MAYHEW, Ph.D.

Page 57

fact to make this chart, this particular chart.

Q.    All right.  And the mean trading volume that you report with respect to put options covers options that -- across the range of moneyness; correct?

A.    Yes.

Q.    Okay.

A.    But to be -- but to be -- but to answer completely, this table only goes across the Relevant BDX Options.  There -- there are potentially hundreds of other options that had zero trading volume that were theoretically available to trade --

Q.    Uh-huh.

A.    -- that I did not -- I did not include any of those because they were not --

Q.    I see.

A.    -- in that set.

Q.    I'm sorry; I don't mean to speak over you.

One last question on this:  Do you know how many BDX options were available to trade during the Class Period?

A.    I don't --

STEWART MAYHEW, Ph.D.

Page 58

Q.    Okay.

A.    -- recall.

MR. NIRMUL:  All right.  We can -- we can take a break.

MS. CHARMANI:  Great.

MR. NIRMUL:  Do you want ten -- ten minutes?

THE VIDEOGRAPHER:  Counsel, just give me one moment.  Let me go off the record for you.

The time is 10:54.  This ends Media No. 1.

- - -

(Whereupon there was a recess in the proceedings.)

- - -

THE VIDEOGRAPHER:  The time is now 11:15.  This begins Media 2.

You may proceed.

MR. NIRMUL:  Okay.  Thank you.

Can we pull up Exhibit 3 of Dr. Mayhew's report?

- - -

(Whereupon the requested document was

STEWART MAYHEW, Ph.D.

Page 59

placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  Actually, let's go to Exhibit 2, the one we were at before the break.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

MR. NIRMUL:  Okay, good.

BY MR. NIRMUL:

Q.    Before the break, Dr. Mayhew, we were looking at the "Average Daily Trading Volume."  I want to turn to the "Percentage of Days with Trading."

And so you note in Paragraph 24 of your report that "As another manifestation of the very low trading volume, the Relevant BDX Option series also traded infrequently during the Putative Class Period."  And you direct the reader to Exhibit 2 of this report.

And so here you have a description of

STEWART MAYHEW, Ph.D.

Page 60

the percentage of days with trading for call options and put options and you list as the mean 19% of days with trading for call options and 18% for put options.

Now, again, with respect to these percentages, the mean, that is the mean across all of the Relevant BDX Options in your sample; is that right?

A.     Yes.  The 19% is the mean across all the call options and the 18% is the mean across all the put option series.

Q.     Right.  And -- and the mean includes options, call options, that were, for instance, deep-out-of-the-money; correct?

A.     Yes, if it was part of the set of Relevant BDX Options.  There may be other options that never traded and didn't make it into the definition of "Relevant BDX Options" because the trading volume -- because it never traded.  But I did not include those.

Q.     Right.  And your analysis of percentage of days with trading does not account for the moneyness of the options; is that right?

A.     Well, as I answered for the earlier

STEWART MAYHEW, Ph.D.

Page 61

question relating to the trading volume, there is substantial variation across the series which may be related to the moneyness of the option, and that's why I looked at the whole distribution -- characteristics of the entire distribution and not just the mean.

But the first column, which reports the mean, does not separate out different categories of moneyness.

Q.   Uh-huh.  Did you or would you expect to see a relationship between the moneyness of an option and the frequency of which it trades?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Yes, I think I would expect that.

BY MR. NIRMUL:

Q.   And what -- what would be the relationship that you would expect to see?

A.   I would expect to see the options that are closer to at-the-money on average to trade more often than ones that were deep-in-the-money or deep-out-of-the-money.

Q.   And what percentage of the options that you looked at roughly were in-the-money during

Case 2:20-cv-02155-SRC-CLW   Document 161-1   Filed 06/30/23   Page 152 of 216
PageID: 4174
STEWART MAYHEW, Ph.D.

Page 62

the Class Period?

A.    I don't recall the answer to that. The information on Exhibit 1, middle panel of Exhibit 1, does show that there was a large range of strike prices for both the calls and the puts and so the sample contains both in-the-money, near-the-money, and out-of-the-money options for both the calls and the puts.  But I don't recall the numbers.

Q.    Okay.  Is there a particular threshold of frequency that you would consider for options to -- to be, you know, frequently traded?

MS. CHARMANI:  Objection to form.

THE WITNESS:  That label does not -- I have -- I don't think that was a very particularly useful label for me in the context of my -- my work.

BY MR. NIRMUL:

Q.    Uh-huh.  You -- you do a comparison in Paragraph 24 with -- with BDX stock, which you point out traded on -- on every single day of the Class Period.

Why -- why is that a relevant comparison?

STEWART MAYHEW, Ph.D.

Page 63

MS. CHARMANI:  And, counsel, you're referring to Paragraph 24 of the report?

- - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

- - -

MS. CHARMANI:  Okay, great, it's on the screen.

MR. NIRMUL:  That's correct, Paragraph 24, the last sentence of that paragraph.

MS. CHARMANI:  Thank you.

THE WITNESS:  I don't -- I don't have a strong view about whether that particular sentence is -- is highly relevant or not.  I constructed the discussion of Paragraph 24 to be parallel to the construction of the prior Paragraph 23, which provides a comparison of the trading volume so that one could get a sense from the report on the relative amount of trading volume in the op -- in the typical option series compared with the underlying stock where the lowest

STEWART MAYHEW, Ph.D.

Page 64

trading volume on any given day was 210 sells and shares.

So given what I've already said in Paragraph 23, that pretty much follows automatically that it must have traded every single day.

BY MR. NIRMUL:

Q.    Is it your view that in order for an options market to be efficient, the trading volume should approximate that of the stock?

A.    I'm not offering that opinion.

Q.    What should, in your view, be the trading volume of the options to facilitate an efficient market for those options?

A.    First of all, I don't think that trading a volume -- trading volume alone would be indicative one way or the other.  But it -- of market efficiency.  But it could be a relevant thing that a person would want to look at to -- as part of the mix of information that they're looking at.

I don't have a specific level in mind as to some magic level as to you have to surpass that threshold.  It's -- it's more of a spectrum.

In my published research I -- I have

STEWART MAYHEW, Ph.D.

Page 65

looked at the degree to which option prices reflect information in the past for returns and found that even as you go from the top ten options to other options that are still in the top 50 but not in the top ten, then you already see a degradation in quality and the ability of option markets to reflect that information.

So it's, I would say, a spectrum and the lower the option volume is, the less you would expect the price discovery mechanism to be functioning efficiently.

Q.    Uh-huh.  In your research have you found that options trade at volumes that are similar to the stock volumes?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I don't recall looking at that question in my research.  I may have.  I just don't recall.

BY MR. NIRMUL:

Q.    Is it your experience based on your research that options tend to have lower volume of trading than -- than stock?

A.    Yes, I think that's true for -- true for many different option classes.  In fact, a lot

STEWART MAYHEW, Ph.D.

Page 66

of -- some stocks don't even have listed options.

Q.    Right.  And -- and is it generally true that stocks that are in-the-money or close-to-the-money trade more frequently than stocks that are out-of-the-money?

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.    I'm sorry; you know, let me rephrase that.

Is it generally true that options that are in-the-money or close-to-the-money trade more frequently than options that are out-of-the-money?

MS. CHARMANI:  Same objection.

THE WITNESS:  Did you say in-the-money or did you say at-the-money?

BY MR. NIRMUL:

Q.    In-the-money or near or at -- in-the-money or at -- or close-to-the-money trade more frequently than stocks that are out-of-the-money.

A.    I would -- I would not -- I think that's sort of two questions mixed into one because you're talking about both in-the-money and

Case 2:20-cv-02155-SRC-CLW    Document 161-1    Filed 06/30/23    Page 157 of 216
PageID: 4179
STEWART MAYHEW, Ph.D.

Page 67

close-to-the-money.  That's in the same question.

Q.    Let me break it up then.

Is it -- is it generally true that options that are in-the-money trade more frequently than options that are out-of-the-money?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I'm not aware of any evidence of that being the case.

BY MR. NIRMUL:

Q.    Uh-huh.  In connection with the analysis you did here, looking at trading volumes, did you find that they were high -- there was a higher frequency of trading of options that were in-the-money versus out-of-the-money?

A.    I don't think I looked at that question.

Q.    Okay.  I'm going to close this out. Is it inconsistent with market efficiency of options to have low trading volumes?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Trading volume strikes me as an important variable that is relevant for the level to which option markets efficiently process information.  The lower

STEWART MAYHEW, Ph.D.

Page 68

the trading volume is, in my -- based on my research and on my understanding, the lower the trading volume is, the less well the price discovery mechanism is likely to function.  So I do believe that it's a highly relevant factor.

BY MR. NIRMUL:

Q.    But -- but you wouldn't say that a market that has low trading volume is necessarily an inefficient market.

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.    Correct?

A.    I don't think it would be appropriate to isolate one factor and focus only on that and make a determination of market efficiency based solely on the trading volume, no.

Q.    And -- and just to be clear, when we -- when you're talking about low trading volume, you don't have a benchmark in mind with respect to options.

A.    Well, I think I testified before that the label "low volume" is not something that I assign a lot of meaning to.

STEWART MAYHEW, Ph.D.

Page 69

But I will say that in my own research and other research that I've seen on individual stock options, researchers often will focus their empirical testing of option models on a select group of the highest volume options, which might include the top 30 or the top 50 most actively traded option classes.

So that would be one way that I would think about the concept of high volume or high and medium volume options.

Q.   Uh-huh.  In -- in the context of the spectrum of trading frequency that you see in your Exhibit 2, would you consider some of the options to be more efficient than others based on -- on observed trading volume?

A.   I haven't made any assessments about the level of efficiency of BDX options and haven't thought about that -- that question.

Q.   Uh-huh.  So if you look at the 90th percentile of percentage of days with trading and you observe that call options in that percentile traded 43% of days, would you consider that to be high frequency of trading --

MS. CHARMANI:  Objection to form.

STEWART MAYHEW, Ph.D.

Page 70

BY MR. NIRMUL:

Q.   -- for options?

A.   Again, I don't really have a lot of use for labels of "high."  I -- I think that actively traded options would be trading multiple times a day; not once a week or once every other day.

Q.   Uh-huh.

A.   But I don't -- but I don't assign a lot of meaning to a particular label like "high volume," "low volume."

Q.   Did you determine whether the trading volume was correlated to any particular events during the Class Period?

A.   I have not looked at that question, no.

Q.   Okay.  Do you think that there -- there may be a relationship between events relevant to BD and trading in the options?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Can you repeat the question, please?

BY MR. NIRMUL:

Q.   Do you think that there may be a

STEWART MAYHEW, Ph.D.

Page 71

relationship between events relevant to BD and the trading frequency of the options?

A.   There may be.  I haven't looked at that.

Q.   Uh-huh.  That could be a relevant consideration when trying to understand whether BD's options responded to value-relevant information; correct?

MS. CHARMANI:  Objection to form.

THE WITNESS:  If I understand the question correctly, you're asking whether an association between trading frequency and events in BD would be a relevant consideration for assessing the efficiency of the market?

BY MR. NIRMUL:

Q.   Correct.

A.   That's not a methodology that I recall seeing in the academic literature.  I don't -- I don't know.  I'd have to think about it more.

Q.   Did you observe whether BD's stock traded at higher volumes around events relevant to BD?

STEWART MAYHEW, Ph.D.

Page 72

MS. CHARMANI:  Objection to form.
The witness has already testified that's
outside the scope of his assignment.

THE WITNESS:  I haven't looked at the
stock volume as part of my analysis here.

BY MR. NIRMUL:

Q.    Okay.  You looked at the bid-ask
spreads for -- for BD options in your sample;
correct?

A.    Yes.

Q.    Okay.  And at Paragraph 25 you note
that "Bid-ask spreads on Relevant" BD option -- "BDX
options were high"; is that right?

MS. CHARMANI:  Doctor, take your time
to review the paragraph.

THE WITNESS:  Yes.

BY MR. NIRMUL:

Q.    Okay.  What is the threshold for
describing the bid-ask spreads as high?  What is the
benchmark against which you're comparing these
bid-ask spreads to arrive at the conclusion that
they were high?

A.    Similar to my prior answers, I don't
have a magic threshold at which spreads become high.

STEWART MAYHEW, Ph.D.

Page 73

Q.      Why do you think it's appropriate to compare the bid-ask spreads for the options to that of BD stock?

A.      It seems to me that it could be helpful information to juxtapose certain metrics such as the volume and frequency of trading and bid-ask spreads in the options compared with the underlying stock to help a reader of the report understand the substantive differences in the liquidity and trading costs of trading in the option market compared with the underlying stock market.

Q.      Is it your view that the bid-ask spreads for options should resemble the bid-ask spreads for BD stock?

A.      No.

Q.      And why not?

A.      Bid-ask spreads tend to be wide in the option markets more generally and this is one of the reasons, in my view, as to why even fairly actively traded options do not always fully reflect publicly available information quickly.

