```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY


INDUSTRIENS                 .
PENSIONFORSIKRING,          .
            Plaintiff,      .
                            . Case No. 20-cv-02155
vs.                         .
                            . Newark, New Jersey
BECTON, DICKSINSON AND      . September 12, 2023
COMPANY, et al.,            .
            Defendants.  .
------------------------
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via teleconference):


For the Plaintiff:    DONALD A. ECKLUND, ESQ.,
                      Carella Byrne Cecchi Olstein Brody
                      & Agnello
                      5 Becker Farm Road
                      Roseland, NJ 07068
                      (973) 422-5579
                      decklund@carellabyrne.com

                      JAMES CECCHI, ESQ.
                      Carella Byrne Cecchi Olstein Brody
                      & Agnello
                      5 Becker Farm Road
                      Roseland, NJ 07068
                      (973) 994-1700
                      jcecchi@carellabyrne.com

Audio Operator:


Transcription Company:  KING TRANSCRIPTION SERVICES
                        3 South Corporate Drive
                        Suite 203
                        Riverdale, NJ 07457
                        (973) 237-6080


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Plaintiff:      JOSHUA EDWARD D'ANCONA, ESQ.
                        Kessler Topaz Meltzer & Check LLP
                        280 King of Prussia Road
                        Radnor, PA 19087
                        (610) 667-7706
                        jdancona@ktmc.com

                        VANESSA M. MILAN, ESQ.,
                        Kessler Topaz Meltzer & Check LLP
                        280 King of Prussia Road
                        Radnor, PA 19087
                        (610) 667-7056
                        vmilan@ktmc.com

                        NATHANIEL C. SIMON, ESQ.,
                        Kessler Topaz Meltzer & Check LLP
                        280 King of Prussia Road
                        Radnor, PA 19087
                        (610) 667-7056
                        nsimon@ktmc.com

For the Defendants:     MATTHEW ADAM SKLAR, ESQ.
                        McCarter & English LLP
                        100 Mulberry Street
                        Four Gateway Center
                        Newark, NJ 07102
                        (973) 622-4444
                        msklar@mccarter.com

                        JAMES P. SMITH III, ESQ.
                        Winston & Strawn LLP
                        200 Park Avenue
                        New York, NY 10166-4193
                        (212) 294-4633

Hearing
20-CV-02155, September 12, 2023

3

(Commencement of proceedings)

THE COURT:  We're going on the record at 20-2155 what is it 2:40, September 12th.  Whose for plaintiff?

MR. ECKLUND:  Good afternoon Your Honor, James Cecchi and Don Ecklund from Carella Byrne.  My co-counsel from Kessler Topaz are also on.  I'll let them introduce themselves so I don't miss anyone.

THE COURT:  Go ahead.

MR. D'ANCONA:  Thanks Jim.  Josh D'Ancona Your Honor from Kessler Topaz Meltzer and Check, and I'm joined by a couple of associates at my firm Nate Simon and Vanessa Milan.

THE COURT:  Okay.  And whose on for defense for BD?

(Conclusion of proceedings)

MR. SKLAR:  Good morning -- afternoon Your Honor this is Matthew Sklar with McCarter and English.  I'm with co-counsel from Winston and Strawn and I will defer to them to introduce themselves as well.

MR. SMITH:  Good afternoon  Your Honor James Smith of Winston and Strawn for the defendants.  I may be joined by one or more of my associates, but I'll let them introduce themselves because I'm not sure if

they're on the call or not.

THE COURT:  Anybody else on that wants to talk -- introduce themselves?  Do I have anybody here for -- for what's it called -- for Software CPR?  Is that a no?

MR. SMITH:  This is Mr. Smith Your Honor, I don't think so.

THE COURT:  Oh, okay.  Well, I think it would be helpful if they were on.  But who's going to argue for plaintiff?  Because we're recording oral argument and I may have some questions.

MR. D'ANCONA:  Yes, Your Honor Joshua D'Ancona for the plaintiff and class representative.  Thank you.

THE COURT:  Okay, and who's going to argue for BD?

MR. SMITH:  It's Jim Smith Your Honor, I'm going to argue for defendants.

THE COURT:  Okay.  Let's have a discussion, not an argument.

MR. SMITH:  Fair enough.

THE COURT:  So, there are 207 entries that are marked attorney/client; is that correct Mr. D'Ancona?

MR. D'ANCONA:  That is correct.

THE COURT:  And that -- just because I'm taking a survey now, how many pages is that?

Hearing                                                                                    5
20-CV-02155, September 12, 2023

MR. D'ANCONA: It's approximately 12 to 15 pages. I may be of --

THE COURT: No, no not -- not the pages -- not the pages of the 207 entries, but the pages of the actual documents that would have to be reviewed by this Court in light of its 400 and something other cases?

MR. D'ANCONA: I -- I understand the question Your Honor.

THE COURT: Just saying.

MR. D'ANCONA: I do not know the number of pages.

THE COURT: Okay.

MR. D'ANCONA: Because we haven't -- you know we haven't actually seen the documents or -- or had a page count from -- from the other side.

