**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

*Liaison Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Sharan Nirmul
David A. Bocian
Joshua E. D'Ancona
Margaret E. Mazzeo
Vanessa M. Milan (admitted *pro hac vice*)
Nathaniel C. Simon (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Class Representative Industriens Pensionsforsikring A/S and Class Counsel for the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDUSTRIENS PENSIONSFORSIKRING A/S, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BECTON, DICKINSON AND COMPANY and THOMAS E. POLEN, <br><br> Defendants. | Case No. 2:20-cv-02155-SRC-CLW <br><br> Hon. Stanley R. Chesler <br> District Court Judge <br><br> Hon. Cathy L. Waldor <br> Magistrate Judge |

### DECLARATION OF JOSHUA E. D'ANCONA IN SUPPORT OF (I) CLASS REPRESENTATIVE'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.    INTRODUCTION ..................................................................................3

II.   BACKGROUND OF THE ACTION AND THE SETTLEMENT ...............8

    A.    Summary of the Class's Claims .........................................................8

    B.    Commencement of the Action and Industriens' Appointment as Lead Plaintiff.................................................................................11

    C.    Lead Plaintiff's Investigation and Filing of the Amended Class Action Complaint ........................................................................12

    D.    Defendants' Motion to Dismiss the Amended Complaint, Lead Plaintiff's Ongoing Investigation, and Lead Plaintiff's Filing of the Second Amended Class Action Complaint Based on Newly Learned Evidence ............................................................................14

    E.    Defendants' Motion to Dismiss the Second Amended Complaint ......................................................................................17

    F.    Lead Plaintiff's Continuing Investigation and Filing of the Third Amended Class Action Complaint...........................................21

    G.    Defendants' Motion to Dismiss the Third Amended Complaint and Answer.................................................................................23

    H.    Lead Plaintiff's Filing of the Fourth Amended Complaint................26

    I.    The Parties' Extensive Discovery Efforts ........................................28

        1.    Rule 26(f) Report, Initial Disclosures, Confidentiality Order and ESI Protocol................................................................29

        2.    Lead Plaintiff's Discovery Propounded on Defendants ...........30

            a.    Lead Plaintiff's Document Requests .............................30

            b.    Lead Plaintiff's Interrogatories.....................................31

        3.    Non-Party Discovery ..............................................................32

        4.    Implementation of Review Protocol and Document Review ...................................................................................33

        5.    The Parties' Discovery Disputes.............................................35

        6.    Preparation for Fact Depositions ............................................39

7. Defendants' Discovery Propounded on Lead Plaintiff.............41

    a. Defendants' Document Requests ..................................41

    b. Defendants' Interrogatories .............................................42

    c. Deposition of Lead Plaintiff ...........................................42

J. Lead Plaintiff's Class Certification Motion .......................................43

K. Class Counsel's Work with Experts......................................................47

L. Mediation and Preliminary Approval of the Settlement ....................48

III. RISKS OF CONTINUED LITIGATION .........................................................50

A. Risks of Establishing Falsity and Scienter at Trial ............................52

B. Risks of Establishing Loss Causation and Damages at Trial.............55

C. Risks on Appeal....................................................................................57

IV. COMPLIANCE WITH COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS TO DATE ...........................58

V. PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE....................................................................................................61

VI. CLASS COUNSEL'S FEE AND EXPENSE APPLICATION ...................66

A. Class Counsel's Fee Request Is Fair and Reasonable and Warrants Approval ...............................................................................67

    1. The Favorable Settlement Achieved........................................67

    2. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases...................................................................68

    3. The Time and Labor Devoted to the Action by Plaintiff's Counsel.................................................................71

    4. The Quality of Plaintiff's Counsel's Representation................74

    5. Class Representative's Endorsement of the Fee Application..............................................................................75

B. Class Counsel's Request for Litigation Expenses Warrants Approval.................................................................................................75

    1. Class Counsel Seeks Reimbursement of Plaintiff's Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund.......................................................75

ii

2.      Reimbursement to Class Representative Is Fair and Reasonable ............................................................79

VII.   CONCLUSION...............................................................................81

I, JOSHUA E. D'ANCONA, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a partner of the law firm of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz" or "Class Counsel"), counsel for Court-appointed Lead Plaintiff and Class Representative Industriens Pensionsforsikring A/S ("Lead Plaintiff," "Class Representative" or "Industriens") in this securities class action lawsuit ("Action").[1] I have personal knowledge of the matters set forth herein based on my active supervision of and participation in the prosecution and resolution of the Action.

2.      I respectfully submit this Declaration in support of Class Representative's motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Rules") for final approval of the proposed settlement with defendants Becton, Dickinson and Company ("BD" or "Company") and Thomas E. Polen ("Polen") (together, "Defendants") for $85,000,000 in cash ("Settlement"). If approved, the Settlement will resolve all claims asserted in the Action against Defendants on behalf of the Court-certified Class, consisting of all persons and entities who, from November 5, 2019 to February 5, 2020, inclusive, purchased or otherwise acquired BD common stock or call options, or sold BD put options, and

---

[1] Capitalized terms not defined in this Declaration have the meanings set forth in the Stipulation and Agreement of Settlement dated as of December 19, 2023 (ECF No. 182-2) ("Stipulation").

1

were damaged thereby.[2] The Court preliminarily approved the Settlement and directed notice thereof to the Class by Order dated January 18, 2024 (ECF No. 186) ("Preliminary Approval Order").

3.      I also respectfully submit this Declaration in support of: (i) the proposed plan for allocating the net proceeds of the Settlement to eligible Class Members ("Plan of Allocation" or "Plan"); and (ii) Class Counsel's motion, on behalf of Plaintiff's Counsel,[3] for an award of attorneys' fees in the amount of 25% of the Settlement Fund; payment of Plaintiff's Counsel's Litigation Expenses in the total amount of $843,144.64; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), reimbursement of $84,856.40 to Class Representative for the costs it incurred in connection with representing the Class ("Fee and Expense Application").

---

[2] Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of BD or any of BD's subsidiaries or affiliates, members of BD's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing individuals' and entities' legal representatives, heirs, successors, or assigns; and (iv) any entity in which any Defendant has a controlling interest. Also excluded from the Class are any persons and entities who or which submit a request for exclusion from the Class that is accepted by the Court.

[3] "Plaintiff's Counsel" refers collectively to Class Counsel Kessler Topaz and Court-appointed Liaison Counsel Carella Byrne Cecchi Brody & Agnello, P.C. (f/k/a Carella Byrne Cecchi Olstein Brody & Agnello, P.C.) ("Carella Byrne").

4.      For the reasons discussed below and in the accompanying briefs,[4] I, on behalf of Class Counsel, respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects. Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Class Representative—a sophisticated, institutional investor that has actively supervised the Action since its inception. *See* Declaration of Jan Østergaard on behalf of Industriens ("Østergaard Decl."), attached hereto as Exhibit 1.

## I.      INTRODUCTION

5.      Following nearly four years of hard-fought litigation and extensive arm's-length negotiations facilitated by an experienced mediator, Class Representative and Class Counsel have succeeded in obtaining a recovery of $85,000,000 in cash ("Settlement Amount") for the benefit of the Class.[5] As

---

[4] In conjunction with this Declaration, Class Representative and Class Counsel are submitting: (i) the Memorandum of Law in Support of Class Representative's Motion for Final Approval of Settlement and Plan of Allocation ("Settlement Memorandum") and (ii) the Memorandum of Law in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fee and Expense Memorandum").

[5] Pursuant to the terms of the Stipulation, the Settlement Amount has been fully funded and is currently being held in the interest-bearing Escrow Account.

provided for in the Stipulation, in exchange for this consideration, the Settlement resolves all claims asserted in the Action (and related claims) by Class Representative and the Class against Defendants and the other Defendants' Releasees.[6]

6.    Until a resolution was reached in October 2023, this Action was vigorously litigated by the Parties. At the time of settlement, Class Counsel had, among other things, conducted an extensive investigation into the claims at issue, including over 200 witness interviews; researched and prepared four detailed amended complaints; briefed three motions to dismiss, defeating the third in substantial part; overcome an opposition to a motion to amend; obtained certification of the Class; and engaged in comprehensive fact discovery—including the review and analysis of over two million pages of documents, depositions of two fact witnesses (while undertaking preparations to depose 20 more), and litigation of multiple discovery disputes before the Court. *See infra* § II. Further, the Settlement

---

[6] As defined in Paragraph 1(s) of the Stipulation, Defendants' Releasees are "Defendants; Defendants' respective former, present, or future parent companies, controlling shareholders, subsidiaries, divisions and affiliates and the respective present and former employees, members, managers, partners, principals, officers, directors, controlling shareholders, agents, attorneys, advisors, accountants, auditors, and insurers and reinsurers of each of them; the predecessors, successors, estates, Immediate Family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them, as well as any trust of which the Individual Defendant is the settlor or which is for the benefit of any of his Immediate Family members; and any firm, trust, corporation, or entity in which any Defendant has a controlling interest."

is the product of protracted arm's-length negotiations, including three formal mediation sessions (two in-person and one virtual) before a highly experienced and respected neutral, David M. Murphy, Esq. ("Mr. Murphy") of Phillips ADR Enterprises, P.C., who ultimately made a mediator's recommendation to resolve the Action for a cash payment of $85 million that the Parties accepted. *See infra* ¶¶ 110-13.

7.      In deciding to settle the Action, Class Representative and Class Counsel carefully considered the significant risks associated with advancing their case through the completion of fact discovery, expert discovery, summary judgment, trial, and the inevitable post-trial appeals. Moreover, an adverse decision for Class Representative at summary judgment or on appeal, or by a jury at trial, could have precluded *any* recovery for the Class. *See infra* § III.

8.      Had the Settlement not been reached, Defendants would have continued to aggressively assert defenses to Class Representative's claims. Here, Class Representative alleged Defendants made statements during the Class Period (i.e., November 5, 2019 to February 5, 2020, inclusive) that misled investors regarding BD's revenue and growth prospects by failing to acknowledge severe safety and compliance issues with BD's Alaris Infusion Pump System ("Alaris") and ongoing scrutiny by the U.S. Food and Drug Administration ("FDA") that had led to a commercial "hold" on Alaris shipments. Had the Action continued, Defendants

would assert, as they did throughout the Action, that the statements at issue were not false at the time they were made, and that Defendants legitimately believed them to be true. For example, Defendants would argue that at the time of the alleged misstatements, the FDA had not formally taken any action that would require BD to stop shipping Alaris. Defendants would further argue that, consistent with their contemporaneous public statements, BD voluntarily imposed the ship hold on Alaris to install software updates. Defendants would also claim that they had no knowledge of the FDA's position that Alaris should not be shipped due to its safety defects until February 3, 2020, undermining any claims that their prior alleged statements during the Class Period were made with scienter.

9.    In addition to the risks associated with establishing Defendants' liability, Class Representative faced substantial challenges in proving loss causation and the Class's full amount of damages had the Settlement not been reached. Defendants would likely assert, among other things, that: (i) BD's February 6, 2020 announcement regarding the FDA's position that Alaris could not be shipped until required device fixes were in place and a new pre-market clearance from the FDA (i.e., a 510(k)) had been obtained—and the effect on BD's FY20 Guidance from this loss of Alaris sales—did not reveal a hidden "truth" underlying any prior misstatement; (ii) Class Representative's proposed methodology for measuring class-wide damages was flawed because it could not reliably measure the damages

6

of options traders; and (iii) the Class Period should, at the very least, be shortened by weeks or even months based on evidence regarding falsity and scienter. Acceptance of any such arguments by the Court or a jury, in whole or in part, would have dramatically limited the potential recovery for the Class, or eliminated it altogether.

10. Class Counsel believes that the Settlement, particularly when viewed in the context of the risks and uncertainties of continued litigation, represents an excellent result for the Class. Notably, based on expert estimates employing various reasonable assumptions, the Settlement represents approximately 10-15% of maximum damages, providing a significant recovery for Class Members.