Q.      Do you have a view that the bid-ask spreads in the options market create opportunities for arbitrage?

STEWART MAYHEW, Ph.D.

Page 74

A.      No.

Q.      Okay.  So why -- why do you believe that bid-ask spreads are relevant to the question of whether the options traded in an efficient market?

MS. CHARMANI:  Objection to form.

THE WITNESS:  So I answer that in Paragraph 21 of my report.  And this relates to the mechanism through which information gets into prices.

BY MR. NIRMUL:

Q.      Did you -- oh, go ahead.

A.      I'm sorry.

Q.      I'm sorry.

A.      I was just going to read a portion of Paragraph 20 -- 21, but it's --

MS. CHARMANI:  Please take your time and finish your answer any way you want to.

BY MR. NIRMUL:

Q.      Go ahead, finish your answer.  What -- what were you going to answer?

A.      I was going to read -- I was going to read -- apologies for talking over you.

I was going to read the portion starting with "For example..." and the remainder of

STEWART MAYHEW, Ph.D.

Page 75

the paragraph.

Q.    Did you reach any conclusion with respect to BD options as to whether the trading costs were high for B -- for BD options during the Class Period?

A.    Well, you used the word "conclusion" as if that's an opinion that I'm planning to offer, but I don't think that's the case.  But it's pretty evident to me that trading costs are high for options generally and especially for options with these types of bid-ask spreads.

Q.    Does that -- when you say when there are high trading costs for options generally, what are you -- what are you referring to?

A.    The fact that bid-ask spreads tend to be wider in option markets than in stock markets generally.

Q.    And is that fact inconsistent with option markets trading efficiently?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I do believe that high trading costs are a relevant and important factor in the -- determining the degree to which a market is informationally efficient

STEWART MAYHEW, Ph.D.

Page 76

and in option markets in particular I do believe that relatively high trading costs are an impediment to the efficient incorporation of information into prices.

I think there's a spectrum of how much that matters as you go from the most actively traded options to the less actively traded options.

BY MR. NIRMUL:

Q.    Are you offering an opinion that BD's options reflected relatively high trading costs compared to other options?

A.    I haven't done an analysis like -- like that for this -- for this report.

Q.    And just, again --

A.    So I don't --

Q.    Okay.  And just so we understand, you don't have a definition of what constitutes relatively high trading costs with regard to options; right?  Am I correct?

A.    I don't have a threshold amount above which I would say it's high and below that it's not high.  I think it's a -- a spectrum of costs.  160% bid-ask spread means that the roundtrip trading cost

STEWART MAYHEW, Ph.D.

Page 77

to buy and sell at once is more than your entire investment.

Q.    So that you would consider 160% high in this context of -- of bid-ask spreads for option.

A.    Yes.

Q.    Okay.  Would you consider 5% high?

A.    Again, I don't have a magic threshold above which I would consider something high and not high.  It's just a -- it's just a spectrum.  I think it's artificial to say that at a certain point it crosses the line from medium to high.  It doesn't -- that is not meaningful to me.

Q.    Okay.  But you do characterize it as high, as trading costs -- I mean as bid-ask spreads being high in your report.  But you don't have a benchmark against which to assess what's high or low; correct?

MS. CHARMANI:  Objection to form.

THE WITNESS:  In my assessment the bid-ask spreads of BDX options were high and I -- I think that other people in the profession would consider them to be high bid-ask spreads.  But I don't have a formal -- I'm not aware of a formal

STEWART MAYHEW, Ph.D.

Page 78

definition in the academic literature of at what level it becomes high.

BY MR. NIRMUL:

Q.    Okay.  Let's turn to your opinion with regard to put-call parity that begins at Paragraph 26.

                    - - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

                    - - -

BY MR. NIRMUL:

Q.    Let me ask you just a basic foundational question:  Do you agree that the absence of arbitrage opportunities is supportive of a hypothesis that the market is efficient?

A.    In a general -- in a very general sense it is supportive.  But if the reason why there's no arbitrage opportunities is because the bid-ask spreads are so wide that the transaction costs would eliminate any profits from any attempted arbitrage opportunity, then I'm not sure that the absence of arbitrage alone carries much weight.

Q.    But -- but you agree that it's a --

STEWART MAYHEW, Ph.D.

Page 79

it is a relevant -- it is relevant evidence one would consider in assessing efficiency of a market.

A.   Yes.  If one looked at arbitrage relationships and found that there were large systematic violations, then that would be a concern and that would be a relevant factor that one would consider in evaluating.  That would be, as I say in my report, one form of it, inefficiency.  So that would be relevant.

Q.   Did you determine whether arbitrage opportunities persisted with options that had low trading volumes and/or high bid-ask spreads in this case?

A.   I did not look at that.

Q.   Okay.

MR. NIRMUL:  Let's take a look at Exhibit 3.

THE VIDEOGRAPHER:  Counsel, do you mean Tab 3?

MR. NIRMUL:  No, no.  I mean actually Exhibit 3 to Dr. Mayhew's report.  That's at Page --

THE VIDEOGRAPHER:  Gotcha.  Thank you.

STEWART MAYHEW, Ph.D.

Page 80

MR. NIRMUL:  -- 30.  Thanks.

- - -

(Whereupon the requested document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.    So this is a Summary of your Bid-Ask Spread Statistics and, as I read this, the -- the -- you know, so you divided this into "Call Options" and "Put Options" and then you further divided the options by whether they're "In-the-Money" or "Out-of-the-Money"; is that right?

Why did you feel that that was a -- a relevant factor to consider when examining the bid-ask spreads for BD's options, whether they're in-the-money or out-of-the-money?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Your question is why I consider it a relevant --

BY MR. NIRMUL:

Q.    Yeah.

A.    -- characteristic to consider?

Q.    Yes.

STEWART MAYHEW, Ph.D.

Page 81

A.      Well, different options that are different -- of different types, in-the-money, at-the-money, out-of-the-money, have different -- do have different economic characteristics from each other.  They have various different characterist -- economic characteristics from each other.

This table shows that bid-ask spreads is one metric that can be substantially different for different types of options and to me this helps illustrate the point that there's heterogeneity across the different option series.  They're not all identical with respect to their characteristics. And that seems to me a relevant point to make in this context.

Q.      Okay.  So looking at the in-the-money call options, you have a mean bid-ask spread of 5% versus out-of-the-money is a mean of 25%.

Would you characterize the bid-ask spread of the in-the-money options as high?

MS. CHARMANI:  Objection to form.

THE WITNESS:  I don't know.  I don't have a specific threshold over which something suddenly becomes high.

STEWART MAYHEW, Ph.D.

Page 82

BY MR. NIRMUL:

Q.     Uh-huh.

Within the in-the-money call options did -- was there a distinction as to the bid-ask spreads as to whether, you know, the spreads were related to how in-the-money the option was?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Can you just -- can you just repeat that question once more?

BY MR. NIRMUL:

Q.     I'll ask it in a different way.

In -- in analyzing these options in the bid-ask spreads, did you discern a relationship with the bid-ask spreads and the moneyness of the option?

A.     I did not specifically look at that question in this report, but I would not be surprised if there was such a relationship.

Q.     Okay.  And -- and by the same token, the more out-of-the-money the option is, the larger the bid-ask spread you observed; is that fair to say?

A.     Again, I did not specifically look at that question, but I would not be surprised if that

STEWART MAYHEW, Ph.D.

Page 83

were the case.

Q.    Okay.

One way to assess the -- the presence of arbitrage opportunities is to -- is to assess put-call parity; is that correct?

A.    That's a bit of a complex question to answer.  Assessing put-call parity can be -- if done in certain ways, can be used as a way to jointly test the efficiency of the stock and option markets.

Q.    Okay.

A.    But it's -- as I explain in my report, it's only a test of whether there's arbitrage opportunities.  Finding that there are large, persistent arbitrage opportunities is relevant evidence of inefficiency, but finding that there are not does not necessarily mean that markets are efficient.

Q.    Okay.  But it is a relevant piece of evidence one can use to assess market efficiency.

MS. CHARMANI:  Objection to form.

THE WITNESS:  It can be in some contexts; yes.

BY MR. NIRMUL:

Q.    Okay.  I wanted to draw your

Page 84

attention to Paragraph 30 of your report.

- - -

(Whereupon the requested portion of the document was placed on the video screen for the witness and counsel.)

- - -

BY MR. NIRMUL:

Q.    You -- you offer a -- an illustration in this paragraph and you -- you provide this illustration that supposes "...that new information is disclosed that reveals to the public that the company faces a large uncertainty that will be resolved in the near future, and it may be resolved in a way that is very favorable or very unfavorable to the company."

And you posit that "Suppose this announcement has no impact on the stock price but doubles the market's assessment of future volatility of the stock price."  Okay?

In this particular scenario what can you infer about the efficiency of the market for the company's stock if there's no change in the stock price despite there being a revelation of uncertainty?

STEWART MAYHEW, Ph.D.

Page 85

MS. CHARMANI:  Objection to form.

THE WITNESS:  So in this example the stock market participants may have believed that the likelihood of a positive outcome offsets the likelihood of a negative outcome in the way so that they offset each other and there's no im -- and there's no net impact on the expected stock price.  So the option -- the stock market could be perfectly efficient.

BY MR. NIRMUL:

Q.    You would see a high volume of trading that allows for this equilibrium to be reached that results in no net change in the stock price?  Is that -- is that true?

MS. CHARMANI:  Objection to form.

THE WITNESS:  In my example it doesn't matter whether or not there's trading volume.  You could have an announcement and nobody knows whether it's good news or bad news, everyone thinks it's neutral news, and nobody trades; or you could have a lot of trading.

Either way, I don't think it matters.

Page 86

The stock price doesn't -- in my example the stock price does not react because there's -- there's no net probability of good versus bad news would -- offsets each other.  So there's no impact on the stock price, my assumption.

BY MR. NIRMUL:

Q.    Okay.  Okay.  So -- but do you believe that in this example, if -- you say:  "If the markets for call and put options are inefficient, it may be the case that the option prices do not change in response to new information (thereby failing to reflect the value implications of the increase in future volatility), or the call and put prices may perversely move in the wrong direction...  In those situations, put-call parity may still hold even though the prices of call and put options failed to incorporate the rise in volatility."

Okay.  Is -- did you observe anything like this example with respect to BD options during the Class Period?

A.    I did not look for that.  The purpose of this paragraph was to illustrate the logic of why

STEWART MAYHEW, Ph.D.

Page 87

testing for put-call parity is not a robust test of market efficiency in the options market, of informational efficiency in the options market.

Q.    Right.  But you nonetheless do concede that it is -- it is relevant as a test --

MS. CHARMANI:  Objection to form.

BY MR. NIRMUL:

Q.    -- of market efficiency.

A.    As I said before, if one were to test for the presence of large, persistent arbitrage opportunities correctly using a formula similar to put-call parity and were to find that it was violated, that could be evidence of market inefficiency.  In that sense I do think it could be relevant.

That doesn't mean that finding an absence of arbitrage opportunities would carry a lot of weight in establishing that the option market is efficient.

Q.    Okay.

THE WITNESS:  How long have we been going?

MS. CHARMANI:  We've been going for almost an hour.

STEWART MAYHEW, Ph.D.

Page 88

THE WITNESS:  Okay.

MR. NIRMUL:  You know, actually, it's a good -- it's a good time for a break.  I'm not going to have too much more.  But why don't we break now, if that's okay with you. I don't know that we would need a lunch break and I probably may have like another half hour or so after this.

MS. CHARMANI:  Do you want to take a ten-minute break and then --

THE WITNESS:  Yeah, let's do it. Should we do a ten?

MR. NIRMUL:  Yeah, let's do ten minutes.

MS. CHARMANI:  Great.

THE VIDEOGRAPHER:  The time is 12:11. This ends Media No. 2.

- - -

(Whereupon there was a recess in the proceedings.)

- - -

THE VIDEOGRAPHER:  The time is 12:22. We are back on the video record.  This begins Media 3.

STEWART MAYHEW, Ph.D.

Page 89

BY MR. NIRMUL:

Q.    Dr. -- Dr. Mayhew, do you -- are you familiar with options pricing models?

A.    Yes.

Q.    Okay.  And do you agree that options -- option pricing models are used by -- by academics to price options?

A.    Yes.

Q.    Okay.  And -- and you're familiar with -- I mean, have you employed option pricing models in the course of your work or research?

A.    Yes, I've published papers on empirical tests of option pricing models.

Q.    Okay.  Are you familiar with the allegations in this case?

A.    I've reviewed the Complaint and have a high-level understanding of the allegations in this case.

Q.    Okay.  So you know, you are aware that the plaintiffs have alleged that -- that BD stock was inflated by false statements during the Class Period and at the end of the Class Period there were -- there was a series of revelations that eliminated that -- that inflation in the stock

STEWART MAYHEW, Ph.D.

Page 90

price?  Are you generally familiar with that kind of core allegation?

A.    I'm generally familiar with the allegations, yes, those -- those allegations.

Q.    Assuming that the stock price was inflated, as plaintiffs allege, during the Class Period, can one use an options pricing model to estimate the impact of the option inflation based on the change in stock price?