THE COURT: Okay. Why don't we just start Mr. D'Ancona by you telling me what the problems are and me interrupting you.

MR. D'ANCONA: Okay. Thank you Your Honor. So my -- my argument can be brief here today. All of the documents we are talking about today are third party documents. And we believe that essentially none of the third party documents at issue here are protected by Becton's privilege, and that's the issue that we're dealing with here. Becton's privilege

Hearing
20-CV-02155, September 12, 2023

6

assertion is the only thing that has blocked the production of these documents to us for the past six months from Software CPR.

Software CPR is -- as I'm sure you're familiar from the background here was retained by Becton Dickinson in approximately November of 2019 to assist with quality and regulatory R and D other issues related to FDA interactions they were having about their Alaris product, which is the product at issue in our case.  As you -- as I know you are well aware You Honor.

Software CPR worked with Becton Dickinson for seemingly several months or even up to a year on this engagement.  Software CPR told us that it has responsive documents, they are on this log.  That it would produce these documents to us if Becton did not assert a privilege claim.  But Becton did and so here -- so here we are.  We are after the Software CPR documents that are on this log, looking to clear away the obstacle.

Your Honor looking at the entries on this log and the other facts of which -- you know to which we have access, it seems clear to us that these documents are not privilege on the single ground that Becton asserts.  And we're asking that the Court rule in our

favor and compel the production of these documents to us.

THE COURT:  Oh, it's this engagement letter which almost seems like an afterthought to the consulting agreement.  I may have the timing on that wrong.  Basically because it -- the consulting agreement, the way I see it, doesn't make any reference to lawyers or anything like that.  It does define the relationship of the parties in Paragraph 6 of 4.4 and the engagement letter basically says everything that you do for us is attorney/client privilege and confidential.

I mean -- and everyone signed off on that. And I guess when you sign off on things you don't anticipate litigation.  But I would suggest to you that essentially that's what it says.  Is whatever we do under this consulting agreement is privilege, except for the 180 documents that were turned over.

So how is somebody supposed to determine whether or not it's attorney/client privilege unless they look at the documents?  Which brings it to my house.  Because I know that there are not always -- according to you Mr. D'Ancona and I don't know if BD agrees, not always attorneys listed in the -- in the privilege marking.  But I imagine BD is saying well

Hearing
20-CV-02155, September 12, 2023

8

attorneys talked about it and maybe there's an underlying consulting or discussion and that makes it privileged.

Mr. Smith am I wrong about that?

MR. SMITH:  No you're right about that Your Honor and we do concede that in a number of the documents there are no attorneys on the documents themselves.  But I think you fairly characterized the nature of the relationship pursuant to the engagement letter and without -- you always have the issues in these types of disputes, you know, without giving the store away in terms of the underlying privileged information.  Yeah, I mean, you would have evidence that it was sort of reported out.  So, that's really the issues.

THE COURT:  And I mean I would like to not do an in camera review, obviously, because I dislike doing them because it invites me, who is not entitled to discovery in the nuances of this case, to make decisions at arm's length, supposedly.  But I don't even know that I have enough information to determine with the documents in front of me whether or not they're attorney/client privilege without perhaps even talking to people.  It seems like a really large task in this case Mr. D'Ancona.  Do you understand where I'm

coming from?

I mean if there's no attorneys listed on the privilege marking how am I to intuit whether or not an attorney was involved or whether or not it's strictly a business communication?

MR. D'ANCONA: Well, I think we look to all of the -- well first of all Your Honor I very much understand the -- the -- the burden concern that Your Honor raise and -- and the judicial -- the tax on the judicial resource here that Your Honor has raised.

To answer the substantive legal question -- actually before I get under that, and I think it may be Your Honor that if -- if directed by Your Honor the parties could confer on some sort of process to attempt to narrow or come up with some other solution to resolve what we believe on the merits -- which I'll get to now -- are really clearly dubious assertions of privilege over documents that have no indicia, really at all, of being privileged other than language in a letter drafted by Becton Dickinson at the outset of this engagement.

If -- if -- if a company can put language into an engagement letter with a third party and say that everything that ever happens between us from here on out is privileged and that's all it takes, despite the

actual facts of the engagement thereafter, notwithstanding the negligible or non-involvement of lawyers, and the fact that everybody involved is a business -- member of a business personnel or function at the company, that -- that really can't be the way that the privilege is -- is sort of created here. That's -- we see no cases cited by defendants suggesting that that's permissible and that that's all that it takes to confer a privilege on every document in the engagement thereafter, which is what they're asserting.

And I think we have serious concerns that these documents are being withheld from us on no valid basis. We respect the privilege as much as anybody, but there needs to be facts support it. Defendants have one fact, and that's the language in the letter. And virtually everything that comes after shows that it's business personnel engaging with the consultants.

And so this brings us to the law here, which is that the privilege is always narrow. And that's from the Westinghouse Case in 1991 in the Third Circuit and -- and -- and from there on out. But it is sacrosanct. But in the -- in the case of documents shared with a third party the privilege is ordinary waived. And these are all third party documents here.

So if the -- if the --

THE COURT:  Well, no.

MR. D'ANCONA:  Yes.