11. Class Counsel has worked with the Court-authorized Claims Administrator, JND Legal Administration ("JND"), to disseminate notice of the Settlement to the Class as directed in the Preliminary Approval Order. In this regard, JND has mailed 200,814 Postcard Notices and 4,131 Notice Packets (i.e., the long-form Notice and Claim Form) to potential Class Members and nominees.[7] Additionally, JND has posted the Notice and Claim Form, along with other documents relevant to the Settlement, on the Settlement website:

---

[7] *See* Declaration of Luiggy Segura Regarding: (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of the Summary Notice; (C) Establishment of Call Center Services and Settlement Website; and (D) Report on Requests for Exclusion Received to Date ("Segura Decl."), ¶ 10, attached as Exhibit 2 hereto.

www.BectonSecuritiesSettlement.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. Segura Decl., ¶¶ 11, 14.

12.    The reaction of the Class thus far has been positive. As ordered by the Court and stated in the notices, requests for exclusion from the Class and objections are due to be received no later than April 1, 2024. To date, there have been no objections to the Settlement, Plan of Allocation, or Class Counsel's request for attorneys' fees and Litigation Expenses, including reimbursement of costs to Class Representative, and there have been no requests for exclusion from the Class.[8]

## II.    BACKGROUND OF THE ACTION AND THE SETTLEMENT

### A.    Summary of the Class's Claims

13.    The Class's claims in the Action are fully set forth in the operative Fourth Amended Class Action Complaint dated June 22, 2023 (ECF No. 158) ("Complaint"). The Complaint asserts claims under: (i) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), against BD and Polen; (ii) Section 20(a) of the Exchange Act against Polen; and (iii) Sections 10(b) and 20A of the Exchange Act and Rule 10b-5 for insider trading against Polen.

---

[8] *See* Segura Decl., ¶ 16. Should any requests for exclusion or objections be received after the date of this submission, Class Counsel will address them in its reply papers to be filed with the Court on or before April 15, 2024.

14.     Class Representative claims that, during the Class Period, Defendants violated the federal securities laws by making numerous statements that were misleading due to their failure to acknowledge severe regulatory, safety and compliance issues concerning Alaris, a key revenue-generating product for BD. *See generally* ¶¶ 295-352.[9]

15.     More specifically, the Complaint alleges that Defendants issued materially false or misleading statements concerning the nature of a ship hold on Alaris and the adverse reason underlying the decision to impose the ship hold. *See generally* ¶¶ 295-356. The Complaint alleges that when BD announced it, Defendants represented that the Alaris ship hold was being voluntarily enacted for a short period of time to complete routine upgrades. *See* ¶¶ 304-308, 341-44. The Complaint also alleges that BD misleadingly affirmed its ability to meet its fiscal year 2020 financial guidance despite the undisclosed regulatory risks involved in the ship hold. *See* ¶¶ 338-40.

16.     As the Complaint claims, however, unbeknownst to investors, Alaris was plagued by significant defects that were the subject of ongoing regulatory scrutiny by the FDA (*see generally* ¶¶ 122-76), and the true impetus for the ship hold was the FDA's critical feedback regarding these defects, not routine upgrades as Defendants represented. *See* ¶¶ 132-45. Moreover, in order to remedy Alaris's issues

---

[9] In this Section II.A, citations to "¶ __" refer to paragraphs in the Complaint.

9

and lift the ship hold, the Complaint asserts that BD would need to satisfy the FDA's lengthy clearance process, severely curtailing BD's Alaris sales, and therefore, its ability to meet its fiscal year 2020 revenue guidance, all the while—again, contrary to what Defendants represented. *See* ¶¶ 146-76.

17.     The Complaint asserts that the allegedly false or misleading misstatements made by Defendants artificially inflated and/or maintained the price of BD common stock and call options and artificially deflated and/or maintained the price of BD put options during the Class Period. ¶¶ 353-56. As a result, Class Members, including Class Representative, who purchased or otherwise acquired (or sold, in the case of put options) BD Securities[10] during the Class Period suffered damages when the inflation (or deflation) was removed from BD's stock price following the corrective disclosure that revealed the relevant truth concealed by those misrepresentations. *Id.*

18.     Specifically, the Complaint claims that the artificial inflation (or deflation) in the price of BD common stock was removed on February 6, 2020 when BD disclosed that Alaris would be recalled and placed on an indefinite ship hold due to various software defects, that the FDA was requiring BD to obtain a new 510(k)

---

[10] BD common stock and call and put options on BD common stock are collectively referred to herein as "BD Securities."

before resuming sales, and that BD would consequently be lowering its financial guidance for the 2020 fiscal year by $400 million. ¶¶ 239-56.

19.    The Complaint asserts that, in response to the foregoing disclosure, the price of BD common stock declined $33.74 per share on February 6, 2020, thereby causing damage to Class Representative and the Class. ¶¶ 23, 253, 355. Additionally, the Complaint alleges that Polen executed sales of BD common stock during the Class Period while in possession of material nonpublic information, including concerning the true nature of and reason for the Alaris ship hold and BD's ability to meet its financial guidance for the 2020 fiscal year. ¶¶ 357-61.

## B.    Commencement of the Action and Industriens' Appointment as Lead Plaintiff

20.    On February 27, 2020, the initial complaint was filed in the United States District Court for the District of New Jersey on behalf of a putative class of investors that purchased or otherwise acquired BD securities between November 5, 2019 and February 5, 2020, inclusive. ECF No. 1.[11] This complaint asserted claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10-5 promulgated thereunder.

---

[11] A related derivative complaint, *In re Becton, Dickinson & Co. Shareholder Derivative Litigation*, Master File No. 2:20-cv-15474, was separately filed on November 2, 2020. The claims asserted in the derivative action are not being released by the Settlement and have been specifically carved out of the "Released Plaintiff's Claims."

11

21.    Also on February 27, 2020, notice was published advising putative class members of the pendency of the litigation and their right to move to serve as lead plaintiff in accordance with the PSLRA. ECF No. 6. On April 27, 2020, Industriens moved to be appointed as lead plaintiff in the Action and to have the Court approve its selection of Kessler Topaz as lead counsel and Carella Byrne as liaison counsel for the class ("Lead Plaintiff Motion"). ECF No. 10. Similar motions were filed by two competing movants. ECF Nos. 8, 9. One of the competing motions was subsequently withdrawn. ECF No. 14.

22.    Following further submissions by Industriens and movant Michael Kim ("Movant Kim") (ECF Nos. 15-18, 20-23), respectively, the Court, on June 9, 2020, issued an Opinion and Order appointing Industriens as Lead Plaintiff, approving Kessler Topaz and Carella Byrne as Lead Counsel and Liaison Counsel, respectively, and denying Movant Kim's motion ("Lead Plaintiff Order"). ECF No. 24.[12]

C.    **Lead Plaintiff's Investigation and Filing of the Amended Class Action Complaint**

23.    Prior to filing the Amended Class Action Complaint on August 10, 2020 (ECF No. 31) ("Amended Complaint"), and before Industriens' appointment

---

[12] On October 2, 2020, Movant Kim filed a motion for reconsideration of the Lead Plaintiff Order. ECF No. 32. Industriens submitted a 14-page memorandum of law in opposition on October 19, 2020. ECF No. 38. Following oral argument, the Court denied the motion for reconsideration of the Lead Plaintiff Order. ECF No. 47.

as Lead Plaintiff, Lead Counsel began an exhaustive investigation into the facts underlying the Action. Lead Counsel completed a detailed review and analysis of: (i) BD's public filings with the SEC, including filings concerning common stock transactions by executives; (ii) press releases and public statements issued by BD, including during earnings calls and conference calls with analysts and investors; (iii) research reports and advisories by securities and financial analysts; (iv) publicly available news articles, press releases, documents and other online and media reports regarding defendants; and (v) data and other information concerning BD Securities.

24.    Additionally, Lead Counsel dedicated substantial time and resources to locating, interviewing, and memorializing interviews with former BD employees. In total, Lead Counsel, through its in-house investigators, contacted or attempted to contact 454 former BD employees and conducted 227 witness interviews. Ultimately, Lead Counsel incorporated information provided from four such witnesses into the Amended Complaint filed on August 10, 2020.

25.    As part of its investigation, Lead Counsel also consulted with an expert in the field of damages to assist in developing the claims that would ultimately be asserted against the named defendants.

26.    Moreover, Lead Counsel conducted extensive legal research before filing the Amended Complaint to understand exactly which theories of liability Industriens could allege and how to allege them given the current state of the law.

13

For instance, Lead Counsel comprehensively researched the law in the Third Circuit related to the standards for pleading securities fraud under Section 10(b) and insider trading claims under Section 20A.

27.     Based upon Lead Counsel's thorough investigation and research, Industriens filed the 86-page Amended Complaint on August 10, 2020 against BD, Polen, Vincent A. Forlenza ("Forlenza"), and Christopher R. Reidy ("Reidy") for alleged violations of Sections 10(b), 20(a) and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder. ECF No. 31.

**D.     Defendants' Motion to Dismiss the Amended Complaint, Lead Plaintiff's Ongoing Investigation, and Lead Plaintiff's Filing of the Second Amended Class Action Complaint Based on Newly Learned Evidence**

28.     Following this filing, Lead Counsel continued to vigorously investigate Lead Plaintiff's claims against the named defendants, including by developing and pursuing additional witness leads, and reviewing and analyzing publicly available information.

29.     Meanwhile, on October 9, 2020, the named defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6). ECF No. 36. Their motion was accompanied by a 46-page memorandum of law, an appendix summarizing Lead Plaintiff's claims and defendants' arguments, and 14 supporting exhibits.

14

30.    The motion challenged nearly every element of Lead Plaintiff's claims. Specifically, the defendants argued that the Amended Complaint should be dismissed in its entirety because it: (i) failed to adequately plead any material misstatements or omissions; (ii) failed to plead a strong inference of scienter; (iii) failed to plead loss causation; (iv) failed to allege a Section 20(a) claim; and (v) failed to adequately plead a Section 20A claim. ECF No. 36-1.

31.    Lead Counsel reviewed and analyzed the defendants' briefing, accompanying exhibits, and cited legal authority, and conducted extensive legal research into Lead Plaintiff's potential responses thereto. On November 23, 2020, Lead Plaintiff filed a 45-page opposition to the defendants' motion to dismiss. ECF No. 54. In its opposition, Lead Plaintiff rebutted the defendants' arguments, cited extensive legal authority supporting its contentions, distinguished key authorities cited in the motion, and argued that the Amended Complaint adequately pleaded all elements of Lead Plaintiff's claims, including falsity, scienter, and loss causation. *Id*. Alongside its opposition brief, Lead Plaintiff moved to strike the appendix attached to the defendants' motion to dismiss. ECF No. 55. Lead Plaintiff argued in its 17-page supporting memorandum of law that the Court should strike the appendix as it contained new arguments not contained within the defendants' brief and impermissibly expanded the page limit mandated by the Court's Local Rules.

15

32.     After filing Lead Plaintiff's opposition, Lead Counsel discovered in its ongoing investigation new, directly relevant evidence through confidential witness interviews. Lead Counsel determined that this new evidence would substantially strengthen the operative allegations in the Amended Complaint, including regarding the individual defendants' scienter, and met and conferred with the defendants regarding a motion to file an amended pleading to reflect these newly unearthed facts.

33.     On January 14, 2021, Lead Plaintiff filed a motion for leave to amend the Amended Complaint. ECF No. 60. Lead Plaintiff's motion attached the 98-page Second Amended Class Action Complaint ("Second Amended Complaint"), which included information from the continued investigation, as an exhibit. ECF No. 60-2. On February 1, 2021, the defendants stipulated that they would not oppose Lead Plaintiff's motion and consented to the filing of the Second Amended Complaint. ECF Nos. 61, 62.

34.     The Second Amended Complaint alleged Section 10(b) claims against the named defendants, asserting that they made materially false or misleading statements and omissions concerning, among other topics: (i) BD's need to obtain regulatory approval from the FDA for intended changes to Alaris, and the nature of the intended changes; (ii) the adequacy of BD's risk disclosures; (iii) the purportedly voluntary ship hold of Alaris; and (iv) BD's ability to meet its fiscal year 2020

16

financial guidance. The Second Amended Complaint additionally alleged Section 20(a) control person claims against individual defendants Polen, Forlenza and Reidy as well as Section 20A insider trading claims against Polen and Forlenza based on their sales of BD common stock while in possession of material non-public information. Lead Plaintiff also pled loss causation based on the alleged February 6, 2020 corrective disclosure, identifying the stock price decline and relevant, contemporaneous analyst and market commentary reacting to the disclosure. In pleading its claims, Lead Plaintiff included first-hand reports from five former BD employees located and interviewed during the course of Lead Counsel's investigation.