MS. CHARMANI:  Objection to form.

THE WITNESS:  Can you repeat the question once more?

BY MR. NIRMUL:

Q.    Yeah.

Assume that, as plaintiffs allege, that the stock price was inflated during the Class Period and that inflation was removed with the corrective disclosure.

Can you use an options pricing model to estimate the amount of inflation in the price of the options during the Class Period?

MS. CHARMANI:  Objection to form.

THE WITNESS:  So let me preface my answer by saying that this question was not

STEWART MAYHEW, Ph.D.

Page 91

part of my assignment and I haven't thought about it specifically in the context of this case.  And damages estimation generally was not part of my assignment in this case.

I have not given a lot of thought in this case or generally about the best way or the optimal way to try to estimate damages for options.  I have no reason to doubt that an option model might be part of that.

But I think that there would be numerous complexities that one would have to address in how to implement that model for it to be reliable.

BY MR. NIRMUL:

Q.    In other words, you'd have to assess the inputs to that model, you know, to determine whether or not the model can be applied to calculate damages.

MS. CHARMANI:  Objection to form.

THE WITNESS:  I think the complexities likely go -- would include complexities regarding selecting the inputs but would not be limited to the complexities of selecting the inputs.

STEWART MAYHEW, Ph.D.

Page 92

BY MR. NIRMUL:

Q.    And you would agree that with regard to -- whether it's complex or not, with regard to the model, the model could be -- the pricing model could be applied to all of the options that are included within the class definition.

MS. CHARMANI:  Objection to form.

THE WITNESS:  You're asking me sort of a general hypothetical question about a model that I don't know what model you're talking about.  I would have to evaluate a specific model as to -- of course one could blindly plug in the numbers into a model.

But to evaluate whether it would be reasonable or reliable to do so, I would have to understand what model and what assumptions were being made and a host of other complexities as to whether that model would actually be measuring harm that was related to the allegations.

BY MR. NIRMUL:

Q.    Okay.  That's it.  That's all I have for you today, Dr. Mayhew.  Thank you for your time.

A.    Thank you very much.  It was a

STEWART MAYHEW, Ph.D.

Page 93

pleasure.

MR. NIRMUL: Okay. Thank you, Thania.

MS. CHARMANI: Thank you, Dr. Mayhew.

MR. NIRMUL: I think that's it.

MS. CHARMANI: Nice seeing you all again.

Thanks, everyone, on the Zoom screen.

THE VIDEOGRAPHER: The time is 12:28. This concludes the deposition.

- - -

(Witness excused.)

- - -

(Whereupon the video-recorded deposition adjourned at 12:28 p.m.)

- - -

Case 2:20-cv-02155-SRC-CLW   Document 161-1   Filed 06/30/23   Page 184 of 216
PageID: 4206
INDUSTRIENS vs. BECTON DICKINSON, et al.

Page 94

- - -

STEWART MAYHEW, Ph.D.

- - -

C E R T I F I C A T E

- - -

I do hereby certify that I am a Notary Public in good standing; that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 4th day of June 2023.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Susan Marie Migatz
Notary Public

Job No. 5942815

Page 95

- - -

STEWART MAYHEW, Ph.D.

- - -

INSTRUCTIONS TO WITNESS

- - -

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Job No. 5942815

Page 96

- - -

STEWART MAYHEW, Ph.D.

- - -

E R R A T A

| PAGE | LINE | CHANGE |
|---|---|---|

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

_____   \_\_\_\_\_   _____

Reason: _____

Job No. 5942815

Case 2:20-cv-02155-SRC-CLW  Document 161-1  Filed 06/30/23  Page 187 of 216
PageID: 4209
INDUSTRIENS vs. BECTON DICKINSON, et al.

Page 97

- - -

ACKNOWLEDGEMENT OF DEPONENT

- - -

I, STEWART MAYHEW, Ph.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on the attached Errata Sheet.


_ _ _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

DATE                      SIGNATURE


                Subscribed and sworn to before me

this _ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ _ , 20__.


                My commission expires:

                _ _ _ _ _ _ _ _ _ _ _


                _ _ _ _ _ _ _ _ _ _ _

                Notary Public




Job No. 5942815

Page 98

Thania Chamani, Esquire

achamani@winston.com

June 5, 2023

RE:   Industriens v. Becton, Dickinson And Company, Et Al

5/31/2023, Stewart Mayhew , Ph.D. (#5942815)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

**[& - academic]**                                                    Page 1

| & | | | |
|---|---|---|---|

**&**

**&**  2:2,10,21 5:4 5:6 7:5,12

**0**

**0001**  3:10 8:20 8:24
**0002**  3:11 13:3 13:7
**02155**  1:9 4:18

**1**

**1**  4:12 12:3 21:8,13 26:17 27:13,18 28:15 58:12 62:3,4
**1.2**  55:13
**1/17/23**  3:10
**10**  33:10 51:23 54:9,12,13,17
**100**  47:8
**10166**  2:12
**10:54**  58:11
**11:15**  58:18
**12**  36:10
**12:11**  88:16
**12:22**  88:22
**12:28**  93:9,15
**13**  3:12
**140**  27:7 53:1
**15**  37:8
**155**  27:7 53:2
**160**  76:23 77:3
**17**  37:14 39:24 41:4 46:19

**18**  60:3,10
**1800**  1:23
**1801**  1:23
**184.58.**  55:7
**19**  42:4 60:2,9
**19087**  2:5
**19103**  1:24

**2**

**2**  18:6 49:16 58:18 59:5,23 69:13 88:17
**20**  74:15 97:15
**200**  2:12
**2019**  21:22
**2020**  21:22 22:2,4,9,20 24:4,19 25:12 25:17
**2023**  1:11 4:5 94:15 98:3
**21**  74:7,15
**210**  64:1
**212-294-6700**  2:13
**22**  48:23
**23**  63:19 64:4
**24**  59:18 62:20 63:2,11,17
**25**  51:23 72:11 81:17
**26**  78:6
**27**  46:18 47:3
**28**  26:17
**280**  2:4

**295**  26:2 27:6 27:19 52:5
**2:20**  1:9 4:18

**3**

**3**  58:21 79:17 79:19,21 88:24
**3.74**  52:3 53:2
**30**  69:6 80:1 84:1 95:18 98:17
**31**  1:11 4:5

**4**

**4**  8:20 18:14
**4.28.**  53:3
**43**  69:22
**484-270-1465**  2:5
**4th**  94:14

**5**

**5**  21:22,22 25:12 55:1 77:6 81:16 98:3
**5/3/23**  3:12
**5/31/2023**  98:5
**50**  32:23 65:4 69:6
**500**  47:8
**5942815**  94:24 95:24 96:24 97:24 98:5

**6**

**6**  3:5 22:2,3,9 22:12,20 24:4 24:19 25:17 27:14

**7**

**75**  51:24

**8**

**8**  3:10
**8,860**  55:12
**88.6**  55:4,9

**9**

**9**  46:19
**9.62**  54:10,15 54:15
**90**  51:24 54:14 54:17
**903**  94:18
**90th**  69:19
**9:31**  1:16 4:4

**a**

**a.m.**  1:16 4:4
**ability**  65:6
**able**  25:5 48:11
**above**  76:21 77:8 98:6
**absence**  78:15 78:23 87:17
**academic**  29:20 30:5 31:6 42:13,24 43:3 43:13 46:15 71:19 78:1

**[academics - article]** Page 2

academics  89:7
accepted  29:20
account  24:5
   24:17 27:4
   60:22
accounting
   47:15
accuracy  98:9
accurate  95:20
achamani  98:2
acharmani
   2:13
acknowledge
   5:14,18
acknowledge...
   97:2
acknowledg...
   98:12
action  1:3
   94:12
actions  17:6
active  47:8
   48:18
actively  48:15
   51:10 54:12
   69:6 70:5
   73:20 76:7,7
actually  8:19
   13:22 15:18
   56:6 59:4
   79:20 88:2
   92:19
address  36:22
   54:22 91:12

addresses
   43:13
adjourned
   93:15
administer
   5:20
administered
   5:19
affect  34:9
   39:15,16
affected  23:16
   37:9
affecting  38:8
affects  34:6,12
   38:19 40:9,11
affirmative
   19:18 20:19
   21:4
aforesaid  94:7
ago  16:14,21,23
   31:9 32:24
agree  5:22 32:2
   33:23 34:4,22
   36:4 47:19
   78:14,24 89:5
   92:2
ahead  74:11,19
aided  94:10
al  4:15 98:4
allegation  90:2
allegations
   89:15,17 90:4
   90:4 92:20
allege  90:6,15

alleged  21:20
   23:5 89:20
allotted  98:20
allowed  26:3
allows  85:13
amend  14:21
amount  63:22
   76:21 90:20
analyses  18:20
   19:6 21:7
   22:19 25:16,18
   27:22 28:2,12
analysis  22:22
   22:23 23:9,15
   24:17 25:22,23
   27:11 40:24
   46:7 49:15
   51:11 53:6,16
   54:21 60:21
   67:11 72:5
   76:13
analyzing  27:4
   82:12
announce  5:1
announcement
   40:1,10 84:17
   85:20
answer  19:5
   20:10,18 57:9
   62:2 74:6,17
   74:19,20 83:7
   90:24
answered  11:2
   20:3,14 21:2
   32:6 41:21

43:11 44:8
   55:18 60:24
answers  72:23
   97:6
anybody  17:6
apologies  74:22
appearance  5:1
appearances
   2:1
appears  9:16
   13:13
appendix  15:1
   15:10,16,18
   16:2 17:3
applicable  98:8
applied  91:17
   92:5
approach  31:5
appropriate
   68:14 73:1
   95:9
approved  1:17
approximate
   64:10
arbitrage  73:24
   78:15,19,22,23
   79:3,10 83:4
   83:13,14 87:10
   87:17
area  37:2
argue  42:12
arrive  25:15
   72:21
article  43:1

**[articles - beyond]**                                                          Page 3

**articles** 42:14
42:15,19,20
43:3,4
**artificial** 77:10
**asked** 11:1 20:2
20:13 21:1
32:6 39:13
43:11 44:8
55:18
**asking** 42:3
71:11 92:8
**aspects** 34:11
**assess** 77:16
83:3,4,19
91:15
**assessing** 22:6
71:14 79:2
83:7
**assessment**
77:19 84:18
**assessments**
69:16
**assign** 68:24
70:9
**assignment**
11:19 18:7
19:3,7 20:5,6,9
20:15 23:13
28:8,9,15 32:9
72:3 91:1,4
**associate** 2:21
7:19,20,22
**associated**
54:18

**association**
71:12
**assume** 43:17
43:20 44:4,19
90:15
**assuming** 53:8
90:5
**assumption**
44:13,14 86:6
**assumptions**
92:17
**athanasia** 2:10
**atlantic** 1:23
**attached** 95:15
97:9 98:11
**attempted**
78:21
**attention** 84:1
**attorney** 95:17
98:13
**attorneys** 5:13
**automatically**
36:14 38:9
43:18,21 44:17
64:5
**available** 18:19
19:12,23 29:13
29:17 30:14
31:4,16 33:8
57:12,22 73:21
98:6
**avenue** 2:12
**average** 24:23
51:17,20 52:19
52:19,23,24

53:18 54:10
55:4,6 59:15
61:20
**aware** 29:19
30:4 43:2,7,8
48:15 67:7
77:24 89:19

**b**

**b** 15:18 17:3
75:4
**back** 28:14
88:23
**bad** 85:21 86:4
**based** 23:22
25:3,7 31:8
35:14 36:7
44:16,24 65:20
68:1,16 69:14
90:8
**basic** 78:13
**basically** 37:24
**basis** 11:7,9,13
11:17,22
**bd** 70:19 71:1
71:13,24 72:8
72:12 73:3,14
75:3,4 86:21
89:20
**bd's** 8:7 10:11
10:15,18,24
22:7 23:10
32:3 71:6,22
76:10 80:16
**bdx** 18:18
19:11,22 20:23

21:7,24 22:7
23:23 24:11,24
25:11 28:1,5,8
33:19,20,21,22
33:23 34:1,3,6
34:13,16,23,24
35:5,6 36:13
36:15 49:10
52:7 57:10,22
59:20 60:7,16
60:18 62:20
69:17 72:12
77:20
**bear** 38:14
**becton** 1:7 4:15
98:4
**beginning**
52:11,13
**begins** 58:18
78:5 88:24
**behalf** 1:4
**belief** 25:15
**believe** 9:14,23
15:1 25:7 26:6
36:16 47:18
68:5 74:2
75:21 76:2
86:9
**believed** 85:3
**benchmark**
50:7 68:20
72:20 77:16
**best** 91:6
**beyond** 34:9