THE COURT:  That's where the engagement letter messes us up.  And my brilliant law clerk Tim Duva who's center square today just sent me an interesting text and it makes sense.

So say we put the engagement letter to the left hand side.  Then we just have to determine whether or not the communication is privileged.  So that makes sense in that it's not a sweeping -- everything here is privileged.  Because we know it's not Mr. Smith, because you've already turned over some of it, in spite of the engagement letter, if you will.

So are you following me?

MR. SMITH:  Well, Your Honor, I -- I think we -- we turned over some of it and I'm not sure exactly what  Your Honor is referring to but there's, you know, two different productions that went on.  Your Honor, pointed out at the outset that Software CPR is not here.  And I mean the reality is this is a challenge to a third party's response to a subpoena and the privilege log --

THE COURT:  But it's your privilege.

MR. SMITH:  It's our privilege, 100 percent

agree.

THE COURT:  Right.

MR. SMITH:  100 percent agree.  But I just wanted to point that out.

And -- and we also made a production out of the Becton Dickinson's files.  We recently clawed back those documents as inadvertently produced.

But I -- I think to Mr. D'Ancona's point  -- and the one that Your Honor is highlighting, if you actually look at the authorities that the plaintiffs have relied on in their arguments here, it's very clear that the engagement letter is the critical starting point in determining whether -- in a situation like this, I don't think there's any dispute that the purpose of the Software CPR's engagement is to do, you know, regulatory compliance consulting.  You can look at the consulting agreement that's in there, the engagement letter that's in there.  That's basically what they were doing.

And under those circumstances with a third party consultant the courts look at the engagement letter as the key indicator as to whether what the consultant was doing was business or legal advice.  And if you look at, for example, the Louisiana Municipal police employees case that the plaintiff's site, it's

one that they rely fairly heavily on.  The -- the court hangs its hat, to a significant extent, on the fact that the retainer agreement in that case contains no mention of advice -- of legal advice with defendant's attorneys.  And now I'm kind of reading from the case.  But it also makes no representation that information provided to be -- to it would be shared with defendant's counsel.  This is indicative of the non-legal nature of -- in that case it was an investment baker's retention.  And it goes through with -- you know, as one commentator has recently noted.  Another important step, is that the attorney should document the relationship with a written engagement agreement, et cetera, et cetera.  The engagement agreement should set forth the legal purpose of the services.

All of this obviously --

THE COURT:  That's what your engagement letter does.

MR. SMITH:  Correct Your Honor, and what the --

THE COURT:  The consulting agreement defines relationship of the parties, and it does not create an employer/employee relationship between BD and supplier, and supplier shall not hold itself out -- which is

standard language --

MR. SMITH: Yeah.

THE COURT: -- as an agent or representative of B&D -- or BD

MR. SMITH: Yeah, it does. They're defined as an independent consultant Your Honor.

THE COURT: Yes.

MR. SMITH: And I think that's in a lot of the cases as well when the -- an independent contractor I should say where the consultant is defined as an independent contractor.

But importantly the engagement letter -- and you can look at the privilege log, Your Honor to see that this were negotiated of a piece. If you look at, I think it's entries like 10 through 12 of -- of the privilege log that Software CPR put out. The consulting agreement is being reviewed by Ms. Quinn, who was then chief regulatory lawyer at Becton Dickinson and the one who signed the legal engagement letter. So it was all being negotiated of a piece. You look at the engagement letter and the engagement letter says that it's a supplement to the statement of work, so it all -- it all pieces together Your Honor.

And my only point is that the courts in looking at this start with that to try to determine --

because otherwise I think you're right.  It's difficult for Your Honor to look at the documents that are generated here and a lot of it is technical and lot of it is compliance, and say okay is this legal advice or business advice?  And the courts really look at the nature of the engagement letter.

And I mean I'm back in this Louisiana Municipal Police Retirement Systems case.  It says here, "If DLJ was truly retained to assist defendant's attorneys in the provision of legal advice, there would likely be at least a mention of legal advice or counsel in the retainer agreement, here there is none."  Well, yeah here we have very much the opposite of that.  And -- and so I think that's the critical starting point.

Now in terms of -- I think Mr. D'Ancona made a productive suggestion.  I do think Your Honor's right that under these circumstances if there's going to be a challenge -- and to be clear I think Mr. D'Ancona would agree, the nature of this challenge is not like to the sufficiency of software CPR's privilege log under, you know, 20 -- 26B-5, it's more of a challenge to is a given document privileged or not.  And that -- you know the case -- I think there's something like, out of 19 cases the parties cited back and forth on this at least

16 of them involve an in camera review. And the ones that don't it's like the parties didn't ask for it or whatever.

But I do think there's a way to do this where we could get together and try to come up with going through the log -- you know some sort of representative sampling, so you don't have to go through everyone. Because I think they break down -- and Mr. D'Ancona pointed this out. If you look at the log, some of these are technical documents and you can see that based on the entry and I think some of the issues -- we can brief this for Your Honor. I mean some of the issues that the courts look at, if it's just technical information or tests results or something like that, are different from when you're actually giving regulatory compliance results.