**E.    Defendants' Motion to Dismiss the Second Amended Complaint**

35.    On March 19, 2021, the defendants filed a motion to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6), accompanied by a 50-page supporting memorandum of law, 14 exhibits, and an appendix summarizing Lead Plaintiff's allegations and the defendants' arguments. ECF No. 69.

36.    In the motion, the defendants again argued that Lead Plaintiff's claims should be dismissed on the grounds that the Second Amended Complaint failed to adequately plead claims under Sections 10(b), 20(a), and Section 20A. More specifically, the defendants argued that the Second Amended Complaint failed to adequately allege a material misstatement or omission because: (i) the defendants

17

disclosed or had no duty to disclose the allegedly omitted facts; (ii) the defendants' statements were forward-looking statements protected by the PSLRA; (iii) the defendants' statements were accurate and complete when made; and (iv) the defendants' statements were puffery or corporate optimism. The defendants also argued that the confidential witness and other factual allegations did not support an inference of scienter, nor sufficiently plead motive to commit fraud, and that nonculpable inferences were more compelling than an inference of scienter. The defendants additionally argued that the Second Amended Complaint failed to plead loss causation. Finally, the defendants argued that because Lead Plaintiff failed to plead a primary violation of Section 10(b), the claims asserted under Sections 20(a) and 20A must be dismissed.

37.    Lead Counsel once again reviewed and analyzed the defendants' briefing and accompanying exhibits, and the legal authority cited therein. Lead Counsel also conducted extensive legal research into the defendants' arguments and developed new responses thereto. On May 3, 2021, Lead Plaintiff filed its 50-page opposition to the motion to dismiss, citing extensive legal authority to support its contentions, rebut the defendants' arguments, and argue that the Second Amended Complaint adequately pleaded each element of its Sections 10(b), 20(a), and 20A claims. ECF No. 75. Specifically, Lead Plaintiff argued that: (i) the defendants' alleged misstatements were materially misleading and omitted adverse material facts

18

about BD's regulatory compliance and sales outlook given the true, undisclosed adverse facts regarding the ship hold on Alaris; (ii) the alleged misstatements were not forward-looking, were not accompanied by cautionary language, and lacked a reasonable basis when made, and thus were not protected by the PSLRA safe harbor; (iii) the former BD employee allegations paired with other facts underlying the claims, including regarding the individual defendants' motive, supported a strong inference of scienter; and (iv) loss causation was adequately pled. Lead Plaintiff further argued that its Sections 20(a) and 20A claims were sufficiently alleged because the Second Amended Complaint contained adequate allegations that the defendants were in possession of material non-public information at the time of the alleged insider sales.

38.    In addition to its opposition, Lead Plaintiff simultaneously moved to strike the appendix attached to the defendants' motion to dismiss. ECF No. 76. Following thorough research on the issue, Lead Plaintiff argued in its 15-page supporting memorandum of law that the appendix was an impermissible argument beyond the allotted page limit of the memorandum and should be stricken.

39.    On June 2, 2021, the defendants filed a 25-page reply in further support of their motion to dismiss. ECF No. 80. On the same day, the defendants filed a 15-page opposition to Lead Plaintiff's motion to strike, arguing that the appendix did

not contain additional legal argument, but was merely a summary of Lead Plaintiff's claims and the defendants' responses. ECF No. 79.

40.    On July 1, 2021, after completing further legal research to support its position and distinguish the defendants' cited authorities, Lead Plaintiff filed a reply in further support of its motion to strike. ECF No. 82.

41.    On July 8, 2021, the Court denied Lead Plaintiff's motion to strike, but granted Lead Plaintiff permission to file, within ten days, a 15-page sur-reply to the defendants' reply in support of their motion to dismiss. ECF No. 84.

42.    Lead Plaintiff completed additional legal research regarding the arguments contained in the defendants' reply and, on July 19, 2021, in accordance with the Court's Order, submitted a sur-reply, arguing responsive points. ECF No. 85.

43.    Following this extensive briefing, on September 15, 2021, the Court issued an Order and Opinion granting the defendants' motion to dismiss the Second Amended Complaint without prejudice. ECF Nos. 87, 88. The Court held that Lead Plaintiff did not adequately allege that the defendants had an obligation to disclose the FDA's true role in driving the ship hold or potential adverse FDA action. The Court explained that "[a]bsent a demonstration that the FDA had in some manner or other made clear that it would require a new 510(k) [premarket clearance] application for Alaris products, and that BD would be required to stop marketing

20

Alaris until that application was successfully resolved, the mere possibility of administrative action is not enough to require disclosure." ECF No. 87 at 22. The Court also held that the Second Amended Complaint's allegations were not sufficient to support an inference of scienter, including with respect to Polen's and Forlenza's alleged insider trades. And, because the Court dismissed Lead Plaintiff's Section 10(b) claims, it also dismissed its Sections 20(a) and 20A claims. The Court granted Lead Plaintiff leave to amend the Second Amended Complaint within 45 days of the Order.

### F.    Lead Plaintiff's Continuing Investigation and Filing of the Third Amended Class Action Complaint

44.    Following the dismissal of the Second Amended Complaint, Lead Counsel reviewed the analysis by the Court in its September 15, 2021 Opinion and the authorities cited therein. Lead Counsel conducted extensive further legal research and ramped up its investigation once more with a focus on addressing the issues highlighted by the Court's Opinion.

45.    During its investigation, Lead Counsel reviewed additional, recently published information, such as BD's SEC filings, transcripts of conference calls, contemporaneous reports by analysts, and news articles. Lead Counsel simultaneously pursued additional witness leads and conducted several additional interviews with former BD employees, including a former senior quality executive of the Company who provided significant evidence to bolster Lead Plaintiff's

21

allegations of falsity and scienter against the individual defendants. As a result of these additional interviews, Lead Counsel was able to ultimately incorporate information provided from eleven former BD employees in the Third Amended Class Action Complaint ("Third Amended Complaint").

46.    Lead Plaintiff filed the 114-page Third Amended Complaint on October 29, 2021. ECF No. 91. The Third Amended Complaint asserted claims against the previously-named defendants under Sections 10(b), 20(a) and 20A of the Exchange Act and alleged that the defendants made materially false or misleading statements and omissions concerning the nature of and impetus for the Alaris ship hold, the adequacy of BD's risk disclosures, BD's voluntary recall of Alaris announced in February 2020, and BD's ability to meet its fiscal year 2020 financial guidance. Further, in order to address shortcomings raised by the Court in its September 15, 2020 Opinion, the Third Amended Complaint provided additional detail regarding the FDA's role as "the impetus" for the Alaris ship hold BD disclosed in November 2019, and new allegations bearing directly upon the individual defendants' scienter, including the account of a former senior executive at BD detailing their personal knowledge of the FDA's interactions with BD regarding Alaris prior to issuing the alleged misstatements. The Third Amended Complaint additionally alleged Section 20(a) control person claims against defendants Polen, Forlenza and Reidy as well as Section 20A insider trading claims

22

against Polen and Forlenza based on their alleged sales of BD common stock while in possession of material non-public information.

### G. Defendants' Motion to Dismiss the Third Amended Complaint and Answer

47.   On December 16, 2021, the named defendants filed a 55-page motion to dismiss the Third Amended Complaint, accompanied by 13 exhibits and an appendix listing the alleged false or misleading statements and omissions and the defendants' responses thereto. ECF No. 99. They urged the Court to dismiss the Third Amended Complaint in its entirety, as it had dismissed the prior complaint. Specifically, the defendants argued pursuant to Rule 12(b)(6) that the Third Amended Complaint did not sufficiently plead a material misstatement or omission because, *inter alia*: (i) BD disclosed or had no duty to disclose the alleged omitted facts concerning Alaris's defects and the FDA's role in precipitating the ship hold; (ii) BD's statements regarding its fiscal year 2020 financial guidance were forward-looking statements covered by the PSLRA safe harbor; (iii) the alleged statements were complete and accurate when made; and (iv) the alleged statements were immaterial statements of opinion or puffery. Regarding scienter, the defendants argued that the former employee accounts and other alleged facts, including concerning the stock sales of Polen and Forlenza, were insufficient to support an inference of scienter. The defendants additionally argued that the Third Amended Complaint failed to plead loss causation.

23

48.     Lead Counsel thoroughly reviewed and analyzed this new briefing and accompanying exhibits. In preparing a response, Lead Counsel researched the authority cited within the defendants' memorandum of law, formed new responses to each of the defendants' arguments, distinguished the authorities cited by the defendants, emphasized that the deficiencies of the prior complaint identified by the Court were now addressed, and substantiated arguments that each element of the Sections 10(b), 20(a) and 20A claims were met with ample legal and factual support. Specifically, in its 55-page opposition filed on February 4, 2022, Lead Plaintiff argued that: (i) the defendants' alleged misstatements and risk disclosures were materially misleading and omitted adverse material facts about the precipitating cause and ongoing risks of the ship hold; (ii) the accounts of the former BD employees cited in the Third Amended Complaint were consistent, detailed and reliable; (iii) the alleged misstatements were not forward-looking, were not accompanied by effective cautionary language, and lacked a reasonable basis when made, and thus were not protected by the PSLRA safe harbor; (iv) the variety of allegations of the individual defendants' knowledge paired with the individual defendants' motive supported a strong inference of scienter; and (v) loss causation was adequately pled. ECF No. 102. Lead Plaintiff also argued that it sufficiently alleged claims pursuant to Sections 20(a) and 20A. *Id.*

24

49.    On March 4, 2022, the defendants filed a 25-page reply in support of their motion to dismiss, arguing that BD disclosed all material information, that the allegations of the former employees cited by Lead Plaintiff were not reliable, and that the Third Amended Complaint did not adequately plead scienter. ECF No. 103.

50.    On August 11, 2022, the Court issued an Opinion denying in part and granting in part the defendants' motion to dismiss the Third Amended Complaint ("MTD Opinion"). ECF No. 106. The MTD Opinion rejected numerous arguments made in the motion and ultimately sustained alleged misstatements related to the nature of and impetus for the Alaris ship hold and statements related to the fiscal year 2020 financial guidance.

51.    Regarding falsity, the Court found that, "[t]he TAC, bolstered over its predecessor by allegations derived by new and knowledgeable confidential witnesses, adequately pleads that Defendants were obligated to disclose the material, adverse reason why the ship hold had been implemented." *Id.* at 21. The Court also held that, "[i]n light of the FDA's unambiguous feedback at the Fall 2019 Meeting, the FY20 Guidance and subsequent forward-looking statements—which relied on durable Alaris sales in FY20—was unmoored from the Company's immediate reality." *Id.* at 30.

52.    Regarding scienter, the Court held that Lead Plaintiff satisfied its burden with respect to Defendants Polen and BD by pleading facts sufficient to

25

support a strong inference of scienter. *Id.* at 32-40. However, the Court held that Lead Plaintiff did not adequately plead scienter with respect to Forlenza and Reidy and dismissed the Section 10(b) claims against them. *Id.* at 40-41.

53.     The Court also held that Lead Plaintiff sufficiently pleaded loss causation based on the February 6, 2020 corrective disclosure. *Id*. at 41-42.

54.     The Court further held that because Lead Plaintiff sufficiently alleged a Section 10(b) claim against Defendant Polen, it would sustain Lead Plaintiff's Section 20(a) control-person liability claims against him, as well. *Id*. at 42.

55.     Finally, the Court sustained Lead Plaintiff's insider trading claim under Section 20A against Polen, finding that Lead Plaintiff sufficiently alleged a violation under Section 10(b) and sufficiently alleged that "Polen was in possession of material, nonpublic information when he sold 13,907 shares of BD common stock[.]" *Id.* at 43.

56.     Defendants answered the Third Amended Complaint on October 3, 2022. ECF No. 116. Thereafter, discovery efforts commenced. *See* § II.I below.