**[bid - claims]**                                                    Page 4

**bid**  23:21 24:16
  24:22,23 25:2
  25:9,22 27:4
  27:24 49:8,11
  52:12,17,20
  72:7,12,19,21
  73:2,7,12,13,17
  73:22 74:3
  75:11,15 76:24
  77:4,14,20,23
  78:20 79:12
  80:8,16 81:7
  81:16,18 82:4
  82:13,14,21
**big**  46:15
**bigger**  20:18,18
**bit**  83:6
**blindly**  92:13
**bonds**  17:10
**bovia**  2:21 7:19
  7:23
**break**  56:1,4,8
  58:4 59:6,14
  67:2 88:3,5,7
  88:10
**broadly**  36:24
**broner**  2:11 5:8
  7:13
**building**  7:4
**buy**  77:1

**c**

**c**  2:4 15:16 94:4
  94:4
**calculate**  51:20
  52:22,22,24

91:17
**call**  17:11
  23:23 27:7
  40:2 41:14
  42:17 51:18,21
  52:3 53:1,6
  54:9 60:1,3,10
  60:13 69:21
  78:5 80:10
  81:16 82:3
  83:5,7 86:10
  86:14,16,17
  87:1,12
**calls**  62:5,8
**camera**  4:8
**carbonite**
  17:17
**carefully**  25:19
  95:7
**carries**  78:23
**carry**  87:17
**case**  4:17 6:22
  8:4,14 11:16
  11:23 17:2,18
  19:1 67:8 75:8
  79:13 83:1
  86:11 89:15,18
  91:3,4,6
**categories**  61:8
**cause**  40:2
**causes**  40:4
**certain**  8:15
  73:5 77:10
  83:8

**certainly**  56:22
**certified**  1:18
  1:19
**certify**  94:6
  97:4
**chamani**  98:1
**change**  34:17
  35:4 45:6 56:9
  84:22 85:14
  86:12 90:9
  96:5
**changes**  14:16
  34:16,23 35:3
  37:10,11,20
  45:4 47:24
  48:9 95:13
  97:8 98:10
**characterist**
  81:5
**characteristic**
  80:23
**characteristics**
  61:5 81:4,6,12
**characterize**
  50:6 77:13
  81:18
**charmani**  2:10
  5:5,5 7:13,21
  11:1 12:17
  19:14 20:2,13
  21:1 22:15
  23:11 24:7,20
  25:24 26:5,12
  26:15 30:3
  31:17 32:5

34:2,18 35:1
  36:9 38:4 39:5
  39:12 40:16
  41:9,20 43:10
  44:7,22 45:13
  45:21 48:2,10
  50:9,23 51:5,9
  53:9 54:20
  55:17,23 58:5
  61:13 62:13
  63:1,8,13
  65:15 66:6,14
  67:6,20 68:11
  69:24 70:20
  71:9 72:1,14
  74:5,16 75:20
  77:18 80:18
  81:20 82:7
  83:20 85:1,16
  87:6,23 88:9
  88:15 90:10,22
  91:19 92:7
  93:4,6
**chart**  57:1,1
**check**  2:2 5:4
**chime**  56:7
**chris**  46:22
**christopher**  1:9
**cite**  46:17,20
**city**  7:1,3
**civil**  1:3
**claim**  42:15,21
**claims**  33:19
  35:10

**[clarification - core]**                                    Page 5

| | | | |
|---|---|---|---|
| **clarification** 28:11 | **commission** 97:17 | **computer** 94:10 | 53:6 56:15 |
| **class** 2:8 11:7,9 11:13,17,22 18:19 19:13,24 23:3 24:4,18 27:16 49:12 52:9,14 57:23 59:22 62:1,22 70:14 75:5 86:22 89:22,22 90:6,16,21 92:6 | **common** 10:11 10:15,18,24 29:10 32:3 | **concede** 87:5 | **considering** 21:24 |
| | **community** 29:21 30:5 | **concept** 32:17 32:21,22 37:3 41:18 69:9 | **consistent** 47:14 |
| | **companies** 35:12 36:1,5 | **concern** 79:5 | **constant** 35:3 |
| | **company** 1:8 4:15 84:12,15 98:4 | **concerned** 47:4 | **constitutes** 50:19 76:18 |
| | | **concludes** 93:10 | **constructed** 63:17 |
| | **company's** 84:22 | **conclusion** 32:3 35:23 72:21 75:2,6 | **construction** 63:18 |
| **classes** 65:24 69:7 | **compare** 73:2 | **conclusions** 11:21 | **contain** 40:10 |
| **clear** 41:22 68:18 | **compared** 55:13 63:23 73:7,11 76:12 | **conducted** 4:7 18:20 | **contains** 62:6 |
| **clearly** 34:3 | | | **contents** 10:2 |
| **close** 44:9 66:4 66:11,19 67:1 67:17 | **comparing** 72:20 | **connected** 25:4 | **context** 29:15 29:24 31:6 43:24 62:17 69:11 77:4 81:14 91:2 |
| | **comparison** 62:19,24 63:20 | **connection** 4:9 27:21 56:16 67:10 | |
| **closer** 61:20 | | **consider** 16:20 22:1 50:2,13 50:16,24 53:23 55:8 56:24 62:11 69:13,22 77:3,6,8,22 79:2,7 80:15 80:20,23 | **contexts** 29:21 30:2 83:22 |
| **clw** 1:9 4:18 | **complaint** 89:16 | | **contract** 50:13 55:2 |
| **colleagues** 5:7 | **completed** 98:17 | | **contracts** 50:20 51:1,7,14 54:10,14,15,18 55:9 |
| **column** 55:5 61:7 | **completely** 30:20 57:9 | | |
| **columns** 51:22 52:1 54:7 | **complex** 83:6 92:3 | | |
| **come** 30:5 35:22 | **complexities** 91:11,21,22,23 92:18 | **consideration** 71:6,14 | **convertible** 17:10 |
| **coming** 38:18 | | **considered** 22:9,13 30:8 35:15 36:8 38:15 50:12 | **convey** 52:4 |
| **commenced** 4:2 | **compute** 52:19 55:3 | | **copies** 98:14 |
| **commencing** 1:16 | | | **copy** 12:18,20 |
| | | | **core** 90:2 |

**[correct - derivative]**                                        Page 6

**correct** 8:12
  10:15,16,21,24
  11:3,17,18,23
  16:15 19:9
  20:1,12,22,24
  22:21 34:17,24
  41:19 43:6
  45:12 46:4
  48:16 53:12,21
  56:17 57:5
  60:14 63:10
  68:13 71:8,17
  72:9 76:20
  77:17 83:5
  94:11 97:6
**corrections**
  95:8,10 97:8
**corrective**
  21:20 23:5
  24:14 90:18
**correctly** 18:21
  54:11 71:11
  87:11 94:9
**correlated**
  70:13
**correlation**
  31:10
**corresponds**
  55:12
**cost** 76:24
**costs** 47:15
  73:10 75:4,9
  75:13,22 76:2
  76:11,19,23
  77:14 78:21

**counsel** 2:7,8
  2:15 4:24 5:21
  6:21 7:12,21
  9:1,8 10:6 12:8
  12:15,17 13:8
  13:20 14:6
  15:6,22 18:11
  19:4 21:17
  26:6,21 28:19
  33:15 42:9
  49:4,20 56:5
  58:8 59:2,10
  63:1,6 78:10
  79:18 80:5
  84:5 94:12
  98:14
**couple** 46:17,17
**course** 89:11
  92:12
**court** 1:1 4:16
  4:21 5:10,12
  6:8,15 95:21
**covers** 57:4
**create** 73:23
**criticize** 49:8
**cross** 52:24
**crosses** 77:11
**cs** 98:15
**cut** 29:10
**cutoff** 50:11
  54:13 55:11
**cv** 1:9 4:18
  15:10,11,13

**d**

**daily** 48:20
  51:17 55:6
  59:15
**damages** 11:6,8
  11:13,16,22
  91:3,7,18
**data** 25:2,3,6
  25:19 52:12,17
**date** 21:20 23:5
  27:14 95:12
  97:12
**day** 27:15
  29:22 30:2,8
  50:14,21 51:1
  51:7,14 52:20
  54:11,14,16
  55:9,13,13
  62:21 64:1,6
  70:6,7 94:15
  97:15
**days** 31:9 59:16
  60:1,2,22
  69:20,22 95:18
  98:17
**deals** 11:12
**decades** 37:1
**decisions** 35:20
**declaration**
  17:21
**decrease** 40:2
**decreasing**
  40:5
**deemed** 95:20

**deep** 53:15
  60:14 61:21,22
**defendants** 1:9
  2:15 5:6
**define** 21:6
**defined** 33:1
**definition** 23:1
  27:9,12 29:20
  30:6 31:19,23
  50:5,18 52:6
  55:10 60:18
  76:18 78:1
  92:6
**definitional**
  49:24
**degradation**
  65:5
**degree** 65:1
  75:23
**depends** 4:8
**deponent** 94:8
  94:9 97:2
  98:13
**deposed** 16:10
**deposing** 95:17
  98:13
**deposition** 1:14
  4:6,13 5:14,15
  5:16 16:3,6
  17:18 93:10,15
  94:11 95:7,15
  95:18,20
**derivative**
  33:21,24 34:4
  35:14 36:7

**[derivative - eligible]**

44:6,20
**derived** 33:22
  33:24
**describing**
  29:10 54:4
  72:19
**description** 3:9
  59:24
**despite** 47:7
  84:23
**determination**
  68:16
**determine** 31:2
  70:12 79:10
  91:16
**determining**
  75:23
**developed**
  31:12 32:23,24
**dickinson** 1:7
  4:15 98:4
**differences**
  53:23 73:9
**different** 25:10
  41:7 56:19,20
  56:20,21 61:8
  65:24 81:1,2,2
  81:3,4,5,8,9,11
  82:11
**direct** 59:22
**direction** 41:13
  41:15 86:16
**disagree** 35:16
**discard** 52:18

**discern** 82:13
**disciplinary**
  16:19
**disclosed** 84:11
**disclosure**
  21:20 23:5
  24:14 90:18
**discovery**
  65:10 68:4
**discussion**
  63:17
**disgorgement**
  17:5
**dispute** 11:20
**disputing** 10:23
**distinction** 82:4
**distribution**
  54:4 61:4,5
**district** 1:1,1
  4:16,17
**divided** 80:10
  80:11
**doctor** 72:14
**document** 8:22
  9:6,13,15 10:4
  12:6 13:5,11
  13:18 14:4,14
  15:4,20 18:10
  21:16 26:19
  28:18 33:14
  42:8 49:3,18
  58:24 59:8
  63:5 78:9 80:3
  84:4

**doing** 95:11
**doubles** 84:18
**doubt** 91:8
**dr** 6:20 8:3,12
  8:16 9:12,16
  9:18 10:9,23
  11:6,21 12:18
  13:12 14:10
  19:8,17 20:7
  20:17 23:14
  25:5 26:11
  28:10 32:2,10
  33:18 35:10,16
  42:12,21 43:5
  49:8 58:22
  59:14 79:21
  89:2,2 92:23
  93:4
**draw** 83:24
**duly** 6:12 94:8

**e**

**e** 1:8 94:4,4
  96:4
**earlier** 60:24
**earliest** 52:20
**early** 52:16
**eastern** 4:4
**economic** 30:9
  36:11,17 81:4
  81:6
**effect** 35:6
  37:22 40:5
**efficiency**
  10:10,14,24
  17:15,24 18:3

22:7 23:9 28:5
28:8 29:3,7,11
31:15,19 32:14
32:18,23 33:1
33:2,4,19,20
36:12,14 37:4
40:15,21 41:8
41:19 43:14,17
43:19,24 44:1
45:12 46:16
47:4,5,16,17,18
64:18 67:18
68:16 69:17
71:14 79:2
83:9,19 84:21
87:2,3,8
**efficient** 10:19
  22:1 30:23
  35:13,15 36:2
  36:6,8 38:16
  38:22 41:11,12
  41:13 42:16
  44:15,17 47:12
  64:9,14 69:14
  74:4 75:24
  76:3 78:16
  83:17 85:10
  87:19
**efficiently**
  20:24 65:11
  67:24 75:19
**either** 25:8
  85:24
**eligible** 23:3