And we can do some samplings of those and documents that fall into each category. And we'd obviously give Your Honor ones that didn't have lawyers on them and things like that, where you don't have to necessarily have to look at every single document. You can categorize. I'm -- I'm spit balling a bit here, but I think there's --

THE COURT: Okay.

MR. SMITH: -- there's ways that we can do

that.

THE COURT:  And -- wait Mr. D'Ancona, just so you know, I mean I always tell the parties I have to have freedom for ex parte communication if I do any in camera, and I can do that under a sealed record or if it's just a procedural question without a record.  But go ahead Mr. D'Ancona.

MR. D'ANCONA:  Yes Your Honor thank you.  I wanted to respond to some of the legal points that Mr. Smith was raising if -- if I may.

THE COURT:  Yeah.

MR. D'ANCONA:  In the case that Mr. Smith cites and really all of the cases, if there is a -- if there is a contract -- a retention agreement that's before the court, the court certainly considers it as one indicia.  The court goes on to consider any other facts and indicia that it has before it.  And here on the scales before Your Honor we have one fact and that is the language in the letter that supports Becton's claim that all of these documents are privileged.  And on the other side we have what actually happened as reflected on this log.

And what -- we don't have Becton arguing that any of the communications themselves conveyed legal advice from Becton's lawyers or anybody else's.  They

don't argue communications contain request for legal advice.  They don't argue that the communications convey legal advice.  The only thing --

THE COURT:  I agree with you.  I have that problem that the engagement letter is sort of this big umbrella --

MR. D'ANCONA:  Right.

THE COURT:  -- that covers everything.  And I agree that courts do look at the retainer agreement, the engagement letter.  Here almost the consulting agreement and the engagement letter are a little bit at odds in that consulting agreement -- the report to is a non-lawyer.

MR. D'ANCONA:  Yes.  Yes.

THE COURT:  So I -- it's a different situation for me.

MR. D'ANCONA:  You jumped -- yeah.

THE COURT:  And the way I see it Mr. Smith, what I was trying to say by putting the engagement to the left, if you will or outside of our box, if you were to consider the privilege markings or reconsider them, not in light of the fact that you're saying everything had -- underlying had legal advice in it, because I'm not -- I'm sure that's not necessarily the case.  I'm just asking is it possible for you to

re-review all of these markings and perhaps narrow them?

I like your idea of a sampling or categorization, which would help me.  But I always feel deficient in technical cases and do an in camera review.  It's much easier for me to do in camera review for internal affairs for police departments, because that's -- there's a lot of common knowledge.

So, I want my job and I know I'm going to have to review these.  I can't make a wholesale determination on everything.  I need help from you all to make my life a little bit easier.  And so you know, generally, I personally do all the in camera stuff.  I ask for my law clerk, the brilliant Mr. Duva to help me, but I like to have hands on in in camera stuff.  I take it very seriously, especially privilege matters.

MR. SMITH:  Your Honor, the one thing that occurs to me -- and the answer is yes, we're happy if Your Honor wants us to do it, to go back through the log again.  And we did -- in fairness it was prepared by Software CPR but pursuant to what we agreed last time we were in front of Your Honor, we looked at all the documents, we told them our view as to whether they were privileged and we can do that again.

The other thing is, as Your Honor knows is often done in these cases to help you with that review is, you know, where you have full briefing on a motion to compel -- and even without that on letters -- is an affidavit.  Where someone can true up the things that are missing from the record, and just looking at the documents in a isolation or looking at the log to explain the process and what was done.  And, you know, that's something else that we could consider here adding to the mix that might facilitate or expedite Your Honor's review of this.

Even though this isn't a police matter, it's a -- it's a technical matter.  You know we could help a little bit in that regard, because again it's the nature of a privilege dispute.  You know, the documents before you go in camera aren't in front of you so we can't -- we can't really make the arguments.  But we can certainly do that I think as well.

THE COURT:  Okay, that's helpful.  Notice I skirted the issue as to whether or not I have jurisdiction because it just -- even if it's in another state it's going to end up back with me anyhow.  So --

MR. SMITH:  And look Your Honor we -- I'd be the one making the arguments there too, if it's the same arguments and it's going to come back here.  So we

wanted to point it out to Your Honor in case it was an issue that was going to be of concern to you.  We're not hung up on it --

THE COURT:  Okay.

MR. SMITH:  -- and you know we're here today. So, yeah.  And by the way I mentioned affidavits and I'm a little out over my skis, but to come back to Your Honor's initial observation that Software CPR Is not in front of you.  I mean I'm not really faulting --

THE COURT:  Right.

MR. SMITH:  -- but they teed it up by a letter to the court, they're not a party so they're not really -- you know it's not a motion against them.

THE COURT:  Right.

MR. SMITH:  But we're in contact with their counsel at Reed Smith and if it's helpful, you know, to get something further from them we can explore that as well.

THE COURT:  Mr. D'Ancona do you have anything to add?  So, let me quantify what I think we've said and you all can interject at any time that BD's going to go back either with Software or on their own and re-review the markings to see if there's anything that might be added to being turned over or not privileged, so to speak.  And then you all are going to meet and

confer and figure out what you can submit to me, or how you submit it. That will make my life a little bit easier.