**H.     Lead Plaintiff's Filing of the Fourth Amended Complaint**

57.     As previewed during the Lead Plaintiff reconsideration hearing (*see* ECF No. 92), Lead Counsel conducted extensive factual and legal research into the potential inclusion of options traders in the class. After thorough consideration and conferring with Defendants, Lead Plaintiff moved for leave to amend the Third

26

Amended Complaint on December 22, 2022 for the limited purpose of including options traders in the class. ECF No. 123. Along with its motion, Lead Plaintiff submitted an 8-page memorandum of law and the proposed Fourth Amended Complaint, which included the proposed allegations needed to add options traders to the class.

58.     On January 10, 2023, Defendants filed an opposition, arguing that: (i) the proposed Fourth Amended Complaint did not remove allegations previously dismissed by the Court's MTD Opinion; (ii) Lead Plaintiff unjustifiably delayed seeking to include options traders in the class; and (iii) the proposed amendment would be futile as Lead Plaintiff did not have standing to bring claims on behalf of options traders and in any event their claims were time-barred. ECF No. 127.

59.     On January 24, 2023, Lead Plaintiff submitted a 7-page reply in further support of its motion for leave to amend the Third Amended Complaint. ECF No. 132. In its reply, Lead Plaintiff argued that: (i) it did not seek to re-allege claims that were previously dismissed by the Court's MTD Opinion in the Fourth Amended Complaint; (ii) there was no undue delay in seeking to include options traders in the class as Lead Plaintiff had indicated it may do so at the Lead Plaintiff hearing (citing ECF No. 92), notified Defendants eight weeks in advance of its intentions to amend the Third Amended Complaint, and moved to amend as soon as practicable; and (iii) the amendment was not futile because precedent supported Lead Plaintiff's standing

to represent options traders and their claims were not time-barred as they related back to the filing of the earlier complaints.

60. On June 15, 2023, the Court held a hearing regarding Lead Plaintiff's motion for leave to amend. ECF No. 160. During the hearing, the Court issued a ruling granting Lead Plaintiff's motion. ECF Nos. 157, 160.

61. Thereafter, on June 22, 2023, Lead Plaintiff filed the Fourth Amended Complaint, which included in the putative class purchasers of BD call options and sellers of BD put options who were damaged during the Class Period. ECF No. 158.

62. On September 15, 2023, Defendants filed their Answer to the Fourth Amended Complaint. ECF No. 175.

## I.    The Parties' Extensive Discovery Efforts

63. Promptly after the Court issued its MTD Opinion, Lead Plaintiff undertook aggressive discovery efforts. Lead Plaintiff's efforts in pursuing discovery in this Action resulted in the production of over two million pages of highly technical information from Defendants and various third parties. Discovery was contentious, involving disputes which required multiple rounds of meet and confers between the Parties and, at times, Court intervention.

64. Lead Counsel pursued discovery using a wide variety of tools, including requests for production of documents, subpoenas for documents and

28

depositions, interrogatories, depositions of fact witnesses, and depositions of expert witnesses in connection with class certification.

65. As set forth in further detail below, Lead Counsel closely reviewed and analyzed approximately 455,000 documents (over two million pages) produced by Defendants and third parties to prepare for fact depositions, class certification, potential summary judgment and trial issues, and mediation. These extensive efforts provided Lead Plaintiff with a thorough understanding of the strengths and weaknesses of its claims and assisted Lead Counsel in engaging in a fruitful mediation process with Defendants and evaluating the fairness of the Settlement.

### 1. Rule 26(f) Report, Initial Disclosures, Confidentiality Order and ESI Protocol

66. Following the Court's issuance of its MTD Opinion on August 11, 2022, the Parties met and conferred pursuant to Rule 26(f). During these discussions, the Parties agreed on a pre-trial schedule, including deadlines for amending the pleadings as well as completing discovery, class certification briefing, expert discovery, and summary judgment briefing. The Parties also agreed to a deposition limit of 20 fact witnesses. On October 4, 2022, Magistrate Judge Cathy L. Waldor entered the Parties' proposed scheduling order. ECF No. 118.

67. The Parties simultaneously engaged in negotiations regarding a protective order to govern confidentiality ("Protective Order") and an order to govern the production of electronically stored information ("ESI Protocol"). The

Parties exchanged multiple rounds of edits to each draft document and met and conferred to resolve their disputes on particular terms. On November 1, 2022, Lead Plaintiff filed a proposed stipulated Protective Order and a proposed stipulated ESI Protocol. ECF No. 119. The Court approved the Protective Order and ESI Protocol on November 2, 2022. ECF Nos. 120, 121.

68.    During this same time, the Parties exchanged initial disclosures pursuant to Rule 26(a)(1) on October 17, 2022. Lead Plaintiff immediately reviewed and evaluated Defendants' initial disclosures and raised a deficiency by letter dated October 18, 2022. In response, Defendants amended their initial disclosures on October 25, 2022.

### 2.    Lead Plaintiff's Discovery Propounded on Defendants

#### a.    Lead Plaintiff's Document Requests

69.    On September 27, 2022, Lead Plaintiff served its First Set of Requests for the Production of Documents ("RFPs") on Defendants, which included 33 unique requests. Defendants served their responses and objections to Lead Plaintiff's RFPs on November 14, 2022.

70.    The Parties conferred extensively to come to an agreement on the scope of discovery and the parameters of Defendants' document collection and production. After multiple telephonic conferences, emails and letters outlining their respective positions, the Parties successfully reached agreement on matters such as the relevant

time period governing Lead Plaintiff's RFPs, the 32 document custodians whose files Defendants would search, and the comprehensive set of search terms Defendants would use to search for electronically stored information. These negotiations were based on, among other things, Defendants' initial disclosures, organizational charts produced by Defendants, information conveyed during the Parties' telephonic meet and confers, data related to the burden of production, and independent research conducted by Lead Counsel.

71.     Following these lengthy negotiations, Defendants produced over 1.95 million pages of documents in response to Lead Plaintiff's RFPs.

### b.     Lead Plaintiff's Interrogatories

72.     Lead Plaintiff also served two sets of interrogatories on Defendants. On October 28, 2022, Lead Plaintiff served its first set of interrogatories ("First Interrogatories"). The First Interrogatories sought information concerning: BD's meetings with the FDA, the consultants BD engaged in connection with Alaris-related matters, and the Amended Consent Decree with the FDA to which Alaris manufacturing and sales were subject. On December 23, 2022, Defendants served written and verified responses and objections to the First Interrogatories. Lead Counsel carefully reviewed each of Defendants' responses and objections. Thereafter, the Parties exchanged correspondence regarding certain disputes arising over Defendants' responses and objections, and met and conferred regarding these

31

disputes on numerous occasions. On January 13, 2023, Defendants served supplemental responses and objections to Lead Plaintiff's interrogatories concerning BD's meetings with the FDA. On March 3, 2023, Defendants served their second supplemental responses and objections to provide a more fulsome response. At one point during the Parties' negotiations, Lead Plaintiff brought a dispute regarding the First Interrogatories to the Court for resolution, as described below in § II.I.5.

73.     On August 21, 2023, Lead Plaintiff served its second set of interrogatories ("Second Interrogatories") on Defendants. These 18 interrogatories sought information concerning topics such as: the SEC's investigation of BD, Polen's securities transactions, Defendants' bases for the alleged false or misleading statements regarding the ship hold and BD's financial guidance, and the affirmative defenses Defendants asserted in their Answer to the Fourth Amended Complaint. On October 5, 2023, Defendants provided written and verified responses and objections to the Second Interrogatories. Lead Counsel was in the process of reviewing Defendants' responses and objections at the time of settlement.

### 3.     Non-Party Discovery

74.     While pursuing discovery from Defendants, Lead Plaintiff also served document subpoenas on ten non-parties, including: (i) three former BD employees; (ii) the FDA Center for Devices and Radiological Health; (iii) the FDA's Office of Regulatory Affairs; (iv) Morgan Stanley Smith Barney LLC and Goldman Sachs &

Co. LLC (the firms responsible for certain investments by certain BD executives); and (v) three consulting firms retained by BD during the Class Period—NSF International, Crisis Prevention and Recovery LLC (d/b/a Software CPR) ("SoftwareCPR"), and Exponent, Inc.

75.    Lead Plaintiff met and conferred with many of these nonparties to negotiate, among other things, the scope of the subpoenas, categories of responsive documents, search protocols, and claims of privilege asserted by the nonparty or BD over certain of the requested documents. Lead Plaintiff was still conferring with certain of these nonparties at the time of settlement.

76.    As a result of these efforts, Lead Plaintiff obtained over 13,000 nonparty documents (over 117,000 pages), all of which were reviewed under Lead Counsel's document review protocol and process set forth below.

### 4.    Implementation of Review Protocol and Document Review

77.    Lead Counsel's review of the over two million pages of documents produced in this Action began after Defendants' first production of documents from the FDA in December 2022, continued throughout 2023, and was ongoing at the time of settlement.

78.    *First*, Lead Counsel solicited bids from database vendors for a document-management system that could accommodate the large anticipated size of the coming productions, enable the review of documents housed on the database by

33

multiple users, and offer the latest coding, review, and search capabilities for efficient electronic discovery management. Foreign data management capabilities were also required given Industriens' location in Europe. Ultimately, Lead Counsel negotiated a favorable pricing arrangement with the third-party vendor International Litigation Services ("ILS") to host a significant volume of information on its sophisticated electronic database and litigation support platform. Lead Counsel used this electronic database to organize and search the large volume of documents produced, allowing the attorneys performing document review to categorize documents by issues and level of relevance and to identify critical documents supporting the Class's claims.

79.    *Second*, once the documents were loaded into the database, Lead Counsel utilized an algorithm-based model that learns from each coding decision fed into it, to rank documents by relevance and predicted priority. This allowed Lead Counsel to focus its review on the most relevant documents first, and de-prioritize potentially irrelevant material more quickly.

80.    *Third*, Lead Counsel developed a detailed document coding manual to guide the attorney review of the documents, which: (i) summarized Lead Plaintiff's claims and the key facts, regulatory concerns, and events at issue; (ii) provided instructions on how to evaluate and code each document's relevance; and (iii) instructed how to use the algorithm-based model to make the review more efficient.

34

81.    *Fourth*, Lead Counsel assembled a team of experienced attorneys to review and analyze the documents produced in discovery. This team of Kessler Topaz staff and contract attorneys were assigned specific projects to maximize review efficiency. Partners, associates, staff attorneys and contract attorneys participated in weekly meetings to share insights, discuss highly relevant documents and to develop the facts supporting the theory of the case. The weekly meetings ensured that the reviewing attorneys were aware of: (i) the issues underlying the Class's claims; (ii) the key facts, individuals, and timelines; (iii) why certain documents were high-value; and (iv) how such documents were informing Lead Plaintiff's theories of liability.

82.    *Finally*, the review team also completed several targeted discovery projects and produced written memoranda summarizing their findings on specific issues and witnesses. These projects included, for example: (i) supporting the development of a list of potential deponents; (ii) summarizing and analyzing the changes in BD's financial projections of revenue over the course of the Class Period; (iii) developing detailed timelines of BD's interactions with the FDA; and (iv) investigating the design and defect history of Alaris.

### 5.    The Parties' Discovery Disputes

83.    Over the course of this litigation, the Parties negotiated extensively on a variety of issues and disputes. In three instances, despite multiple rounds of letters

and telephonic meet and confers, the Parties were not able to resolve their disagreement without the Court's assistance.[13]

84.   *First*, the Parties brought a dispute to the Court early in discovery regarding Lead Plaintiff's interrogatory seeking information regarding BD's meetings with the FDA, including *inter alia* the dates, attendees, and the general subject matter of the meetings. In both their original responses and objections and their first supplemental responses and objections to the interrogatory, Defendants relied on Rule 33(d), indicating they would produce responsive documents later in discovery. On February 24, 2023, in a discovery dispute letter submitted to the Court, Lead Plaintiff moved to compel Defendants to provide a complete and substantive response to the interrogatory at issue. ECF No. 135. On March 3, 2023,

---

[13] While not formally submitted as a dispute, during a January 24, 2023 status conference before Magistrate Judge Waldor, Lead Plaintiff raised concerns that given the progress of discovery at that point, the Parties would not be able to meet the deadlines set by the Court's first Pretrial Scheduling Order. ECF No. 118. During the status conference, Lead Plaintiff specifically requested that the Court order a substantial completion deadline, which Defendants did not oppose. To propel discovery, the Court ordered: (i) Defendants to submit proposed search terms and custodians by January 27, 2023; (ii) Lead Plaintiff to submit any counter proposal by January 31, 2023; and (iii) the Parties to inform the Court by February 3, 2023 of the number of documents to be produced and a proposed substantial completion date. After multiple meet and confers, the Parties submitted a joint status update to the Court on February 3, 2023 indicating that the Parties had reached agreement on search terms and custodians and a substantial completion deadline of April 21, 2023. ECF No. 133. The Parties also submitted a proposed amended scheduling order including the substantial completion deadline and certain corresponding modifications, which the Court ordered on February 6, 2023. ECF No. 134.