**[eliminate - fama]**                                                    Page 8

| | | | |
|---|---|---|---|
| eliminate 78:21 | estimation 91:3 | exchange 17:12 | 23:4 24:4,13 |
| eliminated | et 4:15 98:4 | 42:17 44:16 | 24:19 25:12,16 |
| 89:24 | evaluate 19:7 | exchanges | expires 97:17 |
| embedded | 20:7,16 23:13 | 35:12 36:1,5 | explain 21:8 |
| 17:10 47:13 | 28:8,9 29:22 | exclude 52:15 | 37:8,15 83:11 |
| empirical 28:4 | 31:7 32:10 | excluded 22:19 | explaining |
| 51:11 69:4 | 46:3,24 92:11 | excuse 39:21 | 17:21 |
| 89:13 | 92:14 | excused 93:12 | exploit 47:12 |
| employed | evaluated | exhibit 3:10,11 | express 14:17 |
| 89:10 | 32:12 | 8:20,23 13:3,6 | expressed 8:15 |
| ends 58:11 | evaluating 28:5 | 26:2,6,10,11,16 | 9:22 14:13 |
| 88:17 | 31:12 50:8 | 26:17 27:18 | 27:13 |
| engagement | 79:7 | 49:16 56:3 | extent 24:3 |
| 18:3 | event 17:22 | 58:21 59:5,22 | extremely |
| entire 43:15 | events 70:13,18 | 62:3,4 69:13 | 50:14 |
| 54:4 61:5 77:1 | 71:1,13,23 | 79:17,21 | |

|   |   |
|---|---|
| | **f** |

| | | | |
|---|---|---|---|
| entirety 9:19 | evidence 67:8 | exhibited 49:10 | f 94:4 |
| entry 17:2 | 79:1 83:15,19 | exhibits 3:7 | faces 84:12 |
| equal 45:4,8 | 87:13 | 13:24 | facilitate 64:13 |
| equilibrium | evident 75:9 | expect 34:15 | fact 57:1 65:24 |
| 85:13 | exactly 12:22 | 35:5 45:5 54:2 | 75:15,18 |
| errata 95:10,11 | 17:9 | 61:10,15,18,19 | factor 34:6 |
| 95:14,17 97:9 | examination | 65:10 | 68:6,15 75:23 |
| 98:11,13,17 | 6:17 | expectations | 79:6 80:15 |
| especially | examined 6:12 | 37:12 | factors 34:8 |
| 75:10 | examining | expected 85:8 | 45:3 |
| esquire 2:3,3,4 | 80:15 | experience 37:1 | fail 95:19 |
| 2:10,11,11 | example 23:16 | 65:20 | failed 86:18 |
| 98:1 | 30:16 31:9 | expert 3:10,11 | failing 86:13 |
| essentially | 40:3,7 46:20 | 8:6,11 18:2 | fails 98:19 |
| 31:23 38:3 | 74:24 85:2,17 | 19:6 | fair 82:21 |
| establishing | 86:1,9,21 | expiration | fairly 73:19 |
| 87:18 | examples 46:17 | 27:14 | false 89:21 |
| estimate 90:8 | except 97:7 | expired 21:19 | fama 32:23 |
| 90:20 91:7 | | 22:2,8,11,20 | |

**[familiar - going]**                                                         Page 9

**familiar** 9:21 11:7 53:11 89:3,9,14 90:1 90:3

**favorable** 84:14

**february** 21:22 22:2,3,9,12,20 24:4,13,19 25:12,17 27:14

**federally** 1:17

**feel** 80:14

**figure** 35:21

**filed** 4:15

**final** 55:5

**find** 14:2 39:21 47:9,10 56:1 67:12 87:12

**finding** 83:13 83:15 87:16

**fine** 12:23

**finish** 56:3 74:17,19

**finra** 16:18

**firm** 4:22

**first** 5:12 6:12 9:4 12:10 17:2 23:12 61:7 64:15

**five** 50:20,24

**flip** 26:16

**focus** 23:15 29:22 68:15 69:4

**follow** 36:13

**follows** 6:13 33:20 43:18,21 64:4

**footnote** 21:8 21:13 27:13 46:18,19 47:3

**foregoing** 97:5

**forlenza** 1:8

**form** 19:14 22:15 23:11 24:7,20 25:24 28:11 30:3 31:17 32:4,5 32:17,22 33:2 33:2,3,6 34:2 34:18 35:1,13 36:2,6,9 38:4 39:5,12 40:16 41:9,20 43:10 44:7,22 45:13 45:21 48:2,10 50:9,23 51:5,9 53:9 54:20 55:17 61:13 62:13 65:15 66:6 67:6,20 68:11 69:24 70:20 71:9 72:1 74:5 75:20 77:18 79:8 80:18 81:20 82:7 83:20 85:1,16 87:6 90:10,22

91:19 92:7 97:8

**formal** 25:18 28:11 50:10 77:24,24

**formula** 87:11

**found** 35:11 65:2,13 79:4

**foundational** 78:14

**four** 16:3,7,14

**framework** 32:24

**frequency** 61:12 62:11 67:13 69:12,23 71:2,12 73:6

**frequent** 48:19

**frequently** 48:22 62:12 66:4,12,20 67:4

**front** 13:1

**fully** 18:18 19:11,23 29:12 30:11,12,13,15 31:3,15,21,21 37:6 38:10,21 41:1 47:1 73:20

**function** 45:1 68:5

**functioning** 65:11

**fundamental** 47:4,16

**further** 5:18,21 80:11

**future** 37:12,15 40:4 84:13,18 86:14

**futures** 46:22

**g**

**general** 56:22 78:17,17 92:9

**generally** 35:12 36:2,5 66:2,10 67:3 73:18 75:10,13,17 90:1,3 91:3,6

**generate** 47:14

**give** 58:8

**given** 42:16 64:1,3 91:5 94:11 97:6

**go** 10:1 13:22 14:24 15:16 18:6 22:24 26:11 28:14 33:10 58:9 59:4 65:3 74:11,19 76:6 91:21

**goes** 57:9

**going** 4:4 42:4 55:24 67:17 74:14,20,21,21 74:23 87:22,23 88:4

**[good - individually]**                                              Page 10

**good**  4:3 6:20
  59:12 85:21
  86:4 88:3,3
  94:7
**gotcha**  79:23
**great**  7:24 58:5
  63:8 88:15
**greater**  21:21
**group**  69:5
**guess**  27:2,2
  49:14

**h**

**half**  88:8
**hand**  12:19
  94:14
**happy**  12:20
**hard**  12:20
**harm**  92:19
**harmed**  17:6
**heading**  18:7
**heard**  4:10
**hearing**  6:8
**held**  1:15
**help**  73:8
**helpful**  73:5
**helps**  81:9
**heterogeneity**
  81:10
**high**  49:11 50:5
  50:16,19,22
  51:8 55:8,11
  55:16 67:12
  69:9,9,23 70:4
  70:10 72:13,19
  72:22,24 75:4

75:9,13,21
76:2,11,19,22
76:23 77:3,6,8
77:9,11,14,15
77:16,20,22
78:2 79:12
81:19,23 85:12
89:17
**higher**  67:13
  71:23
**highest**  69:5
**highly**  38:17
  54:18 63:16
  68:6
**hold**  86:17
**holding**  35:2
**host**  92:17
**hour**  87:24
  88:8
**hourly**  48:20
**huh**  21:11,23
  31:13 37:7,18
  52:8 53:4 54:6
  57:14 61:10
  62:19 65:12
  67:10 69:11,19
  70:8 71:5 82:2
**hundreds**
  57:11
**hypothesis**
  78:16
**hypothetical**
  92:9

**i**

**identical**  81:12
**identification**
  8:23 13:6
**identified**
  42:13,19
**illustrate**  81:10
  86:24
**illustration**
  84:8,10
**immediately**
  30:19
**impact**  23:9
  37:16,17 38:1
  38:2 39:3,11
  40:12 44:5
  48:8 84:17
  85:8 86:5 90:8
**impacted**  45:20
  46:13
**impacts**  39:2
  39:10 41:5,6
  44:4
**impediment**
  76:3
**imperative**
  95:16
**implement**  31:7
  91:12
**implications**
  86:13
**implies**  28:7
**important**
  30:17 37:16
  67:22 75:22

**impounded**
  37:20
**include**  57:16
  60:20 69:6
  91:21
**included**  25:22
  53:16 92:6
**includes**  21:19
  60:12
**including**  53:12
**inconsistent**
  40:14,20 41:7
  41:18 45:12
  67:18 75:18
**incorporate**
  30:24 86:18
**incorporated**
  33:5 38:9
**incorporates**
  31:1
**incorporation**
  76:4
**increase**  40:3,4
  86:14
**index**  3:2 47:10
  47:13
**indicated**  94:8
**indicative**
  64:17
**indices**  47:11
**individual**
  49:10 69:3
**individually**
  1:4

**[industriens - listed]**                                           Page 11

| industriens 1:3 2:7 4:14 98:4 | informational 29:3,7,11 | **j** | **l** |
|---|---|---|---|

**industriens** 1:3
2:7 4:14 98:4
**industry** 42:14
42:20 43:3
**inefficiency**
79:8 83:15
87:14
**inefficient**
68:10 86:11
**infer** 84:21
**inflated** 89:21
90:6,16
**inflation** 89:24
90:8,17,20
**information**
14:20 18:19
19:12,24 23:19
29:13,18,23
30:14,17,21,24
31:1,4,8,9,16
31:22 33:4,8
37:5,10,15,19
37:24 38:6,11
38:18,21 39:2
39:10,14 40:8
40:10,12 41:1
41:2,5 44:4,5
44:20,21 45:20
46:14 47:2,13
47:24 48:8
62:3 64:20
65:2,7 67:24
71:7 73:5,21
74:8 76:4
84:10 86:12

**informational**
29:3,7,11
31:14,14,19
37:4 40:15,20
41:8,18 44:1
45:12 47:5,17
47:18 87:3
**informational...**
30:22 38:16
39:2 41:11
44:17 75:24
**informed** 37:1
**infrequently**
59:21
**inputs** 91:16,22
91:24
**instance** 60:13
**instructions**
95:4
**instruments**
33:21,24 34:4
**interested**
94:12
**internet** 4:9
**interpretation**
17:22
**investment**
77:2
**investors** 47:12
**isolate** 68:15
**issue** 31:12
32:8 47:15

**j**

**jasmine** 2:21
7:23
**jersey** 1:1 4:17
**job** 94:24 95:24
96:24 97:24
**jointly** 83:8
**joseph** 3:10
8:12
**journal** 46:22
**june** 94:15 98:3
**juxtapose** 73:5

**k**

**keener** 17:1,4
**kessler** 2:2 5:3
**key** 34:5
**kin** 94:12
**kind** 42:23 51:3
90:1
**king** 2:4
**know** 16:19
17:11 39:9
40:24 48:18
51:3 57:22
62:12 66:8
71:20 80:10
81:21 82:5
88:2,6 89:19
91:16 92:10
**knows** 85:20
**ktmc.com** 2:6,6
2:7

**l**

**label** 62:14,16
68:23 70:10
**labels** 55:20
70:4
**language** 29:9
**large** 43:12
62:4 79:4
83:14 84:12
87:10
**larger** 82:20
**lawyers** 7:14
**lead** 2:7,8
**left** 56:8
**legal** 1:22 4:20
4:22 35:19
98:23
**level** 34:12 40:8
55:11 64:21,22
67:23 69:17
78:2 89:17
**levels** 33:1,3
53:7 56:20
**lieu** 5:19
**likelihood** 85:4
85:5
**likely** 68:4
91:21
**limited** 91:23
**line** 77:11 96:5
**liquidity** 73:10
**list** 60:2
**listed** 17:2
52:12 66:1

[literature - mean]                                                      Page 12

**literature**
43:13,16 46:16
71:19 78:1
**livenote** 1:19
**llp** 2:2,10,21
**located** 6:24
7:3
**logic** 86:24
**long** 16:21
30:20 87:21
**look** 26:3,3
51:17,18 64:19
69:19 79:14,16
82:16,23 86:23
**looked** 25:19
25:19 27:20,24
52:9 56:14
61:4,24 65:1
67:15 70:15
71:3 72:4,7
79:3
**looking** 31:10
36:21 39:22
49:8 59:15
64:20 65:16
67:11 81:15
**lot** 65:24 68:24
70:3,10 85:23
87:17 91:5
**low** 49:10 50:2
50:5,7,11,12,14
50:21 51:1,8
55:12,16 59:20
67:19 68:9,19
68:23 70:11

77:17 79:11
**lower** 65:9,21
67:24 68:2
**lowest** 63:24
**luna** 17:17
**lunch** 88:6

**m**

**m** 2:3
**machine** 94:9
**made** 69:16
92:17 95:10
**magic** 64:22
72:24 77:7
**major** 35:12
36:1,5
**make** 14:17
57:1 60:17
68:16 81:13
95:8
**makers** 47:20
48:15,15
**making** 26:10
**manifestation**
59:19
**manner** 6:3
**marie** 1:17
94:19
**mark** 13:2
**marked** 8:22
13:5
**market** 1:23
10:10,15,19
17:15,24 18:4
20:24 21:24
22:7 23:10

28:5 30:19,23
30:23 31:20
32:4,13,17
33:1,2,3,19,20
36:14 38:22
41:10 42:15
43:14,18,19
44:14,15 45:8
46:16 47:20,21
48:15,15,16
55:14 64:9,14
64:18 67:18
68:9,10,16
71:15 73:11,11
73:23 74:4
75:24 78:16
79:2 83:19
84:21 85:3,9
87:2,2,3,8,13
87:18
**market's** 37:11
84:18
**markets** 35:13
35:15 36:3,6,8
36:12 42:17
43:15 46:23
47:9,9,11
56:19 65:6
67:23 73:18
75:16,16,19
76:1 83:9,16
86:10
**mason** 3:10
8:12,16 10:9
33:18 35:10