MR. SMITH: Yeah, and we'll -- I think Your Honor was saying what we'll submit we'll confer on in terms of representative samplings of documents or something like that. And then, I think this is primarily on defendants, we'll undertake to explore what additional evidence we can give you by way of affidavits --

THE COURT: Okay.

MR. SMITH: -- or declarations that will help round out the record for you.

THE COURT: Okay. Mr. D'Ancona did I misstate anything or --

MR. D'ANCONA: No Your Honor that -- that accurately reflects, I think, where we've arrived at in this -- in this productive discussion. I think that -- that gives us a good path forward here. Thank you very much.

THE COURT: So let's quickly talk about ECF 171. Two -- these are two ex-employees?

MR. D'ANCONA: The -- these are the -- the SCC transcripts Your Honor?

THE COURT: Yes.

MR. D'ANCONA: Yes, they are -- they are two ex-employees.

THE COURT: So, shouldn't they be subpoenaed, would they have the transcripts?

MR. D'ANCONA: They have been subpoenaed they -- they are -- it is within their power to request the transcripts from the SCC. Every witness --

THE COURT: Right.

MR. D'ANCONA: -- interviewed by the SCC has that right. And -- but their counsel is, as we gather, sort of following the lead of defense counsel for Becton and declining to request the transcripts so far for the grounds that effectively Becton has stated in its -- in its portion of the SCC transcript letter to Your Honor.

So we're at a bit of a standstill because the entity -- the parties or entities with the right to request the transcript from the SCC are refusing to do so and instead suggesting that we ask the SCC for the transcripts under, I supposed a -- request or something where the SCC will likely tell us that the investigation -- any investigation is confidential and cannot be disclosed. But that's -- that's not the way the process works. The process works that the witness is entitled to request their own transcript. And

that's what the court -- the courts in the cases that we cited in the letter to Your Honor recognized and that's why they compelled those individuals -- or the companies that control those individuals to go ahead and request these transcripts of relevant and responsive information.  And that's -- that's -- that's where we've arrived at -- in the SCC dispute.

THE COURT:  Did you notice the SCC, by the way, about the subpoenas?  Just curious.

MR. D'ANCONA:  Did we --

THE COURT:  Notice the SCC.

MR. D'ANCONA:  We have -- I can say --

THE COURT:  It's just a curiosity question, it's of no consequence.

MR. D'ANCONA:  It is my understanding that the SCC is aware of -- of the request for transcripts from the individuals, but we did not copy them, or anything like that on the subpoenas.

THE COURT:  So your next move is to move to enforce the subpoenas then?

MR. D'ANCONA:  If it comes to that with these third parties.  We are in -- we are in continuing discussions with their counsel who, as I said, every indication is, you know, they're being paid for by Becton's, you know, insurers and so forth.  It appears

that they are lined up and dancing in the same with us here.

THE COURT:  Okay.

MR. D'ANCONA:  But yes if we need to move to enforce those --

THE COURT:  Okay.

MR. D'ANCONA:  -- those will come into Your Honor was well.  It's the same issue, however, with the transcripts that are under Becton's power to request.  And I -- I don't want to get out over my skis here, to borrow a phrase from Mr. Smith.  It is my understanding that as Becton goes these third parties who are being -- who counsel are being paid for by Becton will go as well.  So a ruling here would -- would dispense with the -- the request for transcripts from non -- non -- former Becton employees who have been -- who have been interviewed by the SCC and who have transcripts that they could request.  They will do what Becton does, as I understand it.

MR. SMITH:  Your Honor if I may I don't know where --

THE COURT:  Go ahead.

MR. SMITH:  -- Mr. D'Ancona is getting his information from, and I'm certainly not privy to anything that -- suggest that the SCC is aware of any

of this, we haven't made them aware.

The -- the former employees that we're talking about are not in Becton Dickinson's control and they are --

THE COURT:  Right.

MR. SMITH:  -- separately represented by their own counsel.  So I just wanted to address, you know, the suggestion --

THE COURT:  Okay.

MR. SMITH:  -- that somehow they're -- I forget what the phrase was -- stepping to our drum, or something like that.

But yeah I mean I think that the issue here is the SCC is conducting an ongoing confidential investigation.  And if Your Honor saw our position, our position is very simply that it's really not for us to --

THE COURT:  Okay.

MR. SMITH:  -- to you know front run --

THE COURT:  I mean if it is actually an ongoing investigation that does raise some substantial issues.  So, I suppose, yeah, that you should move to enforce, if necessary.  And I suggest that you put the SCC on notice of that, because they may have to come into play at some point.

MR. SMITH: Okay.

THE COURT: Or even with the motion to enforce I need to know more from the SCC probably.

MR. D'ANCONA: Under the law, Your Honor, that was cited it is fairly routine, in our cases, as Your Honor is no doubt aware that there is a parallel SCC or governmental investigation alongside a 10B-5 case like ours.

THE COURT: Yup.

MR. D'ANCONA: And in those cases it is ordinarily requested that documents produced -- SCC be produced as we've done here, and such documents are routinely produced.