Defendants supplemented their response to the interrogatory with the requested information, rendering the request for relief and further Court intervention moot. *See* ECF No. 138.

85.    *Second*, the Parties disputed BD's claim of privilege over a majority of the documents responsive to Lead Plaintiff's subpoena to third-party SoftwareCPR. After meeting and conferring with both SoftwareCPR and Defendants, Lead Plaintiff, on April 21, 2023, submitted a letter to the Court requesting a protective order directing BD to cease its interference with the SoftwareCPR subpoena which would allow the immediate production of responsive documents. ECF No. 146. On April 24, 2023, Defendants submitted a letter in response agreeing to SoftwareCPR's production of a set of non-privileged documents and a privilege log. ECF No. 149. On May 12, 2023, SoftwareCPR produced a limited set of documents and a 21-page privilege log. Lead Plaintiff reviewed each entry on the privilege log accompanying SoftwareCPR's production and conducted legal research to support its position that no privilege applied to the logged documents. After numerous rounds of correspondence and conferring to resolve the privilege dispute, the Parties reached an impasse. On August 28, 2023, the Parties filed a joint letter to the Court, detailing the Parties' months-long dispute concerning Lead Plaintiff's request for the production of SoftwareCPR's documents. ECF No. 169. On September 12, 2023, the Parties presented oral argument at a hearing before Magistrate Judge Waldor.

ECF No. 178. Following the hearing, Magistrate Judge Waldor ordered that Defendants re-review their privilege designations over the SoftwareCPR production and that the Parties meet and confer to present the Court with a sampling of contested documents from the SoftwareCPR privilege log for in camera review. ECF No. 173. The Parties were in the midst of complying with the ordered process at the time of settlement.

86.    *Third*, through its RFPs served on September 27, 2022, Lead Plaintiff requested Defendants' production of all documents concerning the SEC's investigation related to Alaris, including transcripts of any interviews conducted by the SEC within the possession of BD or its current employees. In November 2022 meet and confers regarding the RFPs, Defendants represented that, at that time, there were no such transcripts. Lead Plaintiff subsequently renewed its request for the production of these interview transcripts. Despite exchanging letters and engaging in a meet and confer on the issue, the Parties could not reach agreement on the production of such transcripts. Given this impasse, the Parties submitted a joint dispute letter to the Court on September 6, 2023. ECF No. 171. On September 12, 2023, after a hearing on the dispute, Magistrate Judge Waldor ordered BD to direct its current employees to request the transcripts from the SEC and produce those transcripts to Lead Plaintiff. ECF Nos. 173, 178. The Court scheduled a future status

38

conference regarding this dispute for December 13, 2023, however, this conference was ultimately held in abeyance given the Settlement.

### 6.       Preparation for Fact Depositions

87.     Early in discovery, the Parties agreed on a limit of 20 fact depositions per side. Considering the complexity of the Class's claims, Lead Counsel deemed each deposition a potentially critical part of developing the necessary proofs for trial. Accordingly, Lead Plaintiff developed a detailed deposition strategy and process.

88.     *First*, Lead Counsel developed a master list of potential deponents, organized by topic area and priority. This list relied on hundreds of hours of analysis and was continuously evolving as Lead Counsel's document review team further analyzed Defendants' ongoing productions and other information.

89.     *Second*, Lead Counsel managed a highly efficient process in preparing for depositions. Partners, associates, staff attorneys and contract attorneys were divided into small groups and each group assigned a short list of deponents. The staff and contract attorneys worked directly under the instruction of partners and associates, who were tasked with developing goals for each deposition and ultimately taking the deposition. First-tier document review was conducted primarily by the staff and contract attorneys who worked to identify documents most likely to contain useful information for a given deponent. Often, this involved a meticulous linear review of all documents in a deponent's custodial file or

documents that mentioned the deponent as well as targeted issue searches. Following this work, the document review attorneys produced memoranda for the deponent that summarized key documents regarding various relevant  issues and events and provided additional publicly available information regarding the deponent. The partners and associates assigned to take the deposition studied these materials and regularly provided feedback and guidance on further areas of review.

90.     *Third*, in order to prepare for depositions, Lead Counsel was required to become well-versed in, among other topics: (i) the intricacies of the Alaris software and the nature of its defects and their proposed fixes; (ii) the FDA's regulations and the various regulatory events related to Alaris that occurred in and around the Class Period as well as historically; and (iii) the complex financial metrics utilized by Defendants to develop their financial guidance.

91.     *Finally*, before taking any fact depositions, Lead Counsel interviewed and solicited bids from several deposition vendors. This allowed Lead Counsel to ultimately negotiate highly favorable pricing, including for, among other things, a remote deposition platform, videographers, and court reporters. Lead Counsel also negotiated a remote deposition protocol with Defendants to allow depositions to be taken remotely and discovery to move forward efficiently.

92.     At the time the Settlement was reached, Lead Plaintiff had deposed two fact witnesses and noticed the depositions of twenty more. On June 30, 2023, Lead

Plaintiff took a full-day deposition of Michelle Doherty (née Badal), BD's former Senior Director of Regulatory Compliance. On July 21, 2023 and July 27, 2023, Lead Plaintiff deposed Jessica Smith, BD's former Vice President of the Medication Management Solutions Unit.

### 7.    Defendants' Discovery Propounded on Lead Plaintiff

### a.    Defendants' Document Requests

93.    On January 23, 2023, Defendants served 60 unique requests on Lead Plaintiff for the production of documents ("Defendants' RFPs"). Defendants' RFPs covered subjects including Lead Plaintiff's investments in BD Securities, Lead Plaintiff's investment strategies and records, Lead Plaintiff's participation in the Action, and prior lawsuits in which Lead Plaintiff participated. After Lead Counsel's review and analysis of the document requests, Lead Plaintiff provided its responses and objections on March 9, 2023. The Parties negotiated at length to agree on the search terms to be used and discrete categories of documents to be produced by Lead Plaintiff.

94.    In conjunction with Defendants' RFPs, Lead Plaintiff, with the assistance of Lead Counsel, began searching for responsive documents in its possession, custody, or control. Lead Counsel developed a coding protocol for the documents identified by Industriens and undertook a thorough review to ensure the documents were relevant, responsive, and not privileged. Lead Counsel also worked

41

closely with Industriens and its data vendor to coordinate the collection, housing and review of documents in compliance with all applicable laws and regulations. As a result of these efforts, Lead Plaintiff produced 65 responsive documents (totaling more than 350 pages) to Defendants.

### b. Defendants' Interrogatories

95. Defendants also served two sets of interrogatories on Lead Plaintiff. *First*, on April 11, 2023, Defendants served two interrogatories on Lead Plaintiff seeking information regarding Lead Plaintiff's investigation of the Class's claims, including the identities of the confidential witnesses cited in the Complaint. Lead Counsel carefully reviewed and analyzed the interrogatories and provided Defendants with written and verified responses and objections on May 26, 2023.

96. *Second*, on August 21, 2023, Defendants served twelve interrogatories on Lead Plaintiff seeking information related to Lead Plaintiff's investment strategies, the damages being sought, and the bases for various contentions made by Lead Plaintiff. Lead Counsel once again reviewed and analyzed the interrogatories and, working with Industriens, provided comprehensive and substantive written and verified responses and objections on October 5, 2023.

### c. Deposition of Lead Plaintiff

97. On February 7, 2023, Defendants noticed the deposition of Lead Plaintiff pursuant to Rule 30(b)(6), seeking the testimony of a corporate

representative regarding a list of nineteen topics. On March 3, 2023, Lead Plaintiff served written responses and objections to Defendants' noticed topics.

98.    On April 12, 2023, Defendants took the remote deposition of Industriens' corporate representative, Jan Østergaard. To prepare for his deposition, Mr. Østergaard met with Lead Counsel for a full day in addition to multiple ancillary communications and preparations with both Lead Counsel and other Industriens personnel. Additionally, following his deposition, Mr. Østergaard was provided with a copy of the deposition transcript for review, after which Mr. Østergaard prepared an errata sheet concerning his testimony.

### J.    Lead Plaintiff's Class Certification Motion

99.    While discovery efforts were ongoing, Lead Plaintiff filed a motion to certify the class ("Class Certification Motion") on January 17, 2023. ECF No. 130. Specifically, the Class Certification Motion sought: (i) certification of a class comprised of all persons and entities who, from November 5, 2019 to February 5, 2020, inclusive, purchased or otherwise acquired BD common stock or call options, or sold BD put options, and were damaged thereby; (ii) appointment of Industriens as Class Representative; and (iii) appointment of Kessler Topaz as Class Counsel and Carella Byrne as Liaison Counsel. The Class Certification Motion was accompanied by a 35-page memorandum of law and related exhibits, demonstrating that Lead Plaintiff and the proposed class met all of the requirements of Rules 23(a)

43

and 23(b)(3). It also included an expert report from Joseph R. Mason, Ph.D. ("Dr. Mason") of The BVA Group, LLC ("BVA Group"), opining that the markets for both BD common stock and options were efficient throughout the Class Period, and that damages could be calculated using a common class-wide methodology. ECF No. 130-3.

100.   In connection with the Class Certification Motion, Lead Counsel defended the depositions of Dr. Mason and Industriens on April 4, 2023 and April 12, 2023, respectively.

101.   On May 3, 2023, Defendants filed an opposition to Lead Plaintiff's Class Certification Motion. ECF No. 152. In their opposition, Defendants asserted that certification of the proposed class should be denied for four reasons. *First*, Defendants argued that options traders could not be included in the class because the claims of options traders were time-barred and evidence did not show that the market for BD options was efficient. *Second*, Defendants contended that Industriens lacked standing to assert a claim on behalf of options traders, rendering it an inadequate and atypical representative. *Third*, Defendants asserted that Industriens was subject to unique defenses as it relied on an outside investment manager to execute trades. And, *fourth*, Defendants argued that Dr. Mason's proposed damages methodology was not appropriate for calculating damages of options traders. With its opposition, Defendants submitted the expert rebuttal report of Stewart Mayhew, Ph.D. ("Dr.

44

Mayhew") of Cornerstone Research, which opined that Dr. Mason failed to demonstrate that the market for BD options was efficient during the Class Period. ECF No. 152-3.

102. Following an in-depth review of his rebuttal report and related preparations, Lead Counsel deposed Dr. Mayhew on May 31, 2023.

103. On June 30, 2023, Lead Plaintiff filed a reply in support of its Class Certification Motion. ECF No. 161. In its reply, Lead Plaintiff asserted that Defendants' arguments regarding Industriens' standing to represent options traders and the timeliness of the options traders' claims were largely mooted by the Court's June 15, 2023 ruling on Lead Plaintiff's motion to amend the Third Amended Complaint, which expressly considered and rejected the same arguments. ECF No. 157. Lead Plaintiff further argued that Industriens' typicality and adequacy under Rule 23(a) were not mitigated by its use of an outside investment manager. Additionally, Lead Plaintiff asserted that Defendants' argument that the market for BD options was not efficient was inconsistent with controlling case law and their own position conceding that the market for BD common stock was efficient. Finally, Lead Plaintiff argued that Dr. Mason's class-wide damages methodology could be applied to calculate the damages of options traders. Lead Plaintiff also submitted the expert reply report of Dr. Mason, which opined that the market for BD options was efficient during the Class Period and that damages for both common stock holders

45

and options traders could be calculated on a class-wide basis using the proposed methodology. ECF No. 161-1.