42:12 49:8
**mason's** 9:16
9:18 10:23
11:6,21 19:8
19:17 20:7,17
23:14 25:5
28:10 32:2,10
35:16 42:21
43:5
**matter** 4:14
17:4,20 23:4
36:12,17 85:18
**matters** 76:6
85:24
**max** 51:24
**mayhew** 1:15
3:4,7,12 4:13
6:11,20 8:3,20
8:23 9:12 13:2
13:6,12 14:10
26:11 59:14
89:2 92:23
93:4 94:2 95:2
96:2 97:4 98:5
**mayhew's**
12:18 58:22
79:21
**mean** 29:16
30:11,12 46:6
46:7,8 48:5
51:23 52:1,2
52:24 57:2,19
60:2,6,6,9,10
60:12 61:6,8
77:14 79:19,20

**[mean - nirmul]**                                                Page 13

81:16,17 83:16
87:16 89:10
**meaning** 68:24
70:10
**meaningful**
55:20 77:12
**means** 30:6
76:24
**measured**
11:17,22
**measuring** 11:6
11:8,12 92:19
**mechanics**
17:21
**mechanism**
65:10 68:4
74:8
**media** 4:12
56:8 58:11,18
88:17,24
**median** 50:13
51:24
**medium** 50:5
50:21 51:8
55:16 69:10
77:11
**meltzer** 2:2 5:4
**mentioned** 37:3
**merit** 1:18
**met** 52:6
**methodologies**
28:10
**methodology**
71:18

**metlife** 7:4
**metric** 81:8
**metrics** 73:5
**michelle** 2:11
5:7 7:13
**mid** 1:23
**midatlantic**
98:15
**middle** 33:7
62:3
**migatz** 1:17
4:22 94:19
**milan** 2:3
**miller** 2:19
4:19
**million** 55:13
**min** 51:23
**mind** 50:18
64:21 68:20
**minute** 48:20
88:10
**minutes** 56:7
58:7 88:14
**mix** 64:20
**mixed** 66:23
**model** 90:7,19
91:9,12,16,17
92:4,4,4,10,10
92:12,13,16,18
**models** 69:4
89:3,6,11,13
**moment** 14:1
58:9
**money** 53:13
53:13,13,15

60:14 61:20,21
61:22,24 62:6
62:7,7 66:3,4,5
66:11,11,13,16
66:16,18,19,19
66:21,24 67:1
67:4,5,14,14
80:12,13,17,17
81:2,3,3,15,17
81:19 82:3,6
82:20
**moneyness**
53:7,20,24
54:19 56:15,20
57:5 60:23
61:3,9,11
82:14
**morning** 4:3
6:20
**move** 86:15
**mtuma** 2:14
**multiple** 70:5

**n**

**name** 4:19 6:20
7:23
**nathaniel** 2:4
**natural** 56:1
**nature** 16:24
17:18
**near** 62:7 66:18
84:13
**necessarily**
68:9 83:16
**necessary** 95:8

**need** 42:24 56:8
88:6
**negative** 85:5
**neither** 94:12
**net** 85:7,14
86:3
**neutral** 85:22
**never** 60:17,19
**new** 1:1 2:12
4:17 7:1,2
30:21 37:10
84:10 86:12
**news** 40:1,4
85:21,21,22
86:4
**nice** 93:6
**nine** 56:7
**nirmul** 2:3 3:5
5:3,3 6:19,21
7:24 8:2,19 9:3
9:10,11 10:1,8
11:4 12:3,10
12:23 13:10,15
13:22 14:8,24
15:8,9,16,24
16:1 18:13
19:19 20:8,21
21:5,12 22:16
24:1,15 25:13
26:8,14,16
27:1 28:14,21
30:10 32:1,15
33:17 34:14,21
35:8 36:18
38:13 39:7,17

**[nirmul - okay]**                                              Page 14

40:17 41:16
42:1,11 43:22
44:11 45:10,16
46:1 48:6,13
49:6 50:15
51:2,6,15
53:10 54:23
55:21,23 56:2
56:10,12 58:3
58:6,20 59:4
59:12,13 61:16
62:18 63:10
64:7 65:19
66:7,17 67:9
68:7,12 70:1
70:23 71:16
72:6,17 74:10
74:18 76:9
78:3,12 79:16
79:20 80:1,7
80:21 82:1,10
83:23 84:7
85:11 86:7
87:7 88:2,13
89:1 90:13
91:14 92:1,21
93:2,5
**non** 27:14
  52:20
**notary** 1:19
  5:23 6:1 94:6
  94:20 97:21
**note** 4:6 27:18
  33:18 35:10
  49:9 59:18

72:11 98:10
**noted** 95:14
  97:9
**notice** 94:7
**noticed** 35:19
**november**
  21:22
**nsimon** 2:7
**number** 3:9
  27:6 35:19
**numbers** 62:9
  92:13
**numerous**
  46:24 91:11
**ny** 2:12

**o**

**oath** 5:19,20
**objection** 6:2,9
  11:1 19:14
  20:2,13 21:1
  22:15 23:11
  24:7,20 25:24
  30:3 31:17
  32:5 34:2,18
  35:1 36:9 38:4
  39:5,12 40:16
  41:9,20 43:10
  44:7,22 45:13
  45:21 48:2,10
  50:9,23 51:5,9
  53:9 54:20
  55:17 61:13
  62:13 65:15
  66:6,14 67:6
  67:20 68:11

69:24 70:20
71:9 72:1 74:5
75:20 77:18
80:18 81:20
82:7 83:20
85:1,16 87:6
90:10,22 91:19
92:7
**objections**
  12:19
**observation**
  35:17
**observe** 46:12
  69:21 71:22
  86:20
**observed** 47:24
  54:10 69:15
  82:21
**obvious** 42:22
**obviously**
  42:23
**occasions** 16:13
**offer** 8:6 75:7
  84:8
**offering** 10:20
  10:22 11:15,24
  19:16,18,21
  20:4,19 21:3
  32:7 64:11
  76:10
**offices** 7:6
**official** 94:14
**offset** 85:6
**offsets** 40:5,11
  85:5 86:4

**oh** 74:11
**okay** 7:2,5,14
  7:24 8:9,14,18
  9:10,15,18,24
  10:13,17,22
  11:5,11,15,20
  12:2 13:2,14
  14:20,23 15:8
  15:12,15,24
  16:5,9,13,16,21
  16:24 17:17
  18:2,6,23 19:5
  20:9 21:6 23:8
  24:2,16 27:9
  27:17,20,24
  28:13 30:11
  32:16 33:10,18
  33:22 35:9
  36:23 37:23
  39:8 41:2,17
  42:2 43:7 44:3
  44:12,18 45:11
  45:17 47:7,23
  48:14,23 49:14
  49:23 50:20
  51:3 53:18,22
  54:24 55:8,22
  56:2,4,10,23
  57:7 58:1,20
  59:12 62:10
  63:8 67:17
  70:17 72:7,11
  72:18 74:2
  76:17 77:6,13
  78:4 79:15

**[okay - pages]**                                          Page 15

81:15 82:19
83:2,10,18,24
84:19 86:8,8
86:20 87:20
88:1,5 89:5,9
89:14,19 92:22
93:2
**old** 31:8
**once** 70:6,6
  77:1 82:9
  90:12
**ones** 61:21
**op** 63:23
**opining** 39:9,14
  39:20
**opinion** 10:10
  10:17,20,23
  11:16,24 19:10
  19:21 20:20,23
  21:4 30:7 32:7
  32:11,12 36:20
  37:1 39:1
  64:11 75:7
  76:10 78:4
**opinions** 8:14
  8:15 9:21
  10:14,23 11:8
  14:13,17 17:14
  17:23 19:8,16
  19:16,18 20:16
  28:9
**opportunities**
  73:23 78:15,19
  79:11 83:4,13
  83:14 87:11,17

**opportunity**
  78:22
**opposed** 30:16
  47:5
**optimal** 91:7
**option** 17:10,12
  23:2,10 24:3
  25:21 27:3,3,7
  27:7 34:9,16
  37:9,16,20
  38:1,10,10
  39:11,16 40:3
  40:11,13 41:13
  41:14 43:14,18
  44:16,24 45:6
  45:19 46:10,13
  46:16 47:1,8
  48:21 49:10
  52:5 53:1,2,5
  54:1 55:6
  56:19 59:20
  60:11 61:3,12
  63:23 65:1,6,9
  65:24 67:23
  69:4,7 72:12
  73:10,18 75:16
  75:19 76:1
  77:4 81:11
  82:6,15,20
  83:9 85:9
  86:11 87:18
  89:6,10,13
  90:8 91:9
**options** 8:7,8
  17:8,13,15,24

18:4,18 19:11
19:22 20:23
21:7,19,24
22:1,8,8,10,20
23:18,22,23
24:6,11,12,18
24:23,24 25:11
25:16 27:10,12
27:13,21 28:1
28:6,9 32:11
33:19,21,23
34:3,7,13,24
35:7 36:13
37:2 38:7,15
38:19,20 39:3
40:18,24 41:6
41:19 42:17
44:6,21 45:7
45:19,23 46:8
47:11,20 48:1
48:4,9,16 50:3
51:11,18,19,21
52:3,7 53:6,13
53:14,15,20
54:9,19 55:22
56:13,15 57:3
57:4,10,11,22
60:1,2,3,4,7,10
60:13,13,16,16
60:18,23 61:19
61:23 62:7,12
64:9,13,14
65:3,4,13,21
66:1,10,12
67:4,5,13,18

68:21 69:3,5
69:10,13,17,21
70:2,5,19 71:2
71:7 72:8,13
73:2,7,13,20,23
74:4 75:3,4,10
75:10,13 76:7
76:8,11,12,20
77:20 79:11
80:10,11,12,16
81:1,9,16,19
82:3,12 86:10
86:18,21 87:2
87:3 89:3,6,7
90:7,19,21
91:8 92:5
**order** 64:8
**original** 95:17
**outcome** 85:4,5
  94:12
**outside** 11:18
  72:3
**own** 69:1

**p**

**p.m.** 93:15
**pa** 2:5
**page** 3:4,9 9:4
  10:2 12:11
  13:16,23 14:2
  15:1,2 18:6
  21:9 26:17
  28:15 46:19
  79:22 96:5
**pages** 97:5

**[pairs - practitioner]**

| | | | |
|---|---|---|---|
| **pairs** 27:3 | **particular** 24:6 | 90:7,17,21 | **planning** 75:7 |
| **panel** 62:3 | 57:1 62:10 | **persisted** 79:11 | **please** 4:6,24 |
| **paper** 46:20,21 | 63:15 70:10,13 | **persistent** | 5:10 6:3 10:2 |
| **papers** 89:12 | 76:1 84:20 | 83:14 87:10 | 12:4 13:23 |
| **paragraph** | **particularly** | **person** 5:19 | 15:17 21:13 |
| 18:14 33:10 | 55:20 62:16 | 64:19 | 22:5 28:15 |
| 36:10 37:8,14 | **parties** 5:21 | **perspective** | 70:22 74:16 |
| 39:24 41:4 | **partway** 52:14 | 30:9 42:22 | 95:7,11 |
| 42:4 46:19 | **party** 6:2 94:12 | **perversely** | **pleasure** 93:1 |
| 48:23 49:7 | **past** 65:2 | 86:15 | **plug** 92:13 |
| 59:18 62:20 | **peer** 42:13 | **ph.d.** 1:15 3:4 | **point** 50:11 |
| 63:2,11,12,17 | **pending** 26:24 | 3:10,12 4:14 | 62:21 77:10 |
| 63:19 64:4 | **pennsylvania** | 6:11 94:2 95:2 | 81:10,13 |
| 72:11,15 74:7 | 1:24 | 96:2 97:4 98:5 | **polen** 1:8 |
| 74:15 75:1 | **pensionsforsi...** | **philadelphia** | **poon** 46:21 |
| 78:6 84:1,9 | 1:3 2:8 | 1:24 | 47:9 |
| 86:24 | **people** 29:21 | **phrase** 29:7 | **pope** 46:21 |
| **paragraphs** | 77:21 | 53:11 | 47:9 |
| 36:21 | **percentage** | **physically** 5:15 | **portion** 12:13 |
| **parallel** 63:18 | 59:16 60:1,22 | **piece** 83:18 | 18:9 21:15 |
| **parity** 78:5 | 61:23 69:20 | **place** 94:8 | 28:17 33:13 |
| 83:5,7 86:16 | **percentages** | **placed** 8:24 9:7 | 42:7 49:2 |
| 87:1,12 | 60:6 | 10:5 12:7,14 | 52:17,18 63:4 |
| **park** 2:12 | **percentile** | 13:7,19 14:5 | 74:14,23 78:8 |
| **part** 19:2 23:3 | 69:20,21 | 15:5,21 18:10 | 84:3 |
| 25:4 28:2 | **perfectly** 85:10 | 21:16 26:20 | **posed** 28:23 |
| 52:14,14 60:15 | **period** 18:20 | 28:18 33:14 | 40:23 |
| 64:19 72:5 | 19:13,24 24:4 | 42:8 49:3,19 | **posit** 84:16 |
| 91:1,4,9 | 24:18 27:16 | 59:1,9 63:5 | **positing** 41:3 |
| **partially** 30:16 | 29:22 49:12 | 78:9 80:4 84:4 | **positive** 85:4 |
| **participants** | 52:10,11,11,13 | **plaintiff** 2:7 5:4 | **possibility** 40:1 |
| 4:9 85:3 | 52:15 57:23 | **plaintiffs** 1:5 | **potentially** |
| **participating** | 59:22 62:1,22 | 6:21 89:20 | 23:3 57:11 |
| 5:13 | 70:14 75:5 | 90:6,15 | **practitioner** |
| | 86:22 89:22,22 | | 42:14,20 43:4 |