In addition, transcripts as -- as specifically noted in the cases we cited are directed by the court to be requested when the -- when the witness is declining to do so on its own as it has the inherent right to do under the SCC regulations. After every interview when a transcript is created the SCC informs the witness that they have a right to request the transcript. So that's a -- that's a -- that's an ironclad right of each of these witness, both the company controlled witnesses and the former employees.

This -- this motion right here Your Honor, you are correct in perceiving that we are not here

requesting  Your Honor to direct the former employees Ms. Behdal (phonetic) and Ms. Smith to do one thing or another, because they are not -- they are not parties to this motion.  This motion is directed --

THE COURT:  Right.

MR. D'ANCONA:  -- to Becton.  As I know -- I know Your Honor perceived.  But we can move separately if --

THE COURT:  Yes.

MR. D'ANCONA:  -- if -- if their counsel asked us to.  But this motion is asking for Becton to be directed to provide to us the documents that we requested long ago, which -- which are these transcripts and other documents from the SCC investigation, which is ongoing.  Which, you know the confidentiality of that investigation, vis-a-vis the public or vis-a-vis others is -- is really not an issue in a case such as this where: A, there's a confidentiality order that is negotiated by the parties and agreed to by the parties; and B, the documents are being requested by the witness themselves, the witness has a right to those documents.

So in effect the documents are in the possession, custody and control of the witness and if it's Becton's controlled witness of Becton.  All they

have to do is request the documents and they have them. And that is --

THE COURT:   -- washed his hands of them.

MR. SMITH:   Your Honor if I -- if I may just briefly.  I think -- I think Mr. D'Ancona is alighting a number of different -- different issues that are floating around in -- in the letter that was submitted.

First of all there is no motion at this point. But the former employees are not before the Court, they're not in our control.  So that's a separate issue.  That issue relates primarily, if not exclusively, to this idea of requesting the -- the testimony -- the transcripts of their testimony before the SCC.

The plaintiff have suggested in their letter that we're under an obligation to insist that all our former employees go and request their testimony.  And so, you know, we've -- we've put that in our response in the letter Your Honor.  I would suggest that that's an issue that would merit briefing, if that was the route it was going to go.  I think Your Honor suggested a better path, which is you know compel the witnesses --

THE COURT:   I just -- Mr. D'Ancona just move to enforce the subpoenas.  That's --

MR. SMITH:  Yeah -- Yeah.  The other thing Your Honor -- sorry I talked over you.

THE COURT:  And I'm not -- and that's without judgment with respect to BD Mr. D'Ancona.  But I just think it's cleaner if you do it that way and easier for me.

MR. SMITH:  Yeah, the two other issues Your Honor, that I think got slightly lost in the presentation is with respect to documents.  We're not shielding documents because they were provided to the SCC.

THE COURT:  Oh good point.

MR. SMITH:  Every document that -- that falls within the scope of the substantive document request in the case that we negotiated that was provide to the SCC we've also already given to the plaintiffs.

THE COURT:  Okay.

MR. SMITH:  All we're trying to do is avoid being put in the position of inadvertently providing a roadmap to what's now a confidential ongoing investigation.  Mr. D'Ancona points out that we have a confidentiality order in this -- in this case.  That's true.  But I don't know the SCC's position vis-a-vis the plaintiffs, whether they want -- you know, so I don't think we're -- we're suggesting that mountains

need to be moved here.  I think we're suggesting that the SCC ought to be, you know, the ones making the call as opposed to us.

THE COURT:  Okay, I think Mr. D'Ancona has path that I've suggested.  But one more thing that you raised Mr. Smith.  So we're just talking about transcripts now, Mr. D'Ancona, BD turned over everything else?  Just so I'm clear.

MR. D'ANCONA:  In our view BD did -- did not turn over everything else that we requested.  They -- they basically told us, and I'll summarize here, that if we requested documents that they also produced to the SCC that we would get those documents.  They did not -- they did not -- we requested further -- let me put it this way.  We requested further things such as the transcripts from the SCC proceeding, other documents including subpoenas that courts -- that we've cited in the letter to Your Honor.  Which again is directed at asking Your Honor to compel Becton to produce to us the documents under its control.  Such as documents form testimony that may be given by its current employees, that may have been given over the past several months to the SCC by its current employees.

THE COURT:  Oh.

MR. D'ANCONA:  That's -- that's what this letter really aims at.  But also related subpoena so that we could understand, you know, more about those -- those dep -- or those interviews that may have occurred and been transcribed.  We requested those.  Becton initially told us that there were no such transcripts, but now there are because the depositions -- or not the depositions, but the interviews before the SCC have been -- have been rolling for the past several months here.

So we are now returning to Becton saying please give us these transcripts which now exists.  And while it may have given us some documents in the past that it also produced to SCC it is declining to give us the SCC transcripts.  So that's -- that's the nub of it.

MR. SMITH:  Your Honor, again I just -- I'm not sure where -- Mr. D'Ancona obviously has a source of information here that is separate and apart from the discussions that we've had.  There are two witnesses who've been deposed in the case who have testified that they have been interviewed by the SCC.  That the -- the interviews are rolling, et cetera.