104. On August 3, 2023, the Court issued an Opinion and Order granting Lead Plaintiff's Class Certification Motion and certifying the Class ("Class Certification Opinion"). ECF No. 168. By its Class Certification Opinion, the Court found, *first*, that the proposed class satisfied the numerosity and commonality requirements. *Second*, the Court ruled that Defendants' argument regarding Lead Plaintiff's standing to represent options traders had already been rejected in connection with the motion to amend and moreover, that Lead Plaintiff's typicality and adequacy were not impacted by the decision to include options traders at this point in the litigation. *Third*, the Court found the use of an independent investment manager did not subject Industriens to a unique defense and that the requirements of typicality and adequacy were satisfied. *Fourth*, the Court ruled that Lead Plaintiff established market efficiency and properly invoked the presumption of reliance. The Court also held that Dr. Mason's report on market efficiency for BD options withstood the challenges raised by Dr. Mayhew. *Finally*, the Court held that Lead Plaintiff adequately demonstrated that damages could be measured on a class-wide basis for both common stock holders and options traders. Thus, the Court found any question of individual damages calculations would not overwhelm common questions.

105. By its Class Certification Opinion, the Court also appointed Industriens as Class Representative and appointed Kessler Topaz as Class Counsel and Carella Byrne as Liaison Counsel for the Class. ECF No. 168.

### K.    Class Counsel's Work with Experts

106. Given the complexity of the issues of damages and loss causation in this Action, Class Representative retained Dr. Mason of BVA Group to offer expert consultation and opinions on these matters at different stages of the litigation. BVA Group is a consulting firm that provides litigation, valuation, and financial advisory services across various industries.

107. Specifically, as noted above, at the class certification stage, Dr. Mason, in coordination with Class Counsel, submitted opening and reply expert reports regarding market efficiency and a model for measuring class-wide damages in accordance with Class Representative's theory of liability. ECF Nos. 130-3, 161-1. Class Counsel defended Dr. Mason at his deposition in connection with the Class Certification Motion on April 4, 2023. Class Counsel frequently communicated with Dr. Mason and his team via emails, telephone and video conferences about economic issues, Defendants' expert report in opposition to the Class Certification Motion, and in preparing for his deposition.

108. Additionally, Dr. Mason provided expert consultation regarding damages immediately following the Court's MTD Order and in connection with the

47

Parties' mediation and settlement discussions. As discussed below, BVA Group economists also attended the Parties' September 13, 2023 mediation session in order to address any questions regarding the calculation of class-wide damages.

109.    Finally, Dr. Mason and his colleagues at BVA Group assisted Class Counsel in developing the proposed Plan of Allocation once the Settlement was reached. *See* § V below.

**L.    Mediation and Preliminary Approval of the Settlement**

110.    While discovery was ongoing and Lead Plaintiff's Class Certification Motion was pending, the Parties began discussing the possibility of resolving the Action through settlement and engaged Mr. Murphy to assist in such efforts. In advance of a scheduled in-person mediation, the Parties prepared and exchanged detailed mediation statements. At the initial mediation session with Mr. Murphy on August 16, 2023, the Parties made presentations addressing their views on liability and damages and engaged in a full day of settlement discussions. Although the Parties were unable to reach agreement at the initial mediation, they continued to negotiate with Mr. Murphy's assistance, meeting twice more—on September 13, 2023 (virtually) with their respective consultants on damages and on October 13, 2023 (in person). Following these mediation sessions, Mr. Murphy issued a mediator's recommendation to resolve the Action for $85 million, which the Parties accepted on October 18, 2023.

111.    On October 20, 2023, the Parties notified the Court of their agreement in principle to settle all claims in the Action, and the Parties' pending discovery dispute (scheduled to be heard on December 13, 2023) was held in abeyance. ECF No. 180. Following further negotiations, the Parties memorialized their agreement in principle to resolve the Action in a term sheet executed on November 13, 2023.

112.    Thereafter, Class Counsel began working on various documents to be submitted with Class Representative's motion for preliminary approval of the Settlement. Over the following weeks, counsel for the Parties negotiated the specific terms of the Settlement, including the Stipulation (and exhibits) and a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement").[14] During this time, Class Counsel also requested and reviewed detailed bids obtained from several organizations specializing in class action notice and claims administration, and conducted follow-up communications with certain of these firms. As a result of this bidding process, Class Counsel selected JND to serve as the Claims Administrator for the Settlement. Class Counsel also worked closely with Class Representative's economic experts at BVA Group to develop the proposed Plan of Allocation. *See infra* § V. The Parties executed the Stipulation,

---

[14] The Supplemental Agreement sets forth the conditions under which Defendants can exercise a right to withdraw from the Settlement in the event that requests for exclusion from the Class exceed certain agreed-upon conditions. Pursuant to its terms, the Supplemental Agreement is not being made public but may be submitted to the Court in camera or under seal.

along with the Supplemental Agreement relating to requests for exclusion, on December 19, 2023.

113.   On December 21, 2023, Class Representative filed the Stipulation (and related exhibits) along with its Unopposed Motion for Preliminary Approval of Proposed Settlement and Authorization to Disseminate Notice of Settlement ("Preliminary Approval Motion") and supporting brief. ECF No. 182. On January 18, 2024, the Court entered the Preliminary Approval Order finding that "it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Class, subject to further consideration at the Settlement Hearing []." ECF No. 186, ¶ 1. The Court set the Settlement Hearing for April 22, 2024, at 11:30 a.m. *Id.*, ¶ 2.

## III.   RISKS OF CONTINUED LITIGATION

114.   As detailed above, when the Settlement was reached, the Parties were in the midst of fact discovery and had ample information and materials against which to evaluate the strengths and weaknesses of Class Representative's claims and Defendants' defenses. Class Counsel had analyzed over two million pages of documents produced by Defendants and nonparties. In addition, Class Counsel had already deposed two BD employees who played critical roles in imposing the Alaris ship hold, and was actively preparing to take another 20 depositions, including of Defendant Polen and other high-level BD executives. The Parties had fully briefed

the Class Certification Motion and engaged in related discovery, and the Court's order certifying the Class had clarified several issues that would shape the litigation steps to come. Furthermore, during mediation, the Parties analyzed evidence to support their respective positions, exchanged mediation statements, and presented on liability and damages analyses which included input from economic experts.

115.    Class Representative's efforts in prosecuting the Class's claims over the last four years, including through discovery and comprehensive legal analysis, ensured that Class Representative and Class Counsel were fully informed of the risks of continued litigation.

116.    While Class Representative firmly believes its case had significant merit, there were a number of factors that made the outcome of continued litigation uncertain. Defendants had already successfully persuaded the Court to dismiss the case once at the motion to dismiss stage, before Industriens' subsequent, successful amendment. Defendants have forcefully denied any culpability throughout the Action and vigorously opposed Class Representative's motion to amend the Third Amended Complaint as well as the Class Certification Motion. Defendants were likely prepared to mount similarly aggressive defenses at summary judgment, and, if necessary, at trial. If successful, Defendants' anticipated summary judgment motions could have narrowed the Class's claims, leading to a recovery in the Action below the Settlement Amount, or no recovery at all. Likewise, if a jury at trial ruled

51

against Class Representative on any one of the elements required to establish an Exchange Act claim, a recovery for the Class would be foreclosed. Moreover, even if Class Representative prevailed at summary judgment and trial, Defendants would have pursued opportunities for appeal, risking eventual loss for the Class, or at minimum, significant delay and additional costs.

117. Several of the most serious risks of an adverse outcome faced by the Class are discussed in the following paragraphs. After careful evaluation, Class Representative determined that the Settlement represents an excellent result for the Class when the risks of continued litigation are weighed against, among other things, the near-term cash benefit to Class Members.

### A.    Risks of Establishing Falsity and Scienter at Trial

118. *First*, had the Action continued, Defendants would have forcefully asserted that the statements regarding the Alaris ship hold were not materially false or misleading when made.

119. To that end, Defendants would argue that at the time of the alleged misstatements, the FDA had not formally taken any action that would require BD to stop shipping Alaris, but instead, had informed BD that it was the agency's view that Alaris should not be shipped. Defendants would further argue that, as they told the public on November 5, 2019, BD voluntarily imposed the ship hold to install updates. In addition, Defendants would contend that at the time of the alleged

52

misstatements, the FDA had not expressly told BD that it would require BD to submit a new application for regulatory clearance before BD could resume shipping Alaris, and that the FDA did not take the position that a new regulatory clearance was required until February 3, 2020—just days before BD disclosed the same. Defendants would continue to assert that until that date, BD thought it could come to an understanding with the FDA regarding a regulatory pathway that would allow BD to continue shipping Alaris while addressing the underlying safety and software issues. Defendants would have further argued that BD's applications for regulatory clearance, or lack thereof, were publicly accessible through the FDA's online databases, such that the market was well aware of the actual regulatory status of Alaris at all relevant times.

120.   With regard to its statements about BD's fiscal year 2020 financial guidance, Defendants would contend that, based on their understanding of BD's conversations with the FDA, they believed the ship hold to install the planned updates would be short-lived and was not dependent on the submission and approval of a new 510(k) clearance application. Defendants would further assert that they believed shipping would resume in full shortly after the start of BD's 2020 fiscal year even as they worked to remediate Alaris's defects. Defendants would argue that, based on that understanding, their affirmations of the 2020 fiscal year financial guidance were not materially false or misleading because BD understood it could

53

pursue regulatory clearance for its new software fixes while continuing to sell Alaris in and after 2020.

121.   Additionally, Defendants would have argued that the statements affirming BD's fiscal year 2020 sales guidance were forward-looking statements and thus protected under the PSLRA's safe harbor.

122.   *Second*, Defendants would likely have argued at summary judgment and trial, as they did at the motion to dismiss stage, that Class Representative could not establish that any of the alleged misstatements and omissions were made with the requisite scienter. To establish scienter, Class Representative would need to prove that Defendants acted intentionally or recklessly when making each of the alleged misstatements regarding the Alaris ship hold and BD's financial guidance for the 2020 fiscal year.

123.   More specifically, Defendants likely would have argued that at the time Polen made the alleged misstatements regarding the ship hold, he (and therefore BD) could not predict and had no knowledge that the FDA was going to require a new Alaris 510(k) application to be filed and granted, as well as the remediation of numerous device software issues, before BD could resume shipping. Defendants would further argue that BD understood its proposed regulatory pathway would allow Alaris to ship to customers while BD worked to remediate the device issues, as it had done with prior Alaris software fixes. Defendants would also assert that

54

they had no knowledge of the FDA's position that Alaris should not be shipped absent these regulatory and remediation steps until February 3, 2020, undermining any claims that the alleged statements in November 2019 through January 2020 were made with scienter. Defendants would also argue that Polen's insider stock sales were not suspicious in timing or amount, including that Polen's trades were made pursuant to a SEC Rule 10b5-1 trading plan, further supporting a finding of no scienter.

124.   Moreover, if Defendants were able to successfully convince a jury that either Defendants' statements were factually true or that Defendants did not act with the requisite scienter, Class Representative's Sections 20(a) and 20A claims against Defendant Polen would have been foreclosed as well, as both of these claims require Class Representative to prove a primary violation of the Exchange Act.

**B.    Risks of Establishing Loss Causation and Damages at Trial**

125.   Even if Class Representative convinced a jury to render a unanimous verdict on falsity and scienter, it still faced significant risks in establishing loss causation and damages. Class Representative would have the burden to prove at trial through complex expert testimony that the alleged disclosure of the fraud on February 6, 2020 proximately caused the substantial declines in the price of BD common stock and call options and the substantial rise in the price of BD put options. At trial, Defendants would have likely made numerous arguments that, if accepted

by jurors, could have materially reduced, or in a worst-case scenario, outright precluded any recovery for the Class.

126. *First*, as they did at the motion to dismiss stage, Defendants likely would have argued that the alleged corrective disclosure on February 6, 2020 did not reveal any truth about any prior misstatements concerning the Alaris ship hold or BD's fiscal year 2020 financial guidance, but instead disclosed an event—the FDA's definitive statement that Alaris needed new regulatory clearance and remediation before it could be shipped—that had occurred just a few days prior, which had required a late change to BD's guidance.

127. *Second*, as they did at the class certification stage, Defendants would contend that Class Representative's proposed damages methodology would not be able to accurately calculate damages for options traders because the model would be unable to determine or take into account what each options trader paid or received for their BD Securities.