**[practitioners - quickly]**                                          Page 17

**practitioners**
  35:11,18,21
**preface**  90:23
**prerequisite**
  31:14,24
**presence**  83:3
  87:10
**present**  2:18
  5:15
**pretty**  64:4
  75:8
**price**  29:16
  30:21 31:3
  33:5,9 34:5,12
  35:4 37:6,13
  37:17,22 38:1
  38:2,8,12,20
  39:3,3,11 40:2
  40:6,9,11 41:5
  41:12 44:4,6
  44:19 45:2,4,7
  46:10 52:12,21
  65:10 68:4
  84:17,19,23
  85:8,15 86:1,2
  86:6 89:7 90:1
  90:5,9,16,20
**prices**  18:17
  19:10,22 29:4
  29:8 31:20,20
  37:11,16,20,21
  38:10,10 39:10
  40:3 45:18,23
  46:8,13 47:1
  62:5 65:1 74:9

76:4 86:12,15
  86:17
**pricing**  89:3,6
  89:10,13 90:7
  90:19 92:4
**print**  12:21
  26:13
**printed**  12:18
**prior**  16:14
  18:3 63:19
  72:23
**probability**
  86:3
**probably**  88:7
**proceed**  58:19
**proceeding**
  16:19
**proceedings**
  18:17 20:11
  58:15 88:20
**process**  67:24
**production**
  25:4
**profession**
  77:22
**professor**  32:23
**profitable**  31:7
**profits**  47:14
  78:21
**propounded**
  97:7
**provide**  47:20
  48:16,19 84:9
**provided**  10:10
  16:5 17:1 18:2

23:1 48:9
**provides**  63:19
**providing**
  10:13
**prussia**  2:4
**public**  1:20
  30:18 31:21
  33:7 41:1,2
  47:1 84:11
  94:7,20 97:21
**publicly**  18:18
  19:12,23 29:12
  29:17 30:13
  31:3,16 33:7
  73:21
**published**
  46:21 64:24
  89:12
**pull**  8:19 12:3
  58:21
**purpose**  86:23
**purposes**  8:23
  13:6 21:7
  27:10
**pursuant**  20:5
  94:7
**put**  27:7 42:17
  51:18 53:2
  55:6,22 56:13
  56:15 57:3
  60:2,3,11 78:5
  80:11 83:5,7
  86:10,15,16,18
  87:1,12

**putative**  2:8
  18:19 19:12,24
  27:16 49:12
  52:9 59:21
**puts**  62:5,8

**q**

**quality**  4:7,8
  65:6
**question**  10:21
  18:16,24 19:6
  19:20 20:6,10
  20:11,19 22:5
  22:18 26:23
  27:3 28:7,22
  28:24 29:24
  34:20 37:4
  40:20,23 43:14
  45:15 46:11
  49:24 54:22
  56:14 57:21
  61:1 65:17
  67:1,16 69:18
  70:15,22 71:11
  74:3 78:14
  80:19 82:9,17
  82:24 83:6
  90:12,24 92:9
**questions**  66:23
  97:7
**quick**  56:11
**quickly**  18:18
  19:11,23 29:12
  29:15,17,21,23
  30:1,6,8,24
  31:1,21 37:5

**[quickly - relevant]**

38:11,21 40:24
  73:21
**quite**  46:5
**quotations**
  47:20 48:1,4,9
  48:16,19
**quote**  18:15
**quoted**  35:19
**quotes**  48:22

**r**

**r**  1:9 3:10 94:4
  96:4,4
**radnor**  2:5
**range**  57:4 62:4
**raw**  25:19
**reach**  18:24
  75:2
**reached**  85:14
**react**  44:21
  86:2
**reacting**  30:19
**reaction**  41:12
  41:14
**reacts**  44:20
**read**  18:21
  74:14,21,22,23
  80:9 95:7 97:5
  98:9
**reader**  59:22
  73:8
**reading**  28:24
  54:11
**really**  40:19
  70:3

**realtime**  1:18
**reason**  78:18
  91:8 95:9 96:7
  96:9,11,13,15
  96:17,19,21,23
  98:11
**reasonable**
  29:10 92:15
**reasons**  54:3
  73:19
**rebuttal**  3:11
**recall**  18:5 58:2
  62:2,8 65:16
  65:18 71:19
**receipt**  95:18
  98:18
**recess**  58:14
  88:19
**recognize**  9:12
  13:11
**recollection**
  26:2
**record**  4:1,4
  5:2 6:23 58:9
  88:23 94:11
**recorded**  1:14
  4:11,13 93:14
  94:9
**recording**  4:8
**refer**  12:24
  26:1
**reference**  26:10
**referenced**  98:6
**referencing**
  42:18

**referring**  22:23
  24:9 35:19,21
  63:2 75:14
**reflect**  15:10
  16:2 29:17
  30:12,13 31:21
  38:11,20 41:1
  47:1 65:1,6
  73:20 86:13
**reflected**  18:18
  19:11,23 23:18
  29:12,23 30:12
  31:3,15 33:8
  37:6 76:11
**reflects**  30:20
**refute**  42:21
  43:1,8
**regard**  76:19
  78:5 92:2,3
**regarding**
  10:23 23:20
  24:9 91:22
**regards**  53:19
**region**  1:23
**registered**  1:18
**reidy**  1:9
**relate**  17:7,14
  17:23 47:17
**related**  17:5
  33:4 53:24
  61:3 82:6
  92:20
**relates**  17:9
  33:7 37:4 74:7

**relating**  8:7,8
  32:11,13 61:1
**relationship**
  61:11,18 70:18
  71:1 82:13,18
**relationships**
  79:4
**relative**  63:22
**relatively**  76:2
  76:11,19
**relevant**  18:16
  18:17,24 19:11
  19:22 20:5,11
  20:17 21:6
  23:23 24:11,24
  27:10,12 28:1
  28:23 30:18
  36:13 37:5
  38:7,17,18
  39:23 40:23
  45:20 46:13
  47:23 48:8
  52:6 57:10
  59:20 60:7,16
  60:18 62:23
  63:16 64:18
  67:22 68:6
  70:18 71:1,5,7
  71:13,23 72:12
  74:3 75:22
  79:1,1,6,9
  80:15,20 81:13
  83:15,18 87:5
  87:15

**[reliable - scenario]**

**reliable** 91:13
  92:15
**remainder**
  74:24
**remaining** 54:7
**remote** 1:14
**remotely** 5:17
  5:20
**removed** 90:17
**repeat** 22:5
  34:19 70:21
  82:9 90:11
**rephrase** 22:17
  36:3 46:10
  66:8
**report** 3:10,11
  8:4,11 9:17,19
  9:22 11:6,12
  12:18,22,24
  13:13 14:18,21
  18:7,15 19:8
  19:15,17 20:7
  20:17 23:14,17
  23:19,20,20
  24:12,22 25:5
  26:7 28:10
  33:11 36:11,22
  37:3,9,14
  39:20,22,24
  42:5 46:18,19
  48:24 49:16
  54:3 57:3
  58:22 59:19,23
  63:2,21 73:8
  74:7 76:14

77:15 79:8,21
  82:17 83:12
  84:1
**reported** 1:17
  55:5
**reporter** 1:18
  1:19,19 4:21
  5:10,12 6:8,15
**reporting** 5:16
  6:3
**reports** 24:10
  24:22 61:7
**represent**
  12:21
**representing**
  4:20
**requested** 9:6
  10:4 12:6,13
  13:18 14:4
  15:4,20 18:9
  21:15 26:19
  28:17 33:13
  42:7 49:2,18
  58:24 59:8
  63:4 78:8 80:3
  84:3
**research** 37:2
  64:24 65:12,17
  65:21 68:2
  69:2,2 89:11
**researchers**
  69:3
**resemble** 73:13
**resolved** 84:13
  84:13

**respect** 10:14
  10:18 11:5,8
  11:21 24:2,16
  25:1 28:1,22
  29:3,7 35:9
  40:12 47:16
  55:22 56:13
  57:3 60:5
  68:20 75:3
  81:12 86:21
**respond** 8:15
  19:8 20:7,16
  23:13 32:10
**responded** 71:7
**respondent's**
  17:6
**response** 6:6
  19:17 86:12
**resulted** 27:19
**results** 85:14
**return** 95:16
  98:13,17
**returns** 31:11
  47:10,14 65:2
**reveals** 84:11
**revelation**
  84:23
**revelations**
  89:23
**review** 9:18
  25:6 72:15
  98:7
**reviewed** 8:11
  11:11 25:3
  42:13 89:16

**ridiculous**
  43:20 44:3,13
  44:19
**right** 8:4,7,16
  10:11,19 11:13
  24:6,19 27:10
  27:18,22 28:2
  30:2 39:18
  41:1,8 43:5
  47:19 49:12,16
  51:17,22 53:7
  53:16,20 56:10
  57:2 58:3 60:8
  60:12,21,23
  66:2 72:13
  76:20 80:13
  87:4
**rise** 86:18
**road** 2:4
**robust** 87:1
**room** 5:15 7:8
  7:11,15,22
**roughly** 61:24
**roundtrip**
  76:24

**s**

**s** 1:4 2:8
**s&p** 47:8,8
**sample** 60:7
  62:6 72:8
**saying** 37:24
  38:3 41:6
  90:24
**scenario** 84:20

**[scope - spreads]**

**scope** 11:19
72:3
**screen** 4:11
8:24 9:7 10:5
12:7,14,21
13:7,19 14:5
15:5,21 18:10
21:10,16 26:7
26:20 28:18
33:14 42:8
49:3,19 59:1,9
63:5,9 78:9
80:4 84:4 93:8
**scroll** 9:3 12:10
13:15 21:13
33:11
**seal** 94:14
**sec** 17:1
**second** 10:1
**section** 11:5,12
**sectional** 52:24
**securities** 35:14
36:7
**security** 30:13
30:18
**see** 28:24 31:10
39:21 48:8
51:4,22 56:18
57:17 61:11,18
61:19 65:5
69:12 85:12
**seeing** 71:19
93:6
**seek** 19:5

**seeking** 8:6
**seems** 73:4
81:13
**seen** 4:10 69:2
**select** 69:5
**selecting** 91:22
91:24
**sell** 77:1
**sells** 64:2
**semi** 32:4,4,17
32:22 33:2,6
35:13 36:2,6
**sense** 63:21
78:18 87:14
**sent** 98:14
**sentence** 29:9
35:10 63:11,16
**separate** 61:8
**series** 23:2
25:21 27:3,6,7
27:8 49:10
52:6,23,23
53:1,2,3,5 54:5
54:13,14 56:19
59:21 60:11
61:2 63:23
81:11 89:23
**set** 23:17 52:5
57:18 60:15
**seven** 16:11,22
**several** 31:9
**sharan** 2:3 5:3
6:21
**shares** 55:12,13
64:2

**sheet** 95:10,11
95:14,17 97:9
98:11
**short** 29:10
**shorthand**
94:10
**show** 62:4
**showing** 21:9
26:7
**shown** 54:7
**shows** 81:7
**sic** 28:15
**sign** 95:11
98:12
**signature** 13:23
14:9 15:2
94:18 97:12
**signed** 98:20
**signing** 95:13
**similar** 65:13
72:23 87:11
**similarly** 1:4
**simon** 2:4
**simply** 43:17
**single** 62:21
64:6
**sitting** 14:12
**situated** 1:5
**situation** 30:17
**situations**
86:16
**six** 16:11
**snirmul** 2:6
**solely** 68:17

**solutions** 1:22
4:20,23 98:23
**sorry** 22:3,10
22:17 47:10
55:23 57:19
66:8 74:12,13
**sort** 66:23 92:8
**space** 95:9
**speak** 57:19
**speaking** 36:24
**specific** 29:24
50:17 64:21
81:22 92:12
**specifically**
37:2 82:16,23
91:2
**spectrum** 64:23
65:8 69:12
76:5,23 77:9
**spread** 25:23
76:24 80:9
81:16,19 82:21
**spreads** 23:21
24:17,22,23
25:2,9 27:5
28:1 49:9,11
72:8,12,19,21
72:24 73:2,7
73:13,14,17,23
74:3 75:11,15
77:4,14,20,23
78:20 79:12
80:16 81:7
82:5,5,13,14

[src - take]                                                                Page 21