Again we've been very careful -- that is to say Becton Dickinson defendants -- not to disclose

information that would reveal the scope of the investigation, because it's our view that's the purview of the SCC to do.

But again our -- our point is not to prevent access to this if the SCC is copasetic with it, our point is simply not to front run the SCC.

MR. D'ANCONA:  Your Honor, the -- the way to discern if the SCC is willing to provide the transcripts, or if it feels that there's some overarching confidentiality concern, is for the witness who has the legal right to request the transcript to request it.  The SCC has full authority, stated in the self-same rule, to say that it declines to provide the transcript.  But that's the mechanism for doing it.  An outside party cant test, really, the SCC's views on the question of whether the person who's entitled to obtain the transcript can obtain it or not.

But I -- but I -- but I heard Your Honor.  We can -- we can -- we can confer further with defendants on how to proceed here.  We can confer further with the lawyers for the third parties who -- who Your Honor identified off the top on this issue and see if motion practice on that front is required.

I do welcome Your Honor's suggestion both here and in the first issue to discuss what are -- what are

frankly mounting discovery issues in this case that may well lead to a significant amounts of paper here, both -- both on the parties side and -- and probably more importantly on Your Honor's side.  We -- we welcome the opportunity to confer with these defendants on these issues, as well as just to flag it for Your Honor what we see as a -- a very substantial privilege log challenge which is -- is something that we need to confer with defendants about, absolutely, before we bring it to Your Honor.  But I do want to raise that we see that around the bend as well in all likelihood.  So I didn't want that to come out -- since we're discussing similar issues today.

THE COURT:  Yeah, I'm concerned though about these other potential transcripts other than the two of the ex-employees that you're talking about.  So there's a document request out to BD for those?

MR. D'ANCONA:  Yes, since December of last year.

THE COURT:  And just so I'm clear Mr. Smith your position is that inquiry needs to go to the SCC.  Mr. D'Ancona says that the inquiry should come from you to the SCC.

MR. SMITH:  Essentially Your Honor there's -- there has been a request for transcripts.  We've

represented that we don't have transcripts and we've represented that repeatedly. The argument that Mr. D'Ancona is making is that we should be required, with respect to both our current and former employees, to ask any witnesses among that cohort that have testified at the SCC to request their transcripts from the SCC for purposes of producing them to Mr. D'Ancona.

And we're simply suggesting that in situation like this there are a -- there are a lot of different circumstances under which this comes up in a lot of different types of cases. But in a circumstance like this where it's an ongoing confidential investigation our doing that is basically giving the plaintiffs a witness list. Which, as far as I'm aware of at the moment that they -- they don't have.

And there are cases that we've pointed to in our part of the letter Your Honor where what has happened is precisely what we're suggesting. Which is the plaintiffs have gone to the SCC in the first instance and said look we know this person has testified, we'd like to get a copy of their transcript. And, you know, in essence we'd like to know who else has testified. And the SCC has actually provided the information and done so in a way that made clear that it had no issue with the -- you know the deponents

themselves or the interviewees themselves requesting, obtaining and then producing their transcripts. And so, you know, that's -- that's what we're suggesting here Your Honor.

THE COURT: The current employees you're -- you're in control of them. So, wouldn't it behoove you to ask those employees if they have copies of their transcripts?

MR. SMITH: Yeah, again if we had -- I think there's two issues here. One is control, what's -- one is what's actually in the company's physical possession and we don't --

THE COURT: Uh huh.

MR. SMITH: -- transcripts. Do we have control over employees -- of our current employees?

THE COURT: Right.

MR. SMITH: Certainly we do. But I think it still begs the same question Your Honor, which is you know if we were to -- and I'm trying to speak in hypotheticals here so as to not, you know, reveal any information that again we thing goes beyond our purview. But if we were to instruct employees to -- any employees who've been interviewed by the SCC to request transcripts of those.

THE COURT: Right.

MR. SMITH:  Then they'll be in our possession

THE COURT:  Right.

MR. SMITH:  And -- and you know then we'll produce them to the plaintiffs.  And by virtue of having done so will have revealed to the plaintiffs who the witnesses are who've testified in the SCC.

THE COURT:  So your fear is revealing potential witnesses?

MR. SMITH:  Yeah, I -- I think that's a fair way to characterize it Your Honor.  It's not so much requesting and providing copies of transcripts, which there is a clear mechanism to do.

THE COURT:  What's the downside of that?  I'm missing the downside of that.

MR. SMITH:  Of -- of which Your Honor?

THE COURT:  Of you revealing the names of witnesses.

MR. SMITH:  Well, just because it's a confidential and ongoing SCC investigation.  And our point is, again, we've pointed to a couple of instances where this has unfolded in a similar fashion to what we're suggesting.  Where, it's unclear, you know, what -- what the downside is of asking the SCC -- of the plaintiffs asking the SCC whether there's any concern, you know, with the discovery in a civil lawsuit

revealing that information.