128. *Finally*, Defendants would argue that the Class Period should at least be shortened, reducing damages for both options traders and shareholders in the Class, on the grounds that there was no evidence of liability during the early stages of the Class Period.

129. Based on expert estimates employing various reasonable assumptions, the Class's maximum aggregate damages for the entire Class Period were estimated

to be between approximately $550 million and $850 million. If the Court or a jury accepted any of Defendants' foregoing arguments, the maximum damages range could have been materially reduced or eliminated altogether.

130. Given the complexity of determining loss causation and measuring damages in the context of a securities fraud case, these issues would have resulted in a "battle of the experts" involving technical testimony by experts. For example, a jury could ultimately credit the view and expected expert evidence put forth by Defendants that the February 6, 2020 disclosure was disconnected from the alleged fraud, and related instead to other intervening causes. Further, while Class Representative strongly believed that Defendants' arguments at the class certification stage regarding the proposed damages methodology were faulty, and would be so at summary judgment and trial, there is no guarantee that a Court or a jury would agree. If the Court or a jury found Defendants' expert testimony more credible, it is likely that the Class's damages could be significantly lower than expected or rejected altogether.

**C. Risks on Appeal**

131. If Class Representative was successful in proving liability and damages at summary judgment and trial, it would face inevitable post-trial appeals which, even if unsuccessful, would prove costly and time consuming. On appeal, Defendants would renew various arguments as to why Class Representative failed

to establish liability, loss causation, and damages, thereby exposing Class Representative to the risk of having any favorable judgment reversed or reduced below the Settlement Amount after years of litigation.

## IV.  COMPLIANCE WITH COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS TO DATE

132.  In its Preliminary Approval Order, the Court authorized Class Counsel to retain JND as the Claims Administrator "to supervise and administer the notice procedure in connection with the proposed Settlement as well as the processing of Claims[.]" ECF No. 186, ¶ 4. In accordance with the Preliminary Approval Order, JND, working in conjunction with Class Counsel: (i) mailed the Postcard Notice to potential Class Members at the addresses set forth in the records provided by Defendants, and to potential Class Members who otherwise could be identified through further reasonable effort;[15] (ii) mailed a copy of the Notice Packet to the Nominees contained in JND's nominee database and to potential Class Members upon request; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted the same over *PR Newswire*; and (iv) developed the Settlement website, www.BectonSecuritiesSettlement.com, from which copies of the Notice and Claim Form can be downloaded. Segura Decl., ¶¶ 3-11,14.

---

[15] The majority of the names and addresses of potential Class Members, as is the case in most securities class actions, were obtained from brokerage firms, banks, institutions, and other nominees (collectively, "Nominees") holding BD common stock/options in street name. Segura Decl., ¶ 5.

133. The Postcard Notice contains important information concerning the Settlement and, along with the Summary Notice, directs recipients to the Settlement website for additional information regarding the Settlement (and the Action), including the long-form Notice, which includes, among other things, details about the Settlement and a copy of the Plan of Allocation as Appendix A.

134. Collectively, the notices provide the Class definition, a description of the Settlement, information regarding the claims asserted in the Action and information to enable Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim; (ii) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (iii) submit a request to be excluded from the Class. The notices also inform prospective Class Members of Class Counsel's intent to: (i) apply for an award of attorneys' fees in the amount of 25% of the Settlement Fund; and (ii) request Litigation Expenses in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1 million, plus interest, which amount may include a request for reimbursement of the reasonable costs incurred by Class Representative directly related to its representation of the Class in the Action in accordance with 15 U.S.C. § 78u-4(a)(4). *See* Segura Decl., Exs. 1 & 2.

135. In accordance with the Preliminary Approval Order, JND began disseminating Postcard Notices to potential Class Members and Notice Packets to

Nominees on February 9, 2024. Segura Decl., ¶¶ 3-10. To date, JND has mailed 200,814 Postcard Notices and 4,131 Notice Packets to potential Class Members and Nominees. *Id.*, ¶ 10. In addition, JND caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on February 28, 2024. *Id.*, ¶11.[16]

136.   JND also developed and currently maintains the Settlement website to provide Class Members and other interested parties with information concerning the Settlement and important dates and deadlines in connection therewith, as well as downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Complaint. Segura Decl., ¶ 14. Additionally, JND maintains a toll-free telephone number to respond to inquiries regarding the Settlement. *Id.*, ¶ 12. Class Members with questions can also contact JND by email at info@BectonSecuritiesSettlement.com.

137.   As noted above and as set forth in the notices, the deadline for Class Members to request exclusion from the Class or to submit an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application is April 1, 2024. To date, there have been no objections to any aspect of the Settlement and not a single request for exclusion. Segura Decl., ¶ 16. Class Representative and Class

---

[16] Defendants have informed Class Counsel that they issued notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 on January 8, 2024.

Counsel will address all requests for exclusion and objections that may be received in their reply submission to be filed on or before April 15, 2024.

## V.   PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

138.   In accordance with the Preliminary Approval Order, and as explained in the notices, Class Members who wish to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator, JND, postmarked (if mailed), or online through the website, www.BectonSecuritiesSettlement.com, no later than June 14, 2024. As provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants[17] in accordance with the plan for allocating the Net Settlement Fund among Authorized Claimants approved by the Court.

139.   The Plan of Allocation proposed by Class Representative is attached as Appendix A to the Notice. *See* Segura Decl., Ex. 2. The Plan is designed to achieve an equitable and rational distribution of the Net Settlement Fund. However, the Plan

---

[17] As defined in Paragraph 1(c) of the Stipulation, an "Authorized Claimant" is a "Class Member who submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund."

is not a formal damages analysis and the calculations made pursuant to it are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after trial.

140. Class Counsel developed the Plan in consultation with Class Representative's damages expert, Dr. Mason and his team at BVA Group. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Class Members who suffered economic losses as a result of the alleged violations of the federal securities laws set forth in the Complaint, as opposed to economic losses caused by market or industry forces or that would likely have been attributed to non-fraud-related information released on the same day. To that end, Dr. Mason calculated the estimated amount of alleged artificial inflation or deflation in the per-share closing prices of BD Securities that allegedly was proximately caused by Defendants' alleged materially false or misleading statements and omissions. As set forth in the Plan, the estimated alleged artificial inflation in BD common stock during the Class Period was $35.11 per share. Tables B and C of the Plan set forth the estimated alleged artificial inflation and deflation in BD call and put options for each day of the Class Period and these tables will be utilized by JND in calculating

a Claimant's Recognized Loss Amounts, and ultimately their overall Recognized Claim, in BD Securities.[18]

141.   As set forth in the Plan, a Claimant's Recognized Loss Amount(s) will depend upon several factors, including when and the price at which they purchased/acquired/sold their BD Securities during the Class Period.[19] In order to have a Recognized Claim under the Plan, a Claimant must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, a Claimant must have held BD common stock or call options purchased/acquired during the Class Period through the alleged corrective disclosure on February 6, 2020, that removed the artificial inflation from the price of BD common stock or call options. Likewise, with respect to BD put options, a Claimant must have sold (written) those options during the Class Period and such option(s) must have remained open through the alleged corrective disclosure on February 6, 2020, that removed the artificial deflation from the price of BD put

---

[18] Pursuant to Paragraph 75 of the Notice, "a 'Recognized Loss Amount' will be calculated for each purchase or acquisition of BD common stock and call options and each sale (writing) of BD put options during the Class Period that is listed on the Claim Form and for which adequate documentation is provided. Pursuant to Paragraph 82 of the Notice, a Claimant's "'Recognized Claim' will be the sum of his, her, or its Recognized Loss Amounts."

[19] The calculation of Recognized Loss Amounts for BD common stock also takes into account the PSLRA's statutory limitation on recoverable damages. *See* Section 21D(e)(1) of the Exchange Act.

options. Under the Plan, the Settlement proceeds available for BD call options purchased/acquired during the Class Period and BD put options sold (written) during the Class Period are limited to a total amount equal to 3.5% of the Net Settlement Fund—the approximate percentage options damages represent of total damages.[20] *See* Notice ¶ 81.

142.    JND, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Class Representative's losses will be calculated in the same manner.

143.    Once JND has processed all submitted Claims and provided Claimants with an opportunity to cure any deficiencies in their Claims or challenge the rejection of their Claims, Class Counsel will file with the Court a motion for approval of JND's determinations with respect to all submitted Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants. As set forth in the Plan,

---

[20] If the cumulative Recognized Loss Amounts for BD call options and BD put options exceeds 3.5% of all Recognized Claims, then the Recognized Loss Amounts calculated for options transactions will be reduced proportionately until they collectively equal 3.5% of all Recognized Claims. In the unlikely event that the Net Settlement Fund is sufficient to pay 100% of the BD common stock-based claims, any excess amount will be used to pay the balance on the remaining option-based claims.

if nine months after the initial distribution, there is a balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), and if it is cost-effective to do so, Class Counsel will conduct another distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such distribution, to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00 from such distribution. *See* Notice ¶ 94. Additional distributions to Authorized Claimants will be repeated until it is determined that additional distribution of the funds remaining in the Net Settlement Fund is no longer cost effective. *Id*. Thereafter, any balance remaining in the Net Settlement Fund will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Class Counsel and approved by the Court. *Id*.

144. The structure of the Plan is similar to the structure of plans of allocation that have been used to apportion settlement proceeds in numerous other securities class actions. To date, there have been no objections to the Plan. In sum, Class Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants, and respectfully submits that the Plan should be approved by the Court.

## VI.    CLASS COUNSEL'S FEE AND EXPENSE APPLICATION

145.    In addition to seeking final approval of the Settlement and Plan of Allocation, Class Counsel is applying for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action. Specifically, Class Counsel is applying for attorneys' fees in the amount of 25% of the Settlement Fund and for Litigation Expenses in the total amount of $928,001.04.[21] This total amount *includes* a request for reimbursement in the amount of $84,856.40 for the costs incurred by Class Representative in representing the Class in the Action, as permitted by 15 U.S.C. § 78u-4(a)(4). *See* Østergaard Decl., ¶¶ 11-13. As noted above, Class Counsel's Fee and Expense Application is consistent with the maximum fee and expense amounts set forth in the notices and, as set forth in the Østergaard Declaration (*see* ¶¶ 8-9), is supported by Class Representative who carefully considered the appropriateness of Class Counsel's

---

[21] The lodestar and expense submissions of: (i) Sharan Nirmul, on behalf of Kessler Topaz ("Kessler Topaz Fee and Expense Decl."); and (ii) James E. Cecchi, on behalf of Carella Byrne ("Carella Byrne Fee and Expense Decl.") (together, the "Fee and Expense Declarations"), are attached hereto as Exhibits 3 and 4. The Fee and Expense Declarations set forth the names of the attorneys and professional support staff employees who worked on the Action and their respective hourly rates, the lodestar value of the time expended by each such attorney and professional support staff employee, and the expenses incurred by each firm.

request. To date, no objections to the Fee and Expense Application have been received.[22]

146.    Below is a summary of the primary factual bases for Class Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Third Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.[23]

### A.    Class Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

#### 1.    The Favorable Settlement Achieved

147.    Courts have consistently recognized that the result achieved is a key factor to be considered in making a fee award. *See* Fee and Expense Memorandum, § II.D.1. As described above, based on expert estimates employing various reasonable assumptions, the $85 million Settlement is a favorable result,

---

[22] Class Counsel will address any objections received after this submission in its reply to be filed with the Court by April 15, 2024.

[23] The Third Circuit has noted that a district court should consider the following factors, among others, in determining a fee award: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted). *See also* Fee and Expense Memorandum, § II.D.

representing between 10% and 15% of the Class's maximum damages. This result—reflecting the informed assessment by Class Counsel and Class Representative of the strengths of the Class's claims and risks of litigating this complex Action through the remainder of discovery, trial and appeals—provides a significant recovery for the Class.

148. In addition to representing a meaningful percentage of estimated damages, the Settlement is also favorable when considered in view of the substantial risks and obstacles to obtaining a larger recovery (or, any recovery) were the Action to continue. *See supra* ¶¶ 114-131. Here, the Settlement avoids the substantial risks to recovery in the absence of settlement and, as a result, numerous Class Members will benefit and receive compensation for their losses.