**src** 1:9 4:18
**stage** 18:16
  20:11
**stand** 14:12
**standing** 94:7
**start** 30:19
  51:21 52:2,19
**started** 52:5
**starting** 52:14
  52:19 74:24
**starts** 30:24
**state** 5:22,24
  6:3 95:9
**statement**
  35:20 42:24
**statements**
  89:21
**states** 1:1 4:16
**statistics** 23:18
  24:10,12 51:16
  54:3 80:9
**stenographic...**
  1:16
**stewart** 1:14
  3:4,12 4:13
  6:11 94:2 95:2
  96:2 97:4 98:5
**stick** 53:5
**stipulate** 5:23
**stivers** 46:22
**stock** 10:11,15
  10:18,24 29:4
  29:4,8,16 31:3
  31:11,15 32:3
  32:11,13 33:5

33:8,20,22
34:1,5,9,10,11
34:11,16,23
35:5,14 36:7
36:15 37:11,12
37:17,21,22
38:2,8,12,24
39:3,4,10,15
40:2,5,8,9 41:5
41:12 42:16,18
43:19 44:4,15
44:16,19 45:1
45:2,3 55:12
55:14 62:20
63:24 64:10
65:14,22 69:3
71:22 72:5
73:3,8,11,14
75:16 83:9
84:17,19,22,22
85:3,8,9,14
86:1,2,5 89:21
89:24 90:5,9
90:16
**stocks** 35:11
  36:1,4 66:1,3,4
  66:20
**stop** 56:1
**strategy** 31:8
**strawn** 2:10,21
  5:6 7:12
**strawn's** 7:5
**street** 1:23
**strike** 62:5

**strikes** 67:21
**strong** 32:4,17
  32:22 33:2,3,6
  35:13 36:2,6
  63:15
**study** 17:22
**subject** 95:13
**submitted** 8:3
  8:12 17:20
**subscribed**
  97:14
**substance** 97:8
**substantial**
  61:2
**substantially**
  81:8
**substantive**
  73:9
**substantively**
  25:10
**subsumed**
  37:10,21
**suddenly** 81:23
**suite** 1:23
**summarize**
  49:15
**summarized**
  25:9
**summarizes**
  19:15
**summary** 51:16
  80:8
**summer** 2:21
  7:19,20,22

**supervision**
  94:10
**support** 35:20
  35:22 36:19
  42:15 43:4,9
**supportive**
  78:15,18
**suppose** 84:16
**supposes** 84:10
**sure** 14:1 35:18
  78:22
**surpass** 64:22
**surprised**
  82:18,24
**susan** 1:17 4:22
  94:19
**swear** 5:10 6:9
**sworn** 5:24
  6:12 94:8
  97:14
**systematic** 79:5

**t**

**t** 94:4,4 96:4
**ta** 54:8
**tab** 8:20 12:3
  79:19
**table** 10:2 24:8
  24:10,21 54:8
  57:9 81:7
**tables** 23:22
  25:10 26:4
**take** 24:17
  26:15 27:4
  30:20 56:1,3
  58:4 72:14

**[take - trading]** Page 22

74:16 79:16 88:9
**taken** 24:5 94:7
**talk** 40:1
**talking** 43:23 43:24 66:24 68:19 74:22 92:11
**tell** 51:24 94:8
**ten** 51:7 54:14 58:6,6 65:3,5 88:10,12,13
**tend** 65:21 73:17 75:15
**tens** 51:12,13
**term** 29:3
**test** 51:4 83:9 83:12 87:1,5,9
**testified** 6:13 16:16,18 32:7 68:22 72:2
**testimony** 8:7 16:3,6 17:1,4,7 17:19 18:3 20:4 94:7,9,11 98:9,18
**testing** 46:16 69:4 87:1
**tests** 28:4 89:13
**textbooks** 42:14,20 43:3
**thania** 5:5 7:12 93:3 98:1
**thank** 6:15 7:24 58:20 63:13

79:23 92:23,24 93:2,4
**thanks** 80:1 93:8
**theoretical** 44:24 45:9
**theoretically** 57:12
**thereof** 94:12
**thing** 64:18
**think** 16:11,22 16:22 29:9 30:15,22 31:13 31:22,22 39:19 43:15,19 44:3 44:12 47:6 55:19 61:14 62:15 64:15 65:23 66:22 67:15 68:14,22 69:9 70:4,17 70:24 71:20 73:1 75:8 76:5 76:23 77:9,21 85:24 87:14 91:10,20 93:5
**thinking** 32:24
**thinks** 85:21
**thirty** 95:18
**thomas** 1:8
**thought** 69:18 91:1,5
**thousands** 51:12,12,13,14

**three** 7:14,14 33:1,3
**threshold** 50:1 50:4,17 62:11 64:23 72:18,24 76:21 77:7 81:22
**time** 4:5,24 26:15 29:22 30:20 31:12 52:10,11,13,22 58:11,17 72:14 74:16 88:3,16 88:22 92:23 93:9 94:8 98:19
**timeframe** 98:8
**times** 16:9,12 70:6
**today** 6:24 7:9 14:12 92:23
**token** 82:19
**top** 54:12,13 55:1 65:3,4,5 69:6,6
**topaz** 2:2 5:4
**topic** 12:1 17:5 21:4
**trade** 35:12,13 35:15 36:1,2,5 36:6,8 45:7 57:13,22 61:20 65:13 66:4,11 66:19 67:4

**traded** 10:18 17:12 18:17 19:10,22 24:3 24:18 25:11 31:20 32:3 38:19,22 42:17 44:16 45:22 46:6,7,8,10 51:10 54:12,15 54:18 59:21 60:17,19 62:12 62:21 64:5 69:7,22 70:5 71:23 73:20 74:4 76:7,8
**trades** 61:12 85:22
**trading** 17:8,12 20:23 21:21 23:21 24:6,9 25:1,8,20 27:15,20 31:8 45:18 47:8 49:9,11,15 50:2 51:17 53:19,23 54:4 54:10 55:4 56:16,21 57:2 57:12 59:15,17 59:20 60:1,3 60:19,22 61:1 63:20,22 64:1 64:9,13,16,16 65:22 67:11,13 67:19,21 68:1

**[trading - videographer]**                                                                 Page 23

68:3,9,17,19
69:12,15,20,23
70:5,12,19
71:2,12 73:6
73:10,10 75:3
75:9,13,19,22
76:2,11,19,24
77:14 79:12
85:13,19,23
**transaction**
47:15 78:20
**transcribed**
94:10
**transcript**
95:19,20 98:6
98:20
**transcription**
94:10 97:6
**trial** 16:6,17,20
**true** 36:16
42:23 44:23
56:22,22 65:23
65:23 66:3,10
67:3 85:15
94:11
**truth** 94:8,9,9
**try** 14:2 91:7
**trying** 38:5
71:6
**tuma** 2:11 5:7
7:13
**turn** 48:23
59:16 78:4
**two** 25:9 66:23

**types** 37:9
39:21 75:11
81:2,9
**typical** 63:23
**typically** 52:16
52:18

**u**

**uh** 21:11,23
31:13 37:7,18
52:8 53:4 54:6
57:14 61:10
62:19 65:12
67:10 69:11,19
70:8 71:5 82:2
**uncertainty**
84:12,24
**uncommon**
56:18
**under** 18:7
45:5 94:10
**underlying**
34:5 35:4 45:1
45:2,3 48:1,4
63:24 73:8,11
**understand**
10:9 18:15
20:10 23:2
28:23 31:18
40:19 41:23
45:14,19 46:5
46:6,7 48:5
71:6,10 73:9
76:17 92:16
**understanding**
18:24 19:3

23:9 29:2,6,11
29:15 32:16,20
48:21 55:1
68:2 89:17
**unfavorable**
84:14
**unit** 4:12
**united** 1:1 4:16
**universally**
29:20
**unnecessary**
43:16
**update** 14:21
15:13
**updated** 48:22
**use** 70:4 83:19
90:7,19
**used** 31:6 75:6
83:8 89:6
95:21 98:20
**useful** 62:16
**using** 87:11

**v**

**v** 98:4
**valuable** 39:2
39:10,14 41:2
44:20
**value** 30:18
34:6,9,12,16,16
34:23,24 35:6
37:5 38:7,18
38:19 44:24
45:5,9,20
46:13 47:23
48:8 71:7

86:13
**values** 33:21,24
37:9 45:20
**vanessa** 2:3
**variable** 67:22
**variation** 61:2
**various** 31:11
81:5
**varying** 53:7
**verify** 98:9
**veritext** 1:15,22
4:20,22 98:14
98:23
**veritext.com**
98:15
**versus** 4:14
17:1,17 50:5
67:14 81:17
86:4
**video** 1:14 4:1
4:13 5:1 8:24
9:7 10:5 12:7
12:14 13:7,19
14:5 15:5,21
18:10 21:16
26:20 28:18
33:14 42:8
49:3,19 59:1,9
63:5 78:9 80:4
84:4 88:23
93:14
**videographer**
2:20 4:3,21 5:9
14:1 56:5 58:8
58:17 79:18,23

**[videographer - zach]**                                                                 Page 24

88:16,22 93:9
**view** 21:23 22:6
 35:24 43:5,9
 50:22 55:15
 63:15 64:8,12
 73:12,19,22
**viii** 11:6
**vincent** 1:8
**violated** 87:13
**violations** 79:5
**virtual** 1:15
**virtually** 4:7
**vmilan** 2:6
**volatility** 37:12
 37:15 40:4
 47:10,13 84:18
 86:14,19
**volume** 21:21
 23:21 24:2,5
 24:10 25:1,8
 25:20,22 27:5
 27:15 49:9,11
 49:15 50:3,6,8
 50:11,13,16
 51:1,14,17
 52:17,23 53:19
 53:24 54:4
 55:2,4,6,7,9,11
 55:16 56:16
 57:3,12 59:15
 59:20 60:19
 61:1 63:20,22
 64:1,9,13,16,16
 65:9,21 67:21
 68:1,3,9,17,19

68:23 69:5,9
 69:10,15 70:11
 70:11,13 72:5
 73:6 85:12,19
**volumes** 27:21
 56:21 65:13,14
 67:11,19 71:23
 79:12
**vs** 1:6

**w**

**want** 26:9,9,11
 58:6 59:16
 64:19 74:17
 88:9
**wanted** 83:24
**way** 17:8,14,23
 40:11 41:7,22
 45:19,23 46:9
 64:17 69:8
 74:17 82:11
 83:3,8 84:14
 85:6,24 91:6,7
**ways** 31:11
 46:24 83:8
**we've** 55:24
 87:23
**weak** 33:2
**wednesday**
 1:11
**week** 70:6
**weight** 78:23
 87:18
**wide** 11:7,9,13
 11:17,22 73:17
 78:20

**wider** 75:16
**william** 2:19
 4:19
**winston** 2:10
 2:21 5:6 7:5,12
**winston.com**
 2:13,14,14
 98:2
**wish** 14:16,21
 15:13
**withdrawn**
 45:17
**witness** 4:10
 5:11,22,24 6:9
 9:1,7 10:5 11:3
 12:7,15 13:8
 13:19 14:5
 15:5,21 18:11
 19:15 20:4,15
 21:3,17 23:12
 24:8,21 26:1
 26:20,23 28:19
 30:4 31:18
 32:6,9 33:15
 34:3,19 35:2
 36:10 38:5
 39:6,13 41:10
 41:21 42:9
 43:12 44:9,23
 45:14,22 48:3
 48:11 49:4,19
 50:10,24 51:10
 54:21 55:19
 59:1,9 61:14
 62:14 63:6,14

65:16 66:15
 67:7,21 70:21
 71:10 72:2,4
 72:16 74:6
 75:21 77:19
 78:10 80:4,19
 81:21 82:8
 83:21 84:5
 85:2,17 87:21
 88:1,11 90:11
 90:23 91:20
 92:8 93:12
 94:11,14 95:4
 98:8,10,12,19
**word** 75:6
**words** 48:7
 91:15
**work** 32:13
 62:17 89:11
**write** 18:14
 36:11 47:7
**wrong** 86:15
**wrote** 23:6

**y**

**yeah** 22:14
 27:2 46:2
 80:22 88:11,13
 90:14
**years** 16:3,7,14
 16:22 32:24
**york** 2:12 7:1,2

**z**

**zach** 7:13

**[zachary - zoom]**                                                    Page 25

**zachary**   2:11
    5:8
**zbroner**   2:14
**zero**   21:21
    27:14 52:12,17
    52:18,20 57:11
**zoom**   1:15 93:8

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination


4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a certified shorthand reporter, the witness shall not sign the deposition. If the officer is not a certified shorthand reporter, then unless reading and signing of the deposition are waived by stipulation of the parties, the officer shall request the deponent to appear at a stated time for the purpose of reading and signing it. At that time or at such later time as the officer and witness agree upon, the deposition shall be submitted to the witness for examination and shall be read to or by the witness, and any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness. If the witness fails to appear at the time stated or if the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the witness' failure or

refusal to sign, together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under R. 4:16-4(d) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.