MR. D'ANCONA:  Your Honor, if I may --

THE COURT:  I'm not sure I agree with you Mr. Smith.  I think that that makes them go through all kinds of governmental hoops to request --

MR. SMITH:  Well, what --

THE COURT:  -- and whatnot, when you have these people in your custody and control -- or control, not custody.  In your control.  And if they have the transcripts it makes sense to me that you ask them to give you their transcripts, if you're saying you don't them, and they're turned in discovery.  The fact that you may reveal witness names under a confidentiality agreement that hovers over this case I don't really see your downside.

MR. SMITH:  Yeah, I mean, that -- that assumes that the SCC has no problem with the plaintiffs knowing the scope of its investigation.  Maybe they don't. But, you know, --

THE COURT:  But wouldn't that be up to you to find out why -- Mr. D'Ancona do you want -- well you don't know the witnesses who testified, right the employees?

MR. D'ANCONA:  Your Honor -- I think that Your Honor's questions go right to questions.  We have a

Hearing                                                                    39
20-CV-02155, September 12, 2023

Baxter (phonetic) case cited in our -- in our part of the letter brief to Your Honor as well.

This -- this -- this -- this sort of punitive concern with an SCC confidentiality and privilege about everything, it's something that courts have heard before for the last 20/30 years and that they have rejected as an argument and instead have gone ahead and compelled the company in Becton's position to order -- or to direct its employees under its control to request their transcripts to which they have a legal right. And if the SCC, as it -- as it is entitled to do under these self-same regulations, if the SCC believes that there's an overriding concern of confidentiality then the SCC --

THE COURT:  They can deny they deny their request.

MR. D'ANCONA:  Correct.  That's how -- that's how the process works, as Your Honor --

THE COURT:  Yeah, that's how I understand it. That's why I'm a little -- so Mr. Smith do you hear what I'm thinking?

MR. SMITH:  I do Your Honor, and you know I would just point out that Your Honor expressed concern that, you know, one procedure would create more work for the SCC than the other.

What I think is being proposed --

THE COURT:  Not the SCC, I just think that the appropriate way to do this, because you claim these people as your employees, is for you to find out if they have transcripts.  Them to ask the SCC for those transcripts.  If the SCC's got a problem with them their going to say you can't have the transcripts.  I mean this seems kind of -- much to do about nothing to me.

MR. SMITH:  Yeah, I guess the only point there, Your Honor, is it's multiple requests from the SCC for multiple witnesses for their transcripts as opposed the procedure that we were suggesting, where you know the parties seeking the discovery goes to the SCC on the front end, and in respect of the totality investigation --

THE COURT:  Backwards.

MR. SMITH:  Well, I -- I understand what Your Honor is saying.  We have, as I noted, cited a couple of cases Herbst (phonetic) and others, in our portion of the letter.  Where the procedure we're suggesting was the one that was followed.  It seemed to us to be the one that makes the most sense under the circumstances.  But I hear what Your Honor is saying.

THE COURT:  So, I would like you to request

these witnesses or deponents to have them make an application to the SCC to request their transcripts, okay.

MR. SMITH:  Understood Your Honor.

THE COURT:  And we got a lot of hoops to go through in this case, we don't need to put more walls up.  So let's do that and that'll take care of that. Tim D. can you do a T.O. on that?   Thanks.

LAW CLERK:  Sure Judge.

THE COURT:  So I'll post sort of -- or Tim will post a text order and it won't be very specific, just so you know.  I try to avoid being too specific on the docket.  And if the SCC needs to look at the docket then they'll see that that's what I ordered Mr. Smith and then they can make their own decisions.  Current employees we're talking about.

MR. SMITH:  Understood Your Honor.  That's what -- Tim just sent me a text.  Isn't technology great?  So he's on -- he's on the Zoom and he's yelling at me at what I'm doing wrong and when and telling me how to do it right.

So you're going to subpoena Mr. D'Ancona the non-employees and then move to enforce, with notice with the SCC, please.

MR. D'ANCONA:  Yes.

THE COURT: So everybody is on equal footing.

MR. D'ANCONA: And -- and I probably have a couple more conversations I need to have with their lawyers before doing that --

THE COURT: Okay.

MR. D'ANCONA: -- to be fair to them, but that will -- that will be where this leads if they do not acquiesce.

THE COURT: Okay, I'm not putting any dates up of for you. Whatever scheduling order there is, there is. If you needed amended I'm happy to do that. I'm not concerned with this case and its movement at this point.

So, I'll just schedule another touch base Zoom or telephone conference. But as you know if you need me before then you know how to get me.

MR. D'ANCONA: Thank you Your Honor.

MR. SMITH: Thank Your Honor.

THE COURT: All right, thank you for your time everybody. Have a good day.

MR. D'ANCONA: Thank you Judge.

THE COURT: Bye-bye.

(Conclusion of proceedings)

CERTIFICATION


    I, JESSICA ROBINSON, Transcriptionist, do hereby certify that the pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

    I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

Jessica Robinson          Date:    09/20/2023
Signature of Approved Transcriber          Date
Jessica Robinson, AOC #581

King Transcription Services
3 South Corporate Drive
Suite 203
Riverdale, NJ 07457
(973) 237-6080

Hearing
20-CV-02155, September 12, 2023

44