**2. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases**

149. The risks faced by Class Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through summary judgment, a trial, and the appeals that would likely follow. As detailed in § III above, Class Counsel and Class Representative faced significant risks to proving Defendants' liability, loss causation, and damages if the Action continued.

68

150. These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that the Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and was undertaken on a contingent-fee basis. From the outset, Class Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Class Counsel was obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Class Counsel alone has dedicated over 28,800 hours in prosecuting this Action for the benefit of the Class, yet has received no compensation for its efforts.

151. Here, Class Counsel also bore the risk that no recovery would be achieved—a risk that was heightened following the Court's dismissal of the Action in its ruling on Defendants' motion to dismiss the Second Amended Complaint. Indeed, Class Counsel knows from experience that the commencement and ongoing

prosecution of a class action does not guarantee a settlement.[24] To the contrary, it takes sustained and diligent work by skilled counsel to develop the facts and legal arguments needed to survive a motion to dismiss or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

152.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

---

[24] For example, there are many appellate decisions affirming summary judgment and directed verdicts for defendants showing that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *In re Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Inc. Sec. Litig. Inc.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x 714 (8th Cir. 2001).

153. Class Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class, as described above. In circumstances such as these, and in consideration of the hard work and excellent result achieved, Class Counsel believes the requested fee is reasonable and should be approved.

### 3. The Time and Labor Devoted to the Action by Plaintiff's Counsel

154. Over the course of four years, Class Counsel along with Court-appointed Liaison Counsel devoted substantial time to the investigation, prosecution, and resolution of the Action. As more fully described above, Class Counsel's efforts included: (i) conducting a thorough investigation into the Class's claims, which involved a detailed review of publicly available information, interviews with former BD employees, consultation with an expert, and extensive legal research to confirm the theories of liability Industriens could pursue on behalf of the Class and the applicable pleading standards; (ii) drafting and filing four detailed amended complaints based on this investigation; (iii) fully briefing and opposing three rounds of motions to dismiss and a motion to amend; (iv) engaging in extensive discovery efforts, including the review of over two million pages of documents, participation in numerous meet and confer sessions with Defendants and third parties regarding discovery disputes (three of which required the Court's intervention), and deposing two fact witnesses and preparing to depose 20 more; (v)

71

successfully moving for class certification, including preparing for and defending the deposition of Class Representative and Class Representative's expert; (vi) preparing for and taking the deposition of Defendants' expert in connection with class certification; and (vii) engaging in vigorous arm's-length negotiations (including three mediation sessions) to achieve the Settlement. At all times throughout the Action, Class Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Class, whether through settlement or trial, by the most efficient means possible.

155.    Throughout the litigation, Class Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As one of the lead partners on the case, I personally monitored and maintained control of the work performed by other lawyers at Kessler Topaz throughout the litigation. Other experienced attorneys at Kessler Topaz were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

156.    All of the attorneys and support personnel that worked on this case are highly qualified in the area of securities class action litigation and greatly assisted in the prosecution and resolution of this Action. *See* Kessler Topaz Fee and Expense Decl., Ex. C (professional bios).

157.   The time devoted to this Action by Plaintiff's Counsel is set forth in the Fee and Expense Declarations attached hereto as Exhibits 3 and 4. Included with the Fee and Expense Declarations are schedules that summarize the time expended by the attorneys and professional support staff employees at each firm, as well as expenses ("Fee and Expense Schedules"). The Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," i.e., their hours multiplied by their hourly rates.[25]

158.   In total, from the inception of this Action through March 1, 2024, Plaintiff's Counsel expended over 29,000 hours on the investigation, prosecution, and resolution of the claims against Defendants for a total lodestar of $15,527,405.50.[26] Thus, pursuant to a lodestar "cross-check," Class Counsel's fee request of 25% of the Settlement Fund (or $21,250,000 plus interest), if awarded,

---

[25] The hourly rates of Plaintiff's Counsel here range from $780 to $1,300 per hour for partners, $750 per hour for counsel, $370 to $600 for other attorneys, $225 to $405 per hour for paralegals, and $370 to $660 per hour for in-house investigators. *See* Kessler Topaz Fee and Expense Decl., Ex. 1; Carella Byrne Fee and Expense Decl., Ex. 1. These hourly rates are reasonable for this type of complex litigation. *See* Fee and Expense Memorandum, § II.C.2.

[26] Class Counsel will continue to perform legal work on behalf of the Class should the Court approve the Settlement. Additional resources will be expended assisting Class Members with their Claims and related inquiries and working with the Claims Administrator, JND, to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

would yield a multiplier of approximately 1.4 on Plaintiff's Counsel's lodestar, which falls well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere. *See* Fee and Expense Memorandum, § II.C.2.

### 4.      The Quality of Plaintiff's Counsel's Representation

159. The skill and diligence of Plaintiff's Counsel also supports the requested fee. As demonstrated by its firm résumé included as Exhibit C to the Kessler Topaz Fee and Expense Declaration, Class Counsel is highly experienced in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country. Liaison Counsel, Carella Byrne, is also highly experienced in complex litigation. The substantial result achieved for the Class here reflects the superior quality of this representation.

160.   The quality of the work performed by Plaintiff's Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced attorneys from the nationally prominent litigation firms Winston & Strawn LLP and McCarter & English, LLP. These firms vigorously and ably defended the Action for four years. In the face of this formidable defense, Class Counsel was nonetheless able to develop

a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Class.

### 5. Class Representative's Endorsement of the Fee Application

161. Class Representative Industriens is a sophisticated institutional investor that has closely supervised and actively participated in the prosecution and settlement of the Action. Class Representative has evaluated and fully supports Class Counsel's 25% fee request—a request that accords with an agreement entered into between Industriens and Class Counsel at the outset of the Action. *See* Østergaard Decl., ¶ 8. Further, as set forth in the declaration submitted on behalf of Industriens, Class Representative has concluded that the requested fee has been earned based on the efforts of Plaintiff's Counsel and the favorable recovery obtained for the Class in a case that involved serious risk. *Id*. Accordingly, Class Representative's endorsement of Class Counsel's fee request further demonstrates its reasonableness and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

### B. Class Counsel's Request for Litigation Expenses Warrants Approval

#### 1. Class Counsel Seeks Reimbursement of Plaintiff's Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund

162. Class Counsel also seeks payment from the Settlement Fund of $843,144.64 for expenses that were reasonably and necessarily incurred by

75

Plaintiff's Counsel in prosecuting and resolving the Action. The notices inform the Class that Class Counsel will apply for Litigation Expenses in an amount not to exceed $1,000,000, which amount may include a request for reimbursement of the reasonable costs incurred by Class Representative directly related to its representation of the Class in accordance with 15 U.S.C. § 78u-4(a)(4). The amount of Litigation Expenses requested by Class Counsel, along with the total amount requested by Class Representative (i.e., $84,856.40), is below the expense cap set forth in the notices. To date, there have been no objections to the maximum amount of Litigation Expenses set forth in the notices.

163.    From the beginning of the Action, Class Counsel was aware that it might not recover any of the expenses it incurred in prosecuting the claims against Defendants and, at the very least, would not recover any of its out-of-pocket expenses until the Action was successfully resolved. Class Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to litigate the claims against Defendants. Thus, Class Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

76

164.    As set forth in the accompanying Fee and Expense Declarations, Plaintiff's Counsel's expenses include charges for, among other things: (i) an expert utilized in connection with various stages of the litigation; (ii) establishing and maintaining a database to house the voluminous amount of documents produced in discovery; (iii) online factual and legal research; (iv) mediation and settlement negotiations with Mr. Murphy; and (v) document reproduction.[27] Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

165.    The largest component of Plaintiff's Counsel's expenses ($545,734.00, or approximately 65% of their total expenses) was incurred to pay BVA Group for economic work regarding issues related to market efficiency, loss causation, and damages. The retention of this expert was necessary and reasonable in order to prove Class Representative's claims and to meet the considerable challenges posed by Defendants' well-credentialed expert at the class certification stage. *See supra* ¶¶ 106-108.  In addition to consulting with Class Counsel in developing the case, Dr. Mason produced two expert reports and was deposed by Defendants' Counsel in

---

[27] These expenses are reflected in Plaintiff's Counsel's books and records, which are prepared in the normal course of business and are an accurate record of the expenses incurred in the prosecution of his matter. These expense items are billed separately by Plaintiff's Counsel and are not duplicated in Plaintiff's Counsel's hourly rates. Kessler Topaz Fee and Expense Decl., Ex. B; Carella Byrne Fee and Expense Decl., Ex. B.

connection with the Class Certification Motion. Dr. Mason and his team at BVA Group also assisted Class Counsel in its mediation efforts and in developing the proposed Plan of Allocation after the Settlement was reached. *Id*., ¶¶ 107, 109.

166. Another substantial component of Plaintiff's Counsel's expenses (i.e., $152,081.39) was incurred in connection with document review and production. As noted in ¶ 78 above, Class Counsel utilized a sophisticated discovery platform to, among other things: (i) maintain the electronic database through which over two million pages of documents produced by Defendants and third parties were reviewed; and (ii) process documents so they would be in a searchable format. Class Counsel also utilized this outside document management vendor to prepare and produce Class Representative's documents to Defendants in response to their discovery requests. Class Counsel believes it kept these costs exceedingly low at roughly 18% of Plaintiff's Counsel's total expenses.

167. Another large component of Plaintiff's Counsel's expenses was incurred for online legal and factual research. This amount represents charges for computerized research services such as Lexis, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. Here, online research was necessary to conduct the factual investigation and identify potential witnesses,

prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, support the Class Certification Motion, and conduct research in connection with certain discovery-related issues and the Parties' settlement negotiations. The total charges for online research amounted to $37,215.45, or 4% of Plaintiff's Counsel's total expenses.

168.  In addition, Class Counsel incurred $63,125.00 for Class Representative's portion of the charges related to the three mediation sessions with Mr. Murphy and the settlement negotiations that followed with his assistance.

169.  The remaining expenses for which Class Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, travel costs (e.g., lodging, airfare, meals), court fees, process servers, telephone costs, copying, and postage and delivery expenses. All of the expenses incurred by Plaintiff's Counsel were reasonably necessary to the successful litigation of the Action, and have been approved by Class Representative. *See* Østergaard Decl., ¶ 9.

### 2.    Reimbursement to Class Representative Is Fair and Reasonable

170.  In addition, Class Representative seeks reimbursement of the reasonable costs that it incurred directly in connection with its representation of the Class. Such payments are expressly authorized and anticipated by the PSLRA, as

79

more fully discussed in the Fee and Expense Memorandum at § IV.[28] Specifically, Class Representative Industriens seeks reimbursement in the amount of $84,856.40 for 520 hours expended in connection with the Action by Jan Østergaard (Industriens' Head of Real Assets) and Uffe Berg (Industriens' Chief Legal Consultant). Østergaard Decl., ¶¶ 11-13.

171.   The substantial amount of time and effort devoted to this Action by Class Representative's employees is detailed in its accompanying declaration, attached as Exhibit 1 hereto. As discussed therein, Class Representative has been fully committed to pursuing the Class's claims since it became involved in the Action and has provided valuable assistance to Class Counsel during the prosecution and resolution of the Action. Class Representative's efforts during the course of the Action included regular communications with Class Counsel concerning significant developments in the litigation and case strategy, reviewing and commenting on significant pleadings and briefs filed in the Action, responding to Defendants' discovery requests and searching for and producing potentially relevant documents in a process supported by multiple meetings with counsel and internal personnel regarding the document search and collection efforts, preparing and sitting for a

---

[28] The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

deposition, and participating in the settlement negotiations. *See* Østergaard Decl., ¶¶ 4-6. These are precisely the types of activities courts have found to support reimbursement of class representatives, and fully support Class Representative's request for reimbursement here.

## VII.  CONCLUSION

172.  For the reasons set forth above, Class Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Class Counsel further submits that the requested attorneys' fees in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiff's Counsel's Litigation Expenses in the amount of $843,144.64, and Class Representative's costs in the aggregate amount of $84,856.40 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed in Radnor, Pennsylvania this 18th day of March 2024

JOSHUA E. D'ANCONA

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2024, I caused a true and correct copy of the foregoing Declaration of Joshua E. D'Ancona in Support of (I) Class Representative's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Class Counsel's Motion for Attorneys' Fees and Litigation Expenses to be electronically filed with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  March 18, 2024

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Class*

82